```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION


WILLIE MC CASKILL,              )  Tampa, Florida
                                )
               Plaintiff,       )  No. 8:15-cv-1559-T-33TBM
                                )
          vs.                   )  October 8, 2015
                                )
NAVIENT SOLUTIONS, INC.,        )  11:00 a.m.
                                )
               Defendant.       )  Courtroom 14B
_____ )
```

**TRANSCRIPT OF CASE MANAGEMENT HEARING**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

# A P P E A R A N C E S

**PLAINTIFF COUNSEL:**

    **William Peerce Howard, Esq.**
    **Frank H. Kerney III, Esq.**
    Morgan & Morgan, PA
    201 North Franklin Street, 7th Floor
    Tampa, Florida 33602
    (813) 223-5505

**DEFENSE COUNSEL:**

    **Pamela Haddock Klavon, Esq.**
    Liles Gavin, PA
    301 West Bay Street, Suite 1030
    Jacksonville, Florida 32202
    (904) 634-1100

    **Lisa M. Simonetti, Esq.**
    Vedder Price, LLP
    1925 Century Park East, Suite 1900
    Los Angeles, California 90067
    (424) 204-7702

- - -

<u>**P R O C E E D I N G S**</u>

- - -

1   COURT SECURITY OFFICER:  All rise.

2   The United States District Court in and for the

3   Middle District of Florida is now in session.  The Honorable

4   Virginia M. Hernandez Covington presiding.

5   Please be seated.

6   THE COURT:  Good morning, everybody.

7   We are here for a case management hearing in

8   *Willie McCaskill versus Navient Solutions*, Case No.

9   8:15-cv-1559-T-33TBM.

10   I'll begin by having counsel state their

11   appearances.  Who do we have for the plaintiff?

12   MR. HOWARD:  Good morning, Your Honor.  Billy

13   Howard for the plaintiff.

14   MR. KERNEY:  Good morning, Your Honor.  Frank

15   Kerney on behalf of the plaintiff.

16   MR. HOWARD:  And my paralegal Jason Placeres is

17   sitting at counsel desk, if that's all right, Your Honor.

18   THE COURT:  Absolutely.  Welcome to all of you.

19   Who do we have for the defendant?

20   MS. SIMONETTI:  Lisa Simonetti of Vedder Price for

21   the defendant.

22   MS. KLAVON:  Good morning, Your Honor.  Pamela

23   Klavon with Liles Gavin.

1          THE COURT:  You submitted a pro hac vice the other

2    day.  Did you file a notice of appearance, Miss Klavon?  I

3    don't think I have one here for you.

4          MS. KLAVON:  Mr. Liles from our firm originally

5    filed a notice, and we just filed an amended notice I believe

6    the day before yesterday, just adding me.

7          THE COURT:  Okay.  That's fine.  I don't see it

8    here.  Yes, I do.  I see it right there.  So very good.  You

9    are both attorneys of record.  Terrific.

10          All right.  Well, let me just tell you, by way of

11    background, what's happened on this case and then you can

12    fill me in.  I'll give you my perspective, and then you can

13    give me your perspective, and we will go ahead and get

14    started setting this case for trial.

15          About a year and a half ago I implemented this

16    fast-track case management system, and I started with the

17    FSLA cases and then moved on to TCPA and ADA premises

18    liability-type cases.  And the reason I did that was because

19    I saw a number of FSLA cases that I thought to myself, you

20    know, if these folks had gone to mediation early, I bet they

21    would have settled the case.

22          What happens is that oftentimes -- at least this

23    is my perspective.  Right or wrong, it's my perspective -- is

24    that defendants, once they are in it so deep that they have

25    been working up and running up attorneys' fees, feel that,

1  for whatever reason, they have to go to trial, where had they

2  just sat down and had a reasonable conversation two or three

3  months into the case, that the case would have been settled.

4          And I think here, did you go to Mark Hanley?

5          MR. HOWARD:  Yes, Your Honor.

6          THE COURT:  Mark has settled 99 percent of these.

7  I know your firm has a lot of FSLA cases.  I think he has not

8  settled maybe two or three.  Everything else has settled.

9  And I mean, that's good.  I think it certainly is good for

10  the defendant, but ultimately it's good for the plaintiff,

11  too, because you have -- not to be so coarse about it, but

12  you have the money in hand, as opposed to waiting a year

13  later to maybe get the recovery that you are entitled to.  So

14  that's what I've done here.

15          I'm sorry that this did not settle, but I

16  understand that there are reasons that cases don't settle,

17  and that's what we are here for.

18          So I now have a new case management form that I

19  just approved yesterday, and I understand that what you've

20  used here is what you were given, and it's not ideal because

21  you are kind of putting a round peg in a square hole here

22  because this is my normal case management form, which really

23  is not applicable to these cases.  But it's fine because it

24  gives me an idea, and I think we just need to tweak it a

25  little bit.

1          As we go forward, I just want to make certain that

2    you have explored all settlements.  I'll ask you,

3    Miss Simonetti, you've explored all settlements and this case

4    is not going to settle?  At least at this juncture, you don't

5    see it happening?

