EXHIBIT INDEX

| Number | Title |
|--------|-------|
| 1 | Deposition Transcript of Kevin Campbell<br>(To be filed under seal upon approval of the Court) |
| 2 | Deposition Transcript of Cheryl Dillon<br>(To be filed under seal upon approval of the Court) |
| 3 | Deposition Transcript of Willie McCaskill |
| 4 | Deposition Transcript of Maretta Newsome |
| 5 | Plaintiff's Second Supplemental Response to Defendants' Request for Production |
| 6 | Responses of Defendant Navient Solutions, Inc. to Plaintiff's First Set of Interrogatories |
| 7 | Responses of Defendant Student Assistance Corporation to Plaintiff's First Set of Interrogatories |
| 8 | Student Assistance Corporation Call Log<br>(To be filed under seal upon approval of the Court) |
| 9 | Navient Solutions, Inc. Call Log<br>(To be filed under seal upon approval of the Court) |
| 10 | Supplemental Responses of Defendant Student Assistance Corporation to Plaintiff's First Set of Interrogatories |
| 11 | Second Supplemental Responses of Defendant Student Assistance Corporation to Plaintiff's First Set of Interrogatories |
| 12 | Supplemental Responses of Defendant Navient Solutions, Inc. to Plaintiff's First Set of Interrogatories |
| 13 | Plaintiff's Supplemental Response to Defendants' Requests for Production |

EXHIBIT 1 – DEPOSITION OF KEVIN CAMPBELL


DOCUMENT TO BE FILED UNDER SEAL UPON
APPROVAL OF THE COURT

EXHIBIT 2 – DEPOSITION OF CHERYL DILLON


DOCUMENT TO BE FILED UNDER SEAL UPON
APPROVAL OF THE COURT

EXHIBIT 3

1                    IN THE UNITED STATES DISTRICT COURT

2                       MIDDLE DISTRICT OF FLORIDA

3                            TAMPA DIVISION

4

    WILLIE MCCASKILL,                  CASE NO:

5              Plaintiff,         8:15-CV-1559-T-33-TBM

6    v.

7    NAVIENT SOLUTIONS, INC., STUDENT

8    ASSISTANCE CORPORATION, and

9    NAVIENT CORPORATION,

10             Defendants.

11   _____/

12

13                    DEPOSITION OF WILLIE MCCASKILL

14        DATE:          December 16, 2015

15        TIME:          1:00 p.m. - 3:30 p.m.

16        PLACE:         Veritext

17                       442 West Kennedy Boulevard

18                       Suite 240

19                       Tampa, Florida

20

21   REPORTED BY:   NANCY H. SWARTZ

22                  Court Reporter

23                  Notary Public, State of Florida

24

25   PAGES 1 - 75

                                            Page 1

1 APPEARANCES:
2
3 Counsel for Plaintiff:
4      FRANK H. KERNEY, III
5      Morgan & Morgan
6      201 North Franklin Street, #700
7      Tampa, Florida ^
8      Phone: 813.223.5505
9      Email: Fkerney@forthepeople.com
10
11
12 Counsel for Defendants:
13      LISA M.  SIMONETTI, ESQUIRE
14      Vedder Price, P.C.
15      1925 Century Park East
16      Suite 1900
17      Los Angeles, California 90067
18      Phone: 424.204.7700
19      Email: Lsimonetti@vedderprice.com
20
21
22
23
24
25

Page 2

1              I N D E X
2 WITNESS:  Willie McCaskill
3                                    Page
4        Direct by Ms. Simonetti        4
5
6
7
8      Certificate of Oath         73
9      Certificate of Reporter       74
10     Errata              75
11
12
13           E X H I B I T S
14 Exhibit   Description              Marked
15 Exhibit 1 Cell phone usage report       23
16 Exhibit 2 Articles of incorporation      45
17 Exhibit 3 2000 Uniform business report   48
18 Exhibit 4 2001 Uniform business report   50
19 Exhibit 5 2002-2015 Uniform business reports  52
20
21
22
23
24
25

Page 3

1      THE COURT REPORTER:  Do you swear or affirm that
2 the testimony that you are about to give will be the
3 truth, the whole truth and nothing but the truth,
4 so help you God?
5      THE WITNESS:  I do.
6         WILLIE MCCASKILL, called as a witness by
7 the defendant, having been first duly
8 sworn, testified as follows:
9           DIRECT EXAMINATION
10 BY MS. SIMONETTI:
11    Q.   Good afternoon, Ms. McCaskill.  You and I had the
12 opportunity to meet quickly before, but my name is
13 Lisa Simonetti.  I represent the defendants in this action.
14    A.   Okay.
15    Q.   Have you had your deposition taken before?
16    A.   Never.
17    Q.   Let's go over a couple of the ground rules to make
18 sure that this is as quick and easy as possible.
19      The court reporter sitting to your right will take
20 down everything we say word for word.  And as a result, it is
21 important that you speak out loud and in words.
22    A.   Okay.
23    Q.   And so in conversation we tend to nod our head or
24 say uh-huh, ut-huh.  She can't take those things down so if
25 you could answer out loud, that would be great.  Okay?

Page 4

1    A.   Yes.
2    Q.   Also, only one of us can speak at one time, so
3 please try to let me finish my question, and I will let you
4 try to finish your answer so we don't speak over each other --
5    A.   Yes.
6    Q.   -- is that okay?
7      See, you just did that, we just spoke over one
8 another.
9      Is there any reason you can't give your best
10 testimony today?
11    A.   No.
12    Q.   You feel well?
13    A.   Yes.
14    Q.   If at any time you are not clear on one of my
15 questions, you don't understand it, you think it's vague or
16 something, will you just tell me?
17    A.   Yes.
18    Q.   I have no interest in a transcript that's not clear,
19 so just let me know if I make any of those things an issue.
20      Also, you can take a break at any time that you need
21 one unless there is a question pending.  Do you understand
22 that?
23    A.   Yes.
24    Q.   So just feel free to ask if you need a break.  I
25 usually get up every hour or so anyway, but we can do that

Page 5

2 (Pages 2 - 5)

1 whenever you like.  Okay?
2   A.   Yes.
3   Q.   Your lawyer, Mr. Kerney, may have some objections to
4 the form of my questions over the course of today and, if so,
5 you will have to answer the question unless he instructs you
6 not to.  There are certain grounds upon which he can instruct
7 you not to answer a question, but, otherwise, you need to
8 provide a response.  Do you understand that?
9   A.   Yes.
10   Q.   Is there anything about the process that's not clear
11 to you at this point?
12   A.   No.
13   Q.   Ms. McCaskill, have you been involved in any other
14 type of litigation or judicial process?
15   A.   Yes.
16   Q.   On how many occasions have you been involved in such
17 proceedings?
18   A.   One.
19   Q.   What was the nature of that particular case?
20   A.   Work comp.
21   Q.   I'm sorry?
22   A.   Work comp.
23   Q.   Workers' comp?
24   A.   Yes.
25   Q.   Were you the claimant in that case?

Page 6

1   A.   No.
2   Q.   How did you prepare for today's deposition?
3   A.   Just do the best I can.  Tell the truth.  That's all
4 I can do.
5   Q.   Did you meet with anyone?
6   A.   I met with my lawyers.
7   Q.   Did you meet with Mr. Kerney?
8   A.   Yes.
9   Q.   Did you meet with anyone in addition to Mr. Kerney?
10   A.   Tav.  That's his name.
11   Q.   Mr. Gomez?
12   A.   Yes.  Mr. Gomez.
13   Q.   When did you meet with Mr. Kerney and Mr. Gomez?
14   A.   Yesterday.
15   Q.   Was anyone else present?
16   A.   My husband.
17   Q.   How about Ms. Newsome, your daughter?
18   A.   No.
19   Q.   How long did you meet with Mr. Kerney and Mr. Gomez?
20   A.   About an hour, maybe, 45 minutes.
21   Q.   Did you review any documents?
22   A.   Yes.
23   Q.   What did you review?
24       MR. KERNEY:  I'm going to have her just hold onto
25 that.

Page 8

1   A.   Yes.
2   Q.   Who was the defendant in the case?
3   A.   Florida Power Corporation, Progress Energy.
4   Q.   Florida Power Corporation?
5   A.   Yes.
6   Q.   Did you add anything after that?  I'm having a
7 little trouble hearing you.
8   A.   Yes, Progress Energy.  They changed over to Progress
9 Energy.
10   Q.   Did you give any testimony in that case?
11   A.   I don't remember.  I don't think so.
12   Q.   Do you remember ever being sworn in like you were
13 this morning and sitting down in a setting like this?
14   A.   No.
15   Q.   How long ago was that matter concluded?
16   A.   2001.  About 14 years ago.
17   Q.   And you haven't been involved in any other
18 arbitrations?
19   A.   No.
20   Q.   Any bankruptcy proceedings?
21   A.   No.
22   Q.   Any other lawsuits of any kind?
23   A.   No.
24   Q.   Have you been a witness in a lawsuit brought by
25 anyone else?

Page 7

1   A.   No other documents other than the number of calls.
2       MR. KERNEY:  I'm just going to object that it's a
3 work product.
4       MS. SIMONETTI:  In the possession of the witness?
5       MR. KERNEY:  Well, she's my client.
6       MS. SIMONETTI:  Yeah, we'll take that up on break.
7       MR. KERNEY:  Fine.
8 BY MS. SIMONETTI:
9   Q.   All right.  I'm sorry.  I think you told me you met
10 with them for about an hour, 45 minutes?
11   A.   Right.  For 45 minutes or an hour.
12   Q.   I understand.  And when you say you went over the
13 number of calls, did you look at a document reflecting the
14 number of calls?
15   A.   Yes.
16   Q.   Is that a document that you had in your possession
17 or that was provided to you?
18   A.   It was provided to me.
19   Q.   And just so you know, at no point in time during the
20 day am I asking you for the content of any conversation you've
21 ever had with counsel, whether it's Mr. Kerney, Mr. Gomez, Mr.
22 Howard, if you've had conversations with them, I'm not asking
23 you for that.  Okay?
24   A.   Okay.
25   Q.   So if you think that one of my questions does call

Page 9

3 (Pages 6 - 9)

1 for that kind of communication, just let me know and we'll
2 sort it out.
3    A.  Sure.  Okay.
4    Q.  Ms. McCaskill, can you tell me about your
5 educational background?
6    A.  Yes.  I completed high school.  I went almost two
7 years in college.
8    Q.  When did you complete high school?
9    A.  In 1966.
10    Q.  Where did you go to high school?
11    A.  Oakland High School in Haines City, Florida.
12    Q.  Is that Haines?
13    A.  Yes.  H-A-I-N-E-S.
14    Q.  Where did you take your two years of college?
15    A.  I spent about a year -- about a year-and-a-half at
16 Florida, FAMU.
17    Q.  I'm not --
18    A.  Florida Agricultural and Mechanical University.
19    Q.  Where is that located?
20    A.  That's in Tallahassee, Florida.
21    Q.  What were you studying there?
22    A.  Library science.
23    Q.  That's funny.  I actually know quite a lot of
24 librarians, and I don't know why.
25      So you didn't finish your degree there?

Page 10

1    A.  No, I transferred to St. Pete Junior College because
2 I moved here.
3    Q.  St. Pete, is that what you said?
4    A.  Yes, St. Pete Junior College.
5    Q.  How long did you attend St. Pete?
6    A.  I don't remember because I wasn't a full-day
7 student, I was working and doing hours at night.
8    Q.  Okay.  So at the end of the two years of your
9 college studies, did you get any type of degree?
10    A.  No, I didn't finish.
11    Q.  Do you have any professional certificates or other
12 types of licenses?  For example, have you ever studied to be a
13 real estate agent or something like that?
14    A.  No.
15    Q.  Since you left St. Pete Junior College, have you had
16 any type of formal education of any kind?
17    A.  No.
18    Q.  Your daughter told me yesterday that you are a
19 minister?
20    A.  Yes.
21    Q.  Did you have to undergo some sort of training or did
22 you undergo some sort of training to become a minister?
23    A.  At the church that I was at, at St. James AME
24 Church.  I was just in training.
25    Q.  And where's St. James?

Page 11

1    A.  That's in Clearwater, Florida.
2    Q.  So is that a program that you went through to a
3 completion date, something like that?
4    A.  No, it wasn't completion dates, it's just that you
5 had, you know, some training there.
6    Q.  So aside from what you've told me, high school,
7 college, and your training at St. James, have you had any
8 other type of education?
9    A.  Only by television.
10    Q.  By television?
11    A.  Uh-huh.
12    Q.  Okay.  What did that consist of?
13    A.  It consisted of study in the word of God.
14    Q.  So how do you take this training by television?
15    A.  I get my book and I go with the people that are
16 giving the study of the word and they go every day, Monday
17 through Friday.
18    Q.  So is this a certain program that you follow with a
19 particular group of people?
20    A.  It's with -- it's with the Jimmy Swaggert
21 Ministries, that's who I learn under.
22    Q.  And that's every day, Monday to Friday; is that
23 right?
24    A.  Yes.  It' not a certificate though.
25    Q.  I understand.  It's just an ongoing process --

Page 12

1    A.  Yes.
2    Q.  You use this for an ongoing process for education?
3    A.  Yes.
4    Q.  So you graduated high school in 1966.  When was your
5 first full-time job?
6    A.  In 1967, I believe it was.
7    Q.  Where did you start working at that time?
8    A.  At the Oakland High School, in the office.
9    Q.  What types of responsibilities did you have?
10    A.  Typing and whatever else the principal needed.
11    Q.  How long did you work at the high school?
12    A.  I think it was about two years, two or three.
13    Q.  Where did you work after that?
14    A.  After that I worked at Cloth World for about three
15 weeks.
16    Q.  It's called Cloth World?
17    A.  Cloth World.  For about three weeks.
18    Q.  What were your responsibilities at Cloth World?
19    A.  To sell fabrics and cut it out and that kind of
20 stuff.
21    Q.  You didn't like that job too much?
22    A.  No.
23    Q.  Okay.  Three weeks.  Where did you work after Cloth
24 World?
25    A.  I worked at Florida Power Corporation.

Page 13

4 (Pages 10 - 13)

1 Q. So this was sometime in maybe 1970 or so?
2 A. It was 1974.
3 Q. 1974. Let me go back for a moment then. So in 1967
4 you started working in the high school office for two to three
5 years?
6 A. Uh-huh.
7 Q. That would be '69, '70, approximately. Then you
8 worked at Cloth World for about three weeks?
9 A. Uh-huh.
10 Q. So there's a little bit more of a gap. Is there a
11 period of time there that you didn't work?
12 A. Yes, I was having children.
13 Q. What was your position with Florida Power when you
14 started in 1974?
15 A. Customer service representative.
16 Q. What were your responsibilities as a customer
17 service rep?
18 A. To take orders for power and disconnects and
19 credit -- I did some credit too.
20 Q. Overall how long did you work for Florida Power
21 Corporation?
22 A. 25 years.
23 Q. That was until 1999? Approximately, I'm not asking
24 you for an exact date.
25 A. Yeah, I'd say around 2000 because I got disabled

Page 14

1 between there.
2 Q. So did your position change from customer service
3 rep to something else?
4 A. No, other than the credit -- the credit department.
5 Q. So in the 25 years that you spent at Florida Power
6 Corporation, you worked in the customer service area --
7 A. Outside. And then at the last, then I did credit in
8 a different department.
9 Q. And what was the responsibility that you had for
10 credit?
11 A. To check the sheets every day to see who's going to
12 get cut off. And if they call and pay, then take them off the
13 list so they won't go out and get cut off.
14 Q. So when you say credits, do you mean payment, people
15 who have paid, people who have not paid?
16 A. People that don't pay the bill, uh-huh.
17 Q. How long approximately did you work in the area
18 taking orders and disconnects?
19 A. I did that for at least 20 years.
20 Q. And the remainder of your time was spent on the
21 credits?
22 A. In the credit department, yes.
23 Q. And you mentioned that somewhere in there you became
24 disabled?
25 A. Yes.

Page 15

1 Q. When did that take place?
2 A. It was in between the 20 years and going over into
3 the 21st, because of the machines that we have to use to
4 validate this -- the stubs and things, and sometimes we do 200
5 to 300 a day doing like this all day, all day long
6 (indicating).
7 Q. A repetitive motion-type injury?
8 A. Yes. Yes.
9 Q. And so that was approximately 1994; does that sound
10 right?
11 A. Let me see. That was probably around 1997, I
12 believe is when it started to get bad.
13 Q. And after that time did you move into the credit
14 area?
15 A. Yeah, they put me in the credit area after two
16 surgeries.
17 Q. And then you left the full-time employment sometime
18 in 2000?
19 A. Yes, around 2001, yes, uh-huh.
20 Q. 2000 or 2001?
21 A. 2001 because they were changing over to Progress
22 Energy, so I had to close mine out under Florida Power,
23 disability.
24 Q. Who was your supervisor when you left in 2001?
25 A. I don't remember.

Page 16

1 Q. Can you remember any supervisor that you had when
2 you were in the credit area?
3 A. One was Carol Phillips. My office manager was Jim
4 Pitts. Jim Pitts.
5 Q. Are you still in contact with Ms. Phillips for any
6 reason?
7 A. No, I haven't seen them in a long time.
8 Q. Have you been in contact with Mr. Pitts for any
9 reason?
10 A. No, all of us have all retired.
11 Q. How many children do you have, Ms. McCaskill?
12 A. Three.
13 Q. What are their names?
14 A. Marcy M. Luckey, L-U-C-K-E-Y; Maretta M. Newsome,
15 N-E-W-S-O-M-E; Melissa M. Coleman, C-O-L-E-M-A-N.
16 Q. All of your daughters are married, correct?
17 A. Yes.
18 Q. These are all of their married names?
19 A. Yes.
20 Q. How old is Mrs. Luckey right now?
21 A. She's 44 years old.
22 Q. How old is Mrs. Newsome?
23 A. She's 40.
24 Q. How old is Mrs. Coleman?
25 A. 36.

Page 17

| | |
|---|---|
| 1  Q.   Where does Mrs. Luckey live right now? | 1  A.   The Heather that was calling and the different ones |
| 2  A.   In Port St. Lucie, Florida. | 2 that was calling. |
| 3  Q.   Where does Mrs. Newsome live right now? | 3  Q.   Did you have any understanding that they were |
| 4  A.   She live in Largo, Florida. | 4 calling about Mrs. Newsome's loans? |
| 5  Q.   Does she live right down the street from you right | 5  A.   No. |
| 6 now? | 6  Q.   You had no idea? |
| 7  A.   Yes. | 7  A.   No idea. |
| 8  Q.   Where does Mrs. Coleman live right now? | 8  Q.   For approximately how long did you receive calls |
| 9  A.   She lives in Port St. Lucie, Florida. | 9 about those loans? |
| 10  Q.   Would you say that you're close with all of your | 10  A.   I would say from about August of 2014, and it made |
| 11 children? | 11 it down in February of 2015. |
| 12  A.   Yes. | 12  Q.   That's approximately six months or so, do you agree |
| 13  Q.   Do you speak with them regularly? | 13 with that? |
| 14  A.   Yes, by phone. | 14  A.   Whatever this is.  That's seven.  Eight.  About |
| 15  Q.   And do you see Mrs. Newsome often? | 15 eight.  Let's see.  Eight months. |
| 16  A.   Maybe once a week or every two weeks. | 16  Q.   And how many calls do you believe you received over |
| 17  Q.   Do you communicate with her mostly by phone? | 17 those approximately eight months? |
| 18  A.   Yes. | 18  A.   Over 700 calls. |
| 19  Q.   Has there ever been any period of time that you have | 19  Q.   Of the 700 calls, approximately how many did you |
| 20 not been in regular contact with your daughters? | 20 answer? |
| 21  A.   No. | 21  A.   I answered one. |
| 22  Q.   Has there ever been a period of time where you had | 22  Q.   When did you do that? |
| 23 some reason to believe that you didn't have accurate | 23  A.   Sometime in August of 2014. |
| 24 information to contact one of your daughters? | 24  Q.   Did you speak with someone during that call? |
| 25  A.   No. | 25  A.   Yes, I did, I spoke to Heather. |
| Page 18 | Page 20 |

| | |
|---|---|
| 1  Q.   How about Mrs. Newsome, she's always been in contact | 1  Q.   Tell me everything you can remember about the |
| 2 with you, you've always been able to reach her? | 2 conversation with Heather. |
| 3  A.   Yes. | 3  A.   Okay.  I wrote it down so I could remember.  Our |
| 4  Q.   Has Mrs. Newsome talked with you at all about the | 4 conversation was, I received a call.  Okay.  And she called |
| 5 status of any of her student loans? | 5 the cell phone and she was calling for Maretta Newsome. |
| 6  A.   No. | 6       And I told her that I was sure that she had |
| 7  Q.   Do you know how many she has? | 7 caller ID and that she could see that that was not |
| 8  A.   I do not. | 8 Maretta Newsome's phone number.  Okay. |
| 9  Q.   Do you know anything about the balance? | 9       And she said, "I need to give" -- she told me, "I |
| 10  A.   No. | 10 need to give Maretta her message." |
| 11  Q.   Do you know whether she's ever made a payment? | 11       And I told her this was the wrong person and I am |
| 12  A.   I don't know. | 12 not her messenger to deliver her calls.  Then Heather asked me |
| 13  Q.   Did you ever ask her anything about the loans? | 13 if I knew her.  I says yes.  And I told her, why doesn't she |
| 14  A.   No. | 14 just call Maretta herself.  And she gave her phone number, she |
| 15  Q.   So you understand that your claims in this case | 15 gave me her phone number, which was 581-8617.  And she said -- |
| 16 relate to phone calls that you say were directed to your | 16 gave me the phone number for Maretta.  And then I told her |
| 17 telephone in connection with Mrs. Newsome's loan.  Is that | 17 that that phone number was correct.  And she said, "Maretta |
| 18 right? | 18 does not answer her phone." |
| 19  A.   Uh-huh. | 19       And I'm not surprised, because she doesn't.  I asked |
| 20  Q.   So when you -- at any time that you were receiving | 20 her not to call my cell phone anymore about a student loan.  I |
| 21 those calls, did you ask Mrs. Newsome anything about the | 21 told Heather I have never had a student loan in my life and I |
| 22 loans? | 22 don't have anything to do with anybody else's loans.  Not at |
| 23  A.   No, I didn't think anything about it because I | 23 all.  And the call ended.  And then after that I was just |
| 24 didn't know the person. | 24 bombarded with phone calls. |
| 25  Q.   Didn't know which person? | 25  Q.   Okay.  So you're reading from some notes in front of |
| Page 19 | Page 21 |

1 you.  Is that correct?
2    A.   Yes, I have to do that.
3    Q.   Are those notes that you made at the time that you
4 believe you had this conversation?
5    A.   I don't believe I know.
6    Q.   No, I'm just asking, are these notes --
7    A.   Yeah.
8    Q.   Hold on.  Let's just be clear.
9        Are those notes that you made at the time that you
10 believe you had the conversation?
11    A.   Yes.
12    Q.   Have you given those notes to your attorneys?
13    A.   Yes, I did.
14    Q.   Do you have any other notes or documentation in your
15 possession that relate to the calls that are at issue in the
16 case?
17    A.   Other than writing them down because there was just
18 so many.
19    Q.   Where did you write down notes about the calls?
20    A.   In the booklets and sheets of paper and everything,
21 just to keep a log.
22    Q.   Did you give those to your attorneys too?
23    A.   Yes.
24    Q.   Have you given any of your cell phone bills to your
25 attorneys?

Page 22

1    A.   Because I wanted to see what was coming into my
2 phone.
3    Q.   Do you agree that that there's no information on
4 this page that identifies you by name?
5    A.   Yes, that's because I'm on the family plan with my
6 daughter and son-in-law.
7    Q.   Which of your daughters are you on the family plan
8 with?
9    A.   Melissa.
10    Q.   Do you agree that this is not a copy of a bill
11 related to your cell phone?
12    A.   No, this is just voice usage at the time and my
13 phone number and my account number.
14    Q.   Where does the bill for your cell phone go?
15    A.   It goes to Melissa.
16    Q.   Does Melissa pay the bill?
17    A.   I do through her.
18    Q.   You pay the entire bill?
19    A.   I pay my part.  I pay my bill for 581-6140.
20    Q.   Do you keep track of how much you pay on your cell
21 phone on any basis, any regular basis?
22    A.   No.
23    Q.   On the cell phone that goes to Melissa, is your name
24 reflected in any capacity?
25    A.   Other than with my phone number, that's it.

Page 24

1        MR. KERNEY:  I can't answer for you so you have to
2 answer the best that you know.
3    A.   Yes, they are privy to it.
4 BY MS. SIMONETTI:
5    Q.   I'm sorry.  What do you mean by, "they are privy to
6 it"?
7    A.   I gave them the information to get the phone calls.
8    Q.   What information did you provide?
9    A.   The telephone numbers, the date, the time.
10        MS. SIMONETTI:  I'm going to mark Exhibit 1.
11        (Exhibit Number 1 was marked for identification.)
12 BY MS. SIMONETTI:
13    Q.   Have you had a chance to look this over, Ms.
14 McCaskill?
15    A.   Yes, I can't because I didn't bring my spyglass.
16    Q.   You didn't bring your what?
17    A.   My spyglass.
18    Q.   Are you unable to read this?
19    A.   It's small, but I'm doing the best I can.
20    Q.   Have you ever seen a document in this format before?
21    A.   Yes.
22    Q.   When have you seen a document like this?
23    A.   About, let's see, about maybe three, four months.
24    Q.   And what was the reason that you had to review a
25 document like this?

Page 23

1    Q.   So your name does not appear on the cell phone bill?
2    A.   On the outside of the bill -- I don't know, I
3 haven't seen it.  But this is the one for me, for just this
4 phone number here, and that's the account number there.
5    Q.   On the cell phone bill that relates to your family
6 plan, does your name appear on it at all?
7    A.   I don't know, but I can find out from my daughter.
8    Q.   Does anyone besides you use your cell phone for any
9 reason?
10    A.   My husband.
11    Q.   For what purposes does your husband use --
12    A.   Any purpose that he wants to.
13    Q.   Does your husband have his own cell phone number?
14    A.   Now he does.
15    Q.   When did he first get his own cell phone number?
16    A.   About a year and maybe a few months ago.
17    Q.   Why did he do that?
18    A.   Because I wanted him to have a phone so if I wasn't
19 around and he got sick or something, he could call me.
20    Q.   Has your husband ever used your cell phone number
21 for a business purpose?
22    A.   What kind of business purpose?
23    Q.   Any kind of business purpose.
24    A.   I'm sure maybe he has.
25    Q.   So why do you say that?

Page 25

7 (Pages 22 - 25)

1    A.   Well, when you've been around for 45 years and using
2  that same number for 40 -- at least 43 years, I'm sure he's
3  used it.
4    Q.   So it's true, prior to maybe two years ago, that was
5  your residence number, correct?
6    A.   In 2013, March of 2013, that's when I got rid of my
7  landline and I imported my numbers, since I had it so long, to
8  my cell phone.
9    Q.   Have you ever received any calls at that number for
10 Sand Ministry?
11   A.   Sand Ministry?  Yes.
12   Q.   What is Sand Ministry?
13   A.   That's one of my -- one of my -- one of my people at
14 the church there, they had a ministry that they would go
15 around and give out pamphlets and, you know, evangelize the
16 people.
17   Q.   Do you have any type of employment with Sand
18 Industry?
19   A.   Oh, no.
20   Q.   Did your husband ever?
21   A.   No.
22   Q.   Do you have any type of ownership interest in it?
23   A.   No.
24   Q.   Is this still an active organization?  I actually
25 can't tell on public sources if it's still active.

Page 26

1    A.   As far as I know it's not, but I don't know.  That
2  was his ministry.
3    Q.   Your husband's ministry?
4    A.   No, no, no.  That was Mr. David Moon's ministry.
5    Q.   Did Mr. McCaskill have a role in that ministry of
6  any kind?
7    A.   Yes, he's the vice president.
8    Q.   Is that a paid position there?
9    A.   No, there is no paid position for anybody, including
10 me.
11   Q.   So both of you worked at that organization for some
12 period of time?
13   A.   Okay.  Now, you talking about -- which one are you
14 talking about?  You talking about Largo for Jesus --
15   Q.   Sand Industry --
16   A.   No, we've never worked on that.
17   Q.   Okay.  So let's just go back then.  We haven't made
18 it to Largo for Jesus yet.
19   A.   Okay.
20   Q.   We'll get there.
21   A.   Oh, okay.
22   Q.   We're talking about Sand Industry.  You identified
23 Mr. David Moon as being primarily responsible for the
24 ministry, and then you said Mr. McCaskill was the vice
25 president?

Page 27

1    A.   Oh, no, no, no, that's wrong.
2    Q.   That's wrong --
3    A.   At Largo for Jesus he's my vice president.  No,
4  we're not on the staff with David Moon and Sand Industry.
5    Q.   Did Mr. McCaskill ever do any kind of work for Sand
6  Ministry?
7    A.   No.
8    Q.   Did he do any work for an organization called Tie
9  the Knot?
10   A.   Tie the who?
11   Q.   Knot, like, tie the knot?
12   A.   No.
13   Q.   What is Mr. McCaskill's cell phone number?
14   A.   (727) 466-8365.
15   Q.   Okay.  You told me a few moments ago in March 2013
16 you imported your number, and that's the number ending 6140,
17 from a landline to your cell phone.  Is that right?
18   A.   That's correct.
19   Q.   Why did you decide to do that?
20   A.   Because I got wireless burglar alarm, everything in
21 my house is wireless, so I didn't need a landline anymore.
22   Q.   And as of that time how long had you been using the
23 6140 number?
24   A.   For 40, at least 40 years, 40, 41.
25   Q.   So is it safe to say that when your daughters were

Page 28

1  growing up, that was their home phone number?
2    A.   Yes, it was.
3    Q.   You also told me earlier that in August of 2014 you
4  made notes of a call with a woman named Heather as you were
5  having the call with Heather, or soon thereafter, correct?
6    A.   Uh-huh.
7    Q.   Is it your habit to make notes of conversations when
8  you have them?
9    A.   Because I didn't know who she was and why she was,
10 you know, telling me I got to tell somebody a message I didn't
11 know.
12   Q.   So was it a unique circumstance for you to make
13 those notes?
14   A.   No.
15   Q.   What's your ordinary practice then with respect to
16 making notes of phone calls?
17   A.   Usually I have phone calls from people that I know
18 and love and I speak with often.  But just somebody out the
19 blue, no.
20   Q.   So I take it you don't make records of phone calls
21 with people you know, is that what you're trying to say?
22   A.   That is correct.
23   Q.   And how many other occasions have you made a record
24 of a phone call with a person you didn't know?
25   A.   I haven't had that experience.

Page 29

8 (Pages 26 - 29)

Page 30

1  Q.  Okay.  So then to be clear, making the notes of the
2  call that you mentioned with Heather, those are the only notes
3  that you've made of that kind?
4  A.  Right.
5  Q.  So why did you feel the need to make notes?
6  A.  To me it was -- it was out of place, because, you
7  know, I didn't call her, if you remember, she called me.
8  Q.  Since your daughters have been adults, have you ever
9  received any other type of phone call at that number for any
10 of them?
11 A.  No.  They don't tell me their business, and I don't
12 ask.
13 Q.  Is it possible that you've received a phone call
14 with respect to any credit card debt that's owed by Mrs.
15 Newsome?
16 A.  No, I don't remember.  I don't know.  I don't think
17 so.
18 Q.  If you told Heather during the phone call that the
19 number did not belong to Mrs. Newsome, and not to call you,
20 why did you make notes of the call?
21 A.  Because I was tired of getting bombarded with calls.
22 Q.  At that point in time how many calls do you think
23 you had already received?
24 A.  Well, a lot of them were voicemails that were left.
25 I only could think of the 29 that were on there because they

Page 31

1  fall off, they don't stay.
2  Q.  Your phone will keep 29 messages?
3     I didn't understand what you just said.
4  A.  Yeah.  Okay.  State your question again, please.
5     MS. SIMONETTI:  Can you read my question back?
6     (The question was read).
7  A.  At that time my phone will hold those voice
8  messages, but they fall off, after, I think nine days they
9  fall off.
10 BY MS. SIMONETTI:
11 Q.  Let's do it in two parts then.
12    By August 2014 when you remember having a
13 conversation with Heather, how many calls had you received?
14 A.  Whatever it is that's on here.  About 27.  In
15 August, right?  27.
16 Q.  All right.  Of those 27 calls approximately how many
17 voicemails did you receive?
18 A.  I think it was about -- I think it was about 29.
19 Q.  Out of 27 calls --
20 A.  No, not 29 -- not 29 from that one, but those would
21 have been the 27 that had them on there, and then the next,
22 you know, the next billing period then there will be some more
23 and that, but they fall off.
24 Q.  I don't think I'm asking you about billing periods.
25 Maybe that's the confusion.

Page 32

1  A.  Okay.
2  Q.  As of August 2014 when you had the conversation you
3  remember with Heather, how many phone calls had come in?
4  A.  Is that from Heather or is that from the voicemails?
5  Q.  Any calls that were coming from any of the
6  defendants that are at issue in the case.
7  A.  Okay.  Now, one of that 27 would have been Heather.
8  She's the only one I spoke to.
9  Q.  Okay.  Got it.
10 A.  And anything else would have been the voicemails.
11 Q.  Okay.  So of the 27 calls that came in, excluding
12 the one with Heather, so now it's 26, how many voicemails did
13 you receive?
14 A.  I say at least -- at least 26.
15 Q.  So is it your recollection that a voicemail was left
16 for almost every call?
17 A.  No, only if they left one on the voicemail.
18 Q.  That would be true.  So, again, of the 26 calls in
19 that time frame, do you believe that you received 26 voicemail
20 messages?
21 A.  I believe that I did.
22 Q.  And I think you told me earlier that, by your count,
23 there were approximately 700 total calls?
24 A.  No, I said it was more than 700.
25 Q.  Okay.  Is there a specific number that you want to

Page 33

1  use?  I'm just trying to make it easier.  Is there a specific
2  number?
3  A.  Well, it's close to 727.
4  Q.  Well, there you go.  We'll use 727.
5     So with respect to the 727 calls that you count, how
6  many voicemail messages were left?
7  A.  Just the ones you just talked about, the 26, because
8  they stopped doing that.
9  Q.  So after this conversation that you remember in
10 August of 2014, when was the next time that you received a
11 phone call?
12 A.  From Heather?
13 Q.  From anyone.  I think you --
14 A.  Well, I didn't answer them.
15 Q.  So how many days after the call with Heather did
16 anyone else call you?
17 A.  It had to be, had to be probably maybe a week or
18 two.
19 Q.  When that next call came in, did you do anything to
20 contact the caller or follow up on the conversation you had
21 with Heather, anything like that?
22 A.  No, I told Heather that I would not be her
23 messenger.  And I wasn't.
24 Q.  So aside from that, that you did not want to be a
25 messenger, is there any reason you didn't follow up after any

9 (Pages 30 - 33)

Page 34

1  of the subsequent calls?
2      A.   No, they were just harassing calls, as far as I'm
3  concerned.  They'd ring and then they'd hang up.
4      Q.   Did you think about answering any of those calls to
5  say, "I told someone named Heather on a certain date not to
6  call here"?
7      A.   Is that the same you're talking about before when I
8  spoke to her in August?
9      Q.   No, I'm talking about after that conversation that
10  you remember.
11      A.   I didn't speak to anybody else.  I just let them
12  ring.
13      Q.   Did you think of maybe sending a letter to one of
14  these companies to say, "I told you not to call me and you're
15  calling me"?
16      A.   I didn't know what was going on and who any of them
17  were.
18      Q.   But you didn't answer the phone on the subsequent
19  calls to ask any other questions.  Is that right?
20      A.   Right.  I just let it ring and they hang up.
21      Q.   Do you have any understanding why the calls ended in
22  2015?
23      A.   Yes, because I called Morgan & Morgan and I went
24  with them and they stopped.  Almost nearly, once I got the
25  lawyer -- I had wondered where could I go because I was

Page 35

1  already signed up with the Do Not Call, but that was on the
2  landline.  So by being on the cell phone, I didn't know what
3  to do.
4          I called a consumer office and I told them I was
5  being bombarded by calls.  And the lady that answered the
6  phone, I guess she was just a secretary, she said, "Well, if
7  you would pay your bills, they wouldn't call you."
8          I says, "Ma'am," I say, "you're not understanding, I
9  don't have a bill with them.  I don't have a bill with
10  anybody.  I pay my bills.  I don't know why they're calling."
11          So she said, "Well, I can arrange you some credit."
12          I said, "I don't need credit."  So I said, "That's
13  okay, just forget it."
14          And then one day I was eating dinner and Billy came
15  up on the screen and he was talking about the harassing calls.
16  I said, "Well, maybe I need to call him, he seemed to know
17  something nobody else knows."  So that's what I did.
18      Q.   And I'm not asking for any of the conversation, but
19  when did you first contact the Morgan & Morgan office?
20      A.   I think it was in -- I think it was in February, but
21  I'm not sure.  I didn't bring my stuff with me.
22      Q.   What stuff would you look at?
23      A.   Stuff they sent me or whatever.
24      Q.   Is there some type of agreement that you have?
25      A.   No, more a letter that they confirmed talking with

Page 36

1  me.
2      Q.   Have you ever asked Mrs. Newsome whether she did
3  anything to stop the calls from happening?
4      A.   Not really because all she said is they're calling
5  her, they don't know why they're calling me too.
6      Q.   Did you ask Mrs. Newsome to give a call to any of
7  the companies and tell them to call her instead?
8      A.   No, because she's a grown lady and she's in charge,
9  her and her husband, not me.
10      Q.   She's a very nice lady.  I agree with you.  She is.
11          And I guess I'm wondering, she is a grown lady, she
12  works, she went to school, got her degree, and if these phone
13  calls are happening over an 8-month period and they should
14  have stopped very early on, why didn't you ask her to do
15  something about it?
16      A.   I didn't know that early on until Billy was on
17  the -- you know, the attorney was on the TV, so I didn't know
18  what was going on.
19          See, you have to understand, when kids get grown,
20  they're grown.  They tell their business to their husbands,
21  not their mom.  And that's what goes on.  I don't ask them
22  anything about their business at all.  They don't ask me.  I
23  told them, if they got bills, they need to pay 'em.  I can't
24  do for anybody but myself and my husband.
25      Q.   So I just want to make sure I understand.  You had

Page 37

1  the call that you remember with Heather in approximately
2  August 2014, correct?
3      A.   Uh-huh.
4      Q.   You started to receive phone calls again within
5  approximately two weeks of that conversation?
6      A.   Maybe one or two weeks, yes.
7      Q.   Okay.  Somewhere soon thereafter, correct?
8      A.   Yeah, soon thereafter.
9      Q.   And from that point forward there were approximately
10  700 calls until February of 2015.  Would that be right too?
11      A.   Through February '15, yes.
12      Q.   And you're not sure when you contacted counsel, but
13  you think it was somewhere around February 15, correct?
14      A.   I think it was.  Might have been in March, but I
15  don't know.
16      Q.   But in that time frame, as the calls were coming in,
17  you did not ask Mrs. Newsome to do anything to stop them?
18      A.   No, that's correct.
19      Q.   And if she did do anything to stop them, you don't
20  know what it is?
21      A.   No.
22      Q.   When those calls were coming in, did you speak with
23  anyone about them?
24      A.   My husband.  He's there, he was in the kitchen with
25  me with all that noise, with all the calls.

10 (Pages 34 - 37)

**Page 38**

1  Q.  Did your husband ever suggest that you speak with
2  your daughter or take some action to get it straightened out?
3  A.  Why would I?  I'm not going to pay it.
4  Q.  I understand.  No one has ever suggested to you that
5  you have an obligation to pay the loans, have they?
6  A.  No.
7  Q.  So the call with Heather that you remember was only
8  about trying to locate your daughter?
9  A.  No, she wasn't trying to locate her.  She had her
10 phone.
11 Q.  Okay.  At any point during that telephone call did
12 anyone make a demand for payment on you?
13 A.  No.
14 Q.  Okay.  So just so we're clear, you don't have an
15 obligation on the loan.  Everyone agrees on that, right?
16 A.  Right.
17 Q.  Okay.  So during the time that the calls were
18 happening and you spoke with your husband, did your husband
19 suggest that you call your daughter and ask her to do
20 something to make it stop?
21 A.  Well, if that was the case, she would have stopped
22 the ones that were going to her phone.
23 Q.  That's not exactly my question.
24 A.  Okay.  No, because she was getting her own phone
25 calls.

**Page 39**

1  Q.  So because she was getting her own phone calls --
2  A.  From Heather.
3  Q.  -- and wasn't doing anything to stop them, you
4  didn't ask her to do anything to stop calls being made to you?
5  A.  No.
6  Q.  How did you know that she was getting calls at her
7  own number?
8  A.  Because after everything was over, all these were
9  over, she says, "Well, I get one -- I get calls all the time
10 on my landline phone.
11 Q.  Do you know whether these companies have any
12 obligation to make phone calls with respect to your daughter's
13 loans?
14 A.  Not to my knowledge, no, they don't.
15 Q.  So you don't know what types of loans your daughter
16 has, right?
17 A.  I do not know.
18 Q.  So if they're federally guaranteed loans, meaning
19 guaranteed by the government, you don't know anything about
20 them?
21 A.  I don't know anything about them.
22 Q.  You don't know anything about the servicing
23 requirements that apply --
24 A.  No.
25 Q.  Let me try to finish.  I know my questions can be

**Page 40**

1  long and might be boring, but --
2  A.  Okay.
3  Q.  So you don't know anything about the servicing
4  requirements that apply to federally guaranteed loans,
5  correct?
6  A.  No.
7  Q.  Do you have an understanding that one of the
8  defendants in this case is Navient Solutions, Inc.?
9  A.  I do now, yes.
10 Q.  Do you have an understanding that one of the
11 defendants in the case is Navient Corporation?
12 A.  Yes.
13 Q.  What is Navient Solutions, Inc., as you understand
14 it?
15 A.  I just figured that was the company giving the loans
16 or whatever they were doing.
17 Q.  What is Navient Corporation?
18 A.  It's not the same as Navient Solutions?
19 Q.  I'm asking you.
20 A.  No, I don't know.  All I know is the one that was on
21 my paper, Navient Solutions.
22 Q.  And when you say it was on your paper, what paper do
23 you mean?
24 A.  When I got the -- forgive me.  When I got the paper
25 from the lawyer, me versus Navient Solutions, that's when I

**Page 41**

1  heard about it.
2  Q.  Understood.  Do you have an understanding that since
3  this case was started, Navient Corporation also was added?
4  A.  I didn't know.  I don't know.
5  Q.  So then is it safe to say you don't know anything
6  about Navient Corporation?
7  A.  No.
8  Q.  You don't know anything about it?
9  A.  No.
10 Q.  Do you use an accountant, Ms. McCaskill?
11 A.  No, I don't.
12 Q.  Who does your taxes?
13 A.  Oh.  Yes, I use H&R Block for my personal, for my
14 personal taxes.
15 Q.  Does Largo for Jesus have its own accountant?
16 A.  No, we don't have that much money, so I take care of
17 that.
18 Q.  Does Largo for Jesus have business expenses on an
19 annual basis?
20 A.  We have rent and our utilities.
21 Q.  What utilities does it have?
22 A.  Power.
23 Q.  Do you expense any part of the cost of the cell
24 phone bill?
25 A.  No, I just pay it.

11 (Pages 38 - 41)

1   Q.   What was the first point in time that Largo for
2   Jesus had a physical space?
3   A.   In 2006 -- I'm sorry.  2009.
4   Q.   Do you want to check that?
5   A.   Yes, it was 2009.
6       MR. KERNEY:  Lisa, before we get into this, can we
7   take a 5-minute break?
8       MS. SIMONETTI:  Sure.
9       (RECESS TAKEN.)
10  BY MS. SIMONETTI:
11  Q.   Ms. McCaskill, before we took the break you told me
12  that the first time that Largo for Jesus had its own physical
13  location was in 2009.  Is that right?
14  A.   Right.
15  Q.   What was the address for that location?
16  A.   152 Eighth Avenue S. W., Largo, Florida 33770, and
17  we have Units 1A and 1AA.
18  Q.   Is that the only physical location that Largo for
19  Jesus has ever had?
20  A.   Yes.  Our permanent one, yes.  Other than that, we
21  were just going to the hotel in the conference rooms and
22  having service.
23  Q.   Okay.  Has Largo for Jesus ever had a landline
24  installed at that physical location?
25  A.   No.

Page 42

1   A.   And she sings, yeah.
2   Q.   She didn't mention the singing, only the piano.
3   A.   Okay.
4   Q.   And for her performances she receives, she thinks,
5   $200 per performances?
6   A.   No, that's just the love offering, if we have it.
7   Q.   And that means that there would be a collection
8   taken up from the congregation and that would represent the
9   love offering if it comes in?
10  A.   Right.  If it comes in, whatever comes in, we put it
11  all in one pot because there's not that many of us.  And if we
12  got extra after we pay our bills or whatever, then we give her
13  a love offering.  But if we don't have it, then it doesn't
14  matter.
15  Q.   And then as I understand it, is there a drummer that
16  receives the love offering if there is one?
17  A.   Yes, the kids.
18  Q.   Any other members of the band than the kids?
19  A.   No, there's only one.
20  Q.   So does Largo for Jesus do any kind of advertising?
21  A.   No, other than we have signs out and then it's word
22  of mouth.
23  Q.   Where do you put signs?
24  A.   On the outside of the church.  It's a storefront and
25  right next to it is a very, very popular post office, so they

Page 44

1   Q.   Since the creation of Largo for Jesus, what has been
2   its telephone number?
3   A.   My number, (727) 581-6140.  I use it for myself, if
4   I have any calls.  Most people don't.
5   Q.   Why doesn't Largo for Jesus have its only telephone
6   number?
7   A.   Because there's nobody there all day.
8   Q.   Is that the only reason?
9   A.   Yes.  Plus we don't -- we don't get a lot of calls
10  because people know me, they just call me.
11  Q.   What's your work with Largo for Jesus?
12  A.   I'm the pastor, pastor/evangelist.
13  Q.   Can you describe for me the work that you do through
14  the center?
15  A.   Yes.  I teach -- I teach the Bible to the
16  congregation and I preach.  Sometimes I go off to other
17  churches and I preach there too.
18  Q.   How many people are in the congregation at this
19  point in time?
20  A.   Approximately 25.
21  Q.   And at this point in time do you hold services every
22  first and third Sunday of the month?
23  A.   First and third, yes.
24  Q.   And I take it that Mrs. Newsome plays piano at the
25  services?

Page 43

1   can just look right to the right and they see it.
2   Q.   So what would the sign say, for example?
3   A.   Largo for Jesus Christian Center.  And we have a
4   sign on the door telling them we have services and what day we
5   have services.
6   Q.   Do you also display the phone number for --
7   A.   No.
8   Q.   Can we try again?
9       Do you also display the phone number for Largo for
10  Jesus on the sign?
11  A.   No.
12  Q.   Thanks.
13      MS. SIMONETTI:  Let's mark this as Exhibit 2.
14      (Exhibit Number 2 was marked for identification.)
15  BY MS. SIMONETTI:
16  Q.   This is a document that consists of six pages.  It
17  bears a cover letter to Florida Secretary of State from
18  Willie Myra McCaskill.  There's no date on it in the date
19  line, but it is marked with, it looks like a stamp that says
20  5/18/99 and then it says filed, June 10, 1999?
21  A.   Right.  Yes, Articles of Incorporation.
22  Q.   You just want to take a look through that?
23      Do you recognize this document, Ms. McCaskill?
24  A.   Yes.
25  Q.   Okay.  When was the last time you saw it?

Page 45

1    A.    It's been about, maybe about 10, 11 months.
2    Q.    When was the last time you had occasion to look at
3 it?
4    A.    Any time.
5    Q.    Pardon me?
6    A.    I said I can see it at any time.
7    Q.    No, I'm saying you last saw it about 10, 11 months
8 ago?
9    A.    Right.  That's because every year we have to renew.
10    Q.    Exactly.  So did you prepare these documents
11 yourself?
12    A.    Yes, and Maretta is our secretary.  We took care of
13 it.
14    Q.    Did you have the assistance of any counsel in
15 putting this together?
16    A.    You mean an attorney?
17    Q.    Yes.
18    A.    No.
19    Q.    Had you incorporated any type of organization prior
20 to this time?
21    A.    No.
22    Q.    So if you look at Page 3 of this exhibit entitled
23 Articles of Incorporation of Largo for Jesus Christian Center,
24 Inc., a non-profit corporation, how did you know how to
25 prepare this?

Page 46

1 yes.
2    Q.    And at that time 1544 Crosby Street was your
3 residence address?
4    A.    Yes.
5    Q.    Is it still your residence address?
6    A.    Yes.
7    Q.    How long has it been your residence address?
8    A.    For 15, almost 16 years coming December 31st.
9    Q.    Where did you live prior to that time?
10    A.    I lived at 1842 Twelfth Street S.W., Largo, Florida.
11    Q.    And so in this document you have identified all of
12 the persons who formed the corporation with you.  Do you
13 agree?
14    A.    Uh-huh.  Yes.  Yes.
15    Q.    And these are all your families members that we just
16 talked about?
17    A.    Yes, they are.
18         (Exhibit Number 3 was marked for identification.)
19 BY MS. SIMONETTI:
20    Q.    So this is Exhibit 3.
21    A.    Okay.
22    Q.    Do you recognize this document, Ms. McCaskill?
23    A.    Yes, I think so.
24    Q.    What is this?
25    A.    Uniform business report.

Page 48

1    A.    Because my son-in-law has a church and he groomed me
2 with it so I could have mine done.
3    Q.    So he helps you with the format of it and the
4 documents, making sure they were in proper form?
5    A.    Right.
6    Q.    And what's his name?  I'm sorry.
7    A.    His name is Troy Luckey.
8    Q.    And Troy Luckey, in the articles of incorporation,
9 is listed as the financial secretary, correct?
10    A.    Uh-huh.  Right.
11    Q.    And Marcy Luckey, your daughter, his wife, is listed
12 as the treasurer, correct?
13    A.    Right.  Uh-huh.
14    Q.    And then Maretta Newsome is listed as the secretary?
15    A.    Right.
16    Q.    Mr. McCaskill is the vice president?
17    A.    Right.
18    Q.    And you get the grand title of president?
19    A.    Yes.
20    Q.    Is it also true that Maretta Newsome is the
21 registered agent?
22    A.    Right.  By being the secretary she is.
23    Q.    So, Ms. McCaskill, on the front page of this
24 document, you see that the 6140 number is listed, correct?
25    A.    Yeah, that's me and my address and my phone number,

Page 47

1    Q.    What do you understand the purpose of this to be?
2    A.    It's just something I had to file every year.
3    Q.    How do you know that you need to file it?
4    A.    Because they used to give us cards to tell us when
5 to pay for our year's certificate, so every year I have to do
6 that.
7    Q.    So you get something from the Secretary of State of
8 Florida?
9    A.    Not anymore.  They stopped sending it out, you just
10 have to do it on your own.
11    Q.    In 2000 would you get a request from the state to
12 fill it out or some kind of reminder?
13    A.    They'd send a reminder, uh-huh.
14    Q.    So on the left-hand side under -- it says officers
15 and directors.  Can you see that?
16    A.    Uh-huh.
17    Q.    This reflects the same persons in the corporation as
18 in the Articles of Incorporation?
19    A.    Right.
20    Q.    So there was no change in the corporate structure?
21    A.    No.
22    Q.    And that's your signature at the bottom?
23    A.    Yeah.
24    Q.    Did you prepare this yourself?
25    A.    It was in the -- it was in the computer at that time

Page 49

13 (Pages 46 - 49)

1 and we just, every year just, you know, do it again, pay the
2 money.
3   Q.   Would you print it out and sign your name and send
4 it in?
5   A.   I don't think we did that since it was already in
6 the computer at that time, they just sent us the notice and we
7 called or either, you know, sent a check.
8   Q.   Okay.  And so the fee for you to renew your
9 certificate is reflected on here of something like $61.25?
10   A.   At that time, yes.
11   MS. SIMONETTI:  Here's 4.
12   (Exhibit Number 4 was marked for identification.)
13 BY MS. SIMONETTI:
14   Q.   Have you had a chance to review this?
15   A.   Yes.
16   Q.   Do you recognize this document as well?
17   A.   It really looks like it's spliced to me.
18   Q.   I'm sorry?  I can't hear you.
19   A.   It looks like it's spliced to me.  Since when did
20 Maretta move from secretary to T, to the treasurer.
21   Is that what you put here?  Is that what's there?
22   Q.   This is printed from the Secretary of State's
23 website?
24   A.   Okay.  It doesn't look just like the one that I have
25 at home.

Page 50

1   Q.   Okay.  Well, maybe you want to provide that to your
2 lawyer, we can see --
3   A.   Yeah, because here, there was nothing here.  Nothing
4 spliced there, nothing spliced there.
5   Is this saying that she is the treasurer?  Is that
6 what you think it's saying?  Because when I look at the -- can
7 I see that other one?
8   Q.   Sure.
9   MR. KERNEY:  Can we go off the record for a second?
10   MS. SIMONETTI:  Why?
11   MR. KERNEY:  Because I'd like to point something out
12 that might be helpful to all of us.
13   MS. SIMONETTI:  Okay.
14   MR. KERNEY:  Thank you.
15   (OFF-THE-RECORD DISCUSSION.)
16 BY MS. SIMONETTI:
17   Q.   So looking at Exhibit 4, Ms. McCaskill, so you do
18 recognize this document, correct?
19   A.   Yes.
20   Q.   Would this be the uniform business report that had
21 to be submitted in 2001 for Largo for Jesus?
22   A.   I think so.
23   Q.   And this, again, identifies the same persons with
24 respect to --
25   A.   Right.

Page 51

1   Q.   -- the corporate roles, correct?
2   A.   That's true.
3   Q.   Okay.  And that's your signature at the bottom,
4 8/3/2001 [sic]?
5   A.   Uh-huh.
6   Q.   I have these up to 2015, we can look at them
7 separately or we could look at them all at once.  The
8 questions are pretty simple.  Which would you prefer?
9   A.   I will leave it to you.
10   Q.   Okay.  We'll mark together on Exhibit 5 the Uniform
11 Business Reports for 2002, 2003, 2004, 2005, 2006, 2007, 2008,
12 2009, 2010, 2011, 2012, 2013 and 2014 and 2015?
13   A.   I was going it say you should have 15.
14   Q.   You're right.  It's February, it's a February
15 reporting date.  Okay.
16   (Exhibit Number 5 was marked for identification.)
17 BY MS. SIMONETTI:
18   Q.   Why don't you take a few minutes to look those over.
19 Sort of in midstream the state changes the form.  It looks a
20 little bit different, so feel free to review that.  You're
21 probably familiar with it, but take a look at it.
22   Have you had enough time to take a look at these
23 documents?
24   A.   Uh-huh.
25   Q.   Okay.  Are these the annual reports that you filed

Page 52

1 with the Secretary of State with respect to Largo for Jesus?
2   A.   Yes, but...
3   MR. KERNEY:  I can't help you with the answer to the
4 question.
5   THE DEPONENT:  I just wanted to know if I could say
6 something.
7 BY MS. SIMONETTI:
8   Q.   You can say whatever you want.
9   A.   The changes that were made were only changes of
10 address where they moved from one place to the other.
11 Troy Luckey is not the secretary, and I see that has changed
12 him to secretary and Maretta to treasurer.  That's not true,
13 that had never changed.
14   Q.   Okay.  Well, again, I don't really have an interest
15 in who serves in what capacity.
16   A.   Well, she's not handling any money.
17   Q.   She told me that.  I'm not really concerned with who
18 serves in what capacity.
19   A.   Okay.
20   Q.   But do you agree that the corporate persons here,
21 the officers and directors of Largo for Jesus, have not
22 changed?
23   A.   No, they have not changed from the beginning.  The
24 only change was addresses.
25   Q.   And do you agree that on the reports for 2000, 2001,

Page 53

14 (Pages 50 - 53)

1 2002, 2003, which are all in the same format, you put the
2 phone number for Largo for Jesus in the right-hand bottom
3 corner?
4     A.    Yeah, well, that's mine.  That's the only phone I
5 got.
6     Q.    And that's the phone number that you gave to the
7 Department of Incorporation?
8     A.    Yes, for myself, yes.
9     Q.    Well, let's look back at Exhibit 2 and make sure
10 there's no confusion.
11        If you take a look at that top page, do you see it?
12     A.    Uh-huh.
13     Q.    That contains the phone number?
14     A.    For me, yes.
15     Q.    Is there anything on there that says it's a personal
16 phone number?
17     A.    Well, I assumed it's personal if it's under my name
18 and my address.
19     Q.    Is that the address for Largo for Jesus at that
20 point in time?
21     A.    No.
22     Q.    That's what address at that point in time?
23     A.    That was my home address.  I was evangelizing then,
24 I didn't have -- I didn't have a church at that time.
25     Q.    Is there any indication on here that that is not

Page 54

1 had one call and that was someone that wanted to come and
2 paint the kids' faces.  Other than that, they usually come to
3 the church itself.
4     Q.    Okay.  But if someone's interested in attending
5 services, getting in contact with Largo for Jesus, the only
6 phone number of record for it is (727) 581-6140?
7     A.    For me, yes.
8     Q.    I just want to be clear.  If I did a search online
9 for Largo for Jesus --
10     A.    It would have my personal phone number and my
11 address as the mailing address because there is no -- there is
12 no box or anything there because a lot of transients get off
13 the bus and they come and they put all kinds of stuff there,
14 so there is nothing there except for the name of the church
15 and my name there and the date, the times that we come for
16 service.
17        And they usually come in person.
18     Q.    But you welcome people --
19     A.    Coming.  Sure.
20     Q.    Right.  So whether --
21     A.    Yeah.  Yeah.
22     Q.    Right.  So whether they call or whether they hear
23 about it, you would welcome people --
24     A.    Yeah.  Sure.
25     Q.    Before you submitted the forms that we've marked as

Page 56

1 going to be a church address for Largo for Jesus?
2        MR. KERNEY:  Are you done looking at that?
3        MS. SIMONETTI:  She's thinking.
4     A.    No, I have a question.
5 BY MS. SIMONETTI:
6     Q.    Okay.
7     A.    Okay.  On this front page here that you were talking
8 about, where my name and my address and my phone number is
9 there?
10     Q.    Uh-huh.
11     A.    Okay.  That's because there is no mailbox and I
12 didn't have -- I didn't have that building until 2009.
13     Q.    Uh-huh.
14     A.    So these were way back in '99 and 2000, that kind of
15 stuff.  So anything that had to be sent to me was sent to my
16 home address.
17     Q.    Uh-huh.  Has there ever been a phone number where
18 someone could call Largo for Jesus except (727) 581-6140?
19     A.    But usually I don't get calls.
20     Q.    If someone were to go to the storefront that you
21 described, and they see that services are offered and wanted
22 to get in touch with you and went to the internet or the
23 yellow pages or whatever, they could find a phone number for
24 Largo for Jesus, correct?
25     A.    They would find a phone number for me.  Now, I only

Page 55

1 Exhibits 3 through 5, did you read all parts of them?
2     A.    I don't have 3.  I've -- is there a 4?
3     Q.    There is.  Just look at 3, 4, and 5.  Those are the
4 actual annual reports that you submitted.
5     A.    Okay.
6     Q.    Have you had a chance to look back through those?
7     A.    Yes, I have, and they're not right.
8     Q.    What's not right about them?
9     A.    Okay.  This is a little thing here, and everything
10 else is big.  And then we have the little squiggly wiggles
11 there and that shouldn't be, there should be a whole piece.  I
12 don't know.
13        Now, this one, this one changed when it got to the
14 next one.
15        I have my own files at home so I don't have to do
16 any -- I don't have to do any -- putting anything together,
17 but this doesn't look right to me.  Yes, it's a copy, but a
18 copy is not supposed to be looking like you're putting
19 something up here and then you're putting something under
20 there and you're pasting it together.  Somebody's pasting it
21 together.  It doesn't look normal.
22        Now, if somebody had told me, I would have brought
23 my own papers here.  But the things changing with the
24 officers, that's not right.
25     Q.    Let me ask you, Ms. McCaskill, is there anything in

Page 57

15 (Pages 54 - 57)

1 the information regarding the officers' identities that you
2 think is incorrect?  Because you told me nothing changed,
3 right?
4    A.   Right.
5    Q.   Is there anything wrong in there with respect to the
6 address information that's reflected?
7    A.   I'm not talking address, I'm talking about the
8 officers.
9    Q.   No, I'm asking you:  Is there anything wrong about
10 the address information that's reflected in that?
11    A.   2009 to 2010, okay.  The address -- the address is
12 corrected to where they live now.
13    Q.   Who's "they"?  I'm sorry.
14    A.   That's Marcy Luckey and Troy Luckey.
15    Q.   I see.
16    A.   Right.  That's their permanent address now, but they
17 had moved a couple of times.
18    Q.   Okay.
19    A.   But their positions did not change.
20    Q.   Okay.
21    A.   So I don't know how Troy's -- Troy Luckey's position
22 changed from a T to S, and then Maretta's came up with a T.
23 That's not right.
24    Q.   Well, what you might want to do after we leave here,
25 if there's any issue, is to print them from the website,

Page 58

1 service center?
2    A.   If we need programs to be typed up and printed,
3 that's what she does.  Or if she needs to, you know, sign any
4 of these or whatever, if we change, that's what she would do
5 when she didn't have -- you know, just me and him we'd take --
6 because we want the ministry to be just what it's supposed to
7 be.  And I can do it and he can do it, but we don't let
8 anybody else.  Because we'll tell them what we have, but
9 nobody put their hands in there and take nothing out and we
10 don't take anything.  We don't have to.
11    Q.   Understood.  And Mrs. Luckey, what's her role,
12 please?
13    A.   Okay.  Whenever she comes this way.  She was -- let
14 me see what she was.  Okay.  She was the treasurer, but being
15 where she is, you know, it's not too much treasurer she can
16 get, but we can, you know, we can change if we want to but,
17 you know, we do have to still have officers.
18    Q.   Uh-huh.  How far is Port St. Lucie from here?
19    A.   About 200 miles.
20    Q.   So it's pretty far?
21    A.   It's on the east coast.  Yeah.
22    Q.   Sorry.  I'm just not that familiar with the area.
23 How about Mr. Luckey, what is his role?
24    A.   He's pastor at their church.
25    Q.   So as with respect to Largo for Jesus, what role

Page 60

1 Department of Incorporations --
2    A.   I'll have to get them straight.
3    Q.   Although I don't think it really matters.
4    A.   Well, there's a difference between a treasurer and a
5 secretary.
6    Q.   Uh-huh.  So in a given year, say in 2014, how much
7 time did you spend working on Largo for Jesus business?
8    A.   I just do it whenever, whenever I want to.  And then
9 it's a lot of time, it's just a lot of time, so.  I don't
10 count the hours that I put into the ministry.
11    Q.   Okay.  In a given year how much time would Mr.
12 McCaskill spend working on Largo for Jesus?
13    A.   Okay.  His is much smaller than me because I have my
14 messages and the study and all like that, so he drives me
15 around to do whatever I need to do for the church, but we
16 don't charge.
17    Q.   I understand.
18    A.   Okay.
19    Q.   So aside from driving you to various appointments
20 and meetings, does Mr. McCaskill do anything else?
21    A.   He usually takes up the offering for me.
22    Q.   During the services?
23    A.   Right.  During the services.
24    Q.   How about Mrs. Newsome, aside from playing the
25 piano, which we talked about before, what does she do in the

Page 59

1 does he play?
2    A.   Just on here, as the, you know, with the officers
3 here; but sometime he come and preach there and they come and
4 sing.
5    Q.   What was the last point in time that Mrs. Newsome
6 lived with you?
7    A.   Since she was a teenager and she got -- where she
8 got married, she never stayed with me again.
9    Q.   And what year did she get married?
10    A.   I think it was '99, I believe.  I don't recall.
11    Q.   Okay.  Somewhere around the time that you were
12 forming Largo for Jesus?
13    A.   I had already -- I had already formed it in 1999.
14 Yeah.  Well, sometime during that time, but I think that she
15 had already -- I had left out because, see, in 1998 my house
16 was done, so I moved in on December the 31st of 1998 and she
17 moved right in behind me at the 1842, so we never stayed
18 together as an adult.
19    Q.   After she was married?
20    A.   Yes.
21    Q.   So after that point in time you were no longer
22 living together?
23    A.   No, not at all.
24    Q.   So you've never lived with Mr. Newsome for any
25 period of time --

Page 61

16 (Pages 58 - 61)

Page 62

```
1   A.   Never.  Never.
2   Q.   Does Mr. Newsome do anything for Largo for Jesus?
3   A.   He reads the scripture or, you know, if he wants to
4   testify, he does that.  He doesn't do a whole lot.
5   Q.   How old is Mr. Newsome?
6   A.   I think he's 49 or 50, something like that.  I
7   believe so.
8   Q.   Is he currently working?
9   A.   No.
10  Q.   When was the last time he was working?
11  A.   I don't know.
12  Q.   What kind of work does he do, generally?
13  A.   That he -- I think he's disabled now, I'm not sure,
14  but Maretta can tell you about that.
15  Q.   Do you have an e-mail address?
16  A.   No.
17  Q.   Does your husband have an e-mail address?
18  A.   No.
19       MS. SIMONETTI:  Why don't you give me five minutes
20  to see what makes sense to do next.
21       MR. KERNEY:  Fine.
22       (Off-the-record discussion.)
23            CONTINUING EXAMINATION
24  BY MS. SIMONETTI:
25  Q.   Ms. McCaskill, we're back on the record.
```

Page 63

```
1   A.   Okay.
2   Q.   You mentioned to me earlier the telephone call that
3   you remember with Heather.  Did you happen to ask for her last
4   name?
5   A.   No.
6   Q.   How long were you on the phone with her?
7   A.   Probably about, maybe about 45 or 50 seconds.  It
8   wasn't that long.
9   Q.   Where are the notes that you mentioned that you have
10  of that call?
11  A.   Right here (indicating).
12  Q.   Did you type that up at the time?
13  A.   No, I didn't type it up at the time.
14  Q.   Did you take notes at the time of the call?
15  A.   Yeah.  I could remember what she was saying and what
16  I was saying.  I wrote it down because I didn't know.
17  Q.   Let's be clear, did you take notes of the phone call
18  at the time that the call happened?
19  A.   Immediately after.
20  Q.   Okay.  Where are those notes today?
21  A.   I had them typed up.  I probably don't have them
22  anymore.  Does it matter?
23  Q.   It does.  Who typed that up for you?
24  A.   I don't know.
25  Q.   Who are the possible candidates for persons who
```

Page 64

```
1   could have typed that up for you?
2   A.   When I give them the information for my statement.
3   Q.   Who's "them"?
4   A.   Okay.  When I called into Morgan & Morgan, I gave
5   them my statement.
6   Q.   When was the last time you saw the original notes?
7   A.   I don't know.
8   Q.   If you still had them, where would you keep them?
9   A.   At home right now.
10  Q.   Where at home would you look for them?
11  A.   In my folder.
12  Q.   What kind of folder is it?
13  A.   Important papers or whatever, but I didn't bring it
14  because I didn't know I had to.
15  Q.   So did your lawyers type up the document you have
16  been looking at today?
17  A.   They typed it up for me because I -- I had it
18  written -- I had it written in my handwriting, and then they
19  typed it up for me.
20  Q.   So you wrote something in your handwriting that you
21  gave to your attorneys and they then typed it up for you?
22  A.   Uh-huh.
23  Q.   And that's what you've been looking at today?
24  A.   Yeah.
25  Q.   Has there ever been a period of time when the phone
```

Page 65

```
1   number at issue, the 6140 number was disconnected?
2   A.   Never.
3   Q.   Does your -- strike that.
4        Does the number, when you call it, have a voicemail
5   message attached to it?
6   A.   Uh-huh.
7   Q.   What does the voicemail message say?
8   A.   Something like, this is Myra McCaskill, leave your
9   information or whatever.  If you call it -- can I get the
10  phone from him?
11  Q.   Is that your recollection -- it doesn't have to be
12  word for word, but is that your recollection of what it is?
13  A.   Yeah, because I never call myself.
14  Q.   Right.  No, of course.
15       And how long has that message been on the phone?
16  A.   Ever since -- ever since it became a cell, but I'm
17  not sure, so that would have been in late March of 2013.
18  Q.   There may have been a message on the number before
19  when it was a landline but you don't remember?
20  A.   A landline?  I had a recorder on my landline, but I
21  don't remember that.  That's been too long ago.
22  Q.   So can you explain to me in your own words what you
23  think Navient Solutions, Inc., has done wrong in this case?
24  Not what your lawyers have told you, but in your own words.
25  A.   Having so many people to call one person and bombard
```

17 (Pages 62 - 65)

1 them with nothing but calls, one right after the other. Every
2 minute sometimes. Even on Saturdays and Sundays. That was
3 not necessary because I don't owe anybody anything, I don't
4 know anything about their business. That was wrong. People
5 don't apologize for anything. And I didn't call myself.
6   Q.   I'm sorry. What did you just say?
7   A.   I said I didn't call myself, somebody called me.
8   Q.   So, again, in your own words, what did the
9 additional defendants, the Student Assistance Corporation do
10 that was wrong?
11       MR. KERNEY: You can go ahead and answer, Willie, if
12 you're ready.
13       THE DEPONENT: I'm waiting on her to repeat it.
14       MS. SIMONETTI: Oh, I'm sorry. The reporter can
15 read it back.
16       (Previous question was read.)
17   A.   I don't really understand the question.
18 BY MS. SIMONETTI:
19   Q.   Do you have an understanding of what companies
20 you're suing?
21   A.   Navient Solutions, right?
22   Q.   Any others that you know of?
23   A.   Well, that was the only one that was on the paper
24 that I had.
25   Q.   And when you say "the paper," what do you mean?

Page 66

1   Q.   Right. But this is a ministry that you conduct by
2 yourself with your family, correct?
3   A.   And some others.
4   Q.   Sure. Sure. So why did you go through the process
5 of incorporating it?
6   A.   Well, that was what I wanted to do.
7   Q.   For what reason?
8   A.   Okay. Because we are a church and we're non-profit,
9 501(c)3, so that's what I was supposed to do.
10   Q.   What are the benefits of being a non-profit
11 501(c)(3)?
12   A.   They give their charitable donations to the church.
13   Q.   So is it your understanding that with that corporate
14 status -- let me start over. Strike that.
15       So is it your understanding that with that status,
16 the corporation can take in donations on a non-profit basis?
17   A.   Right.
18   Q.   So, in other words, Largo for Jesus is not intended
19 to make money?
20   A.   Right. This is true.
21   Q.   So that affects the tax treatment of the
22 contributions that come in?
23   A.   Right.
24   Q.   Were there any other reasons that you wanted to
25 incorporate Largo for Jesus?

Page 68

1   A.   When it was -- when it was registered with the
2 court, Willie McCaskill versus Navient Solutions.
3   Q.   So you don't have any information about any
4 additional defendants, if there are any?
5   A.   No.
6   Q.   Is that correct?
7   A.   Not to my knowledge.
8   Q.   So you don't have any further information?
9   A.   No.
10   Q.   Okay. Just want to make sure we're on the same
11 page.
12       When you had the conversation that you remember with
13 Heather, did she identify a company she was working with?
14   A.   She said, "Hi, this is Heather from Navient," that's
15 what she said, "for Maretta Newsome." That's the way she came
16 off.
17   Q.   Why did you incorporate Largo for Jesus?
18   A.   Because I needed to incorporate that to establish
19 that as the church.
20   Q.   Why did you need to incorporate it?
21   A.   Well, that's part of the state. I have to have -- I
22 have to have a license -- a certificate from the state each
23 year, so I have to do that.
24   Q.   In order to do what?
25   A.   Certificates for Largo for Jesus.

Page 67

1   A.   Because I want to continue to have service and have
2 my -- have my certificate for every year or it will expire.
3   Q.   Aside from the tax treatment of the donations, was
4 there any other reason that you felt the corporate status was
5 important to have?
6   A.   Well, it was important to me.
7   Q.   For what purpose?
8   A.   For purpose of the church.
9   Q.   Why?
10   A.   Usually, you know, when a person opens up -- opens
11 up a business or a church, that is what is required.
12   Q.   And you understood that from your background in
13 ministry and from you education, and maybe your son-in-law,
14 that this was a typical structure?
15   A.   Yes.
16   Q.   And you didn't consult any lawyers, I think you told
17 me?
18   A.   No. But I talked with the IRS when I had to get all
19 the stuff together and they told me what I needed to do, so
20 that's what I did.
21   Q.   So just to be clear, you have never drawn any kind
22 of a salary or --
23   A.   Never.
24   Q.   And no one in the corporate structure that we looked
25 at before, the officers and directors, is drawing a salary?

Page 69

18 (Pages 66 - 69)

1   A.   Not one dime.
2   Q.   So no compensation except for the fact that
3 Mrs. Newsome is paid sometimes for the piano services?
4   A.   She's not paid, but she's given a love offering.
5   Q.   Do you pay the rent?
6   A.   Yes.
7   Q.   Do you pay the rent from contributions made by the
8 congregation?
9   A.   Yes.
10   Q.   Do you also pay the expenses of Largo for Jesus? I
11 think you identified power, that kind of thing, from the
12 contributions?
13   A.   Yes.
14   Q.   Do you ever put your own personal money into Largo
15 for Jesus?
16   A.   All the time.
17   Q.   It sounds like any small business owner.
18   A.   That's right.  Sure do.
19   Q.   Has Largo for Jesus ever been involved in any kind
20 of litigation?
21   A.   No.
22   Q.   Does it have insurance coverage?
23   A.   We didn't have to have the insurance coverage
24 because the landlord had the insurance for the building.
25   Q.   Do you think that Mrs. Newsome is responsible with

Page 70

1 her bills?
2   A.   Probably not, if people are calling.
3   Q.   She's never asked you for help on her student loans?
4   A.   No.
5   Q.   Have you helped any of your kids with any debt that
6 they owe?
7   A.   All the time.
8   Q.   Sounds like what a typical parent would say?
9   A.   Yes.
10   Q.   If Mrs. Newsome asked you for help on her student
11 loans, would you give it?
12   A.   Maybe.
13   Q.   But she hasn't asked you?
14   A.   No.
15   Q.   What do you hope to achieve in this case?
16   A.   I want to achieve not being bombarded with calls for
17 no reason at all for something that I have not done.  I hate
18 that.  It gets on my nerves to have something -- I'm in the
19 bed -- sometimes if I don't get a good night's sleep and I
20 have to sleep in, then the calls just start at 7:50, 8:00 on,
21 until 9:00 at night, and that would aggravate anybody.
22      MS. SIMONETTI:  I don't have anything further for
23      you, Ms. McCaskill.  I thank you for your help
24      today.
25      Do you have anything.

Page 71

1      MR. KERNEY:  I do not.
2      MS. SIMONETTI:  Let's go off the record for a
3      second.
4      (Off-the-record discussion.)
5      (Testimony was concluded at 3:30 p.m.)
6      MR. KERNEY:  We'll read.
7      MS. SIMONETTI:  I'll take the original and CD,
8 attach the exhibits.
9      MR. KERNEY:  Make it two.
10      THE COURT REPORTER:  Same thing?
11      MR. KERNEY:  Yes, ma'am.

Page 72

1        CERTIFICATE OF OATH
2
3 STATE OF FLORIDA
4 COUNTY OF HILLSBOROUGH
5
6      I, the undersigned authority, certify that
7 WILLIE McCASKILL personally appeared before me on December 16,
8 2015, and was duly sworn.
9
10      WITNESS my hand and official seal this 30th day of
11 December 2015.
12
13
14
15
16
17
18
19   Nancy H. Swartz
20   Florida Court Reporter
21   Notary Public - State of Florida
22   My Commission Expires:  8/11/2019
23   Commission No. FF 908705
24
25

Page 73

19 (Pages 70 - 73)

```
 1              REPORTER'S CERTIFICATE
 2
 3  STATE OF FLORIDA
 4  COUNTY OF HILLSBOROUGH
 5
          I, Nancy H. Swartz, Florida Court Reporter, Notary
 6  Public, certify that I was authorized to and did
    stenographically report the deposition of WILLIE McCASKILL;
 7  that a review of the transcript was requested; and that the
    transcript is a true and complete record of the testimony
 8  given by the witness.
 9
10       I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties, nor am I
11  a relative or employee of any of the parties' attorney or
    counsel connected with the action, nor am I financially
12  interested in the action.
13
14       Dated this 30TH day of December 2015.
15
16
17
18
19
20
21       Nancy H. Swartz, Court Reporter
22
23
24
25
                                              Page 74
```

```
 1       I declare under penalty of perjury
 2  under the laws that the foregoing is
 3  true and correct.
 4
 5       Executed on _____ , 20___,
 6  at _____, _____.
 7
 8
 9
10
11       _____
12       WILLIE McCASKILL
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 75
```

20 (Pages 74 - 75)

**[& - agrees]**

**&**

**&**   2:5 34:23 35:19
64:4

**1**

**1**   1:25 3:15 23:10,11
**10**   45:20 46:1,7
**11**   46:1,7
**14**   7:16
**15**   37:11,13 48:8
52:13
**152**   42:16
**1544**   48:2
**1559**   1:5
**16**   1:14 48:8 73:7
**1842**   48:10 61:17
**1900**   2:16
**1925**   2:15
**1966**   10:9 13:4
**1967**   13:6 14:3
**1970**   14:1
**1974**   14:2,3,14
**1994**   16:9
**1997**   16:11
**1998**   61:15,16
**1999**   14:23 45:20
61:13
**1:00**   1:15
**1a**   42:17
**1aa**   42:17

**2**

**2**   3:16 45:13,14 54:9
**20**   15:19 16:2 75:5
**200**   16:4 44:5 60:19
**2000**   3:17 14:25
16:18,20 49:11
53:25 55:14
**2001**   3:18 7:16
16:19,20,21,24
51:21 53:25
**2002**   52:11 54:1
**2002-2015**   3:19
**2003**   52:11 54:1

**2004**   52:11
**2005**   52:11
**2006**   42:3 52:11
**2007**   52:11
**2008**   52:11
**2009**   42:3,5,13
52:12 55:12 58:11
**201**   2:6
**2010**   52:12 58:11
**2011**   52:12
**2012**   52:12
**2013**   26:6,6 28:15
52:12 65:17
**2014**   20:10,23 29:3
31:12 32:2 33:10
37:2 52:12 59:6
**2015**   1:14 20:11
34:22 37:10 52:6,12
73:8,11 74:14
**21st**   16:3
**23**   3:15
**240**   1:18
**25**   14:22 15:5 43:20
**26**   32:12,14,18,19
33:7
**27**   31:14,15,16,19,21
32:7,11
**29**   30:25 31:2,18,20
31:20

**3**

**3**   3:17 46:22 48:18
48:20 57:1,2,3 68:9
68:11
**300**   16:5
**30th**   73:10 74:14
**31st**   48:8 61:16
**33**   1:5
**33770**   42:16
**36**   17:25
**3:30**   1:15 72:5

**4**

**4**   3:4,18 50:11,12
51:17 57:2,3

**40**   17:23 26:2 28:24
28:24,24
**41**   28:24
**424.204.7700**   2:18
**43**   26:2
**44**   17:21
**442**   1:17
**45**   3:16 8:20 9:10,11
26:1 63:7
**466-8365**   28:14
**48**   3:17
**49**   62:6

**5**

**5**   3:19 42:7 52:10,16
57:1,3
**5/18/99**   45:20
**50**   3:18 62:6 63:7
**501**   68:9,11
**52**   3:19
**581-6140**   24:19 43:3
55:18 56:6
**581-8617**   21:15

**6**

**61.25**   50:9
**6140**   28:16,23 47:24
65:1
**69**   14:7

**7**

**70**   14:7
**700**   2:6 20:18,19
32:23,24 37:10
**727**   28:14 33:3,4,5
43:3 55:18 56:6
**73**   3:8
**74**   3:9
**75**   1:25 3:10
**7:50**   71:20

**8**

**8**   36:13
**8/11/2019**   73:22
**8/3/2001**   52:4
**813.223.5505**   2:8

**8:00**   71:20
**8:15**   1:5

**9**

**90067**   2:17
**908705**   73:23
**99**   55:14 61:10
**9:00**   71:21

**a**

**able**   19:2
**account**   24:13 25:4
**accountant**   41:10,15
**accurate**   18:23
**achieve**   71:15,16
**action**   4:13 38:2
74:11,12
**active**   26:24,25
**actual**   57:4
**add**   7:6
**added**   41:3
**addition**   8:9
**additional**   66:9 67:4
**address**   42:15 47:25
48:3,5,7 53:10
54:18,19,22,23 55:1
55:8,16 56:11,11
58:6,7,10,11,11,16
62:15,17
**addresses**   53:24
**adult**   61:18
**adults**   30:8
**advertising**   44:20
**affirm**   4:1
**afternoon**   4:11
**agent**   11:13 47:21
**aggravate**   71:21
**ago**   7:15,16 25:16
26:4 28:15 46:8
65:21
**agree**   20:12 24:3,10
36:10 48:13 53:20
53:25
**agreement**   35:24
**agrees**   38:15

[agricultural - center]

**agricultural** 10:18
**ahead** 66:11
**alarm** 28:20
**ame** 11:23
**angeles** 2:17
**annual** 41:19 52:25
57:4
**answer** 4:25 5:4 6:5
6:7 20:20 21:18
23:1,2 33:14 34:18
53:3 66:11
**answered** 20:21
35:5
**answering** 34:4
**anybody** 21:22 27:9
34:11 35:10 36:24
60:8 66:3 71:21
**anymore** 21:20
28:21 49:9 63:22
**anyway** 5:25
**apologize** 66:5
**appear** 25:1,6
**appearances** 2:1
**appeared** 73:7
**apply** 39:23 40:4
**appointments** 59:19
**approximately** 14:7
14:23 15:17 16:9
20:8,12,17,19 31:16
32:23 37:1,5,9
43:20
**arbitrations** 7:18
**area** 15:6,17 16:14
16:15 17:2 60:22
**arrange** 35:11
**articles** 3:16 45:21
46:23 47:8 49:18
**aside** 12:6 33:24
59:19,24 69:3
**asked** 21:12,19 36:2
71:3,10,13
**asking** 9:20,22
14:23 22:6 31:24
35:18 40:19 58:9

**assistance** 1:8 46:14
66:9
**assumed** 54:17
**attach** 72:8
**attached** 65:5
**attend** 11:5
**attending** 56:4
**attorney** 36:17
46:16 74:10,11
**attorneys** 22:12,22
22:25 64:21
**august** 20:10,23
29:3 31:12,15 32:2
33:10 34:8 37:2
**authority** 73:6
**authorized** 74:6
**avenue** 42:16

**b**

**b** 3:13
**back** 14:3 27:17
31:5 54:9 55:14
57:6 62:25 66:15
**background** 10:5
69:12
**bad** 16:12
**balance** 19:9
**band** 44:18
**bankruptcy** 7:20
**basis** 24:21,21 41:19
68:16
**bears** 45:17
**bed** 71:19
**beginning** 53:23
**believe** 13:6 16:12
18:23 20:16 22:4,5
22:10 32:19,21
61:10 62:7
**belong** 30:19
**benefits** 68:10
**best** 5:9 8:3 23:2,19
**bible** 43:15
**big** 57:10
**bill** 15:16 24:10,14
24:16,18,19 25:1,2

25:5 35:9,9 41:24
**billing** 31:22,24
**bills** 22:24 35:7,10
36:23 44:12 71:1
**billy** 35:14 36:16
**bit** 14:10 52:20
**block** 41:13
**blue** 29:19
**bombard** 65:25
**bombarded** 21:24
30:21 35:5 71:16
**book** 12:15
**booklets** 22:20
**boring** 40:1
**bottom** 49:22 52:3
54:2
**boulevard** 1:17
**box** 56:12
**break** 5:20,24 9:6
42:7,11
**bring** 23:15,16
35:21 64:13
**brought** 7:24 57:22
**building** 55:12
70:24
**burglar** 28:20
**bus** 56:13
**business** 3:17,18,19
25:21,22,23 30:11
36:20,22 41:18
48:25 51:20 52:11
59:7 66:4 69:11
70:17

**c**

**c** 17:14,15 68:9,11
**california** 2:17
**call** 9:25 15:12
20:24 21:4,14,20,23
25:19 29:4,5,24
30:2,7,9,13,18,19,20
32:16 33:11,15,16
33:19 34:6,14 35:1
35:7,16 36:6,7 37:1
38:7,11,19 43:10

55:18 56:1,22 63:2
63:10,14,17,18 65:4
65:9,13,25 66:5,7
**called** 4:6 13:16
21:4 28:8 30:7
34:23 35:4 50:7
64:4 66:7
**caller** 21:7 33:20
**calling** 20:1,2,4 21:5
34:15 35:10 36:4,5
71:2
**calls** 9:1,13,14 19:16
19:21 20:8,16,18,19
21:12,24 22:15,19
23:7 26:9 29:16,17
29:20 30:21,22
31:13,16,19 32:3,5
32:11,18,23 33:5
34:1,2,4,19,21 35:5
35:15 36:3,13 37:4
37:10,16,22,25
38:17,25 39:1,4,6,9
39:12 43:4,9 55:19
66:1 71:16,20
**candidates** 63:25
**capacity** 24:24
53:15,18
**card** 30:14
**cards** 49:4
**care** 41:16 46:12
**carol** 17:3
**case** 1:4 6:19,25 7:2
7:10 19:15 22:16
32:6 38:21 40:8,11
41:3 65:23 71:15
**cd** 72:7
**cell** 3:15 21:5,20
22:24 24:11,14,20
24:23 25:1,5,8,13
25:15,20 26:8 28:13
28:17 35:2 41:23
65:16
**center** 43:14 45:3
46:23 60:1

Veritext Legal Solutions
866 299-5127

[century - december]

century  2:15
certain  6:6 12:18
  34:5
certificate  3:8,9
  12:24 49:5 50:9
  67:22 69:2 73:1
  74:1
certificates  11:11
  67:25
certify  73:6 74:6,10
chance  23:13 50:14
  57:6
change  15:2 49:20
  53:24 58:19 60:4,16
changed  7:8 53:11
  53:13,22,23 57:13
  58:2,22
changes  52:19 53:9
  53:9
changing  16:21
  57:23
charge  36:8 59:16
charitable  68:12
check  15:11 42:4
  50:7
children  14:12
  17:11 18:11
christian  45:3 46:23
church  11:23,24
  26:14 44:24 47:1
  54:24 55:1 56:3,14
  59:15 60:24 67:19
  68:8,12 69:8,11
churches  43:17
circumstance  29:12
city  10:11
claimant  6:25
claims  19:15
clear  5:14,18 6:10
  22:8 30:1 38:14
  56:8 63:17 69:21
clearwater  12:1
client  9:5
close  16:22 18:10
  33:3

cloth  13:14,16,17,18
  13:23 14:8
coast  60:21
coleman  17:15,24
  18:8
collection  44:7
college  10:7,14 11:1
  11:4,9,15 12:7
come  32:3 56:1,2,13
  56:15,17 61:3,3
  68:22
comes  44:9,10,10
  60:13
coming  24:1 32:5
  37:16,22 48:8 56:19
commission  73:22
  73:23
communicate  18:17
communication
  10:1
comp  6:20,22,23
companies  34:14
  36:7 39:11 66:19
company  40:15
  67:13
compensation  70:2
complete  10:8 74:7
completed  10:6
completion  12:3,4
computer  49:25
  50:6
concerned  34:3
  53:17
concluded  7:15 72:5
conduct  68:1
conference  42:21
confirmed  35:25
confusion  31:25
  54:10
congregation  43:16
  43:18 44:8 70:8
connected  74:11
connection  19:17
consist  12:12

consisted  12:13
consists  45:16
consult  69:16
consumer  35:4
contact  17:5,8 18:20
  18:24 19:1 33:20
  35:19 56:5
contacted  37:12
contains  54:13
content  9:20
continue  69:1
continuing  62:23
contributions  68:22
  70:7,12
conversation  4:23
  9:20 21:2,4 22:4,10
  31:13 32:2 33:9,20
  34:9 35:18 37:5
  67:12
conversations  9:22
  29:7
copy  24:10 57:17,18
corner  54:3
corporate  49:20
  52:1 53:20 68:13
  69:4,24
corporation  1:8,9
  7:3,4 13:25 14:21
  15:6 40:11,17 41:3
  41:6 46:24 48:12
  49:17 66:9 68:16
correct  17:16 21:17
  22:1 26:5 28:18
  29:5,22 37:2,7,13
  37:18 40:5 47:9,12
  47:24 51:18 52:1
  55:24 67:6 68:2
  75:3
corrected  58:12
cost  41:23
counsel  2:3,12 9:21
  37:12 46:14 74:10
  74:11
count  32:22 33:5
  59:10

county  73:4 74:4
couple  4:17 58:17
course  6:4 65:14
court  1:1,22 4:1,19
  67:2 72:10 73:20
  74:5,21
cover  45:17
coverage  70:22,23
creation  43:1
credit  14:19,19 15:4
  15:4,7,10,22 16:13
  16:15 17:2 30:14
  35:11,12
credits  15:14,21
crosby  48:2
currently  62:8
customer  14:15,16
  15:2,6
cut  13:19 15:12,13
cv  1:5

**d**

d  3:1
date  1:14 12:3 14:24
  23:9 34:5 45:18,18
  52:15 56:15
dated  74:14
dates  12:4
daughter  8:17 11:18
  24:6 25:7 38:2,8,19
  39:15 47:11
daughter's  39:12
daughters  17:16
  18:20,24 24:7 28:25
  30:8
david  27:4,23 28:4
day  9:20 11:6 12:16
  12:22 15:11 16:5,5
  16:5 35:14 43:7
  45:4 73:10 74:14
days  31:8 33:15
debt  30:14 71:5
december  1:14 48:8
  61:16 73:7,11 74:14

[decide - forward]

| | | | |
|---|---|---|---|
| **decide**  28:19 | **documents**  8:21 9:1 | **establish**  67:18 | **feel**  5:12,24 30:5 |
| **declare**  75:1 | 46:10 47:4 52:23 | **estate**  11:13 | 52:20 |
| **defendant**  4:7 7:2 | **doing**  11:7 16:5 | **evangelist**  43:12 | **felt**  69:4 |
| **defendants**  1:10 | 23:19 33:8 39:3 | **evangelize**  26:15 | **ff**  73:23 |
| 2:12 4:13 32:6 40:8 | 40:16 | **evangelizing**  54:23 | **figured**  40:15 |
| 40:11 66:9 67:4 | **donations**  68:12,16 | **exact**  14:24 | **file**  49:2,3 |
| **degree**  10:25 11:9 | 69:3 | **exactly**  38:23 46:10 | **filed**  45:20 52:25 |
| 36:12 | **door**  45:4 | **examination**  4:9 | **files**  57:15 |
| **deliver**  21:12 | **drawing**  69:25 | 62:23 | **fill**  49:12 |
| **demand**  38:12 | **drawn**  69:21 | **example**  11:12 45:2 | **financial**  47:9 |
| **department**  15:4,8 | **drives**  59:14 | **excluding**  32:11 | **financially**  74:11 |
| 15:22 54:7 59:1 | **driving**  59:19 | **executed**  75:5 | **find**  25:7 55:23,25 |
| **deponent**  53:5 66:13 | **drummer**  44:15 | **exhibit**  3:14,15,16 | **fine**  9:7 62:21 |
| **deposition**  1:13 4:15 | **duly**  4:7 73:8 | 3:17,18,19 23:10,11 | **finish**  5:3,4 10:25 |
| 8:2 74:6 | | 45:13,14 46:22 | 11:10 39:25 |
| **describe**  43:13 | **e** | 48:18,20 50:12 | **first**  4:7 13:5 25:15 |
| **described**  55:21 | **e**  3:1,13 10:13 17:14 | 51:17 52:10,16 54:9 | 35:19 42:1,12 43:22 |
| **description**  3:14 | 17:15,15,15 62:15 | **exhibits**  57:1 72:8 | 43:23 |
| **difference**  59:4 | 62:17 | **expense**  41:23 | **five**  62:19 |
| **different**  15:8 20:1 | **earlier**  29:3 32:22 | **expenses**  41:18 | **fkerney**  2:9 |
| 52:20 | 63:2 | 70:10 | **florida**  1:2,19,23 2:7 |
| **dime**  70:1 | **early**  36:14,16 | **experience**  29:25 | 7:3,4 10:11,16,18 |
| **dinner**  35:14 | **easier**  33:1 | **expire**  69:2 | 10:20 12:1 13:25 |
| **direct**  3:4 4:9 | **east**  2:15 60:21 | **expires**  73:22 | 14:13,20 15:5 16:22 |
| **directed**  19:16 | **easy**  4:18 | **explain**  65:22 | 18:2,4,9 42:16 |
| **directors**  49:15 | **eating**  35:14 | **extra**  44:12 | 45:17 48:10 49:8 |
| 53:21 69:25 | **education**  11:16 | | 73:3,20,21 74:3,5 |
| **disability**  16:23 | 12:8 13:2 69:13 | **f** | **folder**  64:11,12 |
| **disabled**  14:25 | **educational**  10:5 | **fabrics**  13:19 | **follow**  12:18 33:20 |
| 15:24 62:13 | **eight**  20:14,15,15,17 | **faces**  56:2 | 33:25 |
| **disconnected**  65:1 | **eighth**  42:16 | **fact**  70:2 | **follows**  4:8 |
| **disconnects**  14:18 | **either**  50:7 | **fall**  31:1,8,9,23 | **foregoing**  75:2 |
| 15:18 | **else's**  21:22 | **familiar**  52:21 60:22 | **forget**  35:13 |
| **discussion**  51:15 | **em**  36:23 | **families**  48:15 | **forgive**  40:24 |
| 62:22 72:4 | **email**  2:9,19 | **family**  24:5,7 25:5 | **form**  6:4 47:4 52:19 |
| **display**  45:6,9 | **employee**  74:10,11 | 68:2 | **formal**  11:16 |
| **district**  1:1,2 | **employment**  16:17 | **famu**  10:16 | **format**  23:20 47:3 |
| **division**  1:3 | 26:17 | **far**  27:1 34:2 60:18 | 54:1 |
| **document**  9:13,16 | **ended**  21:23 34:21 | 60:20 | **formed**  48:12 61:13 |
| 23:20,22,25 45:16 | **energy**  7:3,8,9 16:22 | **february**  20:11 | **forming**  61:12 |
| 45:23 47:24 48:11 | **entire**  24:18 | 35:20 37:10,11,13 | **forms**  56:25 |
| 48:22 50:16 51:18 | **entitled**  46:22 | 52:14,14 | **forthepeople.com** |
| 64:15 | **errata**  3:10 | **federally**  39:18 40:4 | 2:9 |
| **documentation** | **esquire**  2:13 | **fee**  50:8 | **forward**  37:9 |
| 22:14 | | | |

[four - issue]

**four** 23:23
**frame** 32:19 37:16
**frank** 2:4
**franklin** 2:6
**free** 5:24 52:20
**friday** 12:17,22
**front** 21:25 47:23
  55:7
**full** 11:6 13:5 16:17
**funny** 10:23
**further** 67:8 71:22
  74:10

**g**

**gap** 14:10
**generally** 62:12
**getting** 30:21 38:24
  39:1,6 56:5
**give** 4:2 5:9 7:10
  21:9,10 22:22 26:15
  36:6 44:12 49:4
  62:19 64:2 68:12
  71:11
**given** 22:12,24 59:6
  59:11 70:4 74:8
**giving** 12:16 40:15
**go** 4:17 10:10 12:15
  12:16 14:3 15:13
  24:14 26:14 27:17
  33:4 34:25 43:16
  51:9 55:20 66:11
  68:4 72:2
**god** 4:4 12:13
**goes** 24:15,23 36:21
**going** 8:24 9:2 15:11
  16:2 23:10 34:16
  36:18 38:3,22 42:21
  52:13 55:1
**gomez** 8:11,12,13,19
  9:21
**good** 4:11 71:19
**government** 39:19
**graduated** 13:4
**grand** 47:18

**great** 4:25
**groomed** 47:1
**ground** 4:17
**grounds** 6:6
**group** 12:19
**growing** 29:1
**grown** 36:8,11,19,20
**guaranteed** 39:18
  39:19 40:4
**guess** 35:6 36:11

**h**

**h** 1:21 2:4 3:13
  10:13 73:19 74:5,21
**h&r** 41:13
**habit** 29:7
**haines** 10:11,12
**half** 10:15
**hand** 49:14 54:2
  73:10
**handling** 53:16
**hands** 60:9
**handwriting** 64:18
  64:20
**hang** 34:3,20
**happen** 63:3
**happened** 63:18
**happening** 36:3,13
  38:18
**harassing** 34:2
  35:15
**hate** 71:17
**head** 4:23
**hear** 50:18 56:22
**heard** 41:1
**hearing** 7:7
**heather** 20:1,25
  21:2,12,21 29:4,5
  30:2,18 31:13 32:3
  32:4,7,12 33:12,15
  33:21,22 34:5 37:1
  38:7 39:2 63:3
  67:13,14
**help** 4:4 53:3 71:3
  71:10,23

**helped** 71:5
**helpful** 51:12
**helps** 47:3
**hi** 67:14
**high** 10:6,8,10,11
  12:6 13:4,8,11 14:4
**hillsborough** 73:4
  74:4
**hold** 8:24 22:8 31:7
  43:21
**home** 29:1 50:25
  54:23 55:16 57:15
  64:9,10
**hope** 71:15
**hotel** 42:21
**hour** 5:25 8:20 9:10
  9:11
**hours** 11:7 59:10
**house** 28:21 61:15
**howard** 9:22
**huh** 4:24,24 12:11
  14:6,9 15:16 16:19
  19:19 29:6 37:3
  47:10,13 48:14
  49:13,16 52:5,24
  54:12 55:10,13,17
  59:6 60:18 64:22
  65:6
**husband** 8:16 25:10
  25:11,13,20 26:20
  36:9,24 37:24 38:1
  38:18,18 62:17
**husband's** 27:3
**husbands** 36:20

**i**

**idea** 20:6,7
**identification** 23:11
  45:14 48:18 50:12
  52:16
**identified** 27:22
  48:11 70:11
**identifies** 24:4 51:23
  58:1

**identify** 67:13
**iii** 2:4
**immediately** 63:19
**important** 4:21
  64:13 69:5,6
**imported** 26:7 28:16
**including** 27:9
**incorporate** 67:17
  67:18,20 68:25
**incorporated** 46:19
**incorporating** 68:5
**incorporation** 3:16
  45:21 46:23 47:8
  49:18 54:7
**incorporations** 59:1
**incorrect** 58:2
**indicating** 16:6
  63:11
**indication** 54:25
**industry** 26:18
  27:15,22 28:4
**information** 18:24
  23:7,8 24:3 58:1,6
  58:10 64:2 65:9
  67:3,8
**injury** 16:7
**installed** 42:24
**instruct** 6:6
**instructs** 6:5
**insurance** 70:22,23
  70:24
**intended** 68:18
**interest** 5:18 26:22
  53:14
**interested** 56:4
  74:12
**internet** 55:22
**involved** 6:13,16
  7:17 70:19
**irs** 69:18
**issue** 5:19 22:15
  32:6 58:25 65:1

Veritext Legal Solutions
866 299-5127

[james - maretta]

## j

**james** 11:23,25 12:7
**jesus** 27:14,18 28:3
41:15,18 42:2,12,19
42:23 43:1,5,11
44:20 45:3,10 46:23
51:21 53:1,21 54:2
54:19 55:1,18,24
56:5,9 59:7,12
60:25 61:12 62:2
67:17,25 68:18,25
70:10,15,19
**jim** 17:3,4
**jimmy** 12:20
**job** 13:5,21
**judicial** 6:14
**june** 45:20
**junior** 11:1,4,15

## k

**k** 17:14
**keep** 22:21 24:20
31:2 64:8
**kennedy** 1:17
**kerney** 2:4 6:3 8:7,9
8:13,19,24 9:2,5,7
9:21 23:1 42:6 51:9
51:11,14 53:3 55:2
62:21 66:11 72:1,6
72:9,11
**kids** 36:19 44:17,18
56:2 71:5
**kind** 7:22 10:1
11:16 13:19 25:22
25:23 27:6 28:5
30:3 44:20 49:12
55:14 62:12 64:12
69:21 70:11,19
**kinds** 56:13
**kitchen** 37:24
**knew** 21:13
**knot** 28:9,11,11
**know** 5:19 9:19 10:1
10:23,24 12:5 19:7
19:9,11,12,24,25

22:5 23:2 25:2,7
26:15 27:1,1 29:9
29:10,11,17,21,24
30:7,16 31:22 34:16
35:2,10,16 36:5,16
36:17,17 37:15,20
39:6,11,15,17,19,21
39:22,25 40:3,20,20
41:4,4,5,8 43:10
46:24 49:3 50:1,7
53:5 57:12 58:21
60:3,5,15,16,17
61:2 62:3,11 63:16
63:24 64:7,14 66:4
66:22 69:10
**knowledge** 39:14
67:7
**knows** 35:17

## l

**l** 17:14,15
**lady** 35:5 36:8,10,11
**landline** 26:7 28:17
28:21 35:2 39:10
42:23 65:19,20,20
**landlord** 70:24
**largo** 18:4 27:14,18
28:3 41:15,18 42:1
42:12,16,18,23 43:1
43:5,11 44:20 45:3
45:9 46:23 48:10
51:21 53:1,21 54:2
54:19 55:1,18,24
56:5,9 59:7,12
60:25 61:12 62:2
67:17,25 68:18,25
70:10,14,19
**late** 65:17
**law** 24:6 47:1 69:13
**laws** 75:2
**lawsuit** 7:24
**lawsuits** 7:22
**lawyer** 6:3 34:25
40:25 51:2

**lawyers** 8:6 64:15
65:24 69:16
**learn** 12:21
**leave** 52:9 58:24
65:8
**left** 11:15 16:17,24
30:24 32:15,17 33:6
49:14 61:15
**letter** 34:13 35:25
45:17
**librarians** 10:24
**library** 10:22
**license** 67:22
**licenses** 11:12
**life** 21:21
**line** 45:19
**lisa** 2:13 4:13 42:6
**list** 15:13
**listed** 47:9,11,14,24
**litigation** 6:14 70:20
**little** 7:7 14:10 52:20
57:9,10
**live** 18:1,3,4,5,8
48:9 58:12
**lived** 48:10 61:6,24
**lives** 18:9
**living** 61:22
**loan** 19:17 21:20,21
38:15
**loans** 19:5,13,22
20:4,9 21:22 38:5
39:13,15,18 40:4,15
71:3,11
**locate** 38:8,9
**located** 10:19
**location** 42:13,15,18
42:24
**log** 22:21
**long** 7:15 8:19 11:5
13:11 14:20 15:17
16:5 17:7 20:8 26:7
28:22 40:1 48:7
63:6,8 65:15,21
**longer** 61:21

**look** 9:13 23:13
35:22 45:1,22 46:2
46:22 50:24 51:6
52:6,7,18,21,22
54:9,11 57:3,6,17
57:21 64:10
**looked** 69:24
**looking** 51:17 55:2
57:18 64:16,23
**looks** 45:19 50:17
50:19 52:19
**los** 2:17
**lot** 10:23 30:24 43:9
56:12 59:9,9 62:4
**loud** 4:21,25
**love** 29:18 44:6,9,13
44:16 70:4
**lsimonetti** 2:19
**lucie** 18:2,9 60:18
**luckey** 17:14,20
18:1 47:7,8,11
53:11 58:14,14
60:11,23
**luckey's** 58:21

## m

**m** 2:13 17:14,14,15
17:15,15
**ma'am** 35:8 72:11
**machines** 16:3
**mail** 62:15,17
**mailbox** 55:11
**mailing** 56:11
**making** 29:16 30:1
47:4
**manager** 17:3
**march** 26:6 28:15
37:14 65:17
**marcy** 17:14 47:11
58:14
**maretta** 17:14 21:5
21:8,10,14,16,17
46:12 47:14,20
50:20 53:12 62:14
67:15

Veritext Legal Solutions
866 299-5127

[maretta's - okay]

maretta's  58:22
mark   23:10 45:13
  52:10
marked   3:14 23:11
  45:14,19 48:18
  50:12 52:16 56:25
married   17:16,18
  61:8,9,19
matter   7:15 44:14
  63:22
matters   59:3
mccaskill   1:4,13 3:2
  4:6,11 6:13 10:4
  17:11 23:14 27:5,24
  28:5 41:10 42:11
  45:18,23 47:16,23
  48:22 51:17 57:25
  59:12,20 62:25 65:8
  67:2 71:23 73:7
  74:6 75:12
mccaskill's   28:13
mean   15:14 23:5
  40:23 46:16 66:25
meaning   39:18
means   44:7
mechanical   10:18
meet   4:12 8:5,7,9,13
  8:19
meetings   59:20
melissa   17:15 24:9
  24:15,16,23
members   44:18
  48:15
mention   44:2
mentioned   15:23
  30:2 63:2,9
message   21:10
  29:10 65:5,7,15,18
messages   31:2,8
  32:20 33:6 59:14
messenger   21:12
  33:23,25
met   8:6 9:9
middle   1:2

midstream   52:19
miles   60:19
mine   16:22 47:2
  54:4
minister   11:19,22
ministries   12:21
ministry   26:10,11
  26:12,14 27:2,3,4,5
  27:24 28:6 59:10
  60:6 68:1 69:13
minute   42:7 66:2
minutes   8:20 9:10
  9:11 52:18 62:19
mom   36:21
moment   14:3
moments   28:15
monday   12:16,22
money   41:16 50:2
  53:16 68:19 70:14
month   36:13 43:22
months   20:12,15,17
  23:23 25:16 46:1,7
moon   27:23 28:4
moon's   27:4
morgan   2:5,5 34:23
  34:23 35:19,19 64:4
  64:4
morning   7:13
motion   16:7
mouth   44:22
move   16:13 50:20
moved   11:2 53:10
  58:17 61:16,17
myra   45:18 65:8

n

n   3:1 10:13 17:15,15
name   4:12 8:10 24:4
  24:23 25:1,6 47:6,7
  50:3 54:17 55:8
  56:14,15 63:4
named   29:4 34:5
names   17:13,18
nancy   1:21 73:19
  74:5,21

nature   6:19
navient   1:7,9 40:8
  40:11,13,17,18,21
  40:25 41:3,6 65:23
  66:21 67:2,14
nearly   34:24
necessary   66:3
need   5:20,24 6:7
  21:9,10 28:21 30:5
  35:12,16 36:23 49:3
  59:15 60:2 67:20
needed   13:10 67:18
  69:19
needs   60:3
nerves   71:18
never   4:16 21:21
  27:16 53:13 61:8,17
  61:24 62:1,1 65:2
  65:13 69:21,23 71:3
newsome   8:17 17:14
  17:22 18:3,15 19:1
  19:4,21 21:5 30:15
  30:19 36:2,6 37:17
  43:24 47:14,20
  59:24 61:5,24 62:2
  62:5 67:15 70:3,25
  71:10
newsome's   19:17
  20:4 21:8
nice   36:10
night   11:7 71:21
night's   71:19
nine   31:8
nod   4:23
noise   37:25
non   46:24 68:8,10
  68:16
normal   57:21
north   2:6
notary   1:23 73:21
  74:5
notes   21:25 22:3,6,9
  22:12,14,19 29:4,7
  29:13,16 30:1,2,5
  30:20 63:9,14,17,20

64:6
notice   50:6
number   9:1,13,14
  21:8,14,15,16,17
  23:11 24:13,13,25
  25:4,4,13,15,20
  26:2,5,9 28:13,16
  28:16,23 29:1 30:9
  30:19 32:25 33:2
  39:7 43:2,3,6 45:6,9
  45:14 47:24,25
  48:18 50:12 52:16
  54:2,6,13,16 55:8
  55:17,23,25 56:6,10
  65:1,1,4,18
numbers   23:9 26:7

o

o   17:15,15
oakland   10:11 13:8
oath   3:8 73:1
object   9:2
objections   6:3
obligation   38:5,15
  39:12
occasion   46:2
occasions   6:16
  29:23
offered   55:21
offering   44:6,9,13
  44:16 59:21 70:4
office   13:8 14:4 17:3
  35:4,19 44:25
officers   49:14 53:21
  57:24 58:1,8 60:17
  61:2 69:25
official   73:10
oh   26:19 27:21 28:1
  41:13 66:14
okay   4:14,22,25 5:6
  6:1 9:23,24 10:3
  11:8 12:12 13:23
  21:3,4,8,25 27:13
  27:17,19,21 28:15
  30:1 31:4 32:1,7,9

[okay - profit]

32:11,25 35:13 37:7
38:11,14,17,24 40:2
42:23 44:3 45:25
48:21 50:8,24 51:1
51:13 52:3,10,15,25
53:14,19 55:6,7,11
56:4 57:5,9 58:11
58:18,20 59:11,13
59:18 60:13,14
61:11 63:1,20 64:4
67:10 68:8
**old**   17:20,21,22,24
22:5
**once**   18:16 34:24
52:7
**ones**   20:1 33:7 38:22
**ongoing**   12:25 13:2
**online**   56:8
**opens**   69:10,10
**opportunity**   4:12
**order**   67:24
**orders**   14:18 15:18
**ordinary**   29:15
**organization**   26:24
27:11 28:8 46:19
**original**   64:6 72:7
**outside**   15:7 25:2
44:24
**overall**   14:20
**owe**   66:3 71:6
**owed**   30:14
**owner**   70:17
**ownership**   26:22

**p**

**p.c.**   2:14
**p.m.**   1:15,15 72:5
**page**   3:3 24:4 46:22
47:23 54:11 55:7
67:11
**pages**   1:25 45:16
55:23
**paid**   15:15,15 27:8,9
70:3,4

**paint**   56:2
**pamphlets**   26:15
**paper**   22:20 40:21
40:22,22,24 66:23
66:25
**papers**   57:23 64:13
**pardon**   46:5
**parent**   71:8
**park**   2:15
**part**   24:19 41:23
67:21
**particular**   6:19
12:19
**parties**   74:10,11
**parts**   31:11 57:1
**pasting**   57:20,20
**pastor**   43:12,12
60:24
**pay**   15:12,16 24:16
24:18,19,19,20 35:7
35:10 36:23 38:3,5
41:25 44:12 49:5
50:1 70:5,7,10
**payment**   15:14
19:11 38:12
**penalty**   75:1
**pending**   5:21
**people**   12:15,19
15:14,15,16 26:13
26:16 29:17,21 43:4
43:10,18 56:18,23
65:25 66:4 71:2
**performances**   44:4
44:5
**period**   14:11 18:19
18:22 27:12 31:22
36:13 61:25 64:25
**periods**   31:24
**perjury**   75:1
**permanent**   42:20
58:16
**person**   19:24,25
21:11 29:24 56:17
65:25 69:10

**personal**   41:13,14
54:15,17 56:10
70:14
**personally**   73:7
**persons**   48:12 49:17
51:23 53:20 63:25
**pete**   11:1,3,4,5,15
**phillips**   17:3,5
**phone**   2:8,18 3:15
18:14,17 19:16 21:5
21:8,14,15,16,17,18
21:20,24 22:24 23:7
24:2,11,13,14,21,23
24:25 25:1,4,5,8,13
25:15,18,20 26:8
28:13,17 29:1,16,17
29:20,24 30:9,13,18
31:2,7 32:3 33:11
34:18 35:2,6 36:12
37:4 38:10,22,24
39:1,10,12 41:24
45:6,9 47:25 54:2,4
54:6,13,16 55:8,17
55:23,25 56:6,10
63:6,17 64:25 65:10
65:15
**physical**   42:2,12,18
42:24
**piano**   43:24 44:2
59:25 70:3
**piece**   57:11
**pitts**   17:4,4,8
**place**   1:16 16:1 30:6
53:10
**plaintiff**   1:5 2:3
**plan**   24:5,7 25:6
**play**   61:1
**playing**   59:24
**plays**   43:24
**please**   5:3 31:4
60:12
**plus**   43:9
**point**   6:11 9:19
30:22 37:9 38:11
42:1 43:19,21 51:11

54:20,22 61:5,21
**popular**   44:25
**port**   18:2,9 60:18
**position**   14:13 15:2
27:8,9 58:21
**positions**   58:19
**possession**   9:4,16
22:15
**possible**   4:18 30:13
63:25
**post**   44:25
**pot**   44:11
**power**   7:3,4 13:25
14:13,18,20 15:5
16:22 41:22 70:11
**practice**   29:15
**preach**   43:16,17
61:3
**prefer**   52:8
**prepare**   8:2 46:10
46:25 49:24
**present**   8:15
**president**   27:7,25
28:3 47:16,18
**pretty**   52:8 60:20
**previous**   66:16
**price**   2:14
**primarily**   27:23
**principal**   13:10
**print**   50:3 58:25
**printed**   50:22 60:2
**prior**   26:4 46:19
48:9
**privy**   23:3,5
**probably**   16:11
33:17 52:21 63:7,21
71:2
**proceedings**   6:17
7:20
**process**   6:10,14
12:25 13:2 68:4
**product**   9:3
**professional**   11:11
**profit**   46:24 68:8,10
68:16

Veritext Legal Solutions
866 299-5127

[program - see]

**program** 12:2,18
**programs** 60:2
**progress** 7:3,8,8
  16:21
**proper** 47:4
**provide** 6:8 23:8
  51:1
**provided** 9:17,18
**public** 1:23 26:25
  73:21 74:6
**purpose** 25:12,21,22
  25:23 49:1 69:7,8
**purposes** 25:11
**put** 16:15 44:10,23
  50:21 54:1 56:13
  59:10 60:9 70:14
**putting** 46:15 57:16
  57:18,19

**q**

**question** 5:3,21 6:5
  6:7 31:4,5,6 38:23
  53:4 55:4 66:16,17
**questions** 5:15 6:4
  9:25 34:19 39:25
  52:8
**quick** 4:18
**quickly** 4:12
**quite** 10:23

**r**

**reach** 19:2
**read** 23:18 31:5,6
  57:1 66:15,16 72:6
**reading** 21:25
**reads** 62:3
**ready** 66:12
**real** 11:13
**really** 36:4 50:17
  53:14,17 59:3 66:17
**reason** 5:9 17:6,9
  18:23 23:24 25:9
  33:25 43:8 68:7
  69:4 71:17
**reasons** 68:24

**recall** 61:10
**receive** 20:8 31:17
  32:13 37:4
**received** 20:16 21:4
  26:9 30:9,13,23
  31:13 32:19 33:10
**receives** 44:4,16
**receiving** 19:20
**recess** 42:9
**recognize** 45:23
  48:22 50:16 51:18
**recollection** 32:15
  65:11,12
**record** 29:23 51:9
  51:15 56:6 62:22,25
  72:2,4 74:7
**recorder** 65:20
**records** 29:20
**reflected** 24:24 50:9
  58:6,10
**reflecting** 9:13
**reflects** 49:17
**regarding** 58:1
**registered** 47:21
  67:1
**regular** 18:20 24:21
**regularly** 18:13
**relate** 19:16 22:15
**related** 24:11
**relates** 25:5
**relative** 74:10,11
**remainder** 15:20
**remember** 7:11,12
  11:6 16:25 17:1
  21:1,3 30:7,16
  31:12 32:3 33:9
  34:10 37:1 38:7
  63:3,15 65:19,21
  67:12
**reminder** 49:12,13
**renew** 46:9 50:8
**rent** 41:20 70:5,7
**rep** 14:17 15:3
**repeat** 66:13

**repetitive** 16:7
**report** 3:15,17,18
  48:25 51:20 74:6
**reported** 1:21
**reporter** 1:22 3:9
  4:1,19 66:14 72:10
  73:20 74:5,21
**reporter's** 74:1
**reporting** 52:15
**reports** 3:19 52:11
  52:25 53:25 57:4
**represent** 4:13 44:8
**representative**
  14:15
**request** 49:11
**requested** 74:7
**required** 69:11
**requirements** 39:23
  40:4
**residence** 26:5 48:3
  48:5,7
**respect** 29:15 30:14
  33:5 39:12 51:24
  53:1 58:5 60:25
**response** 6:8
**responsibilities** 13:9
  13:18 14:16
**responsibility** 15:9
**responsible** 27:23
  70:25
**result** 4:20
**retired** 17:10
**review** 8:21,23
  23:24 50:14 52:20
  74:7
**rid** 26:6
**right** 4:19 9:9,11
  12:23 16:10 17:20
  18:1,3,5,5,8 19:18
  28:17 30:4 31:15,16
  34:19,20 37:10
  38:15,16 39:16
  42:13,14 44:10,25
  45:1,1,21 46:9 47:5
  47:10,13,15,17,22

  49:19 51:25 52:14
  54:2 56:20,22 57:7
  57:8,17,24 58:3,4
  58:16,23 59:23
  61:17 63:11 64:9
  65:14 66:1,21 68:1
  68:17,20,23 70:18
**ring** 34:3,12,20
**role** 27:5 60:11,23
  60:25
**roles** 52:1
**rooms** 42:21
**rules** 4:17

**s**

**s** 3:13 10:13 17:15
  42:16 58:22
**s.w.** 48:10
**safe** 28:25 41:5
**salary** 69:22,25
**sand** 26:10,11,12,17
  27:15,22 28:4,5
**saturdays** 66:2
**saw** 45:25 46:7 64:6
**saying** 46:7 51:5,6
  63:15,16
**says** 35:8 39:9 45:19
  45:20 49:14 54:15
**school** 10:6,8,10,11
  12:6 13:4,8,11 14:4
  36:12
**science** 10:22
**screen** 35:15
**scripture** 62:3
**seal** 73:10
**search** 56:8
**second** 51:9 72:3
**seconds** 63:7
**secretary** 35:6 45:17
  46:12 47:9,14,22
  49:7 50:20,22 53:1
  53:11,12 59:5
**see** 5:7 15:11 16:11
  18:15 20:15 21:7
  23:23 24:1 36:19

Veritext Legal Solutions
866 299-5127

[see - tampa]

45:1 46:6 47:24
49:15 51:2,7 53:11
54:11 55:21 58:15
60:14 61:15 62:20
**seen** 17:7 23:20,22
25:3
**sell** 13:19
**send** 49:13 50:3
**sending** 34:13 49:9
**sense** 62:20
**sent** 35:23 50:6,7
55:15,15
**separately** 52:7
**serves** 53:15,18
**service** 14:15,17
15:2,6 42:22 56:16
60:1 69:1
**services** 43:21,25
45:4,5 55:21 56:5
59:22,23 70:3
**servicing** 39:22 40:3
**setting** 7:13
**seven** 20:14
**sheets** 15:11 22:20
**sic** 52:4
**sick** 25:19
**side** 49:14
**sign** 45:2,4,10 50:3
60:3
**signature** 49:22
52:3 73:18 74:20
**signed** 35:1
**signs** 44:21,23
**simonetti** 2:13 3:4
4:10,13 9:4,6,8 23:4
23:10,12 31:5,10
42:8,10 45:13,15
48:19 50:11,13
51:10,13,16 52:17
53:7 55:3,5 62:19
62:24 66:14,18
71:22 72:2,7
**simple** 52:8
**sing** 61:4

**singing** 44:2
**sings** 44:1
**sitting** 4:19 7:13
**six** 20:12 45:16
**sleep** 71:19,20
**small** 23:19 70:17
**smaller** 59:13
**solutions** 1:7 40:8
40:13,18,21,25
65:23 66:21 67:2
**somebody** 29:10,18
57:22 66:7
**somebody's** 57:20
**someone's** 56:4
**son** 24:6 47:1 69:13
**soon** 29:5 37:7,8
**sorry** 6:21 9:9 23:5
42:3 47:6 50:18
58:13 60:22 66:6,14
**sort** 10:2 11:21,22
52:19
**sound** 16:9
**sounds** 70:17 71:8
**sources** 26:25
**space** 42:2
**speak** 4:21 5:2,4
18:13 20:24 29:18
34:11 37:22 38:1
**specific** 32:25 33:1
**spend** 59:7,12
**spent** 10:15 15:5,20
**spliced** 50:17,19
51:4,4
**spoke** 5:7 20:25
32:8 34:8 38:18
**spyglass** 23:15,17
**squiggly** 57:10
**st** 11:1,3,4,5,15,23
11:25 12:7 18:2,9
60:18
**staff** 28:4
**stamp** 45:19
**start** 13:7 68:14
71:20

**started** 14:4,14
16:12 37:4 41:3
**state** 1:23 31:4
45:17 49:7,11 52:19
53:1 67:21,22 73:3
73:21 74:3
**state's** 50:22
**statement** 64:2,5
**states** 1:1
**status** 19:5 68:14,15
69:4
**stay** 31:1
**stayed** 61:8,17
**stenographically**
74:6
**stop** 36:3 37:17,19
38:20 39:3,4
**stopped** 33:8 34:24
36:14 38:21 49:9
**storefront** 44:24
55:20
**straight** 59:2
**straightened** 38:2
**street** 2:6 18:5 48:2
48:10
**strike** 65:3 68:14
**structure** 49:20
69:14,24
**stubs** 16:4
**student** 1:7 11:7
19:5 21:20,21 66:9
71:3,10
**studied** 11:12
**studies** 11:9
**study** 12:13,16
59:14
**studying** 10:21
**stuff** 13:20 35:21,22
35:23 55:15 56:13
69:19
**submitted** 51:21
56:25 57:4
**subsequent** 34:1,18
**suggest** 38:1,19

**suggested** 38:4
**suing** 66:20
**suite** 1:18 2:16
**sunday** 43:22
**sundays** 66:2
**supervisor** 16:24
17:1
**supposed** 57:18 60:6
68:9
**sure** 4:18 10:3 21:6
25:24 26:2 35:21
36:25 37:12 42:8
47:4 51:8 54:9
56:19,24 62:13
65:17 67:10 68:4,4
70:18
**surgeries** 16:16
**surprised** 21:19
**swaggert** 12:20
**swartz** 1:21 73:19
74:5,21
**swear** 4:1
**sworn** 4:8 7:12 73:8

**t**

**t** 1:5 3:13 50:20
58:22,22
**take** 4:19,24 5:20
9:6 10:14 12:14
14:18 15:12 16:1
29:20 38:2 41:16
42:7 43:24 45:22
52:18,21,22 54:11
60:5,9,10 63:14,17
68:16 72:7
**taken** 4:15 42:9 44:8
**takes** 59:21
**talked** 19:4 33:7
48:16 59:25 69:18
**talking** 27:13,14,14
27:22 34:7,9 35:15
35:25 55:7 58:7,7
**tallahassee** 10:20
**tampa** 1:3,19 2:7

Veritext Legal Solutions
866 299-5127

[tav - wanted]

**tav** 8:10
**tax** 68:21 69:3
**taxes** 41:12,14
**tbm** 1:5
**teach** 43:15,15
**teenager** 61:7
**telephone** 19:17
  23:9 38:11 43:2,5
  63:2
**television** 12:9,10,14
**tell** 5:16 8:3 10:4
  21:1 26:25 29:10
  30:11 36:7,20 49:4
  60:8 62:14
**telling** 29:10 45:4
**tend** 4:23
**testified** 4:8
**testify** 62:4
**testimony** 4:2 5:10
  7:10 72:5 74:7
**thank** 51:14 71:23
**thanks** 45:12
**thing** 57:9 70:11
  72:10
**things** 4:24 5:19
  16:4 57:23
**think** 5:15 7:11 9:9
  9:25 13:12 19:23
  30:16,22,25 31:8,18
  31:18,24 32:22
  33:13 34:4,13 35:20
  35:20 37:13,14
  48:23 50:5 51:6,22
  58:2 59:3 61:10,14
  62:6,13 65:23 69:16
  70:11,25
**thinking** 55:3
**thinks** 44:4
**third** 43:22,23
**three** 13:12,14,17,23
  14:4,8 17:12 23:23
**tie** 28:8,10,11
**time** 1:15 5:2,14,20
  9:19 13:5,7 14:11
  15:20 16:13,17 17:7

18:19,22 19:20 22:3
22:9 23:9 24:12
27:12 28:22 30:22
31:7 32:19 33:10
37:16 38:17 39:9
42:1,12 43:19,21
45:25 46:2,4,6,20
48:2,9 49:25 50:6
50:10 52:22 54:20
54:22,24 59:7,9,9
59:11 61:5,11,14,21
61:25 62:10 63:12
63:13,14,18 64:6,25
70:16 71:7
**times** 56:15 58:17
**tired** 30:21
**title** 47:18
**today** 5:10 6:4 63:20
  64:16,23 71:24
**today's** 8:2
**told** 9:9 11:18 12:6
  21:6,9,11,13,16,21
  28:15 29:3 30:18
  32:22 33:22 34:5,14
  35:4 36:23 42:11
  53:17 57:22 58:2
  65:24 69:16,19
**top** 54:11
**total** 32:23
**touch** 55:22
**track** 24:20
**training** 11:21,22,24
  12:5,7,14
**transcript** 5:18 74:7
  74:7
**transferred** 11:1
**transients** 56:12
**treasurer** 47:12
  50:20 51:5 53:12
  59:4 60:14,15
**treatment** 68:21
  69:3
**trouble** 7:7
**troy** 47:7,8 53:11
  58:14,21

**troy's** 58:21
**true** 26:4 32:18
  47:20 52:2 53:12
  68:20 74:7 75:3
**truth** 4:3,3,3 8:3
**try** 5:3,4 39:25 45:8
**trying** 29:21 33:1
  38:8,9
**tv** 36:17
**twelfth** 48:10
**two** 10:6,14 11:8
  13:12,12 14:4 16:15
  18:16 26:4 31:11
  33:18 37:5,6 72:9
**type** 6:14 11:9,16
  12:8 16:7 26:17,22
  30:9 35:24 46:19
  63:12,13 64:15
**typed** 60:2 63:21,23
  64:1,17,19,21
**types** 11:12 13:9
  39:15
**typical** 69:14 71:8
**typing** 13:10

**u**

**u** 17:14
**uh** 4:24 12:11 14:6,9
  15:16 16:19 19:19
  29:6 37:3 47:10,13
  48:14 49:13,16 52:5
  52:24 54:12 55:10
  55:13,17 59:6 60:18
  64:22 65:6
**unable** 23:18
**undergo** 11:21,22
**undersigned** 73:6
**understand** 5:15,21
  6:8 9:12 12:25
  19:15 31:3 36:19,25
  38:4 40:13 44:15
  49:1 59:17 66:17
**understanding** 20:3
  34:21 35:8 40:7,10
  41:2 66:19 68:13,15

**understood** 41:2
  60:11 69:12
**uniform** 3:17,18,19
  48:25 51:20 52:10
**unique** 29:12
**united** 1:1
**units** 42:17
**university** 10:18
**usage** 3:15 24:12
**use** 13:2 16:3 25:8
  25:11 33:1,4 41:10
  41:13 43:3
**usually** 5:25 29:17
  55:19 56:2,17 59:21
  69:10
**ut** 4:24
**utilities** 41:20,21

**v**

**v** 1:6
**vague** 5:15
**validate** 16:4
**various** 59:19
**vedder** 2:14
**vedderprice.com**
  2:19
**veritext** 1:16
**versus** 40:25 67:2
**vice** 27:7,24 28:3
  47:16
**voice** 24:12 31:7
**voicemail** 32:15,17
  32:19 33:6 65:4,7
**voicemails** 30:24
  31:17 32:4,10,12

**w**

**w** 17:15 42:16
**waiting** 66:13
**want** 32:25 33:24
  36:25 42:4 45:22
  51:1 53:8 56:8
  58:24 59:8 60:6,16
  67:10 69:1 71:16
**wanted** 24:1 25:18
  53:5 55:21 56:1

Page 11

**[wanted - yesterday]**

68:6,24
**wants**  25:12 62:3
**way**  55:14 60:13
  67:15
**we've**  27:16 56:25
**website**  50:23 58:25
**week**  18:16 33:17
**weeks**  13:15,17,23
  14:8 18:16 37:5,6
**welcome**  56:18,23
**went**  9:12 10:6 12:2
  34:23 36:12 55:22
**west**  1:17
**wife**  47:11
**wigglies**  57:10
**willie**  1:4,13 3:2 4:6
  45:18 66:11 67:2
  73:7 74:6 75:12
**wireless**  28:20,21
**witness**  3:2 4:5,6
  7:24 9:4 73:10 74:8
**woman**  29:4
**wondered**  34:25
**wondering**  36:11
**word**  4:20,20 12:13
  12:16 44:21 65:12
  65:12
**words**  4:21 65:22,24
  66:8 68:18
**work**  6:20,22 9:3
  13:11,13,23 14:11
  14:20 15:17 28:5,8
  43:11,13 62:12
**worked**  13:14,25
  14:8 15:6 27:11,16
**workers**  6:23
**working**  11:7 13:7
  14:4 59:7,12 62:8
  62:10 67:13
**works**  36:12
**world**  13:14,16,17
  13:18,24 14:8
**write**  22:19
**writing**  22:17

**written**  64:18,18
**wrong**  21:11 28:1,2
  58:5,9 65:23 66:4
  66:10
**wrote**  21:3 63:16
  64:20

| x |
| --- |

**x**  3:1,13

| y |
| --- |

**y**  17:14
**yeah**  9:6 14:25
  16:15 22:7 31:4
  37:8 44:1 47:25
  49:23 51:3 54:4
  56:21,21,24 60:21
  61:14 63:15 64:24
  65:13
**year**  10:15,15 25:16
  46:9 49:2,5 50:1
  59:6,11 61:9 67:23
  69:2
**year's**  49:5
**years**  7:16 10:7,14
  11:8 13:12 14:5,22
  15:5,19 16:2 17:21
  26:1,2,4 28:24 48:8
**yellow**  55:23
**yesterday**  8:14
  11:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

N99000003575

To:   FLORIDA SECRETARY OF STATE
      Secretary of State
      Division of Corporations
      P.O. Box 6327
      Tallahassee, FL 32314

From: Willie Myra McCaskill
      1544 Crosby Street
      Largo, FL 33778
      727-581-6140

Date:

Re: .LARGO FOR JESUS CHRISTIAN CENTER, INC.

Enclosed please find:

XX____   Certificate of Incorporation
XX____   Check in the amount of $78.75.

700002878437--2
  --05/18/99--01034--003
   ****78.75  ****78.75

Please take the following action:

XX____   File in your office on an expedited basis.
XX____   Issue Certified Copy.
XX____   Return Regular Mail.

      Thank you for your assistance in this matter.  If there are
any problems or questions with this filing, please contact me.



EXHIBIT
2
12/16/15 ml.

FINGERO 800-631-6989

FILED
99 JUN 10 PM 2: 05
SECRETARY OF STATE
TALLAHASSEE, FLORIDA.





Ŧ BROWN  JUN 1 0 1999



## FLORIDA DEPARTMENT OF STATE
### Katherine Harris
#### Secretary of State

May 21, 1999

WILLIE MYRA MCCASKILL
1544 CROSBY STREET
LARGO, FL 33778

SUBJECT: LARGO FOR JESUS CHRISTIAN CENTER, INC.
Ref. Number: W99000011929

We have received your document for LARGO FOR JESUS CHRISTIAN
CENTER, INC. and your check(s) totaling $78.75.  However, the enclosed
document has not been filed and is being returned for the following correction(s):

The person designated as incorporator in the document and the person signing
as incorporator must be the same.

Please return your document, along with a copy of this letter, within 60 days or
your filing will be considered abandoned.

If you have any questions concerning the filing of your document, please call
(850) 487-6933.

Teresa Brown
Corporate Specialist

Letter Number: 099A00028185

Division of Corporations - P.O. BOX 6327 - Tallahassee, Florida 32314

FILED
99 JUN 10 PM 2: 05
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

ARTICLES OF INCORPORATION

OF

LARGO FOR JESUS CHRISTIAN CENTER, INC.

A NONPROFIT CORPORATION

We, the undersigned, with other persons being
desirous of forming a nonprofit corporation, under the
provisions of Chapter 617 of the Florida Statutes, do
agree to the following:

ARTICLE I.

The name of the corporation shall be:

LARGO FOR JESUS CHRISTIAN CENTER, INC.

The address of the principal office of this corporation
shall be 1544 Crosby Street, Largo, FL 33778 and the mailing
address of the corporation shall be the same.

ARTICLE II.

Said corporation is organized exclusively for
charitable, religious, educational, literary and scientific
purposes within the meaning of section 501(c)(3) of the
Internal Revenue Code of 1986 or the corresponding provision
of any future United States Internal Revenue Law.

Notwithstanding any other provision of these articles,
this corporation will not carry on any other activities
not permitted to be carried on by an organization exempt

from Federal income tax under section 501(c)(3) of the
Internal Revenue Code of 1954 or the corresponding
provision of any future United States Internal Revenue Law.

In the event of dissolution, the residual assets of
the organization will be turned over to one or more
organizations which themselves are exempt as organizations
described in sections 501(c)(3) and 170(c)(2) of the
Internal Revenue Code of 1954 or corresponding sections
of any prior or future Internal Revenue Code, or to the
Federal, State, or local government for exclusive public
purpose; and to engaging in preaching and teaching the
the gospel of Jesus Christ and operating in all areas
of ministry.

### ARTICLE III.

The manner in which the directors are to be elected
or appointed is as stated in the bylaws.

### ARTICLE IV.

The name and address of the incorporator of these
Articles is:

             Willie Myra McCaskill
             1544 Crosby Street
             Largo, FL 33778

### ARTICLE V.

This corporation is to exist perpetually.

*Willie Myra McCaskill*
Incorporator

*Notary Public: Lucy S. Knapp*
*June 7, 1999*
*State of Florida*
*Pinellas County*

OFFICIAL NOTARY SEAL
LUCY S KNAPP
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC547393
MY COMMISSION EXP. APR. 14,2000

ARTICLE VI.

The names and addresses of the initial officers of the corporation who shall hold office for the first year of the corporation, or until their successors are elected or appointed are:

Willie Myra McCaskill          1544 Crosby Street
President                      Largo, FL 33778

Malachi McCaskill, Jr.         1544 Crosby Street
Vice-President                 Largo, FL 33778

Maretta Newsome               1842 12th Street, S.W.
Secretary                     Largo, FL 33778

Marcy Luckey                  302 S.W. East Port Circle
Treasurer                     Port St. Lucie, FL 34953

Troy D. Luckey                302 S.W. East Port Circle
Financial Secretary           Port St. Lucie, FL 34953

ARTICLE VII.

The street address of the initial registered office of the corporation shall be 1842 12th Street, S.W., Largo Florida 33778, and the name of the initial registered agent of the corporation at that address is Maretta Newsome.

IN WITNESS THEREOF, the undersigned has hereunto set their hand and seal on May 7, 1999.

By: _Maretta Newsome_
    Maretta Newsome          Registered Agent

MARIZA BUDNEY
MY COMMISSION # CC 758682
EXPIRES: July 12, 2002
Bonded Thru Notary Public Underwriters

<u>ACCEPTANCE OF REGISTERED AGENT DESIGNATED</u>
<u>IN ARTICLES OF INCORPORATION</u>.

Maretta Newsome, having a business office identical
with the registered office of the corporation named above,
and having been designated as the Registered Agent in the
above and foregoing Articles, is familiar with and accepts
the obligations of the position of Registered Agent under
Section 607.0505, Florida Statutes.


By: _Maretta Newsome_
    Maretta Newsome

MARITZA BUDNEY
MY COMMISSION # CC 758662
EXPIRES: July 12, 2002
Bonded Thru Notary Public Underwriters

## 2000 UNIFORM BUSINESS REPORT (UBR)

4/5.

**DOCUMENT # N99000003575**

1. Entity Name

LARGO FOR JESUS CHRISTIAN CENTER, INC.

| Principal Place of Business | Mailing Address |
|---|---|
| 1544 CROSBY STREET LARGO FL 33770 | 1544 CROSBY STREET LARGO FL 33770-1728 |

| 2. Principal Place of Business | 3. Mailing Address |
|---|---|
| Suite, Apt. #, etc. | Suite, Apt. #, etc. |
| City & State | City & State |
| Zip    County | Zip    County |

**FILED**
**May 11, 2000 8:00 am**
**Secretary of State**

05-11-2000 90322 031 ****8.75
04-05-2000 90111 025 ****61.25

DO NOT WRITE IN THIS SPACE

4. FEI Number  59-3591095   ☐ Applied For  ☐ Not Applicable

5. Certificate of Status Desired ☐  ☑ $8.75 Additional Fee Required

6. Name and Address of Current Registered Agent

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO FL 33770

7. Name and Address of New Registered Agent

Name —
Street Address (P.O. Box Number is Not Acceptable)
City                    FL    Zip Code

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the state of Florida.

SIGNATURE _____

FILE NOW!
FEE IS $61.25

9. Election Campaign Financing Trust Fund Contribution. ☐   $5.00 May Be Added to Fees

Make Check Payable to "Department of State"

| 10. OFFICERS AND DIRECTORS | 11. ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS IN 10 |
|---|---|
| TITLE P  NAME MCCASKILL, WILLIE M  *DT*  STREET ADDRESS 1544 CROSBY STREET  CITY-ST-ZIP LARGO FL 33770 | ☐ Delete | ☐ Change ☐ Addition |
| TITLE V  NAME MCCASKILL, MALACHI JR.  *DT*  STREET ADDRESS 1544 CROSBY STREET  CITY-ST-ZIP LARGO FL 33770 | ☐ Delete | ☐ Change ☐ Addition |
| TITLE S  NAME NEWSOME, MARETTA  *T*  STREET ADDRESS 1842 12TH STREET, SW  CITY-ST-ZIP LARGO FL 33770 | ☐ Delete | ☐ Change ☐ Addition |
| TITLE T  NAME LUCKEY, MARCY  STREET ADDRESS 302 SW EAST PORT CIRCLE  CITY-ST-ZIP PORT ST. LUCIE FL 34953 | ☐ Delete | ☐ Change ☐ Addition |
| TITLE S  NAME LUCKEY, TROY D  STREET ADDRESS 302 SW EAST PORT CIRCLE  CITY-ST-ZIP PORT ST. LUCIE FL 34953 | ☐ Delete | ☐ Change ☐ Addition |
|  | ☐ Delete | ☐ Change ☐ Addition |

12. I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

SIGNATURE: WILLIAM MCCASKILL / MALACHI MCCASKILL    4-2-00    (727) 581-6140



EXHIBIT
3
12/16/15 M

PENGAD 800-631-6989

# 2001 UNIFORM BUSINESS REPORT (UBR)

**FILED**
## Apr 06, 2001 8:00 am
## Secretary of State
04-06-2001 90028 002 ****70.00

**DOCUMENT #  N99000003575**

**1. Entity Name**

**LARGO FOR JESUS CHRISTIAN CENTER, INC.**

| Principal Place of Business | Mailing Address |
|---|---|
| 1544 CROSBY STREET<br>LARGO FL 33778 | 1544 CROSBY STREET<br>LARGO FL 33778 |

**D0032199**

DO NOT WRITE IN THIS SPACE

| 2. Principal Place of Business | 3. Mailing Address |
|---|---|
| Suite, Apt. #, etc. | Suite, Apt. #, etc. |
| City & State | City & State |
| Zip   Country | Zip   Country |

**4. FEI Number**  59-3591095  — Applied For / Not Applicable

**5. Certificate of Status Desired**  ☑  **$8.75** Additional Fee Required

**6. Name and Address of Current Registered Agent**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO FL 33778

**7. Name and Address of New Registered Agent**

Name

Street Address (P.O. Box Number is Not Acceptable)

City    FL    Zip Code

**8.** The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the state of Florida.

SIGNATURE

Signature, typed or printed name of registered agent and title if applicable.    (NOTE: Registered Agent signature required when reinstating)    DATE

**FILE NOW:**
**FEE IS $61.25**

**9.** Election Campaign Financing
Trust Fund Contribution. ☐  **$5.00** May Be Added to Fees

**Make Check Payable to Department of State**

| **10.** | OFFICERS AND DIRECTORS | | **11.** | ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS IN 10 | | |
|---|---|---|---|---|---|---|
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | DT<br>MCCASKILL, WILLIE M<br>1544 CROSBY STREET<br>LARGO FL 33778 | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Change | ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | DT<br>MCCASKILL, MALACHI JR.<br>1544 CROSBY STREET<br>LARGO FL 33778 | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Change | ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | T<br>NEWSOME, MARETTA<br>1842 12TH STREET, SW<br>LARGO FL 33778 | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Change | ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | T<br>LUCKEY, MARCY<br>302 SW EAST PORT CIRCLE<br>PORT ST. LUCIE FL 34953 | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Change | ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | S<br>LUCKEY, TROY D<br>302 SW EAST PORT CIRCLE<br>PORT ST. LUCIE FL 34953 | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Change | ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | | ☐ Change | ☐ Addition |

**EXHIBIT**
**4**
12/16/15 nk

**12.** I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

**SIGNATURE:**  WILLIAM McCaskill P/WILLIAM McCaskill    4-3-01    (727) 581-6140
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR    Date    Daytime Phone #

# 2002 UNIFORM BUSINESS REPORT (UBR)

## FILED
## Apr 16, 2002 8:00 am
## Secretary of State
04 16 2002 90124 018 ****70.00

**DOCUMENT # N99000003575**

1. Entity Name

**LARGO FOR JESUS CHRISTIAN CENTER, INC.**

| Principal Place of Business | Mailing Address |
|---|---|
| 1544 CROSBY STREET<br>LARGO FL 33778 | 1544 CROSBY STREET<br>LARGO FL 33778 |

**EXHIBIT**

**5**

12/14/15 nh

DO NOT WRITE IN THIS SPACE

| 2. Principal Place of Business | 3. Mailing Address |
|---|---|
| Suite, Apt. #, etc. | Suite, Apt. #, etc. |
| City & State | City & State |
| Zip | Country | Zip | Country |

4. FEI Number  NOT APPLICABLE | Applied For / Not Applicable

5. Certificate of Status Desired ☒ | $8.75 Additional Fee Required

| 6. Name and Address of Current Registered Agent | 7. Name and Address of New Registered Agent |
|---|---|
| NEWSOME, MARETTA<br>1842 12TH STREET, SW<br>LARGO FL 33778 | Name<br>Street Address (P.O. Box Number is Not Acceptable)<br>City ____ FL  Zip Code |

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the state of Florida.

SIGNATURE _____

Signature, typed or printed name of registered agent and title if applicable.   (NOTE: Registered Agent signature required when reinstating)   DATE

**FILE NOW: FEE IS $61.25**

9. Election Campaign Financing Trust Fund Contribution. ☐ | $5.00 May Be Added to Fees

Make Check Payable to Department of State

| 10. | OFFICERS AND DIRECTORS | | 11. | ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS IN 10 | |
|---|---|---|---|---|---|
| TITLE | DT | ☐ Delete | TITLE | | ☐ Change  ☐ Addition |
| NAME | MCCASKILL, WILLIE M | | NAME | | |
| STREET ADDRESS | 1544 CROSBY STREET | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL 33778 | | CITY-ST-ZIP | | |
| TITLE | DT | ☐ Delete | TITLE | | ☐ Change  ☐ Addition |
| NAME | MCCASKILL, MALACHI JR. | | NAME | | |
| STREET ADDRESS | 1544 CROSBY STREET | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL 33778 | | CITY-ST-ZIP | | |
| TITLE | T | ☐ Delete | TITLE | | ☐ Change  ☐ Addition |
| NAME | NEWSOME, MARETTA | | NAME | | |
| STREET ADDRESS | 1842 12TH STREET, SW | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL 33778 | | CITY-ST-ZIP | | |
| TITLE | T | ☐ Delete | TITLE | | ☐ Change  ☐ Addition |
| NAME | LUCKEY, MARCY | | NAME | | |
| STREET ADDRESS | 302 SW EAST PORT CIRCLE | | STREET ADDRESS | | |
| CITY-ST-ZIP | PORT ST. LUCIE FL 34953 | | CITY-ST-ZIP | | |
| TITLE | S | ☐ Delete | TITLE | | ☐ Change  ☐ Addition |
| NAME | LUCKEY, TROY D | | NAME | | |
| STREET ADDRESS | 302 SW EAST PORT CIRCLE | | STREET ADDRESS | | |
| CITY-ST-ZIP | PORT ST. LUCIE FL 34953 | | CITY-ST-ZIP | | |
| TITLE | | ☐ Delete | TITLE | | ☐ Change  ☐ Addition |
| NAME | | | NAME | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY-ST-ZIP | | | CITY-ST-ZIP | | |

CR2E037 (9/01)

12. I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

SIGNATURE: *Willstran McCaskill / Wilhemina McCaskill*   4-4-02   (727) 581-6140

SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR   Date   Daytime Phone #

# 2003 NOT-FOR-PROFIT CORPORATION
# UNIFORM BUSINESS REPORT (UBR)

**FILED**
## Mar 20, 2003 8:00 am
## Secretary of State

03-20-2003 90161 002 ****61.25

**DOCUMENT #** N99000003575

1. Entity Name
**LARGO FOR JESUS CHRISTIAN CENTER, INC.**

Principal Place of Business
1544 CROSBY STREET
LARGO FL 33778

Mailing Address
1544 CROSBY STREET
LARGO FL 33778

☐ CHECK HERE IF MAKING CHANGES

2. Principal Place of Business

3. Mailing Address

Suite, Apt. #, etc.

Suite, Apt. #, etc.

City & State

City & State

4. FEI Number **NOT APPLICABLE**     Applied For

Zip   Country

Zip   Country

☐ Not Applicable

5. Certificate of Status Desired ☐  **$8.75** Additional Fee Required

6. Name and Address of Current Registered Agent

7. Name and Address of New Registered Agent

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO FL 33778

Name

Street Address (P.O. Box Number is Not Acceptable)

City                        FL   Zip Code

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida. I am familiar with, and accept the obligations of registered agent.

SIGNATURE

Signature, typed or printed name of registered agent and title if applicable.    (NOTE: Registered Agent signature required when reinstating)    DATE

**FILE NOW: FEE IS $61.25**

9. Election Campaign Financing Trust Fund Contribution. ☐  **$5.00** May Be Added to Fees

Make Check Payable to Florida Department of State

| 10. | OFFICERS AND DIRECTORS | | 11. | ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS IN 10 | |
|---|---|---|---|---|---|
| TITLE | DT | ☐ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | MCCASKILL, WILLIE M | | NAME | | |
| STREET ADDRESS | 1544 CROSBY STREET | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL 33778 | | CITY-ST-ZIP | | |
| TITLE | DT | ☐ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | MCCASKILL, MALACHI JR. | | NAME | | |
| STREET ADDRESS | 1544 CROSBY STREET | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL 33778 | | CITY-ST-ZIP | | |
| TITLE | T | ☐ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | NEWSOME, MARETTA | | NAME | | |
| STREET ADDRESS | 1842 12TH STREET, SW | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL 33778 | | CITY-ST-ZIP | | |
| TITLE | T | ☐ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | LUCKEY, MARCY | | NAME | | |
| STREET ADDRESS | 302 SW EAST PORT CIRCLE | | STREET ADDRESS | | |
| CITY-ST-ZIP | PORT ST. LUCIE FL 34953 | | CITY-ST-ZIP | | |
| TITLE | S | ☐ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | LUCKEY, TROY D | | NAME | | |
| STREET ADDRESS | 302 SW EAST PORT CIRCLE | | STREET ADDRESS | | |
| CITY-ST-ZIP | PORT ST. LUCIE FL 34953 | | CITY-ST-ZIP | | |
| TITLE | | ☐ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | | | NAME | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY-ST-ZIP | | | CITY-ST-ZIP | | |

12. I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

**SIGNATURE:** Willism McCaskill Willie JR M McCaskill     3-17-03     (727) 581-6140
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR    Date    Daytime Phone #

## 2004 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

FILED
Feb 27, 2004
Secretary of State

DOCUMENT# N99000003575

Entity Name:  LARGO FOR JESUS CHRISTIAN CENTER, INC.

**Current Principal Place of Business:**          **New Principal Place of Business:**

1544 CROSBY STREET
LARGO, FL 33778

**Current Mailing Address:**          **New Mailing Address:**

1544 CROSBY STREET
LARGO, FL 33778

FEI Number:          FEI Number Applied For ( )          FEI Number Not Applicable (X)          Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**          **Name and Address of New Registered Agent:**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL 33778

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____
               Electronic Signature of Registered Agent          Date

**OFFICERS AND DIRECTORS:**          **ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

| | | |
|---|---|---|
| Title: | DT          ( ) Delete | Title: ( ) Change ( ) Addition |
| Name: | MCCASKILL, WILLIE M | Name: |
| Address: | 1544 CROSBY STREET | Address: |
| City-St-Zip: | LARGO, FL 33778 | City-St-Zip: |

| | | |
|---|---|---|
| Title: | DT          ( ) Delete | Title: ( ) Change ( ) Addition |
| Name: | MCCASKILL, MALACHI JR. | Name: |
| Address: | 1544 CROSBY STREET | Address: |
| City-St-Zip: | LARGO, FL 33778 | City-St-Zip: |

| | | |
|---|---|---|
| Title: | T          ( ) Delete | Title: ( ) Change ( ) Addition |
| Name: | NEWSOME, MARETTA | Name: |
| Address: | 1842 12TH STREET, SW | Address: |
| City-St-Zip: | LARGO, FL 33778 | City-St-Zip: |

| | | |
|---|---|---|
| Title: | T          ( ) Delete | Title: T          (X) Change ( ) Addition |
| Name: | LUCKEY, MARCY | Name: LUCKEY, MARCY |
| Address: | 302 SW EAST PORT CIRCLE | Address: 651 S.E. PRINEVILLE STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34953 | City-St-Zip: PORT ST. LUCIE, FL 34983 |

| | | |
|---|---|---|
| Title: | S          ( ) Delete | Title: S          (X) Change ( ) Addition |
| Name: | LUCKEY, TROY D | Name: LUCKEY, TROY D |
| Address: | 302 SW EAST PORT CIRCLE | Address: 651 S.E. PRINEVILLE STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34953 | City-St-Zip: PORT ST. LUCIE, FL 34983 |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes.  I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  WILLIE M. MCCASKILL                    DT          02/27/2004
               Electronic Signature of Signing Officer or Director          Date

# 2005 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

**DOCUMENT# N99000003575**

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

**FILED**
Feb 23, 2005
Secretary of State

| Current Principal Place of Business: | New Principal Place of Business: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

| Current Mailing Address: | New Mailing Address: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

FEI Number:          FEI Number Applied For ( )    FEI Number Not Applicable (X)    Certificate of Status Desired ( )

| Name and Address of Current Registered Agent: | Name and Address of New Registered Agent: |
|---|---|
| NEWSOME, MARETTA<br>1842 12TH STREET, SW<br>LARGO, FL 33778    US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                        Date

## OFFICERS AND DIRECTORS:

## ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:

| Title: | DT          ( ) Delete |
|---|---|
| Name: | MCCASKILL, WILLIE M |
| Address: | 1544 CROSBY STREET |
| City-St-Zip: | LARGO, FL 33778 |

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

| Title: | DT          ( ) Delete |
|---|---|
| Name: | MCCASKILL, MALACHI JR. |
| Address: | 1544 CROSBY STREET |
| City-St-Zip: | LARGO, FL 33778 |

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

| Title: | T          ( ) Delete |
|---|---|
| Name: | NEWSOME, MARETTA |
| Address: | 1842 12TH STREET, SW |
| City-St-Zip: | LARGO, FL 33778 |

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

| Title: | T          ( ) Delete |
|---|---|
| Name: | LUCKEY, MARCY |
| Address: | 651 S.E. PRINEVILLE STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34983 |

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

| Title: | S          ( ) Delete |
|---|---|
| Name: | LUCKEY, TROY D |
| Address: | 651 S.E. PRINEVILLE STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34983 |

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:   WILLIE M. MCCASKILL                    DT              02/23/2005

Electronic Signature of Signing Officer or Director                        Date

# 2006 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

**FILED**
Apr 24, 2006
**Secretary of State**

DOCUMENT# N99000003575

**Entity Name:** LARGO FOR JESUS CHRISTIAN CENTER, INC.

**Current Principal Place of Business:**

1544 CROSBY STREET
LARGO, FL 33778

**New Principal Place of Business:**

**Current Mailing Address:**

1544 CROSBY STREET
LARGO, FL 33778

**New Mailing Address:**

FEI Number:          FEI Number Applied For ( )     FEI Number Not Applicable (X)     Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL 33778    US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____
              Electronic Signature of Registered Agent                                     Date

**OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title: | DT          ( ) Delete |
| Name: | MCCASKILL, WILLIE M |
| Address: | 1544 CROSBY STREET |
| City-St-Zip: | LARGO, FL 33778 |

| | |
|---|---|
| Title: | DT          ( ) Delete |
| Name: | MCCASKILL, MALACHI JR. |
| Address: | 1544 CROSBY STREET |
| City-St-Zip: | LARGO, FL 33778 |

| | |
|---|---|
| Title: | T          ( ) Delete |
| Name: | NEWSOME, MARETTA |
| Address: | 1842 12TH STREET, SW |
| City-St-Zip: | LARGO, FL 33778 |

| | |
|---|---|
| Title: | T          ( ) Delete |
| Name: | LUCKEY, MARCY |
| Address: | 651 S.E. PRINEVILLE STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34983 |

| | |
|---|---|
| Title: | S          ( ) Delete |
| Name: | LUCKEY, TROY D |
| Address: | 651 S.E. PRINEVILLE STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34983 |

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

Title:          ( ) Change ( ) Addition
Name:
Address:
City-St-Zip:

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  WILLIE M. MCCASKILL                          DT                04/24/2006
              Electronic Signature of Signing Officer or Director                              Date

# 2007 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

**FILED**
Mar 13, 2007
**Secretary of State**

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

| Current Principal Place of Business: | New Principal Place of Business: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

| Current Mailing Address: | New Mailing Address: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

FEI Number:          FEI Number Applied For ( )          FEI Number Not Applicable (X)          Certificate of Status Desired ( )

| Name and Address of Current Registered Agent: | Name and Address of New Registered Agent: |
|---|---|
| NEWSOME, MARETTA<br>1842 12TH STREET, SW<br>LARGO, FL 33778   US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

## OFFICERS AND DIRECTORS:

| | | ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS: |
|---|---|---|

Title:      DT       ( ) Delete
Name:      MCCASKILL, WILLIE M
Address:    1544 CROSBY STREET
City-St-Zip:  LARGO, FL 33778

Title:      ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

Title:      DT       ( ) Delete
Name:      MCCASKILL, MALACHI JR.
Address:    1544 CROSBY STREET
City-St-Zip:  LARGO, FL 33778

Title:      ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

Title:      T       ( ) Delete
Name:      NEWSOME, MARETTA
Address:    1842 12TH STREET, SW
City-St-Zip:  LARGO, FL 33778

Title:      ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

Title:      T       ( ) Delete
Name:      LUCKEY, MARCY
Address:    651 S.E. PRINEVILLE STREET
City-St-Zip:  PORT ST. LUCIE, FL 34983

Title:      ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

Title:      S       ( ) Delete
Name:      LUCKEY, TROY D
Address:    651 S.E. PRINEVILLE STREET
City-St-Zip:  PORT ST. LUCIE, FL 34983

Title:      ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:   WILLIE M. MCCASKILL                    DT          03/13/2007

Electronic Signature of Signing Officer or Director                              Date

# 2008 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

FILED
Mar 30, 2008
Secretary of State

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

| Current Principal Place of Business: | New Principal Place of Business: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

| Current Mailing Address: | New Mailing Address: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

FEI Number:          FEI Number Applied For ( )          FEI Number Not Applicable (X)          Certificate of Status Desired ( )

| Name and Address of Current Registered Agent: | Name and Address of New Registered Agent: |
|---|---|
| NEWSOME, MARETTA<br>1842 12TH STREET, SW<br>LARGO, FL 33778   US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

## OFFICERS AND DIRECTORS:

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

| | OFFICERS AND DIRECTORS | ADDITIONS/CHANGES |
|---|---|---|
| Title: | DT          ( ) Delete | ( ) Change ( ) Addition |
| Name: | MCCASKILL, WILLIE M | |
| Address: | 1544 CROSBY STREET | |
| City-St-Zip: | LARGO, FL 33778 | |
| Title: | DT          ( ) Delete | ( ) Change ( ) Addition |
| Name: | MCCASKILL, MALACHI JR. | |
| Address: | 1544 CROSBY STREET | |
| City-St-Zip: | LARGO, FL 33778 | |
| Title: | T          ( ) Delete | ( ) Change ( ) Addition |
| Name: | NEWSOME, MARETTA | |
| Address: | 1842 12TH STREET, SW | |
| City-St-Zip: | LARGO, FL 33778 | |
| Title: | T          ( ) Delete | Title: T          (X) Change ( ) Addition |
| Name: | LUCKEY, MARCY | Name: LUCKEY, MARCY |
| Address: | 651 S.E. PRINEVILLE STREET | Address: 1650 S.W. DAY STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34983 | City-St-Zip: PORT ST. LUCIE, FL 34953 |
| Title: | S          ( ) Delete | Title: S          (X) Change ( ) Addition |
| Name: | LUCKEY, TROY D | Name: LUCKEY, TROY D |
| Address: | 651 S.E. PRINEVILLE STREET | Address: 1650 S.W. DAY STREET |
| City-St-Zip: | PORT ST. LUCIE, FL 34983 | City-St-Zip: PORT ST. LUCIE, FL 34953 |

I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:   WILLIE M. MCCASKILL                              DT          03/30/2008

Electronic Signature of Signing Officer or Director                                    Date

# 2009 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

FILED
Apr 09, 2009
Secretary of State

DOCUMENT# N99000003575

Entity Name:  LARGO FOR JESUS CHRISTIAN CENTER, INC.

| Current Principal Place of Business: | New Principal Place of Business: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

| Current Mailing Address: | New Mailing Address: |
|---|---|
| 1544 CROSBY STREET<br>LARGO, FL 33778 | |

FEI Number:            FEI Number Applied For ( )        FEI Number Not Applicable (X)        Certificate of Status Desired ( )

| Name and Address of Current Registered Agent: | Name and Address of New Registered Agent: |
|---|---|
| NEWSOME, MARETTA<br>1842 12TH STREET, SW<br>LARGO, FL  33778    US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____          _____
                    Electronic Signature of Registered Agent                                    Date

**OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title:       DT        ( ) Delete<br>Name:      MCCASKILL, WILLIE M<br>Address:   1544 CROSBY STREET<br>City-St-Zip:  LARGO, FL 33778 | |

| | |
|---|---|
| Title:       DT        ( ) Delete<br>Name:      MCCASKILL, MALACHI  JR.<br>Address:   1544 CROSBY STREET<br>City-St-Zip:  LARGO, FL 33778 | |

| | |
|---|---|
| Title:       T        ( ) Delete<br>Name:      NEWSOME, MARETTA<br>Address:   1842 12TH STREET, SW<br>City-St-Zip:  LARGO, FL 33778 | |

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

| Title:       T        (X) Change  ( ) Addition<br>Name:      LUCKEY, MARCY<br>Address:   732 NW RIVERSIDE DRIVE<br>City-St-Zip:  PORT ST. LUCIE, FL 34983 |

| Title:       T        ( ) Delete<br>Name:      LUCKEY, MARCY<br>Address:   1650 S.W. DAY STREET<br>City-St-Zip:  PORT ST. LUCIE, FL 34953 |

| Title:       S        ( ) Delete<br>Name:      LUCKEY, TROY D<br>Address:   1650 S.W. DAY STREET<br>City-St-Zip:  PORT ST. LUCIE, FL 34953 |

| Title:       S        (X) Change  ( ) Addition<br>Name:      LUCKEY, TROY D<br>Address:   732 NW RIVERSIDE DRIVE<br>City-St-Zip:  PORT ST. LUCIE, FL 34983 |

I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:   WILLIE M. MCCASKILL                              DT              04/09/2009
                    Electronic Signature of Signing Officer or Director                      Date

# 2010 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Mar 04, 2010**
**Secretary of State**

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

**Current Principal Place of Business:**    **New Principal Place of Business:**

1544 CROSBY STREET
LARGO, FL  33778

**Current Mailing Address:**    **New Mailing Address:**

1544 CROSBY STREET
LARGO, FL  33778

FEI Number:         FEI Number Applied For ( )    FEI Number Not Applicable (X)    Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**    **Name and Address of New Registered Agent:**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL  33778    US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____
Electronic Signature of Registered Agent                              Date

**OFFICERS AND DIRECTORS:**

Title:       DT
Name:       MCCASKILL, WILLIE M
Address:    1544 CROSBY STREET
City-St-Zip: LARGO, FL  33778

Title:       DT
Name:       MCCASKILL, MALACHI  JR.
Address:    1544 CROSBY STREET
City-St-Zip: LARGO, FL  33778

Title:       T
Name:       NEWSOME, MARETTA
Address:    1842 12TH STREET, SW
City-St-Zip: LARGO, FL  33778

Title:       T
Name:       LUCKEY, MARCY
Address:    732 NW RIVERSIDE DRIVE
City-St-Zip: PORT ST. LUCIE, FL  34983

Title:       S
Name:       LUCKEY, TROY D
Address:    732 NW RIVERSIDE DRIVE
City-St-Zip: PORT ST. LUCIE, FL  34983

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:   WILLIE M. MCCASKILL                    DT           03/04/2010
Electronic Signature of Signing Officer or Director                              Date

# 2011 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

FILED
Feb 15, 2011
Secretary of State

DOCUMENT# N99000003575

Entity Name:  LARGO FOR JESUS CHRISTIAN CENTER, INC.

**Current Principal Place of Business:**

1544 CROSBY STREET
LARGO, FL 33778

**New Principal Place of Business:**

152-8TH AVE. S.W.
SUITE #AA-1
LARGO, FL 33770

**Current Mailing Address:**

1544 CROSBY STREET
LARGO, FL 33778

**New Mailing Address:**

FEI Number:          FEI Number Applied For ( )      FEI Number Not Applicable (X)      Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL 33778    US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

**OFFICERS AND DIRECTORS:**

Title:        DT
Name:        MCCASKILL, WILLIE M
Address:     1544 CROSBY STREET
City-St-Zip:  LARGO, FL 33778

Title:        DT
Name:        MCCASKILL, MALACHI JR.
Address:     1544 CROSBY STREET
City-St-Zip:  LARGO, FL 33778

Title:        T
Name:        NEWSOME, MARETTA
Address:     1842 12TH STREET, SW
City-St-Zip:  LARGO, FL 33778

Title:        T
Name:        LUCKEY, MARCY
Address:     732 NW RIVERSIDE DRIVE
City-St-Zip:  PORT ST. LUCIE, FL 34983

Title:        S
Name:        LUCKEY, TROY D
Address:     732 NW RIVERSIDE DRIVE
City-St-Zip:  PORT ST. LUCIE, FL 34983

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:  WILLIE M. MCCASKILL                    DT              02/15/2011

Electronic Signature of Signing Officer or Director                              Date

# 2012 NOT-FOR-PROFIT CORPORATION ANNUAL REPORT

**FILED**
Jan 17, 2012
Secretary of State

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

**Current Principal Place of Business:**

152-8TH AVE. S.W.
SUITE #AA-1
LARGO, FL 33770

**New Principal Place of Business:**

**Current Mailing Address:**

1544 CROSBY STREET
LARGO, FL 33778

**New Mailing Address:**

| FEI Number: | FEI Number Applied For ( ) | FEI Number Not Applicable (X) | Certificate of Status Desired ( ) |
|---|---|---|---|

**Name and Address of Current Registered Agent:**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL 33778   US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:
_____     _____
Electronic Signature of Registered Agent                              Date

**OFFICERS AND DIRECTORS:**

Title:       DT
Name:       MCCASKILL, WILLIE M
Address:    1544 CROSBY STREET
City-St-Zip: LARGO, FL 33778

Title:       DT
Name:       MCCASKILL, MALACHI JR.
Address:    1544 CROSBY STREET
City-St-Zip: LARGO, FL 33778

Title:       T
Name:       NEWSOME, MARETTA
Address:    1842 12TH STREET, SW
City-St-Zip: LARGO, FL 33778

Title:       T
Name:       LUCKEY, MARCY
Address:    732 NW RIVERSIDE DRIVE
City-St-Zip: PORT ST. LUCIE, FL 34983

Title:       S
Name:       LUCKEY, TROY D
Address:    732 NW RIVERSIDE DRIVE
City-St-Zip: PORT ST. LUCIE, FL 34983

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:  WILLIE M. MCCASKILL                    DT          01/17/2012
_____          _____
Electronic Signature of Signing Officer or Director                  Date

## 2013 FLORIDA NOT FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

**FILED**
Jan 25, 2013
Secretary of State
CC4977556688

**Current Principal Place of Business:**

152-8TH AVE. S.W.
SUITE #AA-1
LARGO, FL 33770

**Current Mailing Address:**

1544 CROSBY STREET
LARGO, FL 33778

FEI Number: **NOT APPLICABLE**                    Certificate of Status Desired: Yes

**Name and Address of Current Registered Agent:**

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL 33778 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:
_____
Electronic Signature of Registered Agent                                   Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | DT | | Title | DT |
| Name | MCCASKILL, WILLIE M | | Name | MCCASKILL, MALACHI JR. |
| Address | 1544 CROSBY STREET | | Address | 1544 CROSBY STREET |
| City-State-Zip: | LARGO FL 33778 | | City-State-Zip: | LARGO FL 33778 |
| | | | | |
| Title | T | | Title | T |
| Name | NEWSOME, MARETTA | | Name | LUCKEY, MARCY |
| Address | 1842 12TH STREET, SW | | Address | 732 NW RIVERSIDE DRIVE |
| City-State-Zip: | LARGO FL 33778 | | City-State-Zip: | PORT ST. LUCIE FL 34983 |
| | | | | |
| Title | S | | | |
| Name | LUCKEY, TROY D | | | |
| Address | 732 NW RIVERSIDE DRIVE | | | |
| City-State-Zip: | PORT ST. LUCIE FL 34983 | | | |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIE M. MCCASKILL                    DT                    01/25/2013
_____
Electronic Signature of Signing Officer/Director Detail                     Date

## 2014 FLORIDA NOT FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

**FILED**
**Jan 14, 2014**
**Secretary of State**
**CC5193292793**

Current Principal Place of Business:

152-8TH AVE. S.W.
SUITE #AA-1
LARGO, FL 33770

Current Mailing Address:

1544 CROSBY STREET
LARGO, FL 33778

FEI Number: NOT APPLICABLE                    Certificate of Status Desired: No

Name and Address of Current Registered Agent:

NEWSOME, MARETTA
1842 12TH STREET, SW
LARGO, FL 33778 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____
                 Electronic Signature of Registered Agent                                    Date

### Officer/Director Detail :

| | | | |
|---|---|---|---|
| Title | DT | Title | DT |
| Name | MCCASKILL, WILLIE M | Name | MCCASKILL, MALACHI JR. |
| Address | 1544 CROSBY STREET | Address | 1544 CROSBY STREET |
| City-State-Zip: | LARGO FL 33778 | City-State-Zip: | LARGO FL 33778 |
| | | | |
| Title | T | Title | T |
| Name | NEWSOME, MARETTA | Name | LUCKEY, MARCY |
| Address | 1842 12TH STREET, SW | Address | 732 NW RIVERSIDE DRIVE |
| City-State-Zip: | LARGO FL 33778 | City-State-Zip: | PORT ST. LUCIE FL 34983 |
| | | | |
| Title | S | | |
| Name | LUCKEY, TROY D | | |
| Address | 732 NW RIVERSIDE DRIVE | | |
| City-State-Zip: | PORT ST. LUCIE FL 34983 | | |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIE M. MCCASKILL                    DT                    01/14/2014
                 Electronic Signature of Signing Officer/Director Detail                                    Date

<u>2015 FLORIDA NOT FOR PROFIT CORPORATION ANNUAL REPORT</u>

DOCUMENT# N99000003575

Entity Name: LARGO FOR JESUS CHRISTIAN CENTER, INC.

**FILED**
**Feb 14, 2015**
**Secretary of State**
**CC9838123189**

Current Principal Place of Business:

152-8TH AVE. S.W.
SUITE #AA-1
LARGO, FL 33770

Current Mailing Address:

1544 CROSBY STREET
LARGO, FL 33778

FEI Number: NOT APPLICABLE                    Certificate of Status Desired: No

Name and Address of Current Registered Agent:

NEWSOME, MARETTA
1380 CROSBY STREET
LARGO, FL 33778 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____    Date _____

        Electronic Signature of Registered Agent

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | DT | | Title | DT |
| Name | MCCASKILL, WILLIE M | | Name | MCCASKILL, MALACHI JR. |
| Address | 1544 CROSBY STREET | | Address | 1544 CROSBY STREET |
| City-State-Zip: | LARGO FL 33778 | | City-State-Zip: | LARGO FL 33778 |
| | | | | |
| Title | T | | Title | T |
| Name | NEWSOME, MARETTA | | Name | LUCKEY, MARCY |
| Address | 1842 12TH STREET, SW | | Address | 732 NW RIVERSIDE DRIVE |
| City-State-Zip: | LARGO FL 33778 | | City-State-Zip: | PORT ST. LUCIE FL 34983 |
| | | | | |
| Title | S | | | |
| Name | LUCKEY, TROY D | | | |
| Address | 732 NW RIVERSIDE DRIVE | | | |
| City-State-Zip: | PORT ST. LUCIE FL 34983 | | | |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIE MYRA MCCASKILL                    PASTOR                    02/14/2015

        Electronic Signature of Signing Officer/Director Detail                    Date

# EXHIBIT 4

1              IN THE UNITED STATES DISTRICT COURT

                 MIDDLE DISTRICT OF FLORIDA

2                      TAMPA DIVISION

3

4           CASE NO: 8:15-CV-1559-T-33-TBM

5    WILLIE McCASKILL,

6                 Plaintiff,

7       vs.

8

     NAVIENT SOLUTIONS, INC.,

9                 Defendant.

10   _____/

11        VIDEOTAPE DEPOSITION OF MARETTA NEWSOME

12                  Tampa, FL 33606

13                December 15, 2015

14                   9:44 a.m.

15

16

17     Taken on behalf of the Defendants before

18     PHILIP RYAN, RPR, Court Reporter, Notary Public in

19     and for the State of Florida at Large, pursuant to

20     Defendants' Notice of Taking Deposition in the

21     above cause.

22

23

24   Job No 2183813

25   Pages 1 - 88

                                          Page 1

1 APPEARANCES:
2 FRANK KERNEY, ESQUIRE
   Morgan & Morgan
3 201 N. Franklin Street
   Suite 700
4 Tampa, FL 33602
5      Attorney for Plaintiff
6 LISA M. SIMONETTI, ESQUIRE
   Vedder Price, LLP
7 1925 Century Park East
   Suite 1900
8 Los Angeles, CA 90067
9      Attorney for Defendants
10
   ALSO PRESENT:
11     Greg Scrivener, CLVS
12          INDEX
13                    PAGE
   DIRECT EXAMINATION:
14 BY MS. SIMONETTI              3
   CROSS-EXAMINATION
15 BY MR. KERNEY                84
16          EXHIBIT INDEX
17 Defendants' Exhibit
18 Exhibit 1   Sallie Mae Documents.          57
19 Exhibit 2   Documents Bates stamped NSI 39 through  82
20
21    NSI 54.
22
23
24
25

1          THE VIDEOGRAPHER:  My name is Greg
2 Scrivener.  I'm a certified legal video
3 specialist for Veritext.  Today's date is
4 December 15th, 2015.  The time on the video
5 monitor is approximately 9:44 a.m.
6      This deposition is being held in the
7 office of Veritext, located at 442 West
8 Kennedy Boulevard, Tampa, Florida, 33606.  The
9 caption in this case is Willie McCaskill,
10 Plaintiff, versus Navient Solutions, Inc.,
11 Defendant.
12      The name of our witness is Maretta
13 Newsome.  At this time, will counsels please
14 introduce themselves, beginning with
15 Plaintiff's counsel.
16      MR. KERNEY:  Yes.  Good morning.  Frank
17 Kerney on behalf of the Plaintiff, Willie
18 McCaskill.  Also here representing the
19 deponent, Maretta Newsome.
20      MS. SIMONETTI:  Good morning.  My name is
21 Lisa Simonetti of Vedder Price, representing
22 the Defendants.
23      THE VIDEOGRAPHER:  The court reporter
24 today is Phil Ryan from Veritext, and he'll
25 now swear in the witness, please.

1 Thereupon:
2          MARETTA NEWSOME,
3 Was called as a witness and, having been first
4 duly sworn and responding "I do," was examined and
5 testified as follows:
6          DIRECT EXAMINATION
7 BY MS. SIMONETTI:
8    Q.   Good morning, Miss Newsome.  We've had a
9 chance just to chat briefly before we started, but
10 my name is Lisa Simonetti.  I represent all of the
11 Defendants in this case.
12    Have you had your deposition taken before?
13    A.   No.
14    Q.   So since that's the case, why don't we
15 talk a little bit about the process.  I understand
16 that you're represented by counsel here today; is
17 that correct?
18    A.   That is correct.
19    Q.   When did you first retain this firm to
20 represent you?
21    A.   Hum, probably today.
22    Q.   Okay.
23    A.   They -- I signed something so they could
24 represent me while I'm here today.
25    Q.   Okay.  So during the course of today, I

1 will be asking you questions.  The court reporter
2 sitting to your left will be taking down
3 everything we say word for word.  And as a result,
4 it is important that only one of us speaks at a
5 time.
6    Do you understand that?
7    A.   Yes, I do.
8    Q.   Okay.  Also, you have to answer the
9 questions verbally.  In conversation, we tend to
10 nod our heads or say uh-huh or huh-uh.  Today we
11 have to speak in plain English if that's okay with
12 you.
13    A.   That's fine.
14    Q.   If at any point in time you don't
15 understand one of my questions, would you please
16 just let me know?
17    A.   Okay.
18    Q.   I'm happy to rephrase and make sure that
19 we're all on the same page before you give an
20 answer; okay?
21    A.   Okay.
22    Q.   Since you are represented by counsel,
23 there may be instances in which objections are
24 placed on the record.  Unless you're instructed
25 not to answer the question for reasons of

2 (Pages 2 - 5)

1  privilege or something like that, you have to
2  answer the question.
3     Do you understand that?
4     A.   Yes, I do.
5     Q.   Is there any reason that you can't give
6  your best testimony today?
7     A.   No.
8     Q.   Okay.  You feel well and you're ready to
9  go?
10    A.   Yes.
11    Q.   Okay.  Also, any time you want to take a
12 break, just let me know.
13    A.   Okay.
14    Q.   We have all day.  I hope we don't take
15 all day, but we have all day.  And unless there's
16 a question pending, I'm happy to have us just take
17 a break any time.
18    A.   Okay.
19    Q.   All right.  Are you ready?
20    A.   Yes.
21    Q.   So is it correct that you have not been
22 involved in any other court proceeding?
23    A.   That is correct.
24    Q.   Have you ever given testimony in any
25 type of case whatsoever?

Page 6

1     A.   No, I am not.
2     Q.   Okay.
3     A.   Okay.  I'm sorry.
4     Q.   That's okay.
5  So have you ever filed a lawsuit of any kind?
6     A.   No.
7     Q.   Have you ever filed a bankruptcy
8  proceeding?
9     A.   No.
10    Q.   Small claims action?
11    A.   No.
12    Q.   All right.  How did you prepare for the
13 deposition today?
14    A.   With my attorney, I spoke briefly with
15 him.
16    Q.   Okay.  And just to be completely clear,
17 at no point today, at any time, am I asking for
18 the content of any communication that you had with
19 counsel.  I'm never doing that.  So if a question
20 sounds to you as if I'm asking for that kind of
21 conversation, then please just let me know, and
22 I'll reframe it because that's not my intent.
23    A.   Okay.
24    Q.   Okay.  How long did you speak with
25 counsel?

Page 8

1     A.   I worked for truancy court for Pinellas
2  County Schools.  So I gave testimony as a case
3  manager.
4     Q.   Okay.  Aside from any connection with
5  employment in the truancy court, have you given
6  testimony in any type of proceeding?
7     A.   No.
8     Q.   Have you ever been involved in any
9  lawsuit as a party?
10    A.   No.
11    Q.   So you understand you're not a party to
12 this lawsuit; is that correct?
13    A.   I'm -- explain that for me.
14    Q.   Who is bringing the claims in this case
15 as you understand it?
16    A.   This -- against Willie Meyer McCaskill
17 and Navient.  So I'm -- I came -- I was subpoenaed
18 to come and testify on behalf of Willie Meyer
19 McCaskill because you all wanted a deposition.
20    Q.   Correct.  So based on that description,
21 you understand that Willie McCaskill is the
22 Plaintiff in the case?
23    A.   Yes, I do.
24    Q.   And you are not a Plaintiff in this
25 case?

Page 7

1     A.   Hum, probably about -- probably about an
2  hour today, and then I spoke over the phone with
3  him as well.  So -- in order to let me know about
4  the deposition coming up, make sure I would be
5  present and things like that, and talking about
6  what to expect for today.
7     Q.   Okay.  So overall, how much time do you
8  think you spent?
9     A.   Hum, I wouldn't say it took five hours.
10    Q.   Okay.  Did you review any documents?
11    A.   I guess I was shown a document.
12    Q.   Can you describe for me what you looked
13 at?
14    A.   It looked to me like the log-in screen
15 of Sallie Mae.
16    Q.   Do you believe that screen related to a
17 system called manager loans?
18    A.   Say that again.
19    Q.   Manager loans?
20    A.   Say the whole sentence again.  I didn't
21 hear the first part.
22    Q.   Do you believe that that screen related
23 to a system called manager loans?
24    A.   I'm not sure if it does or not.  I know
25 it said Sallie Mae.

Page 9

3 (Pages 6 - 9)

1    Q.   Just to let you know, the name of the
2  company has changed.  The company that you know as
3  Sallie Mae is now known as Navient Solutions, Inc.
4  so I will probably use the abbreviation NSI, if
5  that's okay with you.
6    A.   Okay.  That's okay.
7    Q.   Just to keep the record clear because
8  all of the pleadings in the case use the same
9  phrase.
10    A.   Okay.
11    Q.   And there's also another Defendant in
12  the case too, Student Assistance Corporation.  Do
13  you understand that?
14    A.   Okay.
15    Q.   And I might refer to that as SAC, if
16  that's okay.
17    A.   As SAC?  Okay.
18    Q.   Okay.  Did you review any documents in
19  addition to the log-in screen?
20    A.   No, I did not.
21    Q.   Have you spoken with anyone else about
22  the deposition today?
23    A.   No, no.
24    Q.   Have you spoken with Miss McCaskill?
25    A.   I've spoke -- yeah, I've spoken to my

Page 10

1    Q.   Where do you live currently?
2    A.   I live in Largo.
3    Q.   So aside from your mother, have you
4  spoken with anyone else about the deposition,
5  including the fact that you're here today?
6    A.   Oh, my job.
7    Q.   Okay.  What was the nature of that
8  conversation?
9    A.   I told my boss I got to go to court
10  tomorrow and I needed off.  She said, "Oh, okay."
11  She goes, "I'm sorry."
12    Q.   There are probably better ways to spend
13  your day.
14    What's the name of your current employer?
15    A.   It is Agency for Health Care
16  Administration.
17    Q.   Can you say that more slowly?
18    A.   Agency.
19    Q.   Agency.
20    A.   For Health Care Administration.  AHCA.
21    Q.   What kind of organization is that?
22    A.   That's a State of Florida job.
23    Q.   And what does it do?
24    A.   Well, I can give you a list.  I do
25  claims for Medicaid -- I actually work for

Page 12

1  mom, yes.
2    Q.   She's included in anyone else.  So have
3  you spoken with anyone else about the deposition?
4    A.   About the deposition?
5    Q.   Uh-huh.
6    A.   No, I haven't spoken to her about the
7  deposition, but she knows I'm -- she knows that
8  they did subpoena me to be here today, but I
9  haven't spoken about what was supposed to go on, I
10  guess is what I'm trying to say.
11    Q.   So why don't you tell me what was the
12  nature of the conversation that you had with your
13  mother about the deposition?
14    A.   She said, "Are you going over to Tampa?
15  Did they tell you to go over to Tampa?"
16    I said, "Yes, I'm going to Tampa."
17    Q.   What else?
18    A.   That -- I mean, I mean that was it,
19  because I told her I didn't want to know her side,
20  I don't want her to hear me.  I didn't want to ask
21  them nothing, and I don't want to be able to say
22  that I heard nothing.  So we left it at that.
23    Q.   Okay.  So I take it then you don't live
24  in Tampa?
25    A.   No.

Page 11

1  Medicaid.
2    Q.   Oh, okay.  How long have you been
3  employed there?
4    A.   I've been there since April of this
5  year.
6    Q.   Have you spoken with anyone else about
7  the deposition?
8    A.   No.  Wait.  Back up.  I have.  My
9  husband.  He knows I'm here today.
10    Q.   That makes sense.  Did you speak with
11  him about anything other than the fact that you
12  would be here today?
13    A.   No.
14    Q.   Is your husband Mr. Freddie Newsome?
15    A.   Yes, it is.
16    Q.   And your mother's name is Willie
17  McCaskill?
18    A.   Willie Meyer McCaskill.
19    Q.   Okay.  What's your father's name?
20    A.   Malachi McCaskill, Jr.
21    Q.   He's Junior.  He has a father that lives
22  somewhere else in Florida?
23    A.   He's passed away.
24    Q.   Oh, I'm sorry.
25    Miss Newsome, what's the highest level of

Page 13

1 education that you have secured so far?
2   A.   I have a bachelor's degree in
3 management.
4   Q.   When did you get that degree?
5   A.   '06.
6   Q.   From what school did you obtain that?
7   A.   At the time it was International
8 College.  They have since -- well, money changes
9 things.  Hodges University.
10   Q.   International College at the time and
11 then what?
12   A.   And now it's called Hodges University.
13 It's down in Naples, Florida.
14   Q.   Do you hold any other degrees or
15 professional licenses?
16   A.   I hold a teaching certificate for
17 exceptional student education, K through 12.
18   Q.   Exceptional student?
19   A.   Uh-huh.
20   Q.   And what does exceptional mean in that
21 sense?
22   A.   They have special needs.
23   Q.   Do you hold any other types of
24 certificates or licenses?
25   A.   Higher than a bachelor's, no.  Other

Page 14

1   Q.   Do you agree that it was formed in 1999?
2   A.   I would say yes.
3   Q.   When it was formed in 1999, what was the
4 mission of Largo for Jesus?
5   A.   That's my mother's ministry.  I wasn't a
6 part of her forming it.  That was something that
7 she did on her own, but I was aware that she was
8 starting her ministry.
9   Q.   So what was the emphasis of the ministry
10 or the work that your mother was doing through the
11 ministry?
12   A.   Christians to help one another,
13 outreach.  I'm not really sure what her -- what
14 she wanted.  I'm just going off of what I think
15 that -- knowing her personality, what she was
16 looking to do.  I don't know, you know, what she
17 set out to do.  I wouldn't be able to tell you
18 that.  I don't know.
19   Q.   That's okay.  I understand.  So on a
20 given day at the ministry, what would be conducted
21 at the center?  Just some examples.  Were there
22 services or programs for kids or, you know --
23   A.   There was just her -- her own -- her own
24 ministry.  She didn't have a church or anything
25 like that.  So, yeah.

Page 16

1 than the teaching license, no.
2   Q.   Have you started any course of education
3 but not finished it?
4   A.   No.
5   Q.   Okay.  When did you graduate high
6 school?
7   A.   '93.
8   Q.   Where did you go to high school?
9   A.   Largo High School in Largo, Florida.
10   Q.   Have you lived in Largo all your life?
11   A.   Yes, ma'am.
12   Q.   That makes it easy then.
13       When did you start your education at
14 International College?
15   A.   I want to say 2003, 2004.  I'm not
16 really sure.
17   Q.   Did you go straight through and complete
18 the degree?
19   A.   Yes, I did.
20   Q.   You didn't take any time off or anything
21 like that?
22   A.   No.
23   Q.   Are you familiar with an organization
24 called Largo for Jesus Christian Center?
25   A.   Yes, I am.

Page 15

1   Q.   Your mother is a pastor; correct?
2   A.   She's an evangelist.
3   Q.   Okay.  And when you say evangelist, what
4 does that mean?
5   A.   I'm going to say I don't know, because I
6 can't give you a real answer as to what it means.
7 She goes -- she prays for people, she -- she's a
8 healer, she's speaks the word of God.
9   Q.   I understand it's not the same thing as
10 what you do as a lawyer.  Okay.  Is your mother
11 still active in the Largo for Jesus ministry?
12   A.   Yes, she is.
13   Q.   So in 1999, what was your residence
14 address?
15   A.   1999?  Let me see.  Oh, my goodness.  I
16 can't remember.
17   Q.   When -- well, in 1999, what was the
18 address of Largo for Jesus?
19   A.   It wasn't a place.
20   Q.   Let me ask it this way.  In 1999, what
21 was your mother's residence address?
22   A.   My mother's residence that she lived at
23 was 18 -- wait.  In 1999?  1842 12th Street
24 Southwest, Largo, Florida.
25   Q.   Slow down there.  1842.

Page 17

5 (Pages 14 - 17)

1    A.   I'm sorry.  12th Street.
2    Q.   12th Street.
3    A.   Southwest.
4    Q.   Southwest.
5    A.   Largo.
6    Q.   Largo.  I'm from New York, and I think
7 that I speak fast.  You got me; okay.
8       Let's try it this way.  Where do you live now?
9    A.   I live at 1380 Crosby Street in Largo.
10   Q.   How long have you lived there,
11 approximately?
12   A.   A year and some months.
13   Q.   Where did you live before that?
14   A.   Before that, I lived at 1842 12th Street
15 Southwest, Largo.
16   Q.   Was the 1380 Crosby Street address ever
17 associated with Largo for Jesus?
18   A.   I don't know.
19   Q.   Did your father ever have any role in
20 the ministry, Largo for Jesus?
21   A.   Hum, just as the -- as her husband.  No.
22   Q.   Did you ever have any role with the
23 ministry?
24   A.   I knew she had started it.  I think she
25 has all of her girls on there, just on paper, so

*Page 18*

1 did or not.
2    Q.   Have you ever seen any of the official
3 filings that were made with the State of Florida
4 for Largo for Jesus?
5    A.   No.
6    Q.   Does your mom have a lawyer to help her
7 with additional filings or any filings made in
8 connection with the ministry?
9    A.   I don't know.
10   Q.   How long, approximately, did you live at
11 the 1842 12th Street address?
12   A.   Probably about -- what time frame are
13 you talking about?
14   Q.   You told me that you have lived at 1380
15 Crosby Street for approximately a year.
16   A.   Uh-huh.
17   Q.   Before that, were you at 1842?
18   A.   Uh-huh.
19   Q.   How long had you lived at 1842 before
20 you moved?
21   A.   As a -- as married, as a married person,
22 probably 14, 14 years.
23   Q.   And so why did you add that qualifier,
24 as a married person?  Had you lived there as a
25 single person?

*Page 20*

1 that if something happens to her, you know, the
2 children are listed.
3    Q.   And when you say "her girls," you mean
4 your sisters; right?
5    A.   Yes, ma'am.
6    Q.   What are your sister's names?
7    A.   They are Marcy Lucky.
8    Q.   Is that with a C-Y or I-E?
9    A.   C-K-E-Y.  And her name is C-Y.  I'm
10 sorry.
11   Q.   That's okay?
12   A.   And Melissa Coleman.
13   Q.   Coleman?
14   A.   Uh-huh.  C-O-L-E-M-A-N.
15   Q.   Is that her married name?
16   A.   Yes.
17   Q.   What was her name prior to that?
18   A.   McCaskill.
19   Q.   That was a trick question.  Do you have
20 any brothers?
21   A.   No.
22   Q.   Were there any other family members that
23 you think might have been listed by your mom as
24 having some type of role with the ministry?
25   A.   That, I don't know what she -- if she

*Page 19*

1    A.   Because that's the home I grew up in.
2    Q.   Is the 1380 Crosby Street address a
3 residence that belongs to your parents?
4    A.   Yes.
5    Q.   How long did they live there?
6    Q.   Where?
7    A.   At the 1380 Crosby Street.
8    A.   They don't live there.
9    Q.   They don't live there.  Where do your
10 parents live right now?
11   A.   They live at 1544 Crosby Street.
12   Q.   1544.  That's pretty close by there?
13   A.   Yes.
14   Q.   Do any of your siblings live with your
15 parents at this time?
16   A.   What -- what time frame are you talking
17 about?  At this time?
18   Q.   At this time.
19   A.   Current?  No.
20   Q.   Have any of your siblings lived with
21 your parents as adults?
22   A.   Before or after marriage?
23   Q.   Could be before or after marriage,
24 whenever they were adults.  That's after 18.
25   A.   We all moved out after marriage.

*Page 21*

6 (Pages 18 - 21)

1   Q.   Okay.  How long have you been working
2   your current job?
3   A.   I'm currently employed with AHCA.  I've
4   been there since April of this year.
5   Q.   That's right.  You told me that.  I'm
6   sorry.
7   Where did you work before?
8   A.   Department of Health.
9   Q.   Again, is that a State of Florida --
10   A.   That's a State of Florida job, uh-huh.
11   Q.   How long did you work there?
12   A.   Hum, I'm going to use my cheat sheet.
13   Q.   That's fine.
14   A.   I started there March 1st of 2013.
15   Q.   You're very good.  March 1st.  And what
16   were your responsibilities at the Department of
17   Health?
18   A.   I was a inspector for child care centers
19   and homes.
20   Q.   What was your employment before that
21   job?
22   A.   I worked for Community Pride Child Care.
23   Q.   Is that the name of the business,
24   Community Pride Child Care, one phrase?
25   A.   Yes, Community Pride Child Care.

Page 22

1   A.   Uh-huh.
2   Q.   Is that also a State of Florida job or a
3   private --
4   A.   No, that was with -- that's a private
5   organization that had a contract with Pinellas
6   County schools.
7   Q.   Community Pride was a private
8   organization, too?
9   A.   Yes, it was.
10   Q.   All right.  And before Family Resources,
11   where did you work?
12   A.   Pinellas County Schools.
13   Q.   What's the first word?
14   A.   Pinellas.
15   Q.   Pinellas?
16   A.   Yes.  County schools.
17   Q.   During what time period did you work for
18   the schools?
19   A.   I was there from 8/1/2005 to 7/11/06.
20   Q.   What were your responsibilities?
21   A.   At that time, I was a teacher assistant
22   for the exceptional students.
23   Q.   All right.  And before then?
24   A.   Before then, I worked for Pinellas
25   County Head Start.  And the time frame was from

Page 24

1   Q.   During what time period did you work
2   there?
3   A.   That was from 6/1/2011 to 2/28/2013.
4   Q.   And what were your responsibilities
5   there?
6   A.   I was the homeless program manager.  So
7   I was responsible for placing preschool age
8   children in the shelters and to school so that
9   their parents could find jobs.
10   Q.   Where did you work before Community
11   Pride Child Care?
12   A.   Family Resources.
13   Q.   During what time period did you work at
14   Family Resources?
15   A.   7/12/06 to 5/31/2011.
16   Q.   7/12/06?
17   A.   5/31/2011.
18   Q.   Okay.  What were your responsibilities
19   at Family Resources?
20   A.   I was a truancy case manager.
21   Q.   I'm sorry.  I can't hear you.
22   A.   It's children in need of services and
23   families in need of services.
24   Q.   Children in need of services.  Got it.
25   Children --

Page 23

1   7/2002 to 7/29/05.
2   Q.   7/7/2002?
3   A.   No.  Seven, like July, of 2002.
4   Q.   Okay.  To?
5   A.   To July of 2005.
6   Q.   Got it.
7   And what were your responsibilities?
8   A.   I was the three- and four-year-old
9   teacher.
10   Q.   You must have a lot of patience then.
11   A.   It's pure entertainment.
12   Q.   If you say so.
13   A.   In its natural form.
14   Q.   If you say so.
15   Okay.  Did you work anywhere before Pinellas
16   County Head Start?
17   A.   Yes, I did.
18   Q.   Okay.  Where did you work?
19   A.   I was a teller at First Union National
20   Bank.
21   Q.   During what time period?
22   A.   That was from September of 1996 to March
23   of 2001.
24   Q.   Did you have the ordinary
25   responsibilities of a teller in a branch?

Page 25

7 (Pages 22 - 25)

1   A.   Uh-huh.
2   Q.   Did you have any full-time employment
3 before that time?
4   A.   Let's see.  Full time, no, I wasn't full
5 time.
6   Q.   Okay.  Did you take out student loans in
7 order to attend your -- strike that.
8   Did you take out student loans in order to
9 attend International College?
10  A.   Yes, I did.
11  Q.   Did you take out student loans to attend
12 any other institutions?
13  A.   Yes.
14  Q.   What other institutions?
15  A.   USF.  And I want to say SPC as well,
16 St. Petersburg College.
17  Q.   USF is the University of South Florida?
18  A.   South Florida, yes.
19  Q.   Is that located here?  Because I passed
20 by that last night.  Do they have a campus here?
21  A.   Uh-huh, that's the main campus.
22  Q.   University of South Florida and also
23 St. --
24  A.   St. Petersburg College.
25  Q.   What types of studies did you undertake

Page 26

1 at University of South Florida?
2   A.   Let me see.  I think at that point in
3 time I was still working on my bachelor's.  I
4 hadn't figured out what I wanted to be yet.  So I
5 would -- I don't know what courses I was taking
6 at that time.
7   Q.   Were those more general ed type courses
8 being in the first --
9   A.   I would say yes.
10  Q.   How long did you attend USF?
11  A.   I don't know dates or the time frame.
12 It wasn't very long.
13  Q.   Okay.  And what sorts of courses did you
14 take at St. Petersburg College?
15  A.   St. Petersburg College?  Those were --
16 let's see.  I got my AA.  I changed majors several
17 times, so I don't know what I was taking.  Well, I
18 know I took -- well, I did take some teacher
19 courses there.
20  Q.   And then you ultimately got your degree
21 at International College?
22  A.   Yes.
23  Q.   How many outstanding student loans do
24 you have at this time?
25  A.   I don't know.

Page 27

1   Q.   What's the approximate overall
2 outstanding balance?
3   A.   Oh, I don't know.  I would be making up
4 a number.
5   Q.   When was the last time that you made a
6 payment on any of the student loans?
7   A.   I've never made a payment.
8   Q.   Do you believe that payments are due and
9 owing at this time?
10  A.   Say that question again.
11  Q.   Do you believe that payments are due and
12 owing at this time?
13  A.   Yes.
14  Q.   Do you intend to make payments?
15  A.   Yes.
16  Q.   When was the last time you were in
17 contact with any lender or servicer about payments
18 on your loans?
19  A.   Probably -- this is November.  December,
20 November.
21  Q.   What type of contact did you have in
22 November?
23  A.   That was a phone contact.
24  Q.   Who did you speak with?  What company?
25  A.   Oh, General Revenue.

Page 28

1   Q.   Did you speak with an agent of General
2 Revenue?
3   A.   Yes, I did.
4   Q.   How did you come to be in contact with
5 that agent?
6   A.   They called me.
7   Q.   And what was the gist of the
8 conversation?
9   A.   It was in regards to an outstanding
10 loan, student loan balance.
11  Q.   And what did you tell the agent about
12 the balance?
13  A.   She said she wanted to help me get back
14 on track to get payments.  And we sat there and
15 talked to see how we could get back on track.
16  Q.   Were you able to come up with a plan?
17  A.   Yes.  She made it so I only have to pay
18 $5 a month.
19  Q.   Prior to that time -- well, strike that.
20  Have you received any statement reflecting the
21 payment plan of $5 per month since you had that
22 conversation?
23  A.   Yes.
24  Q.   Okay.  That was pretty recent.  So have
25 you received one statement or more than one

Page 29

8 (Pages 26 - 29)

1 statement showing the $5 payment?
2   A.   It's just a -- it's a bunch of papers
3 about this big, going over what we said, just in
4 physical writing.  And it's a loan repayment
5 schedule.
6   Q.   And what is your understanding of what
7 the payment plan covers?
8   A.   It helps me to repay the loan.  And what
9 they're going to do is try to get me back on track
10 to give the loan back to somebody else, but they
11 want to show that I can make payments to get me
12 back on track, and then they're going to give the
13 loan back to someone else.
14   Q.   Okay.  Do you have an understanding that
15 some or all of your loans are federally
16 guaranteed?
17   A.   Yes, I do.
18   Q.   Prior to that contact in November with
19 General Revenue Corporation, had you ever spoken
20 with anyone from Navient Solutions, Inc."
21   A.   Spoken with, no.
22   Q.   Have you ever spoken with anyone from
23 Student Acceptance Corporation?
24   A.   No.
25   Q.   Have you ever heard of a company called
Page 30

1 Navient Corporation?
2   A.   Yes.
3   Q.   What is Navient Corporation?
4   A.   A debt collector, student loan debt
5 collector.
6   Q.   And what do you base the belief that
7 Navient Corporation is a debt collector?
8   A.   Wait.  Say that question again.  What
9 makes me believe that they're a student --
10   Q.   Navient Corporation --
11   A.   Uh-huh.
12   Q.   -- is a debt collector?
13   A.   It's a student loan debt collector.
14 Because of the number of phone calls, they're
15 trying to retrieve their money, as student loan
16 companies do.  And they -- yeah, they try to
17 retrieve their money.  So anybody who is trying to
18 recoup their money would be considered a debt
19 collector.
20   Q.   Just to be sure that we're on the same
21 page, I'm asking you about a company called
22 Navient Corporation.
23   A.   Uh-huh.
24   Q.   There's also a Defendant in this case
25 called Navient Solutions, Inc.  Do you have any
Page 31

1 understanding as to whether those are different?
2   A.   No.  Because I'm thinking Navient,
3 they're all under the same umbrella.
4   Q.   So aside from that, do you have any
5 information or understanding as to what Navient
6 Corporation might be?
7   A.   I know one's a student loan.  I would
8 assume there's -- somebody took over for Sallie
9 Mae.  I'm believing that's Navient.  Navient took
10 other for Sallie Mae.
11   Q.   You think that was Navient Corporation?
12   A.   I don't know.
13   Q.   Was it Navient Solutions, Inc.?
14   A.   All I know is Navient.
15   Q.   Okay.  That's just fine.
16   Sorry.  You actually improved the day.  Trust
17 me.  I know so more now.
18   What's your current cell phone number, Miss
19 Newsome?
20   A.   (727) 218-4347.
21   Q.   218?
22   A.   4347.
23   Q.   How long have you had that cell number?
24   A.   Hum, two years.  I'm not really sure.
25   Q.   What was your cell number before that?
Page 32

1   A.   It was (727) 485-3740.
2   Q.   3740?
3   A.   Correct.
4   Q.   How long did you hold that number?
5   A.   Oh, I had that one a number of years,
6 but I don't know how many.  But I had it several
7 years.
8   Q.   Do you think you had that number back in
9 2000?
10   A.   I was just looking, trying to see.  I
11 believe I had that -- I know I had it at least in
12 '06, back to '06.
13   Q.   Okay.  What's your current residence
14 address?
15   A.   My current residence is 1380 Crosby
16 Street.
17   Q.   I'm sorry.  Strike that.
18   What's your current residence phone number?
19   A.   It's (727) 581-8617.
20   Q.   8617.  How long have you had that
21 residence number?
22   A.   Hum, I got married in September of '98.
23 Since then.
24   Q.   Okay.  So since 2006, then you've had
25 three different phone numbers, one residence phone
Page 33

9 (Pages 30 - 33)

1 number and two cell numbers; is that correct?
2    A.   I believe so, yes.
3    Q.   Okay.  Does your husband have his own
4 cell phone number at the current time?
5    A.   Yes.
6    Q.   Has he always had his own cell phone
7 number?
8    A.   Yes.
9    Q.   What's his number now?
10    A.   (727) 218-4346.
11    Q.   How long has he had that number?
12    A.   Probably about two years.  I'm not
13 really sure.
14    Q.   And before that time, did he have a cell
15 number?
16    A.   Yes.
17    Q.   What was it?
18    A.   I don't remember.
19    Q.   Do you have any children, Miss Newsome?
20    A.   Yes.
21    Q.   How many children?
22    A.   Birth, three.
23    Q.   I couldn't hear you.
24    A.   Birth, three.
25    Q.   What are the names and ages of those

Page 34

1 children?
2    A.   Matthew McCaskill, he's 23.
3    Q.   Twenty-three?
4    A.   Uh-huh.  There's Morgan Newsome, 16.
5 And Malik Newsome, he's 14.
6    Q.   How do you spell Malik?
7    A.   M-A-L-I-K.
8    Q.   Okay.  Do you have other children not by
9 birth?
10    A.   Well, married, by marriage.
11    Q.   Do you have any other children not by
12 marriage?
13    A.   No.
14    Q.   Do you have three total children?
15    A.   Three total children.
16    Q.   There you go.
17    A.   I call those mine two because they're
18 his, so ...
19    Q.   You have three total children?
20    A.   Uh-huh.
21    Q.   Do any of them live with you currently?
22    A.   The last two, the youngest two.
23    Q.   Where does Matthew live right now?
24    A.   I don't have an address for him.  I
25 don't know.

Page 35

1    Q.   Is he in Largo?
2    A.   Largo, Clearwater, somewhere.  I don't
3 know.  The girlfriend.  I don't know.
4    Q.   So you don't know if he's working?
5    A.   Oh, I know he's working, but I don't
6 know his physical address.  They only let moms
7 know so much.
8    Q.   That's true.
9       What's your current e-mail address that you
10 most regularly sure?
11    A.   My first name dot my last name
12 75@gmail.com.
13    Q.   Maretta.newsome75@ --
14    A.   @gmail.com.
15    Q.   @gmail.
16    A.   Uh-huh.
17    Q.   How long have you used that e-mail
18 address?
19    A.   I don't know how long I've been using
20 that.
21    Q.   Is it quite a while?
22    A.   It's been a little while, but I can't --
23 I wouldn't be able to tell you a date.  I don't
24 know.
25    Q.   Do you think more than five years?

Page 36

1    A.   I don't think more than -- I'm trying to
2 look back to see where I was.  No, I don't know.
3    Q.   Do you remember having another e-mail
4 address?
5    A.   Yes, I do.
6    Q.   Okay.  Does your mother also regularly
7 use an e-mail address?
8    A.   She doesn't have one, I don't think.
9    Q.   How about your father?
10    A.   Huh-uh.  I'm sorry.  No.
11    Q.   Understood.  Understood.
12       So if you wanted to reach your mother right
13 now, what would you do to contact her?
14    A.   Call her.
15    Q.   Where would you call?
16    A.   On her phone.
17    Q.   What's her phone number?
18    A.   (727) 581-6140.
19    Q.   How long has your mother had that
20 telephone number?
21    A.   The exact date, I don't know.  It's
22 always been -- she's always had it, as far as I
23 can remember, and I'm 40 years old.
24    Q.   I'll never ask you for specific dates,
25 just your best recollection.

Page 37

10 (Pages 34 - 37)

1    A.    Oh, okay.  So at least 40 years.
2    Q.    I don't think there was a cell phone 40
3  years ago; okay.
4    A.    You said she had that number?
5    Q.    Yeah.
6    A.    Yeah, about 40 years.
7    Q.    As long as you can remember?
8    A.    As long as I can remember.
9    Q.    Has that number always been associated
10  with a cell phone?
11    A.    No.
12    Q.    When did it become associated with a
13  cell phone?
14    A.    I don't know the date.  I just know she
15  got rid of her house phone, and she transported it
16  over to her cell.  So she had the same phone
17  number.  I don't know -- I don't know the date,
18  though.
19    Q.    Approximately when did she do that?  Not
20  a date but just approximately when did she do
21  that?
22    A.    Maybe -- I don't know a date, but maybe
23  two, three years ago.  I'm not real sure.
24    Q.    So that number is active as of today;
25  correct?

Page 38

1    Q.    Does Jesus for Largo have a bank
2  account?
3    A.    Largo for Jesus?
4    Q.    I'm sorry.  Does Largo for Jesus have a
5  bank account?
6    A.    I don't know.  I can't -- I don't know.
7  I wouldn't be able to answer that.  I don't know.
8    Q.    Have you ever held a position of
9  treasurer for Largo for Jesus?
10    A.    On paper?
11    Q.    In any capacity.
12    A.    Probably on paper, because I do know
13  like when you -- when you file with the state, you
14  have to do who owns it and all that other stuff
15  and what they hold.  But I'm not -- I'm not a
16  treasurer.  I've never held any money or anything
17  like that for it.  So when I say on paper,
18  probably just on paper.  Because she has -- lists
19  all her girls as part of her -- whatever she has.
20    Q.    Is there any money that comes into Jesus
21  for Largo for anything?
22    A.    The church, Largo for Jesus?
23    Q.    I'm so sorry.  You know what, I wrote it
24  down wrong, and I'm just going to change that so I
25  stop doing it.  I apologize.

Page 40

1    A.    Correct.
2    Q.    Has it ever been disconnected?
3    A.    My mom always pays her bills.
4    Q.    Okay.  If you call her today and you
5  don't reach her, does the call go into voice mail?
6    A.    I think there is a voice mail hooked to
7  it.
8    Q.    Is her voice on a message?
9    A.    Her voice?  I'm not sure if it's her
10  voice.  I don't think it is.  I think my sister
11  did it for her because she didn't know how.
12    Q.    What does the voice mail message say, to
13  the best of your recollection?
14    A.    Honestly, I don't know, because if I
15  don't get her, I just hang up and I don't leave
16  her messages.  So I -- I don't know.
17    Q.    Does your father have his own cell
18  phone?
19    A.    He does have a cell phone.
20    Q.    What's his number?
21    A.    It's emergencies only.  So I don't know.
22  We always call my mom to get to him.
23    Q.    Do you ever remember seeing a bill for
24  the number that ends is 6140, telephone bill?
25    A.    No.

Page 39

1  Does any money come into Largo for Jesus for
2  any reason?
3    A.    Yes, they do take up collection.
4    Q.    Is there any other kind of money that
5  comes in?
6    A.    I don't know.
7    Q.    So you don't know what happens in
8  processing the collection money?
9    A.    I don't.  I don't have anything to do
10  with that.
11    Q.    Did your mother ever ask you if you
12  wanted to have a particular role, even on paper,
13  with the ministry?
14    A.    Well, I know -- I knew she was doing it.
15    Q.    Uh-huh.
16    A.    And whatever -- she told me she put us
17  down, but I don't have any, you know, I -- as --
18  I'm not a treasurer, I ain't never held no money
19  or anything like that.  But she always makes us a
20  part of things that she does.
21    Q.    So you don't know whether you were a
22  treasurer or a director or secretary or any
23  particular thing on paper?
24    A.    No, I don't.
25    Q.    Okay.  So starting in 1999 when the

Page 41

11 (Pages 38 - 41)

1 center was formed, how were people contacted by
2 phone?
3    A.   It wasn't -- that was her business, that
4 was her title.
5    Q.   Uh-huh.
6    A.   Because she wanted to be able to do her
7 own outreach and not have to be under some other
8 Christian type, Catholic or this or this.  It was
9 her non-denominational thing.  She wanted to be
10 able to do outreach and go speak the word of God
11 on her own.  So there was no physical property
12 that was -- you could go to.
13    Q.   Correct.  But if you wanted to contact
14 your mother, where would you call her?
15    A.   You would call her number.
16    Q.   When you say her number, it is the 61 --
17    A.   (727) 581-6140.
18    Q.   Can we just call it 6140?  It will just
19 make it easier.
20    A.   Okay.  Yes, we can.
21    Q.   So a person who wanted to speak with
22 your mom would call the 6140 number?
23    A.   Yes.
24    Q.   Is that always the number where she
25 could be reached for the ministry?

Page 42

1    A.   Yes.  I'm sorry.  I shook my head.  I'm
2 sorry.
3    Q.   Pardon me?
4    A.   I shook my head.  Yes.
5    Q.   You said yes.
6    A.   Okay.  All right.
7    Q.   Have you ever looked up Largo for Jesus
8 in any white pages or telephone directory?
9    A.   No.
10    Q.   If you did that, you wouldn't be
11 surprised to see the 6140 number listed for Largo
12 for Jesus, would you?
13    A.   I don't -- I don't know if it -- I don't
14 even know if I could find it in the phone book.  I
15 don't -- I don't know.
16    Q.   If it was in the phone book, is that the
17 number that you would expect to find for the
18 center?
19    A.   Yeah.
20    Q.   Would you say that your mom carries on
21 an active ministry?  She's a busy person?
22    A.   Yes.
23    Q.   And I'm sorry if you already told me
24 this, but did your father ever have any role that
25 you are aware of with the center?

Page 43

1    A.   I mean, he's -- he's her husband.  He's
2 probably had a role on paper as well, like the
3 rest of us.  But I don't know what that is.  I --
4 I don't know what those paper -- the paperwork for
5 the State of Florida says.  I don't -- I don't
6 know if he was vice-president or president, I -- I
7 don't know.
8    Q.   So in the community, how would people
9 become aware of the center and that they could
10 contact your mom for help and services?
11    A.   Word of mouth.  My mom knows a lot of
12 people and people know her.  And word of mouth
13 from other people, they tell them to contact mom.
14 So ...
15    Q.   Has your mom lived in Largo a long time?
16    A.   Uh-huh.
17    Q.   Basically all her life?
18    A.   As far as I can remember.
19    Q.   Where was your mom born?
20    A.   Haines City, Florida.
21    Q.   Haines City, Florida?
22    A.   Uh-huh.
23    Q.   Does your mom regularly attend a
24 particular church just as part of her life?
25    A.   Her own.

Page 44

1    Q.   Just her own church; okay.
2    A.   I mean, I don't know if she visits
3 others, I don't know.
4    Q.   Does your father currently separately
5 have his own ministry?
6    A.   My father?  No.
7    Q.   Is anyone in your family associated with
8 a ministry that provides premarriage counseling?
9    A.   Not that I know of.  I don't know.
10    Q.   I'm sorry.  I had myself a little bit
11 confused right at the moment.  Relates to -- your
12 current address is -- hang on.  You told me.
13       MR. KERNEY:  I'm sorry.  While you find
14 your place, do you care if we take a break?
15       MS. SIMONETTI:  Oh, sure.
16       MR. KERNEY:  Been about an hour or so.
17       MS. SIMONETTI:  Oh, sure.  That's fine.
18       THE VIDEOGRAPHER:  We're going to go off
19 the record at 10:46.
20          (Short break record.)
21       THE VIDEOGRAPHER:  We're now going back
22 on the record at 10:55.
23 BY MS. SIMONETTI:
24    Q.   Miss Newsome, we're back on record
25 having taken a little break.  Do you want to

Page 45

12 (Pages 42 - 45)

1  change any of the answers that you previously gave
2  me?
3      A.   No.
4      Q.   Okay.  So I'd like to go back to your
5  residence addresses because I may have missed
6  something.  Maybe this will make it easier.  In
7  1999 -- 1999, you lived at 1842 12th Street;
8  correct?
9      A.   I got married in '98.  So that would be
10 no, I did not.
11     Q.   So as of 1999 -- I'm sorry.  When did
12 you first start living at 1842 12th Street?  I
13 think you said as a married person.  I think I'm
14 getting my dates wrong.
15     A.   Okay.  Let's see.  I moved out in '98.
16 My parents were still living there, because I
17 moved to another address, and then my parents
18 moved from 1842 into another house.  And then I
19 moved back in.  So that's why I'm not real sure on
20 the dates in 1999, or -- that's why.
21     Q.   Okay.  So is it fair to say that your
22 parents moved out of 1842 and into 1544 Crosby
23 Street?
24     A.   When?
25     Q.   At any point in time, did --

1      A.   That sounds familiar.  I don't know the
2  time frame when I lived there, but I've lived in
3  two other places other than 1380 and 1842.
4      Q.   Okay.
5      A.   No, 12640 116th.
6      Q.   Lane?
7      A.   Lane?  That sounds about right.  In
8  Largo?
9      Q.   Yes.
10     A.   Yes, that sounds about right.  I only
11 lived there a short time, though, like a year or
12 something like that, so ...
13     Q.   Okay.  Are you familiar with the address
14 152 8th Avenue Southwest?
15     A.   Yes, that's the location of Largo for
16 Jesus Christian Center.
17     Q.   So when we talked about the center
18 before, I thought that you had indicated it didn't
19 have a physical address.
20     A.   Which in 1999, it did not.
21     Q.   Understood.  All right.
22     So as of what point in time did the center
23 begin to use the 152 8th Avenue address as a
24 physical location?
25     A.   How long have we been there?  One, two,

1      A.   Oh, yes, uh-huh.
2      Q.   Got it.
3      And was there any period of time when you and
4  your husband lived at 1544 Crosby Street?
5      A.   No.
6      Q.   That was no; correct?
7      A.   No.
8      Q.   And approximately when did your parents
9  move into 1544 Crosby Street?
10     A.   It was either in '99 or 2000.  It was --
11 I was pregnant.  I had my daughter in April of
12 '99.  I was pregnant at the time.  So I want to
13 say it was '99-ish.  Either late '98, early '99.
14 I was pregnant at the time, but I don't know how
15 far along I was.
16     Q.   Okay.  Now, you just mentioned that you
17 were pregnant with your daughter?
18     A.   Uh-huh.
19     Q.   Did you tell me about your daughter
20 before?
21     A.   Yes.  She's Morgan.
22     Q.   Two sons and a daughter?
23     A.   That's correct.
24     Q.   Okay.  Have you ever lived at
25 12640 116th Street in Largo?

1  maybe two, maybe three years.  I'm not sure on the
2  dates, but it's only been two or three years.
3      Q.   Is that a physical location that is open
4  for people to come into every day?
5      A.   Every first and third Sunday.
6      Q.   Every first and third Sunday.  And your
7  mom still is the person who provides all of the
8  services through the ministry?
9      A.   Yes.
10     Q.   Including on those first and third
11 Sundays?
12     A.   Yes.
13     Q.   Is there anyone else who works with her
14 in the ministry providing services to people?
15     A.   What type of services would you be
16 talking about?
17     Q.   Ministry services.  Not, you know,
18 running the building or that kind of thing.
19     A.   No, she's the pastor/evangelist.  She
20 has another -- there's another minister in the
21 building that, you know, that attends as well.
22     Q.   But there's no person that has a title
23 of, say, assistant pastor --
24     A.   No.
25     Q.   -- or works in an official capacity part

Veritext Legal Solutions
866 299-5127

**Page 50**

1  time --
2      A.   No.
3      Q.   -- or something like that?
4      Is there a land line telephone number that is
5  associated with the 152 8th Avenue address?
6      A.   There's no land line there.
7      Q.   You told me earlier that one of your
8  sisters is Marcy Lucky; correct?
9      A.   That's correct.
10     Q.   Does she reside at 732 Northwest
11  Riverside Drive in Port St. Lucie, Florida?
12     A.   That sounds correct.
13     Q.   Is her husband Troy?
14     A.   Yes, he is.
15     Q.   Has anyone ever delivered any papers to
16  you on behalf of the center?
17     A.   What do you mean?  What kind of papers
18  are you referring to?
19     Q.   Has anyone delivered any type of papers
20  or letters to you that were addressed to --
21     A.   To Largo for Jesus?  No.
22     Q.   Are you familiar with what it is to be a
23  registered agent?
24     A.   Is that State of Florida paperwork?
25     Q.   I don't know.  Any kind of paperwork.

**Page 51**

1      A.   I'm going to say I don't know because I
2  don't know.
3      Q.   Okay.
4      A.   That definition, I don't know.
5      Q.   That's fair.
6      What's your understanding of what this case is
7  about?
8      A.   This case is about my mother being
9  called numerous times, over and over again, and
10  they -- she's not the one that they -- that made
11  the debt.  It was me.
12     Q.   Did your mom tell you when the calls
13  were happening that they were happening?
14     A.   Not at first.  I didn't know that she
15  was getting the amount of calls.  She didn't tell
16  me anything.  I had no idea she was getting that
17  many phone calls.
18     Q.   When did she tell you?
19     A.   When she started writing them down, and
20  she showed me, look how many times this number has
21  called me.  As to a date, I don't know the exact
22  date.
23     Q.   Just give me your best estimate as to
24  when that was.
25     A.   Oh, my gosh.  About a year ago maybe, a

**Page 52**

1  year and a half.  I'm not really sure.
2      Q.   When she told you about the calls, what
3  did you do?
4      A.   At first, she just said, "Oh, you know,
5  somebody called me, and I told them that you don't
6  live here, and they need to contact you."
7      And I didn't do anything because I didn't know
8  she was being called that many times.
9      Q.   Did you ever call the Navient Solutions,
10  Inc. or Student Assistance Corporation to say you
11  should call me instead?
12     A.   No, I did not.
13     Q.   At any point in time did it occur to you
14  to do that?
15     A.   Well, they were calling my house phone.
16  So they knew to call me.
17     Q.   What number were they calling for you?
18     A.   581-8617.
19     Q.   Did you speak with --
20     A.   I never spoke with anybody.
21     Q.   Why not?
22     A.   Because I did all my transactions
23  online.
24     Q.   But you knew that calls were being made
25  to you at 8617 about the loan?

**Page 53**

1      A.   I did.
2      Q.   So I'm having trouble following you.
3  Why didn't you talk with them when they called
4  you?
5      A.   Well, I knew I owed, didn't have the
6  money.
7      Q.   So did you choose not to speak with them
8  because --
9      A.   I would just do it online, yeah.
10     Q.   And forgive me if I have this wrong, but
11  was the 8617 your residence number?
12     A.   Correct.
13     Q.   Okay.  It's hard to keep them all
14  straight.
15     Over what period of time were you receiving
16  calls at that number about your loans?
17     A.   Hum, I've always received numbers -- I
18  mean calls at that number, whether it was Sallie
19  Mae was doing it, you know?  And then I would do a
20  deferment or forbearance, you know, for a year.
21  And then the calls would start because I always
22  forget to go back and do it again.
23     Q.   Uh-huh.
24     A.   Life, just forgot and do it all.  But,
25  yeah, they've always called me at that number.

14 (Pages 50 - 53)

1   Q.   In the past four years, have you
2 received calls to that number or any other numbers
3 with respect to any other outstanding debt?
4   A.   Yes.
5   Q.   What other outstanding debts do you
6 have?
7   A.   Credit cards.  That's about it.  And
8 student loans.
9   Q.   Did your mom ever receive calls about
10 any credit card debts?
11   A.   I don't know.
12   Q.   Did your mom ask you to do anything
13 about the calls coming in?
14   A.   I'm trying to think.  Hum, I don't -- I
15 don't -- I don't remember.  I don't remember
16 exactly what was said.  As far as did she say stop
17 or anything, I -- I don't remember.  I don't
18 recall her saying.  But go tell them folks to stop
19 calling me, no.
20   Q.   If she had asked you to do that, would
21 you have done it?
22   A.   Hum, I didn't know they were calling her
23 hundreds of times in a month.  I'm thinking she's
24 getting the calls that I'm getting.  And I just
25 told her to ignore them, and then I would do my

Page 54

1 down.  I had no idea they was calling her that
2 many times.
3   Q.   All right.  And then when they were
4 calling so many times and she didn't ask you to do
5 something, do you know why?
6   A.   Ask me to do -- ask me to do what?  What
7 is something?
8   Q.   Call, write a letter, send an e-mail, do
9 something to contact the companies and straighten
10 it out as to where the calls should be going.
11   A.   I don't know if they would have stopped.
12   Q.   But you didn't try; right?
13   A.   I can't say, because I've done
14 forbearances on there before.  But it's about her
15 calls.  So, I don't think that would have stopped
16 them from calling her.  They call whoever they
17 need to call to get their money.
18   Q.   Do you believe that your name is
19 associated with the -- with your mother's cell
20 phone numbers -- strike that.
21     Do you believe that your name is associated
22 with your mother's cell phone number in any public
23 records?
24   A.   In any public records?  I don't know.  I
25 know if you Google my name, her name will come up.

Page 56

1 forbearance, and it would go away.
2   Q.   Is the 152 8th Street address the only
3 physical address that the center has had?
4   A.   Yes.
5   Q.   Why do you think your mom did not ask
6 you to do something about the calls?  If she was
7 receiving so many calls, and now you think they
8 were annoying her, why didn't she just ask you to
9 do something?
10     MR. KERNEY:  I'm going to object to the
11   form.  The question calls for speculation.  Go
12   ahead and answer the question.
13     THE WITNESS:  Ask it again.  I'm sorry.
14 BY MS. SIMONETTI:
15   Q.   Since your mom was receiving a lot of
16 phone calls, and how she says they were annoying
17 her, why didn't she ask you to do something about
18 it?
19   A.   Well, they shouldn't have had her number
20 in the first place.  But they went and got it
21 because I never put her number on anything.  So
22 like I said, I don't even know why they are even
23 calling you.  But I just -- I just -- I had no
24 idea they was calling her that many times.  I
25 mean, that was a lot when she started writing them

Page 55

1 If you Google her name, my name will come up.  And
2 I don't have any private numbers or anything that
3 can't be reached.  So I would say any number that
4 pops up and associates you with that person, then
5 I'm pretty sure that number will come up.
6   Q.   Do you think your name and that number
7 would be associated with the center in public
8 records?
9   A.   With the center in public records?
10   Q.   Uh-huh.
11   A.   I don't know.  It might.
12   Q.   Who pays the bill for your mom's cell
13 phone?
14   A.   She does.
15   Q.   Are you sure of that?
16   A.   No.  I know she takes care of all her
17 bills.
18     MS. SIMONETTI:  Let's mark as Exhibit 1
19   documents that are Bates stamped NSI 2 through
20   NSI 38.  I've left out all the zeros just for
21   convenience.  But he's just going to mark it
22   and give it to you.
23     THE WITNESS:  Oh, okay.
24     (Whereupon, Defendants' Exhibit 1 was
25   marked for identification.)

Page 57

15 (Pages 54 - 57)

1  BY MS. SIMONETTI:
2      Q.    Have you had a chance to take a look at
3  that?
4      A.    Briefly.  Not all the way through, but
5  if you want me to go all the way through --
6      Q.    As much as you want.
7      A.    Okay.
8      Q.    Whenever you're comfortable, I'm good.
9      A.    I'm sorry.  Did you say a question or
10  something?
11      Q.    No.
12      A.    Just want me -- okay.  I was like, did I
13  not answer a question?  Okay.  Oh, okay.  Okay.
14      Q.    If you take a look at Page 1.
15      A.    Uh-huh.
16      Q.    And when I say Page 1, I mean you can
17  use the Bates numbers.  Are you familiar with
18  these numbers?  Look at Bates Number Page 2.
19      A.    Okay.
20      Q.    Okay.  Have you ever seen a screen that
21  looks like this before?
22      A.    The screen is familiar.  However, the
23  information on there is not something I put on
24  there.
25      Q.    Okay.  If you look at the box it says

Page 58

1  phone, didn't you?
2      A.    Yes.
3      Q.    So do you see at the top of this page
4  where it says, "Edit your contact information"?
5      Do you see that?
6      A.    Yes.
7      Q.    Do you see that next paragraph that
8  says, "We would like to ensure we have the most
9  up-to-date records for your student loan account.
10  Please take a few moments to review your contact
11  information and update as needed.  If no changes
12  are needed, please click submit."
13      Do you see that?
14      A.    I do see that.
15      Q.    The next paragraph says, "It is
16  important that we have the most current address,
17  telephone number, and e-mail address.  Use this
18  form to update and/or verify any part of your
19  contact information."
20      Do you see that?
21      A.    Yes, I do.
22      Q.    Do you also see the next sentence that
23  says, "Required fields are marked with an
24  asterisk"?
25      A.    I do.

Page 60

1  name and date of birth.  Do you agree that is your
2  name, Maretta Newsome?
3      A.    Yes.
4      Q.    Is that your date of birth, 7/16/1975?
5      A.    Yes.
6      Q.    All right.  If you look at address
7  information, it's a little bit hard to read, but
8  1842 12th Street Southwest.  Do you see that?
9      A.    I see it.
10      Q.    Was that ever your address?
11      A.    Not when I was filing my student loans,
12  no.
13      Q.    When was that your address?
14      A.    Before I got -- well -- well, I take
15  that back because I did live there while I was
16  married, yeah.  So 1842 12th Street.
17      Q.    Okay.  And do you see the contact
18  information at the bottom of the screen?
19      A.    Yes.  That is not -- that is not a
20  number that I put in there.
21      Q.    Do you see that it's marked as home
22  phone?
23      A.    I do.
24      Q.    And during the time that your student
25  loans were outstanding, you had your own home

Page 59

1      Q.    Do you agree that the home phone field
2  is marked with an asterisk?
3      A.    Yes, I do.
4      Q.    And that would mean that it's required
5  information?
6      A.    That is correct.
7      Q.    So at the time that you would review the
8  screen like this, why didn't you change that
9  number to your phone home number?
10      A.    Why would I need to change a number I
11  never put in?
12      Q.    Do you think that number did not appear
13  in the field when you pulled it up?
14      A.    That number, no, it did not.
15      Q.    So your belief is that the moment that
16  you pulled up this screen --
17      A.    The only information that I -- I'm
18  sorry.
19      Q.    So it's your belief that when you pulled
20  up this screen to take a look at your loan
21  information, this -- was any part of this filled
22  in?
23      A.    Yes.
24      Q.    So what was filled in?
25      A.    I'm not sure.  I'm assuming it was, but

Page 61

16 (Pages 58 - 61)

1 it's probably the address and the phone number.
2 However, that is not the phone number that I've
3 ever given them.  I've never given them 6140.
4    Q.    Let's assume that's true.  Why didn't
5 you just change it?
6    A.    There was nothing to change because it
7 was 8617.
8    Q.    Again, let me just make sure I
9 understand what your testimony is.
10    A.    Uh-huh.
11    Q.    When you -- did you ever see a screen
12 that looked like this that said you can edit your
13 contact information?
14    A.    I would say yes, there was a screen that
15 did say that.
16    Q.    Okay.  So is it your testimony that when
17 you looked at this screen, the contact
18 information, home phone field was blank?
19    A.    No, I'm not saying it was blank.
20    Q.    Okay.  What did it reflect, then?
21    A.    It reflected the number that I gave
22 them, which was (727) 581-8617.  I would never
23 I -- have never given them (727) 581-6140.
24    Q.    So would it be your belief then that
25 after you updated your information, the

*Page 62*

1 information was further updated with information
2 that you did not ever see?  Is that what you're
3 trying to tell me?
4    A.    Say that again.
5    Q.    So is it your testimony that every time
6 you pulled up this screen, the number that was
7 reflected in contact information, home phone, was
8 the 8617 number?
9    A.    When I'm saying is, I've never given
10 them (727) 581-6140.  So there was no number to
11 update because that's -- the only number I had
12 given them was (727) 581-8617.
13    Q.    Okay.  Let's assume that this number
14 appeared in the field and you didn't give it to
15 them; okay?  Let's just assume that.
16    A.    Uh-huh.
17    Q.    If the number was in that field, why
18 wouldn't you change it?
19    A.    Because I wouldn't think that anybody
20 would go in and put in a new number that I didn't
21 give them.
22    Q.    Did you ever wonder why your mom was
23 getting telephone calls at her center?
24    A.    I know that if you Google anybody, you
25 can find out any information that's associated

*Page 63*

1 with that person.  So I knew how they got their
2 number.  It wasn't anything that I put down.
3    Q.    Is the 6140 number associated with you?
4    A.    Probably before I am married, yes.
5    Q.    Is it associated with you right now?
6    A.    No.
7    Q.    Is it associated with your father?
8    A.    With my dad, yes.
9    Q.    Is it associated with anybody else?
10    A.    There's only two people live in that
11 home.  Everybody moved out.  Haven't been back
12 since.
13    Q.    It's a cell phone number, isn't it?
14    A.    It is now, yes.
15    Q.    It's not a residence line, is it?
16    A.    Not anymore.
17    Q.    You don't know whether it's associated
18 with anyone other than you, your mother, your
19 father.  You don't know, do you?
20    A.    Offhand, no.  I would have to Google it.
21    Q.    On the page that's marked NSI 3, do you
22 see the text at the bottom that reads, "By
23 providing my telephone number, I authorize Sallie
24 Mae, Inc., it's affiliates and agents to contact
25 me at such number, using any means of

*Page 64*

1 communication, including but not limited to calls
2 placed to my cellular phone using an automated
3 dialing device, calls using pre-recorded messages,
4 and/or SMS text messages regarding current or
5 future loans owned or serviced by Sallie Mae,
6 Inc., its affiliates and agents even if I'm
7 charged by my service providers for receiving such
8 communications."
9    Do you see that?
10    A.    I see that.
11    Q.    Did you ever read that information?
12    A.    I can honestly say I probably didn't
13 read through it thoroughly, but I know there was
14 something there.
15    Q.    Did you have any understanding of what
16 that meant?
17    A.    Yes.  That they could contact me with
18 the number that I gave them, which was (727)
19 581-8617.
20    Q.    If your mother's cell phone number did
21 appear in this field at any point in time when you
22 looked at it, do you think you should have changed
23 it?
24    A.    It should not have been there because I
25 have never given them that number.  So why would I

*Page 65*

**Page 66**

1  need to feel to change a phone number that should
2  only be the one that I gave them?
3     Q.   If the phone number was in that field,
4  do you think you should have changed it?
5     A.   That phone number was not in the field,
6  because that's not my phone number.
7     Q.   Say it was in the field in error, any
8  kind of error.  Do you think you should have
9  changed it?
10    A.   But how would it be in the field in
11 error if I never gave it to them?
12    Q.   Miss Newsome.
13    A.   Yes.
14    Q.   If you can just answer my question that
15 I asked you.
16    A.   Okay.  Go ahead.  What was the question
17 again?  I'm sorry.
18    Q.   If the number was in the field at any
19 point in time that you were logged on --
20    A.   Uh-huh.
21    Q.   -- should you have changed it?
22    A.   Are we doing hypotheticals?  Because I
23 don't think that number was there.  So
24 hypothetically speaking, if that number was there,
25 should I have changed it?  Yes.

**Page 67**

1     Q.   Okay.
2     A.   Because that is not my phone number.
3     Q.   Okay.  If you look at Page 6, Bates
4  stamp 6 --
5     A.   Uh-huh.
6     Q.   -- under loan summary, do you see a
7  grand total $54,358.31?
8     A.   Yes.
9     Q.   Does that help refresh your recollection
10 as to how much you might owe on your student
11 loans?
12    A.   Yes.  I don't know if that's an exact
13 amount, but, yes, that's -- I've taken out several
14 loans.  So I don't know the actual dollar amount.
15    Q.   So based on what you can remember?
16    A.   Oh, yeah.
17    Q.   Somewhere around --
18    A.   Somewhere, uh-huh.
19    Q.   Okay.  Can you look at Page NSI 15 for
20 me, please?
21    A.   Okay.
22    Q.   Tell me when you've had a chance --
23    A.   I've had a chance to look at it, uh-huh.
24    Q.   And this is the screen that at the top
25 is entitled "Voluntary Forbearance Update

**Page 68**

1  Information."
2     Do you see that?
3     A.   Yes, I do.
4     Q.   Do you see it's dated February 4th,
5  2014?
6     A.   Yes, I do.
7     Q.   You see those next two sentences that
8  says, "Your voluntary request is listed below.
9  Please read over the information before
10 submitting."
11    A.   Yes, I do.
12    Q.   Okay.  On the left-hand side it says
13 personal, Maretta M. Newsome, 1542 12th Street
14 Southwest, Largo, Florida.
15    A.   Eighteen.
16    Q.   Pardon?
17    A.   That would be 18.
18    Q.   You're right.  That is really -- it's a
19 poor copy, isn't it?  Let's start over.
20    On the left-hand side under personal, do you
21 agree that this reads, "Maretta M. Newsome, 1842
22 12th Street Southwest, Largo, Florida, 33778."  Do
23 you see that?
24    A.   I do.
25    Q.   Was that information accurate for you at

**Page 69**

1  that time?
2     A.   Yes, it was.
3     Q.   Okay.  Then on the right-hand side, it
4  says contact, home phone, (727) 581-6140, work
5  phone is blank.  And then e-mails,
6  Maretta.newsome75@gmail.com.  Do you see that?
7     A.   Yes, I do.
8     Q.   That e-mail address is correct; correct?
9     A.   The e-mail, yes.
10    Q.   The e-mail address was correct for you
11 at that time; right?
12    A.   Yes.
13    Q.   Okay.  And the home phone is your
14 mother's cell phone?
15    A.   But I didn't give it to them.  But, yes,
16 that's what that number is.
17    Q.   Okay.  You submitted this request for
18 forbearance, didn't you?
19    A.   I submitted a forbearance.  I can't tell
20 you that that number was on there because I didn't
21 give them that number.
22    Q.   Did you get the forbearance that you
23 applied for here?
24    A.   I would have to go on the screen and
25 look to see what happened, if I sent all the

1  information in.
2     Q.   Well, why don't you take a look.  The
3  next few pages relate to the forbearance.
4     A.   Okay.  So, yes, it was confirmed?
5     Q.   Okay.  If you turn over to Page NSI 16,
6  see at the top it says "Voluntary Forbearance
7  Verified Information"?
8     A.   Yes, ma'am, I do.
9     Q.   You see dated it's 2/4/2014?
10    A.   Yes, I do.
11    Q.   All right.  And then it reads, "This is
12 a certification page for your voluntary
13 forbearance request.  Please read over the
14 information carefully before submitting.  Should
15 any of the information be incorrect, click the
16 edit button to make changes."
17    Do you see that?
18    A.   Yes, I do.
19    Q.   Do you agree that on the right-hand
20 side, your mother's cell phone number is listed as
21 your home phone?
22    A.   I see it on the paper.  However, I did
23 not give them that number.
24    Q.   I agree that you didn't give them the
25 number.  Do you see the number is there?

Page 70

1     A.   Yes, I see it on this piece of paper,
2  yes.
3     Q.   Did you do anything to change it?
4     A.   I don't know that it was there at the
5  time that I was doing it.  But had I seen the
6  number, I would have changed it.
7     Q.   Did you read this information carefully
8  when you were submitting your request for
9  forbearance?
10    A.   Thoroughly, like I'm reading it now,
11 probably not.  However, I never gave them my
12 mother's cell phone number.  The only number that
13 I've given them is (727) 581-8617.  I never even
14 gave them my cell phone number, which is (727)
15 485-3740.  Therefore, I would -- I wouldn't know
16 why they would put in another number and then ask
17 me to verify was it -- if it were correct.
18    Q.   I'm assuming that you didn't give them
19 the number.  It shows up repeatedly on these
20 pages, doesn't it?  And Sallie Mae is asking you
21 to change it if it's wrong.
22    A.   Say that one more.
23    Q.   I am not disagreeing with you that you
24 did not give the number --
25    A.   Uh-huh.

Page 71

1     Q.   -- to Sallie Mae, but the number appears
2  on these pages repeatedly with request to correct
3  if wrong, doesn't it?
4     A.   It does state that.
5     Q.   Okay.  So let's go to Page NSI 19.
6     A.   Okay.
7     Q.   Do you see that one?
8     A.   Yes, I do.
9     Q.   All right.  At the top it "says
10 Voluntary Forbearance e-Signature"?
11    A.   Uh-huh.
12    Q.   I think you told me earlier that you
13 like to conduct your business online.
14    A.   Yes.
15    Q.   So is this --
16    A.   That's -- yes.
17    Q.   So you're familiar with the e-signature
18 process.  You don't have to send paper through the
19 mail?
20    A.   Uh-huh.
21    Q.   Okay.  So do you see that under
22 electronic signature, it says, "I have chosen to
23 submit my forbearance request with an electronic
24 signature.  By typing in my name, I am completing
25 the borrower signature field on the voluntary

Page 72

1  forbearance request with an electronic signature.
2  My electronic signature certifies that I have
3  read, understand, and agree to the terms and
4  conditions of the voluntary forbearance request.
5  If I prefer to print and sign a paper copy or I do
6  not want my payments postponed, I can discontinue
7  the electronic signature process by selecting the
8  cancel button."
9     Do you see that?
10    A.   Yes, I do.
11    Q.   So then it says, "By submitting my
12 electronic signature, I understand and agree with
13 the following statements.  I agree to the terms of
14 this forbearance and agree to repay my loans upon
15 expiration of this forbearance in accordance with
16 the terms of my promissory note."
17    Do you see that?
18    A.   I see that.
19    Q.   And you did receive this forbearance,
20 didn't you?
21    A.   It says that it was verified, yes.
22    Q.   And that was --
23    A.   Confirmed.
24    Q.   I'm sorry.  And that was a benefit to
25 you, wasn't it?

Page 73

19 (Pages 70 - 73)

1    A.   Yes.  A bene -- well, scratch that.
2  Benefit how?  What do you mean?
3    Q.   Did you benefit from that by not having
4  to make payments for the loan?
5    A.   Oh, yes, I see.  Yes.
6    Q.   I think you told me earlier that your
7  mom has received some calls for you with respect
8  to outstanding credit card debt.  Do you remember
9  that?
10   A.   I said I had other -- you asked me did I
11  have any other outstanding debtors, and I said
12  credit cards.  And I don't know if she has
13  received any calls from credit cards.
14   Q.   Would it surprise you if she did?
15   A.   She shouldn't.  I don't put her number
16  down for anything.
17   Q.   Have you ever received any kind of a
18  paycheck or anything like that from the center?
19   A.   I do receive a donation, but it's not a
20  paycheck.
21   Q.   What is a donation?
22   A.   Because I play.  I play -- give them
23  music, I play music.
24   Q.   What form is the donation take?
25   A.   It's just a check.

Page 74

1  Power?
2    A.   Yes.
3    Q.   Does your father still work?
4    A.   No.
5    Q.   What did he do when he was working?
6    A.   He was a teacher.
7    Q.   What did he teach?
8    A.   Industrial arts.
9    Q.   Industrial arts.
10   Has your father ever received any kind of
11  donations or compensation from the center?
12   A.   No.
13   Q.   Aside from you, is there anyone who
14  receives donations, compensation through the
15  center?
16   A.   No.
17   Q.   Are you the only piano player?
18   A.   Yes, ma'am.  That's not true.  Strike
19  that.
20   Q.   Okay.
21   A.   We have a drummer, and they -- they
22  do -- a love offering goes to him as well.  So
23  strike the word "donation."  It's called a love
24  offering.
25   Q.   Oh, okay.

Page 76

1    Q.   How often do you receive that kind of
2  check?
3    A.   They give me something every time I
4  play.
5    Q.   How often do you play for them?
6    A.   The first and third Sunday.
7    Q.   So what do you play?
8    A.   A piano.
9    Q.   And how much is the amount of the
10  donation each time you play?
11   A.   They give me like $200.
12   Q.   Does your mother draw a salary or other
13  compensation from the center?
14   A.   No.
15   Q.   Does your mother otherwise work?
16   A.   No.  She's retired.
17   Q.   What did she do when she was working?
18   A.   She worked for, used to be Florida
19  Power.
20   Q.   How long did your mom work for Florida
21  Power?
22   A.   That's the only job I ever knew her
23  having.  So I don't have a date, though, a time
24  frame.
25   Q.   And so your mother retired from Florida

Page 75

1    A.   Uh-huh.
2    MS. SIMONETTI:  Why don't you give me
3  about five minutes to go through some of these
4  other documents and get organized a little bit
5  better, and then we can pick up; okay?
6    THE VIDEOGRAPHER:  Counsel, there's 13
7  minutes left.  Do you want me to change this?
8    MS. SIMONETTI:  Oh, sure.
9    THE VIDEOGRAPHER:  Okay.  This will mark
10  the end of videotape number one.  We are now
11  going off the record at 11:38.
12      (Short break.)
13   THE VIDEOGRAPHER:  This will mark the
14  beginning of videotape number two.  We're
15  going back on the record at 11:47.
16  BY MS. SIMONETTI:
17   Q.   Miss Newsome, having taken a break for a
18  couple of minutes, do you want to change any of
19  the answers to the questions that you previously
20  gave?
21   A.   No.
22   Q.   Do you have an understanding of what the
23  annual average revenue of the center might be?
24   A.   That, I don't know.
25   Q.   If I told you it was 200,000, would you

Page 77

1 think that's accurate?
2    A.   I don't know.
3    Q.   Does the center have any employees?
4    A.   Employees?  Those will be people that
5 are paid.  No.
6    Q.   So if there were information in the
7 public record indicating that there were six
8 employees, you would think that that would not be
9 accurate?
10    A.   I don't know.  I would have to see -- I
11 mean, other than on paper, I don't know what's
12 there.  But to my knowledge, there's no employees.
13    Q.   Does the center have an accountant?
14    A.   Not that -- I don't know.  Not that I
15 know of.
16    Q.   When your mother first told you that she
17 was receiving calls on her cell phone for you with
18 respect to the debt, I think you told me that was
19 maybe a year, year and a half ago; is that right?
20    A.   I believe so.
21    Q.   So that would put it in approximately
22 sometime in 2014, 2014, something like that?
23    A.   That sounds about right.
24    Q.   And when she told you this and as you
25 stated a number of times, you haven't provided

Page 78

1 that number to Sallie Mae, were you surprised that
2 the calls were going to the number?
3    A.   Yes.
4    Q.   Okay.  So tell me then why you didn't do
5 something to stop the calls going to that number
6 at that point in time?
7    A.   What is something?  What is it that
8 you're supposed to do?
9    Q.   I don't know.  Anything that might come
10 to you.
11    A.   I don't have any real reason.  I just
12 know you shouldn't receive calls, and it's not
13 your debt, from anybody, for that.  And nobody's
14 given you that number for that many phone calls.
15    Q.   All right.  And if that's your view,
16 again, I'm just having trouble understanding why
17 you didn't do something to try to stop the calls.
18    A.   Like what?  What is something?  You keep
19 saying do something.  What do you mean?
20    Q.   Well, you could contact the company by
21 telephone; correct?
22       MR. KERNEY:  I'm going to object that
23    this line of questioning was already asked and
24    answered.
25       MS. SIMONETTI:  Okay.

Page 79

1 BY MS. SIMONETTI:
2    Q.   Go ahead.  You could contact the company
3 by telephone; correct?
4    A.   Uh-huh.
5    Q.   You could write a letter, couldn't you?
6    A.   Okay.
7    Q.   You could find a way to e-mail?
8    A.   But I had no control over the person
9 that was making the phone calls.
10    Q.   Could you have done any of those things?
11    A.   Did I do those things?  No.  However, I
12 didn't make the phone calls 700 times either.
13    Q.   Could you have done any of those things?
14    A.   Could I have?  I guess anybody could
15 have done anything.  But I didn't give them the
16 number to call, nor did I tell them to call that
17 many times.  So I have no control over that.  And
18 had I called, no, would I have been able to pay
19 them $54,000?  No.  So would that have stopped the
20 phone calls?  Probably not.
21    Q.   So is it true that you didn't call
22 because you owed the money?
23    A.   Hum, no.  I know that I owe the money.
24 So that wasn't -- you know, I knew that already.
25    Q.   All right.  So why didn't you do

Page 80

1 something to stop the calls to your mom?
2    A.   I don't know what I was supposed to do.
3 I had no idea she was being called that many
4 times.  None.  Absolutely no idea she was being
5 harassed like that.  And I say harassed because
6 it's a lot.  That is a lot of times.  They're
7 calling her, they were calling me.  They shouldn't
8 have been calling her in the first place.
9    Q.   Exactly.  So when they were calling her
10 in the first place, let's say she received two
11 calls, five calls, wouldn't it be your view that
12 those calls shouldn't have been made either?
13    A.   Yeah, they should not have been made.
14    Q.   Okay.  So at that point in time, before
15 there were hundreds of calls, do you agree that
16 you could have done something or tried to do
17 something to stop the calls?
18    A.   Well, I didn't give them that number to
19 call.  So they took it upon themselves to find a
20 number to start calling her and harassing her.  I
21 didn't give them that number.
22    Q.   Let's read the question back.
23       (Whereupon, the testimony was read back by the
24    court reporter, as recorded above.)
25 BY MS. SIMONETTI:

Page 81

21 (Pages 78 - 81)

1   Q.   That's the question.
2   A.   Hum, I don't know.
3   Q.   Looking back, do you think you should
4 have tried?
5   A.   I don't know.
6   Q.   What makes you unsure?
7   A.   Because you're asking me about something
8 that I have no control over.  I have no control
9 over how many times somebody else calls somebody
10 else for a number that they -- was not given to
11 them by me.
12      MS. SIMONETTI:  Let's mark as Exhibit 2
13   the pages that are marked NSI 39 through NSI
14   54.
15      (Whereupon, Defendants' Exhibit 2 was
16 marked for identification.)
17 BY MS. SIMONETTI:
18   Q.   Take as much time as you need to look
19 through that.
20   A.   Okay.
21   Q.   Okay.  So in Exhibit 2, if you look at
22 Page 42, do you have that one?
23   A.   Yes, I do.
24   Q.   Okay.  Do you see the two boxes for
25 phone number that are filled in?

Page 82

1   A.   Yes, I do.
2   Q.   The box that is marked primary phone is
3 (727) 581-8617, I believe; is that correct?
4   A.   Yes.
5   Q.   And do you recognize that telephone
6 number?
7   A.   Yes, I do.
8   Q.   What number is that?
9   A.   That's my land line.
10   Q.   Okay.  And the next line, it reads
11 alternate phone, and that is (727) 218-4347; is
12 that correct?
13   A.   That is correct.
14   Q.   Do you recognize that?
15   A.   Yes, I do.
16   Q.   And what's that telephone number?
17   A.   That is my cell phone number.
18   Q.   Okay.  And do you agree that your e-mail
19 address is maretta.newsome75@gmail.com as your --
20   A.   Yes, I do.
21   Q.   At any point in time did you go on to
22 Sallie Mae's website and remove your mother's cell
23 phone number from your record?
24   A.   No.  I didn't remove anything because I
25 never put it there.

Page 83

1   Q.   Are you certain of that?
2   A.   Positive.  I never use my mom's number.
3 You don't know my mom.
4   Q.   Did you give your residence number and
5 cell phone number to Sallie Mae as reflected here?
6   A.   On page what?  41?
7   Q.   Yes.
8   A.   Yes.
9   Q.   How did you do that?
10   A.   Online.
11   Q.   You've never spoken with anyone from
12 Sallie Mae; right?
13   A.   Yeah, I have never spoken with anybody.
14      MS. SIMONETTI:  I don't think I have
15   anything else.  Do you have anything?
16         CROSS-EXAMINATION
17 BY MR. KERNEY:
18   Q.   Maretta, did your mother ever authorize
19 you at any time to provide anyone with her cell
20 phone number?
21   A.   Oh, no.
22   Q.   Did you ever provide Sallie Mae,
23 Navient, Navient Solutions, or SAC with your
24 mother's cell phone number?
25   A.   No, I did not.

Page 84

1   Q.   Would you have ever done that?
2   A.   Oh, no.
3   Q.   Why not?
4   A.   You don't give out my mom's number,
5 which is her business.  I handle my own business,
6 she handles her own business.  I don't give out
7 her number in regards to anything, for anything,
8 because I just -- that's not her, that's not me.
9 She stay over there, and I stay over here.
10   Q.   Do you believe that you were ever
11 authorized in any capacity at any time to provide
12 your mother's cell phone number to anyone?
13   A.   No.
14   Q.   Do you believe in any way your mother is
15 responsible for your loans that were serviced by
16 Navient or Sallie Mae or SAC?
17   A.   No.
18   Q.   Did your mother ever offer to pay for
19 any of your loans?
20   A.   No.
21      MR. KERNEY:  Okay.  I have nothing
22   further.
23      MS. SIMONETTI:  Okay.
24      THE VIDEOGRAPHER:  This will conclude
25   this videotape deposition at 12:01.

Page 85

22 (Pages 82 - 85)

```
 1      (Thereupon, the taking of the deposition
        was concluded 12:01 p.m.)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 86

```
 1          CERTIFICATE OF REPORTER
 2  STATE OF FLORIDA
 3  COUNTY OF HILLSBOROUGH
 4      I, PHILIP RYAN, RPR, certify that I
 5  was authorized to and did stenographically
 6  report the foregoing deposition; and that the
 7  foregoing transcript is a true record of the
 8  testimony given by the witness.
 9          I further certify that I am not a
10  relative, employee, attorney, or counsel of any
11  of the parties, nor am I a relative or employee
12  of any of the parties' attorneys or counsel
13  connected with the action, nor am I financially
14  interested in the action.
15
16      DATED this 26th day of December,
17
18
19
20
21
22
23      PHILIP RYAN, RPR
24          RPR, Court Reporter, Notary Public
25
```
Page 88

```
 1      I declare under penalty of perjury
 2  under the laws that the foregoing is
 3  true and correct.
 4
 5      Executed on _____ , 20___,
 6  at _____, _____.
 7
 8
 9
10
11      _____
12      Maretta Newsome
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 87

23 (Pages 86 - 88)

[& - addresses]

**&**

**&**   2:2

**0**

**06**   14:5 33:12,12

**1**

**1**   1:25 2:18 57:18,24
58:14,16
**10:46**   45:19
**10:55**   45:22
**116th**   47:25 48:5
**11:38**   77:11
**11:47**   77:15
**12**   14:17
**12640**   47:25 48:5
**12:01**   85:25 86:1
**12th**   17:23 18:1,2,14
20:11 46:7,12 59:8
59:16 68:13,22
**13**   77:6
**1380**   18:9,16 20:14
21:2,7 33:15 48:3
**14**   20:22,22 35:5
**15**   1:13 67:19
**152**   48:14,23 50:5
55:2
**1542**   68:13
**1544**   21:11,12 46:22
47:4,9
**1559**   1:4
**15th**   3:4
**16**   35:4 70:5
**18**   17:23 21:24
68:17
**1842**   17:23,25 18:14
20:11,17,19 46:7,12
46:18,22 48:3 59:8
59:16 68:21
**19**   72:5
**1900**   2:7
**1925**   2:7
**1996**   25:22
**1999**   16:1,3 17:13
17:15,17,20,23

41:25 46:7,7,11,20
48:20
**1st**   22:14,15

**2**

**2**   2:19 57:19 58:18
82:12,15,21
**2/28/2013**   23:3
**2/4/2014**   70:9
**20**   87:5
**200**   75:11
**200,000**   77:25
**2000**   33:9 47:10
**2001**   25:23
**2002**   25:3
**2003**   15:15
**2004**   15:15
**2005**   25:5
**2006**   33:24
**201**   2:3
**2013**   22:14
**2014**   68:5 78:22,22
**2015**   1:13 3:4
**218**   32:21
**218-4346**   34:10
**218-4347**   32:20
83:11
**2183813**   1:24
**23**   35:2
**26th**   88:16

**3**

**3**   2:14 64:21
**33**   1:4
**33602**   2:4
**33606**   1:12 3:8
**33778**   68:22
**3740**   33:2
**38**   57:20
**39**   2:19 82:13

**4**

**40**   37:23 38:1,2,6
**41**   84:6
**42**   82:22

**4347**   32:22
**442**   3:7
**485-3740**   33:1 71:15
**4th**   68:4

**5**

**5**   29:18,21 30:1
**5/31/2011**   23:15,17
**54**   2:21 82:14
**54,000**   80:19
**54,358.31**   67:7
**57**   2:18
**581-6140**   37:18
42:17 62:23 63:10
69:4
**581-8617**   33:19
52:18 62:22 63:12
65:19 71:13 83:3

**6**

**6**   67:3,4
**6/1/2011**   23:3
**61**   42:16
**6140**   39:24 42:18,22
43:11 62:3 64:3

**7**

**7/11/06**   24:19
**7/12/06**   23:15,16
**7/16/1975**   59:4
**7/2002**   25:1
**7/29/05**   25:1
**7/7/2002**   25:2
**700**   2:3 80:12
**727**   32:20 33:1,19
34:10 37:18 42:17
62:22,23 63:10,12
65:18 69:4 71:13,14
83:3,11
**732**   50:10
**75**   36:12

**8**

**8/1/2005**   24:19
**82**   2:19
**84**   2:15

**8617**   33:20 52:25
53:11 62:7 63:8
**88**   1:25
**8:15**   1:4
**8th**   48:14,23 50:5
55:2

**9**

**90067**   2:8
**93**   15:7
**98**   33:22 46:9,15
47:13
**99**   47:10,12,13,13
**9:44**   1:14 3:5

**a**

**a.m.**   1:14 3:5
**aa**   27:16
**abbreviation**   10:4
**able**   11:21 16:17
29:16 36:23 40:7
42:6,10 80:18
**absolutely**   81:4
**acceptance**   30:23
**account**   40:2,5 60:9
**accountant**   78:13
**accurate**   68:25 78:1
78:9
**action**   8:10 88:13,14
**active**   17:11 38:24
43:21
**actual**   67:14
**add**   20:23
**addition**   10:19
**additional**   20:7
**address**   17:14,18,21
18:16 20:11 21:2
33:14 35:24 36:6,9
36:18 37:4,7 45:12
46:17 48:13,19,23
50:5 55:2,3 59:6,10
59:13 60:16,17 62:1
69:8,10 83:19
**addressed**   50:20
**addresses**   46:5

[administration - cancel]

**administration** 12:16,20
**adults** 21:21,24
**affiliates** 64:24 65:6
**age** 23:7
**agency** 12:15,18,19
**agent** 29:1,5,11 50:23
**agents** 64:24 65:6
**ages** 34:25
**ago** 38:3,23 51:25 78:19
**agree** 16:1 59:1 61:1 68:21 70:19,24 73:3 73:12,13,14 81:15 83:18
**ahca** 12:20 22:3
**ahead** 55:12 66:16 80:2
**ain't** 41:18
**alternate** 83:11
**amount** 51:15 67:13 67:14 75:9
**angeles** 2:8
**annoying** 55:8,16
**annual** 77:23
**answer** 5:8,20,25 6:2 17:6 40:7 55:12 58:13 66:14
**answered** 79:24
**answers** 46:1 77:19
**anybody** 31:17 52:20 63:19,24 64:9 79:13 80:14 84:13
**anymore** 64:16
**apologize** 40:25
**appear** 61:12 65:21
**appearances** 2:1
**appeared** 63:14
**appears** 72:1
**applied** 69:23
**approximate** 28:1
**approximately** 3:5 18:11 20:10,15 38:19,20 47:8 78:21

**april** 13:4 22:4 47:11
**arts** 76:8,9
**aside** 7:4 12:3 32:4 76:13
**asked** 54:20 66:15 74:10 79:23
**asking** 5:1 8:17,20 31:21 71:20 82:7
**assistance** 10:12 52:10
**assistant** 24:21 49:23
**associated** 18:17 38:9,12 45:7 50:5 56:19,21 57:7 63:25 64:3,5,7,9,17
**associates** 57:4
**assume** 32:8 62:4 63:13,15
**assuming** 61:25 71:18
**asterisk** 60:24 61:2
**attend** 26:7,9,11 27:10 44:23
**attends** 49:21
**attorney** 2:5,9 8:14 88:10
**attorneys** 88:12
**authorize** 64:23 84:18
**authorized** 85:11 88:5
**automated** 65:2
**avenue** 48:14,23 50:5
**average** 77:23
**aware** 16:7 43:25 44:9

| **b** |
| --- |

**bachelor's** 14:2,25 27:3
**back** 13:8 29:13,15 30:9,10,12,13 33:8

33:12 37:2 45:21,24 46:4,19 53:22 59:15 64:11 77:15 81:22 81:23 82:3
**balance** 28:2 29:10 29:12
**bank** 25:20 40:1,5
**bankruptcy** 8:7
**base** 31:6
**based** 7:20 67:15
**basically** 44:17
**bates** 2:19 57:19 58:17,18 67:3
**beginning** 3:14 77:14
**behalf** 1:17 3:17 7:18 50:16
**belief** 31:6 61:15,19 62:24
**believe** 9:16,22 28:8 28:11 31:9 33:11 34:2 56:18,21 78:20 83:3 85:10,14
**believing** 32:9
**belongs** 21:3
**bene** 74:1
**benefit** 73:24 74:2,3
**best** 6:6 37:25 39:13 51:23
**better** 12:12 77:5
**big** 30:3
**bill** 39:23,24 57:12
**bills** 39:3 57:17
**birth** 34:22,24 35:9 59:1,4
**bit** 4:15 45:10 59:7 77:4
**blank** 62:18,19 69:5
**book** 43:14,16
**born** 44:19
**borrower** 72:25
**boss** 12:9
**bottom** 59:18 64:22
**boulevard** 3:8

**box** 58:25 83:2
**boxes** 82:24
**branch** 25:25
**break** 6:12,17 45:14 45:20,25 77:12,17
**briefly** 4:9 8:14 58:4
**bringing** 7:14
**brothers** 19:20
**building** 49:18,21
**bunch** 30:2
**business** 22:23 42:3 72:13 85:5,5,6
**busy** 43:21
**button** 70:16 73:8

| **c** |
| --- |

**c** 19:8,9,9,14
**ca** 2:8
**call** 35:17 37:14,15 39:4,5,22 42:14,15 42:18,22 52:9,11,16 56:8,16,17 80:16,16 80:21 81:19
**called** 4:3 9:17,23 14:12 15:24 29:6 30:25 31:21,25 51:9 51:21 52:5,8 53:3 53:25 76:23 80:18 81:3
**calling** 52:15,17 54:19,22 55:23,24 56:1,4,16 81:7,7,8,9 81:20
**calls** 31:14 51:12,15 51:17 52:2,24 53:16 53:18,21 54:2,9,13 54:24 55:6,7,11,16 56:10,15 63:23 65:1 65:3 74:7,13 78:17 79:2,5,12,14,17 80:9,12,20 81:1,11 81:11,12,15,17 82:9
**campus** 26:20,21
**cancel** 73:8

[capacity - dad]

**capacity** 40:11 49:25 85:11
**caption** 3:9
**card** 54:10 74:8
**cards** 54:7 74:12,13
**care** 12:15,20 22:18 22:22,24,25 23:11 45:14 57:16
**carefully** 70:14 71:7
**carries** 43:20
**case** 1:4 3:9 4:11,14 6:25 7:2,14,22,25 10:8,12 23:20 31:24 51:6,8
**catholic** 42:8
**cause** 1:21
**cell** 32:18,23,25 34:1 34:4,6,14 38:2,10 38:13,16 39:17,19 56:19,22 57:12 64:13 65:20 69:14 70:20 71:12,14 78:17 83:17,22 84:5 84:19,24 85:12
**cellular** 65:2
**center** 15:24 16:21 42:1 43:18,25 44:9 48:16,17,22 50:16 55:3 57:7,9 63:23 74:18 75:13 76:11 76:15 77:23 78:3,13
**centers** 22:18
**century** 2:7
**certain** 84:1
**certificate** 14:16 88:1
**certificates** 14:24
**certification** 70:12
**certified** 3:2
**certifies** 73:2
**certify** 88:4,9
**chance** 4:9 58:2 67:22,23
**change** 40:24 46:1 61:8,10 62:5,6

63:18 66:1 71:3,21 77:7,18
**changed** 10:2 27:16 65:22 66:4,9,21,25 71:6
**changes** 14:8 60:11 70:16
**charged** 65:7
**chat** 4:9
**cheat** 22:12
**check** 74:25 75:2
**child** 22:18,22,24,25 23:11
**children** 19:2 23:8 23:22,24,25 34:19 34:21 35:1,8,11,14 35:15,19
**choose** 53:7
**chosen** 72:22
**christian** 15:24 42:8 48:16
**christians** 16:12
**church** 16:24 40:22 44:24 45:1
**city** 44:20,21
**claims** 7:14 8:10 12:25
**clear** 8:16 10:7
**clearwater** 36:2
**click** 60:12 70:15
**close** 21:12
**clvs** 2:11
**coleman** 19:12,13
**collection** 41:3,8
**collector** 31:4,5,7,12 31:13,19
**college** 14:8,10 15:14 26:9,16,24 27:14,15,21
**come** 7:18 29:4,16 41:1 49:4 56:25 57:1,5 79:9
**comes** 40:20 41:5
**comfortable** 58:8

**coming** 9:4 54:13
**communication** 8:18 65:1
**communications** 65:8
**community** 22:22 22:24,25 23:10 24:7 44:8
**companies** 31:16 56:9
**company** 10:2,2 28:24 30:25 31:21 79:20 80:2
**compensation** 75:13 76:11,14
**complete** 15:17
**completely** 8:16
**completing** 72:24
**conclude** 85:24
**concluded** 86:1
**conditions** 73:4
**conduct** 72:13
**conducted** 16:20
**confirmed** 70:4 73:23
**confused** 45:11
**connected** 88:13
**connection** 7:4 20:8
**considered** 31:18
**contact** 28:17,21,23 29:4 30:18 37:13 42:13 44:10,13 52:6 56:9 59:17 60:4,10 60:19 62:13,17 63:7 64:24 65:17 69:4 79:20 80:2
**contacted** 42:1
**content** 8:18
**contract** 24:5
**control** 80:8,17 82:8 82:8
**convenience** 57:21
**conversation** 5:9 8:21 11:12 12:8 29:8,22

**copy** 68:19 73:5
**corporation** 10:12 30:19,23 31:1,3,7 31:10,22 32:6,11 52:10
**correct** 4:17,18 6:21 6:23 7:12,20 17:1 33:3 34:1 38:25 39:1 42:13 46:8 47:6,23 50:8,9,12 53:12 61:6 69:8,8 69:10 71:17 72:2 79:21 80:3 83:3,12 83:13 87:3
**counsel** 3:15 4:16 5:22 8:19,25 77:6 88:10,12
**counseling** 45:8
**counsels** 3:13
**county** 7:2 24:6,12 24:16,25 25:16 88:3
**couple** 77:18
**course** 4:25 15:2
**courses** 27:5,7,13,19
**court** 1:1,18 3:23 5:1 6:22 7:1,5 12:9 81:24 88:24
**covers** 30:7
**credit** 54:7,10 74:8 74:12,13
**crosby** 18:9,16 20:15 21:2,7,11 33:15 46:22 47:4,9
**cross** 2:14 84:16
**current** 12:14 21:19 22:2 32:18 33:13,15 33:18 34:4 36:9 45:12 60:16 65:4
**currently** 12:1 22:3 35:21 45:4
**cv** 1:4

| d |
| --- |

**dad** 64:8

**[date - first]**

**date** 3:3 36:23 37:21 38:14,17,20,22 51:21,22 59:1,4 60:9 75:23
**dated** 68:4 70:9 88:16
**dates** 27:11 37:24 46:14,20 49:2
**daughter** 47:11,17 47:19,22
**day** 6:14,15,15 12:13 16:20 32:16 49:4 88:16
**debt** 31:4,4,7,12,13 31:18 51:11 54:3 74:8 78:18 79:13
**debtors** 74:11
**debts** 54:5,10
**december** 1:13 3:4 28:19 88:16
**declare** 87:1
**defendant** 1:9 3:11 10:11 31:24
**defendants** 1:17,20 2:9,17 3:22 4:11 57:24 82:15
**deferment** 53:20
**definition** 51:4
**degree** 14:2,4 15:18 27:20
**degrees** 14:14
**delivered** 50:15,19
**denominational** 42:9
**department** 22:8,16
**deponent** 3:19
**deposition** 1:11,20 3:6 4:12 7:19 8:13 9:4 10:22 11:3,4,7 11:13 12:4 13:7 85:25 86:1 88:6
**describe** 9:12
**description** 7:20
**device** 65:3

**dialing** 65:3
**different** 32:1 33:25
**direct** 2:13 4:6
**director** 41:22
**directory** 43:8
**disagreeing** 71:23
**disconnected** 39:2
**discontinue** 73:6
**district** 1:1,1
**division** 1:2
**document** 9:11
**documents** 2:18,19 9:10 10:18 57:19 77:4
**doing** 8:19 16:10 40:25 41:14 53:19 66:22 71:5
**dollar** 67:14
**donation** 74:19,21 74:24 75:10 76:23
**donations** 76:11,14
**dot** 36:11
**draw** 75:12
**drive** 50:11
**drummer** 76:21
**due** 28:8,11
**duly** 4:4

**e**

**e** 19:8,9,14 36:9,17 37:3,7 56:8 60:17 69:5,8,9,10 72:10 72:17 80:7 83:18
**earlier** 50:7 72:12 74:6
**early** 47:13
**easier** 42:19 46:6
**east** 2:7
**easy** 15:12
**ed** 27:7
**edit** 60:4 62:12 70:16
**education** 14:1,17 15:2,13

**eighteen** 68:15
**either** 47:10,13 80:12 81:12
**electronic** 72:22,23 73:1,2,7,12
**emergencies** 39:21
**emphasis** 16:9
**employed** 13:3 22:3
**employee** 88:10,11
**employees** 78:3,4,8 78:12
**employer** 12:14
**employment** 7:5 22:20 26:2
**ends** 39:24
**english** 5:11
**ensure** 60:8
**entertainment** 25:11
**entitled** 67:25
**error** 66:7,8,11
**esquire** 2:2,6
**estimate** 51:23
**evangelist** 17:2,3 49:19
**everybody** 64:11
**exact** 37:21 51:21 67:12
**exactly** 54:16 81:9
**examination** 2:13 2:14 4:6 84:16
**examined** 4:4
**examples** 16:21
**exceptional** 14:17 14:18,20 24:22
**executed** 87:5
**exhibit** 2:16,17,18 2:19 57:18,24 82:12 82:15,21
**expect** 9:6 43:17
**expiration** 73:15
**explain** 7:13

**f**

**fact** 12:5 13:11
**fair** 46:21 51:5
**familiar** 15:23 48:1 48:13 50:22 58:17 58:22 72:17
**families** 23:23
**family** 19:22 23:12 23:14,19 24:10 45:7
**far** 14:1 37:22 44:18 47:15 54:16
**fast** 18:7
**father** 13:21 18:19 37:9 39:17 43:24 45:4,6 64:7,19 76:3 76:10
**father's** 13:19
**february** 68:4
**federally** 30:15
**feel** 6:8 66:1
**field** 61:1,13 62:18 63:14,17 65:21 66:3 66:5,7,10,18 72:25
**fields** 60:23
**figured** 27:4
**file** 40:13
**filed** 8:5,7
**filing** 59:11
**filings** 20:3,7,7
**filled** 61:21,24 82:25
**financially** 88:13
**find** 23:9 43:14,17 45:13 63:25 80:7 81:19
**fine** 5:13 22:13 32:15 45:17
**finished** 15:3
**firm** 4:19
**first** 4:3,19 9:21 24:13 25:19 27:8 36:11 46:12 49:5,6 49:10 51:14 52:4 55:20 75:6 78:16 81:8,10

**five**  9:9 36:25 77:3
  81:11
**fl**  1:12 2:4
**florida**  1:1,19 3:8
  12:22 13:22 14:13
  15:9 17:24 20:3
  22:9,10 24:2 26:17
  26:18,22 27:1 44:5
  44:20,21 50:11,24
  68:14,22 75:18,20
  75:25 88:2
**folks**  54:18
**following**  53:2 73:13
**follows**  4:5
**forbearance**  53:20
  55:1 67:25 69:18,19
  69:22 70:3,6,13
  71:9 72:10,23 73:1
  73:4,14,15,19
**forbearances**  56:14
**foregoing**  87:2 88:6
  88:7
**forget**  53:22
**forgive**  53:10
**forgot**  53:24
**form**  25:13 55:11
  60:18 74:24
**formed**  16:1,3 42:1
**forming**  16:6
**four**  25:8 54:1
**frame**  20:12 21:16
  24:25 27:11 48:2
  75:24
**frank**  2:2 3:16
**franklin**  2:3
**freddie**  13:14
**full**  26:2,4,4
**further**  63:1 85:22
  88:9
**future**  65:5

**g**

**general**  27:7 28:25
  29:1 30:19

**getting**  46:14 51:15
  51:16 54:24,24
  63:23
**girlfriend**  36:3
**girls**  18:25 19:3
  40:19
**gist**  29:7
**give**  5:19 6:5 12:24
  17:6 30:10,12 51:23
  57:22 63:14,21
  69:15,21 70:23,24
  71:18,24 74:22 75:3
  75:11 77:2 80:15
  81:18,21 84:4 85:4
  85:6
**given**  6:24 7:5 16:20
  62:3,3,23 63:9,12
  65:25 71:13 79:14
  82:10 88:8
**gmail**  36:15
**gmail.com**  83:19
**gmail.com.**  36:12,14
  69:6
**go**  6:9 11:9,15 12:9
  15:8,17 35:16 39:5
  42:10,12 45:18 46:4
  53:22 54:18 55:1,11
  58:5 63:20 66:16
  69:24 72:5 77:3
  80:2 83:21
**god**  17:8 42:10
**goes**  12:11 17:7
  76:22
**going**  11:14,16
  16:14 17:5 22:12
  30:3,9,12 40:24
  45:18,21 51:1 55:10
  56:10 57:21 77:11
  77:15 79:2,5,22
**good**  3:16,20 4:8
  22:15 58:8
**goodness**  17:15
**google**  56:25 57:1
  63:24 64:20

**gosh**  51:25
**graduate**  15:5
**grand**  67:7
**greg**  2:11 3:1
**grew**  21:1
**guaranteed**  30:16
**guess**  9:11 11:10
  80:14

**h**

**haines**  44:20,21
**half**  52:1 78:19
**hand**  68:12,20 69:3
  70:19
**handle**  85:5
**handles**  85:6
**hang**  39:15 45:12
**happened**  69:25
**happening**  51:13,13
**happens**  19:1 41:7
**happy**  5:18 6:16
**harassed**  81:5,5
**harassing**  81:20
**hard**  53:13 59:7
**he'll**  3:24
**head**  24:25 25:16
  43:1,4
**heads**  5:10
**healer**  17:8
**health**  12:15,20 22:8
  22:17
**hear**  9:21 11:20
  23:21 34:23
**heard**  11:22 30:25
**held**  3:6 40:8,16
  41:18
**help**  16:12 20:6
  29:13 44:10 67:9
**helps**  30:8
**high**  15:5,8,9
**higher**  14:25
**highest**  13:25
**hillsborough**  88:3
**hodges**  14:9,12

**hold**  14:14,16,23
  33:4 40:15
**home**  21:1 59:21,25
  61:1,9 62:18 63:7
  64:11 69:4,13 70:21
**homeless**  23:6
**homes**  22:19
**honestly**  39:14
  65:12
**hooked**  39:6
**hope**  6:14
**hour**  9:2 45:16
**hours**  9:9
**house**  38:15 46:18
  52:15
**huh**  5:10,10 11:5
  14:19 19:14 20:16
  20:18 22:10 24:1
  26:1,21 31:11,23
  35:4,20 36:16 37:10
  41:15 42:5 44:16,22
  47:1,18 53:23 57:10
  58:15 62:10 63:16
  66:20 67:5,18,23
  71:25 72:11,20 77:1
  80:4
**hum**  4:21 9:1,9
  18:21 22:12 32:24
  33:22 53:17 54:14
  54:22 80:23 82:2
**hundreds**  54:23
  81:15
**husband**  13:9,14
  18:21 34:3 44:1
  47:4 50:13
**hypothetically**
  66:24
**hypotheticals**  66:22

**i**

**idea**  51:16 55:24
  56:1 81:3,4
**identification**  57:25
  82:16

[ignore - looks]

**ignore** 54:25
**important** 5:4 60:16
**improved** 32:16
**included** 11:2
**including** 12:5
49:10 65:1
**incorrect** 70:15
**index** 2:12,16
**indicated** 48:18
**indicating** 78:7
**industrial** 76:8,9
**information** 32:5
58:23 59:7,18 60:4
60:11,19 61:5,17,21
62:13,18,25 63:1,1
63:7,25 65:11 68:1
68:9,25 70:1,7,14
70:15 71:7 78:6
**inspector** 22:18
**instances** 5:23
**institutions** 26:12
26:14
**instructed** 5:24
**intend** 28:14
**intent** 8:22
**interested** 88:14
**international** 14:7
14:10 15:14 26:9
27:21
**introduce** 3:14
**involved** 6:22 7:8
**ish** 47:13

**j**

**jesus** 15:24 16:4
17:11,18 18:17,20
20:4 40:1,3,4,9,20
40:22 41:1 43:7,12
48:16 50:21
**job** 1:24 12:6,22
22:2,10,21 24:2
75:22
**jobs** 23:9
**jr** 13:20

**july** 25:3,5
**junior** 13:21

**k**

**k** 14:17 19:9 35:7
**keep** 10:7 53:13
79:18
**kennedy** 3:8
**kerney** 2:2,15 3:16
3:17 45:13,16 55:10
79:22 84:17 85:21
**kids** 16:22
**kind** 8:5,20 12:21
41:4 49:18 50:17,25
66:8 74:17 75:1
76:10
**knew** 18:24 41:14
52:16,24 53:5 64:1
75:22 80:24
**know** 5:16 6:12 8:21
9:3,24 10:1,2 11:19
16:16,16,18,22 17:5
18:18 19:1,25 20:9
27:5,11,17,18,25
28:3 32:7,12,14,17
33:6,11 35:25 36:3
36:3,4,5,6,7,19,24
37:2,21 38:14,14,17
38:17,22 39:11,14
39:16,21 40:6,6,7
40:12,23 41:6,7,14
41:17,21 43:13,14
43:15 44:3,4,6,7,12
45:2,3,9,9 47:14
48:1 49:17,21 50:25
51:1,2,4,14,21 52:4
52:7 53:19,20 54:11
54:22 55:22 56:5,11
56:24,25 57:11,16
63:24 64:17,19
65:13 67:12,14 71:4
71:15 74:12 77:24
78:2,10,11,14,15
79:9,12 80:23,24
81:2 82:2,5 84:3

**knowing** 16:15
**knowledge** 78:12
**known** 10:3
**knows** 11:7,7 13:9
44:11

**l**

**l** 19:14 35:7
**land** 50:4,6 83:9
**lane** 48:6,7
**large** 1:19
**largo** 12:2 15:9,9,10
15:24 16:4 17:11,18
17:24 18:5,6,9,15
18:17,20 20:4 36:1
36:2 40:1,3,4,9,21
40:22 41:1 43:7,11
44:15 47:25 48:8,15
50:21 68:14,22
**late** 47:13
**laws** 87:2
**lawsuit** 7:9,12 8:5
**lawyer** 17:10 20:6
**leave** 39:15
**left** 5:2 11:22 57:20
68:12,20 77:7
**legal** 3:2
**lender** 28:17
**letter** 56:8 80:5
**letters** 50:20
**level** 13:25
**license** 15:1
**licenses** 14:15,24
**life** 15:10 44:17,24
53:24
**limited** 65:1
**line** 50:4,6 64:15
79:23 83:9,10
**lisa** 2:6 3:21 4:10
**list** 12:24
**listed** 19:2,23 43:11
68:8 70:20
**lists** 40:18
**little** 4:15 36:22
45:10,25 59:7 77:4

**live** 11:23 12:1,2
18:8,9,13 20:10
21:5,8,9,10,11,14
35:21,23 52:6 59:15
64:10
**lived** 15:10 17:22
18:10,14 20:14,19
20:24 21:20 44:15
46:7 47:4,24 48:2,2
48:11
**lives** 13:21
**living** 46:12,16
**llp** 2:6
**loan** 29:10,10 30:4,8
30:10,13 31:4,13,15
32:7 52:25 60:9
61:20 67:6 74:4
**loans** 9:17,19,23
26:6,8,11 27:23
28:6,18 30:15 53:16
54:8 59:11,25 65:5
67:11,14 73:14
85:15,19
**located** 3:7 26:19
**location** 48:15,24
49:3
**log** 9:14 10:19
**logged** 66:19
**long** 8:24 13:2 18:10
20:10,19 21:5 22:1
22:11 27:10,12
32:23 33:4,20 34:11
36:17,19 37:19 38:7
38:8 44:15 48:25
75:20
**look** 37:2 51:20 58:2
58:14,18,25 59:6
61:20 67:3,19,23
69:25 70:2 82:18,21
**looked** 9:12,14 43:7
62:12,17 65:22
**looking** 16:16 33:10
82:3
**looks** 58:21

Veritext Legal Solutions
866 299-5127

[los - number]

**los** 2:8
**lot** 25:10 44:11
   55:15,25 81:6,6
**love** 76:22,23
**lucie** 50:11
**lucky** 19:7 50:8

**m**

**m** 2:6 19:14 35:7
   68:13,21
**ma'am** 15:11 19:5
   70:8 76:18
**mae** 2:18 9:15,25
   10:3 32:9,10 53:19
   64:24 65:5 71:20
   72:1 79:1 84:5,12
   84:22 85:16
**mae's** 83:22
**mail** 36:9,17 37:3,7
   39:5,6,12 56:8
   60:17 69:8,9,10
   72:19 80:7 83:18
**mails** 69:5
**main** 26:21
**majors** 27:16
**making** 28:3 80:9
**malachi** 13:20
**malik** 35:5,6
**management** 14:3
**manager** 7:3 9:17
   9:19,23 23:6,20
**march** 22:14,15
   25:22
**marcy** 19:7 50:8
**maretta** 1:11 3:12
   3:19 4:2 59:2 68:13
   68:21 84:18 87:12
**maretta.newsome75**
   36:13 69:6 83:19
**mark** 57:18,21 77:9
   77:13 82:12
**marked** 57:25 59:21
   60:23 61:2 64:21
   82:13,16 83:2

**marriage** 21:22,23
   21:25 35:10,12
**married** 19:15
   20:21,21,24 33:22
   35:10 46:9,13 59:16
   64:4
**matthew** 35:2,23
**mccaskill** 1:5 3:9,18
   7:16,19,21 10:24
   13:17,18,20 19:18
   35:2
**mean** 11:18,18
   14:20 17:4 19:3
   44:1 45:2 50:17
   53:18 55:25 58:16
   61:4 74:2 78:11
   79:19
**means** 17:6 64:25
**meant** 65:16
**medicaid** 12:25 13:1
**melissa** 19:12
**members** 19:22
**mentioned** 47:16
**message** 39:8,12
**messages** 39:16 65:3
   65:4
**meyer** 7:16,18 13:18
**middle** 1:1
**mine** 35:17
**minister** 49:20
**ministry** 16:5,8,9,11
   16:20,24 17:11
   18:20,23 19:24 20:8
   41:13 42:25 43:21
   45:5,8 49:8,14,17
**minutes** 77:3,7,18
**missed** 46:5
**mission** 16:4
**mom** 11:1 19:23
   20:6 39:3,22 42:22
   43:20 44:10,11,13
   44:15,19,23 49:7
   51:12 54:9,12 55:5
   55:15 63:22 74:7
   75:20 81:1 84:3

**mom's** 57:12 84:2
   85:4
**moment** 45:11 61:15
**moments** 60:10
**moms** 36:6
**money** 14:8 31:15
   31:17,18 40:16,20
   41:1,4,8,18 53:6
   56:17 80:22,23
**monitor** 3:5
**month** 29:18,21
   54:23
**months** 18:12
**morgan** 2:2,2 35:4
   47:21
**morning** 3:16,20 4:8
**mother** 11:13 12:3
   16:10 17:1,10 37:6
   37:12,19 41:11
   42:14 51:8 64:18
   75:12,15,25 78:16
   84:18 85:14,18
**mother's** 13:16 16:5
   17:21,22 56:19,22
   65:20 69:14 70:20
   71:12 83:22 84:24
   85:12
**mouth** 44:11,12
**move** 47:9
**moved** 20:20 21:25
   46:15,17,18,19,22
   64:11
**music** 74:23,23

**n**

**n** 2:3 19:14
**name** 3:1,12,20 4:10
   10:1 12:14 13:16,19
   19:9,15,17 22:23
   36:11,11 56:18,21
   56:25,25 57:1,1,6
   59:1,2 72:24
**names** 19:6 34:25
**naples** 14:13

**national** 25:19
**natural** 25:13
**nature** 11:12 12:7
**navient** 1:8 3:10
   7:17 10:3 30:20
   31:1,3,7,10,22,25
   32:2,5,9,9,11,13,14
   52:9 84:23,23 85:16
**need** 23:22,23,24
   52:6 56:17 61:10
   66:1 82:18
**needed** 12:10 60:11
   60:12
**needs** 14:22
**never** 8:19 28:7
   37:24 40:16 41:18
   52:20 55:21 61:11
   62:3,22,23 63:9
   65:25 66:11 71:11
   71:13 83:25 84:2,11
   84:13
**new** 18:6 63:20
**newsome** 1:11 3:13
   3:19 4:2,8 13:14,25
   32:19 34:19 35:4,5
   45:24 59:2 66:12
   68:13,21 77:17
   87:12
**night** 26:20
**nobody's** 79:13
**nod** 5:10
**non** 42:9
**northwest** 50:10
**notary** 1:18 88:24
**note** 73:16
**notice** 1:20
**november** 28:19,20
   28:22 30:18
**nsi** 2:19,21 10:4
   57:19,20 64:21
   67:19 70:5 72:5
   82:13,13
**number** 28:4 31:14
   32:18,23,25 33:4,5
   33:8,18,21 34:1,4,7

Veritext Legal Solutions
866 299-5127

**[number - phrase]**

34:9,11,15 37:17,20
38:4,9,17,24 39:20
39:24 42:15,16,22
42:24 43:11,17 50:4
51:20 52:17 53:11
53:16,18,25 54:2
55:19,21 56:22 57:3
57:5,6 58:18 59:20
60:17 61:9,9,10,12
61:14 62:1,2,21
63:6,8,10,11,13,17
63:20 64:2,3,13,23
64:25 65:18,20,25
66:1,3,5,6,18,23,24
67:2 69:16,20,21
70:20,23,25,25 71:6
71:12,12,14,16,19
71:24 72:1 74:15
77:10,14 78:25 79:1
79:2,5,14 80:16
81:18,20,21 82:10
82:25 83:6,8,16,17
83:23 84:2,4,5,20
84:24 85:4,7,12
**numbers** 33:25 34:1
53:17 54:2 56:20
57:2 58:17,18
**numerous** 51:9

**o**

**o** 19:14
**object** 55:10 79:22
**objections** 5:23
**obtain** 14:6
**occur** 52:13
**offer** 85:18
**offering** 76:22,24
**offhand** 64:20
**office** 3:7
**official** 20:2 49:25
**oh** 12:6,10 13:2,24
17:15 28:3,25 33:5
36:5 38:1 45:15,17
47:1 51:25 52:4
57:23 58:13 67:16

74:5 76:25 77:8
84:21 85:2
**okay** 4:22,25 5:8,11
5:17,20,21 6:8,11
6:13,18 7:4 8:2,3,4
8:16,23,24 9:7,10
10:5,6,6,10,14,16,17
10:18 11:23 12:7,10
13:2,19 15:5 16:19
17:3,10 18:7 19:11
22:1 23:18 25:4,15
25:18 26:6 27:13
29:24 30:14 32:15
33:13,24 34:3,11
35:8 37:6 38:1,3
39:4 41:25 42:20
43:6 45:1 46:4,15
46:21 47:16,24 48:4
48:13 51:3 53:13
57:23 58:7,12,13,13
58:13,19,20,25
59:17 62:16,20
63:13,15 66:16 67:1
67:3,19,21 68:12
69:3,13,17 70:4,5
72:5,6,21 76:20,25
77:5,9 79:4,25 80:6
81:14 82:20,21,24
83:10,18 85:21,23
**old** 25:8 37:23
**one's** 32:7
**online** 52:23 53:9
72:13 84:10
**open** 49:3
**order** 9:3 26:7,8
**ordinary** 25:24
**organization** 12:21
15:23 24:5,8
**organized** 77:4
**outreach** 16:13 42:7
42:10
**outstanding** 27:23
28:2 29:9 54:3,5
59:25 74:8,11

**overall** 9:7 28:1
**owe** 67:10 80:23
**owed** 53:5 80:22
**owing** 28:9,12
**owned** 65:5
**owns** 40:14

**p**

**p.m.** 86:1
**page** 2:13 5:19
31:21 58:14,16,18
60:3 64:21 67:3,19
70:5,12 72:5 82:22
84:6
**pages** 1:25 43:8 70:3
71:20 72:2 82:13
**paid** 78:5
**paper** 18:25 40:10
40:12,17,18 41:12
41:23 44:2,4 70:22
71:1 72:18 73:5
78:11
**papers** 30:2 50:15
50:17,19
**paperwork** 44:4
50:24,25
**paragraph** 60:7,15
**pardon** 43:3 68:16
**parents** 21:3,10,15
21:21 23:9 46:16,17
46:22 47:8
**park** 2:7
**part** 9:21 16:6 40:19
41:20 44:24 49:25
60:18 61:21
**particular** 41:12,23
44:24
**parties** 88:11,12
**party** 7:9,11
**passed** 13:23 26:19
**pastor** 17:1 49:19,23
**patience** 25:10
**pay** 29:17 80:18
85:18

**paycheck** 74:18,20
**payment** 28:6,7
29:21 30:1,7
**payments** 28:8,11
28:14,17 29:14
30:11 73:6 74:4
**pays** 39:3 57:12
**penalty** 87:1
**pending** 6:16
**people** 17:7 42:1
44:8,12,12,13 49:4
49:14 64:10 78:4
**period** 23:1,13
24:17 25:21 47:3
53:15
**perjury** 87:1
**person** 20:21,24,25
42:21 43:21 46:13
49:7,22 57:4 64:1
80:8
**personal** 68:13,20
**personality** 16:15
**petersburg** 26:16,24
27:14,15
**phil** 3:24
**philip** 1:18 88:4,23
**phone** 9:2 28:23
31:14 32:18 33:18
33:25,25 34:4,6
37:16,17 38:2,10,13
38:15,16 39:18,19
42:2 43:14,16 51:17
52:15 55:16 56:20
56:22 57:13 59:22
60:1 61:1,9 62:1,2
62:18 63:7 64:13
65:2,20 66:1,3,5,6
67:2 69:4,5,13,14
70:20,21 71:12,14
78:17 79:14 80:9,12
80:20 82:25 83:2,11
83:17,23 84:5,20,24
85:12
**phrase** 10:9 22:24

Veritext Legal Solutions
866 299-5127

[physical - represent]

**physical** 30:4 36:6
42:11 48:19,24 49:3
55:3
**piano** 75:8 76:17
**pick** 77:5
**piece** 71:1
**pinellas** 7:1 24:5,12
24:14,15,24 25:15
**place** 17:19 45:14
55:20 81:8,10
**placed** 5:24 65:2
**places** 48:3
**placing** 23:7
**plain** 5:11
**plaintiff** 1:6 2:5
3:10,17 7:22,24
**plaintiff's** 3:15
**plan** 29:16,21 30:7
**play** 74:22,22,23
75:4,5,7,10
**player** 76:17
**pleadings** 10:8
**please** 3:13,25 5:15
8:21 60:10,12 67:20
68:9 70:13
**point** 5:14 8:17 27:2
46:25 48:22 52:13
65:21 66:19 79:6
81:14 83:21
**poor** 68:19
**pops** 57:4
**port** 50:11
**position** 40:8
**positive** 84:2
**postponed** 73:6
**power** 75:19,21 76:1
**prays** 17:7
**pre** 65:3
**prefer** 73:5
**pregnant** 47:11,12
47:14,17
**premarriage** 45:8
**prepare** 8:12
**preschool** 23:7

**present** 2:10 9:5
**president** 44:6,6
**pretty** 21:12 29:24
57:5
**previously** 46:1
77:19
**price** 2:6 3:21
**pride** 22:22,24,25
23:11 24:7
**primary** 83:2
**print** 73:5
**prior** 19:17 29:19
30:18
**private** 24:3,4,7
57:2
**privilege** 6:1
**probably** 4:21 9:1,1
10:4 12:12 20:12,22
28:19 34:12 40:12
40:18 44:2 62:1
64:4 65:12 71:11
80:20
**proceeding** 6:22 7:6
8:8
**process** 4:15 72:18
73:7
**processing** 41:8
**professional** 14:15
**program** 23:6
**programs** 16:22
**promissory** 73:16
**property** 42:11
**provide** 84:19,22
85:11
**provided** 78:25
**providers** 65:7
**provides** 45:8 49:7
**providing** 49:14
64:23
**public** 1:18 56:22,24
57:7,9 78:7 88:24
**pulled** 61:13,16,19
63:6
**pure** 25:11

**pursuant** 1:19
**put** 41:16 55:21
58:23 59:20 61:11
63:20 64:2 71:16
74:15 78:21 83:25

**q**

**qualifier** 20:23
**question** 5:25 6:2,16
8:19 19:19 28:10
31:8 55:11,12 58:9
58:13 66:14,16
81:22 82:1
**questioning** 79:23
**questions** 5:1,9,15
77:19
**quite** 36:21

**r**

**reach** 37:12 39:5
**reached** 42:25 57:3
**read** 59:7 65:11,13
68:9 70:13 71:7
73:3 81:22,23
**reading** 71:10
**reads** 64:22 68:21
70:11 83:10
**ready** 6:8,19
**real** 17:6 38:23
46:19 79:11
**really** 15:16 16:13
32:24 34:13 52:1
68:18
**reason** 6:5 41:2
79:11
**reasons** 5:25
**recall** 54:18
**receive** 54:9 73:19
74:19 75:1 79:12
**received** 29:20,25
53:17 54:2 74:7,13
74:17 76:10 81:10
**receives** 76:14
**receiving** 53:15 55:7
55:15 65:7 78:17

**recognize** 83:5,14
**recollection** 37:25
39:13 67:9
**record** 5:24 10:7
45:19,20,22,24
77:11,15 78:7 83:23
88:7
**recorded** 65:3 81:24
**records** 56:23,24
57:8,9 60:9
**recoup** 31:18
**refer** 10:15
**referring** 50:18
**reflect** 62:20
**reflected** 62:21 63:7
84:5
**reflecting** 29:20
**reframe** 8:22
**refresh** 67:9
**regarding** 65:4
**regards** 29:9 85:7
**registered** 50:23
**regularly** 36:10 37:6
44:23
**relate** 70:3
**related** 9:16,22
**relates** 45:11
**relative** 88:10,11
**remember** 17:16
34:18 37:3,23 38:7
38:8 39:23 44:18
54:15,15,17 67:15
74:8
**remove** 83:22,24
**repay** 30:8 73:14
**repayment** 30:4
**repeatedly** 71:19
72:2
**rephrase** 5:18
**report** 88:6
**reporter** 1:18 3:23
5:1 81:24 88:1,24
**represent** 4:10,20
4:24

[represented - spell]

**represented** 4:16
  5:22
**representing** 3:18
  3:21
**request** 68:8 69:17
  70:13 71:8 72:2,23
  73:1,4
**required** 60:23 61:4
**reside** 50:10
**residence** 17:13,21
  17:22 21:3 33:13,15
  33:18,21,25 46:5
  53:11 64:15 84:4
**resources** 23:12,14
  23:19 24:10
**respect** 54:3 74:7
  78:18
**responding** 4:4
**responsibilities**
  22:16 23:4,18 24:20
  25:7,25
**responsible** 23:7
  85:15
**rest** 44:3
**result** 5:3
**retain** 4:19
**retired** 75:16,25
**retrieve** 31:15,17
**revenue** 28:25 29:2
  30:19 77:23
**review** 9:10 10:18
  60:10 61:7
**rid** 38:15
**right** 6:19 8:12 19:4
  21:10 22:5 24:10,23
  35:23 37:12 43:6
  45:11 48:7,10,21
  56:3,12 59:6 64:5
  68:18 69:3,11 70:11
  70:19 72:9 78:19,23
  79:15 80:25 84:12
**riverside** 50:11
**role** 18:19,22 19:24
  41:12 43:24 44:2

**rpr** 1:18 88:4,23,24
**running** 49:18
**ryan** 1:18 3:24 88:4
  88:23

**s**

**sac** 10:15,17 84:23
  85:16
**salary** 75:12
**sallie** 2:18 9:15,25
  10:3 32:8,10 53:18
  64:23 65:5 71:20
  72:1 79:1 83:22
  84:5,12,22 85:16
**sat** 29:14
**saying** 54:18 62:19
  63:9 79:19
**says** 44:5 55:16
  58:25 60:4,8,15,23
  68:8,12 69:4 70:6
  72:9,22 73:11,21
**schedule** 30:5
**school** 14:6 15:6,8,9
  23:8
**schools** 7:2 24:6,12
  24:16,18
**scratch** 74:1
**screen** 9:14,16,22
  10:19 58:20,22
  59:18 61:8,16,20
  62:11,14,17 63:6
  67:24 69:24
**scrivener** 2:11 3:2
**secretary** 41:22
**secured** 14:1
**see** 17:15 26:4 27:2
  27:16 29:15 33:10
  37:2 43:11 46:15
  59:8,9,17,21 60:3,5
  60:7,13,14,20,22
  62:11 63:2 64:22
  65:9,10 67:6 68:2,4
  68:7,23 69:6,25
  70:6,9,17,22,25
  71:1 72:7,21 73:9

73:17,18 74:5 78:10
  82:24
**seeing** 39:23
**seen** 20:2 58:20 71:5
**selecting** 73:7
**send** 56:8 72:18
**sense** 13:10 14:21
**sent** 69:25
**sentence** 9:20 60:22
**sentences** 68:7
**separately** 45:4
**september** 25:22
  33:22
**service** 65:7
**serviced** 65:5 85:15
**servicer** 28:17
**services** 16:22 23:22
  23:23,24 44:10 49:8
  49:14,15,17
**set** 16:17
**seven** 25:3
**sheet** 22:12
**shelters** 23:8
**shook** 43:1,4
**short** 45:20 48:11
  77:12
**show** 30:11
**showed** 51:20
**showing** 30:1
**shown** 9:11
**shows** 71:19
**siblings** 21:14,20
**side** 11:19 68:12,20
  69:3 70:20
**sign** 73:5
**signature** 72:10,17
  72:22,24,25 73:1,2
  73:7,12 88:22
**signed** 4:23
**simonetti** 2:6,14
  3:20,21 4:7,10
  45:15,17,23 55:14
  57:18 58:1 77:2,8
  77:16 79:25 80:1
  81:25 82:12,17

84:14 85:23
**single** 20:25
**sister** 39:10
**sister's** 19:6
**sisters** 19:4 50:8
**sitting** 5:2
**six** 78:7
**slow** 17:25
**slowly** 12:17
**small** 8:10
**sms** 65:4
**solutions** 1:8 3:10
  10:3 30:20 31:25
  32:13 52:9 84:23
**somebody** 30:10
  32:8 52:5 82:9,9
**sons** 47:22
**sorry** 8:3 12:11
  13:24 18:1 19:10
  22:6 23:21 32:16
  33:17 37:10 40:4,23
  43:1,2,23 45:10,13
  46:11 55:13 58:9
  61:18 66:17 73:24
**sorts** 27:13
**sounds** 8:20 48:1,7
  48:10 50:12 78:23
**south** 26:17,18,22
  27:1
**southwest** 17:24
  18:3,4,15 48:14
  59:8 68:14,22
**spc** 26:15
**speak** 5:11 8:24
  13:10 18:7 28:24
  29:1 42:10,21 52:19
  53:7
**speaking** 66:24
**speaks** 5:4 17:8
**special** 14:22
**specialist** 3:3
**specific** 37:24
**speculation** 55:11
**spell** 35:6

[spend - tomorrow]

**spend**  12:12
**spent**  9:8
**spoke**  8:14 9:2
   10:25 52:20
**spoken**  10:21,24,25
   11:3,6,9 12:4 13:6
   30:19,21,22 84:11
   84:13
**st**  26:16,23,24 27:14
   27:15 50:11
**stamp**  67:4
**stamped**  2:19 57:19
**start**  15:13 24:25
   25:16 46:12 53:21
   68:19 81:20
**started**  4:9 15:2
   18:24 22:14 51:19
   55:25
**starting**  16:8 41:25
**state**  1:19 12:22
   20:3 22:9,10 24:2
   40:13 44:5 50:24
   72:4 88:2
**stated**  78:25
**statement**  29:20,25
   30:1
**statements**  73:13
**states**  1:1
**stay**  85:9,9
**stenographically**
   88:5
**stop**  40:25 54:16,18
   79:5,17 81:1,17
**stopped**  56:11,15
   80:19
**straight**  15:17 53:14
**straighten**  56:9
**street**  2:3 17:23 18:1
   18:2,9,14,16 20:11
   20:15 21:2,7,11
   33:16 46:7,12,23
   47:4,9,25 55:2 59:8
   59:16 68:13,22
**strike**  26:7 29:19
   33:17 56:20 76:18

76:23
**student**  10:12 14:17
   14:18 26:6,8,11
   27:23 28:6 29:10
   30:23 31:4,9,13,15
   32:7 52:10 54:8
   59:11,24 60:9 67:10
**students**  24:22
**studies**  26:25
**stuff**  40:14
**submit**  60:12 72:23
**submitted**  69:17,19
**submitting**  68:10
   70:14 71:8 73:11
**subpoena**  11:8
**subpoenaed**  7:17
**suite**  2:3,7
**summary**  67:6
**sunday**  49:5,6 75:6
**sundays**  49:11
**supposed**  11:9 79:8
   81:2
**sure**  5:18 9:4,24
   15:16 16:13 31:20
   32:24 34:13 36:10
   38:23 39:9 45:15,17
   46:19 49:1 52:1
   57:5,15 61:25 62:8
   77:8
**surprise**  74:14
**surprised**  43:11
   79:1
**swear**  3:25
**sworn**  4:4
**system**  9:17,23

**t**

**t**  1:4
**take**  6:11,14,16
   11:23 15:20 26:6,8
   26:11 27:14,18 41:3
   45:14 58:2,14 59:14
   60:10 61:20 70:2
   74:24 82:18

**taken**  1:17 4:12
   45:25 67:13 77:17
**takes**  57:16
**talk**  4:15 53:3
**talked**  29:15 48:17
**talking**  9:5 20:13
   21:16 49:16
**tampa**  1:2,12 2:4
   3:8 11:14,15,16,24
**tbm**  1:4
**teach**  76:7
**teacher**  24:21 25:9
   27:18 76:6
**teaching**  14:16 15:1
**telephone**  37:20
   39:24 43:8 50:4
   60:17 63:23 64:23
   79:21 80:3 83:5,16
**tell**  11:11,15 16:17
   29:11 36:23 44:13
   47:19 51:12,15,18
   54:18 63:3 67:22
   69:19 79:4 80:16
**teller**  25:19,25
**tend**  5:9
**terms**  73:3,13,16
**testified**  4:5
**testify**  7:18
**testimony**  6:6,24 7:2
   7:6 62:9,16 63:5
   81:23 88:8
**text**  64:22 65:4
**thing**  17:9 41:23
   42:9 49:18
**things**  9:5 14:9
   41:20 80:10,11,13
**think**  9:8 16:14 18:6
   18:24 19:23 27:2
   32:11 33:8 36:25
   37:1,8 38:2 39:6,10
   39:10 46:13,13
   54:14 55:5,7 56:15
   57:6 61:12 63:19
   65:22 66:4,8,23
   72:12 74:6 78:1,8

78:18 82:3 84:14
**thinking**  32:2 54:23
**third**  49:5,6,10 75:6
**thoroughly**  65:13
   71:10
**thought**  48:18
**three**  25:8 33:25
   34:22,24 35:3,14,15
   35:19 38:23 49:1,2
**time**  3:4,13 5:5,14
   6:11,17 8:17 9:7
   14:7,10 15:20 20:12
   21:15,16,17,18 23:1
   23:13 24:17,21,25
   25:21 26:2,3,4,5
   27:3,6,11,24 28:5,9
   28:12,16 29:19 34:4
   34:14 44:15 46:25
   47:3,12,14 48:2,11
   48:22 50:1 52:13
   53:15 59:24 61:7
   63:5 65:21 66:19
   69:1,11 71:5 75:3
   75:10,23 79:6 81:14
   82:18 83:21 84:19
   85:11
**times**  27:17 51:9,20
   52:8 54:23 55:24
   56:2,4 78:25 80:12
   80:17 81:4,6 82:9
**title**  42:4 49:22
**today**  3:24 4:16,21
   4:24,25 5:10 6:6
   8:13,17 9:2,6 10:22
   11:8 12:5 13:9,12
   38:24 39:4
**today's**  3:3
**told**  11:19 12:9
   20:14 22:5 41:16
   43:23 45:12 50:7
   52:2,5 54:25 72:12
   74:6 77:25 78:16,18
   78:24
**tomorrow**  12:10

[top - zeros]

**top**   60:3 67:24 70:6 72:9
**total**   35:14,15,19 67:7
**track**   29:14,15 30:9 30:12
**transactions**   52:22
**transcript**   88:7
**transported**   38:15
**treasurer**   40:9,16 41:18,22
**trick**   19:19
**tried**   81:16 82:4
**trouble**   53:2 79:16
**troy**   50:13
**truancy**   7:1,5 23:20
**true**   36:8 62:4 76:18 80:21 87:3 88:7
**trust**   32:16
**try**   18:8 30:9 31:16 56:12 79:17
**trying**   11:10 31:15 31:17 33:10 37:1 54:14 63:3
**turn**   70:5
**twenty**   35:3
**two**   32:24 34:1,12 35:17,22,22 38:23 47:22 48:3,25 49:1 49:2 64:10 68:7 77:14 81:10 82:24
**type**   6:25 7:6 19:24 27:7 28:21 42:8 49:15 50:19
**types**   14:23 26:25
**typing**   72:24

**u**

**uh**   5:10,10 11:5 14:19 19:14 20:16 20:18 22:10 24:1 26:1,21 31:11,23 35:4,20 36:16 37:10 41:15 42:5 44:16,22 47:1,18 53:23 57:10

**58:15** 62:10 63:16 66:20 67:5,18,23 71:25 72:11,20 77:1 80:4
**ultimately**   27:20
**umbrella**   32:3
**understand**   4:15 5:6 5:15 6:3 7:11,15,21 10:13 16:19 17:9 62:9 73:3,12
**understanding**   30:6 30:14 32:1,5 51:6 65:15 77:22 79:16
**understood**   37:11 37:11 48:21
**undertake**   26:25
**union**   25:19
**united**   1:1
**university**   14:9,12 26:17,22 27:1
**unsure**   82:6
**update**   60:11,18 63:11 67:25
**updated**   62:25 63:1
**use**   10:4,8 22:12 37:7 48:23 58:17 60:17 84:2
**usf**   26:15,17 27:10

**v**

**vedder**   2:6 3:21
**verbally**   5:9
**verified**   70:7 73:21
**verify**   60:18 71:17
**veritext**   3:3,7,24
**versus**   3:10
**vice**   44:6
**video**   3:2,4
**videographer**   3:1,23 45:18,21 77:6,9,13 85:24
**videotape**   1:11 77:10,14 85:25
**view**   79:15 81:11

**visits**   45:2
**voice**   39:5,6,8,9,10 39:12
**voluntary**   67:25 68:8 70:6,12 72:10 72:25 73:4
**vs**   1:7

**w**

**wait**   13:8 17:23 31:8
**want**   6:11 11:19,20 11:20,21 15:15 26:15 30:11 45:25 47:12 58:5,6,12 73:6 77:7,18
**wanted**   7:19 16:14 27:4 29:13 37:12 41:12 42:6,9,13,21
**way**   17:20 18:8 58:4 58:5 80:7 85:14
**ways**   12:12
**we've**   4:8
**website**   83:22
**went**   55:20
**west**   3:7
**whatsoever**   6:25
**white**   43:8
**willie**   1:5 3:9,17 7:16,18,21 13:16,18
**witness**   3:12,25 4:3 55:13 57:23 88:8
**wonder**   63:22
**word**   5:3,3 17:8 24:13 42:10 44:11 44:12 76:23
**work**   12:25 16:10 22:7,11 23:1,10,13 24:11,17 25:15,18 69:4 75:15,20 76:3
**worked**   7:1 22:22 24:24 75:18
**working**   22:1 27:3 36:4,5 75:17 76:5
**works**   49:13,25

**write**   56:8 80:5
**writing**   30:4 51:19 55:25
**wrong**   40:24 46:14 53:10 71:21 72:3
**wrote**   40:23

**y**

**y**   19:8,9,9
**yeah**   10:25 16:25 31:16 38:5,6 43:19 53:9,25 59:16 67:16 81:13 84:13
**year**   13:5 18:12 20:15 22:4 25:8 48:11 51:25 52:1 53:20 78:19,19
**years**   20:22 32:24 33:5,7 34:12 36:25 37:23 38:1,3,6,23 49:1,2 54:1
**york**   18:6
**youngest**   35:22

**z**

**zeros**   57:20

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

    Plaintiff,

                                      CASE NO.:  8:15-CV-1559-T-33-TBM

-vs-

NAVIENT SOLUTIONS, INC., STUDENT
ASSISTANCE CORPORATION, and
NAVIENT CORPORATION,

    Defendants.

_____/

## PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES TO DEFENDANTS', NAVIENT SOLUTIONS, INC. AND STUDENT ASSISTANCE CORPORATION, REQUESTS FOR PRODUCTION

COMES NOW the Plaintiff, Willie McCaskill, by and through undersigned counsel and hereby supplements her Responses and Objections to the Defendants', Navient Solutions, Inc. and Student Assistance Corporation, Requests for Production, as follows:

**REQUEST FOR PRODUCTION #1:**     Notes regarding a telephone call that allegedly was made by "Heather" to you on behalf of NSI or SAC. These notes were the subject of deposition testimony taken on December 16, 2015.

**ANSWER:**   Plaintiff objects to this Request on the grounds it seeks the production of a document protected by attorney-client privilege. Please see Plaintiff's corresponding Privilege Log.

**SUPPLEMENTAL ANSWER:**     **Notwithstanding the above asserted objection, Plaintiff hereby produces herewith the note from client to attorney concerning telephone calls and conversation with Heather referenced in Plaintiff's Privilege Log.  Plaintiff also produces herewith a copy of the hand-written note referenced in her deposition testimony.**

**REQUEST FOR PRODUCTION #3:**        The tax returns for Largo for Jesus Christian Center, Inc. for the past four tax years.

**ANSWER:**    Plaintiff objects to this Request on the grounds it is unduly burdensome, intended to harass, not reasonably calculated to lead to the discovery of admissible evidence and is irrelevant.

**SUPPLEMENTAL ANSWER:**       **Notwithstanding the above asserted objection, Plaintiff hereby states no responsive documents exist and therefore no documents can be produced.**

**REQUEST FOR PRODUCTION #5:**        The documents reviewed by you during deposition testimony taken on December 16, 2015, specifically: (a) a typewritten page of information, including with respect to a call allegedly made to you by "Heather"; and (b) a chart.

**ANSWER:**    Plaintiff objects to this Request on the grounds it seeks the production of a document protected by attorney-client privilege. Please see Plaintiff's corresponding Privilege Log.

**SUPPLEMENTAL ANSWER:**       **Notwithstanding the above asserted objection, Plaintiff hereby produces herewith the note from client to attorney concerning telephone calls and conversation with Heather referenced in Plaintiff's Privilege Log and the chart.**

Dated this 27th day of January, 2016.

*s/Frank H. Kerney, III, Esquire*  
William Peerce Howard, Esq.  
Florida Bar No.:  0103330  
whoward@forthepeople.com  
Octavio Gomez, Esq.  
Florida Bar No.: 338620  
tgomez@forthepeople.com  
Frank H. Kerney III, Esq.  
Florida Bar No.: 88672  
fkerney@forthepeople.com  
Morgan & Morgan, Tampa,  P.A.  
One Tampa City Center, 7th Floor  
201 North Franklin Street  
Tampa, FL 33602  
Telephone:  (813) 223-5505/Facsimile:  (813) 223-5402  
*Attorney for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

E-Mail this 27th day of January, 2016 to: lsimonetti@vedderprice.com;

dmaye@vedderprice.com; ecfladocket@vedderprice.com; dvanhoose@sessions-law.biz; and

evap@sessions-law.biz.

<div style="margin-left: 45%;">

*/s/Frank H. Kerney, III, Esq.*
Frank H. Kerney, III, Esq.
Morgan & Morgan, Tampa, P.A.
Florida Bar #: 0088672

</div>

Date of Incident: On or about August 26, 2014

Description of incident J/Montana 4/7/2015

I have been receiving harassing calls on my cell phone from Heather with Navient and many Student Loan Servicers with 55 different phone numbers calling me. I am 67 years old and have 3 adult married children ages 35-44 years old. They do not discuss their business with me about their obligations or anything else.

Location of Incident: Largo, florida

Some of the names of the company servicers that have been calling me:
Navient, ERC, Student Loan Solutions and Student Loan Assistance. I have never had a student loan in my life or signed for anyone else.

Total number of cell phone calls from August 2014 to April 2015 is 382 . I have lost over 900 calls as they were dropped. Total number of voice mails not counted with phone calls were 29, but they were all dropped except one I recorded on 4/17/15 at 9:57a.m. from Eric at Student Assistance asking for Maretta Newsome.  I also received 8 Sunday calls.

Monthly calls:
August 2014 (2), Sept. 2014 (70), Oct. 2014 (62), Nov. 2014 (53), Dec. 2014 (91), Jan. 2015 (56), Feb. 2015 (17), March 2015 (11), April 2015 (20) Total 382 +29 voice mails = 411.

My Statement:

I received a call from Heather around or about on 8-26-14. She called my cell phone and said she was calling for Maretta Newsome and I told her I am sure that she has caller I.D. and she can see this is not Maretta Newsome's phone number. She said I  need to give Maretta her message and I told her she has the wrong person and I am not her messenger to deliver her calls. Heather ask me if I knew her and I said yes, and told her why doesn't she call her and did she have her phone number. Heather gave me the phone number for Maretta and I told her it was correct. She said Maretta does not answer her phone. I ask her not to call my cell phone any more about a student loan. I told Heather I have never had a student loan and I don't have anything to do with someone elses bills. The call ended. After a short time I began to get bombarded with cell phone calls. Calls started from 7:59a.m. until 8:56 p.m. some times. At times it did not matter if it was even Saturday and Sunday. I have been aggrevated enough for no reason at all.

*Willie Myra McCaskill*

Willie Myra McCaskill



①

My name is Willie Myra McCaskill and I had a call from Heather around or about the 26th of August 2014. She called my cell phone and said she was calling for Maretta Newsome and I told her I am sure that she has caller I.d. and know this is not the number for Maretta. She said I need to give Maretta Newsome her message and I told her she has the wrong person and I am not her messenger to deliver her calls. She ask me did I know her and I said yes, and told her why doesn't she call Maretta and did she have her phone number and Heather told me what her home number was and I told her it was correct. I told her not to call my cellphone any more. It was about a Student Loan. I told Heather I have never had a student loan and I don't have anything to do with someone elses bills. The call ended. After that call, my cell phone rang constantly and I had Saturday and Sunday calls also.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

      Plaintiff,

v.                                              Case No. 8:15-cv-1559-T-33-TBM

NAVIENT SOLUTIONS, INC.,

      Defendant.

## RESPONSES OF DEFENDANT NAVIENT SOLUTIONS, INC. TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant Navient Solutions, Inc. ("NSI") hereby responds and objects to the First Set of Interrogatories (the "Interrogatories") propounded by plaintiff Willie McCaskill ("Plaintiff") as follows:

## PRELIMINARY STATEMENT

NSI responds to the Interrogatories based upon the investigation conducted in the time available since service of the Interrogatories. As of the date of these Responses, NSI has had an insufficient opportunity to review all documents, interview all personnel and otherwise obtain information that may prove relevant in this case, including, without limitation, through discovery of Plaintiff and/or third parties. As a consequence, these Responses are based upon information now known to NSI and that NSI believes to be relevant to the subject matter covered by the Interrogatories. In the future, NSI may discover or acquire additional information, or may discover documents currently in its possession, bearing upon the Interrogatories and these Responses thereto. Without in any way obligating itself to do so, NSI reserves the right: (A) to make subsequent revisions, supplementation or amendment to these Responses based upon any information, evidence, documents, facts and things that hereafter may be discovered, or the

relevance of which may hereafter be discovered; and (B) to produce, introduce or rely upon additional or subsequently acquired or discovered writings, evidence and information at trial or in any pretrial proceedings held herein. NSI incorporates this Preliminary Statement into each Response herein as if fully set forth.

## GENERAL OBJECTIONS

1.      Subject to the Preliminary Statement and to every general and specific objection stated herein, NSI objects to the Interrogatories as set forth below. NSI's statements in response to the Interrogatories shall not be construed to be a waiver of any of the general or specific objections interposed herein.

2.      NSI objects to the Interrogatories to the extent that they seek to impose burdens on NSI that are inconsistent with, or in addition to, its discovery obligations pursuant to the Federal Rules of Civil Procedure and/or the Local Rules of this Court. NSI will respond consistent with the applicable requirements.

3.      NSI objects to the Interrogatories to the extent that they are not limited to a time period relevant or even proximate to the events at issue in this action.

4.      NSI objects to the Interrogatories to the extent that they are vague and ambiguous.

5.      NSI objects to the Interrogatories to the extent that they are overly broad, unduly burdensome and harassing.

6.      NSI objects to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine, applicable regulatory privileges or any other applicable privilege or immunity.

-2-

7.      NSI objects to the Interrogatories to the extent that they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

8.      NSI objects to the Interrogatories to the extent that they seek information in which non-parties have a legitimate expectation and/or right of privacy.

9.      NSI objects to the Interrogatories to the extent that they seek confidential, proprietary business information that belongs to NSI.  NSI will disclose such confidential information upon the execution by the parties, and entry by the Court, of an appropriate Stipulation re Confidentiality Agreement and Protective Order.

10.      NSI incorporates the Preliminary Statement and the General Objections into each Response herein as if fully set forth.  Without waiving any of the foregoing objections, all of which are incorporated by reference in the specific Responses below, NSI responds as follows.

## SPECIFIC RESPONSES

### INTERROGATORY NO. 1:

Please provide the name of the individual answering these Interrogatories and if applicable the person's official position or relationship with whom the Interrogatories are directed.

### ANSWER TO INTERROGATORY NO. 1:

Patricia Peterson, an employee of NSI, in consultation with counsel.

### INTERROGATORY NO. 2:

List the steps taken to confirm that Defendant had the express permission of the Plaintiff to call her cellular telephone.

-3-

**ANSWER TO INTERROGATORY NO. 2:**

      NSI services the loans of Plaintiff's daughter, Maretta Newsome ("Newsome").  On

February 4, 2014, Newsome logged into NSI's Manage Your Loan ("MYL") system and

confirmed (727) 581-6140 as her "Home Phone" in the Contact Information section.  This

section contained the following notice:

> By providing my telephone number, I authorize Sallie Mae, Inc., its affiliates and
> agents to contact me at such number using any means of communication,
> including, but not limited to, calls placed to my cellular phone using an automated
> dialing service, calls using prerecorded messages and/or SMS text messages,
> regarding any current or future loans owned or serviced by Sallie Mae, Inc. its
> affiliates and agents, even if I will be charged by my service provider(s) for
> receiving such communications.

Investigation is ongoing.

**INTERROGATORY NO. 3:**

      Describe and identify the system used by Defendant to make telephone calls to Plaintiff.

This should include the manufacturer's name, make, model, software name, and software

version, (also sometimes commonly referred to as an "autodialer," "robo-dialer," "predictive

dialer," "power dialer") that was used by Defendant to place telephone calls to Plaintiff's cellular

telephone number (727) 581-6140 during the time period beginning January 1, 2014 to the

present date.

**ANSWER TO INTERROGATORY NO. 3:**

      NSI objects to this Interrogatory on the grounds, among others, that:  (i) it seeks

information that is neither relevant nor reasonably calculated to lead to the discovery of

admissible evidence in this action; and (ii) it seeks confidential, proprietary business information

that belongs to NSI.  Without waiving and subject to these objections and the general objections,

NSI responds to this Interrogatory as follows:  NSI states that 244 calls were made to Plaintiff

-4-

using an automated telephone dialing system, and 4 were made manually.  For purposes of this action only, however, NSI will not distinguish between the modes of calling as related to Plaintiff.

**INTERROGATORY NO. 4:**

List how many calls were made by the Defendant to telephone number (727) 581-6140 during the period beginning January 1, 2014.

**ANSWER TO INTERROGATORY NO. 4:**

NSI objects to this Interrogatory on the grounds, among others, that it seeks information that is equally available to Plaintiff.  Without waiving and subject to these objections and the general objections, NSI responds to this Interrogatory as follows:  NSI made 248 calls to telephone number (727) 581-6140 during the period beginning January 1, 2014.

**INTERROGATORY NO. 5:**

List the exact conversations during the relevant period the Defendant had with the Plaintiff, the identity (by name, position and title) of the individual who spoke with the Plaintiff, and the date and time of each conversation.

**ANSWER TO INTERROGATORY NO. 5:**

NSI objects to this Interrogatory on the grounds, among others, that:  (i) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; (ii) it seeks information that is equally available to Plaintiff.

-5-

**INTERROGATORY NO. 6:**

Please identify the name, residence address, business address and telephone number of each person believed or known by you, your agents or attorney to have any knowledge of the incidents described in the Complaint, including any agents who are heard on recordings previously provided by the Defendant, and specify the subject matter of the witness' knowledge.

**ANSWER TO INTERROGATORY NO. 6:**

NSI objects to this Interrogatory on the grounds, among others, that: (i) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (ii) it seeks information in which non-parties have a legitimate expectation and or right of privacy. Without waiving and subject to these objections and the general objections, NSI responds to this Interrogatory as follows: Plaintiff, Newsome and NSI's employee, Patricia Peterson, who has knowledge of NSI's calling practices, including with respect to alleged wrong number calls. Ms. Peterson can be reached through NSI's counsel.

**INTERROGATORY NO. 7:**

Identify all telephone numbers from which Defendant made telephone calls to Plaintiff's cellular telephone number (727) 581-6140 during the relevant time period.

**ANSWER TO INTERROGATORY NO. 7:**

NSI objects to this Interrogatory on the grounds, among others, that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action. Without waiving and subject to these objections and the general objections, NSI responds to this Interrogatory as follows: Investigation is ongoing. NSI made telephone calls to (727) 581-6140 from the following numbers during the relevant time period:

-6-

- 888-272-5543
- 317-595-1244
- 607-562-4731
- 888-913-7654
- 703-763-0079
- 607-235-5092
- 585-445-6796
- 703-763-0111
- 877-830-7667

## INTERROGATORY NO. 8:

Identify and explain what communications took place between Defendant and Navient Corporation concerning the account described in the complaint.

## ANSWER TO INTERROGATORY NO. 8:

NSI objects to this Interrogatory on the grounds, among others, that: (i) it is vague and ambiguous; and (ii) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action. Without waiving and subject to these objections and the general objections, NSI responds to this Interrogatory as follows: No communications took place between NSI and Navient Corporation concerning the account described in the complaint.

## INTERROGATORY NO. 9:

Identify the total number of calls made to the Plaintiff's cellular telephone by the Defendant using an ATDS.

-7-

**ANSWER TO INTERROGATORY NO. 9:**

      NSI incorporates herein the Response to Interrogatory No. 3, as if fully set forth.

**INTERROGATORY NO. 10:**

      Identify the total number of calls made to the Plaintiff's cellular telephone by Student Assistance Corporation using an ATDS.

**ANSWER TO INTERROGATORY NO. 10:**

      NSI objects to this Interrogatory on the grounds, among others, that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

**INTERROGATORY NO. 11:**

      Identify the total number of calls made to the Plaintiff's cellular telephone by the Defendant using manual dialing and/or human intervention and the name, model and software version of the system used to make those calls.

**ANSWER TO INTERROGATORY NO. 11:**

      NSI incorporates herein the Response to Interrogatory No. 3, as if fully set forth.

**INTERROGATORY NO. 12:**

      Identify the total number of calls made to the Plaintiff's cellular telephone by Student Assistance Corporation using manual dialing and/or human intervention and the name, model and software version of the system used to make those calls.

**ANSWER TO INTERROGATORY NO. 12:**

NSI objects to this Interrogatory on the grounds, among others, that it seeks information

that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence

in this action.

Dated:  October 27, 2015

Respectfully submitted,

NAVIENT SOLUTIONS, INC.

By:  _____
                    Lisa M. Simonetti

Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 (424) 204 7700

## VERIFICATION

I, Patricia Peterson, am an employee of Navient Solutions, Inc. ("NSI"), a party to this action, and am authorized to make this Verification on its behalf. I have read NSI's Responses to Plaintiff's First Set of Interrogatories (the "Responses"). I am informed and believe, including based on information that I have received during the course of my employment at NSI, as well as a review of records maintained by or belonging to NSI with respect to the conduct challenged by plaintiff in this action, that the matters set forth in the Responses are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this $\underline{27}$ day of October 2015 at $\underline{\text{Newark}}$ ,

$\underline{DE}$ .

$\underline{\text{Patricia Peterson}}$
Patricia Peterson

-10-

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing **RESPONSES OF DEFENDANT NAVIENT SOLUTIONS, INC. TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** were served on:

> William Peerce Howard, Esq.
> Morgan & Morgan
> One Tampa City Center
> 201 N. Franklin Street, 7th Floor
> Tampa, FL 33602
> Tele: (813) 223-5505
> Fax: (813) 223-5402
> bhoward@forthepeople.com

by electronic mail on October 27, 2015.

David M. Cummings

-11-

CHICAGO/#2766254.1

EXHIBIT 7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

        Plaintiff,

v.

NAVIENT SOLUTIONS, INC., STUDENT
ASSISTANCE CORPORATION, and
NAVIENT CORPORATION,

        Defendants.

Case No. 8:15-cv-1559-T-33-TBM

## RESPONSES OF DEFENDANT STUDENT ASSISTANCE CORPORATION TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant Student

Assistance Corporation ("SAC") hereby responds and objects to the First Set of Interrogatories

(the "Interrogatories") propounded by plaintiff Willie McCaskill ("Plaintiff") as follows:

## PRELIMINARY STATEMENT

SAC responds to the Interrogatories based upon the investigation conducted in the time

available since service of the Interrogatories. As of the date of these Responses, SAC has had an

insufficient opportunity to review all documents, interview all personnel and otherwise obtain

information that may prove relevant in this case, including, without limitation, through discovery

of Plaintiff and/or third parties. As a consequence, these Responses are based upon information

now known to SAC and that SAC believes to be relevant to the subject matter covered by the

Interrogatories. In the future, SAC may discover or acquire additional information, or may

discover documents currently in its possession, bearing upon the Interrogatories and these

Responses thereto. Without in any way obligating itself to do so, SAC reserves the right: (A) to

make subsequent revisions, supplementation or amendment to these Responses based upon any

information, evidence, documents, facts and things that hereafter may be discovered, or the

relevance of which may hereafter be discovered; and (B) to produce, introduce or rely upon

additional or subsequently acquired or discovered writings, evidence and information at trial or

in any pretrial proceedings held herein.  SAC incorporates this Preliminary Statement into each

Response herein as if fully set forth.

### GENERAL OBJECTIONS

1.      Subject to the Preliminary Statement and to every general and specific objection

stated herein, SAC objects to the Interrogatories as set forth below.  SAC's statements in

response to the Interrogatories shall not be construed to be a waiver of any of the general or

specific objections interposed herein.

2.      SAC objects to the Interrogatories to the extent that they seek to impose burdens

on SAC that are inconsistent with, or in addition to, its discovery obligations pursuant to the

Federal Rules of Civil Procedure and/or the Local Rules of this Court.  SAC will respond

inconsistent with the applicable requirements.

3.      SAC objects to the Interrogatories to the extent that they are not limited to a time

period relevant or even proximate to the events at issue in this action.

4.      SAC objects to the Interrogatories to the extent that they are vague and

ambiguous.

5.      SAC objects to the Interrogatories to the extent that they are overly broad, unduly

burdensome and harassing.

6.      SAC objects to the Interrogatories to the extent that they seek information that is

protected from disclosure by the attorney-client privilege, the attorney work product doctrine,

applicable regulatory privileges or any other applicable privilege or immunity.

7.    SAC objects to the Interrogatories to the extent that they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

8.    SAC objects to the Interrogatories to the extent that they seek information in which non-parties have a legitimate expectation and/or right of privacy.

9.    SAC objects to the Interrogatories to the extent that they seek confidential, proprietary business information that belongs to SAC.  SAC will disclose such confidential information upon the execution by the parties, and entry by the Court, of an appropriate Stipulation re Confidentiality Agreement and Protective Order.

10.    SAC incorporates the Preliminary Statement and the General Objections into each Response herein as if fully set forth.  Without waiving any of the foregoing objections, all of which are incorporated by reference in the specific Responses below, SAC responds as follows.

## SPECIFIC RESPONSES

### INTERROGATORY NO. 1:

Please provide the name of the individual answering these Interrogatories and if applicable the person's official position or relationship with whom the Interrogatories are directed.

### ANSWER TO INTERROGATORY NO. 1:

Kevin Campbell, an employee of SAC, in consultation with counsel.

### INTERROGATORY NO. 2:

List the steps taken to confirm that Defendant had the express permission of the Plaintiff to call her cellular telephone.

**ANSWER TO INTERROGATORY NO. 2:**

Defendant Navient Solutions, Inc., formerly known as Sallie Mae, Inc., ("NSI") services the loans of Plaintiff's daughter, Maretta Newsome ("Newsome"). On February 4, 2014, Newsome logged into NSI's Manage Your Loan ("MYL") system and confirmed (727) 581-6140 as her "Home Phone" in the Contact Information section. This section contained the following notice:

> By providing my telephone number, I authorize Sallie Mae, Inc., its affiliates and agents to contact me at such number using any means of communication, including, but not limited to, calls placed to my cellular phone using an automated dialing service, calls using prerecorded messages and/or SMS text messages, regarding any current or future loans owned or serviced by Sallie Mae, Inc. its affiliates and agents, even if I will be charged by my service provider(s) for receiving such communications.

Investigation is ongoing.

**INTERROGATORY NO. 3:**

Describe and identify the system used by Defendant to make telephone calls to Plaintiff. This should include the manufacturer's name, make, model, software name, and software version, (also sometimes commonly referred to as an "autodialer," "robo-dialer," "predictive dialer," "power dialer") that was used by Defendant to place telephone calls to Plaintiff's cellular telephone number (727) 581-6140 during the time period beginning January 1, 2014 to the present date.

**ANSWER TO INTERROGATORY NO. 3:**

SAC objects to this Interrogatory on the grounds, among others, that: (i) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (ii) it seeks confidential, proprietary business information that belongs to SAC. Without waiving and subject to these objections and the general

-4-

objections, SAC responds to this Interrogatory as follows: SAC states that 466 calls were made

to Plaintiff using an automated telephone dialing system, and 12 were made manually. For

purposes of this action only, however, SAC will not distinguish between the modes of calling as

related to Plaintiff.

**INTERROGATORY NO. 4:**

List how many calls were made by the Defendant to telephone number (727) 581-6140

during the period beginning January 1, 2014.

**ANSWER TO INTERROGATORY NO. 4:**

SAC objects to this Interrogatory on the grounds, among others, that it seeks information

that is equally available to Plaintiff. Without waiving and subject to these objections and the

general objections, SAC responds to this Interrogatory as follows: SAC made 478 calls to

telephone number (727) 581-6140 during the period beginning January 1, 2014.

**INTERROGATORY NO. 5:**

List the exact conversations during the relevant period the Defendant had with the

Plaintiff, the identity (by name, position and title) of the individual who spoke with the Plaintiff,

and the date and time of each conversation. [This interrogatories ask for exactly what the

Plaintiff said to the Defendant and what the Defendant said to the Plaintiff during each telephone

call during the relevant time period].

**ANSWER TO INTERROGATORY NO. 5:**

SAC objects to this Interrogatory on the grounds, among others, that: (i) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; (ii) it seeks information that is equally available to Plaintiff.

**INTERROGATORY NO. 6:**

Please identify the name, residence address, business address and telephone number of each person believed or known by you, your agents or attorney to have any knowledge of the incidents described in the Complaint, including any agents who are heard on recordings previously provided by the Defendant, and specify the subject matter of the witness' knowledge.

**ANSWER TO INTERROGATORY NO. 6:**

SAC objects to this Interrogatory on the grounds, among others, that: (i) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (ii) it seeks information in which non-parties have a legitimate expectation and or right of privacy. Without waiving and subject to these objections and the general objections, SAC responds to this Interrogatory as follows: Plaintiff, Newsome and SAC's employee, Kevin Campbell, who has knowledge of SAC's calling practices, including with respect to alleged wrong number calls. Mr. Campbell can be reached through SAC's counsel.

**INTERROGATORY NO. 7:**

Identify all telephone numbers from which Defendant made telephone calls to Plaintiff's cellular telephone number (727) 581-6140 during the relevant time period.

**ANSWER TO INTERROGATORY NO. 7:**

SAC objects to this Interrogatory on the grounds, among others, that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action. Without waiving and subject to these objections and the general objections, SAC responds to this Interrogatory as follows: Investigation is ongoing. SAC made telephone calls to (727) 581-6140 from the following numbers during the relevant time period:

- (317) 550-5548
- (317) 550-5549
- (866) 905-8941
- (765) 283-3495
- (317) 348-9725
- (317) 348-9728
- (317) 348-9732
- (800) 335-9188
- (765) 283-3485
- (765) 637-0781
- (765) 637-0782
- (866) 283-5184
- (317) 550-5534
- (317) 550-5540
- (866) 640-5206

**INTERROGATORY NO. 8:**

Identify and explain what communications took place between Defendant and Student Assistance Corporation concerning the account described in the complaint.

-7-

**ANSWER TO INTERROGATORY NO. 8:**

SAC objects to this Interrogatory on the grounds that it is unintelligible.


**INTERROGATORY NO. 9:**

Identify the total number of calls made to the Plaintiff's cellular telephone by the

Defendant using an ATDS.

**ANSWER TO INTERROGATORY NO. 9:**

SAC incorporates herein the Response to Interrogatory No. 3, as if fully set forth.


**INTERROGATORY NO. 10:**

Identify the total number of calls made to the Plaintiff's cellular telephone by Student

Assistance Corporation using an ATDS.

**ANSWER TO INTERROGATORY NO. 10:**

SAC incorporates herein the Response to Interrogatory No. 3, as if fully set forth.


**INTERROGATORY NO. 11:**

Identify the total number of calls made to the Plaintiff's cellular telephone by the

Defendant using manual dialing and/or human intervention and the name, model and software

version of the system used to make those calls.

**ANSWER TO INTERROGATORY NO. 11:**

SAC incorporates herein the Response to Interrogatory No. 3, as if fully set forth.

**INTERROGATORY NO. 12:**

Identify the total number of calls made to the Plaintiff's cellular telephone by Student

Assistance Corporation using manual dialing and/or human intervention and the name, model

and software version of the system used to make those calls.

**ANSWER TO INTERROGATORY NO. 12:**

SAC incorporates herein the Response to Interrogatory No. 3, as if fully set forth.

Dated:  December 14, 2015

Respectfully submitted,

STUDENT ASSISTANCE CORPORATION

By: _____
                              Lisa M. Simonetti

Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 (424) 204 7700

## VERIFICATION

I, Kevin Campbell, am an employee of Student Assistance Corporation ("SAC"), a party to this action, and am authorized to make this Verification on its behalf. I have read SAC's Responses to Plaintiff's First Set of Interrogatories (the "Responses"). I am informed and believe, including based on information that I have received during the course of my employment at SAC, as well as a review of records maintained by or belonging to SAC with respect to the conduct challenged by plaintiff in this action, that the matters set forth in the Responses are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 15 day of December 2015 at Muncie, Indiana.

_____
Kevin Campbell

-10-

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing **RESPONSES OF DEFENDANT STUDENT ASSISTANCE CORPORATION TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** were served on:

> William Peerce Howard, Esq.
> Morgan & Morgan
> One Tampa City Center
> 201 N. Franklin Street, 7th Floor
> Tampa, FL 33602
> Tele: (813) 223-5505
> Fax: (813) 223-5402
> bhoward@forthepeople.com

by electronic mail on December 14, 2015.

Desiree Allen-Maye

# EXHIBIT 8 – STUDENT ACCEPTANCE CORPORATION CALL LOG

# DOCUMENT TO BE FILED UNDER SEAL UPON APPROVAL OF THE COURT

# EXHIBIT 9 – NAVIENT SOLUTIONS, INC. CALL LOG

## DOCUMENT TO BE FILED UNDER SEAL UPON APPROVAL OF THE COURT

EXHIBIT 10

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

        Plaintiff,

v.                                                          Case No. 8:15-cv-1559-T-33-TBM

NAVIENT SOLUTIONS, INC.,

        Defendant.

## SUPPLEMENTAL RESPONSES OF DEFENDANT STUDENT ASSISTANCE CORPORATION TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the December 31, 2015 Order on Plaintiff's Motion to Compel Defendant's Discovery Responses (the "Order"), defendant Student Assistance Corporation ("SAC") hereby supplements its Responses to the First Set of Interrogatories (the "Interrogatories") propounded by plaintiff Willie McCaskill ("Plaintiff") as follows:

## SPECIFIC RESPONSES

## INTERROGATORY NO. 5:

List the exact conversations during the relevant period the Defendant had with the Plaintiff, the identity (by name, position and title) of the individual who spoke with the Plaintiff, and the date and time of each conversation.

## SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 5:

An inbound telephone call was placed to SAC or Defendant Navient Solutions, Inc. ("NSI") by the cell number allegedly owned by Plaintiff on April 16, 2015. It proceeded as follows:

**Company**:      This call may be recorded.  Is this Maretta Newsome?

**Caller**:      Who?

**Company**:      Maretta Newsome?

**Caller**:      No, I thought this was Lowe's.  Sorry I've got the wrong number.

**Company**:      Oh, I'm sorry, you don't know anyone by that name?

**[Call ends]**

SAC is not aware of any other conversations taking place with Plaintiff.  In addition, SAC has produced the recordings of the calls made to the cell number allegedly owned by Plaintiff.  Further, SAC is not aware of any conversations with Plaintiff that were not recorded, or that were recorded and such recordings subsequently were deleted.


## INTERROGATORY NO. 6:

Please identify the name, residence address, business address and telephone number of each person believed or known by you, your agents or attorney to have any knowledge of the incidents described in the Complaint, including any agents who are heard on recordings previously provided by the Defendant, and specify the subject matter of the witness' knowledge.

## SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 6:

The full name and, if no longer in SAC's employ, the last known address of each SAC employee identified by code in the call logs are as follows:

| Code | Name (Last Known Address) |
|------|---------------------------|
| S585 | Elizabeth Young (5440 W. Whittier Dr., Knightstown, IN 46148) |
| S607 | Jennifer Kirk |

| | |
|---|---|
| S588 | Kimberly Hunnicutt-Harris (3175 S. Highway 29, Moreland, GA 30259) |
| S738 | Angela Overla (1715 S. Jefferson St., Hartford City, IN 47348) |
| S597 | Lauren Kahl (2221 Braeburn East Drive, Indianapolis, IN 46219) |
| S170 | Kiann Johnson (17729 Gasparilla Court, Westfield, IN 46062) |
| S298 | Kylie Oliveira |
| S239 | Rena Jones |
| S409 | Casey Stephens-Whittaker (608 W. Ashland Ave., Muncie, IN 47303) |
| S530 | D'Andre Wilkins (807 E. Charles St., Muncie, IN 47305) |
| S377 | Kurt Noggle |
| S571 | Anna Tyree-McCowan (1806 E. Waid Ave., Muncie, IN 47303) |
| S566 | Jesus Martinez (202 S. Talley Ave., Muncie, IN 47303) |
| S398 | Antoinette Gudger (2330 S. Pershing Dr., Muncie, IN 47302) |
| S536 | Derick Chowning (202 S. Talley Ave., Muncie, IN 47303) |
| S699 | Eric McKay |
| S664 | Christine Hampton |

Dated:  January 7, 2016

Respectfully submitted,

STUDENT ASSISTANCE CORPORATION

By:  _____
                 Lisa M. Simonetti

Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 (424) 204 7700

-4-

## VERIFICATION

I, Kevin Campbell, am an employee of Student Assistance Corporation ("SAC"), a party to this action, and am authorized to make this Verification on its behalf. I have read SAC's Supplemental Responses to Plaintiff's First Set of Interrogatories (the "Supplemental Responses"). I am informed and believe, including based on information that I have received during the course of my employment at SAC, as well as a review of records maintained by or belonging to SAC with respect to the conduct challenged by plaintiff in this action, that the matters set forth in the Supplemental Responses are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___7___ day of January 2016 at _Indianapolis_,

_____.

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing **SUPPLEMENTAL RESPONSES OF DEFENDANT STUDENT ASSISTANCE CORPORATION TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** were served on:

> William Peerce Howard, Esq.
> Morgan & Morgan
> One Tampa City Center
> 201 N. Franklin Street, 7th Floor
> Tampa, FL 33602
> Tele: (813) 223-5505
> Fax: (813) 223-5402
> bhoward@forthepeople.com

by electronic mail on January 7, 2016.

Desiree Allen-Maye

CHICAGO/#2794348.1

EXHIBIT 11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

      Plaintiff,

v.

      Case No. 8:15-cv-1559-T-33-TBM

NAVIENT SOLUTIONS, INC.,

      Defendant.

## SECOND SUPPLEMENTAL RESPONSES OF DEFENDANT STUDENT ASSISTANCE CORPORATION TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the December 31, 2015 Order on Plaintiff's Motion to Compel Defendant's Discovery Responses (the "Order"), defendant Student Assistance Corporation ("SAC") hereby provides its Second Supplemental Responses to the First Set of Interrogatories (the "Interrogatories") propounded by plaintiff Willie McCaskill ("Plaintiff") as follows:

### SPECIFIC RESPONSES

**INTERROGATORY NO. 6:**

Please identify the name, residence address, business address and telephone number of each person believed or known by you, your agents or attorney to have any knowledge of the incidents described in the Complaint, including any agents who are heard on recordings previously provided by the Defendant, and specify the subject matter of the witness' knowledge.

**AMENDED ANSWER TO INTERROGATORY NO. 6:**

| Code | Name (Last Known Address) |
|------|---------------------------|
| S771 | Thomas Hart (3500 E Wysor Street, Muncie, IN 47303) |
| S615 | Lanicka Robinson |
| S681 | Amanda Currie |

Dated:  January 13, 2016

Respectfully submitted,

STUDENT ASSISTANCE CORPORATION

By: _____

Lisa M. Simonetti

Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 (424) 204 7700

## VERIFICATION

    I, Kevin Campbell, am an employee of Student Assistance Corporation ("SAC"), a party

to this action, and am authorized to make this Verification on its behalf.  I have read SAC's

Supplemental Responses to Plaintiff's First Set of Interrogatories (the "Supplemental

Responses").  I am informed and believe, including based on information that I have received

during the course of my employment at SAC, as well as a review of records maintained by or

belonging to SAC with respect to the conduct challenged by plaintiff in this action, that the

matters set forth in the Supplemental Responses are true.

    I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.  Executed this 13 day of January 2016 at Indianapolis,

Indiana.

 

                                                     Kevin Campbell

-3-

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing **AMENDED RESPONSES OF DEFENDANT STUDENT ASSISTANCE CORPORATION TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** were served on:

> William Peerce Howard, Esq.
> Morgan & Morgan
> One Tampa City Center
> 201 N. Franklin Street, 7th Floor
> Tampa, FL 33602
> Tele: (813) 223-5505
> Fax: (813) 223-5402
> bhoward@forthepeople.com

by electronic mail on January 13, 2016.

_____
Ryan Lo

EXHIBIT 12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

        Plaintiff,

v.                              Case No. 8:15-cv-1559-T-33-TBM

NAVIENT SOLUTIONS, INC.,

        Defendant.

**SUPPLEMENTAL RESPONSES OF
DEFENDANT NAVIENT SOLUTIONS, INC. TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the December 31, 2015

Order on Plaintiff's Motion to Compel Defendant's Discovery Responses (the "Order"),

defendant Navient Solutions, Inc. ("NSI") hereby supplements its Responses to the First Set of

Interrogatories (the "Interrogatories") propounded by plaintiff Willie McCaskill ("Plaintiff") as

follows:

**SPECIFIC RESPONSES**

**INTERROGATORY NO. 5:**

List the exact conversations during the relevant period the Defendant had with the

Plaintiff, the identity (by name, position and title) of the individual who spoke with the Plaintiff,

and the date and time of each conversation.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 5:**

An inbound telephone call was placed to NSI or defendant Student Assistance

Corporation ("SAC") by the cell number allegedly owned by Plaintiff on April 16, 2015.  It

proceeded as follows:

**Company**:      This call may be recorded.  Is this Maretta Newsome?

**Caller**:      Who?

**Company**:      Maretta Newsome?

**Caller**:      No, I thought this was Lowe's.  Sorry I've got the wrong number.

**Company**:      Oh, I'm sorry, you don't know anyone by that name?

**[Call ends]**

NSI is not aware of any other conversations taking place with Plaintiff.  In addition, NSI has produced the recordings of the calls made to the cell number allegedly owned by Plaintiff. Further, NSI is not aware of any conversations with Plaintiff that were not recorded, or that were recorded and such recordings subsequently were deleted.


**INTERROGATORY NO. 6:**

Please identify the name, residence address, business address and telephone number of each person believed or known by you, your agents or attorney to have any knowledge of the incidents described in the Complaint, including any agents who are heard on recordings previously provided by the Defendant, and specify the subject matter of the witness' knowledge.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 6:**

The full name and, if no longer in NSI's employ, the last known address of each NSI employee identified by code in the call logs are as follows:

| Code | Name (Last Known Address) |
|---|---|
| S614 | Regan Glancy |
| F965 | Endia Scanlan (9425 San Miguel Dr., Apt. D, Indianapolis, IN 46250) |

CHICAGO/#2794275.1

| FA76 | Cicily Rogers |
|---|---|
| FB01 | Haley Smith (320 S. Grant St., Apt. 215, West Lafayette, IN 47906) |
| F967 | Jonathan Dilk (10060 Bahamas Circle, Fishers, IN 46037) |
| DA34 | Bedriya Robinson |
| PA60 | Grace McNeil |
| FD07 | Tiesha Lee (6028 East 24th Street, Indianapolis, IN 46219) |
| FC53 | Aaron Nelson (760 Homewood Dr., Indianapolis, IN 46280) |
| FC54 | Alexander Peterson (21 Arrowae Dr., Apt. E, Carmel, IN 46032) |
| FB81 | Noe Barragan-Pena |
| F799 | Kent Morrison (917D Hall Street, Tipton, IN 46072) |
| FA50 | Christopher Burnside |
| FB68 | James Harlan |
| C48284 | Jinky Sazon |

CHICAGO/#2794275.1

Dated:  January 7, 2016

Respectfully submitted,

NAVIENT SOLUTIONS, INC.

By:  _____
Lisa M. Simonetti

Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 (424) 204 7700

-4-

## **VERIFICATION**

I, Cheryl Dillon, am an employee of Navient Solutions, Inc. ("NSI"), a party to this action, and am authorized to make this Verification on its behalf. I have read NSI's Supplemental Responses to Plaintiff's First Set of Interrogatories (the "Supplemental Responses"). I am informed and believe, including based on information that I have received during the course of my employment at NSI, as well as a review of records maintained by or belonging to NSI with respect to the conduct challenged by plaintiff in this action, that the matters set forth in the Supplemental Responses are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _7_ day of January 2016 at _Newark_, _Delaware_.

_Cheryl A Dillon_

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing

**SUPPLEMENTAL RESPONSES OF DEFENDANT NAVIENT SOLUTIONS, INC. TO**

**PLAINTIFF'S FIRST SET OF INTERROGATORIES** were served on:

> William Peerce Howard, Esq.
> Morgan & Morgan
> One Tampa City Center
> 201 N. Franklin Street, 7th Floor
> Tampa, FL 33602
> Tele: (813) 223-5505
> Fax: (813) 223-5402
> bhoward@forthepeople.com

by electronic mail on January 7, 2016.

Desiree Allen-Maye

CHICAGO/#2794275.1

EXHIBIT 13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

    Plaintiff,

                                CASE NO.:  8:15-CV-1559-T-33-TBM

-vs-

NAVIENT SOLUTIONS, INC., STUDENT
ASSISTANCE CORPORATION, and
NAVIENT CORPORATION,

    Defendants.

_____/

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANTS',
NAVIENT SOLUTIONS, INC. AND STUDENT ASSISTANCE CORPORATION,
REQUESTS FOR PRODUCTION**

      COMES NOW the Plaintiff, Willie McCaskill, by and through undersigned counsel and hereby supplements her Responses and Objections to the Defendants', Navient Solutions, Inc. and Student Assistance Corporation, Requests for Production, as follows:

**REQUEST FOR PRODUCTION #1:**    Notes regarding a telephone call that allegedly was made by "Heather" to you on behalf of NSI or SAC. These notes were the subject of deposition testimony taken on December 16, 2015.

**ANSWER:**    Plaintiff objects to this Request on the grounds it seeks the production of a document protected by attorney-client privilege. Please see Plaintiff's corresponding Privilege Log.

**SUPPLEMENTAL ANSWER:**    **Notwithstanding the above asserted objection, Plaintiff hereby agrees to produce herewith the note from client to attorney concerning telephone calls and conversation with Heather referenced in Plaintiff's Privilege Log and will produce same under separate cover.  Plaintiff further states it is unclear as to the testimony**

in which Defendants reference in this requests and asks for clarification (i.e., Page and Line Number within the Plaintiff's deposition transcript) from the Defendants.

**REQUEST FOR PRODUCTION #5:**      The documents reviewed by you during deposition testimony taken on December 16, 2015, specifically: (a) a typewritten page of information, including with respect to a call allegedly made to you by "Heather"; and (b) a chart.

**ANSWER:**      Plaintiff objects to this Request on the grounds it seeks the production of a document protected by attorney-client privilege. Please see Plaintiff's corresponding Privilege Log.

**SUPPLEMENTAL ANSWER:**      Notwithstanding the above asserted objection, Plaintiff hereby agrees to produce herewith the note from client to attorney concerning telephone calls and conversation with Heather referenced in Plaintiff's Privilege Log and the chart. Plaintiff further states it is unclear as to the testimony in which Defendants reference in this requests and asks for clarification (i.e., Page and Line Number within the Plaintiff's deposition transcript) from the Defendants.

Dated this 19th day of January, 2016.

> *s/Frank H. Kerney, III, Esquire*
> William Peerce Howard, Esq.
> Florida Bar No.:  0103330
> whoward@forthepeople.com
> Octavio Gomez, Esq.
> Florida Bar No.: 338620
> tgomez@forthepeople.com
> Frank H. Kerney III, Esq.
> Florida Bar No.: 88672
> fkerney@forthepeople.com
> Morgan & Morgan, Tampa,  P.A.
> One Tampa City Center, 7th Floor
> 201 North Franklin Street
> Tampa, FL 33602
> Telephone:  (813) 223-5505/Facsimile:  (813) 223-5402
> *Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

E-Mail this 19th day of January, 2016 to: lsimonetti@vedderprice.com;

dmaye@vedderprice.com; ecfladocket@vedderprice.com; dvanhoose@sessions-law.biz; and

evap@sessions-law.biz.

*/s/Frank H. Kerney, III, Esq.*
Frank H. Kerney, III, Esq.
Morgan & Morgan, Tampa,  P.A.
Florida Bar #:  0088672

Date of Incident: On or about August 26, 2014

Description of incident J/Montana 4/7/2015

I have been receiving harassing calls on my cell phone from Heather with Navient and many Student Loan Servicers with 55 different phone numbers calling me. I am 67 years old and have 3 adult married children ages 35-44 years old. They do not discuss their business with me about their obligations or anything else.

Location of Incident: Largo, florida

Some of the names of the company servicers that have been calling me:
Navient, ERC, Student Loan Solutions and Student Loan Assistance. I have never had a student loan in my life or signed for anyone else.

Total number of cell phone calls from August 2014 to April 2015 is 382 . I have lost over 900 calls as they were dropped. Total number of voice mails not counted with phone calls were 29, but they were all dropped except one I recorded on 4/17/15 at 9:57a.m. from Eric at Student Assistance asking for Maretta Newsome. I also received 8 Sunday calls.

Monthly calls:
August 2014 (2), Sept. 2014 (70), Oct. 2014 (62), Nov. 2014 (53), Dec. 2014 (91), Jan. 2015 (56), Feb. 2015 (17), March 2015 (11), April 2015 (20) Total 382 +29 voice mails = 411.

My Statement:

I received a call from Heather around or about on 8-26-14. She called my cell phone and said she was calling for Maretta Newsome and I told her I am sure that she has caller I.D. and she can see this is not Maretta Newsome's phone number. She said I need to give Maretta her message and I told her she has the wrong person and I am not her messenger to deliver her calls. Heather ask me if I knew her and I said yes, and told her why doesn't she call her and did she have her phone number. Heather gave me the phone number for Maretta and I told her it was correct. She said Maretta does not answer her phone. I ask her not to call my cell phone any more about a student loan. I told Heather I have never had a student loan and I don't have anything to do with someone elses bills. The call ended. After a short time I began to get bombarded with cell phone calls. Calls started from 7:59a.m. until 8:56 p.m. some times. At times it did not matter if it was even Saturday and Sunday. I have been aggrevated enough for no reason at all.

*Willie Myra McCaskill*

Willie Myra McCaskill

