EXHIBIT INDEX

| Number | Title |
|--------|-------|
| 1 | Deposition Transcript of Kevin Campbell |
| 2 | Deposition Transcript of Cheryl Dillon |
| 3 | Deposition Transcript of Willie McCaskill |
| 4 | Deposition Transcript of Maretta Newsome |
| 5 | Plaintiff's Second Supplemental Response to Defendants' Request for Production |
| 6 | Responses of Defendant Navient Solutions, Inc. to Plaintiff's First Set of Interrogatories |
| 7 | Responses of Defendant Student Assistance Corporation to Plaintiff's First Set of Interrogatories |
| 8 | Student Assistance Corporation Call Log |
| 9 | Navient Solutions, Inc. Call Log |
| 10 | Supplemental Responses of Defendant Student Assistance Corporation to Plaintiff's First Set of Interrogatories |
| 11 | Second Supplemental Responses of Defendant Student Assistance Corporation to Plaintiff's First Set of Interrogatories |
| 12 | Supplemental Responses of Defendant Navient Solutions, Inc. to Plaintiff's First Set of Interrogatories |
| 13 | Plaintiff's Supplemental Response to Defendants' Requests for Production |

# EXHIBIT 1

**In The Matter Of:**

*McCaskill v.*
*Navient Solutions, et al.*

---

*Kevin Campbell*
*December 22, 2015*
*McCaskill v. Navient Solutions, et al.*

---

*Smith Reporting*
*400 North High Street - Suite 200*
*Muncie, Indiana  47305*
*1-800-700-3566 / 765.284.7836*
*www.smithreporting.net*



Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 4 of 86 PageID 1182
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 1

```
 1            UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                  TAMPA DIVISION

 3          CASE NO. 8:15-CV-1559-T-33-TBM

 4

 5
    WILLIE McCASKILL,              )
 6                                 )
            Plaintiff,             )
 7                                 )
    v.                             )
 8                                 )
    NAVIENT SOLUTIONS, INC.,       )
 9  STUDENT ASSISTANCE             )
    CORPORATION, and NAVIENT       )
10  CORPORATION,                   )
                                   )
11          Defendants.            )

12

13

14      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                  OF KEVIN CAMPBELL
15

16          The videotaped deposition upon oral
        examination of KEVIN CAMPBELL, a witness
17      produced and sworn before me, Karon A. Voloski
        Brown, CSR, CCR, Notary Public in and for the
18      County of Boone, State of Indiana, taken on
        behalf of the Plaintiff, at the offices of
19      Smith Reporting, 400 N. High, Suite 200,
        Muncie, Indiana, on Tuesday, December 22, 2015,
20      at 9:00 a.m., pursuant to the Federal Rules of
        Civil Procedure with written notice as to time
21      and place thereof having not been waived.

22

23

24

25
```

Page 2

```
 1          A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3
            Octavio "Tav" Gomez, Esq.
 4          Frank H. Kerney, III, Esq.
            MORGAN & MORGAN
 5          201 North Franklin Street
            7th Floor
 6          Tampa, FL 33602
            (813) 223-5505
 7          TGomez@forthepeople.com

 8
    FOR THE DEFENDANTS:
 9
            Lisa M. Simonetti, Esq.
10          VEDDER PRICE
            1925 Century Park East
11          Suite 1900
            Los Angeles, CA 90067
12          (424) 204-7700
            lsimonetti@vedderprice.com
13

14          Anne L. Milem, Esq.
            NAVIENT
15          2001 Edmund Halley Drive
            Reston, VA 20191
16          (703) 984-6733
            anne.milem@navient.com
17

18

19    Also present:

20          Jason D'Angelo, videographer

21

22

23

24

25
```

Page 3

```
 1          I N D E X   O F   E X A M I N A T I O N

 2
    DIRECT EXAMINATION. . . . . . . . . . . . . . . 5
 3          Questions by Mr. Gomez

 4

 5

 6

 7

 8          I N D E X   O F   E X H I B I T S

 9

10  Plaintiff's Exhibit:
```

```
11  1 - Day 060 letter . . . . . . . . . . . . . . 19
    2 - Caller list. . . . . . . . . . . . . . . . 67
12  3 - 5/24/11 Student Assistance Corp letter . . 72
    4 - Day 090 letter . . . . . . . . . . . . . . 74
13
```

```
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1          THE VIDEOGRAPHER: We are on record for

 2  the deposition of Kevin Campbell, in the matter of

 3  Willie McCaskill versus Navient Solutions, Inc., et

 4  al., taken in the US District Court for the Middle

 5  District of Florida, Tampa Division, Case No.

 6  8:15-CV-1559-T-33-TBM.

 7          Today is December 22nd, 2015.  The time is

 8  approximately 9:03 in the morning.  We're at the

 9  offices of Smith Reporting, located at 400 North

10  High Street, Suite 200, in Muncie, Indiana.

11          And would Counsel please identify

12  themselves for the record.

13          MR. GOMEZ: Tav Gomez, with Morgan &

14  Morgan, representing Willie McCaskill.

15          MR. KERNEY: Frank Kerney, with Morgan &

16  Morgan, representing the plaintiff.

17          MS. SIMONETTI: Lisa Simonetti, with

18  Vedder Price, representing Defendant.

19          MS. MILEM: Anne L. Milem, in-house

20  counsel.

21          THE VIDEOGRAPHER: And would the court

22  reporter please swear in or affirm the witness.

23

24

25
```

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 5 of 86 PageID 1183
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 5

1              KEVIN CAMPBELL,
2        having been duly sworn to tell the truth, the
3        whole truth, and nothing but the truth relating
4        to said matter was examined and testified as
5        follows:
6   DIRECT EXAMINATION,
7   **QUESTIONS BY MR. GOMEZ:**
8   Q    Good morning, Mr. Campbell.  As you heard, my name
9        is Tav Gomez, and I represent Willie
10       McCaskill.  She's the plaintiff in this case.
11       We're here to take your deposition as Student
12       Assistance Corporation's corporate representative.
13       Is that your understanding?
14  A    **Yes.**
15  Q    Have you ever had your deposition taken?
16  A    **Yes.**
17  Q    I'll tell you a little bit regarding the way today
18       is going to work.  I'm going to ask you questions.
19       If you don't understand a question, feel free to
20       ask me to repeat it.  I will try to keep the
21       questions as simple as I can.
22            I will also tell you that this case, even
23       though this deposition is taking place in Indiana,
24       this is a Middle District Court case, Middle
25       District of Florida case.  Therefore, the rules

Page 6

1        will apply regarding the Middle District of
2        Florida.  When I ask you a question, you might hear
3        your counsel make an objection.  Okay?  In the
4        Middle District, you're allowed to object, under
5        two circumstances:  One, you will say I'm going to
6        object as to form.  And, of course, defense counsel
7        is aware of the local rules where you will not
8        state a speaking objection.  So if you hear her go,
9        "Objection.  Form.", that doesn't mean don't
10       answer, that just means she's noting this
11       objection, then you will proceed to answer.  You
12       understand that?
13  A    **Yes.**
14  Q    Moreover, if she does say, I'm going to instruct
15       you not to answer, then at that point you can
16       actually not answer that question.  Do you
17       understand that?
18  A    **Yes.**
19  Q    Okay.  What it does, is it just keeps the flow
20       going as we progress through this, so you don't
21       stop every time and look at her.  She'll just go,
22       "Objection.  Form."
23  A    **And you're saying "form"?**
24  Q    Form, F-O-R-M.  Just the form.
25  A    **Okay.**

Page 7

1   Q    To the form of the question or whatever.  As
2        opposed to, in a lot of districts, you can go,
3        "Objection.  Relevance."  "Objection.  He wouldn't
4        know that."  Those are speaking objections.  Well,
5        the Middle District, in these depositions, will
6        limit the defense to that.
7             So let's go on with a little bit of
8        background on you.  Mr. Campbell, where do you
9        live?  What city?
10  A    **Middleton.**
11            **MS. SIMONETTI:** Hang on.
12            **THE WITNESS:** I'm sorry.
13            **MS. SIMONETTI:** Don't give your street
14       address.  You can just give the city where you
15       live.
16            If you need to reach the witness,
17       obviously you can reach him through me.
18  **QUESTIONS BY MR. GOMEZ:**
19  Q    Absolutely.  I just say, what city do you live?
20  A    **In Middletown.**
21  Q    In what state?
22  A    **Indiana.**
23  Q    Okay.  Who do you currently work for?
24  A    **Student Assistance Corp.**
25  Q    Now, I asked you earlier if you had your deposition

Page 8

1        taken, and your answer was yes, correct?
2   A    **Yes.**
3   Q    How many times have you had your deposition taken?
4   A    **Once.**
5   Q    And when was that?
6   A    **Approximately ten years ago.**
7   Q    Was that deposition taken as part of your job, or
8        was it individual deposition?
9   A    **My job.**
10  Q    Were you, at that point, also a corporate
11       representative for whomever you worked for?
12  A    **Yes.**
13  Q    Okay.  Was it Student Assistance Corp?
14  A    **No.**
15  Q    Was it Sallie Mae?
16  A    **No.**
17  Q    Who was it, the name of the company?
18  A    **J. P. Morgan Chase.**
19  Q    What is your job title at Student Assistance Corp?
20  A    **President of Student Assistance Corp.**
21  Q    From now on I'll call it SAC, if that's okay with
22       you.
23  A    **Yes.**
24  Q    How long have you been president of SAC?
25  A    **Approximately four years.**

McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 9

1 Q   How long have you worked for SAC?
2 A   **Since April 2007.**
3 Q   When you first started with SAC, what did you work
4     as, in what capacity?
5 A   **Director.**
6 Q   Director of what?
7 A   **Student Assistance Corp.**
8 Q   Now, the hierarchy at SAC, do you report to a CEO?
9     Is there people above you, or are you the top of
10    SAC?
11 A  **I am the top of SAC.**
12 Q  Now, do you report to Navient Corp as a parent
13    company?
14 A  **No.**
15 Q  Do you report to anyone, as for your job?
16 A  **Yes.**
17 Q  Who would that be to?
18 A  **Troy Standish.**
19 Q  Troy?  What was the last name?
20 A  **Standish.**
21 Q  And what is his job title?
22 A  **Senior Vice President.**
23 Q  Of what?
24 A  **Navient Solutions.**
25 Q  So you, as president of SAC, are directly

Page 10

1     underneath Troy Standish, which is the senior vice
2     president of Navient Solutions, correct?
3 A   **Yes.**
4 Q   And Mr. Standish, does he report to the president
5     of Navient Solutions?
6 A   **Yes.**
7 Q   And what is the name of the president of Navient
8     Solutions?
9 A   **John Kane.**
10 Q  How long has SAC been reporting to Navient
11    Solutions?  Have they always been together as one,
12    or are they separate entities?  Can you explain to
13    me the relationship between the companies?
14        **MS. SIMONETTI:** What's the question?  That
15    was about three questions.  Can you read that back?
16        Is it the last one?
17        **MR. GOMEZ:** Yeah.  If he can just explain.
18    And I'm going to ask you to please object to form,
19    and then I can repeat it if he doesn't understand.
20        **MS. SIMONETTI:** I asked her to repeat the
21    question.  There were, I think, three questions.
22 **QUESTIONS BY MR. GOMEZ:**
23 Q  Correct.  What is the relationship between Navient
24    Solutions and SAC?
25 A  **We are sister companies, affiliates.**

Page 11

1 Q   Is it fair to say that Navient Solutions, even
2     though they are sister companies, is a superior
3     company?
4 A   **No.**
5 Q   Well, you are on top of SAC, yet you respond to the
6     vice president and president of Navient Solutions,
7     correct?
8 A   **Yes.**
9 Q   Do you guys have a contractual agreement between
10    Navient Solutions and SAC?
11 A  **For what reason?**
12 Q  Well, I'm trying to understand -- well, let's go
13    with the what Students Assistance
14    Corporation does.  What is your main business?
15 A  **We perform default prevention on behalf of**
16    **guarantor agencies.**
17 Q  All right.  So let's go through this.  When you say
18    "default prevention," what does that mean?
19 A  **We, on behalf of guarantor agencies, who we are in**
20    **contract with, we make outreach to their borrowers,**
21    **to counsel their -- to counsel their borrowers.**
22 Q  Do you also collect the debts?
23 A  **No.**
24 Q  So explain to me what -- the counseling that you
25    do.  What is it exactly that you do?

Page 12

1 A   **We, at the instruction of the GA's, make outbound**
2     **attempts to their borrowers, to counsel them on**
3     **repayment options.  When I say "repayment options,"**
4     **this is a government agency term, or a Department**
5     **of Ed term, on all of their options available to**
6     **them.**
7 Q   Okay.  When SAC receives an account, is that
8     account already delinquent?
9 A   **Yes.**
10 Q  You stated that you represent several guarantor
11    agencies.  Tell me who are these agencies.
12 A  **USA Funds.**
13 Q  As you go through them, I'll ask you, is that
14    student loans, or is it all kinds of loans for USA
15    Funds?
16 A  **For the business I do?**
17 Q  For SAC.
18 A  **Student loans.**
19 Q  Is Student Assistance Corp, is it strictly student
20    loans that you're trying to counsel on, or make
21    phone calls on?
22 A  **Yes.**
23 Q  Okay.  So you said USA Funds.  Who else?
24 A  **NELA.**
25 Q  At that N-E --

Page 13

1 A N-E-L-A.

2 Q Okay. And, once again, those are student loans for
3 all of these companies?

4 A Yes.

5 Q Who else?

6 A OCAP, which is Oklahoma.

7 Q So it would be O-K?

8 A O-C-A-P.

9 Q Okay. Who else?

10 A Okay. MGA, which is Michigan.

11 Q Okay. Do you know what the "G" stands for?

12 A Guarantor.

13 Q Okay. Who else?

14 A FAME.

15 Q Is that F --

16 A FAME. It's Federal Authority of Maine.

17 Q Okay. Who else? You got two, four, five.

18 A SAC, NELA, OCAP, MGA. Louisiana. It's LOSFA.

19 Q And that's Louisiana what? Do you know what it
20 stands for?

21 A I don't know exactly.

22 Q Okay. Fair enough. Who else?

23 A That is six. That is all of them.

24 Q You don't do anything for Nelnet?

25 A The guarantor?

Page 14

1 Q Yeah. Do you know the company Nelnet? It's also a
2 student loans company.

3 A I am aware of the company, yes.

4 Q But SAC does no work for Nelnet?

5 A I do no work, no.

6 Q Now, let me ask you. These companies that you just
7 listed, you gave me six. Are these companies also
8 owned by your parent company, Navient Corporation?

9 A No.

10 Q So they are separately owned, as far as you know --

11 A Yes.

12 Q -- by other entities?

13 Do you have any individual contract with
14 each of these guarantor agencies?

15 A Yes.

16 Q Are you paid based on the amount of collections
17 that you make, meaning how much money you actually
18 collect for each one of these companies? Or is it
19 based on the number of phone calls that you make,
20 or the number of attempts? Tell me how SAC gets
21 compensated for this.

22 A There's several variations.

23 Q Okay. So explain them to me.

24 A Well, in some cases, we receive what is called DAF.
25 This is a Department of Education term. It's a

Page 15

1 Default Aversion Fee.

2 Q Okay. And this is a fee based on what, if you're
3 able to get somebody up to date on their payments?

4 A The Department of Education pays the guarantor a
5 fee for default prevention. We are in contract
6 with the guarantor, and they use that fee to pay us
7 to perform default prevention.

8 Q How else? You said there's several ways. So this
9 is one way, through the Department of Education for
10 default prevention. How else?

11 A There is a fee per cure.

12 Q And how does that one work?

13 A We receive a fee based on a borrower cure.

14 Q And what do you mean by the borrower cure?

15 A A delinquent borrower that has been placed with us
16 ultimately cures their delinquency.

17 Q So once they get up to date, or whatever process it
18 takes, the fact that you get the borrower to be
19 non-delinquent, you will get maybe a fee for that?

20 A Yes.

21 Q Okay. What other ways does SAC?

22 A Those are the two ways.

23 Q Okay. Now, let me ask you. When an account is
24 given to you by one of those six entities, what
25 does SAC do with that account when it comes into

Page 16

1 SAC? What is the first step? How do you process a
2 brand new account that is delinquent? What do you
3 do with that account?

4 A Repeat the question.

5 Q Okay. If a new account, so if one of these
6 companies that we discussed, let's just use the
7 first one, USA Funds gives you an account that, of
8 course, is delinquent, for you to do your default
9 prevention, walk me through how does that account
10 get introduced into SAC's system, and what happens
11 to that account?

12 A Okay. So first question that you're asking me, how
13 does it get into our system?

14 Q Yes.

15 A Okay. We work on the guarantor system.

16 Q So you have complete access to the guarantor's
17 system?

18 A Yes.

19 Q When that account is then, I guess, assigned to
20 you, you now can access the guarantor systems to
21 see the history of the account, correct?

22 A Yes.

23 Q Are you able to introduce new data into the
24 guarantor systems?

25 A Yes.

Page 17

1  Q  Okay.  Once that account is assigned to SAC and you
2     go into the system, what is it that SAC will do
3     with that delinquent account?
4  A  **We begin default prevention efforts.**
5  Q  And what does that involve?
6  A  **We make outreach calls.  We send letters.  We send**
7     **emails.**
8  Q  Do you have a progression?  Do you have policies or
9     procedures regarding the process?  Meaning a new
10    account should receive this many calls within the
11    first 30 days?  Do you have any type of protocol
12    for phone calls, at first?
13 A  **No.**
14 Q  Okay.  What about for letters?
15 A  **There are letters that go out, yes.**
16 Q  Do you have an introductory -- like an introductory
17    letter that you send out to every new account to
18    SAC?
19 A  **Rephrase that, please.**
20 Q  So when the scenario we're talking about, an
21    account has been assigned to SAC, is delinquent,
22    you now have access to the guarantor system, and
23    you stated that you begin your default prevention
24    efforts.  I want to know if you send out an
25    introduction letter.

Page 18

1  A  **Yes.**
2  Q  Okay.  Do you know if that was done in Ms.
3     McCaskill's case?
4  A  **I'm fairly certain, yes.**
5  Q  Today we just received 25 to 30 pages of discovery
6     from, I guess, correspondence sent from SAC to Ms.
7     McCaskill.  Have you seen those letters today?  If
8     you don't mind, if you could take a look at them.
9  A  **Yes.  I've seen these.**
10 Q  Okay.  If you can go through that stack, do you
11    find this introduction letter that you're talking
12    about in that correspondence?
13 A  **Yes.**
14 Q  If you can show me the -- now, this one starts with
15    Day 060 on top.  Correct?  Day 060, is that what it
16    stays?
17 A  **It states Day 060.**
18 Q  What does that mean?
19 A  **It's a term for our letter.**
20 Q  Okay.  So does it mean you've had these accounts 60
21    days?  Or it just says Day 060, so I'm just trying
22    to figure it out.
23 A  **No.**
24 Q  So let me see that letter back again.  I apologize.
25    Like I said, we just got this today.

Page 19

1     Now, this seems to have been emailed,
2     correct?  Or is there any way to tell whether that
3     was mailed or emailed?
4  A  **I can't tell, based off of this.**
5  Q  And if you don't mind, I'm going to mark that as
6     Exhibit 1.
7     (Plaintiff's Exhibit 1 marked for
8     identification.)
9  Q  Now, what we've marked as Plaintiff's Exhibit 1, it
10    has a handwritten date of 9/11/14.  Do you see that
11    on top?
12 A  **Yes.**
13 Q  Do you know who wrote that?
14 A  **Yes.**
15 Q  Who did?
16 A  **A manager of mine.**
17 Q  Okay.  Do you know how he gathered that date?
18 A  **It should correspond with the date in the system.**
19 Q  Okay.  And who was that manager?
20 A  **Robert Tucker.**
21 Q  T-U-C-K-E-R?
22 A  **Yes.**
23 Q  Okay.  And his position is manager of what?
24 A  **Student Assistance Corp.**
25 Q  So it also has three emails on top.  So would that

Page 20

1     lead you to assume that that's where the emails
2     were sent for this letter, or do you not know that?
3  A  **My assumption is yes.**
4  Q  In this letter you do not say anything about this
5     is an attempt to collect a debt.  Is there a reason
6     why?
7  A  **We're not debt collectors.**
8  Q  So if somebody, when you make a phone call and they
9     answer -- let's go through the phone calls then.
10    When SAC makes these original calls, so in
11    the scenario we were talking about -- excuse me.
12    Let me remove this from you.
13    In the scenario we were discussing, an
14    account has been assigned to you, you now have full
15    access to the guarantor system.  You begin by
16    sending this letter.  Is there a gap on your
17    policies?  Or is there a time that you wait after
18    you send these letters to start making phone calls?
19    Or does it happen all automatically?
20 A  **Situations vary.**
21 Q  Situations vary, okay.
22    So you don't have a policy set in place,
23    like send a letter, wait 72 hours and begin the
24    phone calls?
25 A  **No contractual obligation from our guarantor.**

Page 21

1 Q   And when you're training your agents or
2     representatives, there's also no explanation as to
3     when the phone calls should begin?
4 A   **We manage the attempts for them.**
5 Q   You manage the attempts?  Okay.
6         So let's go through the phone calls and
7     the attempts.
8         What is SAC policies regarding attempts
9     per day to one account?
10 A  **To one account?**
11 Q  To one account, yes.  Not to one phone number, to
12    one account.
13 A  **Maximum attempts would be eight.**
14 Q  What about maximum attempts to one phone number?
15 A  **Eight.**
16 Q  And this is per day?
17 A  **Per day.**
18 Q  How do you control these maximum attempts?  What
19    system?  Is it through your dialer?  How do you
20    control that there's no more than eight attempts a
21    day?
22 A  **It's through our system.**
23 Q  What type of system do you use?
24 A  **Noble.**
25 Q  Which version of the Noble, do you know?

Page 22

1 A   **I don't know the latest version.**
2 Q   Is there a limit to how many contacts you can make
3     a day per account?
4 A   **Yes.**
5 Q   How many?
6 A   **One.**
7 Q   What about the amount of voice messages left?
8 A   **Yes.**
9 Q   How many?
10 A  **One.**
11 Q  Do you have -- how many different prerecorded
12    messages do you use for this context?  Is it the
13    same one, or do you have several different ones
14    that you interchange?
15 A  **Restate that, please.**
16 Q  When you leave this one voice message per day, is
17    it one same message for all the phone calls that
18    are being made on that day?  Or is it do you have
19    variations of the message from SAC?
20 A  **It's variations.**
21 Q  Do you know how many different ones you have?
22 A  **Please state.**
23 Q  Yeah.  Like, do you know how many different voice
24    messages does SAC use during this campaigns of
25    default prevention?

Page 23

1 A   **Each person leaves a different message.**
2 Q   So each person will leave a different message --
3 A   **Well --**
4 Q   Yeah.  Go ahead.
5 A   **Each person leaves a message.**
6 Q   So you have your system set up to the point where,
7     during these eight attempts, only one voice message
8     is left, correct?
9 A   **Yes.**
10 Q  That message, would it be a prerecorded message, or
11    actually the system will just transfer one
12    answering machine back to that agent to leave the
13    message?
14 A  **It --**
15 Q  Could be either one?
16 A  **Either one.**
17 Q  How long has it been that eight phone calls per day
18    is the maximum?  As far as you know, how long has
19    that policy been in place?
20 A  **Long time.**
21 Q  Long time?  So as long as you've been president,
22    it's been eight phone calls per day?
23 A  **I can't answer that.  I don't know the exact time.**
24 Q  Who is the person who's in charge of running your
25    dialers in this type of programs?  I'm assuming you

Page 24

1     have an IT person, or a general manager for that
2     portion.
3 A   **There's a group.**
4 Q   What is the name of that group?
5 A   **Dialer Team.**
6 Q   And is there a supervisor for the Dialer Team?
7 A   **I'm sure there is.**
8 Q   You just don't know the name of that person?
9 A   **I don't know the name of that person.**
10 Q  Now, you stated you make eight accounts -- I mean
11    I'm sorry.  A maximum of eight phone calls per day.
12    Do you know how that number was reached, why eight
13    phone calls a day?
14 A  **Yeah.  Restate that.**
15 Q  Yeah.  Do you know why you have a cap of eight
16    phone calls a day, why the number eight?
17 A  **That's the number we came up with.**
18 Q  Okay.  Is there a limit how many phone calls per
19    week?  Or is it just eight times 7, 56, therefore
20    56?
21 A  **There's no guidelines, no limit.**
22 Q  And there's no guidelines, I'm assuming, per month
23    either, correct?
24 A  **Correct.**
25 Q  Eight times seven, of course, is 56, times 30 days,

McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 25

1  I guess, is 1,680 phone calls.  Let me try and get
2  that right.
3        So that's 1,680 phone calls that you
4  believe the system could do on one account per
5  month, correct?  Eight times seven times 30 days,
6  seems to be 1,680.  Is that a fair statement?
7  A  If that's the number.
8  Q  Do you think that that's excessive, 1,000 phone
9  calls in one month?
10       MS. SIMONETTI:  Object to the extent
11       you're calling for a legal conclusion.  You can't
12       talk about any communications with lawyers.
13  QUESTIONS BY MR. GOMEZ:
14  Q  Correct.  I'm just asking you your opinion.
15       MS. SIMONETTI:  That, you can answer.
16  QUESTIONS BY MR. GOMEZ:
17  Q  Is 1,000 phone calls a month a lot of phone calls?
18  A  That would be -- I don't know.
19  Q  Is there any number that you would consider to be
20  too many phone calls to be received in one month?
21  A  More than eight per day.
22  Q  More than eight per day, okay.  Let's go through
23  the scenario we had.  So when you make a phone
24  call, on behalf of one of these guarantor agencies,
25  and you explain to an individual -- first of all,

Page 26

1  you identify yourself as SAC, Student Assistance
2  Corp, or do you identify yourself as one of the six
3  companies that actually guarantee the loans?
4  A  Student Assistance Corp.
5  Q  So you use a different name?
6       MS. SIMONETTI:  I didn't hear the end of
7       that.
8  A  I'm sorry?
9  QUESTIONS BY MR. GOMEZ:
10  Q  Yeah.  You use the name of your company, correct,
11  you don't use the name of your guarantor when
12  you're making the phone calls, correct?
13  A  We can.
14  Q  So you're allowed to do it?
15  A  On behalf of.
16  Q  Okay.  So when you make that phone call, I want to
17  know about -- I'm pretty sure you have maybe a
18  script that your agents, or representatives -- what
19  do you call them?  I want to make sure I'm calling
20  them the correct word.
21  A  Counselors.
22  Q  Counselors, okay.  Your counselors, when they make
23  these phone calls, the Noble system identifies it
24  as an answer of a live person, therefore it
25  connects it to a live agent, correct?

Page 27

1  A  It can.
2  Q  When that live counselor comes to the line, I'm
3  assuming that they are looking at a computer that
4  has a script that they're reading from.
5  A  No.
6  Q  So what is that counselor supposed to do?
7  A  Counsel the borrower on available options.
8  Q  Okay.  And what are the available options that SAC
9  offers at that point?
10  A  We don't offer -- they are Department of Ed
11       options.  By regulations.
12  Q  By regulations.  Okay.  So let's go through those.
13  Tell me the options that the Department of
14  Education, through your company, offers.  Is it
15  like forbearance, deferment, those kind of things?
16  A  Yes.
17  Q  What are the options that your counselors give
18  these individuals?
19  A  Well, we first ask if they are able to bring their
20  account current.
21  Q  Okay.  Let's pretend they say, yes, I am, I
22  actually have $800, which I'm behind.  Would your
23  counselor be able to take that payment over the
24  phone?
25  A  No.

Page 28

1  Q  What happens if the person says I actually do, I
2  can make the payment right now?  What do you do?
3  A  We call their servicer.
4  Q  Would you transfer that phone call automatically,
5  or would you give them a number to call?  What is
6  the protocol there?
7  A  We, typically, transfer it.
8  Q  So you will have a direct connection while that
9  person say, great, let me connect you, and you will
10  put it through the guarantor?
11  A  No.
12  Q  What happens?  Then tell me.
13  A  We will transfer it to their servicer.
14  Q  To the loan servicer?
15  A  Yes.
16  Q  Is Navient Solutions, Inc. a servicer for all these
17  companies?  Or is there different servicers that
18  you deal with?
19  A  Different servicers.
20  Q  Okay.  So you gave me the six names of the
21  guarantor agencies.  Tell me the different
22  servicers that you work with.
23  A  There's many servicers.
24  Q  More than ten?
25  A  Yes.

SMITH REPORTING
www.smithreporting.net

McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 29

1 Q   More than 20?
2 A   Yes.
3 Q   Navient Solutions, Inc. is just one of several
4      servicers you deal with, correct?
5 A   Correct.
6 Q   Fair to assume several of those servicers are also
7      not owned by Navient Corp?
8 A   Correct.
9 Q   Is there any way that Student Assistance Corp could
10     actually take payment from someone?
11 A   No.
12 Q   Okay.  So you never ever take payments from any
13     individuals over the phone?
14 A   No.
15 Q   You stated you are making these phone calls.
16     How many emails are you sending?  Do you have a
17     protocol for how many emails you're going to send
18     per account, per day, or per week, or per month?
19 A   No contractual obligation.
20 Q   No contractual.  But do you have any protocol
21     inside SAC that limits the amount of contacts
22     through email that you will send a person?
23 A   I believe the system does have limits.
24 Q   Do you know what those limits are?
25 A   I can't speak to them.  I don't remember.

Page 30

1 Q   What about regarding letters in the mail?
2 A   I believe there are limits, as well.
3 Q   But you don't know those limits either?
4 A   Not offhand.
5         MS. SIMONETTI:  Tav, when you reach a good
6      place, I need to return a phone call just for like
7      five minutes.  Is now okay?
8         MR. GOMEZ:  That's fine.  Let's go off.
9         MS. SIMONETTI:  It should be quick.
10        THE VIDEOGRAPHER:  Going off record.  It's
11     9:40.
12        (A recess was taken.)
13        THE VIDEOGRAPHER:  We are back on record.
14     It is 9:51.
15 QUESTIONS BY MR. GOMEZ:
16 Q   Okay.  Mr. Campbell, let's continue with this.
17     We were discussing when a case is given to SAC for
18     default counseling, you stated you have access to
19     the guarantor's system, correct?
20 A   Yes.
21 Q   Regarding that account specifically, correct?
22 A   Yes.
23 Q   Do you have also access to the servicing company?
24 A   We have view access.
25 Q   So that access is different than the guarantor's

Page 31

1      access?
2 A   Different system of record.
3 Q   You stated before that your counselors were able to
4      actually introduce data into the guarantor's
5      systems maybe regarding attempts, or
6      communications.  You're not able to do the same for
7      the servicing companies?
8 A   No.
9 Q   So how do you communicate with the servicing
10     companies?
11 A   Rephrase that.
12 Q   Well, I want to know how do you update the
13     servicing companies regarding your efforts, or
14     communications, with the customers?
15 A   The Department of Education has what you call is
16     the NSLDS database, National Loan or -- National --
17     well, what is it?  National Student Loan Database.
18 Q   So is the NSLD?
19 A   S.
20 Q   S.  Now, this is a system that is, you said, from
21     the Department of Education.  Is that shared by --
22     by who?  By the guarantors, the servicing
23     companies, and you guys?
24 A   That is the go-between between the servicers and
25     the guarantors.

Page 32

1 Q   Are you able to view this system, the NSLDS?
2 A   No.
3 Q   So that system goes between the servicing company
4      and the guaranteeing company, correct?  The
5      guarantors and the servicing companies?
6 A   Correct.
7 Q   What access does SAC have to that account, or to
8      this system, to this network?
9 A   Refer to what "this" is.
10 Q   Well, you have an account, like Maretta McCaskill.
11     And when you get an account like that, you stated
12     that when that account is assigned to SAC, that you
13     try to begin your counseling portion, correct?
14 A   Yes.
15 Q   What are your counselors supposed to go look at,
16     before starting this campaign?  Or what access are
17     they having to that account?
18 A   The guarantor system.
19 Q   The guarantor systems only, correct?
20 A   Correct.
21 Q   They don't get to see anything about the servicing
22     corporation, or company, like the company that's
23     actually servicing the loan?
24 A   We use the guarantor system.
25 Q   Okay.  Do you know if the servicing company has

Page 33

1   access to introduce this data into the guarantor's
2   system?
3 A   **Not into the guarantor's system.**
4 Q   So how does SAC know what a company like Navient
5   Solution is trying to do to service a loan?
6 A   **As I stated, they go through NSLDS. Servicer**
7   **updates the Department of Ed system. It then**
8   **updates the guarantors. The guarantors update**
9   **NSLDS, which then updates the servicers.**
10 Q   So that's how those two communicate. I understand
11   that. How does SAC communicate with the servicing
12   company, only through putting notes on the
13   guarantor and then it gets translated like that
14   back to the servicing company?
15 A   **Correct.**
16 Q   What sort of data are your counselors introducing
17   into the guarantor's database that we're talking
18   about?
19 A   **Outreach attempts.**
20 Q   So if you send out an email, it will be updated on
21   the guarantor's main database, and, therefore, the
22   servicing company can see that. Is that your
23   understanding?
24 A   **Yes.**
25 Q   What about phone call attempts? Is that updated to

Page 34

1   the guarantor's system?
2 A   **Yes.**
3 Q   Are you able to see, in this case, Navient
4   Solutions' attempts, being uploaded into the
5   guarantor's system?
6 A   **No.**
7 Q   Well, if you have full access to the guarantor's
8   system, why can't you see the uploads from Navient
9   Solutions into the guarantor's systems?
10 A   **It's all relevant to the guarantor.**
11 Q   What do you mean "it's all relevant to the
12   guarantor"?
13 A   **The guarantor's contractual obligation is to**
14   **perform default prevention efforts.**
15 Q   I understand that. What I'm trying to understand
16   is, you stated that the servicing companies clearly
17   communicated with the guarantors about accounts,
18   correct? Through these network you described here,
19   NSLDS?
20 A   **Via the loan status.**
21 Q   When your counselors are looking at the guarantor's
22   data, notes, from one account, correct? So you
23   follow me so far? Can they see the attempts that
24   Navient is making in trying to service a loan?
25 A   **No.**

Page 35

1 Q   So those are completely separate from each other,
2   so you never have access to see what the servicing
3   company is doing?
4 A   **No.**
5 Q   So what if the servicing company is able to get a
6   loan to not be delinquent? How would you even know
7   that to stop your efforts?
8 A   **In the event, as I stated before, we have view**
9   **access to the servicer, or servicers' screens.**
10 Q   Okay. So you actually can go and look in Navient
11   Solutions' data for a specific customer?
12 A   **Loan status data for many servicers.**
13 Q   Okay. You call these loan status data. What kind
14   of data is included within this loan status?
15 A   **If they're current or still delinquent.**
16 Q   Okay. Is there more information than that?
17   Meaning, I understand it's going to have the
18   account number and all that. But is it going to
19   have payments, or attempts to collect payments,
20   things like that?
21 A   **I don't know if we have that access.**
22 Q   Okay. SAC, does it concern SAC that you're making
23   eight phone calls a day, and Navient, or any other
24   person servicing this loan, could also be making
25   eight phone calls a day, or more or less?

