ROUGH DRAFT     ROUGH DRAFT    ROUGH DRAFT

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:15-CV-1559-T-33-TBM

WILLIE MCCASKILL,                    )
                                     )
        Plaintiff,                   )
                                     )
        -vs-                         )
                                     )
NAVIENT SOLUTIONS, INC.,             )
STUDENT ASSISTANCE                   )
CORPORATION, and NAVIENT             )
CORPORATION,                         )
                                     )
        Defendants.                  )

THE DEPOSITION UPON ORAL EXAMINATION OF:
CHRISTINE HAMPTON
the deponent produced and sworn before me,
Joyce E. Shinault, a Notary Public at large,
in and for the State of Indiana, taken on
behalf of the Plaintiffs, at the offices of
Williams Reporting, 412 W. Ninth Street,
Anderson, Indiana, on the 22nd day of
January, 2016, pursuant to the applicable
rules.


WILLIAMS REPORTING
JOYCE E. SHINAULT, REPORTER
412 W. Ninth Street
Anderson, Indiana  46016
TELEPHONE:  (765) 644-3040
Fax:  (765) 644-5366
Toll Free:  877-840-1114
E-Mail:  williamsreporting@att.com

Deposition of Corporate Representative
Christine Hampton

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    Frank H. Kerney, III, Esq.
    Octavio Gomez, Esq.
    MORGAN & MORGAN, P.A.
    One Tampa City Center, 7th Floor
    201 N. Franklin Street
    Tampa, FL  33602
    fkerney@forthepeople.com

ON BEHALF OF THE DEFENDANTS:

    Lisa M. Simonetti, Esq.
    VEDDER PRICE
    1925 Century Park East, Suite 1900
    Los Angeles, CA  90067
    lsimonetti@vedderprice.com

ALSO PRESENT:  Patrick Chaing, In-House
               Counsel for Navient
               Solutions, Inc.

Page 3

1          I N D E X   O F   E X A M I N A T I O N

2                                              PAGE

3     DIRECT EXAMINATION.....................4
          QUESTIONS BY MR. KERNEY

4

5

6

7          I N D E X   O F   E X H I B I T S

8                                              PAGE

9     DEPOSITION EXHIBIT NO.

10

1 -     Outreach Counsel
        Job Description..................18

2 -     BPS system notes
        (SAC-431 - SAC-450)..............28

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1           (The witness is sworn by the court

2      reporter at 12:40 p.m., at which time the

3      following proceedings are had:)

4                CHRISTINE HAMPTON,

5      having been first duly sworn to tell the

6      truth, the whole truth, and nothing but the

7      truth relating to said matter, is examined

8      and testifies as follows:

9      DIRECT EXAMINATION,

10       QUESTIONS BY MR. KERNEY:

11 Q.   Would you please state and spell your full

12      name for me?

13 A.   Christine Hampton.  C-H-R-I-S-T-I-N-E,

14      H-A-M-P-T-O-N.

15 Q.   Thank you, Ms. Hampton.  Just a couple things

16      before we get started.  Number one, we have

17      to be careful that we just talk one at a

18      time.  So I'll always wait for you to answer

19      before I start rambling, and I'd ask you to

20      do the same.

21 A.   Okay.

22 Q.   And then number two, just make sure you give

23      audible answers so the court reporter can

24      take it down.  You know, don't shake your

25      head or nod because we won't be able to have

Christine Hampton

Page 5

1      a record of it.

2             So, Ms. Hampton, have you ever gone

3      by any other name?

4   A.  No.

5   Q.  Where do you live?  What city?

6   A.  Indianapolis, Indiana.

7   Q.  And how old are you?

8   A.  36.

9   Q.  And what's your highest level of education?

10  A.  I have some college.

11  Q.  Where did you attend college?

12  A.  Indiana -- IUPUI.

13  Q.  Okay.  And where did you attend high school?

14  A.  Northwest High School.

15  Q.  And where is that?

16  A.  It's in Indianapolis.

17  Q.  Okay.  And how long have you lived in

18      Indianapolis for?

19  A.  All my life.

20  Q.  Have you ever been arrested or charged with a

21      crime?

22  A.  No.

23  Q.  Have you ever had your deposition taken

24      before today?

25  A.  No.

```
                                                Page 6

 1  Q.  Did you do anything in preparation for

 2      today's deposition?

 3  A.  Just met briefly with my lawyers.

 4  Q.  Okay.  And we're not going to talk about

 5      anything your lawyers said.  But I might ask

 6      you questions throughout the day, and

 7      Ms. Simonetti will obviously object if she

 8      doesn't want you to answer something.  And

 9      she'll tell you how to proceed if that does

10      occur.  Okay?

11  A.  Okay.

12  Q.  Before you answer a question, just make sure

13      you don't tell me anything any of the lawyers

14      told you.

15  A.  Okay.

16  Q.  How long did you meet with the lawyers for?

17  A.  I think about an hour and a half.

18  Q.  And who was present during that meeting?

19  A.  Patrick.  And she was on conference call.

20  Q.  And just you?

21  A.  Yes.

22  Q.  No one else from SAC, no coworkers, or

23      anything like that?

24  A.  No.

25  Q.  Did you review any documents in preparation
```

Deposition of Corporate Representative
Christine Hampton

Page 7

1      for today's depo?

