**In The Matter Of:**

*McCaskill v.*
*Navient Solutions, Inc.*

---

*Patty Peterson*
*January 4, 2016*

---

*Wilcox & Fetzer, Ltd.*

*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



Original File 010416PetersonP.jg.txt
Min-U-Script® with Word Index

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,              )
              Plaintiff,   )8:15 CV
                           )1559-T-33-TBM
v.                         )
                           )
NAVIENT SOLUTIONS, INC.,   )
STUDENT ASSISTANCE         )
CORPORATION, and NAVIENT   )
CORPORATION,               )
              Defendants. )

        Deposition of PATTY PETERSON taken
pursuant to notice at the office of Stat Office
Solutions, 1201 North Orange Street, Suite 700
Wilmington, Delaware, beginning at 9:57 a.m. on
Monday, January 4, 2016, before Jennifer M.
Guy, Registered Professional Reporter and
Notary Public.

              WILCOX & FETZER
        Registered Professional Reporters
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

---

Patty Peterson                                    Page 2

1  APPEARANCES:
2
3      OCTAVIO GOMEZ, ESQ.
       MORGAN & MORGAN
4         201 North Franklin Street, 7th Floor
          Tampa, Florida 33602
5         For the Plaintiff
6      LISA M. SIMONETTI, ESQ.
       VEDDER PRICE
7         1925 Century Park East, Suite 1900
          Los Angeles, California 90067
8         For the Defendants
9  Also Present:
10         Patrick Chaing, Esq., Navient Solutions
11             - - - - -
12          PATTY PETERSON, after
13       having been first duly sworn, was
14       examined and testified as follows:
15             EXAMINATION
16 BY MR. GOMEZ:
17     Q.  Good morning, Ms. Peterson.  If you
18 could please state your name and spell your
19 last name for the record.
20     A.  Patty, Patricia, Peterson,
21 P-E-T-E-R-S-O-N.
22     Q.  And who are you currently employed by?
23     A.  Navient.
24     Q.  And when you say Navient, is that

---

Patty Peterson                                    Page 3

1  Navient Corp or Navient Solutions, or who is
2  it?
3  A.  Navient Solutions.
4  Q.  That would be Navient Solutions, Inc.,
5  correct?
6  A.  Yes.
7  Q.  How long have you been working with
8  Navient Solutions, Inc.?
9  A.  I worked with Sallie Mae previous to
10 Navient, and I've been with the combined
11 company 26 years.
12 Q.  26 years, okay.  What is your title
13 with Navient Solutions?
14 A.  Vice president, operational support
15 services.
16 Q.  And what are some of the duties you
17 have as vice president of operational -- what
18 are some of the duties, what are you in charge
19 of?
20 A.  Responsibility for the asset recovery,
21 so our collections and default prevention
22 areas, supporting those areas.  So things like
23 reporting, operational reporting, managing or
24 assistant managing the auto dialers, the

---

Patty Peterson                                    Page 4

1  training, some of the systems, liaison with our
2  IT area with the systems that we work with.
3  Q.  You're the vice president.  Who is the
4  president of operational support?
5  A.  There's not a president.
6  Q.  So you are the main person when it
7  comes to asset recovery and pretty much what
8  you just described?
9  A.  Of the support areas of asset recovery,
10 yes.
11 Q.  Now, how long have you served in this
12 position as vice president?
13 A.  Approximately four years.
14 Q.  Now, have you ever -- has your
15 deposition ever been taken?
16 A.  Yes.
17 Q.  About how many times?
18 A.  Five or six.
19 Q.  Out of those five or six times, how
20 many times have you been deposed as a corporate
21 representative for Navient Solutions or for
22 Sallie Mae?
23 A.  All but one of those.
24 Q.  All but one?  Okay.  In the last year,

1  have you had any of these depositions where you
2  have been presented as a corporate
3  representative?
4  A.  Yes.
5  Q.  How many of those last year, in 2015?
6  A.  I'm not sure.
7  Q.  All of these five times, of the times
8  that you were presented as a representative for
9  Navient Solutions, did they all involve TCPA
10 cases?
11 A.  No.
12 Q.  How many of those involved TCPA
13 violations or alleged violations?
14 A.  I'm not sure.
15 Q.  Do you recall any of the name of the
16 cases you were deposed on?
17 A.  None are coming to mind; sorry.
18 Q.  I want to talk a little bit about the
19 history of Sallie Mae and how they broke up or
20 what happened.  So you were hired originally
21 through Sallie Mae, correct?
22 A.  Yes.
23     MS. SIMONETTI: That company is
24 Sallie Mae, Inc.

1      MR. GOMEZ: Sallie Mae, Inc.,
2  okay.
3      BY MR. GOMEZ:
4  Q.  For now we'll call it Sallie Mae, just
5  to make it shorter.  But when you get employed
6  by Sallie Mae, Inc., what capacity did you come
7  in?  Doing what?
8  A.  Entry level.  My title was a financial
9  analyst.
10 Q.  And tell me a little bit about the way
11 you climbed up to become the vice president of
12 the operational support.
13 A.  Twenty-six years I've been with the
14 company, so moved a few different locations.
15 So started in 1989 in our Killeen, Texas of
16 financial analyst, which is really
17 responsibility for our billing of the guarantee
18 fees which go along with guaranteeing the
19 student loans.  Promoted in various positions
20 through the front end of our operations
21 businesses, so things like originating student
22 loans, so I was in that area.  Moved through
23 supervisor and manager roles there.
24     I was over our collections in a

1  manager and director level, over our private
2  credit collections areas, so private student
3  loans, as well as some of our default
4  prevention areas within the company.
5  Q.  So it seems like as you climb,
6  regarding the collection portion or the default
7  management portion, you actually were a manager
8  of I guess the people who were actually doing
9  the phone calls or answering the calls once
10 somebody answers?
11 A.  At one time I was, yes.
12 Q.  How long did you do that for?
13 A.  Ten years.
14 Q.  And after that, where did you go?  What
15 was the next step up?
16 A.  Moved into more of the support
17 organization.  So a lot of what I do today,
18 I've just added on responsibilities as my job
19 titles have changed.
20 Q.  And throughout this entire 26 years,
21 you worked mostly with student loans?  Is that
22 fairly stated?
23 A.  Yes.
24 Q.  So you're fairly knowledgeable about

1  student loans and how they work, at least how
2  Sallie Mae, Inc., or Navient Solutions, Inc.,
3  attempts to collect those loans?
4  A.  I believe so.
5  Q.  Good; good.
6      Now, tell me a little bit about
7  your education.  Do you have any degrees?
8  A.  I have a bachelor's degree.
9  Q.  In what?
10 A.  Management.
11 Q.  From what school?
12 A.  University of Northern Iowa.
13 Q.  Any other certificates or anything
14 else?
15 A.  No.
16 Q.  I want to talk a little bit regarding
17 Navient Solutions, Inc.  Now, of course, I
18 understand you're being presented as an
19 individual, so you're not, you didn't have to
20 prepare or do all this research.  I just want
21 to know about what you know about the questions
22 I want to ask you.  I'm going to ask you a
23 little bit about Navient Solutions and any
24 relationships with other companies.

McCaskill v.
Navient Solutions, Inc.

Patty Peterson                                                    Page 9

1    Have you heard of a company
2  called Student Assistance Corporation?
3  **A. Yes.**
4  Q. What do you know about them?
5  **A. They do default prevention activity on**
6  **behalf of guarantee agencies.**
7  Q. Are you, as vice president of
8  operational support, are you in contact with
9  SAC at all?
10 **A. Yes.**
11 Q. And in what manner or what capacity do
12 you contact them?
13 **A. I provide some of the support services**
14 **for them, specifically training and auto dialer**
15 **support.**
16 Q. Are you in charge of any group or
17 people from Student Assistance Corp?
18 **A. No.**
19 Q. When you stated that you provide
20 support for their system, do they have a
21 separate system from Navient, a separate
22 dialer, separate equipment?
23    **MS. SIMONETTI: Objection. You**
24 can answer if you can.

Patty Peterson                                                   Page 10

1    **THE WITNESS: They have a**
2  separate collections system, and their dialer
3  is the same technology, but a separate auto
4  dialer system.
5    **BY MR. GOMEZ:**
6  Q. Do you also help them set up training
7  for these representatives that are going to be
8  answering the phone? Are you in charge of
9  that, too?
10 **A. I have a team that does the training**
11 **for them, yes.**
12 Q. And this team trains both Student
13 Assistance Corp and Navient Solutions
14 employees?
15 **A. Can you be more specific on that?**
16 Q. Yeah, I'm referring to, I guess, what
17 do you call them, agents, the people that would
18 answer the phone once the auto dialer calls and
19 somebody picks up the phone, it gets sent to an
20 agent, or you call them representatives? What
21 do you call those people?
22 **A. Agents.**
23 Q. My question is when you're setting up
24 this training, do the same teachers or trainers

Patty Peterson                                                   Page 11

1  both train SAC and NCI employees?
2  **A. No, they have separate trainers.**
3  Q. So what part do you take on the
4  training for SAC individuals?
5  **A. So the team responsible for training of**
6  **our default prevention representatives, some of**
7  **which are Student Assistance Corporation**
8  **representatives, some are Navient collections**
9  **representatives or default prevention**
10 **representatives, they have separate technical**
11 **trainers that are responsible for doing the**
12 **training for those individuals, and they have**
13 **separate classes for those individuals.**
14 Q. Now, the relationship between NCI and
15 SAC, are they affiliates, sister companies,
16 same company, what is it? What is your
17 understanding of that?
18 **A. I don't know the legal difference**
19 **between them, but to me, they're separate**
20 **companies.**
21 Q. You've stated they have the same
22 technology, but they have separate dialers. Do
23 you know how many dialers SAC has?
24 **A. I believe just one.**

Patty Peterson                                                   Page 12

1  Q. What about NSI?
2  **A. Three different auto dialers.**
3  Q. Are they all Noble, or what is the
4  brand or manufacturer of the dialers, if you
5  know?
6  **A. Noble, Interactive Intelligence, and GC**
7  **Dialer.**
8  Q. Did you say GC?
9  **A. GC.**
10 Q. In your position today, do you oversee
11 all the call centers, or whatever you call
12 them, where the agents sit to receive calls for
13 NSI?
14 **A. I do not have responsibility for any of**
15 **the collections staff or default prevention**
16 **staff.**
17 Q. So at this point, you do not provide
18 any -- so what exactly is it that you do, then,
19 regarding the collection portion?
20 **A. Provide the supporting functions for**
21 **them. Do their reporting, manage their auto**
22 **dialers, interact with IT. But the collectors**
23 **themselves do not work under my area.**
24 Q. What area do they work under? Who

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

Patty Peterson                                        Page 13

1   would be their boss, or what is that called,
2   that area that you're describing?
3   **A.   There's multiple areas there within**
4   **NSI. We have our federal default prevention**
5   **areas; we have our private credit collections**
6   **agents; and then separate from that, we have**
7   **our customer service agents.**
8   Q.   Regarding Navient Solutions Inc., you
9   service these loans, correct?  You service
10  student loans?  Is that the main function of
11  Navient Solutions?
12  **A.   Yes.**
13  Q.   You service both private and federal
14  loans?
15  **A.   Yes.**
16  Q.   About how many guarantee agencies,
17  guarantor agencies do you guys work with, do
18  you know?
19  **A.   Not specifically.**
20  Q.   Navient Solutions Corp is your parent
21  company?
22      **MS. SIMONETTI:** Navient
23  Corporation.
24

Patty Peterson                                        Page 14

1       **BY MR. GOMEZ:**
2   Q.   I'm sorry, Navient Corporation, is that
3   your parent company?
4   **A.   I believe so.**
5   Q.   Do you partake in any way in creating
6   the manuals or the policies, procedures
7   regarding the auto dialers, when to be used,
8   when not to be used?
9   **A.   I have a team responsible for writing**
10  **the procedures that the agents use, are**
11  **responsible for adhering to.**
12  Q.   But do you personally partake in any of
13  that, whether it is resolving it, trying to
14  create these policies, or trying to enforce
15  these policies?
16  **A.   I serve in a consulting capacity, so**
17  **questions that come up, whether or not we, you**
18  **know, should write procedures for it or**
19  **question, you know, whether or not our**
20  **procedures need to be updated based off of new**
21  **guidelines that we're receiving. So more of a**
22  **facilitation and review process.**
23  Q.   Let me ask you a little bit about have
24  you ever received any training regarding the

Patty Peterson                                        Page 15

1   TCPA?  And by the TCPA, I mean the Telephonic
2   Consumer Protection Act?
3   **A.   What do you mean by training?**
4   Q.   Someone has come up to you or given you
5   materials or you have read yourself, anything
6   to educate yourself regarding the TCPA?
7       **MS. SIMONETTI:** To be clear, at
8   no point are you to discuss any advice you've
9   been given by counsel.
10      **BY MR. GOMEZ:**
11  Q.   Nothing by lawyers, I mean through your
12  job or through websites or things, have you
13  received any training regarding the TCPA?
14  **A.   I wouldn't call it training. I've read**
15  **material about TCPA, but I wouldn't call it**
16  **training.**
17  Q.   Are you tested, meaning in your
18  position as you are right now as vice
19  president, do you have to take an annual test,
20  or every six years, do you have to take any
21  kind of continuing education?
22  **A.   Yes.**
23  Q.   How often do you do that?
24  **A.   Annually.**

Patty Peterson                                        Page 16

1   Q.   Do you know if that material or this
2   testing we're talking about, does it involve
3   any TCPA?
4   **A.   Yes.**
5   Q.   Is it done online, or how is it that
6   you take this test?  How is it that you learn
7   about whether or not you know about the TCPA?
8   **A.   It's an online testing.**
9   Q.   And you do it annually?  Does everybody
10  do it annually?
11  **A.   I don't know when employees do it.**
12  Q.   You stated that when it comes to
13  regarding policies and procedures, you are
14  somewhat involved in a consulting manner.  Is
15  it fair to say you're familiar with the
16  policies and procedures that NSI has regarding
17  the TCPA?
18  **A.   Generally.**
19  Q.   I want to go through some of them.  As
20  you know, we're here for a lawsuit regarding
21  alleged violations of the Telephonic Consumer
22  Protection Act.  Is that your understanding?
23  **A.   Yes.**
24  Q.   As far as you know, what are the

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

Patty Peterson                                    Page 17

1  policies when a consumer asks Navient
2  Solutions, Inc., to stop calling them to their
3  cell phone?
4  A.  That we remove -- if we have consent
5  from the customer, we'll remove that consent,
6  auto dial consent.
7  Q.  Would you then continue to call them
8  manually or have people dial, or what is the
9  procedure?  What is it that you do at NSI?
10  A.  We would still probably call them
11  manually.  Depends on how they asked us or what
12  they said to us at the time.
13  Q.  So let's go through this.  First of
14  all, you just described consent.  What is your
15  understanding of how does NSI normally get
16  consent to call someone using an auto dialer?
17  A.  Customer provides it through a
18  communication, telephone conversation with us.
19  Q.  And when you receive a number like
20  that, do you run any type of scrub on the
21  number to see whether or not it's a cell phone
22  or a landline?
23  A.  Yes.
24  Q.  Is that done with every phone number,

Patty Peterson                                    Page 18

1  or how does that work?
2  A.  I believe it's done with every phone
3  number.
4  Q.  Once a number is identified as a cell
5  phone, what is it that NSI does next?
6  A.  Can you be more specific with that
7  question?
8  Q.  Sure.  You stated you get the number
9  from the consumer themselves.  Sometimes you
10  probably get numbers from the guarantors,
11  correct, actually when the loan occurred?
12  A.  No.
13  Q.  So tell me, you get a number from a
14  consumer you said?
15  A.  Yes.
16  Q.  And you run it through the scrub
17  process to see if it's a landline or a cell
18  phone, correct?
19  A.  Yes.
20  Q.  Once you see that it's a cell phone,
21  it's going to be treated differently, correct?
22  A.  Potentially.
23  Q.  Because you need this express consent
24  to use the dialers; is that your understanding?

