IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE MCCASKILL,

        Plaintiff,

v.

NAVIENT SOLUTIONS, INC., STUDENT
ASSISTANCE CORPORATION, and
NAVIENT CORPORATION

        Defendants.

No. 8:15-CV-1559-T-33-TBM

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

        Defendants Navient Solutions, Inc. and Student Assistance Corporation, through counsel and under Federal Rule of Civil Procedure 56 and Local Rule 3.01, file this Opposition to Plaintiff's Motion for Partial Summary Judgment.

## I.      INTRODUCTION

        By her Motion for Partial Summary Judgment (the "Motion"), plaintiff Willie McCaskill ("McCaskill") seeks to prevail against defendants Navient Solutions, Inc. ("NSI") and Student Assistance Corporation ("SAC") (together, "Defendants") for supposed violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.55, et seq., and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, et seq.  McCaskill's claims arise from autodialed telephone calls made by Defendants to a cellular telephone number -- (727) 581-6140 (the "Number") -- that supposedly belongs to her.  Defendants called the Number in connection with efforts to reach McCaskill's daughter, Maretta Newsome ("Newsome"), who had delinquent

federal student loans and who had confirmed to NSI that the Number was <u>hers</u>.  According to the Motion: the calls were made in negligent and willful violation of the TCPA; the calls also were improper attempts to collect a debt from McCaskill in violation of the FDCPA and FCCPA; and McCaskill supposedly is entitled to summary judgment except as to damages.  As detailed below, however, the Motion fails based on disputed facts and well-settled law.

Indeed, with respect to the issue of prior express consent under the TCPA, the situation here is not nearly so simple as McCaskill suggests.  The facts regarding McCaskill's consent -- involving her daughter and a long course of their using the Number -- are very much in dispute, and Defendants are entitled to have a jury hear those facts.  Further, McCaskill is not entitled to judgment on her claims under existing law.  For instance, in the Eleventh Circuit, a calling party incurs liability for a willful violation of the TCPA (and, thus, potential treble damages) for <u>knowingly</u> making an autodialed call to a cell phone without the called party's "prior express consent."  Here, Defendants did no such thing.  Defendants were attempting to reach Newsome, who had confirmed the Number <u>as her own</u> when applying for a loan forbearance with NSI.  Further, neither McCaskill nor Newsome ever told Defendants not to call the Number, or that it supposedly belongs to McCaskill.  McCaskill therefore cannot meet the standard for willful violation of the TCPA and, instead, Defendants are entitled to summary judgment on that issue.[1]

Moreover, and also as detailed in Defendants' Motion, McCaskill's claims of improper debt collection fail.  Setting aside that she mischaracterizes certain facts, McCaskill also cannot demonstrate entitlement to judgment as a matter of law.  Defendants obviously did not make any attempt to collect Newsome's debt from McCaskill, nor did they engage in any conduct that

---

[1]  Defendants have filed their own Motion for Partial Summary Judgment, and Summary Judgment ("Defendants' Motion").

violates the FDCPA or the FCCPA.  Further, SAC is not a debt collector in any event.  Thus, the instant Motion should be denied, and Defendants' Motion should be granted.

## II.  RESPONSE TO STATEMENT OF MATERIAL FACTS

1.      Undisputed.

2.      Disputed.  (**Ex. 3**, Deposition of Willie McCaskill ("McCaskill Deposition"), 43:1–43:7, 43:11–43:12, 45:16–47:22; 51:17–53:18, Exs. 4, 5; **Ex. 4**, Deposition of Maretta Newsome ("Newsome Deposition").)

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Disputed.  (**Ex. 6**, Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 2; **Ex. 7**, Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 2; **Ex. 4**, Newsome Deposition, 57:18–74:5, Ex. 1.)

9.      Disputed.  (**Ex. 6**, Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 2; **Ex. 7**, Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 2; **Ex. 4**, Newsome Deposition, 57:18–74:5, Ex. 1.)

10.     Undisputed that the Number was initially obtained through an internet search.

11.     Undisputed that NSI associated the Number with Newsome's account.  However, "they have no earthly idea how it got there" is not a statement of fact.

12.     Disputed.  (**Ex. 6**, Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 2; **Ex. 7**, Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 2; **Ex. 4**, Newsome Deposition, 57:18–74:5, 64:21–65:10 Ex. 1.)

3

13.     Disputed.  (**Ex. 10**, Supplemental Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 6; **Ex. 11**, Second Supplemental Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 6; **Ex. 12**, Supplemental Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 6., **Ex. 13**, Pl.'s Supplemental Resp. to Defs.' Reqs. for Produc., No. 1.; **Ex. 5**, Pl.'s Second Supplemental Resp. to Defs.' Reqs. for Produc., No. 1.)