6          MS. SIMONETTI:  Your Honor, it's not going to

7    settle at this juncture, but all hope is not lost.  I think

8    we will have to go through some discovery.  There are some

9    disputes among the parties now.  I've just been involved in

10   the case for a week or so; but I've done a lot of this type

11   of work, and we have not tried a case yet.  So we will see.

12          THE COURT:  I'm trying to think.  I think I've

13   tried one of these cases, and it was maybe six or seven years

14   ago.  I've had one.  It was a one-day trial, and it was a law

15   firm from California that I think is the plaintiff in some of

16   these cases.  I can't think of the lady's name, the lady from

17   L.A.  And it was a one-day trial, and I think that's the only

18   one I've had.  I don't think I've had any others.

19          All right.  So let's go through this.

20          Mandatory initial disclosures, October --

21          MR. HOWARD:  Your Honor, if I may, I just feel

22   it's necessary to bring this up --

23          THE COURT:  Of course.

24          MR. HOWARD:  -- because I'm listening to exactly

25   what you said, and I was before you on one of these TCPA

1  cases against this exact defendant, and we had a very candid

2  discussion about what do you guys really need in this.

3          Some of my suggestions made it and some of them

4  did not, to your order, which I understand.  And I told you

5  at that time that the law firm that was representing -- I

6  think it was Laura Compton was the lawyer with Garrison

7  Yount.

8          I had told you that we have had a very free-flow

9  of discovery back and forth, never had a problem, had a very

10 professional relationship with the law firm and the defendant.

11         This case has taken on that exact same route.  We

12 knew we had early mediation.  I called up and we scheduled --

13 we asked for Mark Hanley because I have the same experience

14 as you do.  He's a little too defense oriented for my taste,

15 but I wanted somebody the defendants were going to listen to.

16 And I think he does a great job.

17         THE COURT:  When I've had -- when I decide to

18 appoint Mark to these cases, which I really didn't want to do

19 because I thought that I should leave that decision to the

20 parties, but I started seeing the success record that he had.

21 And when I decided to do that, I asked him specifically, Are

22 you somebody who can be fair to both sides?  And he assured

23 me he could be.  And he said what he really brings to the

24 table -- and I happen to think this is correct, having seen

25 his success rate -- is that he knows what a case is worth.

1    He knows how to talk to parties and say to them,

2  This is what you are looking at and this is what I think you

3  will ultimately get.  This is what you can get today.  And I

4  think he very much has the respect of the defense bar, and I

5  hope to the plaintiff's bar.  But you are the one -- these

6  are the people that need to pay.  So if they respect Mark

7  Hanley, then I think they are much more apt to sit down and

8  say, you know, maybe this is what we need to come up with.

9  So I'm very glad you said that, Mr. Howard.

10    Is there something else you think that is lacking?

11  Because I had not remembered you were the lawyer on that

12  case, but it was about a year or so ago.

13    MR. HOWARD:  It was December.  We had a 30-minute

14  conversation then.  I wish you would put some more of my

15  suggestions in there, but I do understand that.

16    So I had spoken to that law firm about this.  We

17  settled that case.  Did we settle that with Hanley?

18    THE COURT:  I think you were going to Peter Grilli.

19    MR. HOWARD:  We were going to Peter and we

20  switched it to Hanley.  This case was going along that same

21  path.

22    I spoke to the lawyer for the defendant.  He said,

23  Billy, you guys have 716 calls to your client's cell phone

24  made with an autodialer.  So that makes it pretty simple, at

25  least from this perspective, because it wasn't her debt.  So

1   there was no consent issue.

2          Off we go to mediation -- or off we were supposed

3   to go to mediation; and the day before mediation -- well, I

4   asked to subpoena -- because like we talked about before,

5   this case comes down to, let me give you my call records and

6   you give me yours.

7          We got our call records, AT&T records.  We

8   provided them to them in the morning, day before mediation.

9   That afternoon they sent me these call logs that were not

10  what call logs look like in these cases, and they only showed

11  249 calls.

12         THE COURT:  And you had what, 700 and something?

13         MR. HOWARD:  It was 716.  I had 716.  I spoke to

14  the attorney; I sent a follow-up e-mail; I got confirmation

15  back.  We go into mediation and they say, Well, it's only

16  249.  So that mediation, you know, ended very abruptly.

17         And I told Miss Simonetti when I saw her in the

18  hall -- I don't know her.  I know she represents Sallie Mae.

19  I sent her a bunch of e-mails saying, Look, I think your

20  client is in contempt of court because they are not providing

21  the documents that we know that are in their possession.

22         THE COURT:  Okay.  So that's one of the concerns

23  that you had, that mediation was not as effective as it could

24  have been because you didn't have all the records that should

25  have been forthcoming; but you didn't realize it until right

1    around the time of mediation.

2            MR. HOWARD:  It was the day before mediation,

3    Your Honor.  But I think it is clear -- crystal clear -- that

4    this defendant has those records.  This is not a theoretical

5    I think maybe it's in their possession and they can get it

6    real easy.  You know, the controlling case law is very easy.