Page 36

1 A   **Repeat the question.**
2 Q   Does it concern SAC that you have a cap of eight
3   phone calls per day, yet the servicing company
4   could also be making at the same time eight phone
5   calls a day, or more?
6 A   **Does it concern SAC? We work, we are in contract**
7   **with the guarantor --**
8 Q   Yes.
9 A   **-- who is in contract with the Department of**
10   **Education.**
11 Q   Correct.
12 A   **It's government regulations on federal loans --**
13 Q   Yes.
14 A   **-- that guarantors make outreach to borrowers.**
15 Q   I understand that.
16 A   **So we are doing what the guarantor has contracted**
17   **us to do.**
18 Q   Correct. To make eight phone calls max a day to
19   one account, correct?
20 A   **To make default prevention outreach.**
21 Q   Okay. And my question to you is: You don't know
22   how many phone calls the servicing company is
23   making per day, correct?
24 A   **Correct.**
25 Q   And in cases, like the one we're talking about

Page 37

1 today, both SAC is making phone calls and NSI is
2 making phone calls at the same time, correct?
3 **A   It could happen.**
4 Q   Okay.  And my question to you was:  Does SAC have
5 any concern regarding the fact that you're making a
6 maximum of eight phone calls a day, yet you have no
7 idea how many more phone calls the servicing
8 company is making?
9 **A   We're fulfilling our obligations, via the contract**
10 **with the guarantor.**
11 Q   So you're only focusing on our contract policy of
12 eight days, regardless of what the servicing
13 company is doing?
14 **A   Yeah.  They are two different -- two different**
15 **Department of Ed obligations.**
16 Q   Okay.  It seems like you worked with J.P. Morgan
17 until, what, 2007, or something like that?
18 **A   Yes.**
19 Q   Are you today an employee of Navient Corp?
20 **A   No.**
21 Q   You are, of course, familiar with the web site
22 LinkedIn?  LinkedIn, I'm sorry.  You know, the
23 professional, you put your profile up?
24 **A   Yes.**
25 Q   And I'm assuming, at some point, you help create,

Page 38

1 you know, just like everybody else does, a profile
2 in it, correct?
3 **A   Some time ago.**
4 Q   Okay.  You list yourself as Navient Vice President,
5 and President of Student Assistance Corp.  Is that
6 still your position?
7 **A   I am the president of Student Assistance Corp.**
8 Q   Are you in any way Navient's vice president?
9      MS. SIMONETTI:  And when you're using
10 "Navient," which company do you mean?  Are you
11 using --
12 **QUESTIONS BY MR. GOMEZ:**
13 Q   I'm not sure.  I can show you what I'm referring
14 to.  Because it's not a trick question.  I'm just
15 looking at your page.  And it literally says
16 Navient, Vice President and President.
17 **A   You know, I put that in at some point in time, but**
18 **it's -- I don't know.  I mean --**
19 Q   It seems to me that this was updated sometime in
20 May, under Experience.  And it says, once again,
21 Navient, Vice President and President of Assistance
22 Corp.
23 **A   Yeah.  I mean it appears that I put that in there.**
24 Q   Okay.  But your testimony today is you do not work
25 directly for Navient, you're just the president of

Page 39

1 the Student Assistance Corp?
2 **A   Explain "Navient."**
3 Q   Well, I don't know.  Navient, I guess, what you put
4 on your thing, you're just not sure what Navient it
5 is.  But do you work for Navient Corp today?
6 **A   I do not work for Navient Corp.**
7 Q   Okay.  Do you work for Navient Solutions, Inc.?
8 **A   I'm employed by Student Assistance Corp --**
9 Q   Okay.
10 **A   -- which is a sister company of Navient Solutions.**
11 Q   So it's fair to say, when you put on your full
12 profile, created by you, Navient Vice President and
13 President of Student Assistance Corp, that's not --
14 that's a mistake, or it's not correct?
15 **A   Navient Corp is the parent company that owns my**
16 **company.**
17 Q   I understand that.
18 **A   So from the LinkedIn profile, I just listed as**
19 **Navient being the whole company itself, and the**
20 **company that owns Student Assistance Corp.**
21 Q   Okay.  When you first started working for Student
22 Assistance Corp, Sallie Mae owned Student
23 Assistance Corp?  Was that the parent company?
24 **A   Okay.  Explain Sallie Mae.**
25 Q   Okay.  Well, I will, actually, then ask you.  Tell

Page 40

1 me the relationship between Student Assistance Corp
2 and Sallie Mae.
3      MS. SIMONETTI:  Do you mean Sallie Mae,
4 Inc., in that light?
5 **QUESTIONS BY MR. GOMEZ:**
6 Q   Well, I'm just trying to understand his own --
7 Sallie Mae, Inc.
8      MS. SIMONETTI:  Sallie Mae, Inc.  I'm
9 sorry.  Could you just then read the question back?
10 **QUESTIONS BY MR. GOMEZ:**
11 Q   All right.  So I tell you what.  Why don't I just
12 show you and see if you can explain to me what you
13 put here.
14      You updated this, and say you are director
15 and president of Student Assistance Corp, and
16 listed Sallie Mae.  So I'm asking you:  What does
17 that mean?
18 **A   I was president of Student Assistance Corp.  I was**
19 **the Senior Director and President of Student**
20 **Assistance Corp, and Sallie Mae, Inc. was -- or at**
21 **the time our parent company.**
22 Q   Do you know how -- what happened with Sallie Mae
23 and Navient Corp?  How did that transition occur?
24 **A   Rephrase the question.**
25 Q   Well, you used to be, your parent company was

Page 41

1    Sallie Mae, Inc., and now is Navient Corp.  Do you
2    know how that transfer occurred, or what happened
3    there?
4 A   The company split into two companies.
5 Q   Okay.  So Sallie Mae split into two companies?
6       MS. SIMONETTI: It's kind of imprecise.
7    QUESTIONS BY MR. GOMEZ:
8 Q   Well, I'm asking you what happened.  You used to
9    worked for Sallie Mae, but that was a parent
10   company.  I'm sorry.  You didn't work for them.
11   But that was your parent company.  You're president
12   of one of these big agencies, subsidiaries,
13   whatever you want to call it.  So my question is,
14   simply:  What happened there?  I mean, you, being
15   the president, you should at least have a little
16   bit of knowledge as to what happened to your parent
17   companies.  So that's what I'm asking.
18 A   Sallie Mae, I'm speaking from a public company,
19   Sallie Mae, Inc. --
20 Q   Absolutely.
21 A   -- split into two companies, forming --
22 Q   And what were those two companies?
23 A   Sally Mae, Inc. and Navient Corp.
24 Q   Okay.  Easy enough.
25       Now, let's go through when an account is

Page 42

1    assigned to you.  How is SAC notified?  Here's an
2    account of Maretta McCaskill, collect on it.  How
3    does SAC become aware that you should counsel this
4    account?
5 A   The guarantor sends us a file of all borrowers that
6    are being placed with us.
7 Q   Once the files comes -- the file comes to you, do
8    you do any type of a scrub process, a scrub, or any
9    type of verifying that that is legitimate, that the
10   phone numbers are good, anything like that?  Do you
11   do anything to verify that account?
12 A   There's multiple questions.  Rephrase that, please.
13 Q   Okay.  You get this file, and it says Maretta
14   McCaskill is delinquent.  Here's --
15       MS. SIMONETTI: Tav, you keep saying
16   Maretta McCaskill.  You don't mean that.  You mean
17   Maretta Newsome.
18       MR. GOMEZ: I'm sorry.  Maretta Newsome.
19   I apologize.
20       MS. SIMONETTI: Just trying to keep the
21   names straight.
22       MR. GOMEZ: I apologize.
23 Q   Maretta Newsome, you get a loan, an account,
24   Maretta Newsome, delinquent, here's personal
25   information.  You get all that, correct?

Page 43

1 A   Yes.
2 Q   What does SAC do with that information?  Do you do
3    any verification, or do you just begin your
4    counseling process?
5 A   Okay.  Account verification, it's on the guarantor
6    system of record.
7 Q   Absolutely.
8 A   So we don't do verifications against the
9    guarantor's system of record.
10 Q   And it's fair -- that's a fair answer.  So you
11   assume all the information coming from the
12   guarantor is accurate, good and all those things,
13   correct?
14 A   We assume that the loan is.  I can't assume that
15   all the information, demographic information, is
16   accurate.
17 Q   When you get these files, and I want to talk
18   regarding specifically phone numbers, do you run
19   any type of -- do you run those phone numbers to
20   verify whether they are land lines, or cell phones?
21 A   Yes.
22 Q   Okay.  What do you use to run that process?
23 A   I can't remember the name of the company.
24 Q   So you have a third-party contractor that you use
25   to kind of verify whether they are land line

Page 44

1    phones, or cell phones?
2 A   Yes.
3 Q   Why do you need to make that distinction?
4 A   We need to understand if the phone number is a cell
5    phone or a landline.
6 Q   For what purpose?
7 A   PCPA consent.
8 Q   So you're aware of the TCPA, correct?
9 A   Yes.
10 Q   All right.  Have you personally taken any courses,
11   any type of legal education, or seminars, regarding
12   the TCPA?
13 A   Yes.
14 Q   Tell me a little bit about those.  When was the
15   first, and how many have you taken?
16       MS. SIMONETTI: Just hang on a second.
17   You can talk about courses you've taken.  But if
18   they were given by, say, in-house counsel for the
19   company, or something like that, then we'd have to
20   determine whether you can --
21   QUESTIONS BY MR. GOMEZ:
22 Q   Well, I'm not going to ask you what they told you.
23   I just want to, first of all, generally talk about
24   if you have taken courses regarding the TCPA.  I
25   just want to know, yeah, I attended a seminar, you

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 15 of 86 PageID 1193

McCaskill v. Navient Solutions, et al.                                    Kevin Campbell
                                                                December 22, 2015

Page 45

1   know, in San Antonio.  So that's my first question.
2 A   No.  In-house.
3 Q   So in-house.  So you're -- and I'm not asking you
4   regarding those exactly what they told you.  I'm
5   simply asking you your education of the TCPA has
6   been through your lawyers and in-house training?
7 A   For the most part.
8 Q   How often do those happen?  I mean is it something
9   you have set that every year you're going to have
10   this?  Is it every six months?
11 A   Annual.
12 Q   Annually?
13   Of SAC's employees, so your employees at
14   Student Assistance Corporation, who attends these
15   meetings?
16 A   Everyone.
17 Q   The entire staff?
18 A   Okay.  Back up.  Meetings?
19 Q   Well, these -- we're talking about TCPA training.
20   I want to know who attends the TCPA training
21   meetings.  I know you do.
22 A   All SAC employees.
23 Q   And your testimony is you have this once a year?
24 A   Yes.
25 Q   Is it always at the same time frame, meaning every

Page 46

1   January you do them?  Every June?  When do you do
2   these once-a-year meetings?
3 A   I can't speak for the time frame.
4 Q   When's the last one you had one?
5 A   Within the past year.
6 Q   You just don't remember around the time?
7 A   I'm sorry.  I would only be guessing.
8 Q   So we have identified that you go through and you
9   determine whether it's a landline, or cell phone,
10   for consent purposes.
11   You also told me you have an ability to
12   view some data for the servicing company.  And you
13   said it was somewhat limited, correct?
14 A   Yes.
15 Q   Okay.  How do you deal with consent issues, when it
16   comes to communications with a servicing company?
17 A   Okay.  Define "servicing company."
18 Q   Navient Solutions, any company does the
19   actual servicing, that's servicing the loan.
20 A   Any company?  Or you referring to Navient
21   Solutions?
22 Q   Let's talk specifically about Navient Solutions.
23   And we'll talk as to whether that defers from
24   company to company.
25   Tell me regarding consent, and how you

Page 47

1   communicate back and forth with the servicing
2   company.
3 A   There is a shared database that we define, or call
4   as CIS, that because we are affiliates we share
5   consent.
6 Q   So that's -- that explains some of the issues.
7   Navient Solutions is a sister company, so you
8   actually do share some data that maybe you wouldn't
9   share with all of the servicing companies.  Is that
10   a true statement?
11 A   I'm not sure I understand.
12 Q   Okay.  You told me there was more than 20 different
13   servicing companies that you, SAC, deals with.
14 A   Yes.
15 Q   I would assume that not all of them are affiliates
16   of SAC.
17 A   Correct.
18 Q   Do you have more access to Navient Solutions, Inc.
19   database, because you are actually an affiliate?
20 A   Because we are affiliated, we share consent.
21 Q   You stated you share the CIS database, correct?
22 A   Correct.
23 Q   What does CIS stand for?
24 A   It's -- I can't even -- it's -- I don't know the
25   actual name of the acronym.

Page 48

1 Q   What information is contained within the CIS?
2 A   Demographic data.
3 Q   By "demographic" what do you mean?
4 A   Phone number, address.
5 Q   Phone number, addresses?
6   In there do you -- and I'm talking
7   specifically with Navient Solutions, Inc., and at
8   CIS.  Do you see attempts, call attempts?
9 A   No.
10 Q   Any type of communication attempts?
11 A   No.
12 Q   Outside of name, address, phone numbers, account
13   number, what else you do see in this CIS?
14 A   Nothing.
15 Q   Nothing else?
16 A   Phone number, address.
17 Q   When one of the counselors is counseling, regarding
18   a Navient Solutions, Inc. account, and the person
19   says, well, I don't have money now, but I'll pay in
20   30 days, does that counselor input anything into
21   this CIS system?
22 A   No.
23 Q   When will one of your counselors from SAC input any
24   information into the CIS?
25 A   Never.

Case 8:15-cv-01559-VMC-TBM    Document 95-1    Filed 02/26/16    Page 16 of 86 PageID 1194
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 49

1 Q   Never?

2 A   **Never.**

3 Q   So who has access to change this CIS?  What
4     personnel can actually change information on the
5     CIS?

6 A   **It's a scrub process.  It's IT.**

7 Q   It's IT, okay.  So if someone -- if Navient
8     Solutions, Inc., because the reason how we got to
9     this CIS, is you told me we share consent through
10    CIS.  But I don't understand how it is that you
11    share consent.

12 A   **CIS is a database --**

13 Q   Absolutely.

14 A   **-- that Student Assistance Corp, being a sister
15    company, an affiliate, to Navient Solutions, we
16    share that database.**

17 Q   Correct.  You have told me that, one, you have just
18    a general demographic information, correct?

19 A   **Yes.**

20 Q   You also told me that SAC's counselors cannot
21    input, or change, the information on these CIS,
22    correct?

23 A   **Correct.**

24 Q   Do you know if Navient Solution, Inc.'s employees
25    or counselors -- I guess they wouldn't have

Page 50

1     counselors.  Agents, or representatives, will they
2     have access to change this CIS?

3 A   **The database?**

4 Q   Yes.

5 A   **No.**

6 Q   Only the IT people that you're referring to will
7     have access to -- to change information on this
8     CIS?

9 A   **There's an IT process, yes.**

10 Q   The IT process, or the IT team, or the people that
11    have the ability to change this information, do
12    they work for SAC, or do they work for Navient
13    Solutions, Inc.?  Or who do they work for?

14 A   **I couldn't specifically identify exactly what their
15    titles are.**

16 Q   So, in our scenario where you get an account, you
17    scrub, you see that it's a cell phone.  SAC makes a
18    phone call and says, Here is your options.

19        And the person says, I don't want you to
20    call me again.

21        What happens?

22 A   **The number is marked bad and we remove the number
23    -- or actually we mark the number bad.**

24 Q   Okay.  So walk me through that process.  What is
25    your counselor to do when someone refers, or just

Page 51

1     mentions I don't want to get anymore phone calls?
2     What do they have to do?

3 A   **Mark the number bad.**

4 Q   And when you say bad, is there a code?  Is there
5     something I'm going to see?  Do they have to write
6     a narrative?  What happens?

7 A   **Check a box.**

8 Q   You check a box.  And what does the box say?

9 A   **I can't -- I don't know exactly.  It just
10    identifies the number as being bad.**

11 Q   What happens when they check that box?

12 A   **On which scenario?**

13 Q   On the scenario that the person just said, I don't
14    want to get anymore phone calls, and the counselor
15    checks the box, so it becomes a bad number.  Does
16    that number now get erased from the system?  Does
17    it get scratched?  Does it get a line through it?
18    Does it say verify the number?  I mean, what
19    happens when you check the box?

20 A   **It removes the consent and places the "bad" on the
21    number.**

22 Q   Now, this would update SAC's system, correct?

23 A   **No.**

24 Q   What does it do?

25 A   **It updates the guarantor's system.**

Page 52

1 Q   And once the guarantor's system is updated, does it
2     change the CIS database?

3 A   **Yes, it will update CIS.**

4 Q   So, automatically, Navient Solutions, Inc. should
5     know that that number has been removed?

6 A   **Yes.  Back up when I say automatically.  There is a
7     -- maybe a 24-hour processing.**

8 Q   Okay.

9 A   **It's not realtime.**

10 Q   Now, in the scenario that I just gave you, the
11    person asked remove the number, and assuming your
12    counselor does everything right to check the box
13    and the number gets removed.  In that same scenario
14    when a person says, I've asked you to stop calling
15    me and you continue to call me -- what
16    I will consider somebody's complaining that they've
17    already asked, and you continue to call.  How do
18    you address a situation like that?

19 A   **We maintain -- Student Assistance Corp maintains a
20    complaint log.**

21 Q   Is a complaint log specific to receiving phone
22    calls, or is it a complaint log about everything,
23    meaning the agent was rude, or is it just -- do you
24    have a specific complaint log regarding people who
25    allege to continue to receive phone calls after

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 17 of 86 PageID 1195
McCaskill v. Navient Solutions, et al.                                    Kevin Campbell
December 22, 2015

Page 53

1    being asked, after asking to stop the calls?
2 **A**   **No.**
3 **Q**   So all the complaints are all put together into one
4    complaint database?
5 **A**   **Yes.**
6 **Q**   How long ago have you kept these complaint
7    database? When did you start having these
8    complaints?
9 **A**   **I don't recall specifics.**
10 **Q**   All right. And has it been since you've been
11    president it's always existed, or is it something
12    that, you know, within the last 12 to 24 months?
13    I'm just trying to see if it's within the last
14    year, or is as far as you can remember?
15 **A**   **Not as far as I can remember, but it's something**
16    **that's been done within the last several years.**
17 **Q**   Who has access to see these complaint database?
18 **A**   **My managers.**
19 **Q**   Is it something that, you know, they can easily
20    pull up if somebody's complaining? They can
21    actually literally go up there and look at all of
22    the complaints?
23 **A**   **Yes.**
24 **Q**   Okay. And how long do you keep the complaints for?
25 **A**   **I don't know the time frame.**

Page 54

1 **Q**   What is the purpose of keeping this complaint
2    database?
3 **A**   **To insure that the borrower's issue is addressed,**
4    **and to inform our compliance team.**
5 **Q**   Okay. So what I want to do is kind of go through
6    that.
7     So if I complain, like the one I just
8    made, say, and I asked you before to stop calling
9    me and you continue to call me, what is a counselor
10    supposed to do with that?
11 **A**   **Mark the number bad.**
12 **Q**   Mark the number bad. Okay. Anything else?
13 **A**   **Apologize.**
14 **Q**   Okay. Yeah. What I'm trying to get to is, how do
15    you get that complaint to the complaint database?
16 **A**   **I can't specifically detail how that works. I**
17    **can't exactly.**
18 **Q**   Who is in charge of this complaints database?
19 **A**   **The managers update it.**
20 **Q**   So the managers are? How many managers do you
21    have?
22 **A**   **Three.**
23 **Q**   All three of them handle these complaints database,
24    or is one of them more specifically assigned to
25    them?

Page 55

1 **A**   **I believe all three. But I mean we rarely get**
2    **them.**
3 **Q**   Okay. Now, you discussed something about a
4    compliance team. Tell me about that. Who's part
5    of your compliance team? How many people do you
6    have there?
7 **A**   **I couldn't tell you. It's a shared services**
8    **compliance team, so they do not report up through**
9    **my structure.**
10 **Q**   Who do they report to, do you know?
11 **A**   **I would assume they report up through Navient**
12    **Solutions.**
13 **Q**   So let's go through that. You say that these are
14    shared services. So this is something separate
15    from the CIS system we discussed before, correct?
16 **A**   **Rephrase that, please.**
17 **Q**   You explained to me that the compliance team is a
18    shared service, or shared services. What does that
19    mean?
20 **A**   **They do work for many of the subsidiaries.**
21 **Q**   So this is a third party, a higher third
22    independent party? Is that what you're saying?
23 **A**   **Define "independent party."**
24 **Q**   Well, if they do work for a bunch of subsidiaries,
25    is it a -- first of all, do you know the name of

Page 56

1    this compliance team?
2 **A**   **Not specifically.**
3 **Q**   Okay. Do you, meaning Student Assistance Corp, do
4    you only employ one compliance team?
5 **A**   **We don't employ a compliance team.**
6 **Q**   Do you hire a compliance team? I'm trying to get
7    who this compliance team is. So does SAC hire
8    them? How are they involved with SAC?
9 **A**   **They, I assume, are Navient Solutions, Inc.**
10    **employees, that we utilize.**
11 **Q**   Do you have a contract with them? Or do you pay
12    them any fees for helping you with this compliance?
13 **A**   **They -- there is an agreement, I believe, that is**
14    **under contract with Student Assistance Corp, and**
15    **Student Assistance Corp receives an allocation to**
16    **our independent budget.**
17 **Q**   So what does that mean, an allocation to your
18    independent budget?
19 **A**   **Well, Student Assistance Corp, being its own**
20    **entity, has its own budget --**
21 **Q**   Correct.
22 **A**   **-- revenue --**
23 **Q**   Yes.
24 **A**   **-- and we receive a portion of the expense for this**
25    **compliance group, under Navient Solutions, Inc.**

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 18 of 86 PageID 1196
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 57

1 Q   Okay. So it's almost like -- I understand exactly.
2     So you get a fee, like you're hiring these guys to
3     help you. Do you kind of share these employees
4     with Navient Solutions, Inc.?
5 A   I would say that's -- that would be correct.
6 Q   Okay. And that team would be the one that will be
7     in charge of reviewing these complaint database?
8 A   That group does see that compliant database yes.
9 Q   Do you have meetings, or do you have -- do you know
10    if these meetings are held between SAC and this
11    compliance team regarding, you know, in the last
12    month, six months, we received complaints about
13    phone calls after requests not to stop? Do you
14    have meetings like that to try to resolve the
15    issues?
16 A  Again, it's very rare that we have complaints, but
17    there is communication that takes place.
18 Q  You say that you have a dialers team. Do you know
19    how many calls, on average, of course, this is all
20    going to be average, does SAC make a day?
21    Attempts, of course.
22 A  Total attempts?
23 Q  Yes.
24 A  It could vary.
25 Q  It could vary?

Page 58

1 A   Significantly.
2 Q   Okay. Well, just give me a low and high, an
3     approximation of low and high.
4 A   We can make 200,000. We could make 20,000.
5 Q   Now, how many -- and if you call them differently,
6     I'm just referring to call centers, meaning where
7     you have counselors sitting in front of a phone for
8     the sole purpose of communicating. How many call
9     centers do you have?
10 A  I have two.
11 Q  Do you have one main dialer? Or do you have
12    several dialers? You described the Noble, but I
13    didn't know if you had more than one.
14 A  One main dialer.
15 Q  These two call centers, where are they located?
16 A  Muncie, Indiana.
17 Q  Uh-huh.
18 A  And Castleton, Indianapolis.
19 Q  Do you know if the calls that were made on the case
20    in question came from one independent call center,
21    or they just called from both of them?
22 A  I'm fairly certain it came from Muncie.
23 Q  How many, I guess, counselors, or agents, do you
24    employ, for the purpose of being representatives on
25    the phone, in the Muncie call center? And I know

Page 59

1     it might vary, but on average.
2 A   Roughly 150.
3 Q   150. Okay. Do you run them in three shifts a day,
4     sort of split throughout the day or --
5 A   Variations.
6 Q   What about in your Castleton, Indiana center?
7 A   Roughly, 80.
8 Q   Okay. What I want to do is I want to start talking
9     a little bit regarding the case that we're here.
10        MR. GOMEZ: If anybody needs to take a
11    break, this would be a good point.
12        How is the tape?
13        THE VIDEOGRAPHER: We have 15 minutes.
14        MS. SIMONETTI: Why don't we just take a
15    break.
16        MR. GOMEZ: Okay. We'll take a break.
17        THE VIDEOGRAPHER: Going off record.
18    It's 10:34.
19        (A recess was taken.)
20        THE VIDEOGRAPHER: We are back on record.
21    It is 10:43.
22 QUESTIONS BY MR. GOMEZ:
23 Q   Now, Mr. Campbell, we were talking about Student
24    Assistance Corp. And right before we move into the
25    actual case we're here, I briefly wanted to ask

Page 60

1     you: When someone complains to the FCC regarding
2     phone calls, or harassing phone calls, how is that
3     handled by SAC? Or who handles that when you're
4     notified by the SAC?
5 A   I can't remember a time ever being notified from
6     the FCC.
7 Q   Okay. What about something regarding the Better
8     Business Bureau?
9 A   We will work through our -- work through with legal
10    in responses on those.
11 Q   So through in-house counsel those are addressed,
12    the complaints of the Better Business Bureau?
13        MS. SIMONETTI: You can answer that "yes"
14    or "no." But, again, we can't talk about any
15    conversations we've had.
16 QUESTIONS BY MR. GOMEZ:
17 Q   I'm not asking you regarding what conversation is,
18    just that's how it's handled.
19 A   Yes.
20 Q   And in the last 12 months, how many complaints
21    would you say you have had from the Better Business
22    Bureau?
23 A   I don't know.
24 Q   What about from the Consumer Financial Protection
25    Bureau, called the CFPB?

Page 61

1  A  I'm not aware of any.

2  Q  Okay.  What about actual losses filed against SAC

3     for violations of the TCPA, specifically?  Do you

4     know how many times SAC has been sued, whether

5     state or federal court, in the last 12 months?

6  A  I don't know.

7  Q  Is that something that, when a lawsuit occurs you

8     are made aware of, or is that handled completely by

9     legal and you don't get involved?

10  A  I'm aware of it.

11  Q  Okay.  So you do get notified.  When you say I

12     don't know, do you think it's more than ten, more

13     than 20 times, a hundred times?

14  A  I would say far less than a hundred.

15  Q  Okay.  What about regarding non-TCPA related, but

16     regarding any other type of Consumer Protection

17     Laws regarding harassment, too many phone calls,

18     those kind of things?  Do you have a number for

19     those?

20  A  Again, very few.

21  Q  Student Assistance Corp, you allege, uses a

22     separate entity from Navient Solutions, Inc.,

23     correct?

24  A  Yes.

25  Q  What is SAC's net worth?

Page 62

1  A  I don't know.

2  Q  What about your -- and I don't need an exact

3     number.  But, in 2014, I'm assuming you filed some

4     type of report regarding your alleged profits for

5     SAC.

6  A  I didn't file any reports.

7  Q  Are you aware of SAC's profits for the year 2014?

8  A  I generally know revenue and expenses.

9  Q  Okay.  So, therefore, by those numbers you could

10     deduct the profits, correct?  And if you can

11     estimate what those were for 2014, or for 2015?

12     Since we're December 22nd.

13  A  Estimate?

14  Q  Yes.

15  A  Roughly, zero.

16  Q  Zero?

17        Do you recall that number being similar

18     last year, zero?  Breaking even last year?

19  A  That was the answer for 2014.

20  Q  Oh, okay.  Do you anticipate that number being the

21     same for this year?

22  A  Very similar.

23  Q  How many people does SAC employ?

24  A  Estimate 240.

25  Q  240 people?  Where is SAC's main office campus?

Page 63

1  A  Muncie, Indiana.

2  Q  Within -- is it a -- are you in a big building and

3     you just rent space from a building?  Or is it your

4     own building that you work out of?

5  A  Be more specific.

6  Q  Okay.  Your offices in Muncie, Indiana, your

7     corporate headquarters, or whatever you work in

8     Muncie, Indiana, is there any Navient Solutions,

9     Inc. employees in your building?

10  A  Yes.

11  Q  Who from Navient Solutions, Inc. works in your

12     building?

13  A  Department name?

14  Q  Yeah.

15  A  Portfolio -- or I'm sorry.  Private Credit.

16  Q  Private credit?

17        Any other departments that work in your

18     same building?

19  A  Servicing.

20  Q  Okay.  Do they have more space, or people, in your

21     building than SAC has?

22  A  Yes.

23  Q  When we were driving in, I'm not sure if that's 65.

24     But right before we get off here, 69, we saw a huge

25     building with a Navient purple light.  Have you

Page 64

1     seen that building?

2  A  More specific on 69.

3  Q  To the right.  I mean when you're on the highway

4     off the road, and there's a big building that has a

5     purple sign.  I might even have a picture of it.

6     Let me see if I did it.

7        The building you work out of, does it have

8     a huge Navient sign on top?

9  A  Are you referring to that one or you -- be more

10     specific.

11  Q  I'm asking you, your building where you work, the

12     building you drive to every day, when I look at

13     that building, does it have a big Navient sign?

14  A  Yes.

15  Q  Do you know how many, I guess, buildings, campuses,

16     Navient has in this area, in the Muncie area?

17  A  In the Muncie area, one.

18  Q  From Muncie to Indianapolis.  I mean I guess --

19  A  Three.

20  Q  Three.  Okay.  This is a terrible picture of the

21     light.  But it's a building, and it has a purple

22     light.  It says Navient.  It looked like a pretty

23     big campus, but it was late at night.

24  A  What location?  Where were you?

25  Q  Driving from the airport to here.

Page 65

1  A   Okay.  Were you here, or were you in Indianapolis?

2  Q   No, I was closer here.  I was almost here, like,

3      literally, ten minutes before we got off, or less.

4  A   Okay.  I mean that, obviously, yes, that is a

5      Navient building.

6  Q   But that's not the one?

7  A   I think you're referring to in Indianapolis, the

8      north side of Indianapolis, there is yes.

9  Q   So they have three buildings in the

10      Indianapolis/Muncie area.  You're in one of the

11      buildings that is, I guess, Navient Solutions, Inc.

12      has a huge presence, yes?

13  A   Yes, they have a presence.

14  Q   And you stated they actually have more people than

15      you in that same building?

16  A   Yes.

17  Q   Are your offices completely separate from each

18      other?  I mean, are you on a separate floor than

19      Navient?  I just want to --

20  A   One floor.

21  Q   Everybody is on one floor.  In your building

22      everybody is on one floor?

23  A   Which building are you referring to?

24  Q   Where you work.

25  A   Okay.  I told you earlier I'm in two locations.

Page 66

1  Q   Okay.  So you're in two locations.  Okay.  Are they

2      both fifty-fifty?  Or do you spend more time in one

3      of the two?

4  A   I'm fifty-fifty.

5  Q   The other location -- are both of them actually

6      occupied by both Navient Solutions, Inc. and SAC?

7  A   No.

8  Q   Which location does not have a Navient presence?

9  A   Castleton.

10  Q   Castleton.  Okay.

11          Let's talk about the account that we are

12      here.  The account of the loan was -- belonged to

13      Maretta Newsome.  Is that your understanding?

14  A   Yes.

15  Q   Do you know -- we have six guarantors that you

16      describe.  Do you know which of these guarantors

17      was the guarantor for Ms. Newsome's loans?

18  A   I believe it was USA Funds.

19  Q   I haven't asked you this.  I don't want you to tell

20      me regarding any communications you've had with

21      your attorney.  But I want you to tell me.  What

22      did you do in preparation for this deposition?

23  A   I met with my attorneys.

24  Q   Okay.  Did you review any documents?

25  A   Yes.

Page 67

1  Q   Okay.  The documents that you reviewed, did you

2      review Student Assistance Corp's documents?

3  A   Yes.

4  Q   And I want to show you what was emailed to us last

5      night.  Maybe we can mark this Exhibit 2.  And it's

6      going to include 20 pages.  If you can please take

7      a look at that one.

8          (Plaintiff's Exhibit 2 marked for

9          identification.)

10  Q   These have been marked SAC431 through 450.

11          MS. SIMONETTI: He's referring to those

12      numbers on the right-hand corner.

13  QUESTIONS BY MR. GOMEZ:

14  Q   The bottom right.

15  A   Okay.  Restate that.

16  Q   Yeah.  So these documents are number SAC431 through

17      SAC450.

18  A   Yes.

19  Q   When you look at these documents, do you recognize

20      them?

21  A   Yes.

22  Q   And what are they?

23  A   They appear to be the logs from the guarantor

24      system.

25  Q   So by looking at this, this is something that's

Page 68

1      printed out from, you believe, USA Funds' system,

2      correct?

3  A   The guarantor's system, correct.

4  Q   Does SAC keep independent logs separate from these

5      logs that the guarantor has?

6  A   No.

7  Q   So the only way for you to know how much work, or

8      attempts you did on an account, is to go to the

9      actual guarantor's data system?  You don't keep

10      your own independent records?

11  A   No, we don't.  No.

12  Q   You stated that you get compensated in one of two

13      ways.  And one of them is if an account is given to

14      you when it's delinquent, and it becomes

15      non-delinquent or up to date, you get a fee for

16      that, correct?

17  A   With some GA's, correct.

18  Q   Do you know if in this, with USA Fund, is that the

19      case?

20  A   No.

21  Q   How does it work with USA Fund, that you, SAC, will

22      make money from USA Funds?

23  A   We receive DAF, which is a default aversion fee,

24      the first time the borrower is placed with us by

25      the guarantor.

Page 69

1  Q   Okay.  And you said DAF?

2  A   DAF.  Default aversion fee.

3  Q   Okay.  In this case were you paid this default

4      aversion fee?

5  A   Since it was placed with us, my assumption is yes.

6  Q   Okay.  This fee, I want you to explain it to me.

7      Is it something that's reoccurring, that you will

8      get paid every three months, every six months?  Or

9      is it a one-time fee, and then you never get paid

10     again?

11 A   One-time fee.

12 Q   One-time fee?  Regardless of how long the account

13     remains delinquent?

14 A   Correct.

15 Q   You agree that it is in SAC's best interest to get

16     this account to become up to date as soon as

17     possible, correct?

18 A   Correct.

19 Q   Just because of the effort it takes to continue to

20     try to service or help counsel this debt?

21     MS. SIMONETTI: Could you say -- what was

22     the last word that you said?

23     MR. GOMEZ: This debt.

24 QUESTIONS BY MR. GOMEZ:

25 Q   Collect the debt, the debt that you're doing.

Page 70

1      Well, you're trying to counsel these

2      people on a delinquency, correct?

3  A   Counsel, correct.

4  Q   Yeah.  So the sooner you counsel them into getting

5      up to date, the better it is for SAC.

6  A   That would be a true statement.

7  Q   Okay.  The agreement with USA Funds, it's your

8      understanding you're never paid in any way but

9      this default aversion fee?

10 A   Correct.

11 Q   How confident are you that the loans of Maretta

12     Newsome were only with USA Funds and not with any

13     of the other guarantors?

14 A   I'm fairly confident, but can't be certain.

15 Q   Is it something that if you look at your system,

16     how would you know?  It should be fairly easy to

17     tell, I guess, who the guarantor is?

18 A   Yes.

19 Q   When was this account given to SAC, Ms. Newsome,

20     the account we're talking about?

21 A   September 9th, it appears, of 2014.

22 Q   September 9th, 2014.  Now, the way these loans

23     work, I guess if someone gets caught up, or is up

24     to date on their payments, will SAC's, I guess

25     involvement with that case stop at that point?

Page 71

1  A   Yes.

2  Q   As far as you know, this account, previous to

3      September 9th, 2014, had it ever been placed with

4      SAC?

5  A   I don't know.

6  Q   Okay.  You understand my question, meaning at some

7      point she might have been delinquent, SAC begins

8      their counseling campaign, they become up to date,

9      therefore you stop.  As far as you know, has that

10     ever happened with this account, or is this the

11     first time SAC ever got them?

12 A   I don't know.

13 Q   You stated you looked at some documents in

14     preparation for this deposition.  Outside of these

15     documents, did you look at any Navient Solutions,

16     Inc. documents?

17 A   No.

18 Q   What other documents did you look at, outside of

19     these 20 pages I just showed you?

20 A   I saw the letters.

21 Q   Okay.

22 A   Call log, and some other various documents.

23 Q   Do you look at the complaint that was filed against

24     Student Assistance Corp?

25 A   I've seen the document.

Page 72

1  Q   Did you look at the answer that was filed against

2      the complaint?

3  A   I believe so.

4  Q   Did you look at any of the responses to the

5      interrogatories?

6  A   Yes.

7  Q   And you actually were the individual who answered

8      the interrogatories, correct?

9  A   Yes.

10 Q   Now, some of the correspondence that we received

11     today, I want to show you what we can mark as

12     Plaintiff's Exhibit 3.

13     (Plaintiff's Exhibit 3 marked for

14     identification.)

15 Q   If you can please take a look at this and tell me

16     what is that document?

17     MS. SIMONETTI: How do you identify it,

18     Tav?

19     MR. GOMEZ: On the top it says 9/25/14,

20     and then it says Student Assistance Corporation.

21     It seems to be a letter as opposed to an email.

22     Yes.

23 QUESTIONS BY MR. GOMEZ:

24 Q   What is that document?

25 A   Let me review here.  Okay.

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 22 of 86 PageID 1200

McCaskill v. Navient Solutions, et al.                                          Kevin Campbell
December 22, 2015

Page 73

1  Q    What is that document?

2  A    **It appears to be a letter that is sent to borrowers**
3       **that are placed with us.**

4  Q    Okay.  It has a handwritten date on the top.  Can
5       you read that date?

6  A    **9/25/14.**

7  Q    It seems to be the same signature of -- I mean same
8       numbers.  Do you know if that was written by that
9       same manager you described before?

10 A    **I believe so, yes.**

11 Q    What does that date tell you?  What's the purpose
12      of that date?

13 A    **The assumption is that was when the letter was**
14      **sent.**

15 Q    Now, do you see any problem with that date in the
16      letter?

17 A    **The letter is just an example.  It's not the actual**
18      **letter.**

19 Q    So this letter, that is dated May 24, 2011, was not
20      sent to Maretta Newsome, or anyone on this account,
21      this is just an example?

22 A    **That actual letter is an example.**

23 Q    And this seems to have been a mail-in letter as
24      opposed to some of the other ones that are emails?

25      Do you agree with that?

Page 74

1  A    **The appearance is that it is a mailed letter.**

2  Q    Now, we discuss in Exhibit 1, which I have right
3       here, that this is a letter that was given to us
4       today, and it starts with day 60.  And he has a
5       date of September 11, 2014, correct?

6  A    **Correct.**

7            (Plaintiff's Exhibit 4 marked for
8            identification.)

9  Q    We can mark this as Exhibit 4.  And this one has a
10      heading that says 10/9/14, and it says day 90, Day
11      090.

12           If you can look at this document real
13      quick.

14 A    **Which document?**

15 Q    Number 4.

16 A    **Okay.**

17 Q    That letter says on top Day 090.  Do you know what
18      that means?

19 A    **It's the name of the letter.**

20 Q    Okay.  Now, it seems to be that that letter was
21      sent, based on your manager's records, 29 days --
22      no.  Thirty-two days after -- 29 days after the
23      first letter.  Do you know the reason for that?

24 A    **I mean I assume, the assumption is that it's 90**
25      **days of delinquency.  So they would be, roughly, 30**

Page 75

1       **days after 60.**

2  Q    So the day 60 is actually relative to the time of
3       delinquency.

4  A    **I assume that that's the reasoning.**

5  Q    Okay.  I just wanted to verify that, because when I
6       first asked you day 60, you weren't sure.  So okay.

7            I'm going to pass you Exhibit No. 2, so we
8       can kind of go through it.  And I understand that
9       is chronologically reversed.  So if you can go to
10      the last page, which is listed SAC450, numbers,
11      once again, at the bottom right.

12           What lets you know that the account has
13      been placed with Student Assistance Corp, when
14      you're looking at USA Funds' logs?

15 A    **The second to last, that starts out -- that has the**
16      **LRA6, and then it shows the date time.**

17 Q    Correct.

18 A    **Shows September 9th of 2014.  Then the SPCLT equals**
19      **996 CAM.**

20 Q    What does that mean?

21 A    **CAM is a process of where the guarantor places --**
22      **or it's the name of the process when the guarantor**
23      **places with Student Assistance Corp.**

24 Q    Now, do you know what CAM stands for?

25 A    **I don't.**

Page 76

1  Q    Then it says PCA activated.  What does that mean?

2  A    **I'm familiar with the term, but I don't know what**
3       **the name of the acronym is.**

4  Q    Now, would every counselor that answers the phone,
5       or is actually talking to someone, have access to
6       this, will this pop up on their screen, when the
7       call is connected for the dialer?

8  A    **Explain "this."**

9  Q    Well, the logs I'm looking at, this database that
10      I'm looking at, who has access to this from SAC?

11 A    **This format or --**

12 Q    Yeah, this format.

13 A    **Not many.**

14 Q    Not many, okay.  So your counselor, when they reach
15      a customer, like in this case, they wouldn't see
16      all these phone calls, they will just see the
17      demographic information?

18 A    **Loan status, demographic information.**

19 Q    And that will pop up, once the call is being
20      transferred, like most dialers work?

21 A    **Yes.**

22 Q    So let's continue to go through these logs.  If you
23      can please -- and I want you to refer to the third
24      line from the bottom.

25           Once again, we're looking at SAC450, which

Page 77

1  has been marked as Exhibit No. 2.  Tell me.  What
2  does that mean when you're going through it?
3  **A  The third line from the bottom?**
4  Q  Yes.  And you can start where it goes SYS, SRC.
5  What does that mean?
6  **A  SRC, okay.  SIS phone number change other to cell.**
7  **It appears to be where we retain -- or obtained**
8  **cell phone permission via the scrub process.**
9  Q  Okay.  So, first of all, before we jump there, do
10  you know what SYSSRC mean?
11  **A  I don't.**
12  Q  Do you know who -- who will have all the knowledge
13  as to who this symbols mean and what these acronyms
14  mean?
15  **A  I would assume someone familiar with the process.**
16  Q  Would it be someone from USA Funds, or would it be
17  someone with SAC?
18  **A  I would say neither.**
19  Q  Okay.  So you think it would be somebody from Noble
20  Systems?
21  **A  No.**
22  Q  So who do you think will know what these symbols
23  mean?
24  **A  Somebody in IT.**
25  Q  SAC's IT?