2  A.   Yes.

3  Q.   What documents were those?

4  A.   I had the handout of the BPS notes.

5  Q.   And that's for the account from Maretta

6      Newsome?

7  A.   Yes.

8  Q.   Okay.  And outside of what you did prepping

9      with your attorneys, if someone had just come

10      up to you on the street last week and asked

11      you, hey, do you remember anything about

12      Maretta Newsome's account, did you have any

13      particular recollection of this account?

14  A.   No.

15  Q.   Okay.  So where are you currently employed?

16  A.   Student Assistance Corporation.

17  Q.   And what is your job title there?

18  A.   Outreach counselor.

19  Q.   And when did you start working for Student

20      Assistance Corp.?

21  A.   Student Assistance Corporation, 2007.

22  Q.   And prior to that, where did you work?

23  A.   General Revenue Corporation.

24  Q.   And how long were you with General Revenue?

25  A.   Two years.

Page 8

1  Q.  And then prior to that where did you work?

2  A.  Hooverwood Nursing Home.

3  Q.  And how long were you with the nursing home

4       for?

5  A.  Six years.

6  Q.  When you began working for Student Assistance

7       Corp., do you recall being tested or trained

8       regarding a law called the TCPA, the

9       Telephone Consumer Protection Act?

10  A.  We have training online that we do yearly.

11  Q.  Okay.  And what does that training consist

12       of?

13  A.  It's basically slide shows.  We read the

14       material and then there's a test at the end.

15  Q.  Okay.  What are your responsibilities with

16       regards to your position at SAC?

17  A.  I'm a default prevention counselor.  So

18       basically what I do is we counsel the

19       delinquent borrowers on their best options to

20       get them up to date so they don't default.

21  Q.  Okay.  Are you a debt collector?

22  A.  No.

23  Q.  Is there a component of SAC that deals with

24       debt collection?

25  A.  I'm not sure.

Deposition of Corporate Representative
Christine Hampton

Page 9

1  Q.  Okay.  Where do you report to every day for

2      work, what office?

3  A.  The Metroplex in Castleton area.

4  Q.  Okay.  Is that a Navient facility?

5  A.  Yes.

6  Q.  Are there employees from other Navient

7      companies working there, like Navient

8      Solutions or...

9  A.  I'm not sure.

10  Q.  Who do you report to directly?

11  A.  You mean my supervisor?

12  Q.  Yes, ma'am.

13  A.  Roger Sedlacek.

14  Q.  Could you spell his name?

15  A.  R-O-G-E-R, S-E-D-L-A-C-E-K.

16  Q.  Thank you.  Good attempt at least.  Do you

17      know who Mr. Sedlacek's supervisor is?

18  A.  Tiffany Graves.

19  Q.  Could you spell Ms. Graves' name?

20  A.  T-I-F-F-A-N-Y, G-R-A-V-E-S.

21  Q.  And do you know what Ms. Graves' job title

22      is?

23  A.  I know it's manager.  I'm not sure.

24  Q.  Okay.  What shifts are you scheduled on

25      currently?

Deposition of Christine on behalf of Defendants
Christine Hampton

Page 10

```
 1  A.  Well, currently my shift is Monday, Tuesday,
 2      12:00 to 9:00, Wednesday through Friday 8:00
 3      to 5:00.  But currently I'm on my own
 4      schedule so I make my own schedule.
 5  Q.  And how does that work?
 6  A.  As long as I make my 40 hours per week.
 7  Q.  You can come and go as you want?
 8  A.  Yes.
 9  Q.  Walk me through a typical shift.  Let's say
10      it's not a day where you're working weird
11      hours, but it's a 12:00 to 9:00 shift.  What
12      do you do when you first get to work?
13  A.  Clock in.
14  Q.  Okay.
15  A.  And then I'll pull up all my systems I'm
16      going to use for the day.
17  Q.  What are those systems that you're going to
18      be using?
19  A.  BPS, Noble.  I check my e-mail and skip
20      sites, skip-tracing sites.
21  Q.  Okay.  Do you pull up the Class system?
22  A.  Yes, Class.
23  Q.  So are all or a portion of the accounts that
24      you service or that you handle serviced by
25      NSI?
```

Page 11

1  A.  I'm not sure.  What's NSI?

2  Q.  I'm sorry.  Navient Solutions, Inc.

3  A.  Oh.  Some, yeah.

4  Q.  Okay.  Tell me what BPS is as far as you

5     understand.

6  A.  It's basically where we document all the

7     activity on the account.

8  Q.  On the SAC side?

9  A.  Yes.

10  Q.  Okay.  What is Noble?

11  A.  That's our dialing system, how we make the

12     calls.

13  Q.  And do you know what the software version or

14     model number is?

15  A.  No.

16  Q.  Okay.  And the Class system, my understanding

17     is that that's NSI's system?