Patty Peterson                                    Page 19

1  A.  Yes.
2  Q.  What other ways do you get phone
3  numbers from customers?
4  A.  Customer can provide it on our Website,
5  so on our login to their account to the
6  Website.  Provide it in their promissory note
7  when they take out the loan.
8  Q.  Let's talk a little bit about the
9  Website.  Have you ever visited the Website,
10  Navient Solutions' Website?
11  A.  Yes.
12  Q.  When you visit the Website in order to
13  access your account, what information do you
14  kind of have to go through?
15  A.  Set up the user ID, so you've got to
16  create the account, password.
17  Q.  And then for future visits, once you
18  know your user ID and your password, what is
19  the normal procedure when people log in to look
20  at the loans or make a payment?
21  A.  I'm not sure what you're asking.
22  Q.  What I'm trying to figure out is once
23  an account is created, it seems that Navient
24  Solutions walks you through these steps to

Patty Peterson                                    Page 20

1  re-verify this number, is this still your phone
2  number; are you familiar with that process?
3  A.  Yes, somewhat.
4  Q.  When you're going through it, of course
5  it has a disclaimer saying by putting your
6  number here or by clicking accept, you're
7  giving us express consent to use an auto
8  dialer, something to that effect.  Are you
9  familiar with that?
10  A.  Yes.
11  Q.  I want to know if you know how that
12  address or phone number is put into that page
13  when somebody logs in?  How is it that it
14  appears there?  Is it something that the client
15  has to write it in every time, or is it
16  something that will automatically populate?
17  A.  It will populate based off of the
18  information that is on file for that customer.
19  Q.  And who has the ability to change that
20  information?  Would it be an agent?
21  A.  An agent or the customer themselves.
22  Q.  When a customer says, "I want you to
23  stop calling my cell phone," you told me that
24  your policies and procedures say the consent

Wilcox & Fetzer Ltd.
www.wilfet.com
(302) 655-0477

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

---

Patty Peterson                                              Page 21

1   shall be changed to no consent; is that a fair
2   statement?
3   **A. Generally, yes.**
4   Q.  And when you say generally, what are
5   the exceptions?
6   **A. In some cases, we could remove the**
7   **phone number completely. The place of**
8   **employment, if they ask us not to call their**
9   **place of employment, we may remove the phone**
10  **number all together.**
11  Q.  And I understand that. If you're
12  talking a cell phone, you can remove it or you
13  can put that you don't have consent anymore,
14  correct?
15  **A. Yes.**
16  Q.  In what system are you making these
17  entries? What is the system called?
18  **A. For which company?**
19  Q.  For NSI. I'm talking only NSI at this
20  point.
21  **A. There's still a couple of systems. Do**
22  **you want to be specific on the type?**
23  Q.  You have something called a Class
24  system, CSI? Do you have something like that?

---

Patty Peterson                                              Page 22

1   **A. Class, yes.**
2   Q.  Class is a system. Tell me a little
3   bit about Class. What is Class, or what is it
4   used for?
5   **A. Class is our servicing system of record**
6   **for servicing our student loans, for our**
7   **federal Stafford loans that we service on**
8   **behalf of the Department of Education.**
9   Q.  I'm assuming all the demographic
10  information is included within Class, correct?
11  **A. Yes.**
12  Q.  Within Class, do you see case notes, I
13  mean call notes?
14  **A. Yes.**
15  Q.  And you see call logs?
16  **A. I see notes about calls.**
17  Q.  Notes about calls. What if the dialer
18  makes a call where the dialer input, makes an
19  input into Class and a call was made at a
20  certain time, if there was no response, there's
21  no notes?
22  **A. Yes.**
23  Q.  This Class system, does SAC have access
24  to see these Class notes?

---

Patty Peterson                                              Page 23

1   **A. I'm not sure.**
2   Q.  Do you know what kind of system they
3   use?
4   **A. Their system is called BPS.**
5   Q.  Do you know what that stands for?
6   **A. Borrower Pursuit; I don't know what the**
7   **S stands for.**
8   Q.  Are you able at Navient Solutions to
9   see the BPS system?
10  **A. I do not believe so.**
11  Q.  This Class servicing system, is this
12  Navient Solutions, Inc.'s own system or is it
13  something that's shared with the guarantors?
14  **A. It's our own system.**
15  Q.  What system do you use to communicate
16  with the guarantors?
17  **A. No system.**
18  Q.  No system? You guys are in the, I
19  guess you provide a service, you service the
20  student loans, correct, at Navient Solutions?
21  Is that a fair statement?
22  **A. Yes.**
23  Q.  If an account becomes delinquent, at
24  what point do you notify the guarantor that the

---

Patty Peterson                                              Page 24

1   account is delinquent?
2   **A. Varies by guarantor, but generally**
3   **about 60 days delinquent.**
4   Q.  Is it your understanding that at that
5   point, the guarantor should find a default
6   consulting company, or someone to do default
7   counseling?
8   **A. The guarantee agencies are required to**
9   **do default prevention activity.**
10  Q.  When you say that they're ordered to do
11  it, do you know why or how, how is it that
12  they're mandated to do it?
13  **A. The regulations, federal regulations**
14  **for student loans.**
15  Q.  So the guarantor agency then, what is
16  it that they do? They find a company like SAC
17  to begin counseling these default accounts?
18  **A. I can't speak for what the guarantee**
19  **agencies do.**
20  Q.  But what is your understanding of how a
21  company like SAC will begin to work on a loan
22  you're servicing?
23  **A. Guarantee company provides information**
24  **to SAC, so basic account information, then SAC**

---

1    **would begin default prevention activities,**
2    **trying to reach out to the customers.**
3   Q.  And that would include, of course,
4   making phone calls, sending letters?
5   **A.  Yes.**
6   Q.  How does Navient Solutions, Inc.,
7   become aware of who the default counseling
8   company is?  Like, who is it that the guarantor
9   agency hires to do the counseling, the default
10   counseling?
11   **A.  I don't know.**
12   Q.  When you're servicing an account, will
13   SAC notify you, hey, we're also going to start
14   doing counseling on that account?
15   **A.  No, I don't know.**
16   Q.  Are you aware of any database that you
17   share with SAC regarding your servicing of the
18   loans and their counseling of the loans?
19   **A.  The customer demographic database that**
20    **each system provides demographic information**
21    **into, but that's the only system that I'm aware**
22    **of.**
23   Q.  What is the name of that system, do you
24   know?

1   **A.  CIS.**
2   Q.  Do you know what that stands for?
3   **A.  I do not.**
4   Q.  And this system is only demographics
5   information?
6   **A.  I believe so.**
7   Q.  Do you know if NSI can make
8   modifications or changes to this demographic
9   information in CIS?
10   **A.  Not directly, that I'm aware of.**
11   Q.  Who could change the demographic
12   information in the CIS system?
13   **A.  The system gets feeds or data files**
14    **from the underlying systems, so, like, Class.**
15   Q.  So Class will -- if you alter Class,
16   there's a good chance it will change it in CIS?
17   **A.  Yes.**
18   Q.  What about Student Assistance Corp, can
19   they, through their BPS system or whatever
20   system, change the demographics on this CIS
21   system?
22   **A.  I'm not familiar with the details**
23    **around how BPS interacts with CIS specifically.**
24   Q.  If a consumer requests that you stop

1   calling them, the way I guess you would notify
2   Student Assistance Corp is change it on the
3   Class system, therefore changing it in the CIS?
4   **A.  Again, I don't know for sure how BPS**
5    **gets what type of information they get from**
6    **CIS.**
7   Q.  Do you know if SAC is relying on this
8   CIS system for consent for phone numbers, for
9   valid phone numbers?
10   **A.  Again, I don't know what the**
11    **interaction with BPS and CIS is specifically.**
12   Q.  CIS -- once again, I'm never going to
13   ask about communications with your attorney,
14   but I know you've been with this company for a
15   long time.  Did you play any role on the Arthur
16   class action?
17     **MS. SIMONETTI:** Just answer yes
18   or no.
19     **THE WITNESS:** Yes.
20     BY MR. GOMEZ:
21   Q.  Once again, I'm not going to ask you
22   any questions about any communication, but I
23   want to know were you a corporate
24   representative of that class action?

1   **A.  No.**
2   Q.  During that class action relevant
3   period through the settlement, I guess that
4   would have been right before you became vice
5   president of operations, or were you already
6   vice president of operational support?
7   **A.  I do not believe I was vice president**
8    **at that point.**
9   Q.  What do you think was your position?
10   **A.  My position before that was senior**
11    **director, and I did not have responsibility,**
12    **all the same responsibility at that role.**
13   Q.  Is it your understanding that that
14   class action involved violations of the TCPA?
15   **A.  Yes.**
16   Q.  Do you get any type of notice or are
17   you made aware that a lawsuit is filed against
18   Navient Solutions for TCPA violations only?
19     **MS. SIMONETTI:** Are you asking
20   aside from a lawyer calls her for something?
21   In the ordinary course?
22     BY MR. GOMEZ:
23   Q.  Is there any method by which you will
24   become aware a lawsuit has been filed against

McCaskill v.
Navient Solutions, Inc.

Patty Peterson                                    Page 29

1    Navient Solutions for TCPA violations?
2        MS. SIMONETTI: Asides from a
3    lawyer calls her or sends her an email that
4    there's --
5        MR. GOMEZ: Correct.
6        THE WITNESS: No.
7    BY MR. GOMEZ:
8    Q.  Are you aware of how many lawsuits have
9    been filed against Navient Solutions in the
10   last 12 months?
11   A.  No.
12   Q.  I guess the same answer would be 24
13   months or any time before that, correct?  You
14   do not know a number or an approximation?
15   A.  I do not.
16   Q.  We were discussing that when a consumer
17   asks the agent to please stop calling, that
18   agent should for the most part remove the
19   number or change the consent, correct?
20   A.  Yes.
21   Q.  What is the penalty if an agent does
22   not do it, if they don't remove it, if they
23   don't change the consent?
24   A.  Could be disciplinary action for not

Patty Peterson                                    Page 30

1    accurately updating the records, which could be
2    as severe as termination.
3    Q.  Is there any set of guidelines, meaning
4    levels of offenses that people will have
5    regarding the disciplinary actions?
6    A.  Yes.
7    Q.  How severe or how serious is the
8    failure to update an account specifically to a
9    request to stop calling?
10   A.  I don't know specifically.
11   Q.  Have you ever taken part in the
12   training of these agents or been involved as a
13   manager of the training of the new agents that
14   come in to serve for NSI?
15   A.  Not directly.
16   Q.  How often do you hear about
17   disciplinary action being taken because someone
18   failed to update the system about a request to
19   stop the phone calls?
20   A.  I don't hear about it very often.  I
21   don't recall when I heard about it last.
22   Q.  Navient Solutions, Inc., is a fairly
23   large company, so they, I mean, it's not
24   unusual to have a lot of complaints.  I want to

Patty Peterson                                    Page 31

1    talk a little bit about a complaint.  So what's
2    your understanding of this?  If somebody says,
3    "I want you to stop calling me," they continue
4    to receive calls, and then they complain,
5    meaning the next time an agent calls, they say,
6    "I've already asked you to not call me and you
7    continue to call me."  I want to find out what
8    happens to that complaint when a consumer is
9    complaining "I've already asked you before and
10   you continue to call" or "this is harassing,"
11   any complaint like that?
12   A.  I need -- each department has different
13   procedures, so I would have to have a specific
14   area that you're talking about.
15   Q.  Let's say in a federal student loan,
16   guaranteed, like the one we're talking about in
17   this case, and an individual has asked before
18   to stop calling, alleges, and then a second
19   time he's saying, "I've already asked you to
20   stop calling me and you continue to call me" or
21   "you're harassing me."  Is there a procedure
22   that you're aware of that you know that that
23   agent or that Navient Solutions has for that?
24   A.  I don't know the specific details on

Patty Peterson                                    Page 32

1    the federal default prevention teams, their
2    process.  I don't have the details around their
3    process.
4    Q.  Do you know if there is a database that
5    keeps complaints from customers?
6    A.  Yes.
7    Q.  Do you have a specific name, or is it
8    just called the complaints database?  What do
9    you know?
10   A.  I believe it's called CSI.
11   Q.  Do you know what is CSI is?  Have you
12   ever opened it up?
13   A.  No.
14   Q.  Who has access to CSI?
15   A.  I'm not sure.
16   Q.  Do you oversee or do you take any part
17   in the compliance team by NSI?
18   A.  No.
19   Q.  Do you know if NSI has a compliance
20   team?
21   A.  Yes.
22   Q.  Do you know who is the director or
23   manager of that complaints team?
24       MS. SIMONETTI: Are you saying

Patty Peterson                                          Page 33

1   complaints or compliance?
2      BY MR. GOMEZ:
3   Q.   You have a compliance team, correct?
4   A.   Yes.
5   Q.   Sorry, my mistake.  Who is the manager
6   of the compliance team?
7   A.   Tim Hynes is our chief compliance
8   officer.
9   Q.   And he does not report to you?  He's in
10  a different group?
11  A.   Correct.
12  Q.   Do you know how large your compliance
13  team is?
14  A.   No.
15  Q.   Do you know if you share that
16  compliance team with SAC?
17  A.   Yes.
18  Q.   Do you manage or are you in charge of
19  the budget of SAC at all?
20  A.   No.
21  Q.   Do you know how large this compliance
22  team is?
23  A.   No.
24  Q.   We talked briefly before regarding the

Patty Peterson                                          Page 34

1   three dialing systems, different systems that
2   NSI uses.  And are you familiar with I guess
3   making eight phone calls per account a day,
4   that kind of policy for NSI?
5   A.   Yes.
6   Q.   And is your understanding that that's
7   the maximum amount of phone calls that should
8   be made from NSI for one account in one day?
9   A.   Yes.
10  Q.   The fact that you learned or you know
11  that SAC is also calling, would that change the
12  number in your opinion?
13  A.   No.
14  Q.   So even if they're calling eight times,
15  you still believe you should be able to call
16  eight times?
17  A.   Yes.
18  Q.   Do you know where the number eight came
19  from, why eight phone calls, not five, not ten?
20  A.   No.
21  Q.   And is it your understanding that NSI
22  calls seven days a week or has the ability to
23  call seven days a week?
24  A.   Yes.