14.     Undisputed as to the making of the note, but the note states: "DID NOT LEAVE MESSAGE DIFF NME ON VM."  (**Ex. 1**, Campbell Deposition, Ex. 2, Bates # SAC0000432.)

15.     Undisputed.

16.     Disputed.  (**Ex. 1**, Campbell Deposition, 27:21–28:13, 29:9–29:14; **Ex. 2**, Deposition of Cheryl Dillon ("Dillon Deposition"), 14:3–14:8.)

17.     Disputed to the extent that NSI reaches the borrower.  (**Ex. 14**, Deposition of Patty Peterson ("Peterson Deposition"), 35:1–35:15.)

18.     Disputed to the extent that NSI reaches the borrower.  (**Ex. 14**, Peterson Deposition, 35:1–35:15.)

19.     Disputed to the extent that SAC reaches the borrower.  (**Ex. 14**, Peterson Deposition, 35:1–35:15.)

20.     Undisputed.

21.     Disputed.  (**Ex. 3**, McCaskill Deposition, 33:15–34:20; **Ex. 4**, Newsome Deposition, 51:6–53:9.)  Further, Defendants state that "Defendants' vehement denials that they did nothing wrong only cements their fate" is not a statement of fact.

LOS_ANGELES/#13626.6

### III.    ADDITIONAL MATERIAL FACTS

**The Defendants**

1.      NSI is engaged in the business of servicing student loans.   (**Ex. 2**, Dillon Deposition, 13:3–13:4.)  Some of those loans, like Newsome's, are owned by the United States Department of Education (the "Department"), and NSI services the loans on its behalf.   (Id. 13:3–13:14.)

2.      The servicing of loans owned or guaranteed by the Department is governed by a complex set of federal regulations.  See 34 C.F.R. §§ 682.400-682.423.  As relevant here:  (a) when loans are delinquent, NSI is required to contact the borrowers (34 C.F.R. § 682.411(c)-(f)); and (b) when a servicer cannot reach a borrower with the information in her records, it must diligently attempt to locate her, including through searches of public records for telephone numbers (34 C.F.R. § 682.411(h)(1)).

3.      SAC is not a loan servicer; it is engaged in default prevention for the guarantors of federal student loans.  (**Ex. 1**, Campbell Deposition, 11:12–11:16.)  Guaranty agencies are state or private nonprofit agencies that administer the federal guaranteed loan program.  See 34 C.F.R. § 682.400.  These agencies insure the funds that lenders provide to students, which are, in turn, reinsured by the federal government.  Id.

4.      At the instruction of guaranty agencies, SAC contacts borrowers to counsel them on repayment options -- by, for instance, offering forbearance plans -- in order to prevent the loans from reaching the stage of delinquency known as default.  (**Ex. 1**, Campbell Deposition, 11:24–12:6; **Ex. 2**, Dillon Deposition, 13:18–13:20.)  If a loan goes into default, the guaranty agency assigns the loan to the federal government.  34 C.F.R. § 682.409.

LOS_ANGELES/#13626.6

5.      When SAC contacts borrowers by phone, it does not request or accept any payments.  Instead, if a borrower wants to make a payment, SAC transfers the borrower to the borrower's loan servicer.  (**Ex. 1**, Campbell Deposition, 27:21–28:13, 29:9–29:14.)[2]

**The Number**

6.      The Number was assigned to McCaskill's home residence for many years.  (**Ex. 4**, Newsome Deposition, 37:19 –38:18; **Ex. 3**, McCaskill Deposition, 25:25–26:8, 28:15–29:2.)

7.      In 1999, McCaskill submitted an application to the Florida Division of Corporations to form a non-profit church, Largo for Jesus ("LFJ").  McCaskill listed the Number in the application for LFJ; the Number was not reflected as her personal number.  McCaskill runs LFJ and serves as its pastor.  (**Ex. 3**, McCaskill Deposition, 43:11–43:12.)

8.      Newsome is referenced in the application to the Florida Division of Corporations as the Secretary for LFJ, and she has been referenced as an officer or director in every annual update with the Division of Corporations.  (**Ex. 4**, Newsome Deposition, 41:11–41:20; **Ex. 3**, McCaskill Deposition 45:16–47:22; 51:17–53:18, Exs. 4, 5.)

9.      LFJ is not affiliated with any other telephone number; the Number is its sole means of telephone contact.  (**Ex. 3**, McCaskill Deposition, 43:1–43:7.)