7    If they can get it, they have to.  This is not a discovery

8    dispute.  This is your order.

9            THE COURT:  I know.  I'll tell you, I've come

10   down, for instance, on FSLA.  I just entered an order on a

11   case with your law firm where I thought somebody was not

12   forthcoming with information, and I ordered that person to

13   turn over that information, to answer those questions,

14   because it's not a dispute -- it's not an issue, as you say,

15   between two lawyers.  Those are my interrogatories; my

16   requests for production.  So I think your point is well made.

17   Let me hear what they have to say.

18           Miss Simonetti, did you not turn over this

19   information?  Was it the other lawyer before you got

20   involved?  What's the story?

21           MS. SIMONETTI:  It's really none of the above.

22           What happened is the former lawyer, Mr. Yount, did

23   provide this number of 716 calls, but that was an error on

24   his part.  He simply didn't know that number includes calls

25   made by a separate company.

1          THE COURT:  Go back.  That didn't all sink in.  Go

2     back and say that again from the beginning.

3          MS. SIMONETTI:  Before the mediation, Mr. Yount,

4     former counsel for Navient Solutions, did give the 716 call

5     count.

6          THE COURT:  That I got.  What was the mistake?

7     That's the part you lost me on.

8          MS. SIMONETTI:  The mistake is that the 249 calls

9     were made by Navient Solutions, Inc., the defendant in this

10    case, and the other calls were made by a different company,

11    called Student Acceptance Corporation.  They share the same

12    corporate parents, Navient Corporation, but they are not the

13    same company.  And, in fact, they make calls for different

14    segments of delinquent borrowers.  Student Acceptance

15    Corporation makes calls on behalf of federal guarantors on

16    federal loans.

17         So the solution to the problem is for plaintiff to

18    amend the complaint if he wants to pursue those calls, and

19    then we will turn over those records.  It's as simple as

20    that.

21         There also is -- there is an issue of consent

22    here.  The number was provided to the company by plaintiff's

23    daughter.  This is not a completely random person in the

24    world.  So I think we are entitled to explore what that

25    relationship was and whether consent was really given.

1          THE COURT:  Okay.  You heard her response, then.

2     So she, in essence, said we did not need to turn over those

3     other documents for mediation because this isn't the named

4     defendant.

5          MS. SIMONETTI:  That's correct.

6          THE COURT:  Those records belong to another

7     defendant; and the defendant who's here before the Court

8     today on this mediation is this defendant, and you've given

9     up what you are entitled to.

10         MS. SIMONETTI:  That's correct.  This is not a

11    matter of not disclosing the name of the other company.  In

12    fact, plaintiff knows who it is because they have a call

13    recording that contains the name.  So I think it's as simple

14    as that.  But the issues in terms of consent and the like I

15    think will be the same.

16         THE COURT:  All right.

17         MR. HOWARD:  Your Honor, my only brief rebuttal,

18    if I may --

19         THE COURT:  Sure.

20         MR. HOWARD:  -- the bottom line is -- and you can

21    tell from my conversation, you can tell from the e-mail, they

22    are in Sallie Mae's possession.  And they are in Navient's

23    now because Navient bought them.

24         I've had -- I think I settled over a dozen cases

25    against this defendant; and, repeatedly, Sallie Mae -- I keep

1 calling them Sallie Mae because that's who they were until

2 recently.  Navient turns over their records and their records

3 are -- included in their records that they turn over are

4 always the Student Assistance [sic] Corporation.  Always.  In

5 all of the lawsuits that I've ever had, they have never once

6 in their disclosures said that there is a related company.

7         THE COURT:  All right.  I'm going back and I'm

8 looking at the order, and here's what it says:

9         All documents in defendant's possession, custody,

10 or control that relate to the telephone calls in question.

11 This includes, but is not limited to, telephone records, call

12 logs and voice recordings pertaining to the telephone calls

13 plaintiff contends were made by the defendant, which includes

14 any and all notations made by defendant's representative or

15 employee during the telephone calls; documentation that

16 plaintiff consented to defendant making the telephone calls

17 in question and any and all documents and/or relevant

18 evidence pertaining to plaintiff's prior complaints to

19 defendant.

20         So I think it comes under, let's see, telephone

21 records, call logs and voice recordings pertaining to the

22 telephone calls plaintiff contends were made by defendants.

23         Let me go back.  All documents in defendant's

24 position, custody, or control that relate to the telephone

25 calls in question.

1          If they focus on A, it says, by defendant.  The

2   defendant is Navient Solutions, Incorporated.

3          MS. SIMONETTI:  That's right, Your Honor.

4          THE COURT:  If you look at that, all documents in

5   defendant's possession, custody, or control, it's one of

6   those gray areas.  But I can't say there was a willful

7   violation of the court order, and they would argue they

8   technically come in under A.  So I'm not going to find there

9   was any kind of willful violation here.

10         MR. HOWARD:  I apologize.  I did not -- I'm not

11  trying to interrupt you.

12         I'm not trying to tell you that I think they are

13  sanctionable at this point.  I just want them to abide by

14  your court order, which is, what do they have in their

15  possession.