Page 78

1  **A  Someone in Navient Solutions' IT.**
2  Q  These entries, are they being made by Navient
3  Solutions?
4  **A  Which entries?**
5  Q  The ones we're talking about, the third one from
6  the bottom.  Who is making this entry?
7  **A  My assumption is it is part of the cell phone**
8  **scrub, so it's an automated entry.**
9  Q  By looking at these documents that you provided to
10  us, one, I want to make sure I'm clear.  This data,
11  these 20 pages where you have in front of you,
12  these are the records from USA Funds, correct?
13  **A  This is pulled from USA Funds' system.**
14  Q  Okay.  By looking at these records, can you tell me
15  who is making the input, whether it's, you know,
16  SAC, whether it's Navient Solutions?
17  **A  These appear to be -- these are SAC inputs.**
18  Q  So these 20 pages are SAC inputting this
19  information into the guarantor's system?
20  **A  Correct.**
21  Q  So why would I have to get someone from Navient
22  Solutions' IT to explain it to me?
23  **MS. SIMONETTI:** Are you talking about the
24  whole document?
25  **A  Yeah.**

Page 79

1  **MR. GOMEZ:** I'm talking about the entries.
2  I'm talking about who knows what SYSSRC means.
3  **MS. SIMONETTI:** You talking about that
4  one?
5  **MR. GOMEZ:** Well, we're going to go
6  through a few of them.
7  **QUESTIONS BY MR. GOMEZ:**
8  Q  So my question to you is:  We've established that
9  all these entries were made by SAC into the
10  guarantor's database, correct?
11  **A  Are you saying all of them?  Are you being specific**
12  **to one?**
13  Q  Let's start No. 3, 3 from the bottom.
14  **A  Okay.**
15  Q  That one, you're telling me that that entry is made
16  from SAC?
17  **A  I am not telling you that was made by SAC.**
18  Q  Who was that made by?
19  **A  That is a -- it appears to be a CIS automated cell**
20  **phone scrub.**
21  Q  Okay.  Let's go to the one below it, where you told
22  me that to Student Assistance Corp received this,
23  and you identified that as being CAM PCA being --
24  the case as being assigned to Student Assistance
25  Corp, correct?

Page 80

1  **A  Correct.**
2  Q  Who made that entry?
3  **A  Again, automated process.**
4  Q  And the automated process, who's in control of this
5  automated process?
6  **A  There are SAC folks involved --**
7  Q  Okay.
8  **A  -- on some processes.**
9  Q  And who else?  Is Navient Solutions also involved
10  in that process?
11  **A  In regards to the third one, that's a cell phone**
12  **scrub between affiliates.**
13  Q  Okay.  So you share, this is part of that CIS
14  database we talked about?  That's what you're
15  referring to under No. 3?
16  **A  Correct.**
17  Q  Under No. 2 you stated that that's an automated
18  process.  I want to know if Navient Solutions lets
19  the guarantor, or recommends to the guarantor, that
20  SAC become involved.
21  **A  No.**
22  Q  Who makes the decision to bring in SAC?
23  **A  The contract that SAC has with the guarantor.**
24  Q  Okay.  And what does that contract say or involve?
25  When does SAC become involved in the loan?

Page 81

1  A   When it's placed with us.
2  Q   What triggers the placing of an account to SAC?
3  A   Department of Ed Federal Guidelines, with the
4      guarantors to perform default prevention work.
5  Q   So if an account is delinquent 30 days, it
6      automatically gets triggered to go to SAC?  Is
7      there 60 days?  A hundred days?  What is the
8      trigger to get an account from the guarantor to
9      SAC?
10 A   Typically, 60 days.
11 Q   So if an account is delinquent 60 days, it should
12     go to SAC?
13 A   The guarantor is required by the Department of Ed
14     to perform default prevention work.
15 Q   And that's how SAC gets involved?
16 A   Yes.
17 Q   So NSI has no input as to whether or not, outside
18     of just letting the guarantor know this person is
19     60 days delinquent?
20 A   NSI does not inform the guarantor that this person
21     is 60 days delinquent.
22 Q   Well, they're servicing the loan, correct -- or the
23     loans?  NSI will be servicing the loans?
24 A   They are a whole another system of record.
25 Q   Okay.  Well, in this case, as we go through these

Page 82

1      logs, Entry No. 3 then you're saying is an
2      automated process, and somebody from Navient
3      Solutions, Inc. might be able to explain what
4      SYSSRC means, because, I guess, they're in control
5      of this CIS system, correct?
6  A   I would assume so, correct.
7  Q   What does it mean to you when it says phone number,
8      727-581-6140, change from other to cell auto dial?
9  A   That means that that phone number -- let me back
10     up.
11         When the guarantor placed the account with
12     us, it ran a scrub against our affiliate, Navient
13     Solutions, and came back with a cell phone consent.
14     So the information there changes it from other,
15     which is no consent, to consent.
16 Q   Okay.  So let's go through that process.  By
17     looking at this, are you able to -- I'm talking
18     about SAC.  When you look at this, is there
19     anything that tells me that Navient Solutions, Inc.
20     is the servicing company for this loan?
21 A   Anything that tells me, no.
22 Q   Okay.  How would you know that SAC is the servicing
23     company for this loan?
24         MS. SIMONETTI:  I think you just misspoke.
25     Yeah.  You didn't mean that.  Did you mean NSI?

Page 83

1  QUESTIONS BY MR. GOMEZ:
2  Q   I'm sorry.  NSI.
3          How does SAC know that Navient Solutions
4      is the servicing company?
5  A   Sorry.  Repeat that.
6  Q   When a file is assigned to you, like this one is,
7      you're alleging September 2014, how do you become
8      aware who the servicing company is?
9  A   The guarantor system of record tells us who the
10     servicer is.
11 Q   Okay.  The moment you identify that the servicing
12     company is NSI, your sister company, you run this
13     scrub process that we have -- that you name CIS,
14     correct?
15 A   Correct.  Let me back up.  I don't run it.
16 Q   Correct.
17 A   Automated process scrubs the file.
18 Q   This notation here seems to reflect the fact that
19     Navient Solutions has phone number, 727-581-6140,
20     changed from other to cell auto dial.  Correct?
21     That's what that entry says.
22 A   We received -- SAC received consent permission on
23     that phone number from NSI.
24 Q   The reason why we were going through tedious thing,
25     is I wanted to make sure that the consent you're

Page 84

1      referring to call that phone number is coming from
2      NSI, correct?
3  A   Correct.
4  Q   It's not coming from the guarantor?
5  A   Correct.
6  Q   You're also dialing a separate number,
7      727-581-8617.  And that number is reflected in line
8      4 from the bottom.  Do you see that?
9  A   Yes.
10 Q   How did you gather that number?
11 A   My assumption is that was on the guarantor system.
12 Q   Okay.  So the guarantor provides you one number,
13     and through your affiliation with NSI you gather
14     this second number, which is the one that ends in
15     6140, correct?
16 A   No.
17 Q   Okay.  Explain why it's not correct.
18 A   A guarantor can provide more than one number.
19 Q   Correct.  I'm just talking about in this case.
20     In this case, what you're telling me is the 6140
21     you got consent not from the guarantor but from
22     NSI, correct?
23 A   Correct.
24 Q   The second number, the 8617, is a number that the
25     guarantor is given to you, we have consent for this

Page 85

1    number?
2  A  I don't know that.
3  Q  Well, I don't see any notation about that number.
4     So I want to know what tells you that that number
5     was given by the guarantor?
6  A  Which number?
7  Q  The one that ends in 8617.
8  A  It's a typical process.  They provide demographic
9     data when they place the account.
10 Q  Okay.  So when they place the account and they gave
11    you the demographic data to you, the guarantor only
12    gave you the number that ends in 8617, correct?
13 A  No.  I can't -- I can't answer that.
14 Q  Okay.  So you just don't know what numbers the
15    guarantor gave you, when the file was originally
16    placed with you?
17 A  I -- I can't -- yeah.  I can't speak to that.  I
18    don't know.
19 Q  Okay.  Would it be something that, if you look at
20    your data, you'll be able to see the original file
21    that was given to you?
22 A  Yes.
23 Q  But line number 3 from the bottom, that we just
24    finished discussing, clearly tells you that you're
25    getting consent to call the number, ending in 6140,

Page 86

1     from Navient Solutions, Inc.?
2  A  We are receiving consent on that number from NSI,
3     correct.
4  Q  Now, the number ending in 6140, SAC is aware it's a
5     cell phone number, correct?
6  A  Yes.
7  Q  Do you know if the number 61 -- ending, I'm sorry,
8     in 8617, do you know if that's a landline, or a
9     cell phone number?
10 A  I don't know.
11 Q  How many times did SAC call the phone number ending
12    in 6140?
13 A  I believe it's stated in those documents you have.
14 Q  Okay.  Do you mean regarding the answers to
15    interrogatories?
16       MS. SIMONETTI:  And, Tav, just to be
17    clear, we've also entered the stipulation that sets
18    aside the ATDS issue --
19       MR. GOMEZ:  Correct.
20       MS. SIMONETTI:  -- and the number of calls
21    is also set forth in there.  And we're not
22    distinguishing between manual and auto dial calls,
23    for purposes of the case.
24 QUESTIONS BY MR. GOMEZ:
25 Q  And how many calls did SAC make?  Do you know that

Page 87

1     answer, or do you just know that it's been
2     stipulated?
3  A  I confirmed the answer in that document.  I don't
4     want to misquote.
5       MS. SIMONETTI:  Tav, the response to the
6     interrogatory states the same agreement, with
7     respect to the manual versus auto dial issue.
8       MR. GOMEZ:  No.  I understand that.  I
9     just wanted to know the exact number that SAC
10    called Ms. McCaskill's number.  After you look
11    through it, let's continue with this.
12 QUESTIONS BY MR. GOMEZ:
13 Q  Now, these notes that we're looking at, when we're
14    looking at Exhibit No. 2, SAC450, these entries
15    seem to be attempts for outbound phone calls,
16    correct?
17 A  Correct.
18 Q  Are these being made by the dialer itself by the
19    Noble system, or these actually being introduced by
20    an actual person?
21 A  It could be both.
22 Q  Seems to be 478 calls were made by SAC.  Does that
23    sound about right?
24 A  That sounds right, if that's what I put in there.
25 Q  Okay.  Now, do you think calling somebody 478 times

Page 88

1     is a lot of phone calls?
2  A  Attempting?
3  Q  Attempting to call and making the phone ring 478
4     times.
5  A  It's within our policy.
6  Q  But I'm asking you, personally, if you think that
7     if I called you 478 times that's calling you a lot
8     of times?
9  A  Over what time frame?
10 Q  Over a period of about -- seven months.
11 A  I don't.
12 Q  If I called you a thousand times within seven
13    months, would that be a lot?
14 A  Call or attempt?
15 Q  I made your phone ring a thousand times.  Do you
16    think I'm harassing you?
17 A  Well, again, attempt --
18 Q  Correct.
19 A  -- calls are different.
20 Q  Absolutely.  I'm just saying you attempted to call
21    my cell phone, and it rang a thousand times within
22    seven months.  Is that a lot?
23 A  Not all attempts ring.
24 Q  In my scenario, then, I guess, they are ringing.
25    If it rings 478 times, my phone rings 478 times, do

Page 89

1    you think that's harassing me?
2  A    **If it falls within our guidelines, no.**
3  Q    So as long as it's less than eight calls per day,
4    you're fine with that many phone calls?
5  A    **Eight attempts per day.**
6  Q    Correct.
7  A    **Yes.**
8  Q    How many times did Student Assistance Corp actually
9    spoke to someone when they made these 478 calls?
10  A    **I would have to go through all of these.**
11  Q    Well, I'm trying to, you know -- in preparation for
12    this deposition, did you try to go through these
13    logs to identify conversations?
14  A    **Yes.**
15  Q    Okay.  And you don't know how many times the 6140
16    actually answer or talked to one of your
17    counselors?
18  A    **I don't know exactly, but very, very few.  In fact,**
19    **let me back up.  I don't recall seeing any that we**
20    **called outbound.**
21  Q    Any that you called outbound?  Okay.  Well, what do
22    you recall?  Was it an inbound call to SAC?
23  A    **From my recollection, we received one in-bound call**
24    **from somebody who thought we were Lowe's at this**
25    **number.**

Page 90

1  Q    Okay.  And do you know approximately the date of
2    that phone call?
3  A    **I don't.**
4  Q    Let's talk a little bit about regarding your
5    recording.  What is the policy of SAC of recording
6    phone calls?
7  A    **We record all contacts.**
8  Q    How long are those recordings kept for?
9  A    **I don't know the time frame.**
10  Q    What triggers the recording of a phone call?  Is it
11    something that your counselors are manually doing?
12    Is it something that automatically the system does?
13  A    **The system automatically.**
14  Q    How many recordings do you have regarding this
15    account?
16  A    **I don't know.**
17  Q    We earlier discussed when someone asks for phone
18    calls to stop and they complain that the phone
19    calls did not stop, who is in charge of going back
20    and reviewing the previous phone calls to see if
21    indeed that happened?
22  A    **Our compliance team.**
23  Q    Okay.  And that's the compliance team that is
24    actually NSI's, but you guys pay a fee to, like a
25    shared employees?

Page 91

1  A    **Yes.**
2  Q    How often do you go through the database of
3    compliance, complaints, I guess, review those, or
4    try to make changes about it?  Are you involved at
5    all in that?
6  A    **I, personally, don't do that.**
7  Q    We have not received, I believe, any policies and
8    procedures from Student Assistance counsel
9    regarding what counselors have to do, or how to
10    follow procedure when someone complains.  We
11    briefly touched on it earlier.  And you stated that
12    they check a box, correct, if somebody says I'm
13    getting phone calls, I don't want to get phone
14    calls?
15  A    **Rephrase the question.**
16  Q    Yeah.  We talked about if somebody complains I
17    don't want to get phone calls, they're supposed to
18    check a box, correct?
19  A    **We -- our system allows us to check a box to mark**
20    **the number bad.**
21  Q    Okay.  Have you ever looked at the screen that your
22    counselors see when somebody answers a phone?
23  A    **Yes, I've seen that.**
24  Q    Okay.  I know it's going to have some demographic,
25    basic information.  What else is in that screen?

Page 92

1  A    **Loan status, days delinquency, demographic data.**
2  Q    Okay.  Does it show the number of attempts that
3    day, or that week, or anything like that?
4  A    **It will not show attempts that day, but it does**
5    **have account history of prior attempts and**
6    **contacts.**
7  Q    So an individual, this counsel, will actually be
8    able to go, and whether it's with that customer or
9    within the system, go back and see other notes of
10    previous contacts with that customer?
11  A    **For a period of time.**
12  Q    How long is that time?
13  A    **While the guarantor's placed it with us.**
14  Q    You wouldn't be able to see the notes that the
15    guarantor has regarding that account?
16  A    **The guarantor doesn't make calls.**
17  Q    Okay.  What about -- okay.  So then we'll see
18    whatever the servicing has put through to the
19    account of the guarantor, and you guys are viewing
20    it?
21  A    **Demographic data.**
22  Q    If someone tells Navient Solutions, Inc., like in
23    this case, where it's alleged that they told
24    Navient Solutions, Inc., stop calling me, it's not
25    her number, do you know what their procedure is,

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 27 of 86 PageID 1205
McCaskill v. Navient Solutions, et al.
Kevin Campbell
December 22, 2015

Page 93

1  since they're an affiliate of yours, and you share
2  the same compliance team?  What is their procedure
3  that they're supposed to do to remove the number?
4 A  **I can't speak to their procedure.**
5 Q  Okay.  Is it fair to say that if somebody tells
6  Navient Solutions stop calling me, you don't get to
7  hear those recordings, correct?
8 A  **Recordings?**
9 Q  Yeah.
10 A  **No, I don't have access to those.**
11 Q  You only see what the guarantor has on their notes?
12 A  **Correct.**
13 Q  So if someone tells Navient Solutions, Inc. stop
14  calling me, and that representative does not put a
15  note on it, you, literally, will continue to call
16  them from there on, correct?  Because you wouldn't
17  know they told them to stop calling?
18 A  **Rephrase the question.**
19 Q  I want to know -- actually, I want to phrase it
20  differently.
21     If someone tells Navient Solutions, Inc.
22  I'm tired of these phone calls, I don't want you to
23  call me, do you believe that they have revoked
24  consent to have SAC call them?
25     **MS. SIMONETTI:** Object to the extent that

Page 94

1  you're calling for a legal conclusion, or any kind
2  of information from counsel.  But, aside from that,
3  go ahead and answer the question.
4 A  **I'm still not following exactly what you're saying.**
5  **QUESTIONS BY MR. GOMEZ:**
6 Q  It's a very simple question.  Case like this,
7  Navient Solutions, Inc. is calling.  You guys are
8  also calling at the same time.  An individual says
9  I want you to stop calling me, to Navient
10  Solutions, Inc.  Does that mean that they have
11  revoked consent for Student Assistance Corporation
12  to call?
13 A  **If the NSI agent properly updates their system of**
14  **record, it will update Student Assistance Corp. --**
15 Q  Through the CSI.
16 A  **-- to revoke -- through CSI to revoke consent, yes.**
17 Q  So you believe a revocation for Navient Solutions,
18  Inc. is a revocation for Student Assistance Corp,
19  if it were properly corrected?
20 A  **Yes.**
21 Q  I know you are sort of deducted, or you pay a fee
22  to this compliance team.  Do you know how large
23  that compliance team is, or how many people are
24  involved in this compliance team?
25 A  **I can't -- I don't know.**

Page 95

1 Q  Do you know where they're located, the compliance
2  team?
3 A  **No one specific location.**
4 Q  Do you have a compliance team person in your main
5  office?  Not the one -- the one in Muncie.
6 A  **Not that I'm aware of.**
7 Q  What about on the other one, of the one in
8  Castle -- what's it called?
9 A  **Castleton.**
10 Q  Yeah.  Do you have a compliance person in that
11  office?
12 A  **No.**
13 Q  Do you schedule meetings with this compliance
14  department of who's in charge of checking with the
15  compliance department, and going over the
16  complaints and keeping up with that?
17 A  **Yeah.  We have regular meetings with compliance.**
18 Q  And you personally do as president?
19 A  **Yes.**
20 Q  And who attends those meetings, your managers, too?
21 A  **Yes.**
22 Q  How often do you have those compliance meetings?
23 A  **Weekly.  Monthly, at a minimum, but mostly weekly.**
24 Q  When you have these meetings, I understand you
25  might not know the full size of this compliance

Page 96

1  team, but how many people normally appear from the
2  compliance team for these weekly or monthly
3  meetings?
4 A  **You want me to guess?**
5     **MS. SIMONETTI:** Don't guess.
6 A  **I can't speak -- I don't know exact details.**
7  **QUESTIONS BY MR. GOMEZ:**
8 Q  And in the discussions in these compliance
9  meetings, okay, I'm assuming they're, of course,
10  referring to complaints that they're receiving of
11  how to fix problems, correct?
12     **MS. SIMONETTI:** Hang on.  Are there
13  lawyers that attend the meetings?  Do you have
14  input from counsel, in connection with the
15  meetings?  I mean you can talk --
16  **QUESTIONS BY MR. GOMEZ:**
17 Q  I don't want you to tell me anything a lawyer says.
18  I want you to tell me just what the compliance team
19  says, not what the lawyers say.
20     **MS. SIMONETTI:** Yeah, but if the
21  compliance team is informed by the lawyers, or
22  there's some conversation there, then it still
23  would be a privileged conversation.
24     **MR. GOMEZ:** I understand.  I'm not asking
25  what you any lawyer is telling you.

McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 97

1    MS. SIMONETTI: Yeah. But if the lawyer
2  is telling the compliance team, and the compliance
3  team is relating advice, it's still privileged.
4  **QUESTIONS BY MR. GOMEZ:**
5  Q   Well, let's see. Who attends these compliance
6  teams?
7  A   **There is legal representation sometimes.**
8  Q   Sometimes. Don't tell me about any time they're
9  present.
10    MS. SIMONETTI: Tav, it's the same thing.
11  If they have a conversation with the compliance
12  team, say, in preparation for the meeting, and then
13  they're talking about legal advice, it's still
14  privileged.
15    MR. GOMEZ: I understand.
16    MS. SIMONETTI: So then he can't tell you
17  what they're talking about in every meeting.
18  **QUESTIONS BY MR. GOMEZ:**
19  Q   I just want you to tell me this. Don't tell me
20  anything that anybody says. I want you to tell me
21  how is SAC preventing phone calls, after people
22  tell them to stop calling?
23    MS. SIMONETTI: That's fine. Go ahead.
24  A   **We mark the number bad.**
25  **QUESTIONS BY MR. GOMEZ:**

Page 98

1  Q   How do you train your employees to do that?
2  A   **Through regular training classes.**
3  Q   How often do you do those?
4  A   **No set time frames.**
5  Q   Somebody -- well, actually we need to take a break,
6  because he needs to change the tape.
7    MS. SIMONETTI: That's fine.
8    THE VIDEOGRAPHER: Going off record.
9  It's 11:42.
10    (A lunch recess was taken.)
11    THE VIDEOGRAPHER: We are back on record.
12  It is one o'clock.
13  **QUESTIONS BY MR. GOMEZ:**
14  Q   Mr. Campbell, if we can look at Exhibit No. 2. I
15  kind of want to go through these 20 pages that were
16  provided yesterday.
17    All right. So to recap, this, that we're
18  looking at, are documents from USA Funds, correct,
19  from their database?
20  A   **It's from their system of record.**
21  Q   Okay. By looking at these records, is there any
22  way of determining whether it was Navient that made
23  the input, or SAC? I'm sorry. Or SAC?
24  A   **These would be all of SAC input.**
25  Q   Okay. So these would be the inputs that SAC made

Page 99

1  into that account?
2  A   **Correct.**
3  Q   That's your understanding? And, of course, we also
4  have this CIS system making, introducing the
5  number, the 6140, but that's an automated, you
6  stated, correct?
7  A   **An automated, yes, entry.**
8  Q   I want to go through some of the ones that, I
9  guess, show us something different. If you look at
10  SAC449. So if you go from the back, it should be
11  the second page from the back. And if you start
12  from the bottom, the first one that looks
13  different, seems to be about 14 from the bottom.
14  And it says something like, NBL out, borrower
15  message completed. Do you see that? If you look
16  at the second page from --
17  A   **Oh. I'm sorry.**
18  Q   So it's numbered SAC449.
19  A   **Yeah. Got it.**
20  Q   The first 14 or 15 are identical. There's a first
21  one that seems to be a little different. Do you
22  notice that? The date seems to be September 13th,
23  2014.
24  A   **Okay. Can you read --**
25  Q   Says something like, borrower message completed.

Page 100

1  Do you see that? From the bottom, it's the first
2  one that has a gap. Actually, I'm sorry. Go back
3  down. The number is actually askew, about six
4  below it.
5  A   **Yes, I see it.**
6  Q   Do you know what BORRMSG completed means?
7  A   **Borrower message completed.**
8  Q   Correct. What does that mean?
9  A   **It means a message was left on that phone number.**
10  Q   Do you have any way of knowing whether that was a
11  prerecorded message, or if it was a person reading
12  a script?
13  A   **Based off this, I cannot determine that.**
14  Q   If we go up seven lines, there's another one that
15  looks different. Here's the one that I was
16  referring to that actually has a gap on the
17  farthest column. Do you see what I'm talking
18  about?
19  A   **Yes.**
20  Q   It says SYS account, reassigned to specialist from
21  pool 260. Do you see that?
22  A   **Yes.**
23  Q   What does that mean?
24  A   **I'm not exactly sure.**
25  Q   Now, do you still hold the same position that the

Page 101

1  best person to answer these questions is going to
2  be an IT person from NSI?  Or who would know this?
3 A  **I couldn't even determine.**
4 Q  You don't know what that means, or who will know
5  what that means?
6 A  **You ask me the best person.**
7 Q  Correct.
8 A  **Yeah.  Because I don't know what it is, I can't**
9  **direct you to the best person.**
10 Q  Okay.  If the term "pool 206," does that mean
11  anything to you?
12 A  **No.**
13 Q  Do you know any reason why an account like this
14  will be reassigned within SAC?
15 A  **Yeah, I don't know.**
16 Q  All right.  Let's continue.  If you can switch to
17  the next page, going in reverse, which is going to
18  be SAC448.  And if you start from the bottom and
19  you go up, you, once again, will notice a gap on
20  the farthest column to the right (indicating).
21  Do you see that?
22 A  **Okay.**
23 Q  That one seems to have a date of September 23rd,
24  2014.  Do you see that?  4:33 p.m.  It's actually
25  two entries at the exact time.  Do you see that?

Page 102

1 A  **Yes.**
2 Q  It says BORRF-U.  Do you know what that means?
3 A  **I don't know what that means.**
4 Q  Underneath it, it says out, BORR.  Do you know what
5  that means?
6 A  **It means a call was -- an outbound call was placed.**
7 Q  Okay.  And then it says disconnected.  Do you know
8  what that means?
9 A  **That would have been the result of the phone call,**
10  **via the system that made the call.**
11 Q  Okay.  Can you determine whether somebody answered
12  that call and they hung up, or how the call was
13  disconnected?
14 A  **This appears to be a system release, meaning the**
15  **system recognized as a disconnected number.**
16 Q  Now, when you're reviewing this account through the
17  relevant time, meaning these phone calls, there
18  seems to be now three phone numbers that you're
19  calling.  Do you recognize that?
20 A  **I see three numbers listed on this sheet, yeah.**
21 Q  Do you know how the third number was gathered?
22 A  **I don't know.**
23 Q  Today, after preparing for this deposition and
24  reviewing all the records, do you have any idea how
25  6140, so the relevant number in this litigation,

Page 103

1  was gathered by NSI?
2 A  **I would not have that information.**
3 Q  Okay.  So you don't know how they got that number.
4  You may not know this.  But if you dial the number
5  that we're discussing here, so the number ending in
6  6140, and you get a voice message, it clearly
7  doesn't discuss Maretta Newsome, meaning the voice
8  message itself says, you know, this is Willie and
9  --
10 A  **Willie --**
11 Q  -- whatever McCaskill were present.  Let me ask you
12  this:  Do you ever do manual phone calls from SAC?
13 A  **Yes, we make manual phone calls.**
14 Q  Okay.  How many people do you employ for your
15  manual phone calls department?
16 A  **The 240.**
17 Q  Okay.  So the same people that are employed through
18  the outbound dialer also sometimes do manual calls?
19  How does that work?
20 A  **Yes.**
21 Q  They do?  Okay.
22       MS. SIMONETTI:  We've taken that issue off
23  the table, Tav.
24 **QUESTIONS BY MR. GOMEZ:**
25 Q  Well, I understand.  I understand that you have

Page 104

1  stipulated for purposes of litigation.  But I want
2  to know if there was ever a manual call made in
3  this case, where a person would have heard the
4  voice message, and clearly hear this is not Maretta
5  Newsome's number, because it says it on the
6  recording.  Do you understand what I'm saying?
7       MS. SIMONETTI:  I don't see why that's
8  limited to a manual call, but...
9 **QUESTIONS BY MR. GOMEZ:**
10 Q  Well, let me ask you this.  Do you have anything
11  that will recognize the voice message reflecting a
12  different name than the person you're calling for?
13 A  **Do I have anything?  Restate that.  I'm sorry.**
14 Q  Yeah.  If SAC call my cell phone number looking for
15  John Kennedy, and they hear my voice message
16  saying, this is Tav Gomez with Morgan & Morgan,
17  clearly you're not calling the right number, or
18  that number is no longer to John Kennedy, in my
19  example.  Do you understand that portion?
20 A  **Restate that.**
21 Q  If I call your cell phone right now --
22 A  **Yeah.**
23 Q  -- looking for Lisa Simonetti, and I hear your
24  voice message.  And you go -- and you have, I'm not
25  available right now, this is Mr. Campbell.  I mean

Page 105

1  clearly going to recognize that that phone number
2  does not belong to Lisa Simonetti, it belongs to
3  some Mr. Campbell.  Do you understand that example?
4  **A    Yes.**
5  Q    My question to you is:  SAC, do they have anything
6  that will recognize what the voice message says on
7  the cell phone, on the phone you're calling, to try
8  to match the names?
9  **A    When you say anything to recognize, I --**
10 Q    Whether it is policies to once a month call that
11 number, make sure it's either the right person, or
12 the voice message reflects the same person?  Do you
13 have anything like that, any policies, or
14 procedures for that?
15 **A    I'm not sure I'm following.**
16 Q    Okay.  If you call a phone number, you get a voice
17 message.  Do you agree with that, for the most
18 part?
19 **A    Sometimes.**
20 Q    Okay.  If that voice message is personalized,
21 meaning you call my cell phone and say this is Tav
22 Gomez with Morgan & Morgan, do you understand what
23 that is, like my personal message in my phone, that
24 if you call and I don't answer, you get that voice
25 message?

Page 106

1  **A    Yes.**
2  Q    Okay.  Do you have any polices and procedures that
3  say that every this amount of times we should have
4  a person call and make sure that either the voice
5  message reflects the person we're looking for, or
6  we talk to the person and it is indeed that person?
7  **A    There are policies out there, yes.**
8  Q    Okay.  When you say policies out there, are they
9  written policies?
10 **A    Yes.**
11 Q    Okay.  SAC has their own independent policies
12 regarding what I'm talking about?
13 **A    Yes.**
14 Q    If I was to request those policies, what are they
15 called?  How would I get those policies?  What is
16 the name of those policies?
17 **A    I couldn't tell you exactly the name of the**
18 **policies.**
19 Q    Okay.  When individuals are employed by SAC in this
20 kind of capacity, meaning answering phone calls, or
21 making phone calls, do they receive any manuals
22 regarding training?
23 **A    They are given guidance and procedures during**
24 **training, yes.**
25 Q    During training, okay.  Are these written?  Do you

Page 107

1  have these written policies?
2  **A    Yeah, there's written policies.**
3  Q    Do you have written policies that specifically
4  address TCPA and TCPA violations?
5  **A    Not a -- I don't know.**
6  Q    Who would know this?  Do you have like a manager
7  that is in charge of Human Resources, or would it
8  be the compliance department?  Who would know
9  whether or not you have written policies regarding
10 violations of the TCPA, or how not to violate the
11 TCPA?
12 **A    Okay.  That's what I need some clarity on.**
13 Q    Do you have written policies regarding the
14 TCPA and violation for the TCPA?
15 **A    You're asking me two questions.**
16 Q    We'll go one at a time.  Do you have written
17 policies regarding the TCPA?
18 **A    There are instruction during training about how to**
19 **perform default prevention activities.**
20 Q    Okay.  And my question to you is:  Do you have
21 written policies that you give each employee who's
22 involved in this capacity, meaning a counselor?  Do
23 you have those, written policies?
24 **A    There are -- from what I understand, yes, there are**
25 **written policies, but I can't tell you that they**

Page 108

1  **are given to them.  They could be online.  They**
2  **could be accessed somehow.**
3  Q    Okay.
4  **A    So I can't confirm that they've been handed to the**
5  **person.**
6  Q    Okay.  You stated yourself, that you, yourself,
7  even receive training.  And do you receive written
8  policies from SAC yourself?
9  **A    Written -- do I receive written policies?**
10 Q    Yes.
11 **A    In what capacity?**
12 Q    In your training, or when you get hired at SAC, do
13 they give you a notebook that says this is your
14 employee handbook regarding harassment, regarding
15 your hours?  I'm assuming you have an employee
16 handbook to when you hire an employee, correct?
17 **A    Yes.**
18 Q    I want to know if, specifically, regarding the
19 TCPA, if you have any materials that are written
20 that are given to employees, going this is the
21 TCPA, this is how it applies, you know.
22 **A    Yeah.  There's guidance in the training capacity.**
23 **I just can't answer.  I don't know if they are**
24 **physically handed to the employees.**
25 Q    What about written instructions, as to when someone

Page 109

1   asks you not to call, or that these phone calls are
2   annoying?  Any instructions that you have written,
3   that you give to these counselors that says here's
4   the steps, if somebody's asking you to cease the
5   phone calls?  Do you have those in writing?
6  A   **They are in writing, yes.**
7  Q   If I'm trying to get those policies, what would I
8   call -- what would I call them?  You know, what are
9   the documents called?
10 A   **I don't know the actual name of the document.**
11 Q   Who would I make that request to, your compliance
12   department?
13 A   **Our training department.**
14 Q   Now, you stated that there's policies out there,
15   too, regarding having individuals call, or verify a
16   number, or the voice message, to try to match it up
17   with the individual you're looking for, kind of
18   what we started talking about a little bit ago.
19   Do you believe we can get those same policies from
20   the training department?
21 A   **I would believe so, yes.**
22 Q   Do you believe you have an operational agreement
23   between SAC and NSI?
24 A   **More descriptive.**
25 Q   Well, do you have any type of operational

Page 110

1   agreement, or a contract, with NSI and SAC?  Is
2   there any type of agreement or contract regarding
3   duties, and, you know, what one company owes to the
4   other one type of thing?
5  A   **Yes.**
6  Q   If I wanted to request that document, how would I
7   go about it?  What is the document called?  And who
8   has this document?
9  A   **I would assume somebody in our legal department**
10   **would have the document.**
11 Q   At the beginning of this deposition, you stated
12   that you -- you know, you are president of SAC, but
13   the person that you would report to will be the
14   vice president of Navient Solutions, Inc., correct?
15   And I believe you gave me his name.  That's
16   correct?
17 A   **No.**
18 Q   Okay.  So how is it incorrect?
19 A   **Senior vice president.**
20 Q   Oh.  The senior vice president.  Sorry.
21   Now, what type of issues do you report to
22   the senior vice president of Navient Solutions?
23 A   **Normal business updates.**
24 Q   Just regarding revenues and expenses?  Or do you
25   also communicate with him regarding compliance or

Page 111

1   complaints?
2  A   **We discuss compliance.**
3  Q   Okay.  How often are you aware that an allegation
4   is made that someone told NSI to stop calling them,
5   yet, there's no notes about it, so now you are, I
6   guess, also held responsible for calling those
7   people?  How often does that happen?
8      **MS. SIMONETTI:** I think we covered this
9   before.  Didn't we cover this before?  Complaints
10   about do not call -- I mean go ahead.  But I think
11   you have.
12   **QUESTIONS BY MR. GOMEZ:**
13 Q   Well, you stated that you cannot relate to him
14   giving compliance.  As president of SAC, you're
15   responsible for SAC, correct?
16 A   **Correct.**
17 Q   How often does it come up that someone is either,
18   through a lawsuit, or complaining on the phone, the
19   fact that they didn't tell SAC, but they told
20   Navient Solutions to stop calling, yet, now you are
21   being held responsible for this.  How often do you
22   get that scenario coming up?
23 A   **Rarely.**
24 Q   But it's happened before, but it's rare?
25 A   **I can recall one other time.**

Page 112

1  Q   Okay.  Was that within the last 12 months?
2  A   **Yes.**
3  Q   And would this be the sort of conversation you will
4   have with your senior vice president, being that he
5   -- he saw the number two on the other side, on NSI?
6  A   **That may be brought up in a conversation.**
7  Q   Now, you have an agreement between SAC and USA
8   Funds correct, a contract, or an agreement with
9   them?
10 A   **Correct.**
11 Q   If I wanted to get that agreement, who would I --
12   who has this agreement?  Would it be your office?
13   Is it your legal department?  Who would I reach out
14   to get that agreement?
15 A   **I have that agreement.**
16 Q   Okay.  Is this an agreement that is renewed yearly?
17   Is it a -- what is the time span of that agreement?
18 A   **It's recently changed.  I believe it is an annual,**
19   **re-up agreement.**
20 Q   And when you say recently changed, in any way did
21   it change the way that SAC is compensated regarding
22   the handling of USA Funds?
23 A   **No.**
24 Q   Is it a fair statement that your agreement with USA
25   Funds has been the same through the last four

Page 113

1    years, regarding compensation and how SAC gets
2    compensated?
3  A   Yes.
4  Q   And your testimony is you do not get compensated
5    based on the individual becoming non-delinquent,
6    you actually just get the out-front pay for -- what
7    did you call that?  DAF?
8  A   DAF, correct.
9  Q   Let me ask you about that.  The fee that SAC gets
10   for the DAF, is that dependent on the amount of the
11   loan?
12 A   Yes.
13 Q   The higher the loan, the higher SAC will get paid
14   to counsel that case?
15 A   According to Department of Education guidelines,
16   yes.
17 Q   And you will get paid the same, because you get
18   paid upfront, regardless of whether you need to do
19   counseling, or attempt communications for ten days,
20   or a year?
21 A   Correct.
22 Q   Now, we discussed whether or not you have policies
23   and procedures, written policies and procedures,
24   for the TCPA.  There's also an allegation of an
25   FDCPA.  Do you know what the FDCPA is, the Fair

Page 114

1    Debt Collection Practice Act?
2  A   I'm aware of it, yes.
3  Q   Okay.  Have you received any training regarding the
4    FDCPA?
5  A   Yes.
6  Q   And as far as you know, do you have any written
7    policies or procedures regarding the FDCPA?
8  A   No.
9  Q   Is there a reason why you don't have any policies
10   on that?
11 A   We don't collect debt.
12 Q   You don't collect debt?  Okay.
13       So you don't believe the FDCPA applies to
14   you?
15       MS. SIMONETTI:  I can't have him testify
16   as to legal advice or instruction.
17       Can you ask answer the question in some
18   other way?
19       MR. GOMEZ:  Well, he's been trained.  He
20   knows what it is.
21       MS. SIMONETTI:  Hang on.  If you can
22   answer the question in another way, that's okay.
23   But if you're just relying on --
24 QUESTIONS BY MR. GOMEZ:
25 Q   I don't want you to tell me what your lawyer told

Page 115

1    you.  I just want you to tell me -- you've trained.
2    You know what it is.  You're a smart guy.  You're
3    the president.  You've read about it.
4       MS. SIMONETTI:  Tav, let him answer the
5    question.  And just let me give the caution rights,
6    just to have a clear record.  Don't answer based on
7    communications with counsel or advice from counsel.
8    But if you have some other source, then that's
9    fine.  Go ahead.
10 QUESTIONS BY MR. GOMEZ:
11 Q   All right.  So you've read the FDCPA, correct?
12       MS. SIMONETTI:  The statute?
13 QUESTIONS BY MR. GOMEZ:
14 Q   The statute.
15 A   I'm aware of it.  Did not read it verbatim, no.
16 Q   And your statement is you don't believe it applies
17   to you, because you don't believe you're collecting
18   a debt; is that correct?
19 A   We do not collect debt, correct.
20 Q   You attempt communications on delinquent accounts,
21   correct?
22 A   On behalf of the guarantor --
23 Q   Yes.
24 A   -- that we're contracted with, we make outbound
25   default prevention outreach.