18  A.  Yes.

19  Q.  Do you have the ability to make edits to the

20     Class system?

21  A.  No.

22  Q.  So you can just review their notes?

23  A.  Yes.

24  Q.  Do you know if NSI employees can make edits

25     to the BPS system?

Deposition of Christine Hampton
Christine Hampton

Page 12

1  A.  Not that I'm aware of.

2  Q.  When you come in and you go to begin your

3      work for the day, do you have specific

4      accounts that are assigned to you?

5  A.  Yes.

6  Q.  How do those accounts get assigned to you?

7  A.  Every month we just -- they upload on a

8      tracker, on a tracking system.

9  Q.  And how many accounts do you have in a given

10     month?

11 A.  Recently it's been like 400.

12 Q.  Okay.

13 A.  450.

14 Q.  Okay.  And how is it determined who you're

15     going to call during a given shift?

16 A.  I determine who I want to make a call to.

17 Q.  What percent of the day or how many hours per

18     day -- let's talk about a typical eight or

19     nine-hour shift -- would you say you spend

20     skip-tracing?

21 A.  Probably -- maybe two to three hours, maybe.

22 Q.  And how many hours do you spend making

23     manually dialed telephone calls?

24 A.  The rest of the time.

25 Q.  Well, do you take auto-dialed calls?

Deposition of Christine Hampton

Christine Hampton

Page 13

1  A.  Periodically.  That's something the managers

2      set up.

3  Q.  Okay.  So how often do you personally take

4      auto-dialed calls?

5  A.  It's up to the management.  Usually we maybe

6      do it maybe once a week.

7  Q.  And for how many hours during that shift?

8  A.  It depends.  It varies.  An hour, hour and a

9      half, maybe.

10 Q.  How are you compensated?  Are you hourly?

11 A.  Yes.

12 Q.  And then do you receive a bonus?

13 A.  If you make goal, you do.

14 Q.  What is your goal?

15 A.  It's basically -- it changes every month.

16 Q.  Okay.  Can you tell me what the number is

17      this month?

18 A.  One point seven million, I believe.

19 Q.  And how much is the bonus if you reach that

20      goal?

21 A.  If you reach a hundred percent, it starts at

22      850.

23 Q.  Okay.  And does it increase?

24 A.  Yes.

25 Q.  And what do you have to hit to get the

Deposition of Christine Hampton
Christine Hampton

Page 14

1    increase?

2  A.  Every 5 percent over goal.

3  Q.  And how much does it increase every

4      5 percent?

5  A.  $100.

6  Q.  Okay.  So let's just take last year as an

7      example, because you've worked there for a

8      long time.  Last calendar year how many times

9      did you not reach your goal?

10 A.  I'm not sure.

11 Q.  Well, was it one, or five, or --

12 A.  I can't -- maybe two or three.  I'm not sure.

13 Q.  Okay.  Most of the time do you make your

14     goal?

15 A.  Most of the time.

16 Q.  Do you know who determines what the goal is

17     for a given month?

18 A.  No.

19 Q.  How many people are on the floor of the call

20     center that you work at?

21 A.  I think about 70.

22 Q.  And does every one of those 70 people work

23     for SAC?

24 A.  Yes.

25 Q.  Okay.  And are you on a team?

Deposition of Christine Hampton
Christine Hampton

Page 15

1  A.  Yes.

2  Q.  And how many people on your team?

3  A.  I think there's 17.

4  Q.  Okay.  And how is your relationship with the

5     17 people on your team?

6  A.  Pretty good.

7  Q.  Okay.  Do you all sit at a table like this,

8     or are you in cubicles?

9  A.  In cubicles.

10 Q.  So do you share a cubicle with anyone?

11 A.  No.

12 Q.  So do you interact with your team pretty

13    frequently?

14 A.  Yes.

15 Q.  And do you and your team members talk to each

16    other about the specific accounts you've

17    called on, and say, oh, I finally got a good

18    number for so and so, or finally got a guy to

19    pay today, anything like that?

20 A.  No, I don't.

21 Q.  Okay.  You don't really share that kind of

22    information?

23 A.  No.

24 Q.  Okay.  Is there a reason why?

25 A.  No.  I'm shy and quiet.

Deposition of Corporate Representative
Christine Hampton

Page 16

1  Q.  Private?  Okay.

2  A.  Yeah.

3  Q.  Okay.  Well, then I'm sorry to drag you down

4      here today to have to talk, but we'll be

5      quick.  So have you ever been tested or given

6      any trainings regarding the Fair Debt

7      Collection Practices Act?  The FDCPA, it's

8      called sometimes.

9  A.  We've had those on -- the training that we do

10     online.

11 Q.  Okay.  When was the last time you had that

12     online training, if you recall?

13 A.  We usually have one every month.  It varies.

14 Q.  Okay.  And have you ever been trained on a

15     law called the Florida Consumer Collection

16     Practices Act?  The FCCPA, it's sometimes

17     called.

18 A.  Not that I recall.

19 Q.  Okay.  During a normal shift typically how

20     many calls do you make?

21 A.  Anywhere from like a 100 to 150, maybe.

22 Q.  Okay.  And that's in a typical eight-hour

23     shift?