Patty Peterson                                          Page 35

1   Q.   A maximum of eight times, correct, per
2   day?
3   A.   Yes.
4   Q.   So that would be 56 calls in one week,
5   seven days times eight?
6   A.   Yes.
7   Q.   Do you find that calling somebody 56
8   times is harassing?
9   A.   No.
10  Q.   Is there a number that you would think
11  is harassing?
12  A.   I mean, if the customer picks up or we
13  talk to the customer, we would, you know, not
14  have to call again.  So we're trying to
15  maximize our ability to reach the customer.
16  Q.   Do you know, and of course it changes,
17  it varies, but do you know on average how many
18  phone calls does NSI make a day through the use
19  of these auto dialers?
20  A.   No.
21  Q.   Do you oversee at all the dialer teams
22  or the people in charge of the dialer teams?
23  A.   Yes.
24  Q.   And they don't provide reports to you

Patty Peterson                                          Page 36

1   regarding the number of phone calls being made?
2   A.   I get reports.
3   Q.   Within those reports, is there a number
4   of phone calls being made or attempted by these
5   dialers?
6   A.   Potentially, yes.
7   Q.   But you don't have an idea of any type
8   of average how many phone calls are being made
9   per day or any quotas or anything like that
10  with the dialers?
11  A.   I don't look at those types of details.
12  Q.   So in your job, and you described
13  reports, what kind of reports are you looking
14  at?  Like, what is it that your job entails?
15  It is not the training and it is not the
16  dialers.
17  A.   I oversee the teams that provide the
18  information to the operational teams.  So the
19  reporting that we do is to provide the
20  operational areas, those areas that have the
21  responsibility for the collectors or the
22  default prevention agents to be able to do
23  their jobs.
24  Q.   So what information is that?  That's

1   what I'm trying to figure out.
2   A.  How their collectors are doing on an
3   individual basis.
4   Q.  Let's talk about that, how an
5   individual collector is doing.  So what does
6   that entail?
7   A.  How much time they're working in a day
8   compared to what they're being paid.  So their
9   utilization of dialer time to their paid time.
10  How many calls they're taking, what their
11  average talk time is, what their number of
12  right party contacts that they have.
13  Q.  So you get to see all those reports?
14  A.  I'm on the distribution.
15  Q.  How many people are employed on NSI in
16  that capacity, meaning as a collector or as an
17  agent?
18  A.  I don't know specifically.
19  Q.  Do you have any type of guesstimate,
20  100, 1,000, 10,000?
21  A.  A thousand.
22  Q.  And I'm talking about the agents, the
23  collectors themselves, are they paid a salary?
24  A.  Yes.

1   Q.  Are they also paid any type of
2   incentives?
3   A.  Depends on what area they're in.
4   Q.  If they're on the federal student
5   loans, let's say the one that is involved in a
6   case like this, where they're calling regarding
7   the guarantor is USA Funds, and they're calling
8   to collect on a delinquent student loan, would
9   they get paid a commission for collecting a
10  debt or for bringing the account up to date?
11  A.  Yes.
12  Q.  Is that based on the percentage that is
13  owed of the total loan, is it based on the
14  amount of the payment by the consumer?  What is
15  it based on?
16  A.  Each compensation, each of these groups
17  have different compensation plans.  But
18  generally, it's based off how they're doing
19  towards the goal they were given on the number
20  of accounts or the dollar accounts that they
21  were able to resolve the delinquency on.
22  Q.  You say they're given goals.  Are these
23  annual goals, monthly goals?  How are they
24  normally set up?

1   A.  Typically monthly.
2   Q.  These goals would involve either the
3   monetary amount they should collect or the
4   number of phone calls they need to make?  What
5   are the goals?  What do they entail?
6   A.  I don't know each component of their
7   incentive compensation plan.
8   Q.  Who would know that kind of
9   information?
10  A.  The individual agents would know it;
11  the managers responsible for the agents
12  themselves.
13      MS. SIMONETTI:  When you find a
14  good place, could we stop for five minutes?
15      MR. GOMEZ:  We can stop right
16  now.
17      (A brief recess was taken.)
18      MR. GOMEZ:  One thing I kind of
19  jumped in without doing is let's identify the
20  lawyers we have present, and if both attorneys
21  could identify themselves.
22      MS. SIMONETTI:  I'm Lisa
23  Simonetti from Vedder Price for defendants.
24      MR. CHAING:  Patrick Chaing with

1   the defendant.
2       MR. GOMEZ:  Thank you.
3       BY MR. GOMEZ:
4   Q.  Let's continue with this.  We were
5   discussing your agents or your employees that
6   are actually involved in the collection.  You
7   served as manager of collectors, so at that
8   point, would you be managing them?
9   A.  I did.
10  Q.  Okay, you did.  So you're familiar --
11  I'm assuming it might have changed a little
12  bit, but you are familiar with overall how the
13  collections work, correct?
14  A.  Yes.
15  Q.  And you did that for almost ten years?
16  A.  Approximately, yes.
17  Q.  As far as you know, how many call
18  centers or locations where these collectors are
19  does NSI have?
20  A.  Approximately seven.
21  Q.  Now, we were discussing you don't know
22  exactly how they get -- they get a salary, but
23  you're not sure about the incentives, how they
24  get paid for those incentives, correct?

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

---

Patty Peterson                                                    Page 41

1  A.  Correct.
2  Q.  Now, regarding the disciplinary action
3  of an agent who does not follow a policy such
4  as updating the account of the requests to stop
5  calling, who would know about the disciplinary
6  action?  Would it be the manager of collectors,
7  or who would know that?
8  A.  Managers of the collectors, our call
9  monitoring team that would find this or
10  potentially find this type of activity.
11  Q.  And this call monitoring team, is that
12  under the compliance department, or is it a
13  separate thing?
14  A.  That's a separate thing.
15  Q.  Is it your understanding that NSI
16  records all phone conversations?
17  A.  Yes.
18  Q.  Both inbound and outbound?
19  A.  Yes.
20  Q.  Do you have any idea how long those
21  conversations are kept?
22  A.  Indefinitely at this point.
23  Q.  Have you ever been involved with a call
24  monitoring team?  Have you ever done any work

---

Patty Peterson                                                    Page 42

1  with them or know about that?
2  A.  Somewhat, yes.
3  Q.  Regarding what their duties are, I'm
4  assuming they listen to phone calls for
5  accuracy and customer service; is that part of
6  their job?
7  A.  Yes.
8  Q.  What else are they looking for?
9  A.  Compliance infractions.
10  Q.  How often, when you were a manager of
11  collectors, did you find I guess failures to
12  comply with requests to stop calling?
13  A.  Not frequently.
14  Q.  If that did indeed happen when you were
15  manager of collectors, what was the punishment?
16  A.  I don't recall.
17  Q.  And I'm just trying to understand how
18  severe it is for NSI when they find a violation
19  like that, but you don't know that answer?
20  A.  Severe cases, so if a person says "you
21  can't call me" on their cell phone and we say
22  they can, that could be a final written
23  warning, or if for some reason they've done it
24  before, they could be terminated.

---

Patty Peterson                                                    Page 43

1  Q.  Do you know if there's a number, three
2  strikes you're out type of thing or anything
3  regarding how many times you can fail to update
4  an account for something like this?
5  A.  I don't know.
6  Q.  Now, who is your direct boss?  Who do
7  you report to?
8  A.  John Kane.
9  Q.  What is his title?
10  A.  Group president.
11  Q.  How often do you and him discuss
12  violations of the TCPA?
13  A.  Rarely.
14  Q.  I want you to tell me, I know you
15  received training and you get tested, what is
16  your understanding of this express consent that
17  is needed to make a phone call?
18     MS. SIMONETTI:  You did ask her
19  that earlier.  Go ahead.
20     THE WITNESS:  Customer tells us
21  that they give us permission to auto dial or
22  text message them.
23  BY MR. GOMEZ:
24  Q.  What is your understanding of who has

---

Patty Peterson                                                    Page 44

1  authority to give that consent for that phone
2  number?
3     MS. SIMONETTI:  Objection to the
4  extent it calls for some kind of legal
5  conclusion, but go ahead.
6     THE WITNESS:  The person that the
7  phone number belongs to.
8  BY MR. GOMEZ:
9  Q.  What is your understanding of what NSI
10  does to verify that that person actually owns
11  the number?
12  A.  Talking to the customer, we would ask
13  them if the phone number is theirs.
14  Q.  And if the customer says, yeah, that's
15  mine, that's all you do?  You don't try to
16  verify it any other way?
17  A.  Not that I know of.
18  Q.  How often do you hear about complaints
19  about calling the wrong number?  Do you keep
20  calling the wrong person?
21  A.  Occasionally.
22  Q.  How would you hear about the complaint
23  outside of any communications with a lawyer?
24  A.  A person in another department or

---

1   another area of the company mentions that we're
2   calling someone, needs to remove the number.
3   Q.   Would you be the person that would have
4   access of order of removal of a number, or
5   that's a different department?
6   A.   If I learn of it, I could do it, as
7   well.
8   Q.   Even when you were manager of
9   collectors, what are the responsibilities of
10  agents as to when it comes to taking notes when
11  contact is made?  How do you train them, what
12  is it that they're required to do and not do?
13  A.   Can you be more specific on that
14  question?
15  Q.   Absolutely.  When an agent actually
16  makes contact with a consumer, to what extent,
17  how do you train your employees to take notes
18  like what notes to take, what's significant,
19  what's not significant?
20  A.   I don't know specifically what's in the
21  training today as far as that goes.  Generally
22  what it was ten years ago was that we would
23  want someone to be able to understand what
24  happened during the course of the conversation.

1   Q.   And clearly a request to stop calling,
2   would you consider that a significant event
3   during that conversation?
4   A.   Yes.
5   Q.   As far as you know, would that agent
6   have to write notes about it and also change
7   the consent box, either do one or the other one
8   or do both?
9   A.   Both.
10  Q.   The reason why I'm asking you all these
11  questions is, you know, our firm has close to
12  20 cases alleging similar things, which is
13  people ask not to call and they call.  Do you
14  have any idea how that's happening, why so many
15  people complain about similar things?
16      MS. SIMONETTI:  I'm just going to
17  note for the record that all of your cases
18  involve allegations; none of them have been
19  proven, and all of them have been contested.
20  Other than that.
21      BY MR. GOMEZ:
22  Q.   So the question is do you have any idea
23  how the policies are not being enforced?
24      MS. SIMONETTI:  That's not a fair

1   question, based on your own cases.  If you have
2   some other way that you want to try to ask the
3   question --
4       MR. GOMEZ:  You can object to
5   form and she can try to answer the question.
6       MS. SIMONETTI:  These are all in
7   litigation.
8       BY MR. GOMEZ:
9   Q.   I'm just simply asking you, do you have
10  any idea, have you ever seen some of the agents
11  try to come up with solutions how it's
12  happening or why does it keep happening?
13  A.   No.
14  Q.   Are you familiar with a case of Randy
15  Johnson vs. Navient Solutions, Inc.?
16  A.   Yes.
17  Q.   Is it your understanding it's an
18  attempted class action, I guess, against
19  Navient Solutions Inc., correct?
20  A.   Yes.
21  Q.   For alleged violations of the TCPA,
22  calling either wrong numbers or without consent
23  to dial; is that your understanding?
24  A.   Yes.

1   Q.   That case involves similar violations
2   to what we're discussing today of calling
3   numbers without having expressed consent.  My
4   question to you is is there a solution for
5   solving that problem?  Have you seen what the
6   problem is or what the gap is that these
7   violations continue to occur?
8   A.   I'm sorry, I'm not following what your
9   question is.
10  Q.   I want to know what is your position,
11  what does Navient Solutions, Inc., need to do
12  better or do different to avoid these
13  violations from continuing?
14      MS. SIMONETTI:  Again, I object
15  to the extent that you're assuming that the
16  allegations are proven.  These are complaints,
17  that's all they are.
18      BY MR. GOMEZ:
19  Q.   So once again, based on this many
20  people complaining and alleging these
21  violations, is there something that Navient
22  Solutions should do differently or do more of
23  to try to avoid these complaints?
24  A.   Without looking at the details on any

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

Patty Peterson                                    Page 49

1   specific account, I can't say what we did or
2   didn't do was right or wrong. I'd have to look
3   at the history and understand, you know, what
4   our agents were doing.
5   Q.   How often do you go and look at
6   individual accounts?
7   A.   Once every couple weeks.
8   Q.   Once every couple weeks would be about
9   23 a year, yeah, about 21 a year? Actually 25;
10  sorry about my math. So how often do you find
11  those violations of those? Accounts that you
12  actually review, meaning failure to update
13  regarding requests not to call?
14  A.   Typically when I'm looking at an
15  account, I'm looking at it for a specific
16  purpose. So I don't necessarily look for that
17  specific situation, or it could be because I'm
18  looking at that specific situation.
19  Q.   How often do you look for that specific
20  situation on average?
21  A.   I don't know.
22  Q.   We're here on the case of Willie
23  McCaskill vs. Navient Solutions, Inc., Navient
24  Corp, and SAC. You're aware of that?

Patty Peterson                                    Page 50

1   A.   Yes.
2   Q.   Your name was given originally as a
3   person having knowledge of this case, and a
4   separate corporate representative was provided.
5   Did you know that?
6   A.   Yes.
7   Q.   I want you to tell me, what do you know
8   about the Willie McCaskill case? And tell me
9   everything but communications with your lawyer.
10  Have you looked at the account notes in this
11  case?
12  A.   Briefly.
13  Q.   Have you looked at the dial logs in
14  this case?
15  A.   Briefly.
16  Q.   What else have you looked at in the
17  Willie McCaskill accounts?
18  A.   The complaint itself; my response.
19  That's all I can think of.
20  Q.   What is your understanding of how did
21  NSI get the phone number, the 4016, the phone
22  number that is part of this lawsuit?
23  A.   From the customer themselves, on the
24  Website.

Patty Peterson                                    Page 51

1   Q.   And I understand that maybe you haven't
2   looked -- when was the last time you looked at
3   the notes in this case?
4   A.   In the last few days.
5   Q.   Do you remember this number ever being
6   skip traced?
7   A.   Yes.
8   Q.   Tell me what does skip tracing mean to
9   you?
10  A.   Trying to find contacts or address or
11  phone numbers for a customer.
12  Q.   And if you're not getting it directly
13  from the customer at this point, skip tracing
14  means getting it from any other third party or
15  any other way?
16  A.   Yes.
17  Q.   Some of it involves going online or
18  third-party agencies? Is that how you would
19  find phone numbers?
20  A.   Yes.
21  Q.   And when you gather a number through
22  skip tracing, is it your opinion you have
23  express consent to call them?
24  A.   No.

Patty Peterson                                    Page 52

1   Q.   In this case, actually, the owner of
2   the loan had been Moretta Nielson. When
3   Ms. Nielson's case gets updated with the skip
4   tracing number, first of all, who is doing the
5   skip tracing?
6   A.   Agents.
7   Q.   So is an agent assigned to the case, to
8   this account? Is that how it works, and they
9   do the skip tracing?
10  A.   Not necessarily assigned to an
11  individual account.
12  Q.   So what will lead an agent to do skip
13  tracing for a number?
14  A.   No information. So we don't have good
15  information, the address or phone is bad, or we
16  haven't been able to reach the customer at the
17  phone number that we do have.
18  Q.   Then you proceed to do the skip
19  tracing. And what are some of the tools you
20  use to skip trace?
21  A.   Different websites, so skip tracing
22  tools, Google searches even, using commercial
23  skip tracing products.
24  Q.   Once you achieve the phone number, does

McCaskill v.
Navient Solutions, Inc.