10.     In March of 2013, McCaskill converted the Number to a cell phone.  (Id. 26:4–26:8.)

**Newsome's Confirmation Of The Number**

11.     Pursuant to its obligations as the servicer of Newsome's federal student loans, NSI found the Number as associated with Newsome through a public records search.

---

[2] Navient Corporation is the ultimate parent of Defendants.  Navient Corporation was dismissed from this action on February 10, 2016, pursuant to a Joint Stipulation of Dismissal With Prejudice.

12.     On February 4, 2014, Newsome applied for a voluntary forbearance through a section of NSI's website called "Manage Your Loans" ("MYL").  During that process, Newsome confirmed the Number as her "Home Phone."  (**Ex. 6**, Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 2; **Ex. 7**, Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 2;  **Ex. 4**, Newsome Deposition, 57:18–74:5, Ex. 1.)

13.     On the "Edit your contact information" page, the forbearance application stated:

> We would like to ensure we have the most up-to-date records for your student loan account.  Please take a few moments to review your contact information and update as needed.  If no changes are needed, please click submit.
>
>           *        *        *
>
> It is important that we have the most current address, telephone number, and e-mail address. Use this form to update and/or verify any part of your contact information.

(**Ex. 4**, Newsome Deposition, 60:7–60:21, Ex. 1, Bates # NSI0000002.)

14.     The "Voluntary Forbearance Verified Information" page stated:

> This is a certification page for your voluntary forbearance request. Please read over the information carefully before submitting. Should any of the information be incorrect, click the edit button to make changes.

(<u>Id.</u> 70:11–70:18, Ex. 1, Bates # NSI0000016.)

15.     In the Contact Information section, the application stated:

> By providing my telephone number, I authorize Sallie Mae, Inc. [now known as Navient Solutions, Inc.], its affiliates and agents to contact me at such number, using any means of communication, including but not limited to calls placed to my cellular phone using an automated dialing device, calls using pre-recorded messages, and/or SMS text messages regarding current or future loans owned or serviced by Sallie Mae, Inc., its affiliates and agents even if I'm charged by my service providers for receiving such communications.

(<u>Id.</u> 64:21–65:10, Ex. 1, Bates # NSI0000003.)

16.     The application contained an electronic signature certification, as follows:

7

I have chosen to submit my forbearance request with an electronic signature. By typing in my name, I am completing the borrower signature field on the voluntary forbearance request with an electronic signature. My electronic signature certifies that I have read, understand, and agree to the terms and conditions of the voluntary forbearance request. If I prefer to print and sign a paper copy or I do not want my payments postponed, I can discontinue the electronic signature process by selecting the cancel button.

By submitting my electronic signature, I understand and agree with the following statements. I agree to the terms of this forbearance and agree to repay my loans upon expiration of this forbearance in accordance with the terms of my promissory note.

(Id. 72:21–73:18, Ex. 1, Bates # NSI0000019.)

17.     Newsome did not change the contact information listed in the application.  (Id. 59:17–59:23, 67:19–69:16, 70:5–71:2.)

18.     Newsome signed the application and received her requested forbearance.  (Id. 73:19–73:23.)

19.     While NSI and SAC exist for different purposes, as explained above, they share some technology services, including the system that stores borrowers' consents for receiving autodialed calls.  (**Ex. 2**, Dillon Deposition, 32:24–38:1.)  Thus, if a borrower provides consent to be called, both NSI and SAC have access to that information.  (Id.)

**The Calls To The Number**

20.     NSI started calling the Number on January 13, 2014, and ceased by February 16, 2015.  SAC started calling on March 27, 2014, and ceased by May 28, 2015.  (See **Ex. 8**, SAC Call Log; **Ex. 9**, NSI Call Log.)

21.     During the relevant timeframes, NSI attempted to call the Number a total of 248 times, while SAC attempted to call it 478 times.  (**Ex. 6**, Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 4; **Ex. 7**, Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogatories, No. 4.)

8

22.     During the relevant timeframes, NSI and SAC did not speak with McCaskill, except when she called in on one occasion (and believed she was calling Lowes). (**Ex. 3**, McCaskill Deposition, 20:16–20:21, 33:9–33:14; 33:15–34:20.)[3] (Id..)

23.     NSI and SAC attempted to contact Newsome at her other phone numbers, but never spoke with her.  (**Ex. 4**, Newsome Deposition, 51:6–53:9.)  Newsome did not make any effort to stop the calls, either to her phone or the Number.  (Id.)