16         Let me just tell you briefly, if I may, what I

17  think they provided.  What they did is they provided just

18  their call logs.  They took out columns that show -- like

19  I've seen these a lot.  For years I've seen them.  They have

20  taken out columns, they have taken out what kind of campaign

21  it is, and they provided, again, just from Navient, very

22  highly redacted call notes.

23         You didn't say to give them a bunch of redacted

24  stuff.  You said to give them the call notes.  What I would

25  just ask is that you order them to produce those documents

```
 1   that they have in their possession right now that are not

 2   redacted and to maybe revisit what they provided so we can

 3   make a determination.

 4          THE COURT:  Well, I think right now, the way this

 5   is, I don't feel comfortable doing that, Mr. Howard, because

 6   I think they technically complied with the letter of that

 7   order, and I'm not going to do it.

 8          Now, I will say this:  The people who really

 9   benefit from these orders are the defendants because those

10   attorneys' fees -- their attorneys' fees stay low.

11          MS. SIMONETTI:  Understood, Your Honor.  Yes.

12          THE COURT:  Low.  If you choose to play hardball,

13   you choose to play hardball, but your client ultimately is

14   the one who takes it in the chin, because when he prepares

15   for trial, those attorneys' fees are going to continue to

16   mount and continue to mount and continue to mount.  Before

17   you know it, you have 50-, 60-, 70-, a hundred thousand

18   dollars in attorneys' fees, where now, the attorneys' fees

19   are still something that your client can look at and say

20   okay, fine, we have to pay what we have to pay.

21          MS. SIMONETTI:  Your Honor, just one thing, if I

22   may?

23          THE COURT:  Sure.

24          MS. SIMONETTI:  I'm very much a fan of efficiency,

25   and I'm not interested in discovery disputes or any of those
```

1    types of things.  I rarely get involved in them.

2            I've had multiple conversations with Mr. Howard

3    about the production, about the entities involved, about the

4    calls, including the call logs, and I asked him to send me a

5    page from any case that is in the format that he thinks is

6    appropriate.  I've seen call logs in many different formats,

7    and I'm happy to look into that for him.  I'm happy to work

8    with him, but he needs to do the same.

9            THE COURT:  Okay.  Well, we are going to move

10   forward.  This is a new day and discovery is open.

11           So what I need to do is I need to truncate the

12   time frame for response for some of these things.  We need to

13   come up with some -- I mean, dates you've given me I can

14   basically live with, but I just want to make certain we have

15   enough time to respond to motions, et cetera.

16           So I can tell you -- let me work my way back.  I'm

17   fine with a March trial term, but it's not March 11th.  It's

18   a month-long trial term that begins on March 7th.  That's

19   fine.  I have no problem with that.

20           The pretrial conference would be the second

21   Thursday of the month, which is February 11th.  Okay.  I'm

22   not going to have filing of motions in limine.  You have a

23   problem, you bring it up at trial.  You can orally move for,

24   you know, the Court to exclude testimony.  You can do it as

25   part of the case.  I don't have time to rule on motions in

1  limine beforehand.

2       MR. HOWARD:  I have had Judge Rakoff in

3  New York -- and you're the only judge I've ever heard besides

4  him.  He said, Motions in limine, you lawyers just make that

5  stuff up; and if you want to do something, then you let me

6  know.  So he agrees with you in New York.

7       THE COURT:  Well, I do motions in limine because

8  it gives me the chance to study it before the trial.

9  Otherwise, you are there hoping you get it right based on

10 what you hear.  I think there are some really good judges

11 that can do that.  I know there are judges here in this

12 Court.  There is one judge who does that, who does not take

13 motions in limine in written form, but I don't consider

14 myself in his category.  I normally need to study things to

15 be able to come up with the right result, but this is the way

16 we do it, and this is the way it's going to be on these cases.

17       The pretrial statement, not January 19th.  I don't

18 need that until February the 4th.  And the meeting in person

19 needs to take place by January 25.  So that's what I care

20 about.

21       Now, let's talk about what the parties are

22 interested in.

23       Do you plan on filing a motion for summary

24 judgment in this case, Miss Simonetti?  Do you think you are

25 going to file a motion for summary judgment?

1    MS. SIMONETTI:  I think there is a possibility.  I

2  had filed a motion recently in a similar situation.  Of

3  course, we haven't taken discovery, but that's a possibility.

4    THE COURT:  Okay.  I'll tell you, you've given

5  yourself about six days there, from the end of discovery, to

6  file a motion for summary judgment.  I think it can be done.

7  I've myself written summary judgment motions in one day back

8  in the old days where you dictated them.  So I know it can be

9  done.  But I just want to make certain you know what you have

10  gotten into there.

11    I will have a ruling before the -- let's see, the

12  pretrial conference is February 11.  I will do my best on

13  that, but I need to truncate the time here to what it

14  normally is and not allow a reply.