Page 116

1  Q   Okay.  So you attempt to communicate with
2    individuals whose accounts are delinquent?
3  A   They are delinquent, correct.
4  Q   You are not servicing these accounts, correct?  You
5    are a completely different perspective of that
6    account, correct?
7  A   Correct.  We do not service the account.
8  Q   You do not service.  So you attempt communications
9    on delinquent accounts for student loans, correct?
10 A   Correct.
11 Q   When you communicate with them, you identify
12   yourselves as Student Assistance Corp, which is the
13   name of your corporation, correct?
14 A   Correct.
15 Q   And it is your policy, of course, to inform these
16   individuals that you're contacting, that they're
17   behind on their payments, correct?
18 A   We counsel them of their options, because they are
19   behind on their payment.
20 Q   So, clearly, you let them know.  And I'm going
21   through your letters.  And, clearly, from all of
22   them you say, you know, we're aware that your
23   account is past due.  I mean it's almost in the
24   beginning of every letter.  Is that a fair
25   statement?

Page 117

1  **A**   **Fair statement.**
2  **Q**   And when you're calling, you also are doing the
3    same thing, letting them know your account is past
4    due, and maybe you are giving them options; is that
5    correct?
6  **A**   **We let them know that they're past due.**
7  **Q**   Okay.  So you let them know you are past due, or
8    you're delinquent.  Do you know if part of your
9    script is to let them know how many days?  Is that
10   something that's part of your script when you make
11   these phone calls?
12 **A**   **We don't have a script.**
13 **Q**   So each counselor is ad lib, they don't have to
14   follow a certain -- you know, identify yourself,
15   ask for this, when you make these phone calls?
16 **A**   **They're trained --**
17 **Q**   Uh-huh.
18 **A**   **-- on a process, but there's not a verbatim script.**
19 **Q**   This training, regarding what they're supposed to
20   say or not, do you know if it's in writing, if you
21   have like a manual that you give them, so they can
22   --
23 **A**   **Yes, there's training documents.**
24 **Q**   And those training documents, most likely, will be
25   from your training department?

Page 118

1  **A**   **Correct.**
2  **Q**   You let them know that they are past due, and if
3    they, indeed, show the ability to make a payment.
4    You don't take the payment, you just simply
5    communicate this phone call, or transfer this phone
6    call to the servicing company, correct?
7  **A**   **We transfer.  We do not communicate.**
8  **Q**   Okay.  So you transfer the phone call, if they show
9    the ability to make a payment?
10 **A**   **Yeah.  If that's what the borrower wants to do.**
11 **Q**   Now, under this loss, I believe there's also an
12   FCCPA claim.  That's a Florida Consumer Collection
13   Practice Act.  Do you have any knowledge regarding
14   the Florida Consumer Collection Practice Act?
15 **A**   **No.**
16 **Q**   Are you aware that you make calls to Florida, to
17   the state of Florida?
18 **A**   **Yes.**
19 **Q**   It's fair to say you do not have any training
20   manuals, or policies, regarding violations of the
21   FCCPA, the Florida Consumer Collection Practice
22   Act?
23 **A**   **We're not debt collectors.**
24 **Q**   Okay.  So the answer is, no, you do not have it,
25   because you don't believe you're a debt collector.

Page 119

1  **A**   **Correct.**
2  **Q**   You stated that you have a policy that says, we
3    will not contact you more than eight times a day,
4    or one voice message, or one actual contact with
5    the person, correct?
6  **A**   **Okay.  Restate that.**
7  **Q**   You stated earlier that you cannot have a cap, no
8    more than eight phone calls a day to an account,
9    correct?
10       **MS. SIMONETTI:** Did you say he cannot have
11   a cap?
12 **QUESTIONS BY MR. GOMEZ:**
13 **Q**   You cannot call more than eight times on one
14   account per day?
15 **A**   **Attempt.**
16 **Q**   Correct.  Attempt to call eight times in one day.
17 **A**   **Correct.**
18 **Q**   Is that in writing somewhere?
19 **A**   **Yes.**
20 **Q**   Where would I find it?  What portion of your
21   policies and procedures?  Where would I find those
22   limitations that you described?
23 **A**   **I can't state verbatim.  It would be under calling.**
24 **Q**   Okay.  It would be under calling somewhere.
25       Who would I have to reach out?  What

Page 120

1    department of SAC, in order to get this policy
2    regarding the limitations that you've described
3    throughout this deposition?
4  **A**   **It would be in our training manual, or I can pull**
    **them.**
6  **Q**   I know we kind of skipped through it.  But tell me,
7    just briefly, a little bit regarding your
8    education.  Normally we do that at the beginning,
9    but we kind of jumped to the case real quick.
10       What is the highest level of education
11   you've accomplished?
12 **A**   **Three or four years of college.**
13 **Q**   And I'm assuming that you did not get a Bachelor of
14   Science, or Bachelor of Arts, but you were in the
15   process of getting one.
16 **A**   **Correct.**
17 **Q**   And what was your attempted major?  What were you
18   going for?
19 **A**   **Business.**
20 **Q**   Do you hold any other professional titles,
21   professional licenses, anything like that?
22 **A**   **No.**
23 **Q**   All right.  So let's continue with this, and see if
24   we can figure out what some of these entries mean.
25       If you can go under Exhibit No. 2 to

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 34 of 86 PageID 1212
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 121

1    SAC447.  So it should be the next page.  And if you
2    look, once again, from the bottom, you'll see one
3    that's there's a gap on the last column.  Do you
4    see that?
5  A   Yes.
6  Q   Okay.  That one seems to have a date, October 1st,
7    2014.  Do you see that?  11:00 a.m.?
8  A   Yes.
9  Q   If you can go through that line and tell me if you
10   know what any of that means.  It starts with 00DAF,
11   and then there's several numbers.  Do you know what
12   any of that information means?
13  A   Total DAF billed, zero.
14  Q   Okay.  And the line below it says, total DAF
15   billed, zero.  What does that mean?
16  A   Okay.  I'm sorry.  We're talking two different
17   things.  Restate that.
18  Q   There's two lines, neither one of them which has a
19   last column.  So you're looking at the right place.
20   We can start from the one at the bottom.  It says,
21   total DAF billed, zero.  In parenthesis 0.00.
22  A   Right.
23  Q   What does that mean?
24  A   I assume that this means that, through the
25   guarantor system, that we receive no fee on this

Page 122

1    borrower.
2  Q   Why would that be?
3  A   Because it's a repeat borrower.
4  Q   And what does that mean, a repeat borrower?
5  A   They must have been placed with us before.
6  Q   So once you get this DAF on an account, whether the
7    person takes one year, or 30 years to pay, you only
8    get one DAF --
9  A   Correct.
10  Q   -- payment?  Even if that individual is delinquent,
11   becomes non-delinquent, so SAC close the account.
12   Three, four years go by and they become delinquent,
13   you still wouldn't get paid?
14  A   Correct.
15  Q   So by looking at this, it's fair to say that this
16   account has been previously with SAC?
17  A   Based on the information I'm seeing here, I think
18   that would be an accurate statement.
19  Q   And today do you have any knowledge when it was
20   that this account was placed with SAC?
21  A   Restate that.
22  Q   Do you know when was the time that SAC had this
23   account before?
24  A   No.
25  Q   If you wanted to look that up, would you do it

Page 123

1    under the loan number, under the phone number,
2    under the name?  How would you look that up on
3    SAC's database?
4  A   SAC doesn't have a database.
5  Q   Okay.  How would you look that up with the
6    guarantor, the agency?  With, I guess, these would
7    be USA Funds.
8  A   We would have to request the account number from
9    the guarantor.
10  Q   Well, you have the account number in this case,
11   correct?
12  A   If it's not placed with us, I don't have it.
13  Q   Well, I'm talking about this account.  You have
14   this account.  You have the ability to look at this
15   account, if you went back right now to SAC, don't
16   you?
17  A   Once the account closes out, it purges back to the
18   guarantor.
19  Q   Okay.  Once the account is reactivated, like it
20   seems to be in this case, you have access again to
21   all the guarantor's information, correct?
22  A   Restate that.
23  Q   Once the account is reactivated again, meaning it
24   gets reassigned to SAC, you have access to the
25   account again?

Page 124

1  A   Yes.
2  Q   And would you be able to see the account was
3    previously provided to SAC?
4  A   Some cases yes, some cases no.
5  Q   Why wouldn't you be able to?
6  A   The data purges off the system.
7  Q   What about the data that is assigned to SAC
8    originally?  Meaning -- you told me there was an
9    entry that reflects this account being assigned to
10   SAC.  Couldn't I simply just go back and see if
11   I've ever been assigned to SAC before?
12  A   It can be done.  I don't know if it can be done
13   this way.
14  Q   What other way can you get it done?
15  A   I would have -- I would have to request it from the
16   guarantor.
17  Q   On the line just above this one, it says, DAF
18   billed, zero, in (28,752.78).  What does that mean?
19  A   My assumption is the DAF billed, zero, means we
20   billed them nothing, and parenthesis means that was
21   the balance of the borrower account.
22  Q   Well, let me ask you this.  In preparation for
23   today's deposition, did you look to see how many
24   loans were involved with this account?
25  A   I did not.

Page 125

1  Q   Do you know the balance of the loan that is owed in
2      this account?
3  A   I do not.
4  Q   Do you know the date that the loan or loans were
5      taken out in this account?
6  A   I do not.
7  Q   Do you know whether the loans are private, or
8      guaranteed by the government?
9  A   I know that they are guaranteed by the government,
10     because the guarantor contracted us to perform
11     default prevention work.
12 Q   Okay.  Now, some private loans are guaranteed by
13     the government, correct?
14 A   Not that I'm aware of.
15 Q   No?
16         You referred to guidelines for the
17     Department of Education that mandates that a
18     60-days delinquent, an account be placed on this
19     default counseling, correct?
20 A   Correct.
21 Q   Where -- explain where -- where is that at?  How
22     are you gathering that information?  Are you aware
23     of any mandate from the Department of Education?  I
24     know you've been doing student loans for a long
25     time.

Page 126

1  A   Right.
2  Q   So tell me a little bit about that.
3  A   From the guarantors and reading the regs on
4      guarantors.
5  Q   I guess the enactment of -- the request that an
6      account be placed with someone like you guys for
7      default counseling, do you know what statute, what
8      law, what enactment it comes from?
9  A   I don't.
10 Q   But you believe that 60 days, if a student loan is
11     being delinquent, it's mandated to go to a company
12     like yours, like SAC?
13 A   No.
14 Q   So what do you believe?
15 A   The guarantor is mandated to perform default
16     prevention.
17 Q   Okay.  And the default prevention, do you know if
18     there's guidelines as to what the default
19     prevention should be?
20 A   I am not aware of any guidelines.
21 Q   So all you know is they have to get involved with
22     the full prevention, but you don't know what it is
23     that default prevention actually is mandated, or
24     that the guarantor has to do?
25 A   The contract we have with our guarantors did not

Page 127

1      mandate specifics.
2  Q   So the contract that you have, specifically with
3      USA Funds, don't say you need to make, or attempt a
4      communication every day?
5  A   Correct.
6  Q   Or every week, or every month?
7  A   Correct.
8  Q   The eight phone calls a day is completely SAC's
9      policies or choosing, correct?
10 A   Correct.
11 Q   How long has it been that that cap of eight phone
12     calls has been in existence?  Do you know?  Was it
13     changed recently?  Has it always been eight?
14 A   It was not changed recently.  It's been for quite
15     some time.
16 Q   Do you remember what it was before that?
17 A   I don't.
18 Q   Let's go to page 441 of the same Exhibit 2.
19     If you start from the bottom and you go up -- just
20     by looking at the last column, you're going to find
21     about 22 above it, something that says customer
22     hung up.  Do you see that one?
23 A   Yes.
24 Q   Customer hung up.  Is it your understanding that
25     that was an input that was made by one of your

Page 128

1      counselors?  Or is this something that the dialer,
2      self, you know, introduces into the data?
3  A   This appears to be an agent release.
4  Q   So what does that mean?  The agent actually typed
5      this?
6  A   Or hit a drop-down button.
7  Q   Do your agents, or your counselors, do they have
8      the ability in the screen that pops up to write
9      notes?
10 A   They can write notes, yes.
11 Q   They can?  Okay.  And you stated now they also have
12     sort of a -- maybe an option where they can drop, I
13     guess, a series of commands like that, customer
14     hung up?
15 A   Yes, majority of the agent releases are drop-down.
16 Q   So we know for sure that on November 24th, right
17     around Thanksgiving, 2014, someone answered 6140,
18     and that conversation was transferred to a live
19     agent, or live counselor, correct?  Now, how long
20     it was, it doesn't seem to reflect, does it?
21 A   No.
22 Q   In preparation for today's deposition, did you go
23     back and try to look for a recording on that date?
24 A   Yes.
25 Q   And what did you find?

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 36 of 86 PageID 1214
McCaskill v. Navient Solutions, et al.                                                    Kevin Campbell
December 22, 2015

1 **A**   For this particular caller?

2 **Q**   Yes.

3 **A**   I can't recall.

4 **Q**   Okay.  Because "customer hung up" doesn't tell me

5       whether there was a 30-second conversation, or hung

6       up as soon as you started talking, or at what point

7       he hung up, correct?

8 **A**   Correct.

9 **Q**   I want to go to page 439.  And if you start from

10       the bottom, right towards the middle of the page

11       you, once again, are going to find a gap in the

12       last column.  Do you see that?  And the date of

13       that seems to be December 12, 2014.

14 **A**   Repeat the date.

15 **Q**   December 12, 2014.  So it starts 14/12/12, because

16       you have the year first.

17 **A**   Yeah.  Okay.

18 **Q**   It says SYS, I'm assuming system.  And then it

19       says, "Account no longer in skip."  What does that

20       mean?

21 **A**   I can't be exactly sure.

22 **Q**   Does the word "skip" mean anything in your SAC, I

23       guess, language, when you're talking to, whether it

24       is managers or anything else?  What does the word

25       "skip"?  Does it have a symbol or meaning?

1 **A**   Typically means that we haven't made contact over a

2       period of time.

3 **Q**   Okay.  So "no longer in skip," does that mean you

4       had contact then?

5 **A**   No.

6 **Q**   Are you familiar with the term "skip tracing"?

7 **A**   Yes.

8 **Q**   What does that mean to you?

9 **A**   When we try to obtain demographic information.

10 **Q**   From a third party?

11 **A**   Yes.

12 **Q**   Do you know if there was a skip trace done in this

13       account?

14 **A**   I don't know.

15 **Q**   How would I know how this entry was made, or who

16       made this entry?

17 **A**   It was an automated entry, I assume, system SYS.

18 **Q**   When it says system, does that mean an SAC system?

19       Does it mean a CIS system?  Like what system do you

20       think is making this entry?

21 **A**   It could be a SAC system update.

22 **Q**   It could be an SAC.  Could it be a CIS update

23       system?

24 **A**   No.

25 **Q**   Okay.  So this will have to be an SAC update?

1 **A**   Yes.

2 **Q**   Who is your IT person, or the person that manages

3       these kind of entries that you're making into the

4       guarantor's data?  Like who's in charge of

5       controlling this system and the entries and what it

6       means?

7 **A**   It could be a couple different people, most likely,

8       one of my analysts.

9 **Q**   One of your analysts?  All right.  Do they work

10       specifically for SAC, or they share with NSI?

11 **A**   SAC.

12 **Q**   What's his name?

13 **A**   It's a her.

14 **Q**   A her.

15 **A**   Tammy Goldstein.

16 **Q**   What's her job title?  Analyst?

17 **A**   I believe it's analyst.

18 **Q**   And is she in charge of this, I guess, entries, or

19       the system itself, how it works and how -- I guess

20       how it makes these entries into the guarantor's

21       database?

22 **A**   No.

23 **Q**   What is she in charge of?

24 **A**   Student Assistance Corp, account assignments,

25       updates, and, along with this, any new information

1       updates.

2 **Q**   Let me ask you this.  If you make an entry, several

3       of these entries are going to be made automatically

4       by your system and your dialer system into the

5       guarantor's database, correct?

6 **A**   Correct.

7 **Q**   Do you have a way of going into that system, the

8       guarantor's system, and deleting an entry that

9       occurred?

10 **A**   No.

11 **Q**   So if a mistake is made, how can that be corrected?

12       If SAC made an entry that is a mistake -- we all

13       make mistakes.  Let's say a mistake is made, and an

14       entry is introduced into the guarantor's database,

15       how can it be corrected?

16 **A**   I mean, what kind of mistake are you referring to?

17 **Q**   It could be something as simple as writing a wrong

18       email address, or you stated that your counselors

19       have a way of introducing notes --

20 **A**   Uh-huh.

21 **Q**   -- into that account, correct?  Those notes go into

22       the guarantor's account, or the guarantor's, in

23       this case, USA Funds' database, correct?

24 **A**   Yes.

25 **Q**   If they write a note and they made a mistake on the

Page 133

1    note, are you able to go and correct that note?
2  A   **No.**
3  Q   Do you know if USA Funds will have the ability to
4    go back and correct that note?
5  A   **Not that I'm aware of.**
6  Q   Do you have any type of quality assurance
7    compliance where you listen to the recordings to
8    make sure your counselors are doing what they're
9    trained to do?
10  A   **Yes.**
11  Q   And is that also handled by the same compliance
12    team that we discussed earlier?
13  A   **Yes.**
14  Q   Let's go to SAC437.
15        And if you start on the right side and go
16    from the bottom up.  The first gap on the right
17    column is the easiest way.  And it says something,
18    it says, Account assigned to 771, on January 1st,
19    2015."  Do you see that?
20  A   **Yes.**
21  Q   Okay.  What does that mean?
22  A   **It appears it's assigned to a rep.**
23  Q   Will rep be 771?
24  A   **My assumption, that's the counselor's number.**
25  Q   Okay.  When does an account get assigned to an

Page 134

1    individual like that?
2  A   **Various different times.**
3  Q   By looking at this, can you tell me what exactly
4    would lead you to it?  Is it because of the amount
5    of time that has passed?  What leads -- why does
6    SAC assign a case to a representative?
7  A   **Majority of the time, it's based off of time, or**
8    **delinquency.**
9  Q   When it's assigned to a representative like this
10    with one, 771, what is that representative now in
11    charge of?  What are their duties with an account?
12  A   **To perform default prevention efforts.**
13  Q   Okay.  And what steps do they actually need to do?
14    Like how does it differentiate from what was
15    happening before?  Now that you assign this rep,
16    how does it change?
17  A   **I'm not sure it does.**
18  Q   So it just gets assigned to someone, but it doesn't
19    necessarily mean anything changes?
20  A   **For who?**
21  Q   Well, for SAC, for what you're doing with this
22    account.  So just because it gets assigned to 771,
23    the dialer continues to do the same thing, the
24    emails continue to be sent the same way, correct?
25  A   **Correct.**

Page 135

1  Q   There's no specific new duties that Representative
2    771 has to do?
3  A   **Manual work begins.**
4  Q   Manual work.  Okay.  Good.  Well, let's talk about
5    that manual work.
6        What is it that this individual should do,
7    manually?
8  A   **Dial the phone numbers.**
9  Q   Okay.  Dial the phone numbers.
10        Do you know who Representative 771 is?
11    771.
12  A   **I don't.**
13  Q   Would that be something that's fairly easy to do,
14    to find out who it is?
15  A   **Fairly easy, yes.**
16  Q   And would you be able to identify who that person
17    is?
18  A   **I could.**
19  Q   Now, in preparation for today's deposition, do you
20    have any idea what Representative 771 did in this
21    case?
22  A   **Restate that.**
23  Q   When you were preparing for this deposition, and if
24    you know that this account became assigned to an
25    individual person to actually now do manual things,

Page 136

1    so kind of remove it from just the automatic thing
2    and do manual things, one, did you contact that
3    person to see what they did about this case?
4  A   **No.**
5  Q   Did you find out who that person was?
6  A   **No.**
7  Q   Did you look at any notes or anything to see what
8    Representative 771 did?
9  A   **No.**
10  Q   So, as far as you know, we don't know if this
11    representative did anything manual in this case,
12    correct?
13  A   **Well, they would be listed here.**
14  Q   Okay.  So if 771 made a manual phone call, it would
15    be listed in this account.  They would be listed
16    within these notes, correct?
17  A   **Correct.**
18  Q   But just looking at it, it looks identical to the
19    way it was before.  So it doesn't seem like
20    Representative 771 did any manual work.  Or am I
21    incorrect by assuming that?
22  A   **I would assume you're incorrect by assuming that.**
23  Q   So tell me what manual work that 771 did.  Or what
24    did Representative 771 do?
25  A   **I mean I can't answer that.**

1  Q   Do you know if Representative 771 called the 6140
2      number?
3  A   **I can't answer that.  I don't know.**
4  Q   When a case is assigned to a representative, like
5      it happened in this case, how long does that
6      account remain with that representative?  Or what's
7      the procedure with that?  Once he's assigned to an
8      individual, what happens?
9  A   **They're responsible for that borrower for a month.**
10 Q   Thirty days.
11 A   **Correct.**
12 Q   At the end of the 30 days, is there any mandate, or
13     rules that they should provide a report of what
14     they did?  Or how do you know they're doing
15     something?
16 A   **We have reporting that lets us know the number of**
17     **calls they've made.**
18 Q   Okay.  Do you have any reports as to what
19     Representative 771 did on this account?
20 A   **I can't answer that.**
21 Q   Okay.  But it's fair to say that if you look within
22     SAC's records, we're going to find that after 30
23     days they should have written a report of this is
24     what I did for this account?
25 A   **Counselors don't write reports.**

1  Q   Well, not counselors.  But these representatives,
2      771, you stated that they get, when a case is
3      assigned to them, they have the case for 30 days to
4      do some manual work, correct?
5  A   **They have the account assigned to them, yes.**
6  Q   For 30 days?
7  A   **Yes.**
8  Q   At the end of the 30 days, these representatives
9      should have written a report of what happened, or
10     what attempts they made?
11 A   **No.**
12 Q   What do they do at the end of 30 days?
13 A   **They start working on a new list of assignments.**
14 Q   Okay.  How do you, as president, know that this
15     representative did anything on this case?
16 A   **We track what they do.**
17 Q   Could you go back in your, I guess, account and
18     look if this case was assigned to them January 1st,
19     2015, you would be able to find out what
20     Representative 771 did for the next 30 days,
21     correct?
22 A   **We should be able to identify that.**
23 Q   Now, would you -- when you're looking for this
24     information, you said you can identify.  Would you
25     look at something other than these notes that you

1      provided here?
2  A   **The codes to the very far right, prior to the time**
3      **and date stamped --**
4  Q   Yes.
5  A   **-- will determine if it was a manual call or a**
6      **dialer call.**
7  Q   Okay.  What are the numbers, and how would I know
8      that?
9  A   **I don't know them offhand, for certain.**
10 Q   Right before you made that statement, you said we
11     can go back and determine what they did during
12     those 30 days.  And my question to you was:  Would
13     you look at anything else, outside of this 20 pages
14     that we have here, in order to determine what they
15     did during those 30 days?
16 A   **No.  It's all here.**
17 Q   So SAC does not keep anything independent, outside
18     of these notes that you gave us?
19 A   **We have no system of record.**
20         MR. GOMEZ: Let's take a break.  He's got
21     to change the tape.
22         MS. SIMONETTI: Oh.  Sure.
23         THE VIDEOGRAPHER: Going off record.
24     It's 2:01.
25         (A recess was taken.)

1          THE VIDEOGRAPHER: We are back on record.
2      It is 2:12.
3  **QUESTIONS BY MR. GOMEZ:**
4  Q   Okay.  Mr. Campbell, so we were talking about
5      Representative 771, which is on page 437.  And at
6      this point, at least, we don't know who that person
7      is, correct?
8  A   **Correct.**
9  Q   Okay.  If we can now move to SAC435, still in
10     Exhibit 2.  And we're almost done with this one.
11         If you can go almost to the top of the
12     page of the right column, and start coming down
13     until you actually see something typed.  And the
14     date of it is 02/20/2015.  And it says something
15     like CIS, phone number ending in 4347, change from
16     POE to cell auto dial.
17 A   **Yes.**
18 Q   Okay.  Tell me, please.  What does that line mean?
19 A   **It appears to be an update from the CIS database**
20     **for phone number -- for that phone number, changing**
21     **it from a place of employment phone number to a**
22     **cell auto dial.**
23 Q   Now, go back.  What did you call that a placement
24     of what?
25 A   **POE.**

Page 141

1 Q   Yeah.  What is that?

2 A   **Place of employment.**

3 Q   Oh.  Place of employment.

4         Now, by looking at this, the fact that

5 it's a CIS change, does that mean that NSI made

6 that change, or that you guys made the change, SAC?

7 A   **My assumption would be that we received an update,**

8 **so NSI would have made the update.**

9 Q   Because regarding updates, like the ones we're

10 seeing there, I don't see, or at least your notes

11 don't reflect the conversation.  So it doesn't seem

12 like you would have gotten a new phone number from

13 the consumer, whether it was Ms. Newsome, or Ms.

14 McCaskill, correct?

15 A   **Repeat that again.**

16 Q   Yes.  I'm looking at your logs.  These are your

17 call logs, correct?

18 A   **Yes.**

19 Q   I don't see any contact, you know, in that entire

20 page reflecting change of address, or change of

21 phone number, correct?

22 A   **Correct.**

23 Q   Therefore, SAC did not change this number from a

24 place of employment to cell auto dial.

25 A   **Correct.**

Page 142

1 Q   Regarding the phone number that we're in question,

2 this 6140, throughout the history that we are

3 almost done with, is it a fair statement that SAC

4 never got express consent from Ms. Newsome, or Ms.

5 McCaskill to call this number?

6         MS. SIMONETTI:  Calls for a legal

7 conclusion.

8 **QUESTIONS BY MR. GOMEZ:**

9 Q   Go ahead and answer.

10 A   **We obtained the consent via CIS through in Navient**

11 **Solutions.**

12 Q   And that's what I wanted to make sure.  The

13 consent, the express consent, that you believe you

14 have in this account, regarding the 6140, never

15 came from Ms. McCaskill, or Ms. Newsome, correct?

16 Directly to SAC.  And I'm only talking SAC.

17 A   **We did not physically talk to them and obtain a**

18 **consent.**

19 Q   Okay.  Within this same page right here, 435, when

20 you go down and you find the next gap in the right

21 column, which is just below the middle line, it is

22 February 2nd, 2015.  So, literally, 30 days after

23 we had the Representative 771 assigned to the case.

24 On that date we have account assigned to 615, on

25 February 1st, 2015.  Do you see that?

Page 143

1 A   **Yes.**

2 Q   Do you believe that that means that the account is

3 now assigned to Representative 615?

4 A   **My assumption is that is the case.**

5 Q   Okay.  Do you know who Representative 615 is?

6 A   **No.**

7 Q   And in preparation for today's deposition, clearly,

8 you did not talk to Representative 615 to see what

9 they did when it was assigned to them?

10 A   **No.**

11 Q   Obtaining the identity of Representative 615 will

12 be a fairly easy, I guess, procedure to look up on

13 your system, who Representative 615 is?

14 A   **Yes.**

15 Q   In preparation for today's deposition, outside of

16 your attorneys, did you communicate with anyone

17 else in your company, or in Navient Solutions, to

18 prepare for this deposition?

19 A   **Restate that, please.**

20 Q   Outside of your lawyers, whether they're present,

21 or any lawyer, did you communicate with anyone else

22 regarding preparation for this deposition?

23 A   **Yes.**

24 Q   Who would that be?

25 A   **My manager pulled those letters.**

Page 144

1 Q   Okay.  And I know you told me his name.  Robert

2 Tucker?

3 A   **Yes.**

4 Q   Outside of Robert Tucker, did you talk to anyone

5 else?

6 A   **I don't believe so.**

7 Q   In the case where you know that individual

8 representatives are assigned to an account like in

9 this one, is there any reason why you wouldn't

10 contact these representatives to see what their

11 experience was with this account, or what they did?

12 A   **Restate that.**

13 Q   Is there any reason why you wouldn't contact

14 Representative 615, or Representative 771, and say

15 tell me what you did in this account so I know when

16 I go to this deposition?

17 A   **On average, they have about 1700 accounts assigned**

18 **to them.  They would have no idea.**

19 Q   Okay.  So you just assume that that's why you

20 didn't even reach out to them to ask them about

21 this, correct, about this specific account?

22 A   **I felt no need to.**

23 Q   Okay.  If we can jump to page 433.  And about the

24 middle of the page on the right column, you're

25 going to start seeing some gaps.  And the first one

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 40 of 86 PageID 1218
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 145

1  begins answering machine.  Do you see that?  That
2  would occur April 8, 2015.  It's calling a 3672
3  number.  Do you see that one?
4 A  April 8th.
5 Q  April 8th, '15.  So it says 15/04/08.
6 A  What time?
7 Q  12:48 p.m.
8 A  Okay.
9 Q  That seems to be dialing a 772-380-3672.  And it
10 says answering machine, ACCRREL.  Do you know what
11 that means?
12 A  I do not.
13 Q  Okay.  Underneath it, it dials a different number,
14 that ends in 5107.  It says no answer, ACCRREL,
15 wireless not available.  Do you see that one?
16 A  Yes.
17 Q  What does that mean?
18 A  Yeah, I don't know.
19 Q  Two lines below it you have a different phone
20 number, an 813 number, 390-5454.  Once again, it
21 says, wrong number, ACCR borrower, wireless.  What
22 does that mean?
23 A  I don't know.
24 Q  Three lines below it, there's another brand new
25 number that says -- ends in 3914, and it says

Page 146

1  disconnected.  Do you see that?
2 A  Yes.
3 Q  And two lines below it, there is a number that ends
4  in 8617, voicemail box is full, BORR voice message
5  -- or VM.  What does that mean?
6 A  Voicemail box is full, borrower voicemail.  So it's
7  a release that.
8 Q  Let me ask you.  That's five brand new numbers.
9  Where do those numbers come from?
10 A  They could be various different places.
11 Q  Okay.  Like, of course, the consumer giving to you.
12  But how else would you get those numbers?
13 A  From the guarantor.
14 Q  From the guarantor, okay.  Would there be a way for
15  me to know that these numbers were provided by the
16  guarantor?
17 A  I'm not certain.
18 Q  Okay.  They don't seem to be coming from CIS,
19  based on the previous entry that we noted how CIS
20  was updated.  Do you agree with that?
21 A  Yes.
22 Q  Could these numbers have been part of a skip trace?
23 A  They could.
24 Q  Do you agree that a skip trace number is not
25  express consent to be called by an auto dialer?

Page 147

1      MS. SIMONETTI: Calls for a legal
2  conclusion.  Go ahead.
3 A  Restate that.
4  QUESTIONS BY MR. GOMEZ:
5 Q  Do you agree that if you get a phone number from a
6  skip trace, through a third company or whatever,
7  that does not give you express consent to call that
8  number with an auto dialer?
9      MS. SIMONETTI: Same objection.  Go ahead
10  and answer.
11 A  Yes.
12  QUESTIONS BY MR. GOMEZ:
13 Q  Let's go to page 432.
14 A  State that again.
15 Q  SAC432.  If you flip to -- we're almost done with
16  this one.  If you look from the bottom on the first
17  gap on the right, it seems to be that, on May 2nd,
18  2015, this account is now assigned to
19  Representative 664.  Would you call them
20  representative, or what would you call them?
21  Counselor?
22 A  Counselor.
23 Q  Counselor.  664.
24      Is it fair to say that you do not know who
25  Counselor 664 is?

Page 148

1 A  Correct.
2 Q  And you don't know what manual attempts, or what
3  they did, regarding this account?
4 A  I do not.
5 Q  Right on top of that line it says, "Account
6  reassigned to specialist from pull 442."  What does
7  that mean?
8 A  That, I don't know.
9 Q  If I tell you that something is -- that an account
10  is going to a specialist, who is the specialist
11  within SAC?
12 A  They're all the same.
13 Q  So the term "counselor 664," or "specialist from
14  pool 442," I'm trying to differentiate how is that
15  different?  How are the positions different or
16  duties different?
17 A  I don't even recall what the -- why it states
18  specialist.  I can't answer that.
19 Q  Are you aware whether Maretta Newsome ever
20  responded to any of these emails that SAC sent?
21 A  I'm not aware of any response.
22 Q  Okay.  If a response -- I see that, for example,
23  throughout these notes you sent, I guess, letters,
24  the ones you provided, to three emails.  Do you
25  agree with that?  It seems to be a Verizon address,

Page 149

1     and Live SB College address, and a Gmail address.
2   **A   Yeah. It appears that way, yes.**
3   Q   If someone replies to those emails, explain to me
4     that process. Who does it go to?
5   **A   It depends on what the response is. I believe**
6     **there could be multiple responses.**
7   Q   So it depends on what department is sending the
8     email?
9   **A   It would determine what was along -- potentially**
10    **along with the email.**
11  Q   Did you actually go back to the guarantor and
12    review this loan, regarding any request for
13    forbearances, or anything like that, within this
14    account?
15  **A   They wouldn't request forbearance through us.**
16  Q   Correct. They would have requested through the
17    guarantors, correct, through USA Funds?
18  **A   No.**
19  Q   Would they have to request that through Navient
20    Solutions?
21  **A   The servicers.**
22  Q   Okay. So you have no way of knowing, if throughout
23    this time, she ever requested a forbearance, or
24    requested a deferment, you have no way of knowing
25    that?

Page 150

1   **A   She would have requested it through the servicer.**
2   Q   Okay. And the servicer should have put it up in
3     his notes?
4   **A   This isn't the servicer's system of record.**
5   Q   Well, if I understand you correctly, this is the
6     record from the guarantors.
7   **A   Correct.**
8   Q   But this is USA Funds' records, correct?
9   **A   Correct.**
10  Q   If I went to look at USA Funds' database where this
11    is included --
12  **A   Yeah.**
13  Q   -- would it have both all your attempts, and
14    Navient Solutions' attempts, in the same list?
15  **A   No.**
16  Q   Would it have windows where it goes SAC, and then I
17    click a different window and it goes Navient
18    Solutions?
19  **A   No.**
20  Q   Navient Solutions makes and inputs data into the
21    guarantor's account, correct? It's just completely
22    different than this one?
23  **A   Rephrase. You asked me two questions.**
24  Q   Yeah. And what I'm trying to figure out is this:
25    I want to be now, for this question, in USA Funds'

Page 151

1     database. Okay? Literally looking at this
2     account, are you able to see what NSI is putting
3     into the account? Their attempts? Their request
4     for forbearances? Things like that?
5   **A   No.**
6   Q   You could not see that?
7   **A   No.**
8   Q   Can they see your attempts?
9   **A   Define. Who is "they"?**
10  Q   NSI.
11  **A   No.**
12  Q   So the guarantor can see both of what each one of
13    them is doing, but you guys don't really see what
14    each other are doing.
15  **A   No.**
16  Q   As we sit here today, do you have any idea what the
17    balance is on these loans for Ms. Maretta Newsome?
18  **A   I don't know the balance.**
19  Q   We talked about when an account is assigned to you,
20    you immediately go through the CIS for the share
21    data to determine if it's a landline, or if it's a
22    cell phone for TCPA regulation, correct?
23  **A   Correct.**
24  Q   Do you have written policies regarding what you can
25    do in land lines as opposed to what you can do on

Page 152

1     cell phones?
2   **A   There are policies around that, yes.**
3   Q   Okay. And these are SAC's policies, or are they
4     policies that are SAC and Navient Solutions?
5   **A   SAC's policies.**
6   Q   And we can get those through your training
7     department, you stated.
8   **A   Yes.**
9   Q   Do you have any type of insurance coverage, meaning
10    SAC, do you guys have any insurance coverage that
11    will cover a TCPA type of lawsuit?
12  **A   Not that I'm aware of.**
13  Q   Outside of -- seems to be that Navient Solutions
14    and SAC share two databases, one the CIS, correct?
15  **A   Correct.**
16  Q   Two, the compliance department is able to see both
17    sides, correct?
18  **A   Refers to a database?**
19  Q   Yes.
20  **A   I don't know anything about a compliance database.**
21  Q   Well, you have a compliance department that you
22    share with NSI, correct?
23  **A   Yes.**
24  Q   You told me that you have a database specifically
25    dedicated to complaints from customers, correct?

Page 153

1   A   Correct.  Let me back up.  We keep a log.  I'm not
2       specifically -- I'm not sure if I stated
3       "database."
4   Q   Okay.
5   A   But we keep a log.
6   Q   You keep a log of complaints?
7   A   Yes.
8   Q   Does it have a name?  What do you call that?
9       Complaints log?  Or does it have a fancy name?
10  A   I don't recall.
11  Q   Who, if I wanted to get this complaint log, who
12      will have it?  Would it be your office, or legal
13      department, or who will have it?
14  A   My office would have it.
15  Q   Since you share the same compliance team, my
16      question is, I guess they can see your complaint
17      log and maybe their complaint log.
18  A   I guess I would assume so.
19  Q   Okay.  Anything else that you share with NIS, that
20      is relevant to what we're talking about now?
21      Phone calls, attempted contacts, contacts,
22      communications?  Any other database?
23  A   Not that I'm aware of.
24          MR. GOMEZ: Why don't we take a
25      five-minute break.

Page 154

1           THE VIDEOGRAPHER: Going off record.
2       It's 2:35.
3           (A recess was taken.)
4           THE VIDEOGRAPHER: We are back on record.
5       It's 2:42.
6   QUESTIONS BY MR. GOMEZ:
7   Q   Mr. Campbell, just to finish up, I'm going to go
8       through some conclusions and try to get your
9       opinion on them.
10          I guess Student Assistance Corp has
11      stipulated that 478 calls were made to the 6140
12      number, using an ATS.  Is that your understanding?
13  A   And definition of ATS?
14  Q   Well, an auto dialer, a predictive dialer, any type
15      of --
16          MS. SIMONETTI: I can make it easier.  It
17      was an agreement with counsel.  It's actually we've
18      agreed.  I don't know if you filed it.  But agreed.
19      I signed it.  I don't know if you have it.
20          MR. KERNEY: Yeah, I think there's a
21      provision of confidentiality.  You know, it
22      wouldn't be made public, unless --
23          MS. SIMONETTI: That's right.
24          MR. KERNEY: -- you required us prove it.
25          MS. SIMONETTI: So you're not got to file

Page 155

1       it at all, under seal or anything?
2           MR. GOMEZ: Well, the judge -- Judge
3       Covington doesn't love sealed.
4           MS. SIMONETTI: She doesn't love sealed
5       documents?
6           MR. GOMEZ: It will become -- if at a
7       trial, it will be will be introduced and stipulated
8       to.
9           MS. SIMONETTI: Okay.  That's fine.
10  QUESTIONS BY MR. GOMEZ:
11  Q   Okay.  So 478 calls using an auto dialer.  Now,
12      none of the phone calls made to the 6140 number
13      were for emergency purposes, correct?
14  A   Correct.
15  Q   The phone calls made to the 6140 number were made,
16      or originated, in the United States, correct?  Your
17      call centers are in the United States?
18  A   Correct.
19  Q   You stated that you received, what you believed to
20      be express consent, from NSI to call this 6140
21      number, correct?
22  A   Correct.
23  Q   You did not get that express consent directly,
24      meaning SAC did not directly get express consent
25      from either Ms. Newsome or Ms. McCaskill, correct?