24 A.  Yes.

25 Q.  Is there a number of calls you're supposed to

Deposition of Christine Hampton
Christine Hampton

Page 17

1    make on a given day?

2 A.  I believe they want you to at least make a

3    hundred calls a day.

4 Q.  Okay.  And when you say "they", is that

5    something your supervisor sets?

6 A.  The management.

7 Q.  Okay.  Who is the manager?

8 A.  My manager is Tiffany Graves.

9 Q.  Okay.  So your boss, Mr. Sedlacek, reports to

10    Ms. Graves?

11 A.  Yes.

12 Q.  And does she report to anybody as far as you

13    know?

14 A.  I believe she reports to Kevin Campbell.

15 Q.  Okay.  And he's the president?

16 A.  I believe that's his title.

17 Q.  Okay.  Do you recall when you first applied

18    to work at SAC?

19 A.  Yeah, 2007.

20 Q.  How did you apply?

21 A.  Well, it was -- I was working previously with

22    the company, and the department that I was in

23    moved.  So I was referred to -- my supervisor

24    at that time, to go apply for Student

25    Assistance.

Page 18

1  Q.  Okay.  I'm passing you a document which we're

2      going to mark as Exhibit 1.  Your attorney

3      already has a copy.

4              (Whereupon, Deposition Exhibit 1

5      was marked for identification.)

6      BY MR. KERNEY:

7  Q.  This is an advertisement for an outreach

8      counselor with SAC for a job that begins on

9      February 1st of this year.  So obviously I

10     would assume you have not seen this exact

11     document before.  Would you agree with that?

12 A.  I would agree.

13 Q.  Okay.  I want to ask you, though, because

14     this is for the same or similar position to

15     what you have, about the content of this

16     advertisement and just see if you can help me

17     understand what these different job tasks

18     are.

19 A.  Okay.

20 Q.  So Number 1, at the bottom you'll see there's

21     some bullet points that begin, achieve

22     assigned goals, calls, contacts, payments and

23     cures, or as specified.

24          What do those four topics mean to

25     you; calls, contacts, payments and cures?

Deposition of FCR 30(b)(6) corporate representative
Christine Hampton

Page 19

```
 1 A.  Make phone calls, try to get in contact with
 2     borrowers.  If you can cure with payments,
 3     make payments or get the cure -- get it
 4     resolved.
 5 Q.  Okay.  So when that says take payments,
 6     that's why I'm asking if there's a debt
 7     collection component to what you do.
 8 A.  We don't take payments.
 9 Q.  What do you do if a person wants to make a
10     payment?
11 A.  We refer them to the lender.
12 Q.  Okay.  And when you say refer them, do you
13     transfer the call?
14 A.  We transfer.  Yes, we can transfer the call
15     to the lender.
16 Q.  Okay.  Go ahead and turn to the next page.
17 A.  (Witness complies.)
18 Q.  Number 3, there's some bullet points under
19     there, and Number 2 is, work within FDCPA
20     state regulations, department/division and
21     compliance policies.  What does that mean to
22     you?
23 A.  Stay compliant.  Don't do anything you're not
24     supposed to.
25 Q.  Very good.  Are you familiar with the FDCPA?
```

Christine Hampton

Page 20

1  A.  Yes.

2  Q.  What state regulations would this be

3       referring to?

4  A.  I'm not sure exactly the state.  There are

5       different states.

6  Q.  Are there different state regulations that

7       you're trained or tested on?

8  A.  Just on the training that we do online.

9  Q.  Okay.  How about the next bullet point under

10      that?  Maintain clear, concise, and accurate

11      documentation of all attempts and/or contacts

12      made and received for accounts in accordance

13      with company and client specifications.

14 A.  Make sure you document everything that you

15      do.

16 Q.  Okay.  And so when you're working in BPS, do

17      you have to take notes on every single thing

18      that you do?

19 A.  Every call that we make, yes.

20 Q.  Okay.  And are you encouraged to -- my

21      understanding is that the system has little

22      buttons you can hit that say, left voicemail

23      or did not leave voicemail or something like

24      that?

25 A.  You can, yes.

Page 21

1   Q.   Are you encouraged to supplement those with

2        your own written note?

3   A.   We can do both.

4   Q.   Okay.  And what is really the policy as far

5        as whether or not you should supplement that

6        and add more information?

7   A.   Anything that occurs on the account that's

8        more than just left a message, you would want

9        to put --

10  Q.   Okay.

11  A.   -- more notes in.

12  Q.   Okay.  And we can come back to that.  We can

13       turn away from this for the time being.  Was

14       there ever a time during your employment with

15       SAC when anybody within management or a

16       supervisor referred to what you were doing as

17       collections or collecting money?

18  A.   Not that I can recall.

19  Q.   Do you know how SAC is compensated for the

20       work that it does?

21  A.   No.

22  Q.   So you have no idea, generally speaking, how

23       SAC earns money?

24  A.   No.

25  Q.   Okay.  We touched on this briefly, but does

1      SAC have policies and procedures in effect

2      that govern what the employees are required

3      to do when calling on certain borrower

4      accounts?