Patty Peterson                                        Page 53

1   it automatically gets put into the Class
2   system, or what happens to the number once a
3   number is -- how is a number verified?  I want
4   you to tell me the life of that number, once it
5   comes up on a skip trace, what happens?
6   **A.   The person that finds the phone number**
7   **would attempt to call the phone number.  If the**
8   **phone number was -- if they reach someone and**
9   **say "it's not me," the number doesn't get**
10  **loaded or used on the account.  We don't get an**
11  **answer, it would be added on to the account.**
12  Q.   Would that call be a manual call or a
13  dialer call?
14  **A.   Manual.**
15  Q.   What if the person makes the phone call
16  and it says, "This is Willie and Malachi
17  McCaskill, please leave a message," and you're
18  looking for a Moretta Nielson, what is an agent
19  to do with that?
20  **A.   I'm not sure.**
21  Q.   As far as you know, is there any
22  training regarding that, reaching a phone
23  number that has a voice message or it is
24  business?

Patty Peterson                                        Page 54

1   **A.   When skip tracing?**
2   Q.   Once you get a number and you're trying
3   to verify it.
4   **A.   I don't know what's in the procedures.**
5   Q.   Do you know if the skip trace numbers
6   are also run through that scrub process to see
7   if it's a cell phone or a landline?
8   **A.   Yes, I believe so.**
9   Q.   So Navient Solutions, Inc., would have
10  immediately or shortly after gathering this
11  number realized it's a cell phone number by
12  that scrub process?
13  **A.   Yes.**
14  Q.   Does it worry you or when you were a
15  manager or collector if an individual seems to
16  show two, three cell phone numbers?  Meaning is
17  that something that would raise a flag or an
18  alarm if you were identifying more than one
19  cell phone number for the same person and you
20  got it through skip tracing?
21  **A.   No.**
22  Q.   Is there any number of cell phones that
23  would raise a flag to say, well, maybe we're
24  calling wrong phone numbers, because most

Patty Peterson                                        Page 55

1   people don't carry two, three, four, five cell
2   phone numbers?
3   **A.   I don't know.**
4   Q.   Are you aware of how many times Navient
5   Solutions called Ms. McCaskill's 4016 number?
6   **A.   I don't recall.**
7   Q.   Did you listen to any recordings from
8   Ms. McCaskill's case or Ms. Moretta Nielson's
9   account when you were reviewing it?
10  **A.   No.**
11  Q.   Do you know who was the agent that skip
12  traced the phone number?
13  **A.   No.**
14  Q.   As far as you know, you don't have or
15  you haven't heard any recordings of Willie
16  McCaskill giving out this phone number to
17  Navient Solutions Inc., correct?
18  **A.   I didn't listen to any recordings.**
19  Q.   And you believe the number was gathered
20  through the Website, correct?
21  **A.   I know it was verified through the**
22  **Website.**
23  Q.   Verified.  Because as far as you know,
24  is there a way to know if a number is simply

Patty Peterson                                        Page 56

1   verified, or if somebody actually changes the
2   information on the Website as their login name
3   or verifying?
4   **A.   You can tell if they changed a phone**
5   **number.**
6   Q.   And that would be within the call
7   notes, there would be a description, customer
8   changed the number?  Is that what it would
9   indicate?
10  **A.   Something like that, yes.**
11  Q.   Do you remember in the case of Moretta
12  Nielson, in this account, if she just verified
13  the number or if she changed the number?
14  **A.   I don't recall.**
15  Q.   Do you know what the net worth of
16  Navient Solutions, Inc., is?
17  **A.   No.**
18  Q.   Do you participate at all on any of the
19  I guess accounting when it comes to financials
20  regarding revenue for a certain year in 2015,
21  this is how much you made, anything like that?
22  **A.   I've seen it.  I don't know**
23  **specifically.**
24  Q.   Do you have any estimation of what the

1    revenue was for Navient Solutions either in
2    2014 or 2015?
3  **A.  I don't recall.**
4  Q.  When you were reviewing
5    Ms. McCaskill's, I guess Ms. Nielson's account,
6    did you look at the Class system and the notes?
7    I'm assuming that's where you read the notes?
8  **A.  Yes.**
9  Q.  Did you look at the CIS system?
10 **A.  No.**
11 Q.  Did you ever look at the CSI system,
12   the complaint system, regarding whether or not
13   this was a complaint that got introduced into
14   it?
15 **A.  No.**
16 Q.  As far as you know, being that in a
17   case like this the complaint is being made not
18   by an accountholder or somebody you're trying
19   to collect from or a third party, would this be
20   the type of case that would also go into that
21   complaint database or log that you maintain?
22 **A.  If a customer -- if a person**
23 **complained.**
24 Q.  So if a person complains, it would go

1    into the database or log regarding the
2    complaint?
3  **A.  I believe so.**
4  Q.  And you don't have access to that
5    complaint system, or you do?
6  **A.  I do not.**
7  Q.  I'm assuming agents don't have access
8    to that complaint system?
9  **A.  No, specialized agents have access.**
10 Q.  So those would be people that work
11   probably for Tim Hynes or people that work in
12   the compliance?
13 **A.  No, it could be managers, could be --**
14 **there's specialized agents that handle**
15 **escalated, some of the escalated inquiries and**
16 **doing some research on them, individuals that**
17 **log them into the system.**
18 Q.  We discussed that, you know, sometimes
19   you do hear that people are calling the wrong
20   number.  I want to talk about how often do you
21   hear that a recording assisted in this?
22   How often does that happen?
23 **A.  It has happened.  I don't know how**
24 **often.  Not very often, as far as I understand.**

1  Q.  Who is in charge of keeping or
2    maintaining the recordings?  Is there a
3    separate team or is there a compliance team?
4    What department handles that portion?
5  **A.  Our telecommunications team is**
6  **responsible for keeping the recordings.**
7  Q.  I want to briefly talk about what you
8    know regarding the Navient Solutions and how
9    they make their money, you know, how they work
10   as the company.  They're a servicing company,
11   of course for student loans as we discussed.
12   So I want to ask you, when they're billing the
13   guarantee fees, how does that work?  Do they
14   get paid per account, or based on the amount of
15   the loan?  How does NSI get paid?
16 **A.  I'm not really sure I can answer the**
17 **question.**
18 Q.  When you worked in the financial
19   department, weren't you doing the billing for
20   the fees to the guarantors, to the agencies?
21 **A.  I was paying the guarantee agencies.**
22 Q.  You were paying their fees?
23 **A.  The insurance premiums for insuring the**
24 **student loans.**

1  Q.  But as of today, you're not sure how
2    NSI actually makes their money?
3  **A.  I know some ways that NSI makes money.**
4  Q.  How is that?
5  **A.  On the ed servicing contract, we get**
6  **paid per account that we are servicing,**
7  **depending on the status that the loan is in.**
8  Q.  So if the loan is non-delinquent,
9    meaning it's up to date, you get paid -- is
10   there a difference for an account that's
11   delinquent versus non-delinquent as to how much
12   you get paid?
13 **A.  Yes.**
14 Q.  Do you know what the difference is?  Is
15   it 25 percent to 100 percent?  How does that
16   work?
17 **A.  I don't know the specific numbers.**
18 **There's a difference, but I don't know the**
19 **difference.**
20 Q.  Is that difference significant?  Do you
21   know that?
22 **A.  It's significant when you get higher**
23 **delinquency.  Again, I don't know the actual**
24 **dollar amounts, though.**

1 Q.   While an account is up to date, NSI is
2 getting paid for that account, correct?  Does
3 it get paid monthly, yearly?  Do you know how
4 often they get paid for that account while it
5 is up to date?
6 **A.   We invoice on a monthly basis.**
7 Q.   When is an account considered
8 delinquent?
9 **A.   For the Department of Education**
10 **contract?**
11 Q.   For you, for NSI.  Or what do you know
12 about it?  I don't know if you know.  I know
13 you're pretty high up there.  When do you
14 consider an account to be delinquent?
15 **A.   When the customers miss their first**
16 **payment.**
17 Q.   So the day after they miss a payment,
18 the account would be delinquent?
19 **A.   Yes.**
20 Q.   Do you participate at all on setting up
21 calling campaigns or not?
22 **A.   I do not.**
23 Q.   Do you have any idea how those calling
24 campaigns are done?

1 **A.   Not specifically.**
2 Q.   I understand you may not be the one
3 ordering a campaign or dictating how it works.
4 Do you have a general idea how a person is
5 delinquent 30 days, but if they're delinquent
6 60 days, is there such a policy or anything
7 that you know of that kind of dictates how many
8 calls a person makes outside of the eight is
9 the maximum?
10 **A.   The managers for those delinquency**
11 **buckets are responsible for setting their**
12 **schedules.  So it can vary depending on the**
13 **state of delinquency.**
14     MR. GOMEZ:  Let's take a
15 five-minute break.  I'm almost done.
16     (A brief recess was taken.)
17     BY MR. GOMEZ:
18 Q.   When someone -- I know we've been
19 talking about mostly phone calls, because
20 that's what this case is about.  But part of
21 Navient Solutions, Inc., you also communicate
22 through emails and letters, I'm assuming?
23 **A.   Yes.**
24 Q.   And if someone changes their address

1 through the Website or through verifying on the
2 Website, does Navient continue to mail letters
3 to all addresses or just to the new one?
4 **A.   Just to the new one.**
5 Q.   What about when someone changes or
6 verifies a new phone number, does Navient
7 continue to call the previous phone numbers now
8 that they have the new number?
9 **A.   I don't believe so.**
10 Q.   So you believe when somebody goes
11 online and changes the phone number, that
12 Navient Solutions removes the number from the
13 database, the old number?
14 **A.   Yes.**
15 Q.   Would you consider that yourself that
16 they revoke consent to call that number, by
17 changing the number?
18 **A.   I'm not sure of the company's position**
19 **on that.**
20 Q.   In the case that we're here for, the
21 Moretta Nielson account, are you aware of when
22 the 4016 number was skip traced, the timeframe?
23 **A.   I don't know.**
24 Q.   Do you know the timeframe for the date

1 when it was verified by logging into the
2 account?
3 **A.   I believe in February of 2014.**
4 Q.   Do you know when is the next time that
5 she logged in or changed that number with
6 Navient Solutions, Inc.?
7 **A.   I don't recall.**
8 Q.   You agree there could be times where
9 both SAC and NSI are calling about the same
10 account?  That wouldn't be something rare,
11 correct?
12 **A.   It's possible, yes.**
13 Q.   And I want to know your position, since
14 you've been doing this for a long time, if
15 someone tells SAC, "I want you to stop calling
16 me on my cell phone," do you think, one, SAC
17 should continue to call them?  I know it's not
18 your company, but do you think they should
19 continue to call them?
20 **A.   It depends.**
21 Q.   What would it depend on?
22 **A.   From my perspective?**
23 Q.   Yeah.
24 **A.   Did they provide another phone number**

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

Patty Peterson                                            Page 65

1    to reach them at?
2  Q.  Let's say they just simply say, "Don't
3    call me, don't call my cell phone."
4    **MS. SIMONETTI:** Is it "don't call
5    me" or "don't call my cell phone"?
6    **BY MR. GOMEZ:**
7  Q.  "Don't call my cell phone," and they
8    don't have any other numbers, won't give you
9    another number.
10 **A.  I can't speak for the company at this**
11 **point.**
12 Q.  Well, I was asking you about SAC, so
13   let me ask you about Navient Solutions.  If
14   somebody tells Navient Solutions, "Don't call
15   my cell phone," my understanding is your
16   representative is supposed to ask, "Well, is
17   there any other number we can call you?"
18   correct, trying to get another number?
19 **A.  Correct.**
20 Q.  The person says, "No, I don't have any
21   other numbers."  Do you think NSI should
22   continue to call that person?
23 **A.  I can't speak for the company's**
24 **position on that.**

Patty Peterson                                            Page 66

1  Q.  I'm asking for your opinion.  You're
2    here today not as a corporate representative,
3    but as an individual.  So do you think that
4    Navient Solutions should continue to call that
5    person, in your opinion?
6  **A.  It's in the customer's best interest to**
7  **continue calling the customer.**
8  Q.  Even if it's against their will?  And
9    it's just your opinion that I'm asking.
10 **A.  Again, I don't know.**
11 Q.  You don't know?
12 **A.  It depends on the situation, it depends**
13 **on what the customer is saying along with that,**
14 **why is it that they don't want to be called.**
15 **I'd have to have some more facts around the**
16 **situation.**
17 Q.  The facts are, "you're harassing me,
18   you call me all the time, you're calling my
19   cell phone, and I don't have any other
20   numbers."  Is it your opinion they should
21   continue calling because it's in their best
22   interest?
23 **A.  I would probably not call them as**
24 **frequently.**

Patty Peterson                                            Page 67

1  Q.  If somebody tells Navient Solutions,
2    Inc., not to call this specific number that is
3    a cell phone, do you think that's also a
4    revocation for SAC to call since it's the same
5    account?
6  **A.  It's not necessarily -- it's not the**
7  **same account.**
8  Q.  Well, it's the same debt.  In the
9    scenario we're talking about, it's one debt
10   that becomes delinquent, SAC gets hired as the
11   default counseling agency, so they're calling
12   about the same debt.  In that scenario,
13   somebody telling NSI, "Please stop calling me,
14   don't call my cell phone," do you consider that
15   a revocation also for SAC since it's the same
16   debt?
17 **A.  They're two different companies.**
18 Q.  NSI also has other sister companies
19   under the Navient Corp umbrella, correct,
20   several companies?
21 **A.  Yes.**
22 Q.  Some of them would be considered
23   third-party collection agencies, correct?
24 **A.  Yes.**

Patty Peterson                                            Page 68

1  Q.  Would there ever be a time when it's
2    possible that SAC is calling, NSI is calling,
3    and one of these third-party collection
4    agencies are calling?
5  **A.  On the same debt?**
6  Q.  Yes.
7  **A.  No.**
8  Q.  In order for the third-party agency to
9    get involved, NSI stops calling and it becomes
10   a defaulted loan?  Is that what it is?
11 **A.  Correct.**
12 Q.  So at most, only two of the three would
13   be calling in this scenario we just went
14   through?
15 **A.  NSI and SAC could call at the same**
16 **time, but once General Revenue Corporation gets**
17 **into the picture, neither of those two agencies**
18 **would be calling on the debt.**
19 Q.  Thank you for clarifying that.
20   Did you ever talk to any of the
21   agents that spoke or made an attempt to call
22   Willie McCaskill in this case?
23 **A.  No.**
24 Q.  Did you ever talk to any of the

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

---

Patty Peterson                                              Page 69

1    managers that may have been involved with the
2    Willie McCaskill or Moretta Nielson loan?
3  A.  Not about the account.
4  Q.   An account like this one, is it
5    assigned to one specific location, or are the
6    calls coming from all seven call centers?  How
7    does that work?
8  A.  It depends.  The accounts are worked
9    depending on their age of delinquency.  So in
10   the earliest stages of delinquency, I don't
11   know the exact cut-off date, but call it early
12   in the delinquency stage, they're called
13   through the auto dialer.  So any of the
14   different sites could be talking to that
15   customer.
16 Q.   So when it's through the auto dialer,
17   it's just basically where a representative is
18   available per site, it's literally where a
19   representative is available to talk to a live
20   person?
21 A.  Yes.
22 Q.   What do you work at, what office?
23 A.  The Newark, Delaware office.
24 Q.   At your office, is that where Tim Hynes