**The Notes From The Alleged Phone Call With "Heather"**

24.     Defendants have no record of any substantive conversation with McCaskill. Further, there is no record of an employee named "Heather" making calls to the Number for either of the Defendants.  (**Ex. 10**, Supplemental Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 6; **Ex. 11**, Second Supplemental Resps. of Def. Student Assistance Corporation to Pl.'s First Set of Interrogs., No. 6; **Ex. 12**, Supplemental Resps. of Def. Navient Solutions, Inc. to Pl.'s First Set of Interrogs., No. 6.)

25.     McCaskill alleges, and testified, that she did answer one call in August 2014 and talked with an employee named "Heather."  (**Ex. 3**, McCaskill Deposition, 20:16 –20:25.)

26.     In order to give this testimony, McCaskill read from a typewritten sheet prepared by her attorneys (the "Attorney Notes").  Also during her Deposition, McCaskill stated that she had written a note of the alleged call with Heather in August 2014 (the "Handwritten Note"). (Id. 63:2–64:14.)

27.     The Handwritten Note had not been referenced in or produced through McCaskill's Initial Disclosures.

---

[3] McCaskill alleges that she did answer one call in August of 2014 and that she spoke with an agent named Heather.  (**Ex. 3**, McCaskill Deposition, 20:19–20:25.)  As discussed in detail below, however, there is no admissible evidence demonstrating that this call occurred.

28.     Following the deposition, Defendants served a document demand for both the

Attorney Notes and the Handwritten Note.

29.     On or about January 19, 2016, McCaskill produced the Attorney Notes, which

provide:

> I received a call from Heather around or about 8-26-14.  She called my cell phone
> and said she was calling for Maretta Newsome and I told her I am sure that she
> has caller I.D. and she can see this is not Maretta Newsome's phone number.  She
> said I need to give Maretta her message and I told her she has the wrong person
> and I am not her messenger to deliver her calls.  Heather ask me if I knew her and
> I said yes, and told her why doesn't she call her and did she have her phone
> number.  Heather gave me the phone number for Maretta and I told her it was
> correct.  She said Maretta does not answer her phone.  I ask her not to call my cell
> phone any more about a student loan.  I told Heather I have never had a student
> loan and I don't have anything to do with someone elses bills.  The call ended.
> After a short time I began to get bombarded with cell phone calls.  Calls started
> from 7:59a.m. until 8:56p.m. some times.  At times it did not matter if it was even
> Saturday and Sunday.  I have been aggrevated enough for no reason at all.

(**Ex. 13**, Pl.'s Supplemental Resp. to Defs.' Reqs. for Produc., No. 1.)

30.     On January 27, 2016, McCaskill produced the Handwritten

Note, which states:

> My name is Willie Myra McCaskill and I had a call from Heather around or about
> the 26th of August 2014.  She called my cell phone and said she was calling for
> Maretta Newsome and I told her I am sure that she has caller I.D. and know this is
> not the number for Maretta.  She said I need to give Maretta Newsome her
> message and I told her she has the wrong person and I am not her messenger to
> deliver her calls.  She ask me did I know her and I said yes, and told her why she
> doesn't call Maretta and did she have her phone number and Heather told me
> what her home number was and I told her it was correct.  I told her not to call my
> cell phone anymore.  It was about a student loan.  I told Heather I have never had
> a student loan and I don't have anything to do with someone elses bills.  The call
> ended.  After that call, my cell phone rang constantly and I had Saturday and
> Sunday calls also.

(**Ex. 5**, Pl.'s Second Supplemental Resp. to Defs.' Reqs. for Produc., No. 1.)

### III.    ARGUMENT

**A.    McCaskill Does Not Come Meet The Legal Standard For Summary Judgment.**

Summary judgment should be granted only "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  In deciding whether an issue of material fact exists, the court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  Hudkins v. Maxim Healthcare Servs., No. 97-332-Civ-T-26(C), 1998 U.S. Dist. LEXIS 21783, at *3 (M.D. Fla. Apr. 10, 1998) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 609 (11th Cir. 1991)).

Further, a court may not make credibility determinations or engage in any weighing of the evidence at the summary judgment stage.  See, e.g., Munnings v. Fedex Ground Package Sys., No. 6:07-cv-282-Orl-19KRS, 2008 U.S. Dist. LEXIS 33041, at *54 (M.D. Fla. Apr. 22, 2008) (citing Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 919 (11th Cir. 1993)).  Nonetheless, this does not mean that a court must credit a plaintiff's self-serving, and questionable, declaration on summary judgment.

**B.    The Issue Of Prior Express Consent Under The TCPA Is Contested Here.**

The TCPA was enacted to protect the privacy interests of telephone subscribers through various restrictions on the use of automated telephone equipment.  See S. Rep. No. 102- 178, 102nd Cong., 1st Sess. (1991).  As relevant here, the TCPA prohibits the making of "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system."  47 U.S.C. § 227(b)(1)(A).