15    Dispositive motion, January 11th is fine; but then

16  the plaintiff will have 14 plus three days.  That is not what

17  I normally do.  I normally now give 30 days.  So you have 14

18  plus three days, so 17 days to respond to that motion for

19  summary judgment.  Please don't ask for any extensions

20  because I can't give it, and please don't ask to file a reply

21  because I can't do it.  That's what it is.

22    MS. SIMONETTI:  Thank you, Your Honor.

23    THE COURT:  I'm okay with January 11.  January 5th

24  discovery deadline I'm also okay with, just as long as you

25  know you've got a really short time frame there and --

1      MS. SIMONETTI:  I think we are okay.  The

2  discovery that we will be taking is very narrow and targeted.

3  We're not going to wait until the end of the period or

4  anything like that.  We are just going to get going.

5      THE COURT:  Very good.

6      All right.  Now, the disclosure of expert reports,

7  why do we have that so late?  We have December 8th for the

8  plaintiff and December 15th for the defendant.

9      Why is that so late, Mr. Howard?

10      MR. HOWARD:  Yes, ma'am.  It's so late because at

11  the very beginning of this case we were one step away from

12  stipulating that all these calls were made with autodialer.

13  I think it was 716, and then they claimed there were a couple

14  that were manually dialed.

15      THE COURT:  The 716, what is that?

16      MR. HOWARD:  The 716 is the amount of calls they

17  made.

18      THE COURT:  Okay.

19      MR. HOWARD:  And they said, Well, they are all

20  autodialed.  We know their system.  They stipulated it in

21  other cases.  I believe opposing counsel has stipulated in

22  other cases.  And now I think that they are not going to

23  stipulate, that they are going to try some other argument.

24  Even in the face of this FCC order that just came out they

25  are still going to try that.

1          THE COURT:  What's the FCC order?  I think I read

2   something about it, but I don't remember exactly what it is.

3          MR. HOWARD:  Yes.  The FCC order came out and

4   basically obliterized, if that's a word, all of the arguments

5   about this autodialer.  If you have the capacity to do all

6   this stuff, then it's an autodialer under the FCC.  I mean

7   under the TCPA.  But there are some defendants -- and I'm

8   shocked and surprised, and that was a part of what

9   Miss Simonetti and I were talking about, that Sallie Mae,

10  given our knowledge of them -- given our knowledge of their

11  dialing system, which is this Novelle dialing system, they

12  are going to try to come up with some argument now that

13  that's not an autodialer.

14          I don't want to go down the path of saying it's

15  meritless and all this stuff right now; but because of that

16  unique issue, I asked that we bump those out a little longer

17  than necessary.  If they stipulated to the 716, then those

18  would -- or a 700-plus number, whatever that number they

19  agree is, then I won't need that.

20          THE COURT:  Okay.

21          MS. SIMONETTI:  Your Honor, can I respond?

22          THE COURT:  Yes, of course.

23          MS. SIMONETTI:  That's not what we are saying at

24  all.  There are various ways in which Navient dials.  Some of

25  the dialing processes are fully automated.  They go through

1   an autodialer, and there is no argument about that.  But

2   there are some manual dialing modes, that those are

3   different; they require people to be involved.  And part of

4   the FCC test for what is an autodialer has to do with human

5   intervention, and that is the limited group of calls that

6   would be treated differently.  That's it.

7               THE COURT:  Okay.

8               MR. HOWARD:  Can I ask, Your Honor, if she can let

9   this Court know that number today and that may solve a lot of

10  our problems?

11              MS. SIMONETTI:  I don't have the number today, but

12  I do have people trying to distill that.  And just to be

13  clear, we are only doing that on the Navient Solutions cause.

14              THE COURT:  Right.  That's the next thing that

15  needs to be resolved.

16              I'm going to leave these expert report disclosures

17  as they are.  If the parties want to at some point jointly

18  move those dates, just let me know.  Otherwise, this is what

19  we have.

20              MR. HOWARD:  Kind of sounds like we may be able to

21  move those up, because I think SAC is the one that called

22  almost 500 times.

23              THE COURT:  That's not a problem.

24              The next thing -- and this dovetails right into

25  what you are saying -- is this motion to add parties or amend

```
1   pleadings.  I understand what's going on here with Navient
2   and the other -- whatever it is, the parent company.
3           What are the names of the companies involved?  I
4   know that this is a -- is it a subsidiary of the other
5   company that now apparently made those phone calls, or no?
6           MS. SIMONETTI:  No.  There is a parent company
7   called Navient Corporation.  Navient Solutions, Inc., the
8   current defendant, and Student Acceptance Corporation are
9   both subsidiaries of that parent.
10          THE COURT:  Of Navient Corporation?
11          MS. SIMONETTI:  Yes.  Essentially they are sister
12  companies, interior companies.
13          THE COURT:  I see.  So why do you need until
14  December 2nd?  That's too long, Mr. Howard.
15          MR. HOWARD:  I do not need it that long.
16          THE COURT:  Okay.  I had written down here October
17  30th.  Is that too soon for you?
18          MR. HOWARD:  Well, Your Honor, again, this is a
19  nuance to me because I've always sued this company, Navient
20  Solutions, Inc.  They have always produced all of SAC's.
21  They have never raised this as an argument.  Do I think now
22  that I need to bring in the parent company and this related
23  company?  I think I at least need to get their discovery
24  before I make that determination.  Or I could still do it
25  next week.
```

1          MS. SIMONETTI:  Your Honor, to respond to that,

2    I've been representing Navient many times, and it's not true

3    that Student Acceptance Corporation information is provided.