Page 156

1           MS. SIMONETTI: I think you asked that
2       about two minutes ago.
3   QUESTIONS BY MR. GOMEZ:
4   Q   So the answer is still yes?
5   A   Still yes.
6   Q   Okay.  I think one of the first questions I asked,
7       and I just want to make sure, now that we went
8       through all of the logs, at all times SAC knew that
9       the 6140 number was a cell phone number?
10  A   Yes.
11  Q   When did SAC become aware that the phone number,
12      6140, ending in 6140, did not belong to Marietta
13      Newsome?
14          MS. SIMONETTI: That calls for a legal
15      conclusion as to who it belongs to.  Are you
16      asking --
17  QUESTIONS BY MR. GOMEZ:
18  Q   I'm asking when did you figure out that that phone
19      number did not belong to Marietta Newsome?
20          MR. SIMONETTI: But hang on.  He's not
21      asking you about the content of any conversation
22      with counsel.
23  QUESTIONS BY MR. GOMEZ:
24  Q   Correct.
25  A   Restate that.

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 43 of 86 PageID 1221
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

Page 157

1 Q   When did SAC become aware that the phone number,
2   ending in 6140, did not belong to Marietta Newsome?
3       MS. SIMONETTI: Same objection. Legal
4   conclusion as to who it belongs to. But -- and
5   aside from conversations with lawyers, can you
6   answer that?
7 A   Give me one second.
8       Not to go through these docs, but we
9   received a disconnect on the phone number.
10 QUESTIONS BY MR. GOMEZ:
11 Q   What does that mean, a disconnect?
12 A   The system identified called -- made the call, and
13   identified through the "phone system" (indicating
14   quotes), that the phone was disconnected,
15   automatically updated our system as being
16   disconnected and marked bad.
17 Q   So your system can identify if a network -- if
18   phone number has been disconnected through a
19   network, and automatically remove that phone
20   number?
21 A   It provides us -- our system provides us with a
22   system release, identifying the number as
23   disconnected.
24 Q   Okay. If the system identifies that number, does
25   it automatically put it into the bad number

Page 158

1   category?
2 A   It marks the number bad.
3 Q   Okay. Would that number be at any point, I guess,
4   re-revived to see maybe it's now back into service
5   again?
6 A   It could be attempted manually afterwards.
7 Q   Do you know if that happened in this case?
8 A   I don't know offhand.
9 Q   We briefly talked about the letter, or, I guess,
10   the email that you sent with like your introductory
11   email, which I guess we have marked as Plaintiff's
12   Exhibit 1.
13       In the complaint, we allege the plaintiff
14   -- well, that the defendant failed to send
15   plaintiff a 30-day validation notice within five
16   days of the initial communication. Do you know
17   what I'm talking about, regarding the 30-day
18   validation notice that is required by the FTCPA?
19 A   We're not collecting a debt.
20 Q   Okay. So it's fair to answer, you don't send a
21   letter because you believe you're not collecting a
22   debt?
23 A   Right. We're not debt collectors.
24 Q   You stated that with USA Funds you get paid at the
25   beginning through DAF, correct?

Page 159

1 A   Correct.
2 Q   With some of the other guarantor agencies, you
3   actually get paid once the account, you're able to
4   make the account through your counseling, or
5   through your communication efforts, to be
6   non-delinquent, correct?
7 A   We counsel. We make default prevention outreach to
8   counsel the borrowers, to help them become current.
9 Q   Correct. And, in some cases, upon you making that
10   account non-delinquent, you get paid that way,
11   correct?
12 A   We don't make the account non-delinquent.
13 Q   Well, the client will pay the account and become
14   non-delinquent, correct?
15       Well, you stated to me there's two ways
16   you get paid: Through DAF, which we've discussed
17   at length. The second way would be if you actually
18   get the account to be non-delinquent, which your
19   relationship with some of these guarantors, you
20   actually get paid for that, correct?
21 A   Correct.
22 Q   Let's briefly discuss those accounts. When that
23   happens, do you get an initial payment, and then
24   once the account becomes un-delinquent you get paid
25   again? How does that work?

Page 160

1 A   We receive a fee when the servicer updates NSLDS,
2   and then NSLDS updates the guarantor that the
3   account has been brought current.
4 Q   And at that point, SAC gets paid on that account,
5   correct?
6 A   Correct.
7 Q   If that account never becomes non-delinquent, does
8   SAC recover any money?
9 A   Recover?
10 Q   Or get paid for their efforts.
11 A   No.
12 Q   So there's no initial -- there's no initial
13   payment, or down payment, on the second four we're
14   talking about? Like you told me on DAF you get
15   paid upfront, no matter how long the case takes,
16   correct?
17 A   Correct.
18 Q   On the second option, which is making the account
19   non-delinquent, or helping, or counseling, for the
20   account to be non-delinquent, you don't get any
21   initial payment, the only way you get paid, as SAC
22   is, when the account becomes non-delinquent?
23 A   When the guarantor is updated through NSLDS that
24   the account has been brought current, once it had
25   been placed with us, we receive payment.

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 44 of 86 PageID 1222

McCaskill v. Navient Solutions, et al.
Kevin Campbell
December 22, 2015

Page 161

1 Q   Okay.  Is that payment based on the amount of the
2     loan, on the amount of the delinquency?  What is
3     that payment based on?
4 A   It's just a cure fee.
5 Q   So it's a standard fee for everything, or is it a
6     percentage of something?  What do you mean by cure
7     fee?
8 A   It is -- I'm trying to recall.  Pretty certain it's
9     just a standard fee.
10 Q   It's a standard fee, you think, no matter what the
11     data is, or what the delinquency amount is?
12 A   Let me rephrase that.  We receive a percent, a
13     basis point percent, based off the principal
14     balance of that guarantor's responsibility on the
15     government back loan.
16 Q   Okay.  You listed six companies.  How many of these
17     six do you actually have the second way of, I
18     guess, making a profit or collecting?
19 A   Three.
20 Q   Which ones are those?
21 A   MGA, Louisiana, and Oklahoma, or OCAP.
22 Q   Are the other three only paid through the DAF
23     system?
24 A   Yes.
25 Q   None of them share both ways, some accounts this,

Page 162

1     some accounts that, it's either this or that one?
2 A   No.
3 Q   For the three you told me, there's no DAF,
4     literally, your collection is upon the account
5     becoming non-delinquent?
6 A   Restate that.
7 Q   For the three companies, OCAP, MGA and LOSFA, you
8     don't have -- you don't get paid through DAF, you
9     get paid once the account becomes non-delinquent?
10 A   Correct.
11 Q   That the guarantor is notified that the account is
12     non-delinquent?
13 A   Correct.
14 Q   And even on those accounts you do not send a 30-day
15     validation notice, correct?
16 A   We're not debt collector, so no.
17 Q   The answer is, no, you do not?
18 A   No.
19 Q   Through the review of the records, you made phone
20     calls on back-to-back days to the 6041 number,
21     correct?
22 A   Correct.
23 Q   Lastly, you informed me, that there was, I guess,
24     an inbound call that came into SAC, and someone
25     thought they were calling Lowe's?  Is that correct?

Page 163

1 A   In review of a recording, I came across the
2     recording where we received an inbound call from
3     that number, and they stated, oh, I thought -- and
4     I thought they said Lowe's.  It was very hard to
5     understand, and hung up.
6 Q   Okay.  So that's the extent of that conversation,
7     there wasn't anymore discussion about the student
8     loans, nobody got into that?
9 A   No.
10     MR. GOMEZ: Okay.  I don't think I have
11 any questions.
12     Do you have any follow-up questions?
13     MS. SIMONETTI: No.
14     MR. GOMEZ: And would he like to read?
15     MS. SIMONETTI: Let's go off the record.
16     THE VIDEOGRAPHER: This concludes the
17 testimony.  It's now 2:58 p.m.
18     (Off the record.)
19     MS. SIMONETTI: Counsel and I have had
20 a conversation about the signing of the transcript.
21 The reporter will forward the original of the
22 transcript to my office, and I will then provide it
23 to the witness.  He will have seven days from the
24 receipt of the transcript to sign and provide it
25 back to me.  Do you want to keep custody of the

Page 164

1 original, or do you want us to?  I think we took
2 control of the other ones.
3     MR. GOMEZ: Since he's your witness, you
4 probably will keep possession of it.
5     MS. SIMONETTI: And then we'll retain
6 possession of the transcript.  And we will notify
7 you within that seven-day time period of any
8 changes to the transcript.
9     Okay.  We are done.
10     AND FURTHER DEPONENT SAITH NOT.
11
12
13
14     _____
15     KEVIN CAMPBELL
16
17
18
19
20
21
22
23
24
25

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 45 of 86 PageID 1223

McCaskill v. Navient Solutions, et al.
Kevin Campbell
December 22, 2015

Page 165

1   STATE OF INDIANA           )
                                ) SS:
2   COUNTY OF BOONE            )

3            CERTIFICATE OF COURT REPORTER

4            I, Karon A. Voloski Brown, the undersigned
    Court Reporter and Notary Public, in and for the County
5   of Boone, State of Indiana, at large, do hereby
    certify:

6
             That at the time and place described in this
7   transcript, the deponent, KEVIN CAMPBELL, presented
    himself before me for administration of an oath of
8   truthfulness, which oath I then administered;

9            That I then reported to the best of my
    ability in machine shorthand all of the words spoken by
10  all parties in attendance during the course of the
    ensuing proceedings, including objections, if any, made
11  by all counsel present;

12           That I later reduced my stenographic notes into
    the foregoing typewritten transcript form, which
13  typewritten transcript is a true record of the
    testimony given by this witness as stated above;

14
             I do further certify that I am a
15  disinterested person in this cause of action; that I am
    not a relative or attorney or employee of any of the
16  parties; that I am not a relative or an employee of such
    attorney or counsel; and that I am not financially
17  interested in this action.

18           IN WITNESS WHEREOF, I have affixed my
    Notarial Seal and subscribed my signature below this
19  4th day of January, 2016.

20

21

22

23                      Karon A. Voloski Brown
                        N O T A R Y   P U B L I C
24
    County of Residence:  Boone
25  My Commission Expires:  August 17, 2022

## $

**$800 (1)**
27:22

## A

**ability (7)**
46:11;50:11;118:3,
9;123:14;128:8;133:3
**able (23)**
15:3;16:23;27:19,
23;31:3,6;32:1;34:3;
35:5;82:3,17;85:20;
92:8,14;124:2,5;133:1;
135:16;138:19,22;
151:2;152:16;159:3
**above (3)**
9:9;124:17;127:21
**Absolutely (5)**
7:19;41:20;43:7;
49:13;88:20
**access (26)**
16:16,19;17:22;
20:15;30:18,23,24,25;
31:1;32:7,16;33:1;
34:7;35:2,9,21;47:18;
49:3;50:2,7;53:17;
76:5,10;93:10;123:20,
24
**accessed (1)**
108:2
**accomplished (1)**
120:11
**According (1)**
113:15
**account (148)**
12:7,8;15:23,25;
16:2,3,5,7,9,11,19,21;
17:1,3,10,17,21;20:14;
21:9,10,11,12;22:3;
25:4;27:20;29:18;
30:21;32:7,10,11,12,
17;34:22;35:18;36:19;
41:25;42:2,4,11,23;
43:5;48:12,18;50:16;
66:11,12;68:8,13;
69:12,16;70:19,20;
71:2,10;73:20;75:12;
81:2,5,8,11;82:11;
85:9,10;90:15;92:5,15,
19;99:1;100:20;
101:13;102:16;116:6,
7,23;117:3;119:8,14;
122:6,11,16,20,23;
123:8,10,13,14,15,17,
19,23,25;124:2,9,21,

24;125:2,5,18;126:6;
129:19;130:13;131:24;
132:21,22;133:18,25;
134:11,22;135:24;
136:15;137:6,19,24;
138:5,17;142:14,24;
143:2;144:8,11,15,21;
147:18;148:3,5,9;
149:14;150:21;151:2,
3,19;159:3,4,10,12,13,
18,24;160:3,4,7,18,20,
22,24;162:4,9,11
**accounts (12)**
18:20;24:10;34:17;
115:20;116:2,4,9;
144:17;159:22;161:25;
162:1,14
**ACCR (1)**
145:21
**ACCRREL (2)**
145:10,14
**accurate (3)**
43:12,16;122:18
**acronym (2)**
47:25;76:3
**acronyms (1)**
77:13
**across (1)**
163:1
**Act (4)**
114:1;118:13,14,22
**activated (1)**
76:1
**activities (1)**
107:19
**actual (10)**
46:19;47:25;59:25;
61:2;68:9;73:17,22;
87:20;109:10;119:4
**actually (44)**
6:16;14:17;23:11;
26:3;27:22;28:1;
29:10;31:4;32:23;
35:10;39:25;47:8,19;
49:4;50:23;53:21;
65:14;66:5;72:7;75:2;
76:5;87:19;89:8,16;
90:24;92:7;93:19;
98:5;100:2,3,16;
101:24;113:6;126:23;
128:4;134:13;135:25;
140:13;149:11;154:17;
159:3,17,20;161:17
**ad (1)**
117:13
**address (11)**
7:14;48:4,12,16;
52:18;107:4;132:18;

141:20;148:25;149:1,1
**addressed (2)**
54:3;60:11
**addresses (1)**
48:5
**advice (4)**
97:3,13;114:16;
115:7
**affiliate (4)**
47:19;49:15;82:12;
93:1
**affiliated (1)**
47:20
**affiliates (4)**
10:25;47:4,15;80:12
**affiliation (1)**
84:13
**affirm (1)**
4:22
**afterwards (1)**
158:6
**again (23)**
13:2;18:24;38:20;
50:20;57:16;60:14;
61:20;69:10;75:11;
76:25;80:3;88:17;
101:19;121:2;123:20,
23,25;129:11;141:15;
145:20;147:14;158:5;
159:25
**against (5)**
43:8;61:2;71:23;
72:1;82:12
**agencies (9)**
11:16,19;12:11,11;
14:14;25:24;28:21;
41:12;159:2
**agency (2)**
12:4;123:6
**agent (8)**
23:12;26:25;52:23;
94:13;128:3,4,15,19
**agents (5)**
21:1;26:18;50:1;
58:23;128:7
**ago (5)**
8:6;38:3;53:6;
109:18;156:2
**agree (7)**
69:15;73:25;105:17;
146:20,24;147:5;
148:25
**agreed (2)**
154:18,18
**agreement (18)**
11:9;56:13;70:7;
87:6;109:22;110:1,2;
112:7,8,11,12,14,15,

16,17,19,24;154:17
**ahead (8)**
23:4;94:3;97:23;
111:10;115:9;142:9;
147:2,9
**airport (1)**
64:25
**al (1)**
4:4
**allegation (2)**
111:3;113:24
**allege (3)**
52:25;61:21;158:13
**alleged (2)**
62:4;92:23
**alleging (1)**
83:7
**allocation (2)**
56:15,17
**allowed (2)**
6:4;26:14
**allows (1)**
91:19
**almost (7)**
57:1;65:2;116:23;
140:10,11;142:3;
147:15
**along (3)**
131:25;149:9,10
**always (9)**
10:11;45:25;53:11;
127:13
**amount (9)**
14:16;22:7;29:21;
106:3;113:10;134:4;
161:1,2,11
**Analyst (2)**
131:16,17
**analysts (2)**
131:8,9
**Anne (1)**
4:19
**annoying (1)**
109:2
**Annual (2)**
45:11;112:18
**Annually (1)**
45:12
**answered (3)**
72:7;102:11;128:17
**anticipate (1)**
62:20
**Antonio (1)**
45:1
**anymore (3)**
51:1,14;163:7
**apologize (4)**
18:24;42:19,22;

16,17,19,24;154:17
**addressed (2)**
54:13
**appear (8)**
67:23;78:17;96:1
**appearance (1)**
74:1
**appears (10)**
38:23;70:21;73:2;
77:7;79:19;102:14;
128:3;133:22;140:19;
149:2
**applies (2)**
108:21;114:13;
115:16
**apply (1)**
6:1
**approximately (4)**
4:8;8:6,25;90:1
**approximation (1)**
58:3
**April (4)**
9:2;145:2,4,5
**area (4)**
64:16,16,17;65:10
**around (3)**
46:6;128:17;152:2
**Arts (1)**
120:14
**aside (3)**
86:18;94:2;157:5
**askew (1)**
100:3
**assign (2)**
134:6,15
**assigned (32)**
16:19;17:1,21;
20:14;32:12;42:1;
54:24;79:24;83:6;
124:7,9,11;133:18,22,
25;134:9,18,22;
135:24;137:4,7;138:3,
5,18;142:23,24;143:3,
9;144:8,17;147:18;
151:19
**assignments (2)**
131:24;138:13
**Assistance (49)**
5:12;7:24;8:13,19,
20;9:7;11:13;12:19;
19:24;26:1,4;29:9;
38:5,7,21;39:1,8,13,20,
22,23;40:1,15,18,20;
45:14;49:14;52:19;
56:3,14,15,19;59:24;
61:21;67:2;71:24;
72:20;75:13,23;79:22,
24;89:8;91:8;94:11,14,
18;116:12;131:24;
154:10

**assume (18)**
20:1;29:6;43:11,14,
14;47:15;55:11;56:9;
74:24;75:4;77:15;
82:6;110:9;121:24;
130:17;136:22;144:19;
153:18
**assuming (12)**
23:25;24:22;27:3;
37:25;52:11;62:3;
96:9;108:15;120:13;
129:18;136:21,22
**assumption (10)**
20:3;69:5;73:13;
74:24;78:7;84:11;
124:19;133:24;141:7;
143:4
**assurance (1)**
133:6
**ATDS (1)**
86:18
**ATS (2)**
154:12,13
**attempt (10)**
20:5;88:14,17;
113:19;115:20;116:1,
8;119:15,16;127:3
**attempted (4)**
88:20;120:17;
153:21;158:6
**Attempting (2)**
88:2,3
**attempts (35)**
12:2;14:20;21:4,5,7,
8,13,14,18,20;23:7;
31:5;33:19,25;34:4,23;
35:19;48:8,8,10;57:21,
22;68:8;87:15;88:23;
89:5;92:2,4,5;138:10;
148:2;150:13,14;
151:3,8
**attend (1)**
96:13
**attended (1)**
44:25
**attends (4)**
45:14,20;95:20;97:5
**attorney (1)**
66:21
**attorneys (2)**
66:23;143:16
**Authority (1)**
13:16
**auto (11)**
82:8;83:20;86:22;
87:7;140:16,22;
141:24;146:25;147:8;
154:14;155:11

**automated (11)**
78:8;79:19;80:3,4,5,
17;82:2;83:17;99:5,7;
130:17
**automatic (1)**
136:1
**automatically (11)**
20:19;28:4;52:4,6;
81:6;90:12,13;132:3;
157:15,19,25
**available (5)**
12:5;27:7,8;104:25;
145:15
**average (4)**
57:19;20;59:1;
144:17
**Aversion (5)**
15:1;68:23;69:2,4;
70:9
**aware (26)**
6:7;14:3;42:3;44:8;
61:1,8,10;62:7;83:8;
86:4;95:6;111:3;
114:2;115:15;116:22;
118:16;125:14,22;
126:20;133:5;148:19,
21;152:12;153:23;
156:11;157:1

## B

**Bachelor (2)**
120:13,14
**back (35)**
10:15;18:24;23:12;
30:13;33:14;40:9;
45:18;47:1;52:6;
59:20;82:9,13;83:15;
89:19;90:19;92:9;
98:11;99:10,11;100:2;
123:15,17;124:10;
128:23;133:4;138:17;
139:11;140:1,23;
149:11;153:1;154:4;
158:4;161:15;163:25
**background (1)**
7:8
**back-to-back (1)**
162:20
**bad (14)**
50:22,23;51:3,4,10,
15,20;54:11,12;91:20;
97:24;157:16,25;158:2
**balance (5)**
124:21;125:1;
151:17,18;161:14
**based (15)**
14:16,19;15:2,13;

19:4;74:21;100:13;
113:5;115:6;122:17;
134:7;146:19;161:1,3,
13
**basic (1)**
91:25
**basis (1)**
161:13
**became (1)**
135:24
**become (12)**
42:3;69:16;71:8;
80:20,25;83:7;122:12;
155:6;156:11;157:1;
159:8,13
**becomes (7)**
51:15;68:14;122:11;
159:24;160:7,22;162:9
**becoming (2)**
113:5;162:5
**begin (6)**
17:4,23;20:15,23;
21:3;32:13;43:3
**beginning (4)**
110:11;116:24;
120:8;158:25
**begins (3)**
71:7;135:3;145:1
**behalf (5)**
11:15,19;25:24;
26:15;115:22
**behind (3)**
27:22;116:17,19
**belong (4)**
105:2;156:12,19;
157:2
**belonged (1)**
66:12
**belongs (3)**
105:2;156:15;157:4
**below (7)**
79:21;100:4;121:14;
142:21;145:19,24;
146:3
**best (4)**
69:15;101:1,6,9
**Better (4)**
60:7,12,21;70:5
**big (5)**
41:12;63:2;64:4,13,
23
**billed (6)**
121:13,15,21;
124:18,19,20
**bit (9)**
5:17;7:7;41:16;
44:14;59:9;90:4;
109:18;120:7;126:2

**BORR (2)**
102:4;146:4
**BORRF-U (1)**
102:2
**BORRMSG (1)**
100:6
**borrower (17)**
15:13,14,15,18;27:7;
68:24;99:14,25;100:7;
118:10;122:1,3,4;
124:21;137:9;145:21;
146:6
**borrowers (7)**
11:20,21;12:2;
36:14;42:5;73:2;159:8
**borrower's (1)**
54:3
**both (10)**
37:1;58:21;66:2,5,6;
87:21;150:13;151:12;
152:16;161:25
**bottom (18)**
67:14;75:11;76:24;
77:3;78:6;79:13;84:8;
85:23;99:12,13;100:1;
101:18;121:2,20;
127:19;129:10;133:16;
147:16
**box (12)**
51:7,8,8,11,15,19;
52:12;91:12,18,19;
146:4,6
**brand (3)**
16:2;145:24;146:8
**break (6)**
59:11,15,16;98:5;
139:20;153:25
**Breaking (1)**
62:18
**briefly (5)**
59:25;91:11;120:7;
158:9;159:22
**bring (2)**
27:19;80:22
**brought (3)**
112:6;160:3,24
**budget (3)**
56:16,18,20
**building (19)**
63:2,3,4,9,12,18,21,
25;64:1,4,7,11,12,13,
21;65:5,15,21,23
**buildings (3)**
64:15;65:9,11
**bunch (1)**
55:24
**Bureau (4)**
60:8,12,22,25

**business (7)**
11:14;12:16;60:8,12,
21;110:23;120:19
**button (1)**
128:6

## C

**call (84)**
8:21;20:8;25:24;
26:16,19;28:3,4,5;
30:6;31:15;33:25;
35:13;41:13;47:3;
48:8;50:18,20;52:15,
17;54:9;58:5,6,8,15,20,
25;71:22;76:7,19;84:1;
85:25;86:11;88:3,14,
20;89:22,23;90:2,10;
93:15,23,24;94:12;
102:6,6,9,10,12,12;
104:2,8,14,21;105:10,
16,21,24;106:4;109:1,
8,8,15;111:10;113:7;
118:5,6,8;119:13,16;
136:14;139:5,6;
140:23;141:17;142:5;
147:7,19,20;153:8;
155:17,20;157:12;
162:24;163:2
**called (15)**
14:24;58:21;60:25;
87:10;88:7,12;89:20,
21;95:8;106:15;109:9;
110:7;137:1;146:25;
157:12
**caller (1)**
129:1
**calling (27)**
25:11;26:19;52:14;
54:8;87:25;88:7;
92:24;93:6,14,17;94:1,
7,8,9;97:22;102:19;
104:12,17;105:7;
111:4,6,20;117:2;
119:23,24;145:2;
162:25
**calls (94)**
12:21;14:19;17:6,10,
12;20:9,10,18,24;21:3,
6;22:17;23:17,22;
24:11,13,16,18;25:1,3,
9,17,17,20;26:12,23;
29:15;35:23,25;36:3,5,
18,22;37:1,2,6,7;51:1,
14;52:22,25;53:1;
57:13,19;58:19;60:2,2;
61:17;76:16;86:20,22,
25;87:15,22;88:1,19;

89:3,4;9;90:6,18,19,20;
91:13,14,17;92:16;
93:22;97:21;102:17;
103:12,13,15,18;
106:20,21;109:1,5;
117:11,15;118:16;
119:8;127:8,12;
137:17;142:6;147:1;
153:21;154:11;155:11,
12,15;156:14;162:20

**CAM (4)**
75:19,21,24;79:23

**came (7)**
24:17;58:20,22;
82:13;142:15;162:24;
163:1

**campaign (2)**
32:16;71:8

**campaigns (1)**
22:24

**Campbell (12)**
4:2;5:1,8;7:8;30:16;
59:23;98:14;104:25;
105:3;140:4;154:7;
164:15

**campus (2)**
62:25;64:23

**campuses (1)**
64:15

**can (83)**
5:21;6:15;7:2,14,17;
10:12,15,17,19;16:20;
18:10,14;22:2;25:15;
26:13;27:1;28:2;
33:22;34:23;35:10;
38:13;40:12;44:17,20;
49:4;53:14,15,19,20;
58:4;60:13;62:10;67:5,
6;72:11,15;73:4;74:9,
12;75:8,9;76:23;77:4;
78:14;84:18;96:15;
98:14;99:24;101:16;
102:11;109:19;111:25;
114:17,21;117:21;
120:4,24,25;121:9,20;
124:12,12,14;128:10,
11,12;132:11,15;
134:3;138:24;139:11;
140:9,11;144:23;
151:8,12,24,25;152:6;
153:16;154:16;157:5,
17

**cap (5)**
24:15;36:2;119:7,
11;127:11

**capacity (5)**
9:4;106:20;107:22;
108:11,22

**Case (43)**
4:5;5:10,22,24,25;
18:3;30:17;34:3;
58:19;59:9,25;68:19;
69:3;70:25;76:15;
79:24;81:25;84:19,20;
86:23;92:23;94:6;
104:3;113:14;120:9;
123:10,20;132:23;
134:6;135:21;136:3,
11;137:4,5;138:2,3,15,
18;142:23;143:4;
144:7;158:7;160:15

**cases (5)**
14:24;36:25;124:4,
4;159:9

**Castle (1)**
95:8

**Castleton (5)**
58:18;59:6;66:9,10;
95:9

**category (1)**
158:1

**caught (1)**
70:23

**caution (1)**
115:5

**cease (1)**
109:4

**cell (26)**
43:20;44:1,4;46:9;
50:17;77:6,8;78:7;
79:19;80:11;82:8,13;
83:20;86:5,9;88:21;
104:14,21;105:7,21;
140:16,22;141:24;
151:22;152:1;156:9

**center (3)**
58:20,25;59:6

**centers (4)**
58:6,9,15;155:17

**CEO (1)**
9:8

**certain (7)**
18:4;58:22;70:14;
117:14;139:9;146:17;
161:8

**CFPB (1)**
60:25

**change (20)**
49:3,4,21;50:2,7,11;
52:2;77:6;82:8;98:6;
112:21;134:16;139:21;
140:15;141:5,6,6,20,
20,23

**changed (5)**
83:20;112:18,20;
127:13,14

**changes (4)**
82:14;91:4;134:19;
164:8

**changing (1)**
140:20

**charge (10)**
23:24;54:18;57:7;
90:19;95:14;107:7;
131:4,18,23;134:11

**Chase (1)**
8:18

**Check (8)**
51:7,8,11,19;52:12;
91:12,18,19

**checking (1)**
95:14

**checks (1)**
51:15

**choosing (1)**
127:9

**chronologically (1)**
75:9

**circumstances (1)**
6:5

**CIS (34)**
47:4,21,23;48:1,8,
13,21,24;49:3,5,9,10,
12,21;50:2,8;52:2,3;
55:15;79:19;80:13;
82:5;83:13;99:4;
130:19,22;140:15,19;
141:5;142:10;146:18,
19;151:20;152:14

**city (3)**
7:9,14,19

**claim (1)**
118:12

**clarity (1)**
107:12

**classes (1)**
98:2

**clear (3)**
78:10;86:17;115:6

**clearly (9)**
34:16;85:24;103:6;
104:4,17;105:1;
116:20,21;143:7

**click (1)**
150:17

**client (1)**
159:13

**close (1)**
122:11

**closer (1)**
65:2

**closes (1)**
123:17

**code (1)**

51:4

**codes (1)**
139:2

**collect (9)**
11:22;14:18;20:5;
35:19;42:2;69:25;
114:11,12;115:19

**collecting (4)**
115:17;158:19,21;
161:18

**Collection (5)**
114:1;118:12,14,21;
162:4

**collections (1)**
14:16

**collector (2)**
118:25;162:16

**collectors (3)**
20:7;118:23;158:23

**college (2)**
120:12;149:1

**column (10)**
100:17;101:20;
121:3,19;127:20;
129:12;133:17;140:12;
142:21;144:24

**coming (6)**
43:11;84:1,4;
111:22;140:12;146:18

**commands (1)**
128:13

**communicate (11)**
31:9;33:10,11;47:1;
110:25;116:1,11;
118:5,7;143:16,21

**communicated (1)**
34:17

**communicating (1)**
58:8

**communication (5)**
48:10;57:17;127:4;
158:16;159:5

**communications (10)**
25:12;31:6,14;
46:16;66:20;113:19;
115:7,20;116:8;153:22

**companies (25)**
10:13,25;11:2;13:3;
14:6,7,18;16:6;26:3;
28:17;31:7,10,13,23;
32:5;34:16;41:4,5,17,
21,22;47:9,13;161:16;
162:7

**company (61)**
8:17;9:13;11:3;14:1,
2,3,8;26:10;27:14;
30:23;32:3,4,22,22,25;
33:4,12,14,22;35:3,5;

36:3,22;37:8,13;38:10;
39:10,15,16,19,20,23;
40:21,25;41:4,10,11,
18;43:23;44:19;46:12,
16,17,18,20,24,24;
47:2,7;49:15;82:20,23;
83:4,8,12,12;110:3;
118:6;126:11;143:17;
147:6

**compensated (5)**
14:21;68:12;112:21;
113:2,4

**compensation (1)**
113:1

**complain (2)**
54:7;90:18

**complaining (3)**
52:16;53:20;111:18

**complains (3)**
60:1;91:10,16

**complaint (17)**
52:20,21,22,24;53:4,
6,17;54:1,15,15;57:7;
71:23;72:2;153:11,16,
17;158:13

**complaints (18)**
53:3,8,22,24;54:18,
23;57:12,16;60:12,20;
91:3;95:16;96:10;
111:1,9;152:25;153:6,
9

**complete (1)**
16:16

**completed (4)**
99:15,25;100:6,7

**completely (6)**
35:1;61:8;65:17;
116:5;127:8;150:21

**compliance (47)**
54:4;55:4,5,8,17;
56:1,4,5,6,7,12,23;
57:11;90:22,23;91:3;
93:2;94:22,23,24;95:1,
4,10,13,15,17,22,25;
96:2,8,18,21;97:2,2,5,
11;107:8;109:11;
110:25;111:2,14;
133:7,11;152:16,20,
21;153:15

**compliant (1)**
57:8

**computer (1)**
27:3

**concern (4)**
35:22;36:2,6;37:5

**concludes (1)**
163:16

**conclusion (6)**

25:11;94:1;142:7;
147:2;156:15;157:4
**conclusions (1)**
154:8
**confident (2)**
70:11,14
**confidentiality (1)**
154:21
**confirm (1)**
108:4
**confirmed (1)**
87:3
**connect (1)**
28:9
**connected (1)**
76:7
**connection (2)**
28:8;96:14
**connects (1)**
26:25
**consent (31)**
44:7;46:10,15,25;
47:5,20;49:9,11;51:20;
82:13,15,15;83:22,25;
84:21,25;85:25;86:2;
93:24;94:11,16;142:4,
10,13,13,18;146:25;
147:7;155:20,23,24
**consider (2)**
25:19;52:16
**Consumer (7)**
60:24;61:16;118:12,
14,21;141:13;146:11
**contact (8)**
119:3,4;130:1,4;
136:2;141:19;144:10,
13
**contacting (1)**
116:16
**contacts (7)**
22:2;29:21;90:7;
92:6,10;153:21,21
**contained (1)**
48:1
**content (1)**
156:21
**context (1)**
22:12
**continue (12)**
30:16;52:15,17,25;
54:9;69:19;76:22;
87:11;93:15;101:16;
120:23;134:24
**continues (1)**
134:23
**contract (16)**
11:20;14:13;15:5;
36:6,9;37:9,11;56:11,

14;80:23,24;110:1,2;
112:8;126:25;127:2
**contracted (3)**
36:16;115:24;
125:10
**contractor (1)**
43:24
**contractual (5)**
11:9;20:25;29:19,
20;34:13
**control (5)**
21:18,20;80:4;82:4;
164:2
**controlling (1)**
131:5
**conversation (12)**
60:17;96:22,23;
97:11;112:3,6;128:18;
129:5;141:11;156:21;
163:6,20
**conversations (3)**
60:15;89:13;157:5
**corner (1)**
67:12
**Corp (51)**
7:24;8:13,19,20;9:7,
12;12:19;19:24;26:2,4;
29:7,9;37:19;38:5,7,
22;39:1,5,6,8,13,15,20,
22,23;40:1,15,18,20,
23;41:1,23;49:14;
52:19;56:3,14,15,19;
59:24;61:21;71:24;
75:13,23;79:22,25;
89:8;94:14,18;116:12;
131:24;154:10
**corporate (3)**
5:12;8:10;63:7
**Corporation (7)**
11:14;14:8;32:22;
45:14;72:20;94:11;
116:13
**Corporation's (1)**
5:12
**Corp's (1)**
67:2
**corrected (3)**
94:19;132:11,15
**correctly (1)**
150:5
**correspond (1)**
19:18
**correspondence (3)**
18:6,12;72:10
**Counsel (29)**
4:11,20;6:3,6;11:21,
21;12:2,20;27:7;42:3;
44:18;60:11;69:20;

70:1,3,4;91:8;92:7;
94:2;96:14;113:14;
115:7,7;116:18;
154:17;156:22;159:7,
8;163:19
**counseling (11)**
11:24;30:18;32:13;
43:4;48:17;71:8;
113:19;125:19;126:7;
159:4;160:19
**counselor (18)**
27:2,6,23;48:20;
50:25;51:14;52:12;
54:9;76:4,14,107:22;
117:13;128:19;147:21,
22,23,25;148:13
**Counselors (26)**
26:21,22,22;27:17;
31:3;32:15;33:16;
34:21;48:17,23;49:20,
25;50:1;58:7,23;89:17;
90:11;91:9,22;109:3;
128:1,7;132:18;133:8;
137:25;138:1
**counselor's (1)**
133:24
**couple (1)**
131:7
**course (10)**
6:6;16:8;24:25;
37:21;57:19,21;96:9;
99:3;116:15;146:11
**courses (3)**
44:10,17,24
**Court (4)**
4:4,21;5:24;61:5
**cover (2)**
111:9;152:11
**coverage (2)**
152:9,10
**covered (1)**
111:8
**Covington (1)**
155:3
**create (1)**
37:25
**created (1)**
39:12
**Credit (2)**
63:15,16
**CSI (2)**
94:15,16
**cure (1)**
15:11,13,14;161:4,6
**cures (1)**
15:16
**current (5)**
27:20;35:15;159:8;

160:3,24
**currently (1)**
7:23
**custody (1)**
163:25
**customer (7)**
35:11;76:15;92:10;
127:21,24;128:13;
129:4
**customers (2)**
31:14;152:25

## D

**DAF (20)**
14:24;68:23;69:1,2;
113:7,8,10;121:13,14,
21;122:6,8;124:17,19;
158:25;159:16;160:14;
161:22;162:3,8
**data (26)**
16:23;31:4;33:1,16;
34:22;35:11,12,13,14;
46:12;47:8;48:2;68:9;
78:10;85:9,11,20;92:1,
21;124:6,7;128:2;
131:4;150:20;151:21;
161:11
**database (39)**
31:16,17;33:17,21;
47:3,19,21;49:12,16;
50:3;52:2;53:4,7,17;
54:2,15,18,23;57:7,8;
76:9;79:10;80:14;
91:2;98:19;123:3,4;
131:21;132:5,14,23;
140:19;150:10;151:1;
152:18,20,24;153:3,22
**databases (1)**
152:14
**date (28)**
15:3,17;19:10,17,18;
68:15;69:16;70:5,24;
71:8;73:4,5,11,12,15;
74:5;75:16;90:1;
99:22;101:23;121:6;
125:4;128:23;129:12,
14;139:3;140:14;
142:24
**dated (1)**
73:19
**Day (46)**
18:15,15,17,21;21:9,
16,17,21;22:3,16,18;
23:17,22;24:11,13,16;
25:21,22;29:13;33:23,
25;36:3,5,18,23;37:6;
57:20;59:3,4;64:12;

74:4,10,10,17;75:2,6;
89:3,5;92:3,4;119:3,8,
14,16;127:4,8
**days (36)**
17:11;18:21;24:25;
25:5;37:12;48:20;
74:21,22,22,25;75:1;
81:5,7,7,10,11,19,21;
92:1;113:19;117:9;
126:10;137:10,12,23;
138:3,6,8,12,20;
139:12,15;142:22;
158:16;162:20;163:23
**deal (3)**
28:18;29:4;46:15
**deals (1)**
47:13
**debt (17)**
20:5,7;69:20,23,25,
25;114:1,11,12;
115:18,19;118:23,25;
158:19,22,23;162:16
**debts (1)**
11:22
**December (4)**
4:7;62:12;129:13,15
**decision (1)**
80:22
**dedicated (1)**
152:25
**deduct (1)**
62:10
**deducted (1)**
94:21
**default (30)**
11:15,18;15:1,5,7,
10;16:8;17:4,23;22:25;
30:18;34:14;36:20;
68:23;69:2,3;70:9;
81:4,14;107:19;
115:25;125:11,19;
126:7,15,17,18,23;
134:12;159:7
**Defendant (2)**
4:18;158:14
**defense (2)**
6:6;7:6
**deferment (2)**
27:15;149:24
**defers (1)**
46:23
**Define (4)**
46:17;47:3;55:23;
151:9
**definition (1)**
154:13
**deleting (1)**
132:8