5  A.  Yes.

6  Q.  Okay.  Are you tested regarding those

7      policies and procedures?

8  A.  Just like I said, on the online things, we do

9      refresher courses.

10  Q.  Okay.  Do you know if there's penalties or

11      reprimands if you don't follow a policy or

12      procedure?

13  A.  Yes.

14  Q.  And what would those reprimands or penalties

15      be?

16  A.  We can be wrote up.  They can -- your bonus

17      can be -- part of your bonus can be taken

18      away if you don't comply.

19  Q.  So have you personally ever been issued any

20      verbal or written reprimand or warning for

21      failing to comply with the policy?

22  A.  No.

23  Q.  Do you know anybody who has?

24  A.  No, not that I know of.  We don't like, talk

25      about it.

Deposition of Corporate Representative of
Christine Hampton

Page 23

1  Q.  Sure.  Do you know if there is a policy or

2      procedure in effect that governs how a

3      borrower may revoke his or her consent to be

4      called on a cell phone by SAC with an

5      auto-dialer?

6  A.  Yes.

7  Q.  Okay.  How may a party do that?

8  Q.  Well, we have to read them a TCPA script.

9  Q.  Okay.

10 A.  And they have to either agree or not.

11 Q.  So let's do a hypothetical where you're

12     answering auto-dialed calls.  Is that the

13     correct terminology I'm using?

14 A.  Well, auto-dialed is if they have agreed.

15 Q.  Sure.  But let's say they've agreed already.

16 A.  Okay.

17 Q.  But would you say that you answered

18     auto-dialed calls that day?  Like, how does

19     an auto-dialed call get to you?

20 A.  Well, if someone calls in, if --

21 Q.  But how does an outbound auto-dialed call get

22     made?

23 A.  On a dialer system.

24 Q.  So do you physically initiate the call or

25     what happens?

Page 24

1  A.  When we have our dialer system set up, no,

2      the system does it.

3  Q.  So it just tells you, hey, there's someone on

4      the line, and you pick it up?

5  A.  The way the system is set up, you know when

6      someone picks up.

7  Q.  Okay.  So someone picks up, you get connected

8      to somebody.  And that person says never call

9      me again and slams the phone down.  What do

10     you do?

11 A.  We have to verify who made that statement.

12 Q.  Okay.  So if you didn't get the opportunity

13     to verify because the person hung up, what

14     would you do?

15 A.  Just document what they said.

16 Q.  But you wouldn't mark it to not call that

17     number again with the auto-dialer?

18 A.  Not -- we have to verify who the number

19     belongs to.

20 Q.  Okay.  Suppose same circumstances, it's an

21     auto-dialed number to a cell phone and he's

22     already given consent.  And then during the

23     conversation he goes, these calls are so

24     annoying, I can't take them anymore.

25 A.  Yes.  If it's a cell phone, we have to mark

Deposition of Corporate Representative of
Christine Hampton

Page 25

1   it do not call.

2  Q.  Okay.  So that language, I can't take it

3      anymore, these calls are so annoying, that to

4      you would be revocation and you have to mark

5      it do not call?

6  A.  I would.

7  Q.  What if the person said, hey, I lost my job,

8      I'm not going to ever be able to pay you

9      guys?

10 A.  No, I wouldn't.

11 Q.  Okay.  Are there any special words or

12     specific verbiage that you're trained or

13     taught to look for when determining whether

14     or not a person has revoked his consent?

15 A.  If they just say don't call my cell phone

16     anymore.

17 Q.  Okay.  So is that really the language you

18     look for?

19 A.  Yes.  Don't call this number, yes.

20 Q.  Is there any specific policy or procedure in

21     effect that governs whether or not you could

22     obtain consent to call someone on a cell

23     phone with an auto-dialer if the number was

24     found via skip-tracing?

25          MS. SIMONETTI:  Can you read that

1    back.  That was pretty long.

2              (Whereupon, the requested material

3    was read back by the court reporter.)

4              THE WITNESS:  I'm not sure.  I

5    don't think so.

6    BY MR. KERNEY:

7  Q.  Okay.  If you first skip-traced a number,

8    what's the first thing you do?

9  A.  Call the number.

10 Q.  Okay.  And suppose no one answers?

11 A.  Mark it as no answer.

12 Q.  When does that number get introduced into a

13   dialer?

14 A.  Only if we have contact with some -- that

15   person and they consent.

16 Q.  Okay.  Do you know, can that consent be

17   obtained orally, or does it need to be

18   obtained in writing?

19 A.  As far as I know it's orally.

20 Q.  Do you know if there's a policy or procedure

21   in effect regarding how many times a borrower

22   can be called on a given day?

23 A.  Yes.

24 Q.  How many times?

25 A.  Eight.

Page 27

1  Q.  And when you say eight, is that eight times

2      per borrower or eight times per phone number

3      on the borrower's account?

4  A.  Per phone number.

5  Q.  Okay.  So if a borrower has one phone number,

6      you could call him eight times on that

7      number?

8  A.  Yes.

9  Q.  And if he has two numbers, you could call him

10     eight times each, which would be 16 total

11     calls, theoretically?