---

Patty Peterson                                              Page 70

1    would work?
2  A.  He works in the Wilmington office.
3  Q.   John Kane works in your office?
4  A.  He works in the Wilmington office.
5  Q.   And I'm sorry, yours was in the New
6    York --
7  A.  Newark.  Newark, Delaware.
8       MR. GOMEZ:  I have no further
9    questions.
10      THE REPORTER:  Do you want the
11   witness to read and sign?
12      MS. SIMONETTI:  Yes.
13      THE REPORTER:  And do you need a
14   copy?
15      MS. SIMONETTI:  Yes.
16   (The deposition concluded at
17   11:33 a.m.)
18
19
20
21
22
23
24

---

Patty Peterson                                              Page 71

1                    I N D E X
2
3  DEPONENT: PATTY PETERSON                      PAGE
4     Examination by Mr. Gomez               2
5
6                  E X H I B I T S
7
8     (There were no exhibits marked at this
      time.)
9
10
11 DIRECTIONS NOT TO ANSWER        PAGE   LINE
       NONE
12
13 REQUESTS MADE FOR DOCUMENTS     PAGE   LINE
14      NONE
15
16 READING AND SIGNING INSTRUCTIONS     PAGE 72
   ERRATA SHEET                         PAGE 73
17 CERTIFICATE OF REPORTER              PAGE 74
18
19
20
21
22
23
24

---

Patty Peterson                                              Page 72

1       READING AND SIGNING INSTRUCTIONS
2
3    After reading the transcript of your
4    deposition, please note any change or
5    correction and the reason therefor on the
6    errata sheet that appears on the following
7    page. DO NOT MAKE ANY MARKS OR NOTATIONS ON
8    THE TRANSCRIPT ITSELF.  Please sign and date
9    the errata sheet and return it to our office at
10   the address indicated below.  Our office will
11   distribute copies of the executed errata sheet
12   to all counsel.  If necessary, you can make
13   additional copies of the errata sheet.
14
15   Rule 30(e) governing this procedure provides
16   the deposition may be filed as transcribed if
17   you do not return a signed errata sheet within
18   30 days.
19
20     RETURN ORIGINAL ERRATA SHEET TO:
21   Wilcox & Fetzer, Ltd.
22   1330 King Street, Wilmington, DE  19801
23   depos@wilfet.com - 302-655-0477
24

---

Patty Peterson                                    Page 73

1   DEPONENT: PATTY PETERSON
    DATE:     Monday, January 4, 2016
2   CASE:     McCaskill vs. Navient Solutions

3              ERRATA SHEET

4   PAGE/LINE/    CHANGE OR CORRECTION AND REASON

5   ____/____/_____

6   ____/____/_____

7   ____/____/_____

8   ____/____/_____

9   ____/____/_____

10  ____/____/_____

11  ____/____/_____

12  ____/____/_____

13  ____/____/_____

14  ____/____/_____

15  ____/____/_____

16  ____/____/_____

17  ____/____/_____

18  ____/____/_____

19  ____/____/_____

20

21  I have read the foregoing transcript of my
    deposition and, except for any corrections or
    changes noted above, I hereby subscribe to the
22  transcript as an accurate record of the
    statements made by me.

23

24  Date:

---

Patty Peterson                                    Page 74

1   State of Delaware)
                     )
2   New Castle County)

3

4

5              CERTIFICATE OF REPORTER

6    I, Jennifer M. Guy, Registered Professional
    Reporter and Notary Public, do hereby certify
7   that there came before me on Monday, January 4,
    2016, the deponent herein, PATTY PETERSON, who
8   was duly examined by counsel for the respective
    parties; that the questions asked of said
9   deponent and the answers given were taken down
    by me in Stenotype notes and thereafter
10  transcribed by use of computer-aided
    transcription and computer printer under my
11  direction.

12   I further certify that the foregoing is a true
    and correct transcript of the testimony given
13  at said examination of said witness.

14   I further certify that I am not counsel,
    attorney, or relative of either party, or
15  otherwise interested in the event of this suit.

16

17

18      Jennifer M. Guy, RPR

19

20

21

22

23

24

McCaskill v.
Navient Solutions, Inc.

## A

**ability (3)**
20:19 34:22 35:15

**able (6)**
23:8 34:15 36:22
38:21 45:23 52:16

**Absolutely (1)**
45:15

**accept (1)**
20:6

**access (7)**
19:13 22:23 32:14
45:4 58:4,7,9

**account (41)**
19:5,13,16,23
23:23 24:1,24 25:12,
14 30:8 34:3,8 38:10
41:4 43:4 49:1,15
50:10 52:8,11 53:10,
11 55:9 56:12 57:5
59:14 60:6,10 61:1,2,
4,7,14,18 63:21 64:2,
10 67:5,7 69:3,4

**accountholder (1)**
57:18

**accounting (1)**
56:19

**accounts (7)**
24:17 38:20,20
49:6,11 50:17 69:8

**accuracy (1)**
42:5

**accurately (1)**
30:1

**achieve (1)**
52:24

**Act (2)**
15:2 16:22

**action (9)**
27:16,24 28:2,14
29:24 30:17 41:2,6
47:18

**actions (1)**
30:5

**activities (1)**
25:1

**activity (3)**
9:5 24:9 41:10

**actual (1)**
60:23

**actually (11)**
7:7,8 18:11 40:6
44:10 45:15 49:9,12
52:1 56:1 60:2

**added (2)**
7:18 53:11

**additional (1)**
72:13

**address (5)**
20:12 51:10 52:15
62:24 72:10

**addresses (1)**
63:3

**adhering (1)**
14:11

**advice (1)**
15:8

**affiliates (1)**
11:15

**after (4)**
7:14 54:10 61:17
72:3

**Again (9)**
27:4,10,12,21
35:14 48:14,19
60:23 66:10

**against (5)**
28:17,24 29:9

**age (1)**
69:9

**agencies (11)**
9:6 13:16,17 24:8,
19 51:18 59:20,21
67:23 68:4,17

**agency (4)**
24:15 25:9 67:11
68:8

**agent (16)**
10:20 20:20,21
29:17,18,21 31:5,23
37:17 41:3 45:15
46:5 52:7,12 53:18
55:11

**agents (21)**
10:17,22 12:12
13:6,7 14:10 30:12,
13 36:22 37:22
39:10,11 40:5 45:10
47:10 49:4 52:6 58:7,
9,14 68:21

**ago (1)**
45:22

**agree (1)**
64:8

**ahead (2)**
43:19 44:5

**alarm (1)**
54:18

**allegations (2)**
46:18 48:16

**alleged (3)**
5:13 16:21 47:21

**alleges (1)**
31:18

**alleging (2)**
46:12 48:20

**almost (2)**

47:18 66:8

**40:15 62:15**

**along (2)**
6:18 66:13

**already (4)**
28:5 31:6,9,19

**also (11)**
10:6 25:13 34:11
38:1 46:6 54:6 57:20
62:21 67:3,15,18

**alter (1)**
26:15

**amount (4)**
34:7 38:14 39:3
59:14

**amounts (1)**
60:24

**analyst (2)**
6:9,16

**annual (2)**
15:19 38:23

**Annually (3)**
15:24 16:9,10

**another (5)**
44:24 45:1 64:24
65:9,18

**answer (8)**
9:24 10:18 27:17
29:12 42:19 47:5
53:11 59:16

**answering (2)**
7:9 10:8

**answers (1)**
7:10

**anymore (1)**
21:13

**anything (6)**
8:13 15:5 36:9
43:2 56:21 62:6

**appears (2)**
20:14 72:6

McCaskill v.
Navient Solutions, Inc.

**Approximately (3)**
  4:13 40:16,20

**approximation (1)**
  29:14

**area (8)**
  4:2 6:22 12:23,24
  13:2 31:14 38:3 45:1

**areas (9)**
  3:22,22 4:9 7:2,4
  13:3,5 36:20,20

**around (3)**
  26:23 32:2 66:15

**Arthur (1)**
  27:15

**aside (1)**
  28:20

**Asides (1)**
  29:2

**asked (5)**
  17:11 31:6,9,17,19

**asking (7)**
  19:21 28:19 46:10
  47:9 65:12 66:1,9

**asks (2)**
  17:1 29:17

**asset (3)**
  3:20 4:7,9

**assigned (3)**
  52:7,10 69:5

**Assistance (6)**
  9:2,17 10:13 11:7
  26:18 27:2

**assistant (1)**
  3:24

**assisted (1)**
  58:21

**assuming (7)**
  22:9 40:11 42:4
  48:15 57:7 58:7
  62:22

**attempt (2)**
  53:7 68:21

**attempted (2)**
  36:4 47:18

**attempts (1)**
  8:3

**attorney (1)**
  27:13

**attorneys (1)**
  39:20

**authority (1)**
  44:1

**auto (14)**
  3:24 9:14 10:3,18
  12:2,21 14:7 17:6,16
  20:7 35:19 43:21
  69:13,16

**automatically (2)**
  20:16 53:1

**available (2)**
  69:18,19

**average (4)**
  35:17 36:8 37:11
  49:20

**avoid (2)**
  48:12,23

**aware (11)**
  25:7,16,21 26:10
  28:17,24 29:8 31:22
  49:24 55:4 63:21

**B**

**bachelor's (1)**
  8:8

**bad (1)**
  52:15

**based (9)**
  14:20 20:17 38:12,
  13,15,18 47:1 48:19

**59:14**

**basic (1)**
  24:24

**basically (1)**
  69:17

**basis (2)**
  37:3 61:6

**became (1)**
  28:4

**become (3)**
  6:11 25:7 28:24

**becomes (3)**
  23:23 67:10 68:9

**before (7)**
  28:4,10 29:13
  31:9,17 33:24 42:24

**begin (3)**
  24:17,21 25:1

**behalf (2)**
  9:6 22:8

**being (10)**
  8:18 30:17 36:1,4,
  8 37:8 46:23 51:5
  57:16,17

**believe (15)**
  8:4 11:24 14:4
  18:2 23:10 26:6 28:7
  32:10 34:15 54:8
  55:19 58:3 63:9,10
  64:3

**belongs (1)**
  44:7

**below (1)**
  72:10

**best (2)**
  66:6,21

**better (1)**
  48:12

**between (2)**
  11:14,19

**billing (3)**
  6:17 59:12,19

**bit (10)**
  5:18 6:10 8:6,16,
  23 14:23 19:8 22:3
  31:1 40:12

**Borrower (1)**
  23:6

**boss (2)**
  13:1 43:6

**both (8)**
  10:12 11:1 13:13
  39:20 41:18 46:8,9
  64:9

**box (1)**
  46:7

**BPS (6)**
  23:4,9 26:19,23
  27:4,11

**brand (1)**
  12:4

**break (1)**
  62:15

**brief (2)**
  39:17 62:16

**briefly (4)**
  33:24 50:12,15
  59:7

**bringing (1)**
  38:10

**broke (1)**
  5:19

**buckets (1)**
  62:11

**budget (1)**
  33:19

**business (1)**
  53:24

**businesses (1)**
  6:21

# C

**call (61)**
6:4 10:17,20,21
12:11,11 15:14,15
17:7,10,16 21:8
22:13,15,18,19 31:6,
7,10,20 34:15,23
35:14 40:17 41:8,11,
23 42:21 43:17
46:13,13 49:13
51:23 53:7,12,12,13,
15 56:6 63:7,16
64:17,19 65:3,3,4,5,
7,14,17,22 66:4,18,
23 67:2,4,14 68:15,
21 69:6,11

**called (10)**
9:2 13:1 21:17,23
23:4 32:8,10 55:5
66:14 69:12

**calling (38)**
17:2 20:23 27:1
29:17 30:9 31:3,18,
20 34:11,14 35:7
38:6,7 41:5 42:12
44:19,20 45:2 46:1
47:22 48:2 54:24
58:19 61:21,23 64:9,
15 66:7,18,21 67:11,
13 68:2,2,4,9,13,18

**calls (28)**
7:9,9 10:18 12:12
22:16,17 25:4 28:20
29:3 30:19 31:4,5
34:3,7,19,22 35:4,18
36:1,4,8 37:10 39:4
42:4 44:4 62:8,19
69:6

**came (1)**
34:18

**campaign (1)**
62:3

**campaigns (2)**
61:21,24

**capacity (4)**
6:6 9:11 14:16
37:16

**carry (1)**
55:1

**case (21)**
22:12 31:17 38:6
47:14 48:1 49:22
50:3,8,11,14 51:3
52:1,3,7 55:8 56:11
57:17,20 62:20
63:20 68:22

**cases (7)**
5:10,16 21:6
42:20 46:12,17 47:1

**cell (22)**
17:3,21 18:4,17,
20 20:23 21:12
42:21 54:7,11,16,19,
22 55:1 64:16 65:3,5,
7,15 66:19 67:3,14

**centers (3)**
12:11 40:18 69:6

**certain (2)**
22:20 56:20

**certificates (1)**
8:13

**CHAING (2)**
39:24,24

**chance (1)**
26:16

**change (10)**
20:19 26:11,16,20
27:2 29:19,23 34:11

46:6 72:4

**changed (7)**
7:19 21:1 40:11
56:4,8,13 64:5

**changes (6)**
26:8 35:16 56:1
62:24 63:5,11

**changing (2)**
27:3 63:17

**charge (6)**
3:18 9:16 10:8
33:18 35:22 59:1

**chief (1)**
33:7

**CIS (12)**
26:1,9,12,16,20,
23 27:3,6,8,11,12
57:9

**clarifying (1)**
68:19

**Class (23)**
21:23 22:1,2,3,3,5,
10,12,19,23,24
23:11 26:14,15,15
27:3,16,24 28:2,14
47:18 53:1 57:6

**classes (1)**
11:13

**clear (1)**
15:7

**clearly (1)**
46:1

**clicking (1)**
20:6

**client (1)**
20:14

**climb (1)**
7:5

**climbed (1)**
6:11

**close (1)**
46:11

**collect (4)**
8:3 38:8 39:3
57:19

**collecting (1)**
38:9

**collection (5)**
7:6 12:19 40:6
67:23 68:3

**collections (8)**
3:21 6:24 7:2 10:2
11:8 12:15 13:5
40:13

**collector (3)**
37:5,16 54:15

**collectors (11)**
12:22 36:21 37:2,
23 40:7,18 41:6,8
42:11,15 45:9

**combined (1)**
3:10

**come (5)**
6:6 14:17 15:4
30:14 47:11

**comes (5)**
4:7 16:12 45:10
53:5 56:19

**coming (2)**
5:17 69:6

**commercial (1)**
52:22

**commission (1)**
38:9

**communicate (2)**
23:15 62:21

**communication (2)**
17:18 27:22

**communications (3)**
27:13 44:23 50:9

**companies (6)**
8:24 11:15,20
67:17,18,20

**company (21)**
3:11 5:23 6:14 7:4
9:1 11:16 13:21 14:3
21:18 24:6,16,21,23
25:8 27:14 30:23
45:1 59:10,10 64:18
65:10

**company's (2)**
63:18 65:23

**compared (1)**
37:8

**compensation (3)**
38:16,17 39:7

**complain (2)**
31:4 46:15

**complained (1)**
57:23

**complaining (2)**
31:9 48:20

**complains (1)**
57:24

**complaint (12)**
31:1,8,11 44:22
50:18 57:12,13,17,
21 58:2,5,8

**complaints (8)**
30:24 32:5,8,23
33:1 44:18 48:16,23

**completely (1)**
21:7

**compliance (13)**
32:17,19 33:1,3,6,
7,12,16,21 41:12
42:9 58:12 59:3

**comply (1)**
42:12

**component (1)**

39:6

**concluded (1)**
70:16

**conclusion (1)**
44:5

**consent (20)**
17:4,5,6,14,16
18:23 20:7,24 21:1,
13 27:8 29:19,23
43:16 44:1 46:7
47:22 48:3 51:23
63:16

**consider (4)**
46:2 61:14 63:15
67:14

**considered (2)**
61:7 67:22

**consulting (3)**
14:16 16:14 24:6

**Consumer (10)**
15:2 16:21 17:1
18:9,14 26:24 29:16
31:8 38:14 45:16

**contact (4)**
9:8,12 45:11,16

**contacts (2)**
37:12 51:10

**contested (1)**
46:19

**continue (15)**
17:7 31:3,7,10,20
40:4 48:7 63:2,7
64:17,19 65:22 66:4,
7,21

**continuing (2)**
15:21 48:13

**contract (2)**
60:5 61:10

**conversation (3)**
17:18 45:24 46:3

**conversations (2)**
41:16,21

**copies (2)**
72:11,13

**copy (1)**
70:14

**Corp (8)**
3:1 9:17 10:13
13:20 26:18 27:2
49:24 67:19

**corporate (5)**
4:20 5:2 27:23
50:4 66:2

**Corporation (5)**
9:2 11:7 13:23
14:2 68:16

**correct (28)**
3:5 5:21 13:9
18:11,18,21 21:14
22:10 23:20 29:5,13,
19 33:3,11 35:1
40:13,24 41:1 47:19
55:17,20 61:2 64:11
65:18,19 67:19,23
68:11