As set forth above in the Additional Statement of Facts, McCaskill and Newsome have both used the Number – in some manner or another – for decades.  Indeed, the Number was

11

assigned to their home residence for many years.  Further, in 1999, when McCaskill formed LFJ, she used the Number in the application, and also listed Newsome as the Secretary for LFJ (and Newsome has since been referenced as an officer or director in every annual update with the Division of Corporations).  On this basis alone, there exists significant question as to whether the Number is exclusively McCaskill's to use and, thus, to provide consent to call (as she asserts).  In addition, though, and importantly, through the process of applying for the forbearance through MYL, Newsome <u>confirmed</u> that it was <u>her</u> "Home Phone."  Meanwhile, neither McCaskill nor Newsome told NSI or SAC to stop calling or that the Number supposedly belongs to McCaskill.

These facts show that, at the very least, the issue of consent is sharply contested.  It involves the tale of close family members; and of McCaskill's standing by to calls to the Number without making any objection for months.  Indeed, it is unfathomable that McCaskill would allow her phone to ring over 700 times and take no steps to stop the calls if she had not consented.  Accordingly, Defendants intend to show that McCaskill's lack of consent is contrived -- after the fact, when she simply became impatient with the calls -- and the jury is entitled to consider the evidence.  Based solely on this issue, the Court should deny the Motion.

But, furthermore, Defendants are entitled to raise significant defenses on this record.  For example, faced with analogous circumstances, the Eleventh Circuit Court of Appeals found that common law agency principles apply to the TCPA's prior express consent requirement, thus creating a genuine issue of material fact that precludes summary judgment.  <u>See</u> <u>Osorio v. State Farm Bank, F.S.B.</u>, 746 F.3d 1242 (11th Cir. 2014).

In <u>Osorio</u>, one partner ("Betancourt")  in an unmarried couple gave the other partner's ("Osorio") phone number to a bank during a credit card application process.  <u>Id.</u> at 1247.  She then proceeded to provide Osorio's number to the bank on two, subsequent occasions.  <u>Id.</u> at

12

1248. When Betancourt failed timely to pay the minimum balance due on the credit card, the bank placed autodialed calls to the cell phone number in an attempt to reach her. Id. at 1246. Osorio sued the bank under the TCPA, and the bank moved for summary judgment. Id.

Noting that the couple lived together, were raising a child together, subscribed together to the same phone company and that Betancourt had given Osorio's number as her own three times, the trial court granted summary judgment in favor of the bank. Id. at 1252. The trial court based its decision on the reasoning in Gutierrez v. Barclays Grp., No. 10cv1012 DMS (BGS), 2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb. 9, 2011). In Gutierrez, the court found prior express consent based on "common authority" over the cell phone at issue. Gutierrez, 2011 U.S. Dist. LEXIS 12546, at *5–9.

On appeal in Osorio, the Eleventh Circuit reversed the trial court's decision. The Eleventh Circuit did not apply the common authority defense, but rather found genuine issues of facts with respect to agency, explaining:

> To fall within [the TCPA's] consent exception, State Farm must demonstrate that it had the consent of Osorio, as defined by the common law, to call No. 8626. One way for State Farm to do so would be by demonstrating that Betancourt had an agency relationship with Osorio that permitted her to consent to Osorio receiving the calls, and by showing that she exercised that authority in this case by giving No. 8626 to State Farm in connection with her debt. . . . A genuine dispute of material fact . . . exists as to whether Betancourt acted as Osorio's agent when she gave State Farm No. 8626 as a contact number. Accordingly, this is not an issue that can properly be decided on summary judgment. The issue must instead be submitted to a factfinder.

Id. at 1253–54.

Here, as in Osorio, at the very least, genuine issues of material fact exist as to whether McCaskill had an agency relationship with Newsome that permitted her to consent to McCaskill receiving the calls, and whether she exercised that actual or apparent authority by providing the Number to NSI in connection with her student loans (or, if not under an agency theory, under the

13

equally fact-intensive doctrines of consent by intermediary or common control).  See, e.g., Mais v. Gulf Coast Collection Bureau, 768 F.3d 1110, 1123–26 (11th Cir. 2014) (holding that wife's disclosure of husband's cell phone number on hospital admission form constituted prior express consent to receive debt collection calls as "consent obtained and conveyed by an intermediary").[4]