4    I've never seen that happen, and I have represented Student

5    Acceptance Corporation in separate cases.  So I don't know

6    what --

7          THE COURT:  Maybe she does it that way.  I have no

8    doubt.

9          Miss Simonetti, maybe that's the way you do it.

10   Maybe they do it differently in another firm he has been

11   dealing with.

12          I'll tell you what.  I think October 30th is

13   enough time.  So you need to move on that, Mr. Howard.  I

14   will give you until October 30th to add parties or amend

15   pleadings.

16          MR. HOWARD:  Fair enough, Your Honor.

17          THE COURT:  If it's after October 30th, it's a

18   much more difficult burden.  This is a pretty low burden, to

19   add them.

20          MR. HOWARD:  Yes, ma'am.

21          THE COURT:  So that ought to give you enough time

22   to do it.

23          Now, do I need to truncate the response time on

24   discovery?  Normally you have 30 days, I think.  I don't get

25   that involved in discovery, but I think it's 30 days and

1   three days for mailing and all that.  Do I need to, or do you

2   want to leave it that way?

3            MR. HOWARD:  I think on this fast track that 15

4   days would be enough.

5            THE COURT:  Do we want to add three days for

6   mailing?

7            MR. HOWARD:  Sure.

8            THE COURT:  Fifteen days?

9            MS. SIMONETTI:  I'm not sure.  It really depends

10  on what discovery looks like.  Fifteen days could be

11  reasonable or entirely not reasonable.

12           THE COURT:  I think I have to do it.  I don't see

13  how you can do it otherwise.  So 15 plus three days for

14  mailing.  It's fast track.  It's not a regular case.  Fifteen

15  plus three days for mailing.

16           So all discovery -- when the Federal Rules of

17  Civil Procedure provide for 30 days -- for instance, a

18  request for admission -- I'll say that one -- it's 15, plus

19  three days.  Even if you serve it electronically, three days.

20  You will always get the three days for mailing.  Whenever the

21  federal rules provide for 30 days, it's 15 days.

22           Now, it's been so long since I've done civil

23  discovery.  When you do a notice for deposition, is it 30

24  days or is it ten days?

25           MR. HOWARD:  It's 30.

1           THE COURT:  How many?

2           MR. HOWARD:  Well, if you do it with the

3  deposition duces tecum, which we won't do, it's 30 because

4  you just can't use that as a way to get around that rule.

5           THE COURT:  All right.  Well, whenever it's 30,

6  it's 15.  If there is something less than that, whatever it

7  happens to be.  If it's ten days for a party or -- like I

8  said, it's been too many years since I've done this stuff,

9  then it's the lesser amount of time.

10          MS. SIMONETTI:  Your Honor, since we are using

11 that process, can we agree that service will be by e-mail,

12 electronic service, so you don't lose any days in the mail?

13          MR. HOWARD:  I can do that.

14          THE COURT:  You still get the three days.  Please

15 do everything by -- well, the understanding -- not just

16 please.  The understanding between the parties is all service

17 will be done by e-mail so that you're not losing the three

18 days for mailing.  It takes more than three days from Florida

19 to California.

20          MS. SIMONETTI:  Yes, it does.

21          THE COURT:  I think that's where you're at.  Are

22 you in L.A.?

23          MS. SIMONETTI:  Yes.

24          THE COURT:  At least a week to get from Florida to

25 California.

1        I think that's what I have.  I don't think I have

2   anything else.

3        Looking through the rest of this, anything that I

4   need to -- any order I need to enter with electronically

5   stored information?  Anything else?  Again, I know you were

6   trying to put a square peg in a round hole here because this

7   is not my normal -- you are using my normal order, and this

8   is not the normal situation.

9        Anything else that I need to cover?  Yes.

10       MS. SIMONETTI:  One thing I would raise,

11  Your Honor, is Mr. Howard had mentioned redaction of some of

12  the account notes and account information.

13       The account belongs to the daughter, a third party

14  here, and so redaction of her private information is what

15  they were doing.  If Mr. Howard is able to secure some sort

16  of a waiver or authorization for that information to be

17  released, we would provide it.  But just to let you know, we

18  felt like that's what we have to do.

19       THE COURT:  Fair enough.  Mr. Howard, that's why

20  they redacted it.

21       MR. HOWARD:  Your Honor, if you would like to see,

22  what is redacted is the lines.  You can't tell if a call was

23  even made.  The redactions are not just personal information,

24  but I understand that.

25       THE COURT:  Moving forward, that's what she says

1    and --

2                MR. HOWARD:  I'll get a waiver.  That's fine.

3                MS. SIMONETTI:  That would take care of it.

4                THE COURT:  Okay.  Anything else?  Anything else

5    that we need to take up today?