**delinquency (8)**
15:16;70:2;74:25;
75:3;92:1;134:8;161:2,
11
**delinquent (26)**
12:8;15:15;16:2,8;
17:3,21;35:6,15;42:14,
24;68:14;69:13;71:7;
81:5,11,19,21;115:20;
116:2,3,9;117:8;
122:10,12;125:18;
126:11
**demographic (12)**
43:15;48:2,3;49:18;
76:17,18;85:8,11;
91:24;92:1,21;130:9
**Department (33)**
12:4;14:25;15:4,9;
27:10,13;31:15,21;
33:7;36:9;37:15;
63:13;81:3,13;95:14,
15;103:15;107:8;
109:12,13,20;110:9;
112:13;113:15;117:25;
120:1;125:17,23;
149:7;152:7,16,21;
153:13
**departments (1)**
63:17
**dependent (1)**
113:10
**depends (2)**
149:5,7
**DEPONENT (1)**
164:10
**deposition (23)**
4:2;5:11,15,23;7:25;
8:3,7,8;66:22;71:14;
89:12;102:23;110:11;
120:3;124:23;128:22;
135:19,23;143:7,15,18,
22;144:16
**depositions (1)**
7:5
**describe (1)**
66:16
**described (5)**
34:18;58:12;73:9;
119:22;120:2
**descriptive (1)**
109:24
**detail (1)**
54:16
**details (1)**
96:6
**determine (10)**
44:20;46:9;100:13;
101:3;102:11;139:5,

11,14;149:9;151:21
**determining (1)**
98:22
**dial (10)**
82:8;83:20;86:22;
87:7;103:4;135:8,9;
140:16,22;141:24
**dialer (17)**
21:19;24:5,6;58:11,
14;76:7;87:18;103:18;
128:1;132:4;134:23;
139:6;146:25;147:8;
154:14,14;155:11
**dialers (4)**
23:25;57:18;58:12;
76:20
**dialing (2)**
84:6;145:9
**dials (1)**
145:13
**different (33)**
22:11,13,21,23;23:1,
2;26:5;28:17,19,21;
30:25;31:2;37:14,14;
47:12;88:19;99:9,13,
21;100:15;104:12;
116:5;121:16;131:7;
134:2;145:13,19;
146:10;148:15,15,16;
150:17,22
**differentiate (2)**
134:14;148:14
**differently (2)**
58:5;93:20
**DIRECT (3)**
5:6;28:8;101:9
**directly (5)**
9:25;38:25;142:16;
155:23,24
**Director (4)**
9:5,6;40:14,19
**disconnect (2)**
157:9,11
**disconnected (8)**
102:7,13,15;146:1;
157:14,16,18,23
**discovery (1)**
18:5
**discuss (4)**
74:2;103:7;111:2;
159:22
**discussed (7)**
16:6;55:3,15;90:17;
113:22;133:12;159:16
**discussing (4)**
20:13;30:17;85:24;
103:5
**discussion (1)**

163:7
**discussions (1)**
96:8
**distinction (1)**
44:3
**distinguishing (1)**
86:22
**District (7)**
4:4,5;5:24,25;6:1,4;
7:5
**districts (1)**
7:2
**Division (1)**
4:5
**docs (1)**
157:8
**document (13)**
71:25;72:16,24;
73:1;74:12,14;78:24;
87:3;109:10;110:6,7,8,
10
**documents (17)**
66:24;67:1,2,16,19;
71:13,15,16,18,22;
78:9;86:13;98:18;
109:9;117:23,24;155:5
**done (10)**
18:2;53:16;124:12,
12,14;130:12;140:10;
142:3;147:15;164:9
**down (4)**
100:3;140:12;
142:20;160:13
**drive (1)**
64:12
**driving (2)**
63:23;64:25
**drop (1)**
128:12
**drop-down (2)**
128:6,15
**due (5)**
116:23;117:4,6,7;
118:2
**duly (1)**
5:2
**during (7)**
22:24;23:7;106:23,
25;107:18;139:11,15
**duties (4)**
110:3;134:11;135:1;
148:16

**E**

**earlier (6)**
7:25;65:25;90:17;
91:11;119:7;133:12

**easier (1)**
154:16
**easiest (1)**
133:17
**easily (1)**
53:19
**Easy (5)**
41:24;70:16;135:13,
15;143:12
**Ed (6)**
12:5;27:10;33:7;
37:15;81:3,13
**Education (14)**
14:25;15:4,9;27:14;
31:15,21;36:10;44:11;
45:5;113:15;120:8,10;
125:17,23
**effort (1)**
69:19
**efforts (8)**
17:4,24;31:13;
34:14;35:7;134:12;
159:5;160:10
**eight (32)**
21:13,15,20;23:7,17,
22;24:10,11,12,15,16,
19,25;25:5,21,22;
35:23,25;36:2,4,18;
37:6,12;89:3,5;119:3,
8,13,16;127:8,11,13
**either (9)**
23:15,16;24:23;
30:3;105:11;106:4;
111:17;155:25;162:1
**else (21)**
12:23;13:5,9,13,17,
22;15:8,10;38:1;48:13,
15;54:12;80:9;91:25;
129:24;139:13;143:17,
21;144:5;146:12;
153:19
**email (8)**
29:22;33:20;72:21;
132:18;149:8,10;
158:10,11
**emailed (3)**
19:1,3;67:4
**emails (10)**
17:7;19:25;20:1;
29:16,17;73:24;
134:24;148:20,24;
149:3
**emergency (1)**
155:13
**employ (5)**
56:4,5;58:24;62:23;
103:14
**employed (3)**

39:8;103:17;106:19
**employee (5)**
37:19;107:21;
108:14,15,16
**employees (11)**
45:13,13,22;49:24;
56:10;57:3;63:9;
90:25;98:1;108:20,24
**employment (4)**
140:21;141:2,3,24
**enactment (2)**
126:5,8
**end (4)**
26:6;137:12;138:8,
12
**ending (8)**
85:25;86:4,7,11;
103:5;140:15;156:12;
157:2
**ends (6)**
84:14;85:7,12;
145:14,25;146:3
**enough (2)**
13:22;41:24
**entered (1)**
86:17
**entire (2)**
45:17;141:19
**entities (3)**
10:12;14:12;15:24
**entity (2)**
56:20;61:22
**entries (12)**
78:2,4;79:1,9;87:14;
101:25;120:24;131:3,
5,18,20;132:3
**entry (17)**
78:6,8;79:15;80:2;
82:1;83:21;99:7;
124:9;130:15,16,17,
20;132:2,8,12,14;
146:19
**equals (1)**
75:18
**erased (1)**
51:16
**established (1)**
79:8
**estimate (3)**
62:11,13,24
**et (1)**
4:3
**even (12)**
5:22;11:1;35:6;
47:24;62:18;64:5;
101:3;108:7;122:10;
144:20;148:17;162:14
**event (1)**

35:8
**everybody (3)**
38:1;65:21,22
**Everyone (1)**
45:16
**exact (5)**
23:23;62:2;87:9;
96:6;101:25
**exactly (13)**
11:25;13:21;45:4;
50:14;51:9;54:17;
57:1;89:18;94:4;
100:24;106:17;129:21;
134:3
**EXAMINATION (1)**
5:6
**examined (1)**
5:4
**example (6)**
73:17,21,22;104:19;
105:3;148:22
**excessive (1)**
25:8
**excuse (1)**
20:11
**Exhibit (18)**
19:6,7,9;67:5,8;
72:12,13;74:2,7,9;
75:7;77:1;87:14;
98:14;120:25;127:18;
140:10;158:12
**existed (1)**
53:11
**existence (1)**
127:12
**expense (1)**
56:24
**expenses (2)**
62:8;110:24
**Experience (2)**
38:20;144:11
**explain (15)**
10:12,17;11:24;
14:23;25:25;39:2,24;
40:12;69:6;76:8;
78:22;82:3;84:17;
125:21;149:3
**explained (1)**
55:17
**explains (1)**
47:6
**explanation (1)**
21:2
**express (7)**
142:4,13;146:25;
147:7;155:20,23,24
**extent (3)**
25:10;93:25;163:6

## F

**fact (6)**
15:18;37:5;83:18;
89:18;111:19;141:4
**failed (1)**
158:14
**fair (18)**
11:1;13:22;25:6;
29:6;39:11;43:10,10;
93:5;112:24;113:25;
116:24;117:1;118:19;
122:15;137:21;142:3;
147:24;158:20
**fairly (7)**
18:4;58:22;70:14,
16;135:13,15;143:12
**falls (1)**
89:2
**FAME (2)**
13:14,16
**familiar (4)**
37:21;76:2;77:15;
130:6
**fancy (1)**
153:9
**far (11)**
14:10;23:18;34:23;
53:14,15;61:14;71:2,9;
114:6;136:10;139:2
**farthest (2)**
100:17;101:20
**FCC (2)**
60:1,6
**FCCPA (2)**
118:12,21
**FDCPA (6)**
113:25,25;114:4,7,
13;115:11
**February (2)**
142:22,25
**Federal (4)**
13:16;36:12;61:5;
81:3
**Fee (27)**
15:1,2,5,6,11,13,19;
57:2;68:15,23;69:2,4,
6,9,11,12;70:9;90:24;
94:21;113:9;121:25;
160:1;161:4,5,7,9,10
**feel (1)**
5:19
**fees (1)**
56:12
**felt (1)**
144:22
**few (3)**

61:20;79:6;89:18
**fifty-fifty (2)**
66:2,4
**figure (4)**
18:22;120:24;
150:24;156:18
**file (9)**
42:5,7,13;62:6;83:6,
17;85:15,20;154:25
**filed (5)**
61:2;62:3;71:23;
72:1;154:18
**files (2)**
42:7;43:17
**Financial (1)**
60:24
**find (11)**
18:11;119:20,21;
127:20;128:25;129:1;
135:14;136:5;137:22;
138:19;142:20
**fine (6)**
30:8;89:4;97:23;
98:7;115:9;155:9
**finish (1)**
154:7
**finished (1)**
85:24
**first (27)**
9:3;16:1,7,12;17:11,
12;25:25;27:19;39:21;
44:15,23;45:1;55:25;
68:24;71:11;74:23;
75:6;77:9;99:12,20,20;
100:1;129:16;133:16;
144:25;147:16;156:6
**five (4)**
13:17;30:7;146:8;
158:15
**five-minute (1)**
153:25
**fix (1)**
96:11
**flip (1)**
147:15
**floor (4)**
65:18,20,21,22
**Florida (8)**
4:5;5:25;6:2;118:12,
14,16,17,21
**flow (1)**
6:19
**focusing (1)**
37:11
**folks (1)**
80:6
**follow (3)**
34:23;91:10;117:14

**following (2)**
94:4;105:15
**follows (1)**
5:5
**follow-up (1)**
163:12
**forbearance (3)**
27:15;149:15,23
**forbearances (2)**
149:13;151:4
**form (8)**
6:6,9,22,23,24;
7:1;10:18
**F-O-R-M (1)**
6:24
**format (2)**
76:11,12
**forming (1)**
41:21
**forth (2)**
47:1;86:21
**forward (1)**
163:21
**four (6)**
8:25;13:17;112:25;
120:12;122:12;160:13
**frame (5)**
45:25;46:3;53:25;
88:9;90:9
**frames (1)**
98:4
**Frank (1)**
4:15
**free (1)**
5:19
**front (2)**
58:7;78:11
**FTCPA (1)**
158:18
**fulfilling (1)**
37:9
**full (7)**
20:14;34:7;39:11;
95:25;126:22;146:4,6
**Fund (2)**
68:18,21
**Funds (19)**
12:12,15,23;16:7;
66:18;68:22;70:7,12;
77:16;78:12;98:18;
112:8,22,25;123:7;
127:3;133:3;149:17;
158:24
**Funds' (7)**
68:1;75:14;78:13;
132:23;150:8,10,25
**FURTHER (1)**
164:10

## G

**gap (9)**
20:16;100:2,16;
101:19;121:3;129:11;
133:16;142:20;147:17
**gaps (1)**
144:25
**GA's (2)**
12:1;68:17
**gather (2)**
84:10,13
**gathered (3)**
19:17;102:21;103:1
**gathering (1)**
125:22
**gave (4)**
14:7;28:20;52:10;
85:10,12,15;110:15;
139:18
**general (2)**
24:1;49:18
**generally (2)**
44:23;62:8
**gets (12)**
14:20;33:13;52:13;
70:23;81:6,15;113:1,9;
123:24;134:18,22;
160:4
**given (12)**
15:24;30:17;44:18;
68:13;70:19;74:3;
84:25;85:5,21;106:23;
108:1,20
**gives (1)**
16:7
**giving (3)**
111:14;117:4;
146:11
**Gmail (1)**
149:1
**go-between (1)**
31:24
**goes (4)**
32:3;77:4;150:16,17
**Goldstein (1)**
131:15
**Gomez (72)**
4:13,13;5:7,9;7:18;
10:17,22;25:13,16;
26:9;30:8,15;38:12;
40:5,10;41:7;42:18,22;
44:21;59:10,16,22;
60:16;67:13;69:23,24;
72:19,23;79:1,5,7;
83:1;86:19,24;87:8,12;
94:5;96:7,16,24;97:4,

15,18,25;98:13;
103:24;104:9,16;
105:22;111:12;114:19,
24;115:10,13;119:12;
139:20;140:3;142:8;
147:4,12;153:24;
154:6;155:2,6,10;
156:3,17,23;157:10;
163:10,14;164:3
**Good (6)**
5:8;30:5;42:10;
43:12;59:11;135:4
**government (6)**
12:4;36:12;125:8,9,
13;161:15
**great (1)**
28:9
**group (4)**
24:3,4;56:25;57:8
**guarantee (1)**
26:3
**guaranteed (3)**
125:8,9,12
**guaranteeing (1)**
32:4
**guarantor (77)**
11:16,19;12:10;
13:12,25;14:14;15:4,6;
16:15,20,24;17:22;
20:15,25;25:24;26:11;
28:10,21;32:18,19,24;
33:13;34:10,12;36:7,
16;37:10;42:5;43:5,12;
66:17;67:23;68:5,25;
70:17;75:21,22;80:19,
19,23;81:8,13,18,20;
82:11;83:9;84:4,11,12,
18,21,25;85:5,11,15;
92:15,16,19;93:11;
115:22;121:25;123:6,
9,18;124:16;125:10;
126:15,24;146:13,14,
16;149:11;151:12;
159:2;160:2,23;162:11
**guarantors (17)**
31:22,25;32:5;33:8,
8;34:17;36:14;66:15,
16;70:13;81:4;126:3,4,
25;149:17;150:6;
159:19
**guarantor's (32)**
16:16;30:19,25;
31:4;33:1,3,17,21;
34:1,5,7,9,13,21;43:9;
51:25;52:1;68:3,9;
78:19;79:10;92:13;
123:21;131:4,20;
132:5,8,14,22,22;

150:21;161:14
**guess (36)**
16:19;18:6;25:1;
39:3;49:25;58:23;
64:15,18;65:11;70:17,
23,24;82:4;88:24;91:3;
96:4,5;99:9;111:6;
123:6;126:5;128:13;
129:23;131:18,19;
138:17;143:12;148:23;
153:16,18;154:10;
158:3,9,11;161:18;
162:23
**guessing (1)**
46:7
**guidance (2)**
106:23;108:22
**guidelines (8)**
24:21,22;81:3;89:2;
113:15;125:16;126:18,
20
**guy (1)**
115:2
**guys (10)**
11:9;31:23;57:2;
90:24;92:19;94:7;
126:6;141:6;151:13;
152:10

## H

**handbook (2)**
108:14,16
**handed (2)**
108:4,24
**handle (1)**
54:23
**handled (4)**
60:3,18;61:8;133:11
**handles (1)**
60:3
**handling (1)**
112:22
**handwritten (2)**
19:10;73:4
**Hang (5)**
7:11;44:16;96:12;
114:21;156:20
**happen (4)**
20:19;37:3;45:8;
111:7
**happened (11)**
40:22;41:2,8,14,16;
71:10;90:21;111:24;
137:5;138:9;158:7
**happening (1)**
134:15
**happens (9)**

16:10;28:1,12;
50:21;51:6,11,19;
137:8;159:23
**harassing (3)**
60:2;88:16;89:1
**harassment (2)**
61:17;108:14
**hard (1)**
163:4
**heading (1)**
74:10
**headquarters (1)**
63:7
**hear (7)**
6:2,8;26:6;93:7;
104:4,15,23
**heard (2)**
5:8;104:3
**held (3)**
57:10;111:6,21
**help (4)**
37:25;57:3;69:20;
159:8
**helping (2)**
56:12;160:19
**Here's (5)**
42:1,14,24;100:15;
109:3
**hierarchy (1)**
9:8
**High (3)**
4:10;58:2,3
**higher (3)**
55:21;113:13,13
**highest (1)**
120:10
**highway (1)**
64:3
**hire (3)**
56:6,7;108:16
**hired (1)**
108:12
**hiring (1)**
57:2
**history (3)**
16:21;92:5;142:2
**hit (1)**
128:6
**hold (2)**
100:25;120:20
**hours (2)**
20:23;108:15
**huge (3)**
63:24;64:8;65:12
**Human (1)**
107:7
**hundred (3)**
61:13,14;81:7

**hung (8)**
102:12;127:22,24;
128:14;129:4,5,7;
163:5

## I

**idea (5)**
37:7;102:24;135:20;
144:18;151:16
**identical (2)**
99:20;136:18
**identification (4)**
19:8;67:9;72:14;
74:8
**identified (4)**
46:8;79:23;157:12,
13
**identifies (3)**
26:23;51:10;157:24
**identify (13)**
4:11;26:1,2;50:14;
72:17;83:11;89:13;
116:11;117:14;135:16;
138:22,24;157:17
**identifying (1)**
157:22
**identity (1)**
143:11
**immediately (1)**
151:20
**imprecise (1)**
41:6
**inbound (3)**
89:22;162:24;163:2
**in-bound (1)**
89:23
**Inc (3)**
4:3;28:16;29:3;39:7;
40:4,7,8,20;41:1,19,23;
46:18;47:18;48:7,18;
49:8;50:13;52:4;56:9,
25;57:4;61:22;63:9,11;
65:11;66:6;71:16;82:3,
19;86:1;92:22,24;
93:13,21;94:7,10,18;
110:14
**include (1)**
67:6
**included (2)**
35:14;150:11
**incorrect (3)**
110:18;136:21,22
**Inc's (1)**
49:24
**indeed (3)**
90:21;106:6;118:3
**independent (9)**

55:22,23;56:16,18;
58:20;68:4,10;106:11;
139:17
**Indiana (8)**
4:10;5:23;7:22;
58:16;59:6;63:1,6,8
**Indianapolis (5)**
58:18;64:18;65:1,7,8
**Indianapolis/Muncie (1)**
65:10
**indicating (2)**
101:20;157:13
**individual (14)**
8:8;14:13;25:25;
72:7;92:7;94:8;
109:17;113:5;122:10;
134:1;135:6,25;137:8;
144:7
**individuals (6)**
27:18;29:13;106:19;
109:15;116:2,16
**inform (3)**
54:4;81:20;116:15
**information (27)**
35:16;42:25;43:2,11,
15,15;48:1,24;49:4,18,
21;50:7,11;76:17,18;
78:19;82:14;91:25;
94:2;103:2;121:12;
122:17;123:21;125:22;
130:9;131:25;138:24
**informed (2)**
96:21;162:23
**in-house (6)**
4:19;44:18;45:2,3,6;
60:11
**initial (5)**
158:16;159:23;
160:12,12,21
**input (9)**
48:20,23;49:21;
78:15;81:17;96:14;
98:23,24;127:25
**inputs (5)**
78:17;98:25;150:20
**inputting (1)**
78:18
**inside (1)**
29:21
**instruct (1)**
6:14
**instruction (3)**
12:1;107:18;114:16
**instructions (2)**
108:25;109:2
**insurance (2)**
152:9,10
**insure (1)**

54:3
**interchange (1)**
22:14
**interest (1)**
69:15
**interrogatories (3)**
72:5,8;86:15
**interrogatory (1)**
87:6
**into (36)**
15:25;16:10,13,23;
17:2;31:4;33:1,3,17;
34:4,9;41:4,5,21;
48:20,24;53:3;59:24;
70:4;78:19;79:9;99:1;
128:2;131:3,20;132:4,
7,14,21,21;150:20;
151:3;157:25;158:4;
162:24;163:8
**introduce (3)**
16:23;31:4;33:1
**introduced (4)**
16:10;87:19;132:14;
155:7
**introduces (1)**
128:2
**introducing (3)**
33:16;99:4;132:19
**introduction (2)**
17:25;18:11
**introductory (3)**
17:16,16;158:10
**involve (2)**
17:5;80:24
**involved (12)**
56:8;61:9;80:6,9,20,
25;81:15;91:4;94:24;
107:22;124:24;126:21
**involvement (1)**
70:25
**issue (4)**
54:3;86:18;87:7;
103:22
**issues (4)**
46:15;47:6;57:15;
110:21

**J**

**January (3)**
46:1;133:18;138:18
**job (6)**
8:7,9,19;9:15,21;
131:16
**John (3)**
10:9;104:15,18
**JP (1)**
37:16

**Judge (2)**
155:2,2
**jump (2)**
77:9;144:23
**jumped (1)**
120:9
**June (1)**
46:1

**K**

**Kane (1)**
10:9
**keep (12)**
5:20;42:15,20;
53:24;68:4,9;139:17;
153:1,5,6;163:25;
164:4
**keeping (2)**
54:1;95:16
**keeps (1)**
6:19
**Kennedy (2)**
104:15,18
**kept (2)**
53:6;90:8
**Kerney (4)**
4:15,15;154:20,24
**Kevin (3)**
4:2;5:1;164:15
**kind (17)**
27:15;35:13;41:6;
43:25;54:5;57:3;
61:18;75:8;94:1;
98:15;106:20;109:17;
120:6,9;131:3;132:16;
136:1
**kinds (1)**
12:14
**knew (1)**
156:8
**knowing (3)**
100:10;149:22,24
**knowledge (4)**
41:16;77:12;118:13;
122:19
**knows (2)**
79:2;114:20

**L**

**land (3)**
43:20,25;151:25
**landline (4)**
44:5;46:9;86:8;
151:21
**language (1)**
129:23

**large (1)**
94:22
**last (21)**
9:19;10:16;46:4;
53:12,13,16;57:11;
60:20;61:5;62:18,18;
67:4;69:22;75:10,15;
112:1,25;121:3,19;
127:20;129:12
**Lastly (1)**
162:23
**late (1)**
64:23
**latest (1)**
22:1
**law (1)**
126:8
**Laws (1)**
61:17
**lawsuit (3)**
61:7;111:18;152:11
**lawyer (5)**
96:17,25;97:1;
114:25;143:21
**lawyers (7)**
25:12;45:6;96:13,19,
21;143:20;157:5
**lead (2)**
20:1;134:4
**leads (1)**
134:5
**least (3)**
41:15;140:6;141:10
**leave (3)**
22:16;23:2,12
**leaves (1)**
23:1,5
**left (3)**
22:7;23:8;100:9
**legal (15)**
25:11;44:11;60:9;
61:9;94:1;97:7,13;
110:9;112:13;114:16;
142:6;147:1;153:12;
156:14;157:3
**legitimate (1)**
42:9
**length (1)**
159:17
**less (4)**
35:25;61:14;65:3;
89:3
**lets (3)**
75:12;80:18;137:16
**letter (27)**
17:17,25;18:11,19,
24;20:2,4,16,23;72:21;
73:2,13,16,17,18,19,

22,23;74:1,3,17,19,20,
23;116:24;158:9,21
**letters (10)**
17:6,14,15;18:7;
20:18;30:1;71:20;
116:21;143:25;148:23
**letting (2)**
81:18;117:3
**level (1)**
120:10
**lib (1)**
117:13
**licenses (1)**
120:21
**light (2)**
40:4;63:25;64:21,22
**likely (2)**
117:24;131:7
**limit (4)**
7:6;22:2;24:18,21
**limitations (1)**
119:22;120:2
**limited (2)**
46:13;104:8
**limits (5)**
29:21,23,24;30:2,3
**line (13)**
27:2;43:25;51:17;
76:24;77:3;84:7;
85:23;121:9,14;
124:17;140:18;142:21;
148:5
**lines (7)**
43:20;100:14;
121:18;145:19,24;
146:3;151:25
**LinkedIn (3)**
37:22,22;39:18
**Lisa (3)**
4:17;104:23;105:2
**list (3)**
38:4;138:13;150:14
**listed (9)**
14:7;39:18;40:16;
75:10;102:20;136:13,
15,15;161:16
**listen (1)**
133:7
**literally (7)**
38:15;53:21;65:3;
93:15;142:22;151:1;
162:4
**litigation (2)**
102:25;104:1
**little (10)**
5:17;7:7;41:15;
44:14;59:9;90:4;
99:21;109:18;120:7;

126:2
**live (9)**
7:9,15,19;26:24,25;
27:2;128:18,19;149:1
**loan (31)**
28:14;31:16,17;
32:23;33:5;34:20,24;
35:6,12,13,14,24;
42:23;43:14;46:19;
66:12;76:18;80:25;
81:22;82:20,23;92:1;
113:11,13;123:1;
125:1,4;126:10;
149:12;161:2,15
**loans (21)**
12:14,14,18,20;13:2;
14:2;26:3;36:12;
66:17;70:11,22;81:23,
23;116:9;124:24;
125:4,7,12,24;151:17;
163:8
**local (1)**
6:7
**located (4)**
4:9;58:15;95:1
**location (4)**
64:24;66:5,8;95:3
**locations (2)**
65:25;66:1
**log (12)**
52:20,21,22,24;
71:22;153:1,5,6,9,11,
17,17
**logs (11)**
67:23;68:4,5;75:14;
76:9,22;82:1;89:13;
141:16,17;156:8
**long (19)**
8:24;9:1;10:10;
23:17,18,20,21,21;
53:6,24;69:12;89:3;
90:8;92:12;125:24;
127:11;128:19;137:5;
160:15
**longer (3)**
104:18;129:19;
130:3
**look (37)**
6:21;18:8;32:15;
35:10;53:21;64:12;
67:7,19;70:15;71:15,
18,23;72:1,4,15;74:12;
82:18;85:19;87:10;
98:14;99:9,15;121:2;
122:25;123:2,5,14;
124:23;128:23;136:7;
137:21;138:18,25;
139:13;143:12;147:16;

150:10

**looked (3)**
64:22;71:13;91:21

**looking (28)**
27:3;34:21;38:15;
67:25;75:14;76:9,10,
25;78:9,14;82:17;
87:13,14;98:18,21;
104:14,23;106:5;
109:17;121:19;122:15;
127:20;134:3;136:18;
138:23;141:4,16;151:1

**looks (3)**
99:12;100:15;
136:18

**LOSFA (2)**
13:18;162:7

**loss (1)**
118:11

**losses (1)**
61:2

**lot (6)**
7:2;25:17;88:1,7,13,
22

**Louisiana (3)**
13:18,19;161:21

**love (2)**
155:3,4

**low (2)**
58:2,3

**Lowe's (3)**
89:24;162:25;163:4

**LRA6 (1)**
75:16

**lunch (1)**
98:10

## M

**machine (3)**
23:12;145:1,10

**Mae (16)**
8:15;39:22,24;40:2,
3,7,8,16,20,22;41:1,5,
9,18,19,23

**mail (1)**
30:1

**mailed (2)**
19:3;74:1

**mail-in (1)**
73:23

**main (6)**
11:14;33:21;58:11,
14;62:25;95:4

**Maine (1)**
13:16

**maintain (1)**
52:19

**maintains (1)**
52:19

**major (1)**
120:17

**majority (2)**
128:15;134:7

**makes (5)**
20:10;50:17;80:22;
131:20;150:20

**making (22)**
20:18;26:12;29:15;
34:24;35:22,24;36:4,
23;37:1,2,5,8;78:6,15;
88:3;99:4;106:21;
130:20;131:3;159:9;
160:18;161:18

**manage (2)**
21:4,5

**manager (7)**
19:16,19,23;24:1;
73:9;107:6;143:25

**managers (6)**
53:18;54:19,20,20;
95:20;129:24

**manager's (1)**
74:21

**manages (1)**
131:2

**mandate (3)**
125:23;127:1;
137:12

**mandated (3)**
126:11,15,23

**mandates (1)**
125:17

**manual (22)**
86:22;87:7;103:12,
13,15,18;104:2,8;
117:21;120:4;135:3,4,
5,25;136:2,11,14,20,
23;138:4;139:5;148:2

**manually (3)**
90:11;135:7;158:6

**manuals (2)**
106:21;118:20

**many (43)**
8:3;17:10;22:2,5,9,
11,21,23;24:18;25:20;
28:23;29:16,17;35:12;
36:22;37:7;44:15;
54:20;55:5,20;57:19;
58:5,8,23;60:20;61:4,
17;62:23;64:15;76:13,
14;86:11,25;89:4,8,15;
90:14;94:23;96:1;
103:14;117:9;124:23;
161:16

**Maretta (15)**

32:10;42:2,13,16,17,
18,23,24;66:13;70:11;
73:20;103:7;104:4;
148:19;151:17

**Marietta (3)**
156:12,19;157:2

**mark (10)**
19:5;50:23;51:3;
54:11,12;67:5;72:11;
74:9;91:19;97:24

**marked (10)**
19:7,9;50:22;67:8,
10;72:13;74:7;77:1;
157:16;158:11

**marks (1)**
158:2

**match (2)**
105:8;109:16

**materials (1)**
108:19

**matter (4)**
4:2;5:4;160:15;
161:10

**max (1)**
36:18

**Maximum (6)**
21:13,14,18;23:18;
24:11;37:6

**May (5)**
38:20;73:19;103:4;
112:6;147:17

**maybe (10)**
15:19;26:17;31:5;
47:8;52:7;67:5;117:4;
128:12;153:17;158:4

**McCaskill (13)**
4:3,14;5:10;18:7;
32:10;42:2,14,16;
103:11;141:14;142:5,
15;155:25

**McCaskill's (2)**
18:3;87:10

**mean (71)**
6:9;11:18;15:14;
18:18,20;24:10;34:11;
38:10,18,23;40:3,17;
41:14;42:16,16;45:8;
48:3;51:18;55:1,19;
56:17;64:3,18;65:4,18;
73:7;74:24;75:20;
76:1;77:2,5,10,13,14,
23;82:7,25,25;86:14;
94:10;96:15;100:8,23;
101:10;104:25;111:10;
116:23;120:24;121:15,
23;122:4;124:18;
128:4;129:20,22;
130:3,8,18,19;132:16;

133:21;134:19;136:25;
140:18;141:5;145:17,
22;146:5;148:7;
157:11;161:6

**meaning (19)**
14:17;17:9;35:17;
45:25;52:23;56:3;
58:6;71:6;102:14,17;
103:7;105:21;106:20;
107:22;123:23;124:8;
129:25;152:9;155:24

**means (23)**
6:10;74:18;79:2;
82:4,9;100:6,9;101:4,
5;102:2,3,5,6,8;121:10,
12,24;124:19,20;
130:1;131:6;143:2;
145:11

**meeting (2)**
97:12,17

**meetings (16)**
45:15,18,21;46:2;
57:9,10,14;95:13,17,
20,22,24;96:3,9,13,15

**mentions (1)**
51:1

**message (31)**
22:16,17,19;23:1,2,
5,7,10,10,13;99:15,25;
100:7,9,11;103:6,8;
104:4,11,15,24;105:6,
12,17,20,23,25;106:5;
109:16;119:4;146:4

**messages (3)**
22:7,12,24

**met (1)**
66:23

**MGA (4)**
13:10,18;161:21;
162:7

**Michigan (1)**
13:10

**Middle (9)**
4:4;5:24,24;6:1,4;
7:5;129:10;142:21;
144:24

**Middleton (1)**
7:10

**Middletown (1)**
7:20

**might (6)**
6:2;59:1;64:5;71:7;
82:3;95:25

**MILEM (2)**
4:19,19

**mind (2)**
18:8;19:5

**mine (1)**

19:16

**minimum (1)**
95:23

**minutes (4)**
30:7;59:13;65:3;
156:2

**misquote (1)**
87:4

**misspoke (1)**
82:24

**mistake (6)**
39:14;132:11,12,13,
16,25

**mistakes (1)**
132:13

**moment (1)**
83:11

**money (4)**
14:17;48:19;68:22;
160:8

**month (10)**
24:22;25:5,9,17,20;
29:18;57:12;105:10;
127:6;137:9

**Monthly (2)**
95:23;96:2

**months (11)**
45:10;53:12;57:12;
60:20;61:5;69:8,8;
88:10,13,22;112:1

**more (26)**
21:20;25:21,22;
28:24;29:1;35:16,25;
36:5;37:7;47:12,18;
54:24;58:13;61:12,12;
63:5,20;64:2,9;65:14;
66:2;84:18;109:24;
119:3,8,13

**Moreover (1)**
6:14

**Morgan (7)**
4:13,14,15,16;8:18;
37:16;104:16,16;
105:22,22

**morning (2)**
4:8;5:8

**most (5)**
45:7;76:20;105:17;
117:24;131:7

**mostly (1)**
95:23

**move (2)**
59:24;140:9

**much (2)**
14:17;68:7

**multiple (2)**
42:12;149:6

**Muncie (11)**

4:10;58:16,22,25;
63:1,6,8;64:16,17,18;
95:5

**must (1)**
122:5

# N

**name (30)**
5:8;8:17;9:19;10:7;
24:4,8,9;26:5,10,11;
43:23;47:25;48:12;
55:25;63:13;74:19;
75:22;76:3;83:13;
104:12;106:16,17;
109:10;110:15;116:13;
123:2;131:12;144:1;
153:8,9
**names (3)**
28:20;42:21;105:8
**narrative (1)**
51:6
**National (3)**
31:16,16,17
**Navient (102)**
4:3;9:12,24;10:2,5,7,
10,23;11:1,6,10;14:8;
28:16;29:3,7;33:4;
34:3,8,24;35:10,23;
37:19;38:4,10,16,21,
25;39:2,3,4,5,6,7,10,
12,15,19;40:23;41:1,
23;46:18,20,22;47:7,
18;48:7,18;49:7,15,24;
50:12;52:4;55:11;56:9,
25;57:4;61:22;63:8,11,
25;64:8,13,16,22;65:5,
11,19;66:6,8;71:15;
78:1,2,16,21;80:9,18;
82:2,12,19;83:3,19;
86:1;92:22,24;93:6,13,
21;94:7,9,17;98:22;
110:14,22;111:20;
142:10;143:17;149:19;
150:14,17,20;152:4,13
**Navient's (1)**
38:8
**NBL (1)**
99:14
**N-E (1)**
12:25
**necessarily (1)**
134:19
**need (11)**
7:16;30:6;44:3,4;
62:2;98:5;107:12;
113:18;127:3;134:13;
144:22

needs (2)
59:10;98:6
**neither (2)**
77:18;121:18
**NELA (2)**
12:24;13:18
**N-E-L-A (1)**
13:1
**Nelnet (3)**
13:24;14:1,4
**net (1)**
61:25
**network (4)**
32:8;34:18;157:17,
19
**new (11)**
16:2,5,23;17:9,17;
131:25;135:1;138:13;
141:12;145:24;146:8
**Newsome (18)**
42:17,18,23,24;
66:13;70:12,19;73:20;
103:7;141:13;142:4,
15;148:19;151:17;
155:25;156:13,19;
157:2
**Newsome's (2)**
66:17;104:5
**next (4)**
101:17;121:1;
138:20;142:20
**night (2)**
64:23;67:5
**NIS (1)**
153:19
**Noble (6)**
21:24,25;26:23;
58:12;77:19;87:19
**nobody (1)**
163:8
**non-delinquent (16)**
15:19;68:15;113:5;
122:11;159:6,10,12,14,
18;160:7,19,20,22;
162:5,9,12
**none (2)**
155:12;161:25
**non-TCPA (1)**
61:15
**Normal (1)**
110:23
**normally (2)**
96:1;120:8
**North (2)**
4:9;65:8
**notation (2)**
83:18;85:3
**note (5)**

93:15;132:25;133:1,
1,4
**notebook (1)**
108:13
**noted (1)**
146:19
**notes (18)**
33:12;34:22;87:13;
92:9,14;93:11;111:5;
128:9,10;132:19,21;
136:7,16;138:25;
139:18;141:10;148:23;
150:3
**notice (5)**
99:22;101:19;
158:15,18;162:15
**notified (5)**
42:1;60:4,5;61:11;
162:11
**notify (1)**
164:6
**noting (1)**
6:10
**November (1)**
128:16
**NSI (26)**
37:1;81:17,20,23;
82:25;83:2,12,23;84:2,
13,22;86:2;94:13;
101:2;103:1;109:23;
110:1;111:4;112:5;
131:10;141:5,8;151:2,
10;152:22;155:20
**NSI's (1)**
90:24
**NSLD (1)**
31:18
**NSLDS (8)**
31:16;32:1;33:6,9;
34:19;160:1,2,23
**number (135)**
14:19,20;21:11,14;
24:12,16,17;25:7,19;
28:5;35:18;44:4;48:4,
5,13,16;50:22,22,23;
51:3,10,15,16,18,21;
52:5,11,13;54:11,12;
61:18;62:3,17,20;
67:16;74:15;77:6;82:7,
9;83:19,23;84:1,6,7,10,
12,14,18,24,24;85:1,3,
4,6,12,23,25;86:2,4,5,
7,9,11,20;87:9,10;
89:25;91:20;92:2,25;
93:3;97:24;99:5;100:3,
9;102:15,21,25;103:3,
4,5;104:5,14,17,18;
105:1,11,16;109:16;

112:5;123:1,1,8,10;
133:24;137:2,16;
140:15,20,20,21;
141:12,21,23;142:1,5;
145:3,13,20,20,21,25;
146:3,24;147:5,8;
154:12;155:12,15,21;
156:9,9,11,19;157:1,9,
18,20,22,24,25;158:2,
3;162:20;163:3
**numbered (1)**
99:18
**numbers (20)**
42:10;43:18,19;
48:12;62:9;67:12;
73:8;75:10;85:14;
102:18,20;121:11;
135:8,9;139:7;146:8,9,
12,15,22