12 A.  Yes.

13 Q.  And if he had 10 numbers, you could call him

14     eight times on each of those 10 numbers for

15     up to 80 calls in one day?

16 A.  I think that's how that works, yes.

17 Q.  Okay.  Would you consider 80 phone calls in

18     one day to be harassment?

19 A.  Yes.

20 Q.  Would you consider 16 calls in one day to be

21     harassment?

22 A.  No.

23 Q.  What's the lowest number you would consider

24     to be harassment?  Is it 20?  Is it 50?

25 A.  I don't think there's a set number.  Maybe

Deposition of Corporate Representative of
Christine Hampton

Page 28

1      20.  In a day, yes.

2  Q.  Is there a policy or procedure that governs

3      whether or not you should leave a voicemail

4      message for someone if the person's voicemail

5      identified them as someone other than the

6      borrower?  And I'm going to give you an

7      example.

8           If you call looking for Maretta

9      Newsome, and the voicemail message says

10     you've reached Willie and Malachi McCaskill,

11     we can't come to the phone, please leave us a

12     message, beep.  Would you leave a voicemail

13     message for that -- Maretta Newsome on that

14     number?

15  A.  Yes.

16  Q.  You would?

17  A.  Yes.

18  Q.  Okay.  I want you to look for me at this

19     document here which is going to be marked as

20     Exhibit 2.  And your attorney already has a

21     copy of it.

22           (Whereupon, Deposition Exhibit 2

23     was marked for identification.)

24     BY MR. KERNEY:

25  Q.  Do you recognize this document?

Christine Hampton

Page 29

1  A.  It looks like documentation from BPS.

2  Q.  Okay.  Is this similar to what you reviewed

3      in preparation for today's depo?

4  A.  Yes.

5  Q.  Okay.  I'd like you to turn for me to the

6      second page, which is Bate-stamped SAC-432 at

7      the bottom.

8  A.  (Witness complies.)  Uh-huh.

9  Q.  If you look about 14 lines down, there's a

10      notation there that says 727-581-6140, did

11      not leave message, diff name on VM.

12  A.  Uh-huh.

13  Q.  If you look over, that was entered by

14      counselor 664CH.  Do you know who that is?

15  A.  That's me.

16  Q.  We know that's you.  So tell me why you left

17      that comment there, did not leave message,

18      different name on voicemail.

19  A.  Because I wasn't sure if it was the person or

20      not.

21  Q.  Okay.  So going back to that question I just

22      asked you, you said you would leave a

23      voicemail for that person.

24  A.  Yeah, in a different situation, yes.

25  Q.  But in this situation, you did not?

Deposition of Christine Hampton

Christine Hampton

                                                    Page 30

1   A.  No.

2   Q.  So what was it that would have made you not

3       leave a voicemail in this particular

4       instance?

5   A.  Maybe I had already called that number and

6       left a message, or...

7   Q.  Well, do you want to review this briefly and

8       see if it looks like you had done something?

9   A.  (Witness complies.)

10              MR. KERNEY:  And if you'd like,

11      and your attorney doesn't object, we have

12      this highlighted with her specific calls.  It

13      might save her time.

14              MS. SIMONETTI:  Sure.

15      BY MR. KERNEY:

16  Q.  Ms. Hampton, if you want to look at this

17      version.  I just highlighted where you were

18      involved.

19              MS. SIMONETTI:  Are you going to

20      attach that one?

21              MR. KERNEY:  I'm going to have to.

22              THE WITNESS:  Okay.  What was the

23      question again?

24      BY MR. KERNEY:

25  Q.  Is there anything contained in that log that

Deposition of Christine Hampton
Christine Hampton

Page 31

```
 1      indicates to you why you would not have left
 2      a message on that entry where you said, diff
 3      name on voicemail?
 4   A. Just because -- I just didn't -- maybe I
 5      didn't -- like I said, I don't know if it was
 6      the correct one or maybe I had already left a
 7      message.
 8   Q. Well, let's assume for argument's sake you
 9      hadn't already left a message on that number.
10   A. Uh-huh.
11   Q. What would the reason be, then, why you
12      didn't leave one on that particular instance?
13   A. I just didn't feel like leaving a message.
14   Q. You marked that as a different name, so you
15      specifically added that information on there.
16      Why would you do that?
17   A. Just in case someone else called it and they
18      might get a different -- you know, if they
19      wanted to leave a message, they could.
20   Q. Would that be a warning for the other
21      counselors?
22   A. No.
23   Q. Okay.  So what -- I'm just trying to
24      understand --
25   A. That's just how I document for myself.  Like,
```

Page 32

1   if I come back to the account, if I see I

2   left a message, I might not leave another

3   message because they haven't called back.

4 Q. Okay.  But in this instance, you hadn't left

5   a message, right?

6 A. No, it doesn't look like it.  No.

7 Q. Do you receive training as to what you should

8   do if there's a different name on the

9   voicemail message like there was in this

10   instance?

11 A. No.

12 Q. How many times would you personally have

13   called that number again after this knowing

14   that the wrong name was on the voicemail

15   message?