**correction (1)**
72:5

**could (15)**
21:6 26:11 29:24
30:1 39:14,21 42:22,
24 45:6 49:17 58:13,
13 64:8 68:15 69:14

**counsel (2)**
15:9 72:12

**counseling (8)**
24:7,17 25:7,9,10,
14,18 67:11

**couple (3)**
21:21 49:7,8

**course (7)**

8:17 20:4 25:3
28:21 35:16 45:24
59:11

**create (2)**
14:14 19:16

**created (1)**
19:23

**creating (1)**
14:5

**credit (2)**
7:2 13:5

**CSI (5)**
21:24 32:10,11,14
57:11

**customer (24)**
13:7 17:5,17 19:4
20:18,21,22 25:19
35:12,13,15 42:5
43:20 44:12,14
50:23 51:11,13
52:16 56:7 57:22
66:7,13 69:15

**customers (4)**
19:3 25:2 32:5
61:15

**customer's (1)**
66:6

**cut-off (1)**
69:11

---

**D**

**data (1)**
26:13

**database (7)**
25:16,19 32:4,8
57:21 58:1 63:13

**date (7)**
38:10 60:9 61:1,5
63:24 69:11 72:8

McCaskill v.
Navient Solutions, Inc.

Patty Peterson
January 4, 2016

**day (7)**
  34:3,8 35:2,18
  36:9 37:7 61:17
**days (8)**
  24:3 34:22,23
  35:5 51:4 62:5,6
  72:18
**DE (1)**
  72:22
**debt (7)**
  38:10 67:8,9,12,
  16 68:5,18
**default (18)**
  3:21 7:3,6 9:5
  11:6,9 12:15 13:4
  24:5,6,9,17 25:1,7,9
  32:1 36:22 67:11
**defaulted (1)**
  68:10
**defendant (1)**
  40:1
**defendants (1)**
  39:23
**degree (1)**
  8:8
**degrees (1)**
  8:7
**Delaware (2)**
  69:23 70:7
**delinquency (7)**
  38:21 60:23 62:10,
  13 69:9,10,12
**delinquent (11)**
  23:23 24:1,3 38:8
  60:11 61:8,14,18
  62:5,5 67:10
**demographic (5)**
  22:9 25:19,20
  26:8,11
**demographics (2)**

26:4,20
**Department (8)**
  22:8 31:12 41:12
  44:24 45:5 59:4,19
  61:9
**depend (1)**
  64:21
**depending (3)**
  60:7 62:12 69:9
**Depends (6)**
  17:11 38:3 64:20
  66:12,12 69:8
**depos@wilfetcom (1)**
  72:23
**deposed (2)**
  4:20 5:16
**deposition (4)**
  4:15 70:16 72:4,16
**depositions (1)**
  5:1
**described (3)**
  4:8 17:14 36:12
**describing (1)**
  13:2
**description (1)**
  56:7
**details (5)**
  26:22 31:24 32:2
  36:11 48:24
**dial (5)**
  17:6,8 43:21
  47:23 50:13
**dialer (16)**
  9:14,22 10:2,4,18
  12:7 17:16 20:8
  22:17,18 35:21,22
  37:9 53:13 69:13,16
**dialers (12)**
  3:24 11:22,23
  12:2,4,22 14:7 18:24

35:19 36:5,10,16
**dialing (1)**
  34:1
**dictates (1)**
  62:7
**dictating (1)**
  62:3
**difference (6)**
  11:18 60:10,14,18,
  19,20
**different (11)**
  6:14 12:2 31:12
  33:10 34:1 38:17
  45:5 48:12 52:21
  67:17 69:14
**differently (2)**
  18:21 48:22
**direct (1)**
  43:6
**directly (3)**
  26:10 30:15 51:12
**director (3)**
  7:1 28:11 32:22
**disciplinary (5)**
  29:24 30:5,17
  41:2,5
**disclaimer (1)**
  20:5
**discuss (2)**
  15:8 43:11
**discussed (2)**
  58:18 59:11
**discussing (4)**
  29:16 40:5,21 48:2
**distribute (1)**
  72:11
**distribution (1)**
  37:14
**dollar (2)**
  38:20 60:24

**done (7)**
  16:5 17:24 18:2
  41:24 42:23 61:24
  62:15
**During (3)**
  28:2 45:24 46:3
**duties (3)**
  3:16,18 42:3

**E**

**each (5)**
  25:20 31:12 38:16,
  16 39:6
**earlier (1)**
  43:19
**earliest (1)**
  69:10
**early (1)**
  69:11
**ed (1)**
  60:5
**educate (1)**
  15:6
**education (4)**
  8:7 15:21 22:8
  61:9
**effect (1)**
  20:8
**eight (8)**
  34:3,14,16,18,19
  35:1,5 62:8
**either (4)**
  39:2 46:7 47:22
  57:1
**else (3)**
  8:14 42:8 50:16
**email (1)**
  29:3
**emails (1)**

62:22

**employed (2)**
6:5 37:15

**employees (5)**
10:14 11:1 16:11
40:5 45:17

**employment (2)**
21:8,9

**end (1)**
6:20

**enforce (1)**
14:14

**enforced (1)**
46:23

**entail (2)**
37:6 39:5

**entails (1)**
36:14

**entire (1)**
7:20

**entries (1)**
21:17

**Entry (1)**
6:8

**equipment (1)**
9:22

**errata (6)**
72:6,9,11,13,17,20

**escalated (2)**
58:15,15

**estimation (1)**
56:24

**even (4)**
34:14 45:8 52:22
66:8

**event (1)**
46:2

**ever (14)**
4:14,15 14:24
19:9 30:11 32:12

41:23,24 47:10 51:5
57:11 68:1,20,24

**every (6)**
15:20 17:24 18:2
20:15 49:7,8

**everybody (1)**
16:9

**everything (1)**
50:9

**exact (1)**
69:11

**exactly (2)**
12:18 40:22

**exceptions (1)**
21:5

**executed (1)**
72:11

**express (4)**
18:23 20:7 43:16
51:23

**expressed (1)**
48:3

**extent (3)**
44:4 45:16 48:15

---

## F

**facilitation (1)**
14:22

**fact (1)**
34:10

**facts (2)**
66:15,17

**fail (1)**
43:3

**failed (1)**
30:18

**failure (2)**
30:8 49:12

**failures (1)**

42:11

**fair (4)**
16:15 21:1 23:21
46:24

**fairly (3)**
7:22,24 30:22

**familiar (8)**
16:15 20:2,9
26:22 34:2 40:10,12
47:14

**far (9)**
16:24 40:17 45:21
46:5 53:21 55:14,23
57:16 58:24

**February (1)**
64:3

**federal (7)**
13:4,13 22:7
24:13 31:15 32:1
38:4

**feeds (1)**
26:13

**fees (4)**
6:18 59:13,20,22

**Fetzer (1)**
72:21

**few (2)**
6:14 51:4

**figure (2)**
19:22 37:1

**file (1)**
20:18

**filed (4)**
28:17,24 29:9
72:16

**files (1)**
26:13

**final (1)**
42:22

**financial (3)**

6:8,16 59:18

**financials (1)**
56:19

**find (12)**
24:5,16 31:7 35:7
39:13 41:9,10 42:11,
18 49:10 51:10,19

**finds (1)**
53:6

**firm (1)**
46:11

**First (3)**
17:13 52:4 61:15

**Five (6)**
4:18,19 5:7 34:19
39:14 55:1

**five-minute (1)**
62:15

**flag (2)**
54:17,23

**follow (1)**
41:3

**following (2)**
48:8 72:6

**form (1)**
47:5

**four (2)**
4:13 55:1

**frequently (2)**
42:13 66:24

**front (1)**
6:20

**function (1)**
13:10

**functions (1)**
12:20

**Funds (1)**
38:7

**further (1)**
70:8

McCaskill v.
Navient Solutions, Inc.

**future (1)**
19:17

## G

**gap (1)**
48:6
**gather (1)**
51:21
**gathered (1)**
55:19
**gathering (1)**
54:10
**GC (3)**
12:6,8,9
**general (2)**
62:4 68:16
**Generally (6)**
16:18 21:3,4 24:2
38:18 45:21
**gets (7)**
10:19 26:13 27:5
52:3 53:1 67:10
68:16
**getting (3)**
51:12,14 61:2
**give (3)**
43:21 44:1 65:8
**given (5)**
15:4,9 38:19,22
50:2
**giving (2)**
20:7 55:16
**goal (1)**
38:19
**goals (5)**
38:22,23,23 39:2,5
**goes (2)**
45:21 63:10
**going (9)**

8:22 10:7 18:21
20:4 25:13 27:12,21
46:16 51:17
**GOMEZ (24)**
6:1,3 10:5 14:1
15:10 27:20 28:22
29:5,7 33:2 39:15,18
40:2,3 43:23 44:8
46:21 47:4,8 48:18
62:14,17 65:6 70:8
**Good (5)**
8:5,5 26:16 39:14
52:14
**Google (1)**
52:22
**governing (1)**
72:15
**group (3)**
9:16 33:10 43:10
**groups (1)**
38:16
**guarantee (8)**
6:17 9:6 13:16
24:8,18,23 59:13,21
**guaranteed (1)**
31:16
**guaranteeing (1)**
6:18
**guarantor (7)**
13:17 23:24 24:2,
5,15 25:8 38:7
**guarantors (4)**
18:10 23:13,16
59:20
**guess (11)**
7:8 10:16 23:19
27:1 28:3 29:12 34:2
42:11 47:18 56:19
57:5
**guesstimate (1)**

37:19
**guidelines (2)**
14:21 30:3
**guys (2)**
13:17 23:18

## H

**handle (1)**
58:14
**handles (1)**
59:4
**happen (2)**
42:14 58:22
**happened (3)**
5:20 45:24 58:23
**happening (3)**
46:14 47:12,12
**happens (3)**
31:8 53:2,5
**harassing (5)**
31:10,21 35:8,11
66:17
**hear (6)**
30:16,20 44:18,22
58:19,21
**heard (3)**
9:1 30:21 55:15
**help (1)**
10:6
**hey (1)**
25:13
**high (1)**
61:13
**higher (1)**
60:22
**hired (2)**
5:20 67:10
**hires (1)**
25:9

**history (2)**
5:19 49:3
**Hynes (3)**
33:7 58:11 69:24

## I

**ID (2)**
19:15,18
**idea (7)**
36:7 41:20 46:14,
22 47:10 61:23 62:4
**identified (1)**
18:4
**identify (2)**
39:19,21
**identifying (1)**
54:18
**immediately (1)**
54:10
**inbound (1)**
41:18
**Inc (22)**
3:4,8 5:24 6:1,6
8:2,2,17 13:8 17:2
25:6 30:22 47:15,19
48:11 49:23 54:9
55:17 56:16 62:21
64:6 67:2
**incentive (1)**
39:7
**incentives (3)**
38:2 40:23,24
**include (1)**
25:3
**included (1)**
22:10
**Inc's (1)**
23:12
**indeed (1)**