## C.     Under Governing Law, McCaskill's Claim For Willful Violation Is Defeated.

As a matter of settled law, the question of willfulness under the TCPA is directed to the Court:  "If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."   47 U.S.C. § 227(b)(3)(C) (emphasis added).   As the Eleventh Circuit has explained, to establish a willful violation of the TCPA, a plaintiff must prove that the defendant engaged in "knowing conduct."   Alea London Ltd. v. Am. Home Services, Inc., 638 F.3d 768, 776 (11th Cir. 2011); Lary v. Trinity Physician Fin. & Ins. Servs., 780 F.3d 1101, 1107 (11th Cir. 2015) ("The requirement of 'willful[ ] or knowing[ ]' conduct requires the violator to know he was performing the conduct that violates the statute").   Thus, where a defendant mistakenly calls a number that belongs to the plaintiff, the court cannot award treble damages under 47 U.S.C. § 227(b)(3)(C).  Lary, 780 F.3d at 1107 .

The facts in this case are nearly identical to those in Harris v. World Fin. Network Nat. Bank, 867 F. Supp. 2d 888 (E.D. Mich. 2012), which is instructive.  There, Leann Morgan ("Morgan"), an individual who was not a party to the lawsuit, opened a credit account with

---

[4]  Indeed, courts routinely find that defenses like agency cannot be resolved on summary judgment due to the existence of issues of fact (and particularly when coupled with problems of credibility).  See In re Brican Am. LLC Equip. Lease Litig., No. 10-md-02183-PAS, 2013 U.S. Dist. LEXIS 109166, at * (S.D. Fla. Aug. 1, 2013) (denying summary judgment because there was an issue of fact as to whether apparent agency existed); accord Platypus Wear, Inc. v. Clarke Modet & Co., S.L., No. 06-20976-CIV-MORENO/TORRES, 2008 U.S. Dist. LEXIS 107078, at *7 (S.D. Fla. June 23, 2008).

defendants.  Id. at 890.  In applying for the credit account, Morgan provided her cellular telephone number to defendants.  Id.  After Morgan fell behind on her credit accounts, defendants initiated collection efforts by placing automated calls to the number that Morgan had provided.  Id. at 891.  On August 23, 2010, plaintiff answered a phone call from defendants and stated that they were calling the wrong number.  Id.  The court denied plaintiff's request for treble damages because, "[w]ithout knowing that the number associated with Morgan's account was actually Plaintiff's number, Defendants' violations cannot be deemed willful or knowing." Id. at 895.

Similarly, Newsome has student loans serviced by NSI.  On February 4, 2014, before Defendants began calling the Number, Newsome logged onto MYL through NSI's website.  She then confirmed the Number as her "Home Phone" in the Contact Information section and authorized Defendants "to contact [her] at such number using any means of communication." (**Ex. 4**, Newsome Deposition, Ex. 1, Bates # NSI0000005.)

Further, neither McCaskill nor Newsome ever told NSI or SAC to stop calling or that the Number supposedly belongs to McCaskill.  Indeed, in this regard, the Court should not permit McCaskill to secure summary judgment through the Handwritten Note.  As noted above, at the summary judgment stage, a court does not make credibility determinations or engage in any weighing of the evidence.  Anderson v Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  This does not mean, however, that a court must credit a plaintiff's self-serving, or questionable, declaration on a motion for summary judgment.  As explained by the United States Supreme Court:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380 (2007).

Such is the circumstance here.  As explained above, Defendants have no record of any substantive conversation with McCaskill, nor of any employee named "Heather" making a call to her.  However, McCaskill testified that she made the Handwritten Note, documenting this supposed conversation, at the time of the call in August 2014 and that she would have kept it in her file of "important" papers.  To be clear, based on their records, Defendants did not credit this testimony whatsoever; they did not believe that such a document was made at that time (because there was no conversation between Defendants and "Heather").  But, following McCaskill's deposition, Defendants requested production.  To put it mildly, it was not promptly produced.  To the contrary, it was provided only after a motion to compel was granted on Defendants' request for production, and after production of the Attorney Notes.  If the Handwritten Note was legitimate, this amount of effort to secure production would not make sense.  Also, if legitimate, the Handwritten Note should have been disclosed or produced with McCaskill's Initial Disclosures.

Given this, and the fact that the Handwritten Note does not at all appear to be what McCaskill described at deposition -- i.e., a note made by her at the time of the supposed phone call -- the Court should not consider it.[5]  Indeed, the Handwritten Note, on its face, references calls made subsequently:  "After that call, my cell phone rang constantly and I had Saturday and Sunday calls also." (**Ex. 5**, Pl.'s Second Supplemental Resp. to Defs.' Reqs. for Produc., No. 1.)  Thus, it could not have been created at the time of the alleged call.  Instead, the Handwritten Note appears to merely recite the Attorney Notes, and the language of the Handwritten Note indicates that it was created well after the occurrence of the supposed phone call.  While

---

[5]  This request also is made in Defendants' Motion.  The Handwritten Note should not be an obstacle to summary judgment in Defendants' favor.  However, if the Court considers it at all, the Handwritten Note certainly should not form the basis of summary judgment for McCaskill.