6                And remind me.  Your complaint charges TCPA and

7    FCCPA, and I always feel like I have to be reminded of this,

8    and I feel so dumb when I ask these basic questions.  But

9    remind me, TCPA, does that -- which is the one that has the

10   fee-shifting provision?

11               MR. HOWARD:  The FCCPA.  TCPA does not have that.

12               THE COURT:  The FCCPA does.  The TCPA, it's a

13   charge, if we want to call it that, per phone call made?

14               MR. HOWARD:  It's per phone call.  If they were

15   made without the call party's consent, then it's a statutory

16   minimum 500 per call; and if the calls were made willfully,

17   then it can be up to 1,500 per call.

18               THE COURT:  And what does it take to have a

19   willful violation?

20               MR. HOWARD:  The facts of this case, Your Honor,

21   where my client told the people, Hey, stop calling me.  I

22   think that's the easiest way.  And the first case in that was

23   the *Harris versus World Financial National Bank* case; but I

24   think that just the fact that we deal with Navient, they are

25   undoubtedly one of, if not the most, prolific violators of

1  the TCPA.  And I think that their conduct as a corporation

2  could easily be shown to make these $1,500.

3        THE COURT:  If my math is right on this -- and I'm

4  using the calculator, so I hope it's right.  If you are

5  alleging 716 phone calls, let's say for the sake of argument,

6  and it's $1,500, which it wouldn't be for all of them,

7  assuming you met your standard, that's over a million dollars.

8        MR. HOWARD:  Yes, ma'am.  In the FCC order, you

9  can see why the TCPA is so important because it's the number

10  one complaint in the country.  These companies call millions

11  of people every day without their permission.

12        THE COURT:  I have another question.  Why can't --

13  is it a defense -- is it a defense for a defendant to say the

14  plaintiff should have just done call block?  Is that a valid

15  defense?

16        MR. HOWARD:  Absolutely not.

17        THE COURT:  Why?

18        MR. HOWARD:  Because the law talks about calls

19  made.  It was one of my first cases where they said, Why

20  don't you just change your phone number?  He said, Well,

21  because it's my phone number.

22        THE COURT:  That's different.  I can understand

23  saying you shouldn't have to change your phone number that

24  you've had for 30 years.  But today, with iPhones or even

25  cell phones, with caller ID, why can't you just do call

1   block?

2          MR. HOWARD:  You probably could, Your Honor; but

3   most people that have these cases are very unsophisticated.

4   They are not the nice ladies and gentlemen in this courtroom

5   today.  They are very unsophisticated.  They don't know how

6   to use call block.  They don't have the new iPhones that have

7   that program.  And the law specifically is intended to

8   prevent companies from making the phone calls, so it's not --

9   even if you have call block and you call blocked 100 calls,

10  the case law is crystal clear that those are all violations.

11         THE COURT:  Well, I understand the law is what it

12  is.  The reason -- I'll tell you, honestly, what prompted my

13  asking you the question was when I looked at the introduction

14  to the Complaint, it talks about what Senator Hollings said

15  in 1991.  It's a different world today.

16         If cell phones existed in 1991, I can assure you,

17  I didn't have one.  I think it was just doctors and it was

18  basically car phones, is what they were.  And at some

19  point -- really in the last five years or ten years,

20  everybody has it.  Everybody has a smart phone, if not a cell

21  phone.

22         MS. SIMONETTI:  Your Honor, I think your question

23  is spot on, and I think it remains to be seen how the law

24  develops following this order.  This was only July of this

25  year.  And from where I sit -- and I've defended lots of

1  different companies in these cases, many of these claims are

2  completely manufactured.  Someone who has the good fortune of

3  receiving cell phone calls from an unrelated company -- or I

4  even had one person let a thousands calls go by and make a

5  contemporaneous record of each one, and then she decides, I

6  have enough calls; I guess I'll file suit now.  Then the

7  argument is that that's unclean hands and other types of

8  defenses, but I don't think it's so simple as the calls are

9  made and you rack up the damages.

10         THE COURT:  I think that's an issue for the jury.

11  I think it's an issue for the jury.  Maybe the judge at some

12  point could weigh in on it, but I think it's a jury issue.

13  It's a jury issue for the jury to decide whether you should

14  hit call block or not.  I think it's particularly interesting

15  when it's not your account.  For instance, if it's your

16  account, I think you would be more concerned about blocking

17  that company because you want to receive the messages that

18  you have to receive.  But when you are -- when it's not your

19  account, block, I don't want to hear from you anymore.

20         MS. SIMONETTI:  Right.

21         THE COURT:  But I also very much respect the law;

22  and if this is what the law is and this is what it permits,

23  that's what the law is and that's what it permits, and I will

24  not stand in the way of what the law allows somebody to

25  recover.  But I do think it's an interesting jury issue.

1          MR. HOWARD:  Your Honor, if I can, I will tell you

2     that -- so in this case -- I know Miss Simonetti is not

3     saying my client manufactured anything.  But that's what she

4     did.  She picked up the phone and said, You are calling the

5     wrong number, and those calls continued, and she really

6     didn't know how to stop them.