# O

**object (5)**
6:4,6;10:18;25:10;
93:25
**objection (9)**
6:3,8,9,11,22;7:3,3;
147:9;157:3
**objections (1)**
7:4
**obligation (3)**
20:25;29:19;34:13
**obligations (2)**
37:9,15
**obtain (2)**
130:9;142:17
**obtained (2)**
77:7;142:10
**Obtaining (1)**
143:11
**obviously (2)**
7:17;65:4
**OCAP (4)**
13:6,18;161:21;
162:7
**O-C-A-P (1)**
13:8
**occupied (1)**
66:6
**occur (2)**
40:23;145:2
**occurred (2)**
41:2;132:9
**occurs (1)**
61:7
**o'clock (1)**
98:12
**October (1)**

121:6
**off (17)**
19:4;30:8,10;59:17;
63:24;64:4;65:3;98:8;
100:13;103:22;124:6;
134:7;139:23;154:1;
161:13;163:15,18
**offer (1)**
27:10
**offers (2)**
27:9,14
**offhand (2)**
30:4;139:9;158:8
**office (7)**
62:25;95:5,11;
112:12;153:12,14;
163:22
**offices (2)**
4:9;63:6;65:17
**often (8)**
45:8;91:2;95:22;
98:3;111:3,7,17,21
**O-K (1)**
13:7
**Oklahoma (2)**
13:6;161:21
**Once (25)**
8:4;13:2;15:17;17:1;
38:20;42:7;45:23;
52:1;75:11;76:19,25;
101:19;105:10;121:2;
122:6;123:17,19,23;
129:11;137:7;145:20;
159:3,24;160:24;162:9
**once-a-year (1)**
46:2
**One (121)**
6:5;10:11,16;14:18;
15:9,12,24;16:5,7;
18:14;21:9,10,11,11,
12,14;22:6,10,13,16,
17;23:7,11,15,16;25:4,
9,20,24;26:2;29:3;
34:22;36:19,25;41:12;
46:4,4;48:17,23;49:17;
53:3;54:7,24;56:4;
57:6;58:11,13,14,20;
64:9,17;65:6,10,20,21,
22;66:2;67:7;68:12,13;
74:9;78:5,10;79:4,12,
15,21;80:11;83:6;
84:12,14,18;85:7;
89:16,23;95:3,5,5,7,7;
98:12;99:12,21;100:2,
14,15;101:23;107:16;
110:3,4;111:25;119:4,
4,13,16;120:15;121:2,
6,18,20;122:7,8;

124:17;127:22,25;
131:8,9;134:10;136:2;
140:10;144:9,25;
145:3,15;147:16;
150:22;151:12;152:14;
156:6;157:7;162:1
**ones (9)**
22:13,21;73:24;
78:5;99:8;141:9;
148:24;161:20;164:2
**one-time (3)**
69:9,11,12
**online (1)**
108:1
**only (15)**
23:7;32:19;33:12;
37:11;46:7;50:6;56:4;
68:7;70:12;85:11;
93:11;122:7;142:16;
160:21;161:22
**operational (2)**
109:22,25
**opinion (2)**
25:14;154:9
**opposed (4)**
7:2;72:21;73:24;
151:25
**option (2)**
128:12;160:18
**options (11)**
12:3,3,5;27:7,8,11,
13,17;50:18;116:18;
117:4
**order (2)**
120:1;139:14
**original (4)**
20:10;85:20;163:21;
164:1
**originally (2)**
85:15;124:8
**originated (1)**
155:16
**out (25)**
17:15,17,24;18:22;
33:20;63:4;64:7;68:1;
75:15;99:14;102:4;
106:7,8;109:14;
112:13;119:25;120:24;
123:17;125:5;135:14;
136:5;138:19;144:20;
150:24;156:18
**outbound (7)**
12:1;87:15;89:20,
21;102:6;103:18;
115:24
**out-front (1)**
113:6
**outreach (7)**

11:20;17:6;33:19;
36:14,20;115:25;159:7
**Outside (10)**
48:12;71:14,18;
81:17;139:13,17;
143:15,20;144:4;
152:13
**over (6)**
27:23;29:13;88:9,
10;95:15;130:1
**owed (1)**
125:1
**owes (1)**
110:3
**own (6)**
40:6;56:19,20;63:4;
68:10;106:11
**owned (4)**
14:8,10;29:7;39:22
**owns (2)**
39:15,20

## P

**page (16)**
38:15;75:10;99:11,
16;101:17;121:1;
127:18;129:9,10;
140:5,12;141:20;
142:19;144:23,24;
147:13
**pages (7)**
18:5;67:6;71:19;
78:11,18;98:15;139:13
**paid (22)**
14:16;69:3,8,9;70:8;
113:13,17,18;122:13;
158:24;159:3,10,16,20,
24;160:4,10,15,21;
161:22;162:8,9
**parent (9)**
9:12;14:8;39:15,23;
40:21,25;41:9,11,16
**parenthesis (2)**
121:21;124:20
**part (9)**
8:7;45:7;55:4;78:7;
80:13;105:18;117:8,
10;146:22
**particular (1)**
129:1
**party (4)**
55:21,22,23;130:10
**pass (1)**
75:7
**passed (1)**
134:5
**past (6)**

46:5;116:23;117:3,6,
7;118:2
**pay (8)**
15:6;48:19;56:11;
90:24;94:21;113:6;
122:7;159:13
**payment (15)**
27:23;28:2;29:10;
116:19;118:3,4,9;
122:10;159:23;160:13,
13,21,25;161:1,3
**payments (6)**
15:3;29:12;35:19,
19;70:24;116:17
**pays (1)**
15:4
**PCA (2)**
76:1;79:23
**PCPA (1)**
44:7
**people (17)**
9:9;50:6,10;52:24;
55:5;62:23,25;63:20;
65:14;70:2;94:23;
96:1;97:21;103:14,17;
111:7;131:7
**per (23)**
15:11;21:9,16,17;
22:3,16;23:17,22;
24:11,18,22;25:4,21,
22;29:18,18,18,18;
36:3,23;89:3,5;119:14
**percent (2)**
161:12,13
**percentage (1)**
161:6
**perform (9)**
11:15;15:7;34:14;
81:4,14;107:19;
125:10;126:15;134:12
**period (4)**
88:10;92:11;130:2;
164:7
**permission (2)**
77:8;83:22
**person (46)**
23:1,2,5,24;24:1,8,9;
26:24;28:1,9;29:22;
35:24;48:18;50:19;
51:13;52:11,14;81:18,
20;87:20;95:4,10;
100:11;101:1,2,6,9;
104:3,12;105:11,12;
106:4,5,6,6;108:5;
110:13;119:5;122:7;
131:2,2;135:16,25;
136:3,5;140:6
**personal (2)**

42:24;105:23
**personalized (1)**
105:20
**personally (4)**
44:10;88:6;91:6;
95:18
**personnel (1)**
49:4
**perspective (1)**
116:5
**phone (156)**
12:21;14:19;17:12;
20:8,9,18,24;21:3,6,11,
14;22:17;23:17,22;
24:11,13,16,18;25:1,3,
8,17,17,20,23;26:12,
16,23;27:24;28:4;
29:13,15;30:6;33:25;
35:23,25;36:3,4,18,22;
37:1,2,6,7;42:10;
43:18,19;44:4,5;46:9;
48:4,5,12,16;50:17,18;
51:1,14;52:21,25;
57:13;58:7,25;60:2,2;
61:17;76:4,16;77:6,8;
78:7;79:20;80:11;82:7,
9,13;83:19,23;84:1;
86:5,9,11;87:15;88:1,
3,15,21,25;89:4;90:2,6,
10,17,18,20;91:13,13,
17,22;93:22;97:21;
100:9;102:9,17,18;
103:12,13,15;104:14,
21;105:1,7,7,16,21,23;
106:20,21;109:1,5;
111:18;117:11,15;
118:5,5,8;119:8;123:1;
127:8,11;135:8,9;
136:14;140:15,20,20,
21;141:12,21;142:1;
145:19;147:5;151:22;
153:21;155:12,15;
156:9,11,18;157:1,9,
13,14,18,19;162:19
**phones (4)**
43:20;44:1,1;152:1
**phrase (1)**
93:19
**physically (2)**
108:24;142:17
**picture (2)**
64:5,20
**place (12)**
5:23;20:22;23:19;
30:6;57:17;85:9,10;
121:19;140:21;141:2,
3,24
**placed (18)**

15:15;42:6;68:24;
69:5;71:3;73:3;75:13;
81:1;82:11;85:16;
92:13;102:6;122:5,20;
123:12;125:18;126:6;
160:25
**placement (1)**
140:23
**places (4)**
51:20;75:21,23;
146:10
**placing (1)**
81:2
**plaintiff (4)**
4:16;5:10;158:13,15
**Plaintiff's (7)**
19:7,9;67:8;72:12,
13;74:7;158:11
**please (13)**
4:11,22;10:18;
17:19;22:15,22;42:12;
55:16;67:6;72:15;
76:23;140:18;143:17
**pm (3)**
101:24;145:7;
163:17
**POE (2)**
140:16,25
**point (14)**
6:15;8:10;23:6;27:9;
37:25;38:17;59:11;
70:25;71:7;129:6;
140:6;158:3;160:4;
161:13
**polices (1)**
106:2
**policies (40)**
17:8;20:17;21:8;
91:7;105:10,13;106:7,
8,9,11,14,15,16,18;
107:1,2,3,9,13,17,21,
23,25;108:8,9;109:7,
14,19;113:22,23;
114:7,9;118:20;
119:21;127:9;151:24;
152:2,3,4,5
**policy (8)**
20:22;23:19;37:11;
88:5;90:5;116:15;
119:2;120:1
**pool (3)**
100:21;101:10;
148:14
**pop (2)**
76:6,19
**pops (1)**
128:8
**Portfolio (1)**

63:15

**portion (5)**
24:2;32:13;56:24;
104:19;119:20

**position (3)**
19:23;38:6;100:25

**positions (1)**
148:15

**possession (2)**
164:4,6

**possible (1)**
69:17

**potentially (1)**
149:9

**Practice (4)**
114:1;118:13,14,21

**predictive (1)**
154:14

**preparation (10)**
66:22;71:14;89:11;
97:12;124:22;128:22;
135:19;143:7,15,22

**prepare (1)**
143:18

**preparing (2)**
102:23;135:23

**prerecorded (3)**
22:11;23:10;100:11

**presence (3)**
65:12,13;66:8

**present (3)**
97:9;103:11;143:20

**President (37)**
8:20,24;9:22,25;
10:2,4,7;11:6,6;23:21;
38:4,5,7,8,16,16,21,21,
25;39:12,13;40:15,18,
19;41:11,15;53:11;
95:18;110:12,14,19,20,
22;111:14;112:4;
115:3;138:14

**pretend (1)**
27:21

**pretty (3)**
26:17;64:22;161:8

**preventing (1)**
97:21

**prevention (23)**
11:15,18;15:5,7,10;
16:9;17:4,23;22:25;
34:14;36:20;81:4,14;
107:19;115:25;125:11;
126:16,17,19,22,23;
134:12;159:7

**previous (4)**
71:2;90:20;92:10;
146:19

**previously (2)**

122:16;124:3

**Price (1)**
4:18

**principal (1)**
161:13

**printed (1)**
68:1

**prior (2)**
92:5;139:2

**Private (4)**
63:15,16;125:7,12

**privileged (3)**
96:23;97:3,14

**probably (1)**
164:4

**problem (1)**
73:15

**problems (1)**
96:11

**procedure (6)**
91:10;92:25;93:2,4;
137:7;143:12

**procedures (9)**
17:9;91:8;105:14;
106:2,23;113:23,23;
114:7;119:21

**proceed (1)**
6:11

**process (27)**
15:17;16:1;17:9;
42:8;43:4,22;49:6;
50:9,10,24;75:21,22;
77:8,15;80:3,4,5,10,18;
82:2,16;83:13,17;85:8;
117:18;120:15;149:4

**processes (1)**
80:8

**processing (1)**
52:7

**professional (3)**
37:23;120:20,21

**profile (4)**
37:23;38:1;39:12,18

**profit (1)**
161:18

**profits (3)**
62:4,7,10

**programs (1)**
23:25

**progress (1)**
6:20

**progression (1)**
17:8

**properly (2)**
94:13,19

**Protection (2)**
60:24;61:16

**protocol (4)**

17:11;28:6;29:17,20

**prove (1)**
154:24

**provide (5)**
84:18;85:8;137:13;
163:22,24

**provided (6)**
78:9;98:16;124:3;
139:1;146:15;148:24

**provides (3)**
84:12;157:21,21

**provision (1)**
154:21

**public (2)**
41:18;154:22

**pull (3)**
53:20;120:4;148:6

**pulled (1)**
78:13;143:25

**purges (2)**
123:17;124:6

**purple (3)**
63:25;64:5,21

**purpose (5)**
44:6;54:1;58:8,24;
73:11

**purposes (4)**
46:10;86:23;104:1;
155:13

**put (13)**
28:10;37:23;38:17,
23;39:3,11;40:13;53:3;
87:24;92:18;93:14;
150:2;157:25

**putting (2)**
33:12;151:2

---

**Q**

**quality (1)**
133:6

**quick (3)**
30:9;74:13;120:9

**quite (1)**
127:14

**quotes (1)**
157:14

---

**R**

**ran (1)**
82:12

**rang (1)**
88:21

**rare (1)**
57:16;111:24

**rarely (2)**
55:1;111:23

**reach (7)**
7:16,17;30:5;76:14;
112:13;119:25;144:20

**reached (1)**
24:12

**reactivated (2)**
123:19,23

**read (8)**
10:15;40:9;73:5;
99:24;115:3,11,15;
163:14

**reading (3)**
27:4;100:11;126:3

**real (2)**
74:12;120:9

**really (1)**
151:13

**realtime (1)**
52:9

**reason (9)**
11:11;20:5;49:8;
74:23;83:24;101:13;
114:9;144:9,13

**reasoning (1)**
75:4

**reassigned (4)**
100:20;101:14;
123:24;148:6

**recall (9)**
53:9;62:17;89:19,
22;111:25;129:3;
148:17;153:10;161:8

**recap (1)**
98:17

**receipt (1)**
163:24

**receive (14)**
14:24;15:13;17:10;
52:25;56:24;68:23;
106:21;108:7,7,9;
121:25;160:1,25;
161:12

**received (14)**
18:5;25:20;57:12;
72:10;79:22;83:22,22;
89:23;91:7;114:3;
141:7;155:19;157:9;
163:2

**receives (2)**
12:7;56:15

**receiving (3)**
52:21;86:2;96:10

**recently (2)**
112:18,20;127:13,14

**recess (5)**
30:12;59:19;98:10;
139:25;154:3

**recognize (6)**

67:19;102:19;
104:11;105:1,6,9

**recognized (1)**
102:15

**recollection (1)**
89:23

**recommends (1)**
80:19

**record (26)**
4:1,12;30:10,13;
31:2;43:6,9;59:17,20;
81:24;83:9;90:7;
94:14;98:8,11,20;
115:6;139:19,23;
140:1;150:4,6;154:1,4;
163:15,18

**recording (7)**
90:5,5,10;104:6;
128:23;163:1,2

**recordings (5)**
90:8,14;93:7,8;133:7

**records (5)**
68:10;74:21;78:12,
14;98:21;102:24;
137:22;150:8;162:19

**recover (2)**
160:8,9

**Refer (2)**
32:9;76:23

**referred (1)**
125:16

**referring (13)**
38:13;46:20;50:6;
58:6;64:9;65:7,23;
67:11;80:15;84:1;
96:10;100:16;132:16

**refers (2)**
50:25;152:18

**reflect (3)**
83:18;128:20;
141:11

**reflected (1)**
84:7

**reflecting (2)**
104:11;141:20

**reflects (3)**
105:12;106:5;124:9

**regarding (60)**
5:17;6:1;17:9;21:8;
30:1,21;31:5,13;37:5;
43:18;44:11,24;45:4;
46:25;48:17;52:24;
57:11;59:9;60:1,7,17;
61:15,16,17;62:4;
66:20;86:14;90:4,14;
91:9;92:15;106:12,22;
107:9,13,17;108:14,14,
18;109:15;110:2,24,

McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

25;112:21;113:1;
114:3,7;117:19;
118:13,20;120:2,7;
141:9;142:1,14;
143:22;148:3;149:12;
151:24;158:17
**regardless (3)**
37:12;69:12;113:18
**regards (1)**
80:11
**regs (1)**
126:3
**regular (2)**
95:17;98:2
**regulation (1)**
151:22
**regulations (3)**
27:11,12;36:12
**relate (1)**
111:13
**related (1)**
61:15
**relating (2)**
5:3;97:3
**relationship (4)**
10:13,23;40:1;
159:19
**relative (1)**
75:2
**release (4)**
102:14;128:3;146:7;
157:22
**releases (1)**
128:15
**Relevance (1)**
7:3
**relevant (5)**
34:10,11;102:17,25;
153:20
**relying (1)**
114:23
**remain (1)**
137:6
**remains (1)**
69:13
**remember (7)**
29:25;43:23;46:6;
53:14,15;60:5;127:16
**remove (6)**
20:12;50:22;52:11;
93:3;136:1;157:19
**removed (2)**
52:5,13
**removes (1)**
51:20
**renewed (1)**
112:16
**rent (1)**

63:3
**reoccurring (1)**
69:7
**rep (3)**
133:22,23;134:15
**repayment (2)**
12:3,3
**repeat (10)**
5:20;10:19,20;16:4;
36:1;83:5;122:3,4;
129:14;141:15
**Rephrase (9)**
17:19;31:11;40:24;
42:12;55:16;91:15;
93:18;150:23;161:12
**replies (1)**
149:3
**report (13)**
9:8,12,15;10:4;55:8,
10,11;62:4;110:13,21;
137:13,23;138:9
**reporter (2)**
4:22;163:21
**Reporting (3)**
4:9;10:10;137:16
**reports (3)**
62:6;137:18,25
**represent (2)**
5:9;12:10
**representation (1)**
97:7
**representative (30)**
5:12;8:11;93:14;
134:6,9,10;135:1,10,
20;136:8,11,20,24;
137:1,4,6,19;138:15,
20;140:5;142:23;
143:3,5,8,11,13;
144:14,14;147:19,20
**representatives (8)**
21:2;26:18;50:1;
58:24;138:1,8;144:8,
10
**representing (3)**
4:14,16,18
**request (10)**
106:14;109:11;
110:6;123:8;124:15;
126:5;149:12,15,19;
151:3
**requested (4)**
149:16,23,24;150:1
**requests (1)**
57:13
**required (3)**
81:13;154:24;
158:18
**re-revived (1)**

158:4
**resolve (1)**
57:14
**Resources (1)**
107:7
**respect (1)**
87:7
**respond (1)**
11:5
**responded (1)**
148:20
**response (4)**
87:5;148:21,22;
149:5
**responses (3)**
60:10;72:4;149:6
**responsibility (1)**
161:14
**responsible (4)**
111:6,15,21;137:9
**Restate (15)**
22:15;24:14;67:15;
104:13,20;119:6;
121:17;122:21;123:22;
135:22;143:19;144:12;
147:3;156:25;162:6
**result (1)**
102:9
**retain (2)**
77:7;164:5
**return (1)**
30:6
**re-up (1)**
112:19
**revenue (2)**
56:22;62:8
**revenues (1)**
110:24
**reverse (1)**
101:17
**reversed (1)**
75:9
**review (7)**
66:24;67:2;72:25;
91:3;149:12;162:19;
163:1
**reviewed (1)**
67:1
**reviewing (4)**
57:7;90:20;102:16,
24
**revocation (2)**
94:17,18
**revoke (2)**
94:16,16
**revoked (2)**
93:23;94:11
**right (43)**

11:17;25:2;28:2;
40:11;44:10;52:12;
53:10;59:24;63:24;
64:3;67:14;74:2;
75:11;87:23,24;98:17;
101:16,20;104:17,21,
25;105:11;115:11;
120:23;121:19,22;
123:15;126:1;128:16;
129:10;131:9;133:15,
16;139:2,10;140:12;
142:19,20;144:24;
147:17;148:5;154:23;
158:23
**right-hand (1)**
67:12
**rights (1)**
115:5
**ring (3)**
88:3,15,23
**ringing (1)**
88:24
**rings (2)**
88:25,25
**road (1)**
64:4
**Robert (3)**
19:20;144:1,4
**Roughly (4)**
59:2,7;62:15;74:25
**rude (1)**
52:23
**rules (3)**
5:25;6:7;137:13
**run (6)**
43:18,19,22;59:3;
83:12,15
**running (1)**
23:24

**S**

**SAC (168)**
8:21,24;9:1,3,8,10,
11,25;10:10,24;11:5,
10;12:7,17;13:18;14:4,
20;15:21,25;16:1;17:1,
2,18,21;18:6;20:10;
21:8;22:19,24;26:1;
27:8;29:21;30:17;32:7,
12;33:4,11;35:22,22;
36:2,6;37:1,4;42:1,3;
43:2;45:22;47:13,16;
48:23;50:12,17;56:7,8;
57:10,20;60:3,4;61:2,
4;62:5,23;63:21;66:6;
68:4,21;70:5,19;71:4,
7,11;76:10;77:17;

78:16,17,18;79:9,16,
17;80:6,20,22,23,25;
81:2,6,9,12,15;82:18,
22;83:3,22;86:4,11,25;
87:9,22;89:22;90:5;
93:24;97:21;98:23,23,
24,25;101:14;103:12;
104:14;105:5;106:11,
19;108:8,12;109:23;
110:1,12;111:14,15,
19;112:7,21;113:1,9,
13;120:1;122:11,16,
20,22;123:4,15,24;
124:3,7,10,11;126:12;
129:22;130:18,21,22,
25;131:10,11;132:12;
134:6,21;139:17;
141:6,23;142:3,16,16;
148:11,20;150:16;
152:4,10,14;155:24;
156:8,11;157:1;160:4,
8,21;162:24
**SAC431 (2)**
67:10,16
**SAC432 (1)**
147:15
**SAC435 (1)**
140:9
**SAC437 (1)**
133:14
**SAC447 (1)**
121:1
**SAC448 (1)**
101:18
**SAC449 (2)**
99:10,18
**SAC450 (4)**
67:17;75:10;76:25;
87:14
**SAC's (15)**
16:10;45:13;49:20;
51:22;61:25;62:7,25;
69:15;70:24;77:25;
123:3;127:8;137:22;
152:3,5
**SAITH (1)**
164:10
**Sallie (15)**
8:15;39:22,24;40:2,
3,7,8,16,20,22;41:1,5,
9,18,19
**Sally (1)**
41:23
**same (34)**
22:13,17;31:6;36:4;
37:2;45:25;52:13;
62:21;63:18;65:15;
73:7,7,9;87:6;93:2;

94:8;97:10;100:25;
103:17;105:12;109:19;
112:25;113:17;117:3;
127:18;133:11;134:23,
24;142:19;147:9;
148:12;150:14;153:15;
157:3

**San (1)**
45:1

**saw (3)**
63:24;71:20;112:5

**saying (9)**
6:23;42:15;55:22;
79:11;82:1;88:20;
94:4;104:6,16

**SB (1)**
149:1

**scenario (11)**
17:20;20:11,13;
25:23;50:16;51:12,13;
52:10,13;88:24;111:22

**schedule (1)**
95:13

**Science (1)**
120:14

**scratched (1)**
51:17

**screen (5)**
76:6;91:21,25;92:8;
128:8

**screens (1)**
35:9

**script (7)**
26:18;27:4;100:12;
117:9,10,12,18

**scrub (10)**
42:8;48:9;49:6;50:17;
77:8;78:8;79:20;
80:12;82:12;83:13

**scrubs (1)**
83:17

**seal (1)**
155:1

**sealed (2)**
155:3,4

**second (11)**
44:16;75:15;84:14,
24;99:11,16;157:7;
159:17;160:13,18;
161:17

**seeing (4)**
89:19;122:17;
141:10;144:25

**seem (5)**
87:15;128:20;
136:19;141:11;146:18

**seems (22)**
19:1;25:6;37:16;

38:19;72:21;73:7,23;
74:20;83:18;87:22;
99:13,21,22;101:23;
102:18;121:6;123:20;
129:13;145:9;147:17;
148:25;152:13

**self (1)**
128:2

**seminar (1)**
44:25

**seminars (1)**
44:11

**send (12)**
17:6,6,17,24;20:18,
23;29:17,22;33:20;
158:14,20;162:14

**sending (3)**
20:16;29:16;149:7

**sends (1)**
42:5

**Senior (7)**
9:22;10:1;40:19;
110:19,20,22;112:4

**sent (10)**
18:6;20:2;73:2,14,
20;74:21;134:24;
148:20,23;158:10

**separate (8)**
10:12;35:1;55:14;
61:22;65:17,18;68:4;
84:6

**separately (1)**
14:10

**September (8)**
70:21,22;71:3;74:5;
75:18;83:7;99:22;
101:23

**series (1)**
128:13

**service (7)**
33:5;34:24;55:18;
69:20;116:7,8;158:4

**servicer (10)**
28:3,13,14,16;33:6;
35:9;83:10;150:1,2;
160:1

**servicers (10)**
28:17,19,22,23;29:4,
6;31:24;33:9;35:12;
149:21

**servicers' (1)**
35:9

**servicer's (1)**
150:4

**services (3)**
55:7,14,18

**servicing (40)**
30:23;31:7,9,13,22;

32:3,5,21,23,25;33:11,
14,22;34:16;35:2,5,24;
36:3,22;37:7,12;46:12,
16,17,19,19;47:1,9,13;
63:19;81:22,23;82:20,
22;83:4,8,11;92:18;
116:4;118:6

**set (5)**
20:22;23:6;45:9;
86:21;98:4

**sets (1)**
86:17

**seven (7)**
24:25;25:5;88:10,12,
22;100:14;163:23

**seven-day (1)**
164:7

**several (10)**
12:10;14:22;15:8;
22:13;29:3,6;53:16;
58:12;121:11;132:2

**share (18)**
47:4,8,9,20,21;49:9,
11,16;57:3;80:13;93:1;
131:10;151:20;152:14,
22;153:15,19;161:25

**shared (7)**
31:21;47:3;55:7,14,
18,18;90:25

**sheet (1)**
102:20

**shifts (1)**
59:3

**show (10)**
18:14;38:13;40:12;
67:4;72:11;92:2,4;
99:9;118:3,8

**showed (1)**
71:19

**shows (2)**
75:16,18

**side (3)**
65:8;112:5;133:15

**sides (1)**
152:17

**sign (4)**
64:5,8,13;163:24

**signature (1)**
73:7

**signed (1)**
154:19

**Significantly (1)**
58:1

**signing (1)**
163:20

**similar (2)**
62:17,22

**SIMONETTI (65)**

4:17,17;7:11,13;
10:14,20;25:10,15;
26:6;30:5,9;38:9;40:3,
8;41:6;42:15,20;44:16;
59:14;60:13;67:11;
69:21;72:17;78:23;
79:3;82:24;86:14,20;
87:5;93:25;96:5,12,20;
97:1,10,16,23;98:7;
103:22;104:7,23;
105:2;111:8;114:15,
21;115:4,12;119:10;
139:22;142:6;147:1,9;
154:16,23,25;155:4,9;
156:1,14,20;157:3;
163:13,15,19;164:5

**simple (3)**
5:21;94:6;132:17

**simply (4)**
41:14;45:5;118:4;
124:10

**SIS (1)**
77:6

**sister (6)**
10:25;11:2;39:10;
47:7;49:14;83:12

**sit (1)**
151:16

**site (1)**
37:21

**sitting (1)**
58:7

**situation (1)**
52:18

**Situations (2)**
20:20,21

**six (12)**
13:23;14:7;15:24;
26:2;28:20;45:10;
57:12;66:15;69:8;
100:3;161:16,17

**size (1)**
95:25

**skip (9)**
129:19,22,25;130:3,
6,12;146:22,24;147:6

**skipped (1)**
120:6

**smart (1)**
115:2

**Smith (1)**
4:9

**sole (1)**
58:8

**Solution (2)**
33:5;49:24

**Solutions (64)**
4:3;9:24;10:2,5,8,11,

24;11:1,6,10;28:16;
29:3;34:9;39:7;9:10;
46:18,21,22;47:7,18;
48:7,18;49:8,15;50:13;
52:4;55:12;56:9,25;
57:4;61:22;63:8,11;
65:11;66:6;71:15;78:3,
16;80:9,18;82:3,13,19;
83:3,19;86:1;92:22,24;
93:6,13,21;94:7,10,17;
110:14,22;111:20;
142:11;143:17;149:20;
150:18,20;152:4,13

**Solutions' (5)**
34:4;35:11;78:1,22;
150:14

**somebody (14)**
15:3;20:8;77:19,24;
82:2;87:25;89:24;
91:12,16,22;93:5;98:5;
102:11;110:9

**somebody's (3)**
52:16;53:20;109:4

**somehow (1)**
108:2

**someone (25)**
29:10;49:7;50:25;
60:1;70:23;76:5;77:15,
16,17;78:1,21;89:9;
90:17;91:10;92:22;
93:13,21;108:25;
111:4,17;126:6;
128:17;134:18;149:3;
162:24

**sometime (1)**
38:19

**sometimes (4)**
97:7,8;103:18;
105:19

**somewhat (1)**
46:13

**somewhere (2)**
119:18,24

**soon (2)**
69:16;129:6

**sooner (1)**
70:4

**sorry (18)**
7:12;24:11;26:8;
37:22;40:9;41:10;
42:18;46:7;63:15;83:2,
5;86:7;98:23;99:17;
100:2;104:13;110:20;
121:16

**sort (5)**
33:16;59:4;94:21;
112:3;128:12

**sound (1)**

Case 8:15-cv-01559-VMC-TBM   Document 95-1   Filed 02/26/16   Page 60 of 86 PageID 1238
McCaskill v. Navient Solutions, et al.

Kevin Campbell
December 22, 2015

87:23

**sounds (1)**
87:24

**source (1)**
115:8

**space (2)**
63:3,20

**span (1)**
112:17

**SPCLT (1)**
75:18

**speak (5)**
29:25;46:3;85:17;
93:4;96:6

**speaking (3)**
6:8;7:4;41:18

**specialist (6)**
100:20;148:6,10,10,
13,18

**specific (10)**
35:11;52:21,24;
63:5;64:2,10;79:11;
95:3;135:1;144:21

**specifically (15)**
30:21;43:18;46:22;
48:7;50:14;54:16,24;
56:2;61:3;107:3;
108:18;127:2;131:10;
152:24;153:2

**specifics (2)**
53:9;127:1

**spend (1)**
66:2

**split (4)**
41:4,5,21;59:4

**spoke (1)**
89:9

**SRC (2)**
77:4,6

**stack (1)**
18:10

**staff (1)**
45:17

**stamped (1)**
139:3

**stand (1)**
47:23

**standard (3)**
161:5,9,10

**Standish (4)**
9:18,20;10:1,4

**stands (3)**
13:11,20;75:24

**start (14)**
20:18;53:7;59:8;
77:4;79:13;99:11;
101:18;121:20;127:19;
129:9;133:15;138:13;

140:12;144:25

**started (4)**
9:3;39:21;109:18;
129:6

**starting (1)**
32:16

**starts (5)**
18:14;74:4;75:15;
121:10;129:15

**state (7)**
6:8;7:21;22:22;61:5;
118:17;119:23;147:14

**stated (33)**
12:10;17:23;24:10;
29:15;30:18;31:3;
32:11;33:6;34:16;
35:8;47:21;65:14;
68:12;71:13;80:17;
86:13;91:11;99:6;
108:6;109:14;110:11;
111:13;119:2,7;
128:11;132:18;138:2;
152:7;153:2;155:19;
158:24;159:15;163:3

**statement (10)**
25:6;47:10;70:6;
112:24;115:16;116:25;
117:1;122:18;139:10;
142:3

**states (5)**
18:17;87:6;148:17;
155:16,17

**status (6)**
34:20;35:12,13,14;
76:18;92:1

**statute (3)**
115:12,14;126:7

**stays (1)**
18:16

**step (1)**
16:1

**steps (2)**
109:4;134:13

**still (11)**
35:15;38:6;94:4;
96:22;97:3,13;100:25;
122:13;140:9;156:4,5

**stipulated (4)**
87:2;104:1;154:11;
155:7

**stipulation (1)**
86:17

**stop (18)**
6:21;35:7;52:14;
53:1;54:8;57:13;
70:25;71:9;90:18,19;
92:24;93:6,13,17;94:9;
97:22;111:4,20

**straight (1)**
42:21

**Street (2)**
4:10;7:13

**strictly (1)**
12:19

**structure (1)**
55:9

**Student (57)**
5:11;7:24;8:13,19,
20;9:7;12:14,18,19,19;
13:2;14:2;19:24;26:1,
4;29:9;31:17;38:5,7;
39:1,8,13,20,21,22;
40:1,15,18,19;45:14;
49:14;52:19;56:3,14,
15,19;59:23;61:21;
67:2;71:24;72:20;
75:13,23;79:22,24;
89:8;91:8;94:11,14,18;
116:9,12;125:24;
126:10;131:24;154:10;
163:7

**Students (1)**
11:13

**subsidiaries (3)**
41:12;55:20,24

**sued (1)**
61:4

**Suite (1)**
4:10

**superior (1)**
11:2

**supervisor (1)**
24:6

**supposed (6)**
27:6;32:15;54:10;
91:17;93:3;117:19

**sure (22)**
24:7;26:17,19;
38:13;39:4;47:11;
63:23;75:6;78:10;
83:25;100:24;105:11,
15;106:4;128:16;
129:21;133:8;134:17;
139:22;142:12;153:2;
156:7

**swear (1)**
4:22

**switch (1)**
101:16

**sworn (1)**
5:2

**symbol (1)**
129:25

**symbols (2)**
77:13,22

**SYS (4)**

77:4;100:20;129:18;
130:17

**SYSSRC (3)**
77:10;79:2;82:4

**system (87)**
16:10,13,15,17;17:2,
22;19:18;20:15;21:19,
22,23;23:6,11;25:4;
26:23;29:23;30:19;
31:2,20;32:1,3,8,18,24;
33:2,3,7;34:1,5,8;43:6,
9;48:21;51:16,22,25;
52:1;55:15;67:24;68:1,
3,9;70:15;78:13,19;
81:24;82:5;83:9;
84:11;87:19;90:12,13;
91:19;92:9;94:13;
98:20;99:4;102:10,14,
15;121:25;124:6;
129:18;130:17,18,18,
19,19,21,23;131:5,19;
132:4,4,7,8;139:19;
143:13;150:4;157:12,
13,15,17,21,22,24;
161:23

**systems (6)**
16:20,24;31:5;
32:19;34:9;77:20

---

**T**

**table (1)**
103:23

**talk (15)**
25:12;43:17;44:17,
23;46:22,23;60:14;
66:11;90:4;96:15;
106:6;135:4;142:17;
143:8;144:4

**talked (5)**
80:14;89:16;91:16;
151:19;158:9

**talking (32)**
17:20;18:11;20:11;
33:17;36:25;45:19;
48:6;59:8,23;70:20;
76:5;78:5,23;79:1,2,3;
82:17;84:19;97:13,17;
100:17;106:12;109:18;
121:16;123:13;129:6,
23;140:4;142:16;
153:20;158:17;160:14

**Tammy (1)**
131:15

**Tampa (1)**
4:5

**tape (3)**
59:12;98:6;139:21

**Tav (12)**
4:13;5:9;30:5;42:15;
72:18;86:16;87:5;
97:10;103:23;104:16;
105:21;115:4

**TCPA (19)**
44:8,12,24;45:5,19,
20;61:3;107:4,4,10,11,
14,14,17;108:19,21;
113:24;151:22;152:11

**Team (33)**
24:5,6;50:10;54:4;
55:4,5,8,17;56:1,4,5,6,
7;57:6,11,18;90:22,23;
93:2;94:22,23,24;95:2,
4;96:1,2,18,21;97:2,3,
12;133:12;153:15

**teams (1)**
97:6

**tedious (1)**
83:24

**telling (5)**
79:15,17;84:20;
96:25;97:2

**tells (9)**
82:19,21;83:9;85:4,
24;92:22;93:5,13,21

**ten (5)**
8:6;28:24;61:12;
65:3;113:19

**term (8)**
12:4,5;14:25;18:19;
76:2;101:10;130:6;
148:13

**terrible (1)**
64:20

**testified (1)**
5:4

**testify (1)**
114:15

**testimony (4)**
38:24;45:23;113:4;
163:17

**Thanksgiving (1)**
128:17

**Therefore (7)**
5:25;24:19;26:24;
33:21;62:9;71:9;
141:23

**third (9)**
55:21,21;76:23;
77:3;78:5;80:11;
102:21;130:10;147:6

**third-party (1)**
43:24

**Thirty (1)**
137:10

**Thirty-two (1)**

74:22

**though (2)**
5:23;11:2

**thought (4)**
89:24;162:25;163:3,
4

**thousand (3)**
88:12,15,21

**three (21)**
10:15,21;19:25;
54:22,23;55:1;59:3;
64:19,20;65:9;69:8;
102:18,20;120:12;
122:12;145:24;148:24;
161:19,22;162:3,7

**throughout (5)**
59:4;120:3;142:2;
148:23;149:22

**times (27)**
8:3;24:19,25,25;
25:5,5;61:4,13,13;
86:11;87:25;88:4,7,8,
12,15,21,25,25;89:8,
15;106:3;119:3,13,16;
134:2;156:8

**tired (1)**
93:22

**title (3)**
8:19;9:21;131:16

**titles (2)**
50:15;120:20

**Today (14)**
4:7;5:17;18:5,7,25;
37:1,19;38:24;39:5;
72:11;74:4;102:23;
122:19;151:16

**today's (5)**
124:23;128:22;
135:19;143:7,15

**together (2)**
10:11;53:3

**told (19)**
44:22;45:4;46:11;
47:12;49:9,17,20;
65:25;79:21;92:23;
93:17;111:4,19;
114:25;124:8;144:1;
152:24;160:14;162:3

**took (1)**
164:1

**top (12)**
9:9,11;11:5;18:15;
19:11,25;64:8;72:19;
73:4;74:17;140:11;
148:5

**Total (4)**
57:22;121:13,14,21

**touched (1)**

**towards (1)**
129:10

**trace (4)**
130:12;146:22,24;
147:6

**tracing (1)**
130:6

**track (1)**
138:16

**train (1)**
98:1

**trained (4)**
114:19;115:1;
117:16;133:9

**training (22)**
21:1;45:6,19,20;
98:2;106:22,24,25;
107:18;108:7,12,22;
109:13,20;114:3;
117:19,23,24,25;
118:19;120:4;152:6