16 A. I probably wouldn't have called it again.

17 Q. Okay.  How many times do you think other

18   counselors should have called that number

19   again given the fact that you put that note

20   in there?

21 A. They use their discretion.

22 Q. Okay.  Do you think that 10 calls would have

23   been too many?

24 A. No.

25 Q. Do you think one hundred calls to that number

Christine Hampton

Page 33

```
 1      would have been too many?

 2 A.   Like I said, it's discretion.  No.

 3 Q.   Do you think 727 calls to that number would

 4      have been too many calls?

 5 A.   No, not necessarily.  No.

 6 Q.   And why not necessarily?

 7 A.   Because just because somebody didn't answer,

 8      we usually, until we get verification from

 9      someone that that's not their number, we

10      call.

11 Q.   Is there any policy or procedure in effect

12      regarding whether or not you should read the

13      notes that other counselors have left on that

14      account when that account gets assigned to

15      you?

16 A.   It's not a policy, no.

17 Q.   Okay.  Well, what do you generally do when an

18      account gets assigned to you?  Do you read

19      the other counselor's notations?

20 A.   Sometimes.

21 Q.   What governs whether or not you're going to

22      do that?

23 A.   Just how I'm feeling that day, if I want to

24      go through the notes.

25 Q.   Very good.
```

Deposition of Corporate Representative of
Christine Hampton

Page 34

1  A.   See if we had any contact.

2  Q.   Do you recall a specific time when a coworker

3       or employee was terminated for failing to

4       follow policies or procedures?

5  A.   Not that I know of, no.

6  Q.   Do you know any time when anyone was

7       reprimanded or issued a warning for failing

8       to follow policies or procedures?

9  A.   I'm not sure.

10 Q.   Do you recall receiving any new or additional

11      training on the TCPA after July of 2015?

12 A.   I don't know.  I'm not sure.  I don't recall.

13 Q.   Okay.  Do you know whether or not the calls

14      that you make are recorded?

15 A.   Yes.

16 Q.   All of them?

17 A.   I believe so.

18 Q.   Do you know whether or not you're

19      periodically monitored by a supervisor or the

20      compliance team?

21 A.   Yes.

22 Q.   How often does that occur?

23 A.   I don't know.

24 Q.   Have you ever had a meeting with the

25      compliance team or a supervisor over the

Case 8:15-cv-01559-VMC-TBM Document 96-4 Filed 02/26/16 Page 35 of 42 PageID 1840
Deposition of ... of ...
Christine Hampton

Page 35

1    content of one of your calls they monitored

2    be it good or bad?

3 A.  No.

4 Q.  So you've never been called in to go over --

5 A.  Not that I can recall, no.

6 Q.  How often does a borrower complain to you

7    when you make a call to them?

8 A.  I don't know.  Daily somebody might say

9    something.

10 Q.  Sure.

11 A.  It could be daily.

12 Q.  Well, you have a high volume of calls, so I

13    know you're calling a lot of people.  So how

14    often do you hear someone say, I wish these

15    calls would stop, or something like that?

16 A.  Every now and then.

17 Q.  How often do you hear people say these calls

18    are so annoying?

19 A.  Every now and then.

20 Q.  How often do you hear people say why don't

21    you guys leave me alone?

22 A.  Every now and them.

23 Q.  So what's the number one complaint you hear?

24 A.  I mean, it varies.  I mean, I guess probably

25    maybe annoying.  I don't know.

Deposition of Corporate Representative of
Christine Hampton

Page 36

1  Q.  Okay.  Have you ever had a borrower complain

2      and ask to speak to your supervisor?

3  A.  Yes.

4  Q.  How often does that occur?

5  A.  Not often.

6  Q.  What are the reasons why that's happened in

7      the past?

8  A.  Just because they want to complain.  They are

9      annoyed.

10 Q.  Okay.  Have you heard of a website called

11     glassdoor.com?

12 A.  No.

13 Q.  Do you have any complaints about your

14     employment with Student Assistance Corp.?

15 A.  No.

16 Q.  Do you know what the compliance team is?

17 A.  Do I know what it is?

18 Q.  Yes.

19 A.  Yes.

20 Q.  Okay.  Do you know who runs the compliance

21     team?

22 A.  No.

23 Q.  Have you ever personally had a meeting with

24     anyone from the compliance team?

25 A.  No.

Deposition of Tiffany Graves-Compliance Officer
Christine Hampton

Page 37

1  Q.  Do you know if your supervisor meets with

2      anyone from the compliance team?

3  A.  Probably.  I'm not sure.

4  Q.  Okay.  And you don't recall any instance

5      where your supervisor directly said, hey, I

6      met with the compliance team today?

7  A.  I don't think they meet with them.

8  Q.  Do you know whether or not Tiffany Graves

9      meets with the compliance team?

10 A.  I believe she does.  I'm not sure.

11 Q.  Okay.  But you don't have any specific

12     recollection?

13 A.  Yeah, they don't tell us.

14 Q.  How often do you hear somebody say something

15     like, I've asked you to stop calling me and

16     you continue to call me?

17 A.  Not often.  I don't know.

18 Q.  Okay.  When you say not often, would you say

19     that's once a month, or once a year?