42:14

**Indefinitely (1)**
41:22

**indicate (1)**
56:9

**indicated (1)**
72:10

**individual (9)**
8:19 31:17 37:3,5
39:10 49:6 52:11
54:15 66:3

**individuals (4)**
11:4,12,13 58:16

**information (17)**
19:13 20:18,20
22:10 24:23,24
25:20 26:5,9,12 27:5
36:18,24 39:9 52:14,
15 56:2

**infractions (1)**
42:9

**input (2)**
22:18,19

**inquiries (1)**
58:15

**INSTRUCTIONS (1)**
72:1

**insurance (1)**
59:23

**insuring (1)**
59:23

**Intelligence (1)**
12:6

**interact (1)**
12:22

**interaction (1)**
27:11

**Interactive (1)**
12:6

**interacts (1)**
42:9

26:23

**interest (2)**
66:6,22

**introduced (1)**
57:13

**invoice (1)**
61:6

**involve (4)**
5:9 16:2 39:2
46:18

**involved (9)**
5:12 16:14 28:14
30:12 38:5 40:6
41:23 68:9 69:1

**involves (2)**
48:1 51:17

**Iowa (1)**
8:12

**itself (2)**
50:18 72:8

## J

**job (5)**
7:18 15:12 36:12,
14 42:6

**jobs (1)**
36:23

**John (2)**
43:8 70:3

**Johnson (1)**
47:15

**jumped (1)**
39:19

## K

**Kane (2)**
43:8 70:3

**keep (2)**

44:19 47:12

**keeping (2)**
59:1,6

**keeps (1)**
32:5

**kept (1)**
41:21

**Killeen (1)**
6:15

**kind (9)**
15:21 19:14 23:2
34:4 36:13 39:8,18
44:4 62:7

**King (1)**
72:22

**knowledge (1)**
50:3

**knowledgeable (1)**
7:24

## L

**landline (3)**
17:22 18:17 54:7

**large (3)**
30:23 33:12,21

**last (6)**
4:24 5:5 29:10
30:21 51:2,4

**lawsuit (4)**
16:20 28:17,24
50:22

**lawsuits (1)**
29:8

**lawyer (4)**
28:20 29:3 44:23
50:9

**lawyers (2)**
15:11 39:20

**lead (1)**

52:12

**learn (2)**
16:6 45:6

**learned (1)**
34:10

**least (1)**
8:1

**leave (1)**
53:17

**legal (2)**
11:18 44:4

**letters (3)**
25:4 62:22 63:2

**level (2)**
6:8 7:1

**levels (1)**
30:4

**liaison (1)**
4:1

**life (1)**
53:4

**Lisa (1)**
39:22

**listen (3)**
42:4 55:7,18

**literally (1)**
69:18

**litigation (1)**
47:7

**little (10)**
5:18 6:10 8:6,16,
23 14:23 19:8 22:2
31:1 40:11

**live (1)**
69:19

**loaded (1)**
53:10

**loan (12)**
18:11 19:7 24:21
31:15 38:8,13 52:2

59:15 60:7,8 68:10
69:2

**loans (19)**
6:19,22 7:3,21 8:1,
3 13:9,10,14 19:20
22:6,7 23:20 24:14
25:18,18 38:5 59:11,
24

**location (1)**
69:5

**locations (2)**
6:14 40:18

**log (4)**
19:19 57:21 58:1,
17

**logged (1)**
64:5

**logging (1)**
64:1

**login (2)**
19:5 56:2

**logs (3)**
20:13 22:15 50:13

**long (6)**
3:7 4:11 7:12
27:15 41:20 64:14

**look (9)**
19:19 36:11 49:2,
5,16,19 57:6,9,11

**looked (5)**
50:10,13,16 51:2,2

**looking (7)**
36:13 42:8 48:24
49:14,15,18 53:18

**lot (2)**
7:17 30:24

**Ltd (1)**
72:21

## M

**made (10)**
22:19 28:17 34:8
36:1,4,8 45:11 56:21
57:17 68:21

**Mae (9)**
3:9 4:22 5:19,21,
24 6:1,4,6 8:2

**mail (1)**
63:2

**main (2)**
4:6 13:10

**maintain (1)**
57:21

**maintaining (1)**
59:2

**make (9)**
6:5 19:20 26:7
35:18 39:4 43:17
59:9 72:7,12

**makes (7)**
22:18,18 45:16
53:15 60:2,3 62:8

**making (3)**
21:16 25:4 34:3

**Malachi (1)**
53:16

**manage (2)**
12:21 33:18

**management (2)**
7:7 8:10

**manager (12)**
6:23 7:1,7 30:13
32:23 33:5 40:7 41:6
42:10,15 45:8 54:15

**managers (5)**
39:11 41:8 58:13
62:10 69:1

**managing (3)**
3:23,24 40:8

**mandated (1)**
24:12

**manner (2)**
9:11 16:14

**manual (2)**
53:12,14

**manually (2)**
17:8,11

**manuals (1)**
14:6

**manufacturer (1)**
12:4

**many (17)**
4:17,20 5:5,12
11:23 13:16 29:8
35:17 36:8 37:10,15
40:17 43:3 46:14
48:19 55:4 62:7

**MARKS (1)**
72:7

**material (2)**
15:15 16:1

**materials (1)**
15:5

**math (1)**
49:10

**maximize (1)**
35:15

**maximum (3)**
34:7 35:1 62:9

**may (4)**
21:9 62:2 69:1
72:16

**maybe (2)**
51:1 54:23

**McCaskill (7)**
49:23 50:8,17
53:17 55:16 68:22

69:2

**McCaskill's (3)**
55:5,8 57:5

**mean (7)**
15:1,3,11 22:13
30:23 35:12 51:8

**meaning (7)**
15:17 30:3 31:5
37:16 49:12 54:16
60:9

**means (1)**
51:14

**mentions (1)**
45:1

**message (3)**
43:22 53:17,23

**method (1)**
28:23

**might (1)**
40:11

**mind (1)**
5:17

**mine (1)**
44:15

**minutes (1)**
39:14

**miss (2)**
61:15,17

**mistake (1)**
33:5

**modifications (1)**
26:8

**monetary (1)**
39:3

**money (3)**
59:9 60:2,3

**monitoring (3)**
41:9,11,24

**monthly (4)**
38:23 39:1 61:3,6

**months (2)**
29:10,13

**more (8)**
7:16 10:15 14:21
18:6 45:13 48:22
54:18 66:15

**Moretta (6)**
52:2 53:18 55:8
56:11 63:21 69:2

**most (3)**
29:18 54:24 68:12

**mostly (2)**
7:21 62:19

**moved (3)**
6:14,22 7:16

**much (4)**
4:7 37:7 56:21
60:11

**multiple (1)**
13:3

## N

**name (5)**
5:15 25:23 32:7
50:2 56:2

**Navient (54)**
3:1,1,3,4,8,10,13
4:21 5:9 8:2,17,23
9:21 10:13 11:8 13:8,
11,20,23 14:2 17:1
19:10,23 23:8,12,20
25:6 28:18 29:1,9
30:22 31:23 47:15,
19 48:11,21 49:23,
23 54:9 55:4,17
56:16 57:1 59:8
62:21 63:2,6,12 64:6
65:13,14 66:4 67:1,
19

**NCI (2)**
11:1,14

**necessarily (3)**
49:16 52:10 67:6

**necessary (1)**
72:12

**need (6)**
14:20 18:23 31:12
39:4 48:11 70:13

**needed (1)**
43:17

**needs (1)**
45:2

**neither (1)**
68:17

**net (1)**
56:15

**never (1)**
27:12

**new (7)**
14:20 30:13 63:3,
4,6,8 70:5

**Newark (3)**
69:23 70:7,7

**next (4)**
7:15 18:5 31:5
64:4

**Nielson (5)**
52:2 53:18 56:12
63:21 69:2

**Nielson's (3)**
52:3 55:8 57:5

**Noble (2)**
12:3,6

**non-delinquent (2)**
60:8,11

**None (2)**
5:17 46:18

**normal (1)**
19:19

**normally (2)**
17:15 38:24

**Northern (1)**
8:12

**NOTATIONS (1)**
72:7

**note (3)**
19:6 46:17 72:4

**notes (15)**
22:12,13,16,17,21,
24 45:10,17,18 46:6
50:10 51:3 56:7 57:6,
7

**Nothing (1)**
15:11

**notice (1)**
28:16

**notify (3)**
23:24 25:13 27:1

**NSI (36)**
12:1,13 13:4
16:16 17:9,15 18:5
21:19,19 26:7 30:14
32:17,19 34:2,4,8,21
35:18 37:15 40:19
41:15 42:18 44:9
50:21 59:15 60:2,3
61:1,11 64:9 65:21
67:13,18 68:2,9,15

**number (77)**
17:19,21,24 18:3,
4,8,13 20:1,2,6,12
21:7,10 29:14,19
34:12,18 35:10 36:1,
3 37:11 38:19 39:4
43:1 44:2,7,11,13,19
45:2,4 50:21,22 51:5,
21 52:4,13,17,24
53:2,3,3,4,6,7,8,9,23
54:2,11,11,19,22

**55:5,12,16,19,24**
56:5,8,13,13 58:20
63:6,8,11,12,13,16,
17,22 64:5,24 65:9,
17,18 67:2

**numbers (17)**
18:10 19:3 27:8,9
47:22 48:3 51:11,19
54:5,16,24 55:2
60:17 63:7 65:8,21
66:20

## O

**object (2)**
47:4 48:14

**Objection (2)**
9:23 44:3

**Occasionally (1)**
44:21

**occur (1)**
48:7

**occurred (1)**
18:11

**off (3)**
14:20 20:17 38:18

**offenses (1)**
30:4

**office (8)**
69:22,23,24 70:2,
3,4 72:9,10

**officer (1)**
33:8

**often (14)**
15:23 30:16,20
42:10 43:11 44:18
49:5,10,19 58:20,22,
24,24 61:4

**old (1)**
63:13

**once (16)**
7:9 10:18 18:4,20
19:17,22 27:12,21
48:19 49:7,8 52:24
53:2,4 54:2 68:16

**one (21)**
4:23,24 7:11
11:24 31:16 34:8,8
35:4 38:5 39:18 46:7,
7 54:18 62:2 63:3,4
64:16 67:9 68:3 69:4,
5

**online (4)**
16:5,8 51:17 63:11

**only (5)**
21:19 25:21 26:4
28:18 68:12

**opened (1)**
32:12

**operational (9)**
3:14,17,23 4:4
6:12 9:8 28:6 36:18,
20

**operations (2)**
6:20 28:5

**opinion (6)**
34:12 51:22 66:1,
5,9,20

**order (3)**
19:12 45:4 68:8

**ordered (1)**
24:10

**ordering (1)**
62:3

**ordinary (1)**
28:21

**organization (1)**
7:17

**ORIGINAL (1)**
72:20

**originally (2)**
5:20 50:2

**originating (1)**
6:21

**other (14)**
8:13,24 19:2
44:16 46:7,20 47:2
51:14,15 65:8,17,21
66:19 67:18

**Out (8)**
4:19 19:7,22 25:2
31:7 37:1 43:2 55:16

**outbound (1)**
41:18

**outside (2)**
44:23 62:8

**over (2)**
6:24 7:1

**overall (1)**
40:12

**oversee (4)**
12:10 32:16 35:21
36:17

**owed (1)**
38:13

**own (3)**
23:12,14 47:1

**owner (1)**
52:1

**owns (1)**
44:10

# P

**page (2)**
20:12 72:7

**paid (14)**
37:8,9,23 38:1,9
40:24 59:14,15 60:6,
9,12 61:2,3,4

**parent (2)**
13:20 14:3

**part (7)**
11:3 29:18 30:11
32:16 42:5 50:22
62:20

**partake (2)**
14:5,12

**participate (2)**
56:18 61:20

**party (3)**
37:12 51:14 57:19

**password (2)**
19:16,18

**Patrick (1)**
39:24

**paying (2)**
59:21,22

**payment (4)**
19:20 38:14 61:16,
17

**penalty (1)**
29:21

**people (16)**
7:8 9:17 10:17,21
17:8 19:19 30:4
35:22 37:15 46:13,
15 48:20 55:1 58:10,
11,19

**per (6)**
34:3 35:1 36:9
59:14 60:6 69:18

**percent (2)**
60:15,15

**percentage (1)**
38:12

**period (1)**
28:3

**permission (1)**
43:21

**person (19)**
4:6 42:20 44:6,10,
20,24 45:3 50:3 53:6,
15 54:19 57:22,24
62:4,8 65:20,22 66:5
69:20

**personally (1)**
14:12

**perspective (1)**
64:22

**phone (71)**
7:9 10:8,18,19
17:3,21,24 18:2,5,18,
20 19:2 20:1,12,23
21:7,9,12 25:4 27:8,
9 30:19 34:3,7,19
35:18 36:1,4,8 39:4
41:16 42:4,21 43:17
44:1,7,13 50:21,21
51:11,19 52:15,17,
24 53:6,7,8,15,22
54:7,11,16,19,24
55:2,12,16 56:4
62:19 63:6,7,11
64:16,24 65:3,5,7,15
66:19 67:3,14

**phones (1)**
54:22

**picks (2)**
10:19 35:12

**picture (1)**
68:17

**place (3)**
21:7,9 39:14

**plan (1)**
39:7

**plans (1)**
38:17

**play (1)**
27:15

**please (5)**
29:17 53:17 67:13
72:4,8

**point (10)**
12:17 15:8 21:20
23:24 24:5 28:8 40:8
41:22 51:13 65:11

**policies (8)**
14:6,14,15 16:13,
16 17:1 20:24 46:23

**policy (3)**
34:4 41:3 62:6

**populate (2)**
20:16,17

**portion (4)**
7:6,7 12:19 59:4

**position (9)**
4:12 12:10 15:18
28:9,10 48:10 63:18
64:13 65:24

**positions (1)**
6:19

**possible (2)**
64:12 68:2

**Potentially (3)**
18:22 36:6 41:10

**premiums (1)**
59:23

**prepare (1)**
8:20

**present (1)**
39:20

**presented (3)**
5:2,8 8:18

**president (13)**
3:14,17 4:3,4,5,12
6:11 9:7 15:19 28:5,
6,7 43:10

**pretty (2)**
4:7 61:13

**prevention (11)**
3:21 7:4 9:5 11:6,
9 12:15 13:4 24:9
25:1 32:1 36:22

**previous (2)**
3:9 63:7

**Price (1)**
39:23

**private (4)**
7:1,2 13:5,13

**probably (4)**
17:10 18:10 58:11
66:23

**problem (2)**
48:5,6

**procedure (4)**
17:9 19:19 31:21
72:15

**procedures (9)**
14:6,10,18,20
16:13,16 20:24
31:13 54:4

**proceed (1)**
52:18

**process (7)**
14:22 18:17 20:2
32:2,3 54:6,12

**products (1)**
52:23

**promissory (1)**
19:6

**Promoted (1)**
6:19

**Protection (2)**
15:2 16:22

**proven (2)**
46:19 48:16

**provide (11)**
9:13,19 12:17,20
19:4,6 23:19 35:24

36:17,19 64:24

**provided (1)**
50:4

**provides (4)**
17:17 24:23 25:20
72:15

**punishment (1)**
42:15

**purpose (1)**
49:16

**Pursuit (1)**
23:6

**put (3)**
20:12 21:13 53:1

**putting (1)**
20:5

**Q**

**question (11)**
10:23 14:19 18:7
45:14 46:22 47:1,3,5
48:4,9 59:17

**questions (5)**
8:21 14:17 27:22
46:11 70:9

**quotas (1)**
36:9

**R**

**raise (2)**
54:17,23

**Randy (1)**
47:14

**rare (1)**
64:10

**Rarely (1)**
43:13

**reach (5)**

25:2 35:15 52:16
53:8 65:1

**reaching (1)**
53:22

**read (4)**
15:5,14 57:7 70:11

**READING (2)**
72:1,3

**realized (1)**
54:11

**really (2)**
6:16 59:16

**reason (3)**
42:23 46:10 72:5

**recall (7)**
5:15 30:21 42:16
55:6 56:14 57:3 64:7

**receive (3)**
12:12 17:19 31:4

**received (3)**
14:24 15:13 43:15

**receiving (1)**
14:21

**recess (2)**
39:17 62:16

**record (2)**
22:5 46:17

**recording (1)**
58:21

**recordings (5)**
55:7,15,18 59:2,6

**records (2)**
30:1 41:16

**recovery (3)**
3:20 4:7,9

**referring (1)**
10:16

**regarding (25)**
7:6 8:16 12:19
13:8 14:7,24 15:6,13

16:13,16,20 25:17
30:5 33:24 36:1 38:6
41:2 42:3 43:3 49:13
53:22 56:20 57:12
58:1 59:8

**regulations (2)**
24:13,13

**relationship (1)**
11:14

**relationships (1)**
8:24

**relevant (1)**
28:2

**relying (1)**
27:7

**remember (2)**
51:5 56:11

**removal (1)**
45:4

**remove (8)**
17:4,5 21:6,9,12
29:18,22 45:2

**removes (1)**
63:12

**report (2)**
33:9 43:7

**REPORTER (2)**
70:10,13

**reporting (4)**
3:23,23 12:21
36:19

**reports (6)**
35:24 36:2,3,13,
13 37:13

**representative (9)**
4:21 5:3,8 27:24
50:4 65:16 66:2
69:17,19

**representatives (6)**
10:7,20 11:6,8,9,

10

**request (3)**
30:9,18 46:1

**requests (4)**
26:24 41:4 42:12
49:13

**required (2)**
24:8 45:12

**research (2)**
8:20 58:16

**resolve (1)**
38:21

**resolving (1)**
14:13

**response (2)**
22:20 50:18

**responsibilities (2)**
7:18 45:9

**Responsibility (6)**
3:20 6:17 12:14
28:11,12 36:21

**responsible (7)**
11:5,11 14:9,11
39:11 59:6 62:11

**return (3)**
72:9,17,20

**revenue (3)**
56:20 57:1 68:16

**re-verify (1)**
20:1

**review (2)**
14:22 49:12

**reviewing (2)**
55:9 57:4

**revocation (2)**
67:4,15

**revoke (1)**
63:16

**right (5)**
15:18 28:4 37:12

39:15 49:2

**role (2)**
27:15 28:12

**roles (1)**
6:23

**Rule (1)**
72:15

**run (3)**
17:20 18:16 54:6

---

## S

**SAC (26)**
9:9 11:1,4,15,23
22:23 24:16,21,24,
24 25:13,17 27:7
33:16,19 34:11
49:24 64:9,15,16
65:12 67:4,10,15
68:2,15