Defendants will never know with certainty what McCaskill did here with the Handwritten Note, or why, she should not be permitted to avoid summary adjudication based on that conduct.  The Handwritten Note is not a contemporaneous record of any supposed conversation with "Heather."  See, e.g., Hall v. Sunjoy Indus. Group, Inc., 764 F. Supp. 2d 1297 (M.D. Fla. 2011) (disregarding on summary judgment plaintiff's unsupported affidavit that contradicted her prior sworn testimony and other evidence on the record).

Finally, in the Motion, McCaskill makes much of the fact that a SAC employee made a note on May 28, 2015 to the effect that the voicemail message on the Number did not state Newsome's name.  But McCaskill fails to mention that no further calls were made after that date.

**D.     McCaskill's Claims Under The FDCPA and FCCPA Likewise Are Defeated.**

**1.     The FCCPA Section 559.72(7) Claim Fails Against Both Defendants.**

McCaskill cannot recover under Section 559.72(7) of the FCCPA because the supporting facts -- namely, a high volume of phone calls -- are insufficient as a matter of law to constitute harassment.  Pursuant to Section 559.72(7), a person may not "[w]illfully communicate with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engage in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family."  Lardner v. Diversified Consultants, Inc., 17 F. Supp. 3d 1215, 1225 (S.D. Fla. 2014) (citing Fla. Stat. § 559.72(7)), vacated on other grounds, Lardner v. Diversified Consultants, Inc., No. 1:13-cv-22751-UU, 2014 U.S. Dist. LEXIS 63007 (S.D. Fla. May 1, 2014).  Importantly, "[p]roof of numerous calls does not make a jury issue on liability if all must agree the creditor called only to inform or remind the debtor of the debt, to determine his reasons for nonpayment, to negotiate differences or to persuade the debtor to pay without litigation."  Id. at 1226 (citing Schauer v. Morse Operations, Inc., 5 So. 3d 2, 5 (Fla. Dist. Ct. App. 2009)).  Rather, such communications

17

may be considered "harassing in their frequency . . . when they continue <u>after all such</u> <u>information has been communicated and reasonable efforts at persuasion and negotiation have</u> <u>failed</u>." <u>Id.</u> (citing <u>Schauer</u>, 5 So. 3d at 5) (emphasis added).  Thus, courts regularly find no harassment as a matter of law under facts similar to this case. <u>Id.</u> at 1225 ("Summary judgment is routinely granted in favor of debt collectors where the party . . . does not present evidence of harassing conduct other than a high volume of calls."); <u>see also</u> <u>Waite v. Financial Recovery</u> <u>Servs.</u>, Case No. 8:09-cv-02336-T-33AEP, 2010 U.S. Dist. LEXIS 133438, at *9, 16 (M.D. Fla. 2010) (granting summary judgment in favor of defendant in an FDCPA case where the number of calls was high, but defendant engaged plaintiff in a live conversation in "only a handful of instances" and there was no indication that "[p]laintiff ever asked [d]efendant to cease contact").[6]

Here, even if the call volume could be viewed as high – approximately 700 calls by two separate companies over the course of about 15 months -- there is no evidence to support a finding that Defendants made the phone calls in a manner that could be reasonably expected to harass.  For instance, Defendants did not engage in a single substantive conversation with McCaskill; she did not answer the calls.  Further, McCaskill never asked Defendants to stop calling.  Indeed, McCaskill did not take any active steps to stop the calls from occurring.  Thus, as in <u>Lardner</u> and <u>Waite</u>, Defendants' conduct did not rise to the level of harassment.

### 2.      The FCCPA Section 559.72(9) Claim Against Both Defendants Also Fails.

To have standing under section 559.72(9), the plaintiff must be a debtor. <u>Smith v.</u> <u>MarkOne Fin., LLC</u>, No. 3:13-cv-933-J-32MCR, 2015 U.S. Dist. LEXIS 11803, at *13 (M.D. Fla. Feb. 2, 2015).  "Unless the context otherwise indicates, the FCCPA uses the word debtor to refer to 'any natural person obligated or allegedly obligated to pay any debt.'" <u>Id.</u> at *11

---

[6] The FCCPA expressly instructs that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the Federal Fair Debt Collection Practices Act."  Fla. Stat. § 559.77(5).