7          Now, that issue about whether they are ringing or

8     not, that may go to what her emotional damages are.  But in a

9     strict liability statute like this, there is no question.

10    And there are a lot of judges that say, Gosh, it seems like

11    a lot.  But just like you said, I will have to follow the

12    law.  And the case law is very clear that it's do you have

13    express consent to call this number by the call party?  My

14    client never gave them the number, period.  No debate about it.

15         THE COURT:  So if it's -- the person doesn't have

16    an obligation to minimize their damages?  They don't have an

17    obligation to do that?

18         MR. HOWARD:  Your Honor, I think if you have a

19    case where maybe there is some -- well, the answer to your

20    question is no.

21         THE COURT:  Under strict liability.

22         MR. HOWARD:  Yes, under strict liability.  If

23    somebody calls -- and people get them all the time.  I get

24    them all the time.  People call me and ask for somebody else,

25    and I say, Stop calling.  And most of time they stop calling,

1   but this defendant doesn't, and we have seen that across the

2   country.  We have seen tons of cases where, Hey, stop

3   calling.  Click.  And they don't take you out of their dialer

4   campaign.  They keep calling, and I think it's 1.5 million

5   people a day.

6            MS. SIMONETTI:  Your Honor, that's not true.  They

7   do stop calling.  Usually the circumstances where calls

8   continue are very complicated.  People add their numbers back

9   into the system.  They will go online and they put the number

10  back in and you see a lot of, you know, "I say no" and then

11  "I say yes" and it becomes very complex.

12           MR. HOWARD:  I agree.  They are complicated cases.

13           THE COURT:  Well, this will be interesting for a

14  jury.  There are pros and cons on both sides, obviously, just

15  listening to this.  I think if you can settle it, so much the

16  better for everybody.  Sooner rather than later.  Because if

17  it goes to trial, those attorneys' fees are going to be

18  significant because you are preparing for a trial and you are

19  doing a trial.  It's not just negotiating something.

20           MR. HOWARD:  Regardless of our fighting over

21  discovery, which I was hoping it wouldn't happen, especially

22  in the face of this order, I think there is still a line of

23  communication between me and Miss Simonetti.  I don't have

24  any doubt we will revisit the settlement table in one form or

25  another.

1          THE COURT:  I had a case -- I don't know if it was

2    before Peter Grilli or Mark Hanley, who both are outstanding

3    mediators -- just phenomenal -- that it didn't settle at

4    mediation.  You know what?  It was an FSLA case, and it was

5    not with your firm, but they settled about two weeks later,

6    and I was happy to see that.

7          MR. HOWARD:  Well, Mark does a great analogy at

8    the very beginning because he talks about him and his wife

9    and who you would want on a jury.  And then he says, Well,

10   you think that you want my wife, but I'll tell you what.  My

11   wife will give you zero.  I'm the defense guy, and I'd give

12   you a lot of money.  So he just does a great job of kind of

13   relating to everybody, I think.

14         THE COURT:  Well, I'm glad to hear that.  I think

15   he does a wonderful job.  And let me tell you, my cases are

16   settling.  I was telling somebody the other day, they are

17   dropping like flies.  It's because of this, because of this

18   fast track.  And I think ultimately we all benefit.  We all

19   benefit.  It's just a benefit in different ways.

20         I've spoken to a lot of plaintiffs' lawyers, and I

21   was a little bit concerned that it would be a problem for

22   them.  But I've talked to people in hearings like this, like

23   I talk to you now -- and I had forgotten it was you,

24   Mr. Howard, but now it comes to me that it was you on that.

25   And they know what they are up against, and they can

1  sometimes count on this being an easy, fast resolution as

2  opposed to a drawn-out year, year and a half.  So you have

3  some that are easy and fast and some that take longer to

4  resolve themselves, and it's the makeup of the cases that you

5  have.

6          Anyway, thank you very much, Mr. Howard.  It was

7  very nice to see you again.  Mr. Kerney.  And I'm glad the

8  paralegal got to come too.  I always had the paralegal who I

9  worked with was always part of the team, so I'm very glad

10 your paralegal was here.

11         Miss Simonetti, thank you for flying all the way

12 from the West Coast.  I appreciate your coming.

13         Miss Klavon, did you drive down from Jacksonville?

14         MS. KLAVON:  Yes, Your Honor.

15         THE COURT:  I did that drive many a time.  I was

16 in Jacksonville for two-and-a-half years.  Anyway, it's nice

17 to see you, and we will see what happens.

18         I'll enter that order and it will go out today

19 with those dates, but you should move forward on discovery so

20 that you're not caught short at the 11th hour, because these

21 are the dates.  Unless somebody gets sick and is in the

22 hospital, these are the dates.  They will not be continued or

23 moved.

24         Okay.  Thank you.  We are in recess.

25             (Proceedings adjourned at 11:45 a.m.)

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


### C E R T I F I C A T E

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript from the stenographic notes taken in the above-entitled matter by the undersigned and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


/S/Scott Gamertsfelder, RMR, FCRR
Official Court Reporter         Date: November 5, 2015

- - -