**transcript (5)**
163:20,22,24;164:6,
8

**transfer (8)**
23:11;28:4,7,13;
41:2;118:5,7,8

**transferred (2)**
76:20;128:18

**transition (1)**
40:23

**translated (1)**
33:13

**trial (1)**
155:7

**trick (1)**
38:14

**trigger (1)**
81:8

**triggered (1)**
81:6

**triggers (2)**
81:2;90:10

**Troy (3)**
9:18,19;10:1

**true (2)**
47:10;70:6

**truth (3)**
5:2,3,3

**try (12)**
5:20;25:1;32:13;
57:14;69:20;89:12;
91:4;105:7;109:16;
128:23;130:9;154:8

**trying (17)**
11:12;12:20;18:21;
33:5;34:15,24;40:6;

42:20;53:13;54:14;
56:6;70:1;89:11;
109:7;148:14;150:24;
161:8

**Tucker (3)**
19:20;144:2,4

**T-U-C-K-E-R (1)**
19:21

**two (28)**
6:5;13:17;15:22;
33:10;37:14,14;41:4,5,
21,22;58:10,15;65:25;
66:1,3;68:12;101:25;
107:15;112:5;121:16,
18;145:19;146:3;
150:23;152:14,16;
156:2;159:15

**type (18)**
17:11;21:23;23:25;
42:8,9;43:19;44:11;
48:10;61:16;62:4;
109:25;110:2,4,21;
133:6;152:9,11;154:14

**typed (2)**
128:4;140:13

**typical (1)**
85:8

**typically (3)**
28:7;81:10;130:1

## U

**ultimately (1)**
15:16

**un-delinquent (1)**
159:24

**under (14)**
6:4;38:20;56:14,25;
80:15,17;118:11;
119:23,24;120:25;
123:1,1,2;155:1

**underneath (3)**
10:1;102:4;145:13

**United (2)**
155:16,17

**unless (1)**
154:22

**up (47)**
15:3,17;23:6;24:17;
37:23;45:18;52:6;
53:20,21;55:8,11;
68:15;69:16;70:5,23,
23;71:8;76:6,19;82:10;
83:15;89:19;95:16;
100:14;101:19;102:12;
109:16;111:17,22;
112:6;122:25;123:2,5;
127:19,22,24;128:8,

14;129:4,6,7;133:16;
143:12;150:2;153:1;
154:7;163:5

**update (12)**
31:12;33:8;51:22;
52:3;54:19;94:14;
130:21,22,25;140:19;
141:7,8

**updated (8)**
33:20,25;38:19;
40:14;52:1;146:20;
157:15;160:23

**updates (11)**
33:7,8,9;51:25;
94:13;110:23;131:25;
132:1;141:9;160:1,2

**upfront (2)**
113:18;160:15

**uploaded (1)**
34:4

**uploads (1)**
34:8

**upon (2)**
109:9;162:4

**USA (28)**
12:12,14,23;16:7;
66:18;68:1,18,21,22;
70:7,12;75:14;77:16;
78:12,13;98:18;112:7,
22,24;123:7;127:3;
132:23;133:3;149:17;
150:8,10,25;158:24

**use (11)**
15:6;16:6;21:23;
22:12,24;26:5,10,11;
32:24;43:22,24

**used (2)**
40:25;41:8

**uses (1)**
61:21

**using (4)**
38:9,11;154:12;
155:11

**utilize (1)**
56:10

## V

**validation (3)**
158:15,18;162:15

**variations (4)**
14:22;22:19,20;59:5

**various (3)**
71:22;134:2;146:10

**vary (5)**
20:20,21;57:24,25;
59:1

**Vedder (1)**

4:18

**verbatim (3)**
115:15;117:18;
119:23

**verification (2)**
43:3,5

**verifications (1)**
43:8

**verify (6)**
42:11;43:20,25;
51:18;75:5;109:15

**verifying (1)**
42:9

**Verizon (1)**
148:25

**version (2)**
21:25;22:1

**versus (2)**
4:3;87:7

**Via (5)**
34:20;37:9;77:8;
102:10;142:10

**Vice (13)**
9:22;10:1;11:6;38:4,
8,16,21;39:12;110:14,
19,20,22;112:4

**VIDEOGRAPHER (14)**
4:1,21;30:10,13;
59:13,17,20;98:8,11;
139:23;140:1;154:1,4;
163:16

**view (4)**
30:24;32:1;35:8;
46:12

**viewing (1)**
92:19

**violate (1)**
107:10

**violation (1)**
107:14

**violations (4)**
61:3;107:4,10;
118:20

**VM (1)**
146:5

**voice (19)**
22:7,16,23;23:7;
103:6,7;104:4,11,15,
24;105:6,12,16,20,24;
106:4;109:16;119:4;
146:4

**voicemail (3)**
146:4,6,6

## W

**wait (2)**
20:17,23

**walk (2)**
16:9;50:24
**wants (1)**
118:10
**way (29)**
5:17;15:9;19:2;29:9;
38:8;68:7;70:8,22;
98:22;100:10;112:20,
21;114:18,22;124:13,
14;132:7,19;133:17;
134:24;136:19;146:14;
149:2,22,24;159:10,
17;160:21;161:17
**ways (6)**
15:8,21,22;68:13;
159:15;161:25
**web (1)**
37:21
**week (4)**
24:19;29:18;92:3;
127:6
**weekly (3)**
95:23,23;96:2
**weren't (1)**
75:6
**What's (6)**
10:14;73:11;95:8;
131:12,16;137:6
**When's (1)**
46:4
**whole (4)**
5:3;39:19;78:24;
81:24
**whomever (1)**
8:11
**who's (6)**
23:24;55:4;80:4;
95:14;107:21;131:4
**whose (1)**
116:2
**Willie (5)**
4:3,14;5:9;103:8,10
**window (1)**
150:17
**windows (1)**
150:16
**wireless (2)**
145:15,21
**within (22)**
17:10;35:14;46:5;
48:1;53:12,13,16;63:2;
88:5,12,21;89:2;92:9;
101:14;112:1;136:16;
137:21;142:19;148:11;
149:13;158:15;164:7
**witness (5)**
4:22;7:12,16;
163:23;164:3

**word (4)**
26:20;69:22;129:22,
24
**work (43)**
5:18;7:23;9:3;14:4,
5;15:12;16:15;28:22;
36:6;38:24;39:5,6,7;
41:10;50:12,12,13;
55:20,24;60:9,9;63:4,
7,17;64:7,11;65:24;
68:7,21;70:23;76:20;
81:4,14;103:19;
125:11;131:9;135:3,4,
5;136:20,23;138:4;
159:25
**worked (4)**
8:11;9:1;37:16;41:9
**working (2)**
39:21;138:13
**works (3)**
54:16;63:11;131:19
**worth (1)**
61:25
**write (5)**
51:5;128:8,10;
132:25;137:25
**writing (5)**
109:5,6;117:20;
119:18;132:17
**written (23)**
73:8;106:9,25;107:1,
2,3,9,13,16,21,23,25;
108:7,9,9,19,25;109:2;
113:23;114:6;137:23;
138:9;151:24
**wrong (2)**
132:17;145:21
**wrote (1)**
19:13

**Y**

**year (11)**
45:9,23;46:5;53:14;
62:7,18,18,21;113:20;
122:7;129:16
**yearly (1)**
112:16
**years (7)**
8:6,25;53:16;113:1;
120:12;122:7,12
**yesterday (1)**
98:16

**Z**

**zero (8)**
62:15,16,18;121:13,

15,21;124:18,19

**0**

**0.00 (1)**
121:21
**00DAF (1)**
121:10
**02/20/2015 (1)**
140:14
**060 (4)**
18:15,15,17,21
**090 (2)**
74:11,17

**1**

**1 (5)**
19:6,7,9;74:2;158:12
**1,000 (2)**
25:8,17
**1,680 (3)**
25:1,3,6
**10/9/14 (1)**
74:10
**10:34 (1)**
59:18
**10:43 (1)**
59:21
**11 (1)**
74:5
**11:00 (1)**
121:7
**11:42 (1)**
98:9
**12 (6)**
53:12;60:20;61:5;
112:1;129:13,15
**12:48 (1)**
145:7
**13th (1)**
99:22
**14 (2)**
99:13,20
**14/12/12 (1)**
129:15
**15 (3)**
59:13;99:20;145:5
**15/04/08 (1)**
145:5
**150 (2)**
59:2,3
**1700 (1)**
144:17
**1st (4)**
121:6;133:18;
138:18;142:25

15,21;124:18,19

**2**

**2 (10)**
67:5,8;75:7;77:1;
80:17;87:14;98:14;
120:25;127:18;140:10
**2:01 (1)**
139:24
**2:12 (1)**
140:2
**2:35 (1)**
154:2
**2:42 (1)**
154:5
**2:58 (1)**
163:17
**20 (9)**
29:1;47:12;61:13;
67:6;71:19;78:11,18;
98:15;139:13
**20,000 (1)**
58:4
**200 (1)**
4:10
**200,000 (1)**
58:4
**2007 (2)**
9:2;37:17
**2011 (1)**
73:19
**2014 (16)**
62:3,7,11,19;70:21,
22;71:3;74:5;75:18;
83:7;99:23;101:24;
121:7;128:17;129:13,
15
**2015 (8)**
4:7;62:11;133:19;
138:19;142:22,25;
145:2;147:18
**206 (1)**
101:10
**22 (1)**
127:21
**22nd (2)**
4:7;62:12
**23rd (1)**
101:23
**24 (2)**
53:12;73:19
**240 (3)**
62:24,25;103:16
**24-hour (1)**
52:7
**24th (1)**
128:16
**25 (1)**

18:5
**260 (1)**
100:21
**28,752.78 (1)**
124:18
**29 (2)**
74:21,22
**2nd (2)**
142:22;147:17

**3**

**3 (7)**
72:12,13;79:13,13;
80:15;82:1;85:23
**30 (18)**
17:11;18:5;24:25;
25:5;48:20;74:25;
81:5;122:7;137:12,22;
138:3,6,8,12,20;
139:12,15;142:22
**30-day (1)**
158:15,17;162:14
**30-second (1)**
129:5
**3672 (1)**
145:2
**390-5454 (1)**
145:20
**3914 (1)**
145:25

**4**

**4 (4)**
74:7,9,15;84:8
**4:33 (1)**
101:24
**400 (1)**
4:9
**432 (1)**
147:13
**433 (1)**
144:23
**4347 (1)**
140:15
**435 (1)**
142:19
**437 (1)**
140:5
**439 (1)**
129:9
**441 (1)**
127:18
**442 (2)**
148:6,14
**450 (1)**
67:10

**478 (9)**
 87:22,25;88:3,7,25,
 25;89:9;154:11;155:11

**5**

**5107 (1)**
 145:14
**56 (3)**
 24:19,20,25

**6**

**60 (11)**
 18:20;74:4;75:1,2,6;
 81:7,10,11,19,21;
 126:10
**6041 (1)**
 162:20
**60-days (1)**
 125:18
**61 (1)**
 86:7
**6140 (21)**
 84:15,20;85:25;86:4,
 12;89:15;99:5;102:25;
 103:6;128:17;137:1;
 142:2,14;154:11;
 155:12,15,20;156:9,12,
 12;157:2
**615 (7)**
 142:24;143:3,5,8,11,
 13;144:14
**65 (1)**
 63:23
**664 (4)**
 147:19,23,25;148:13
**69 (2)**
 63:24;64:2

**7**

**7 (1)**
 24:19
**72 (1)**
 20:23
**727-581-6140 (2)**
 82:8;83:19
**727-581-8617 (1)**
 84:7
**771 (20)**
 133:18,23;134:10,
 22;135:2,10,11,20;
 136:8,14,20,23,24;
 137:1,19;138:2,20;
 140:5;142:23;144:14
**772-380-3672 (1)**
 145:9

**8**

**8 (1)**
 145:2
**8:15-CV-1559-T-33-TBM (1)**
 4:6
**80 (1)**
 59:7
**813 (1)**
 145:20
**8617 (5)**
 84:24;85:7,12;86:8;
 146:4
**8th (2)**
 145:4,5

**9**

**9/11/14 (1)**
 19:10
**9/25/14 (2)**
 72:19;73:6
**9:03 (1)**
 4:8
**9:40 (1)**
 30:11
**9:51 (1)**
 30:14
**90 (2)**
 74:10,24
**996 (1)**
 75:19
**9th (4)**
 70:21,22;71:3;75:18

9/11/14
To: Newsome64@verizon.net
Mnews01@Live.spcollege.edu
maretta.newsome75@gmail.com

**Day 060**

Hi Borrower First and Last Name,

We are here to help you with your account status. Here is some helpful information.

If you cannot send a payment today, there may still be a way for you to avoid defaulting on your loan and facing the consequences. You may be able to qualify for a deferment or forbearance, which can postpone your loan payments and keep your loan from going into default. You can learn more about these options online by visiting LOANSOLUTIONS.USAFUNDS.ORG.

Time is limited, so please contact us by calling 1-800-635-3743 today or responding to this E-mail and let us help you explore your options for repaying your loan.

Student Assistance Corporation


You'll need Adobe Reader to view the file. For optimal viewing and security, we recommend installing the latest version of Adobe Reader and keeping it updated. Download a free copy of the Adobe Reader at http://www.adobe.com/products/acrobat/readstep2.html.

To remove your name from future E-mail communication, call us at 1-800-635-3743 or simply reply to this email.



PLAINTIFF'S
EXHIBIT

12-22-15 KB

PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989
12-22-15 KWB

CONFIDENTIAL

SAC0000431

PHONE NBR (727)581-8141 LOCATION CHANGED FROM CELL AUTO DIAL TO REFUSED PERMISSION

(727)488-6081 OTH OTH

*[The remainder of the page is a dense, rotated telephone call-activity log consisting of many rows of date/time codes, phone numbers ((727)218-4347, (727)581-8617, etc.), call-status notes (e.g. "OUT BORR MSG COMPLETED", "OUT BORR NO MSG LEFT-AM MACH", "ANSWERING MACHINE", "SENT TO:NEWS@OMEF4@VERIZON.NET", "SENT TO:MNEWS01@LIVE.SPCOLLEGE.EDU", "SENT TO:MARETTA.NEWS@OMEF5@GMAIL.COM"), AM/PM timestamps, and the repeated column label "SERVICER NAVIENT". The individual rows are not legibly reproducible at this resolution.]*

CONFIDENTIAL

SAC0000432

| Activity | Phone | Result | Note |
|---|---|---|---|
| LRA=06 DT/TM=15042601:59AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | AZG2 04/24/15 10:15 AM | |
| RA=06 DT/TM=15042601:46AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A201 04/24/15 01:21 PM | |
| RA=06 DT/TM=15042601:26AM SPCL=T=698EM OUT BORR | (727) 581-8617 | VOICE MAILBOX IS FULL | |
| RA=06 DT/TM=15042201:44PM SPCL=T=698EM OUT BORR | (727) 581-8617 | VOICE MAILBOX IS FULL | |
| RA=06 DT/TM=15042201:47AM SPCL=T=000SYS EMAIL-CHNLH LT STG VRBL | SENT TO:NEWSOMEFR@VERIZON.NET | | SERVICER NAVIENT |
| RA=06 DT/TM=15042201:47AM SPCL=T=000SYS EMAIL-CHNLH6 LT STG VRBL | SENT TO:MARIETTA.NEWSOME76@LIVE.SPCOLLEGE.HJU | | SERVICER NAVIENT |
| RA=06 DT/TM=15042201:47AM SPCL=T=000SYS EMAIL-CHNLH6 LT STG VRBL | SENT TO:MARIETTA.NEWSOME76@GMAIL.COM | | SERVICER NAVIENT |
| RA=06 DT/TM=15041704:72AM SPCL=T=698EM OUT OTH | (727) 581-8140 | ANSWERING MACHINE OUT OTH | |
| RA=06 DT/TM=15041704:70AM SPCL=T=698EM OUT OTH | (727) 581-8140 | ANSWERING MACHINE GGLRSRCH FUSS FUE +OP SD BORR NL IN DEPT | |
| RA=06 DT/TM=15041705:50AM SPCL=T=698EM OUT BORR | (727) 527-4567 | ANSWERING MACHINE FLORIDA CHILD CARE | |
| RA=06 DT/TM=15041706:57AM SPCL=T=698EM OUT BORR | (727) 581-8617 | A2G2 04/16/15 01:50 PM | |
| RA=06 DT/TM=15041701:49AM SPCL=T=000NBL IN NO CNNCT/ NO ANS | (727) 581-6140 | SE14 X08 04/16/15 01:50 PM | |
| RA=06 DT/TM=15041601:50PM SPCL=T=614+HK IN BORR | (727) 581-6140 | NO ANSWER | |
| RA=06 DT/TM=15041601:42AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A201 06/15/15 06:51 PM | |
| RA=06 DT/TM=15041501:51AM SPCL=T=000SYS EMAIL-CHNLI2 LT STG GEN1 | SENT TO:NEWSOMEM4@VERIZON.NET | | |
| RA=06 DT/TM=15041501:54AM SPCL=T=000SYS EMAIL-CHNLI2 LT STG GEN1 | SENT TO:MARIETTA.NEWSOME76@LIVE.SPCOLLEGE.EDU | | SERVICER NAVIENT |
| RA=06 DT/TM=15041501:51AM SPCL=T=000SYS EMAIL-CHNLI2 LT STG GEN1 | SENT TO:MARIETTA.NEWSOME76@GMAIL.COM | | SERVICER NAVIENT |
| RA=06 DT/TM=15041401:22AM SPCL=T=000NBL OUT BORR MSG COMPLETED | (727) 218-4347 | A242 04/13/15 08:24 PM | |
| RA=06 DT/TM=15041401:22AM SPCL=T=000NBL OUT BORR MSG COMPLETED | (727) 581-8617 | A241 04/14/15 05:30 PM | |
| RA=06 DT/TM=15041102:14AM SPCL=T=000NBL OUT OTH | (727) 581-8617 | A282 04/10/15 06:33 PM | |
| RA=06 DT/TM=15041102:11AM SPCL=T=000NBL OUT BORR MSG COMPLETED | SENT TO:NEWSOMDMH4549@VERIZON.NET | | |
| RA=06 DT/TM=15041002:02AM SPCL=T=000SYS EMAIL-CHNLO7 LT STG VRBL WFRB | SENT TO:MNEWSOI01@LIVE.SPCOLLEGE.EDU | | |
| RA=06 DT/TM=15041002:02AM SPCL=T=000SYS EMAIL-CHNLO7 LT STG VRBL WFRB | SENT TO:MARIETTA.NEWSOME76@GMAIL.COM | | |
| RA=06 DT/TM=15041001:53AM SPCL=T=000NBL OUT BORR MSG COMPLETED | (727) 218-4347 | A232 04/08/15 08:48 AM | |
| RA=06 DT/TM=15041001:53AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A242 04/09/15 06:12 PM | |
| RA=06 DT/TM=15040812:46PM SPCL=T=000NBL OUT OTH | (727) 581-8617 | A242 04/09/15 05:15 PM | |
| RA=06 DT/TM=15040812:41PM SPCL=T=698EM OUT OTH | (727) 581-8617 | NO ANSWER ACCR KEL WRLSS NI AVAIL | |
| RA=06 DT/TM=15040812:44PM SPCL=T=698EM BORR FIU | (727) 581-8617 | | |
| RA=06 DT/TM=15040812:44PM SPCL=T=696EM BORR FIU | (727) 581-8617 | | |
| RA=06 DT/TM=15040812:44PM SPCL=T=696EM BORR FIU | (727) 581-8617 | | |
| RA=06 DT/TM=15040812:44PM SPCL=T=696EM BORR FIU - TERMINATE | (813)390-5454 | WRUNG NUMBER ACCR BORR WRLSS | |
| RA=06 DT/TM=15040812:41PM SPCL=T=99SHM BORR FIU | | | |
| RA=06 DT/TM=15040812:41PM SPCL=T=99SHM BORR FIU - TERMINATE | (727)288-3814 | DISCONNECTED | |
| RA=06 DT/TM=15040812:41PM SPCL=T=898EM BORR FIU | | | |
| LRA=06 DT/TM=15040812:29PM SPCL=T=893EM FRS BORR | SEND MAIL - FORBEARANCE | | |
| RA=06 DT/TM=15040812:29PM SPCL=T=898EM FRS BORR | SEND MAIL - FORBEARANCE | | |
| RA=06 DT/TM=15040812:28PM SPCL=T=698EM FRS BORR | (727) 581-8617 | VOICE MAILBOX IS FULL DORR VM | |
| RA=06 DT/TM=15040801:47AM SPCL=T=000NBL OUT BORR NO CNNCT NO ANS | (727) 218-4347 | S323 A211 04/07/15 02:57 PM | |
| RA=06 DT/TM=15040601:23SHI OUT BORR | (727) 581-8617 | S139 A111 03/28/15 09:40 AM | |
| RA=06 DT/TM=15040601:47AM SPCL=T=000NBL OUT BORR MSG COMPLETED | (777) 218-4347 | A283 04/05/15 08:01 PM | |
| RA=06 DT/TM=15040601:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A282 04/05/15 06:33 PM | |
| RA=06 DT/TM=15040503:28AM SPCL=T=000SYS ACCOUNT REASSIGNED TO SPECIALIST FROM POOL 981 | | | |
| RA=06 DT/TM=15040502:09AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | | A232 04/04/15 07:01 PM | |
| LRA=06 DT/TM=15040502:09AM SPCL=T=000NBL OUT BORR PARTIAL MSG DELIVERED | (727) 581-8617 | A231 04/03/15 06:04 PM | |
| RA=06 DT/TM=15040103:01AM SPCL=T=000SYS Account reassigned to 899 on 3/31/2015 | | | |
| RA=06 DT/TM=15040102:29AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A183 03/31/15 10:46 AM | |
| RA=06 DT/TM=15040102:29AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 581-8617 | A183 03/31/15 07:45 PM | |
| RA=06 DT/TM=15040102:29AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A182 03/30/15 07:23 PM | |
| RA=06 DT/TM=15040102:29AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 581-8617 | A132 03/31/15 11:23 AM | |
| RA=06 DT/TM=15032902:18AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A102 03/28/15 08:12 AM | |
| RA=06 DT/TM=15032902:18AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 581-8617 | A142 03/25/15 07:42 PM | |
| RA=06 DT/TM=15032901:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 218-4347 | A101 03/25/15 10:29 AM | |
| RA=06 DT/TM=15032901:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A101 03/25/15 03:36 PM | |
| RA=06 DT/TM=15032901:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 218-4347 | A102 03/25/15 10:48 AM | |
| RA=06 DT/TM=15032901:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | NO ANSWER | |
| RA=06 DT/TM=15032303:01AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A232 03/23/15 08:41 AM | |
| RA=06 DT/TM=15032300:24AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 581-8617 | A183 03/27/15 07:59 PM | |
| RA=06 DT/TM=15032302:24AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A183 03/27/15 07:54 PM | |
| RA=06 DT/TM=15032302:06AM SPCL=T=000NBL OUT BORR MSG COMPLETED | (727) 581-8617 | A101 03/27/15 05:08 PM | |
| RA=06 DT/TM=15032302:06AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 218-4347 | A102 03/27/15 06:23 PM | |
| RA=06 DT/TM=15032301:47AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 581-8617 | A132 03/25/15 06:09 AM | |
| RA=06 DT/TM=15032301:47AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A142 03/25/15 07:42 PM | |
| RA=06 DT/TM=15032001:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 218-4347 | A101 03/25/15 10:29 AM | |
| RA=06 DT/TM=15032001:47AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A102 03/25/15 10:48 AM | |
| RA=06 DT/TM=15032001:47AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A232 03/22/15 08:45 AM | |
| RA=06 DT/TM=15032201:47AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A102 03/22/15 09:38 PM | |
| RA=06 DT/TM=15032201:47AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 581-8617 | A101 03/23/15 08:10 PM | |
| RA=06 DT/TM=15032201:34AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A102 03/21/15 09:21 AM | |
| RA=06 DT/TM=15032201:34AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A101 03/20/15 08:11 AM | |
| RA=06 DT/TM=15032201:47AM SPCL=T=000NBL OUT BORR NO ANSWER | (727) 218-4347 | A101 03/21/15 10:47 AM | |
| RA=06 DT/TM=15032102:16AM SPCL=T=000NBL OUT BORR NO MSG LEFT-AN MACH | (727) 581-8617 | A182 03/20/15 06:14 PM | |
| RA=06 DT/TM=15032102:16AM SPCL=T=000NBL OUT BORR MSG COMPLETED | (727) 218-4347 | A183 03/20/15 07:16 PM | |

CONFIDENTIAL

SAC0000433

CONFIDENTIAL

SAC0000434

LRA=06 DT/TM=150222/02:29AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/21/15 10:24 AM
LRA=06 DT/TM=150222/02:29AM SPCLT=00DNBL OUT BORR NO ANSWER   (777) 218-4347 :   A102 02/17/15 08:35 AM
LPA=06 DT/TM=150222/02:29AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/21/15 08:10 AM
LRA=06 DT/TM=150222/02:29AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 218-4347 :   A102 02/17/15 09:50 AM
LRA=06 DT/TM=150222/02:22AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 218-4347 :   A103 02/20/15 07:15 PM
LRA=05 DT/TM=150221/02:22AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/20/15 10:31 AM
LRA=06 DT/TM=150221/02:22AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A102 02/20/15 10:16 AM
LRA=05 DT/TM=150221/02:20AM SPCLT=00DNBL OUT HDRR MSG COMPLETED   (727) 581-8617 :   A182 02/20/15 08:15 PM
LRA=06 DT/TM=150220/02:09AM SPCLT=00DNBL OUT BORR NUMBER 727-218-4347 CHANGED FROM POE TO CELL AUTODIAL
LRA=05 DT/TM=150221/01:51AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/19/15 07:46 PM
LPA=05 DT/TM=150221/01:51AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/19/15 10:37 AM
LRA=06 DT/TM=150221/01:51AM SPCLT=00SYS EMAIL-CHRJD2 SENT TO:HEWSOME46@VERIZON.NET   SERVICER NAVIENT
LRA=05 DT/TM=150221/01:49AM SPCLT=00SLLS QLR IDINR                                                 SERVICER NAVIENT
LRA=06 DT/TM=150221/01:49AM SPCLT=00SYS EMAIL-CHRJD2 SENT TO:NEWSPCO.LPGF.FDU                      VOIC=MAILBOX IS FULL
LRA=05 DT/TM=150218/01:45AM SPCLT=00SLS QLR IDINR   (727) 581-8617 :   A101 02/17/15 10:31 AM
LRA=06 DT/TM=150218/01:43AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   S815 B107 02/19/15 10:17 AM
LRA=06 DT/TM=150218/01:43AM SPCLT=00DNBL OUT BORR NO CNNCT-NO ANS   (727) 581-8617 :   S414 A101 02/17/15 07:47 PM
LRA=05 DT/TM=150218/01:43AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACHINE   (727) 581-8617 :   S815 B107 02/17/15 06:43 PM
LRA=05 DT/TM=150218/01:41AM SPCLT=00DNBL OUT HOFRR   (727) 581-8617 :   NO ANSWER
LRA=06 DT/TM=150217/07:46PM SPCLT=414LM OUT IIOFR   (727) 581-8617 :   NO ANSWER
LRA=06 DT/TM=150217/07:06PM SPCLT=414LM OUT INOFR   (727) 581-8617 :   VOICE MAILBOX IS FULL
LPA=06 DT/TM=150215/02:13AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/14/15 10:26 AM
LRA=05 DT/TM=150215/02:13AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/14/15 08:09 AM
LRA=06 DT/TM=150214/02:25AM SPCLT=00DNBL OUT BORR MSG COMPLETED   (727) 581-8617 :   A182 02/13/15 07:57 PM
LRA=06 DT/TM=150214/02:09AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/13/15 05:07 PM
LRA=05 DT/TM=150214/02:06AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/13/15 08:21 AM
LRA=06 DT/TM=150212/01:57AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/11/15 10:27 AM
LRA=06 DT/TM=150212/01:57AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/11/15 08:17 PM
LPA=06 DT/TM=150212/01:49AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/06/15 08:08 PM
LRA=06 DT/TM=150211/02:24AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/09/15 10:59 AM
LRA=05 DT/TM=150209/01:41AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/08/15 02:51 PM
LRA=05 DT/TM=150208/02:47AM SPCLT=00SYS ACCOUNT REASSIGNED TO 25FICIALIST FROM POOL 771
LRA=05 DT/TM=150206/01:27AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/07/15 10:50 AM
LRA=06 DT/TM=150206/01:57AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/07/15 08:13 AM
LRA=05 DT/TM=150207/02:25AM SPCLT=00DNBL OUT BORR MSG COMPLETED   (727) 581-8617 :   A182 02/06/15 08:22 PM
LRA=05 DT/TM=150206/02:32AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/05/15 05:18 PM
LRA=05 DT/TM=150206/02:20AM SPCLT=00DNBL OUT RORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/05/15 10:21 AM
LPA=06 DT/TM=150206/02:20AM SPCLT=00SYS Xdl Verbal and Forbearance Email sent to NEWSOME46@VERIZON.NET on 2/2/2015
LRA=06 DT/TM=150206/01:54AM SPCLT=00SYS Xdl Verbal and Forbearance Email sent to MINFWS01@LIVE.SPCOLLEGE.EDU on 2/2/2015
LRA=06 DT/TM=150204/02:16AM SPCLT=00SYS Xdl Verbal and Forbearance Email sent to MARETTA.NEWSOME76@GMALL.COM on 2/2/2015
LRA=05 DT/TM=150204/02:06AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/03/15 10:59 AM
LRA=06 DT/TM=150204/02:06AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/03/15 07:55 PM
LPA=06 DT/TM=150203/01:31AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A132 02/02/15 08:27 AM
LRA=06 DT/TM=150203/01:31AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8140 :   A142 02/02/15 08:35 PM
LRA=06 DT/TM=150131/09:56AM SPCLT=530DC OUT BORR DISC                                 (727) 581-8140 :
LRA=06 DT/TM=150203/01:56AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/02/15 05:56 PM
LPA=05 DT/TM=150203/01:58AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A132 02/02/15 05:49 PM
LRA=05 DT/TM=150203/01:58AM SPCLT=00DNBL OUT BORR NO ANSWER   (771) 591-8140 :   A101 02/02/15 11:44 AM
LPA=06 DT/TM=150203/01:58AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 02/02/15 11:09 AM
LRA=06 DT/TM=150202/01:36AM SPCLT=00SYS Account assigned to 616 on 2/1/2015
LRA=06 DT/TM=150202/01:30AM SPCLT=00DNBL OUT BORR DEAD AIR   (727) 581-8140 : S336 A102 01/31/15 08:18 AM
LRA=06 DT/TM=150202/01:22AM SPCLT=00DNBL OUT BORR LEFT MSG-AN MACHINE   (727) 581-8617 : S336 A111 01/31/15 09:55 AM
LRA=06 DT/TM=150201/01:31AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8140 :   A101 01/31/15 08:09 AM
I RA=06 DT/TM=150131/01:31AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A102 01/31/15 11:35 AM
LRA=06 DT/TM=150131/09:56AM SPCLT=530DC OUT BORR                         (727) 581-8617 :   ANSWERING MACHINE
I RA=06 DT/TM=150131/01:56AM SPCLT=530DC OUT BORR   (777) 591-8140 :   NO ANSWER
LPA=06 DT/TM=150131/01:54AM SPCLT=00DNBL OUT BORR MSG COMPLETED   (771) 581-8617 :   A182 01/30/15 08:18 PM
LRA=06 DT/TM=150131/01:54AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A1B3 01/30/15 07:17 PM
LRA=05 DT/TM=150131/01:54AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A102 01/30/15 10:33 AM
LRA=06 DT/TM=150131/01:54AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/30/15 10:15 AM
LRA=06 DT/TM=150130/01:59AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/29/15 10:15 AM
LRA=06 DT/TM=150130/01:59AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8140 :   A102 01/29/15 12:58 PM
LRA=06 DT/TM=150130/01:59AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/29/15 06:18 PM
LRA=06 DT/TM=150130/01:59AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8140 :   A101 01/29/15 09:36 AM
LRA=06 DT/TM=150129/01:56AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A102 01/28/15 07:15 PM
LRA=05 DT/TM=150129/01:56AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/28/15 06:08 PM
LPA=06 DT/TM=150128/01:53AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/28/15 05:12 AM
LRA=06 DT/TM=150128/01:53AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/27/15 07:40 PM
LRA=06 DT/TM=150128/01:53AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A102 01/27/15 08:02 PM
LRA=06 DT/TM=150127/06:47AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8140 :   A142 01/27/15 05:28 PM
LRA=05 DT/TM=150127/01:58AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A102 01/27/15 10:20 AM
LRA=06 DT/TM=150130/01:54AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/27/15 10:19 AM
LRA=06 DT/TM=150127/01:54AM SPCLT=00DNBL OUT BORR NO ANSWER   (727) 581-8140 :   A132 01/27/15 08:28 AM
LRA=06 DT/TM=150127/01:47AM SPCLT=00DNBL OUT BORR NO MSG LEFT-AN MACH   (727) 581-8617 :   A101 01/26/15 08:30 AM

CONFIDENTIAL   SAC0000435

CONFIDENTIAL

SAC0000436

CONFIDENTIAL

SAC000437

CONFIDENTIAL

SAC0000438

CONFIDENTIAL

SAC0000439

CONFIDENTIAL

SAC0000440

SAC0000441

CONFIDENTIAL

CONFIDENTIAL

SAC0000442

CONFIDENTIAL

SAC0000443

CONFIDENTIAL

SAC0000444

CONFIDENTIAL

SAC0000445

LRA=06 D7/TM=14/02302:28AM SPCLT=00KSYS RECEIVED NEW ADDRESS FROM I-FINDER ADDED AS ALTERNATE: 1380 CROSSBY ST , LARGO, FL 33778

[Dense rotated call-log table of records follows, columns comprising record ID / date-time / SPCLT code / status message / phone number / timestamp — individual entries not legibly reproducible.]

CONFIDENTIAL

SAC0000446

CONFIDENTIAL

SAC0000447

CONFIDENTIAL

SAC0000448

CONFIDENTIAL

SAC0000449

CONFIDENTIAL

SAC00000450

LRA=06 DT/TM=14091202/28AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-6140 :        A002 09/17/14 12:16 PM
LRA=06 DT/TM=14091202/28AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/11/14 08:39 AM
LRA=06 DT/TM=14091202/28AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-6140 :        A002 09/11/14 04:59 PM
LRA=06 DT/TM=14091202/28AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/11/14 08:53 PM
LRA=06 DT/TM=14091202/28AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/11/14 02:11 PM
LRA=06 DT/TM=14091102/13AM SPCLT=000SYS EMAIL-690 SENT TO:NEWSOMES46@VERIZON.NET
LRA=06 DT/TM=14091102/13AM SPCLT=000SYS EMAIL-690 SENT TO:MNEWS01@LIVE.SHCOLLEGE.EDU                                               SERVICER 700191
LRA=06 DT/TM=14091102/13AM SPCLT=000SYS EMAIL-690 SENT TO:MARETTA.NEWSOMET58@GMAIL.COM                                             SERVICER 700191
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/10/14 03:29 PM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-6140 :        A002 09/10/14 11:50 AM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/10/14 08:37 AM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-6140 : * A002 09/10/14 05:41 PM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-6140 :        A002 09/10/14 04:00 PM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-6140 :        A002 09/10/14 09:49 AM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/10/14 10:16 AM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR MSG COMPLETED                      (727) 581-8617 :        A230 09/10/14 08:54 PM
LRA=06 D T/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH               (727) 581-6140 :        A002 09/10/14 02:16 PM
LRA=06 DT/TM=14091102/05AM SPCLT=000NRI  OUT BORR MSG COMPLETED                     (727) 581-6140 :        A091 09/10/14 08:38 PM
LRA=06 DT/TM=14091102/05AM SPCLT=000NBL OUT BORR NO MSG LEFT-AN MACH                (727) 581-8617 :        A001 09/10/14 01:45 PM
LRA=06 DT/TM=14091002/19AM SPCLT=000SYS SRC: OS PHONE NUMBER 727-581-8140 CHANGED FROM OTHER TO CELL AUTODIAL
LRA=06 DT/TM=14090909/03PM SPCLT=996CAM LN TYP: CL:REG: DF STDT: 000000000 GA: 800      PRD: 000000000 000000000 LST PMT DT: 000000000 LST PMT AMT: 000000000.00 DAYS DUNQ: 060 USIHR DT: 20090712 EI/ID: USS34237021



STUDENT ASSISTANCE CORPORATION
P O BOX 9570
WILKES BARRE, PA 18773-9570
Phone: 800-635-3743
Fax: 1-800-220-2008
loansolutions.nela.net

XXXXX XXXXXXXXX
9999 X XXXXXXXXXX XX 999
MESA AZ 85201

MAY 24, 2011                                    Account Number 9999999999

Dear XXXXX XXXXXXXXX:

This letter is to inform you that your student loan is past due. If you forgot to
make your payment, please do so today. If you have already made your payment, please
disregard this notice.

If you are experiencing financial hardship and are unable to make your payment, we can
help. We may be able to help you lower or postpone your monthly payments with a
deferment.

                Please call STUDENT ASSISTANCE CORPORATION today at:
                            *800-635-3743*

If you wish to temporarily suspend your student loan payment via forbearance, simply
complete the attached forbearance request form and fax it to us at *1-800-220-2008* for
processing.

If you do not make a payment or make other arrangements, you may default on your
education loan. Take the first step towards getting your loan back in good standing
by calling us today!

Thank you.

Atencion: Si usted habla Espanol, por favor llame *1-800-635-3783*.

Guarantor: Northwest Education Loan Assoc.

Lender/Servicer:
Navient Solutions, Inc.
PO Box 9500
Wilkes-Barre PA 18773-9500
888-272-5543



10/9/14

TO: Newsome64@verizon.net
Mnews01@live.spcollege.edu
moretta.newson75@gmail.com

**Day 090**

Hi Borrower First and Last Name,

\*\*\*Your student loan payment is seriously past due! We have tried unsuccessfully to contact you about this important matter. It is critical that you take care of your past-due student loan immediately.
Please contact Student Assistance Corporation at:
1-800-635-3743

If you are experiencing financial difficulties and are unable to make your payment, we can help. You may qualify for a deferment or forbearance, which can postpone your student loan payments including the payments that are past due. You may also be eligible for an alternative repayment plan. You can learn more about these options by calling us at 1-800-635-3743 or by visiting LOANSOLUTIONS.USAFUNDS.ORG. Time is limited, so please take action today.

If you default on your student loan, you may:
   * Damage your credit rating.
   * Be unable to obtain loans in the future for a car or home.
   * Be unable to finance your education with student loans in the future.
   * Be contacted by a collection agency.
   * Be assessed collection fees.

To avoid these consequences, please call us today at:
1-800-635-3743
Thank you.

To remove your name from future E-mail communication, call us at 1-800-635-3743 or simply reply to this email.

\*\*\* The information contained in this communication is proprietary and confidential and intended only for the recipient named. If the reader of this information is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us via E-mail response to this notice or by phone at 1-800-635-3743. Thank you.



PLAINTIFF'S EXHIBIT 4 — PENGAD 800-631-6989