20 A.  Yeah, once a year -- I mean, maybe once a

21     month.  I'm not sure.

22 Q.  And when someone makes a complaint like that,

23     what do you do?

24 A.  Well, like I said, we would have to verify

25     who -- who it is.  And if they don't say

Case 8:15-cv-01559-VMC-TBM  Document 96-4  Filed 02/26/16  Page 38 of 42 PageID 1843
Deposition of Christine Hampton, Volume 1 of 1
Christine Hampton

Page 38

1    don't call me, you know...

2 Q.  Sure.  Do you know, is there a complaint

3    database or a place where complaints are

4    stored?

5 A.  I don't know.

6 Q.  Are you required to report complaints like

7    that to your supervisor?

8 A.  No.

9 Q.  Do you ever report complaints like that to

10    your supervisor?

11 A.  Me?  No.

12 Q.  So there really wouldn't be a way for anyone

13    to gauge or know or have a record of how many

14    times someone has said I've asked you to stop

15    calling and you keep doing it.  Is that

16    accurate?

17 A.  I don't know.

18              MR. KERNEY:  We're just going to

19    take a five-minute break.

20              (Whereupon, a recess was taken.)

21              MR. KERNEY:  So just a couple more

22    follow-up questions.

23    BY MR. KERNEY:

24 Q.  First of all, how often does it occur that an

25    account gets recycled back to you?  Meaning,

Christine Hampton

1    have you ever had an instance where when you

2    got your next month's list of borrowers that

3    you're going to call, and you said, oh, my

4    gosh, Mr. Johnson, I called him -- six months

5    ago I had him.  Does that ever occur?

6  A.  Sometimes.

7  Q.  How often does that happen?

8  A.  Once every few months, maybe.

9  Q.  Now, earlier I had asked you about a

10    hypothetical situation where someone says

11    don't call me and hangs up, and you said

12    well, we'd have to verify.  Do you always

13    have to verify before you mark a number do

14    not call?

15  A.  Yes.

16  Q.  Is there ever an instance where you would

17    hypothetically mark a number do not call even

18    without verifying it?

19  A.  If it's someone's place of employment and

20    they tell you don't call.

21  Q.  Okay.  And you said earlier there's a

22    complaint basically daily or almost daily.

23    And you said that every so often you hear

24    someone say don't call me anymore.  Is that

25    correct?

Christine Hampton

Page 40

1 A.  I believe that's correct.

2 Q.  How often do you hear don't call me anymore

3     or something to that effect?

4 A.  I mean, it's not -- it's every -- I mean,

5     every now and then.

6 Q.  Daily or weekly?

7 A.  Maybe once a week, maybe, or -- you know, I

8     have been talking to a lot of people.  I

9     don't know.

10 Q.  And if that number is not verified, is there

11    anything that's done to keep track of that

12    information, the fact that that person said

13    that?

14 A.  I don't know.

15 Q.  Do you do anything personally to track that

16    information?

17 A.  No.

18          MR. KERNEY:  I don't have anything

19    else.

20          MS. SIMONETTI:  We'll enter into

21    the same agreement as on the prior two.

22          MR. KERNEY:  So you have an option

23    if you want to read or waive it, but your

24    attorney is indicating that you're going to

25    read the document.  So they're going to draw

Deposition of Corporate Representative of
Christine Hampton

Page 41

1    up a transcript.  Ms. Simonetti will get it

2    to you, and she'll give you instructions on

3    how to proceed from there.

4              (Whereupon, the deposition was

5    concluded at 1:25 p.m.)

6

7         AND FURTHER THE DEPONENT SAITH NOT.

8

9         _____

10                 CHRISTINE HAMPTON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     STATE OF INDIANA      )
                             )  SS:
 2     COUNTY OF SHELBY      )

 3            CERTIFICATE OF COURT REPORTER

 4        I, Joyce E. Shinault, the undersigned
       Court Reporter and Notary Public, residing in the
 5     County of Shelby, State of Indiana, do hereby
       certify:

 6

          That at the time and place described in
 7     this transcript, the deponent, CHRISTINE HAMPTON,
       presented herself before me for administration of
 8     an oath of truthfulness, which oath I then
       administered;

 9

          That I then reported to the best of my
10     ability in machine shorthand all of the words
       spoken by all parties in attendance during the
11     course of the ensuing proceedings, including
       objections, if any, made by all counsel present;

12

          That I later reduced my stenographic notes
13     into the foregoing typewritten transcript form,
       which typewritten transcript is a true record of
14     the testimony given by this witness as stated
       above;

15

          I do further certify that I am a
16     disinterested person in this cause of action;
       that I am not a relative or attorney or employee
17     of any of the parties; that I am not a relative
       of an employee of such attorney or counsel; and
18     that I am not financially interested in this
       action.

19

          IN WITNESS HERETO, I have affixed my
20     Notarial Seal and subscribed my signature below
       this _____ day of January, 2016.

21

          _____
22            Joyce E. Shinault, RPR, Notary Public

23     My Commission Expires:
       September 8, 2023
24     County of Residence:
       Shelby

25
```