**said (2)**
17:12 18:14

**salary (2)**
37:23 40:22

**Sallie (9)**
3:9 4:22 5:19,21,
24 6:1,4,6 8:2

**same (15)**
10:3,24 11:16,21
28:12 29:12 54:19
64:9 67:4,7,8,12,15
68:5,15

**saying (4)**
20:5 31:19 32:24
66:13

**scenario (3)**
67:9,12 68:13

**schedules (1)**
62:12

**school (1)**

8:11

**scrub (4)**
17:20 18:16 54:6,
12

**searches (1)**
52:22

**second (1)**
31:18

**seems (3)**
7:5 19:23 54:15

**sending (1)**
25:4

**sends (1)**
29:3

**senior (1)**
28:10

**sent (1)**
10:19

**separate (15)**
9:21,21,22 10:2,3
11:2,10,13,19,22
13:6 41:13,14 50:4
59:3

**serious (1)**
30:7

**serve (2)**
14:16 30:14

**served (2)**
4:11 40:7

**service (8)**
13:7,9,9,13 22:7
23:19,19 42:5

**services (2)**
3:15 9:13

**servicing (9)**
22:5,6 23:11
24:22 25:12,17
59:10 60:5,6

**set (4)**
10:6 19:15 30:3

38:24

**setting (3)**
10:23 61:20 62:11

**settlement (1)**
28:3

**seven (5)**
34:22,23 35:5
40:20 69:6

**several (1)**
67:20

**severe (4)**
30:2,7 42:18,20

**shall (1)**
21:1

**share (2)**
25:17 33:15

**shared (1)**
23:13

**sheet (6)**
72:6,9,11,13,17,20

**shorter (1)**
6:5

**shortly (1)**
54:10

**show (1)**
54:16

**sign (2)**
70:11 72:8

**signed (1)**
72:17

**significant (5)**
45:18,19 46:2
60:20,22

**SIGNING (1)**
72:1

**similar (3)**
46:12,15 48:1

**SIMONETTI (20)**
5:23 9:23 13:22
15:7 27:17 28:19

29:2 32:24 39:13,22,
23 43:18 44:3 46:16,
24 47:6 48:14 65:4
70:12,15

**simply (3)**
47:9 55:24 65:2

**sister (2)**
11:15 67:18

**sit (1)**
12:12

**site (1)**
69:18

**sites (1)**
69:14

**situation (5)**
49:17,18,20 66:12,
16

**six (3)**
4:18,19 15:20

**skip (18)**
51:6,8,13,22 52:3,
5,9,12,18,20,21,23
53:5 54:1,5,20 55:11
63:22

**solution (1)**
48:4

**Solutions (44)**
3:1,3,4,8,13 4:21
5:9 8:2,17,23 10:13
13:8,11,20 17:2
19:24 23:8,12,20
25:6 28:18 29:1,9
30:22 31:23 47:11,
15,19 48:11,22
49:23 54:9 55:5,17
56:16 57:1 59:8
62:21 63:12 64:6
65:13,14 66:4 67:1

**Solutions' (1)**
19:10

**solving (1)**
48:5

**somebody (11)**
7:10 10:19 20:13
31:2 35:7 56:1 57:18
63:10 65:14 67:1,13

**Someone (11)**
15:4 17:16 24:6
30:17 45:2,23 53:8
62:18,24 63:5 64:15

**something (12)**
20:8,14,16 21:23,
24 23:13 28:20 43:4
48:21 54:17 56:10
64:10

**Sometimes (2)**
18:9 58:18

**somewhat (3)**
16:14 20:3 42:2

**sorry (6)**
5:17 14:2 33:5
48:8 49:10 70:5

**speak (3)**
24:18 65:10,23

**specialized (2)**
58:9,14

**specific (15)**
10:15 18:6 21:22
31:13,24 32:7 45:13
49:1,15,17,18,19
60:17 67:2 69:5

**specifically (10)**
9:14 13:19 26:23
27:11 30:8,10 37:18
45:20 56:23 62:1

**spoke (1)**
68:21

**staff (2)**
12:15,16

**Stafford (1)**

22:7

**stage (1)**
69:12

**stages (1)**
69:10

**stands (3)**
23:5,7 26:2

**start (1)**
25:13

**started (1)**
6:15

**state (1)**
62:13

**stated (5)**
7:22 9:19 11:21
16:12 18:8

**statement (2)**
21:2 23:21

**status (1)**
60:7

**step (1)**
7:15

**steps (1)**
19:24

**still (4)**
17:10 20:1 21:21
34:15

**stop (16)**
17:2 20:23 26:24
29:17 30:9,19 31:3,
18,20 39:14,15 41:4
42:12 46:1 64:15
67:13

**stops (1)**
68:9

**Street (1)**
72:22

**strikes (1)**
43:2

**student (20)**

6:19,21 7:2,21 8:1
9:2,17 10:12 11:7
13:10 22:6 23:20
24:14 26:18 27:2
31:15 38:4,8 59:11,
24

**supervisor (1)**
6:23

**support (10)**
3:14 4:4,9 6:12
7:16 9:8,13,15,20
28:6

**supporting (2)**
3:22 12:20

**supposed (1)**
65:16

**sure (12)**
5:6,14 18:8 19:21
23:1 27:4 32:15
40:23 53:20 59:16
60:1 63:18

**system (39)**
9:20,21 10:2,4
21:16,17,24 22:2,5,
23 23:2,4,9,11,12,14,
15,17,18 25:20,21,
23 26:4,12,13,19,20,
21 27:3,8 30:18 53:2
57:6,9,11,12 58:5,8,
17

**systems (6)**
4:1,2 21:21 26:14
34:1,1

### T

**taking (2)**
37:10 45:10

**talk (12)**
5:18 8:16 19:8

31:1 35:13 37:4,11
58:20 59:7 68:20,24
69:19

**talked (1)**
33:24

**talking (10)**
16:2 21:12,19
31:14,16 37:22
44:12 62:19 67:9
69:14

**TCPA (15)**
5:9,12 15:1,1,6,13,
15 16:3,7,17 28:14,
18 29:1 43:12 47:21

**teachers (1)**
10:24

**team (18)**
10:10,12 11:5
14:9 32:17,20,23
33:3,6,13,16,22 41:9,
11,24 59:3,3,5

**teams (5)**
32:1 35:21,22
36:17,18

**technical (1)**
11:10

**technology (2)**
10:3 11:22

**telecommunications (1)**
59:5

**telephone (1)**
17:18

**Telephonic (2)**
15:1 16:21

**telling (1)**
67:13

**tells (4)**
43:20 64:15 65:14
67:1

**Ten (4)**

7:13 34:19 40:15
45:22

**terminated (1)**
42:24

**termination (1)**
30:2

**test (2)**
15:19 16:6

**tested (2)**
15:17 43:15

**testing (2)**
16:2,8

**Texas (1)**
6:15

**text (1)**
43:22

**their (34)**
9:20 10:2 12:21,
21 13:1 17:2 19:5,6
21:8 23:4 25:18
26:19 32:1,2 36:23
37:2,8,9,10,11 39:6
42:3,6,21 56:2 59:9,
22 60:2 61:15 62:11,
24 66:8,21 69:9

**theirs (1)**
44:13

**themselves (7)**
12:23 18:9 20:21
37:23 39:12,21 50:23

**there (24)**
6:23 13:3 20:14
22:20 28:23 30:3
31:21 32:4 35:10
36:3 48:4,21 53:21
54:22 55:24 56:7
59:2,3 60:10 61:13
62:6 64:8 65:17 68:1

**therefor (1)**
72:5

**therefore (1)**
27:3

**they (67)**
5:9,19 8:1 9:5,20
10:1 11:2,10,12,15,
21,22 12:3,24 17:11,
12 19:7 21:8 23:2
24:16,16 26:19 27:5
29:22,22 30:23 31:3,
4,5 35:24 37:12,23
38:1,9,19,20,23 39:3,
4,5 40:22,22,23 42:4,
8,18,22,24 43:21
46:13 48:17 52:8
53:8 56:4 59:9,9,13
61:4,17 63:8,16
64:18,24 65:2,7
66:14,20

**thing (4)**
39:18 41:13,14
43:2

**things (5)**
3:22 6:21 15:12
46:12,15

**think (8)**
28:9 35:10 50:19
64:16,18 65:21 66:3
67:3

**third (2)**
51:14 57:19

**third-party (4)**
51:18 67:23 68:3,8

**though (1)**
60:24

**thousand (1)**
37:21

**Three (6)**
12:2 34:1 43:1
54:16 55:1 68:12

**throughout (1)**

7:20

**Tim (3)**
33:7 58:11 69:24

**timeframe (2)**
63:22,24

**times (13)**
4:17,19,20 5:7,7
34:14,16 35:1,5,8
43:3 55:4 64:8

**title (3)**
3:12 6:8 43:9

**titles (1)**
7:19

**today (6)**
7:17 12:10 45:21
48:2 60:1 66:2

**together (1)**
21:10

**told (1)**
20:23

**tools (2)**
52:19,22

**total (1)**
38:13

**towards (1)**
38:19

**trace (3)**
52:20 53:5 54:5

**traced (3)**
51:6 55:12 63:22

**tracing (12)**
51:8,13,22 52:4,5,
9,13,19,21,23 54:1,
20

**train (3)**
11:1 45:11,17

**trainers (3)**
10:24 11:2,11

**training (19)**
4:1 9:14 10:6,10,

24 11:4,5,12 14:24
15:3,13,14,16 30:12,
13 36:15 43:15
45:21 53:22

**trains (1)**
10:12

**transcribed (1)**
72:16

**transcript (2)**
72:3,8

**treated (1)**
18:21

**try (5)**
44:15 47:2,5,11
48:23

**trying (11)**
14:13,14 19:22
25:2 35:14 37:1
42:17 51:10 54:2
57:18 65:18

**Twenty-six (1)**
6:13

**two (5)**
54:16 55:1 67:17
68:12,17

**type (10)**
17:20 21:22 27:5
28:16 36:7 37:19
38:1 41:10 43:2
57:20

**types (1)**
36:11

**Typically (2)**
39:1 49:14

## U

**umbrella (1)**
67:19

**under (4)**

12:23,24 41:12
67:19

**underlying (1)**
26:14

**understand (8)**
8:18 21:11 42:17
45:23 49:3 51:1
58:24 62:2

**understanding (18)**
11:17 16:22 17:15
18:24 24:4,20 28:13
31:2 34:6,21 41:15
43:16,24 44:9 47:17,
23 50:20 65:15

**University (1)**
8:12

**unusual (1)**
30:24

**up (20)**
5:19 6:11 7:15
10:6,19,23 14:17
15:4 19:15 32:12
35:12 38:10,24
47:11 53:5 60:9 61:1,
5,13,20

**update (4)**
30:8,18 43:3 49:12

**updated (2)**
14:20 52:3

**updating (2)**
30:1 41:4

**USA (1)**
38:7

**use (7)**
14:10 18:24 20:7
23:3,15 35:18 52:20

**used (4)**
14:7,8 22:4 53:10

**user (2)**
19:15,18

**uses (1)**
34:2

**using (2)**
17:16 52:22

**utilization (1)**
37:9

## V

**valid (1)**
27:9

**Varies (2)**
24:2 35:17

**various (1)**
6:19

**vary (1)**
62:12

**Vedder (1)**
39:23

**verified (6)**
53:3 55:21,23
56:1,12 64:1

**verifies (1)**
63:6

**verify (3)**
44:10,16 54:3

**verifying (2)**
56:3 63:1

**versus (1)**
60:11

**Vice (10)**
3:14,17 4:3,12
6:11 9:7 15:18 28:4,
6,7

**violation (1)**
42:18

**violations (13)**
5:13,13 16:21
28:14,18 29:1 43:12
47:21 48:1,7,13,21

49:11

**visit (1)**
19:12

**visited (1)**
19:9

**visits (1)**
19:17

**voice (1)**
53:23

**vs (2)**
47:15 49:23

### W

**walks (1)**
19:24

**warning (1)**
42:23

**way (7)**
6:10 14:5 27:1
44:16 47:2 51:15
55:24

**ways (2)**
19:2 60:3

**Website (12)**
19:4,6,9,9,10,12
50:24 55:20,22 56:2
63:1,2

**websites (2)**
15:12 52:21

**week (3)**
34:22,23 35:4

**weeks (2)**
49:7,8

**weren't (1)**
59:19

**whatever (2)**
12:11 26:19

**what's (5)**
31:1 45:18,19,20

54:4

**Wilcox (1)**
72:21

**Willie (7)**
49:22 50:8,17
53:16 55:15 68:22
69:2

**Wilmington (3)**
70:2,4 72:22

**within (7)**
7:4 13:3 22:10,12
36:3 56:6 72:17

**without (4)**
39:19 47:22 48:3,
24

**WITNESS (6)**
10:1 27:19 29:6
43:20 44:6 70:11

**work (17)**
4:2 8:1 12:23,24
13:17 18:1 24:21
40:13 41:24 58:10,
11 59:9,13 60:16
69:7,22 70:1

**worked (4)**
3:9 7:21 59:18
69:8

**working (2)**
3:7 37:7

**works (5)**
52:8 62:3 70:2,3,4

**worry (1)**
54:14

**worth (1)**
56:15

**write (3)**
14:18 20:15 46:6

**writing (1)**
14:9

**written (1)**

42:22

**wrong (6)**
44:19,20 47:22
49:2 54:24 58:19

### Y

**year (5)**
4:24 5:5 49:9,9
56:20

**yearly (1)**
61:3

**years (9)**
3:11,12 4:13 6:13
7:13,20 15:20 40:15
45:22

**York (1)**
70:6

**yourself (3)**
15:5,6 63:15

### 1

**1,000 (1)**
37:20

**10,000 (1)**
37:20

**100 (2)**
37:20 60:15

**11:33 (1)**
70:17

**12 (1)**
29:10

**1330 (1)**
72:22

**19801 (1)**
72:22

**1989 (1)**
6:15

### 2

**20 (1)**
46:12

**2014 (2)**
57:2 64:3

**2015 (3)**
5:5 56:20 57:2

**21 (1)**
49:9

**23 (1)**
49:9

**24 (1)**
29:12

**25 (2)**
49:9 60:15

**26 (3)**
3:11,12 7:20

### 3

**30 (2)**
62:5 72:18

**302-655-0477 (1)**
72:23

**30e (1)**
72:15

### 4

**4016 (3)**
50:21 55:5 63:22

### 5

**56 (2)**
35:4,7

**6**

**60 (2)**
   24:3 62:6