(quoting Fla. Stat. § 559.55(8)).  "In determining whether a plaintiff was allegedly obligated to pay a debt, the operative question is whether the defendant communicated to the plaintiff that she was obligated."  Id. (citing Fini v. Dish Network L.L.C., 955 F. Supp. 2d 1288, 1298 (M.D. Fla. 2013)).  "Thus, where a creditor calls the wrong number and alleges that the call recipient owes a debt, the recipient is a debtor under the FCCPA."  Id. at *11–12 (citing cases).  "Where instead a creditor calls a debtor's family member to direct the debtor to return the call, . . . the family member lack[s] standing."  Id. (citing Belin v. Litton Loan Servicing, LP, No. 8:06-cv-760-T-24, 2006 U.S. Dist. LEXIS 47953, at *1 (M.D. Fla. July 14, 2006)).  As a result, courts regularly find that the family member of a debtor lacks standing to sue under section 559.72(9) of the FCCPA where the family member is not alleged to owe on the debt.  See also Smith, 2015 U.S. Dist. LEXIS 11803, at *13 ("As [Defendant] did not allege that [Plaintiff] was obligated to pay the debt, [Plaintiff] is not a debtor under the traditional FCCPA definition. Accordingly, [Plaintiff] does not have standing to bring a claim under § 559.72(9).").

Similarly, here, Defendants never claimed that McCaskill owed on Newsome's student loans.  Under these facts, McCaskill does not have standing to sue under section 559.72(9).

**3.      Finally, The FCCPA And FDCPA Claims Against SAC Are Insupportable.**

To prevail on an FDCPA claim, a plaintiff must prove," among other things, that "the defendant is a debt collector."  Bacelli v. MFP, Inc., 729 F. Supp. 2d 1328, 1344 (M.D. Fla. 2010) (citing Kaplan v. Assetcare, Inc., 88 F. Supp. 2d 1355, 1360–61 (S.D. Fla. 2000)).  The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  Id. (citing 15 U.S.C. § 1692a(6)).  Similarly, while the FCCPA is not limited to "debt collectors," but applies to "persons" generally, to prevail on an

19

FCCPA claim, a plaintiff must prove, among other things, that the defendant was engaging "in collecting consumer debts." Renfrow v. First Mortg. Am., Inc., Case No. 08-80233-CIV-MARIA/JOHNSON, 2011 U.S. Dist. LEXIS 63392, (S.D. Fla. June 13, 2011) (citing Fla. Stat. § 559.72 (2015)); Fla Stat. § 559.72 (2015) ("In collecting consumer debts, no person shall . . ." engage in the prohibited conduct.).

As explained above, SAC performs default prevention on behalf of federal guaranty agencies by counseling debtors. (**Ex. 1**, Campbell Deposition, 11:12–11:16.) SAC does not take payments of any kind, nor does it collect or attempt to collect debts. (Id. 19:19–20:7; **Ex. 2**, Dillon Deposition, 14:3–14:8.) As a result, Plaintiff's claims under the FDCPA and FCCPA against SAC fail as a matter of law. Kirby v. Professional Ass'n Mgmt., No. 3:12-cv-697-J20-MCR, 2012 U.S. Dist. LEXIS 162138, at *11 (M.D. Fla. Nov. 9 2012) (granting summary judgment on FDCPA claim because defendant was not a debt collector).

## IV.   CONCLUSION

WHEREFORE, Defendants respectfully request that this Court deny the Motion in its entirety and, instead, grant Defendants' Motion.

Dated:  February 26, 2016              Respectfully submitted,

By:     /s/ Lisa M. Simonetti

Lisa M. Simonetti (admitted *pro hac vice*)
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T: (424) 204-7700; F: (424) 204-7702
lsimonetti@vedderprice.com

Dayle M. Van Hoose, Esq. (Florida Bar No. 0016277)
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.
3350 Buschwood Park Drive, Suite 195
Tampa, FL 33618
T: (813) 890-2463; F: (866) 466-3140
dvanhoose@sessions-law.biz

Attorney for Defendants NAVIENT SOLUTIONS, INC. and STUDENT ASSISTANCE CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 26, 2016, a copy of the foregoing **DEFENDANTS'**

**OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

was served by electronic mail on the party listed below:

> William Peerce Howard, Esq.
> The Consumer Protection Firm
> 210-A Macdill Avenue
> Tampa, FL 33609
> Tel: (813) 220-2954
> Billy@TheConsumerProtectionFirm.com

/s/  Lisa M. Simonetti
          Lisa M. Simonetti

LOS_ANGELES/#13626.6